**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| RM Holdco LLC, <u>et al.</u>[1] | Case No. 18-11795 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND
(B) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED LENDERS; (III) PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (IV) SCHEDULING FINAL HEARING; AND
(V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")[2]

submit this motion (this "<u>Motion</u>"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1), and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

(the "<u>Bankruptcy Code</u>") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") seeking entry of an interim order attached

hereto as <u>Exhibit A</u> (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>") (i) authorizing the

Debtors to (a) obtain postpetition secured financing pursuant to a multi-draw term loan debtor-

in-possession financing facility on the terms described herein and (b) use cash collateral;

(ii) granting adequate protection to the Debtors' prepetition secured lenders (the "<u>Prepetition</u>

<u>Lenders</u>"); (iii) providing superpriority administrative expense status; (iv) scheduling a hearing

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: RM Holdco LLC (6847); RM Opco LLC (7122); RM HQ LLC (8615); RM Chevys LLC (N/A); RM Acapulco LLC (N/A); and RM El Torito LLC (N/A). The Debtors' headquarters and mailing address is 5660 Katella Avenue, Suite 200, Cypress, CA 90630.

[2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the First Day Declaration (as defined herein).

to consider approval of the Motion on a final basis (the "<u>Final Hearing</u>"); and (v) granting related relief.  The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of Jonathan Tibus in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>").  In further support of this Motion, the Debtors respectfully state as follows:

<p style="text-align:center"><strong><u>STATUS OF THE CASE AND JURISDICTION</u></strong></p>

1.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested joint administration of these chapter 11 cases (the "<u>Chapter 11 Cases</u>") pursuant to Bankruptcy Rule 1015(b).

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in the Chapter 11 Cases, and no statutory committee has been appointed.

3.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Debtors consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The legal authority for the relief requested in this Motion is sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 4001-2 and 9013-1.

## PRELIMINARY STATEMENT

6.      As discussed at length in the First Day Declaration, the Debtors have faced certain operational and financial challenges over the past several years, which led them in January 2018 to hire Piper Jaffray & Co. ("PJC") as investment banker to advise on strategic alternatives. Although the Debtors are able to fund a certain level of operations out of cash flow, they determined, in consultation with PJC and Alvarez & Marsal, which had been hired to provide certain restructuring management and advisory services, that additional financing was required to ensure a smooth bankruptcy sale process.

7.      In connection with that prepetition marketing process, as described further in the First Day Declaration, the Debtors initiated a multi-week competitive process, which has culminated in a commitment for a $5.5 million multi-draw debtor-in possession financing facility (the "DIP Facility"), financed by two of the Debtor' majority owners and prepetition lenders. One of these prepetition lenders, Z Capital Group ("Z Capital") has been selected as the Stalking Horse Bidder for the sale of substantially all of the Debtors' assets, as more fully described in the First Day Declaration.  The DIP Facility will allow the Debtors to reach and consummate a sale of substantially all of its assets in a controlled and deliberate manner, and provide the Debtors with critical liquidity throughout the process.

8.      Access to the DIP Facility and Cash Collateral (as defined in the DIP Financing and Guaranty Agreement) will allow the Debtors to continue normal business operations in the

Chapter 11 Cases, including by maintaining vendor and supply relationships, continuing to pay their employees, and satisfying other working capital and operational requirements. Satisfaction of these key obligations is necessary to preserve and maintain the going-concern value of the enterprise and effectuate a successful sale of substantially all of the Debtors' assets. Accordingly, the Debtors respectfully submit that the DIP Facility should be approved.

## BACKGROUND OF THE DEBTORS

### I.     GENERAL BACKGROUND

9.     The events leading up to the Petition Date and additional facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration, which is incorporated by reference herein.

### II.     THE DEBTORS' PREPETITION INDEBTEDNESS

10.     The Debtors' primary liabilities consist of: (i) a first lien credit facility; (ii) a second lien credit facility; and (iii) a subordinated convertible loan.

*(a)     First Lien Credit Facility*

11.     The Debtors[3] are party to that certain Financing Agreement (First Lien), dated as of March 21, 2012, as amended by Amendment No. 1, dated as of November 2, 2012, as further amended by Amendment No. 2, dated as of April 26, 2013, as further amended by Amendment No. 3, dated as of November 21, 2014, as further amended by Amendment No. 4, dated as of June 17, 2015, as further amended by Amendment No. 5, dated as of March 22, 2016 and effective as of March 21, 2016, as further amended by Amendment No, 6, dated as of April 28, 2016, as further amended by Amendment No. 7, dated as of July 15, 2016, as further amended by Amendment No. 8, dated as of February 21, 2017, as further amended by Amendment No. 9,

---

[3] RM Opco LLC is the borrower, and RM Holdco LLC, RM Chevys LLC, RM Acapulco LLC, RM El Torito LLC, and RM HQ LLC are each guarantors, under the Pre-Petition First Lien Credit Facility.

dated as of June 5, 2017, as further amended by Amendment No. 10, dated September 8, 2017 as further amended by Amendment No. 11, dated December 29, 2017, and as further amended by Amendment No. 12, dated June 20, 2018 (together, the "Prepetition First Lien Credit Facility"), with Wells Fargo Bank, N.A. ("Wells Fargo") as Agent (the "Prepetition First Lien Agent"). The lenders and noteholders under the Prepetition First Lien Credit Facility are Special Value Continuation Partners, L.P., Tennenbaum Opportunities Partners V, LP, Z Capital Loan Opportunity Master Fund Ltd., Z Capital Partners Holdings I, L.L.C., and Z Capital Partners GP II, L.P. (together, the "First Lien Lenders").

12.     The commitments under the Prepetition First Lien Credit Facility are divided into the First Out Term Loan A, the Term Loan A, and the Term A Notes (in each case, as defined in the Prepetition First Lien Credit Facility), each of which bears interest at a per annum rate of 7%, payable in-kind, and each of which matured on July 31, 2018. The Prepetition First Lien Credit Facility is secured by a first-priority lien on substantially all of the Debtors' assets (the "First Lien Collateral"). As of the Petition Date, approximately $11.23 million was outstanding under First Out Term Loan A; approximately $20.29 million was outstanding under Term Loan A; and approximately $10.14 million was outstanding in Term A Notes, totaling approximately $41.66 million in outstanding obligations under the Prepetition First Lien Credit Facility.

*(b)     Second Lien Credit Facility*

13.     The Debtors[4] are also party that certain Amended and Restated Financing Agreement (Second Lien), dated as of November 21, 2014, as amended by Amendment No. 1 to Amended and Restated Financing Agreement (Second Lien), dated as of June 17, 2015, as further amended by Amendment No. 2 to Amended and Restated Financing Agreement (Second

---

[4] RM Opco LLC is the borrower, and RM Holdco LLC, RM Portland Realco LLC, RM Dixon Realco LLC, RM Chevys LLC, RM Acapulco LLC, RM El Torito LLC, RM Foods LLC, and RM HQ LLC are each guarantors, under the Pre-Petition Second Lien Credit Facility.

Lien), dated as of July 15, 2016, as further amended by Amendment No. 3 to Amended and Restated Financing Agreement (Second Lien), dated as of November 18, 2016, as further amended by Amendment No. 4 to Amended and Restated Financing Agreement (Second Lien), dated as of February 17, 2017, as further amended by Amendment No. 5 to Amended and Restated Financing Agreement (Second Lien), dated as of June 5, 2017, as further amended by Amendment No. 6 to Amended and Restated Financing Agreement (Second Lien), dated as of September 8, 2017, as further amended by Amendment No. 7 to Amended and Restated Financing Agreement (Second Lien), dated as of November 20, 2017, as further amended by Amendment No. 8 to Amended and Restated Financing Agreement (Second Lien), dated as of December 29, 2017 and as further amended by Amendment No. 9 to Amended and Restated Financing Agreement (Second Lien), dated as of June 20, 2018 (together, the "Prepetition Second Lien Credit Facility," and together with the Prepetition Fist Lien Credit Facility, the "Prepetition Indebtedness"), with Wells Fargo as Agent (the "Prepetition Second Lien Agent," and together with the Prepetition First Lien Agent, the "Prepetition Agents").  The lenders under the Prepetition Second Lien Credit Facility are Tennenbaum Opportunities Partners V, LP, Z Capital Loan Opportunity Master Fund Ltd., Z Capital SSF Holdings I, LLC, Z Capital Partners II L.P., Z Capital Partners II-A L.P., Z Capital Partners II-B, L.P., and Special Value Continuation Partners, LP (together, the "Second Lien Lenders," and together with the First Lien Lenders, the "Prepetition Lenders").

14.    The commitments under the Prepetition Second Lien Credit Facility are divided into the Senior Convertible Term B Loans, the Reimbursement Obligation Loans, the Convertible Term Loan B-1, the Term Loan B-1, and the Term Loan B (in each case, as defined in the Prepetition Second Lien Financing Agreement), each of which bears interest at a per

annum rate of 8.5%, payable in-kind, and each of which matured on July 31, 2018.   The Prepetition Second Lien Credit Facility is secured by a second-priority lien on substantially all of the Debtors' assets (the "Second Lien Collateral," and together with the First Lien Collateral, the "Prepetition Collateral").   As of the Petition Date the following amounts, excluding the Reimbursement Obligation Loans[5], remained outstanding under the Prepetition Second Lien Facility: (i) approximately $61.03 million remained outstanding under the Senior Convertible Term B Loans; (ii) approximately $17.82 million remained outstanding under the Convertible Term Loan B-1; (iii) approximately $22.16 million remained outstanding under Term Loan B-1; and (iv) approximately $94.09 million remained outstanding in Term Loan B, totaling approximately $195.1 million in outstanding obligations, excluding the Reimbursement Obligation Loans, under the Second Lien Credit Facility.

    *(c)    Intercreditor Agreement*

15.    The relative priority of Debtors' obligations under the First Lien Credit Facility and Second Lien Credit Facility are set forth in that certain Intercreditor Agreement dated as of March 21, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which governs, among other things, the respective rights, interests, obligations, priority, and positions of the Prepetition Lenders with respect to the Prepetition Collateral.   Pursuant to and on the terms set forth in the Intercreditor Agreement, the Prepetition First Priority Liens are senior and prior in right to the Prepetition Second Priority Liens.

---

[5] As described more fully in the First Day Declaration, the Reimbursement Obligation Loans consist of obligations payable by the Debtors in connection with a Reimbursement and Fee Agreement executed in support of certain letters of credit issued on behalf of the Debtors.   Under the Amended and Restated Financing Agreement (Second Lien), the Reimbursement Obligations are automatically converted into secured obligations under the Second Lien Credit Facility.   As of the Petition Date, approximately $17.53 million remained outstanding under the Reimbursement Obligation Loans.

*(d)      Subordinated Convertible Loan*

16.      RM Holdco LLC is a party to that certain unsecured Subordinated Convertible

Loan

Agreement, dated as of March 21, 2012 (the "Parent Subordinated Credit Facility") with Wells

Fargo as Agent (the "Parent Subordinated Agent") and the lenders party thereto.    The

commitments under the Subordinated Convertible Loan Agreement bear interest at a rate per

annum of 1.12%, which matured on March 21, 2018.    As of the Petition Date, approximately

$53.62 million remained outstanding under the Parent Subordinated Credit Facility.    The Parent

Subordinated Agent and the Prepetition Agents are party to that certain Subordination

Agreement, dated as of March 21, 2012 (as amended, restated, supplemented, or otherwise

modified from time to time, the "Subordination Agreement"), pursuant to which all debt incurred

by RM Holdco LLC under the Parent Subordinated Credit Facility is junior in priority of

payment and subordinated to the Debtors' obligations under the First Lien Credit Facility and

Second Lien Credit Facility.

## RELIEF REQUESTED

17.      By this Motion, the Debtors request entry of the Interim Order and the Final

Order.

> (a)      authorizing RM Opco LLC to obtain, as borrower (the "Borrower"),
> secured priming superpriority postpetition loans, advances, and other
> financial accommodations pursuant to the terms of that certain DIP
> Financing Agreement dated August 7, 2018 (as amended, restated,
> supplemented or otherwise modified from time to time, the "DIP
> Financing and Guaranty Agreement"), a copy of which is attached hereto
> as Exhibit B, by and among (a) the Borrower, (b) Wells Fargo as
> administrative agent (the "DIP Agent"), (c) the guarantors from time to
> time party thereto (the "Guarantors," and together with the Borrower, the
> "Credit Parties"), and (d) the lenders from time to time party thereto (the
> "DIP Lenders");

(b)     authorizing Debtors to execute and deliver the DIP Financing and Guaranty Agreement and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties, and promissory notes (collectively, the "DIP Loan Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(c)     authorizing Debtors, subject to the terms, conditions, and limitations set forth in the DIP Financing and Guaranty Agreement, the DIP Loan Documents, and the Interim Order, to borrow up to an aggregate principal amount of $3,000,000.00 upon entry of the Interim Order, and up to an aggregate principal amount of $2,500,000.00 upon entry of the Final Order.

(d)     authorizing Debtors to use Cash Collateral as contemplated by section 363 of the Bankruptcy Code on the terms and conditions set forth in the DIP Financing and Guaranty Agreement and the Interim Order;

(e)     authorizing Debtors to grant adequate protection to the Prepetition Agents in their capacity as agents for the Prepetition Lenders with the relative priorities set forth herein, consisting of replacement liens and superpriority claims, as well as various other benefits more fully described herein;

(f)     providing DIP Agent (for the benefit of the DIP Lenders) with superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code;

(g)     granting to the DIP Agent (for the benefit of the DIP Lenders) perfected security interests in and liens on all of the DIP Collateral (as defined below), pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure all of the DIP Obligations (as defined below), subject only to Permitted Liens (as defined below) and prior payment of the Carve-Out (as defined below);

(h)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing and Guaranty Agreement and the Interim Order (and, upon its entry, the Final Order);

(i)     scheduling a Final Hearing to consider the relief requested in this Motion on a final basis no later than 30 days following entry of the Interim Order;

(j)     granting related relief.

## DIP FACILITY OVERVIEW

### I.    PREPETITION EFFORTS TO OBTAIN FINANCING

18.    As more fully described in the First Day Declaration, the Debtors are able to maintain much of their normal operations based on operating cash flow.  However, in consultation with their investment bank PJC, the Debtors determined that additional funding would be necessary to finance postpetition operations, including payroll and other essential payments, as well as other administrative costs in a bankruptcy.

19.    The Debtors' critical financial situation required them to seek immediate access to credit to enable the continuation of normal business operations and the preservation of value of their estates for the benefit of all stakeholders until a going-concern sale of substantially all of the Debtors' assets could be completed.  The absence of such immediate working capital would irreparably harm the Debtors, their estates, and stakeholders by compromising the Debtors' ability to finance basic operations, maintain business relationships, and pay employees while simultaneously pursuing efforts to maximize value for the estate.

20.    Prior to the Petition Date, the Debtors, with the assistance of their professional advisors, evaluated strategic and financial options to improve postpetition liquidity.  The efforts of the Debtors and PJC to raise new capital are more fully described in the First Day Declaration. Before agreeing to enter into the DIP Financing and Guaranty Agreement with Debtors' Prepetition Lenders, the Debtors approached a number of potential debtor-in-possession financing lenders in the hopes of soliciting meaningful debtor-in-possession proposals.

21.    The Debtors evaluated prospective lenders on a number of factors, including economic terms, financing certainty, proposed restrictions on the operation of the Debtors' business and the use of proceeds, and the security packages requested.  The Debtors ultimately

01:23488629.1

determined that, given the amount of their funded debt, which is secured by substantially all assets, the financing proposal by their existing prepetition lenders provided the best postpetition financing option on the most favorable terms. Following arm's length negotiations with the Prepetition Lenders, the Debtors reached an agreement on the terms set forth in the DIP Financing and Guaranty Agreement and described in this Motion.

22.     Throughout these efforts, the Debtors were unable to obtain the necessary financing on an unsecured, administrative expense basis under section 503(b)(1) of the Bankruptcy Code. The Debtors have further been unable to obtain credit on an unsecured basis, but enjoying (a) "superiority" over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) secured solely by a lien on property of the Debtors' estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors' estates that is subject to other liens. Although the Debtors attempted to secure financing from their Prepetition Lenders on better terms, the DIP Lenders were unwilling to extend additional funding without obtaining superpriority claim status, perfected security interests in liens on the Debtors' existing and after-acquired assets with the priorities set forth in the Interim Order, and the other protections set forth in the Interim Order.

23.     Without the DIP Facility and the authorized use of Cash Collateral, the Debtors do not have sufficient available sources of working capital to finance their business operations in the ordinary course of business or to fund other administrative expenses in the Chapter 11 Cases. The Prepetition Lenders have agreed to provide liquidity that the Debtors believe is an essential component of their efforts to preserve their business as a going concern, maximize the value of their estates in anticipation of a sale of substantially all of the Debtors' assets, and successfully administer the Chapter 11 Cases. As a result, by this Motion, the Debtors seek authorization to

01:23488629.1

obtain postpetition financing pursuant to the terms set forth in this Motion, the DIP Financing

and Guaranty Agreement, the Interim Order, and the Final Order.

## II.    MATERIAL TERMS OF THE DIP FACILITY

24.    Pursuant to Bankruptcy Rule 4001(c)(1) and Local Rule 4001-2, the significant

terms of the DIP Financing and Guaranty Agreement are as follows:[6]

| MATERIAL TERMS OF DEBTORS' POSTPETITION FINANCING | |
|---|---|
| **Borrower**<br>*See* DIP Financing and Guaranty Agreement, Preamble. | RM Opco LLC, as debtor and debtor-in-possession |
| **Guarantors**<br>*See* DIP Financing and Guaranty Agreement, Preamble. | RM Holdco LLC, RM Chevys LLC, RM Acapulco LLC, RM El Torito LLC, and RM HQ LLC |
| **DIP Lenders**<br>*See* DIP Financing and Guaranty Agreement, Preamble. | Each of the lenders listed on Schedule 1.01(A) to the DIP Financing and Guaranty Agreement |
| **DIP Administrative Agent**<br>*See* DIP Financing and Guaranty Agreement, Preamble. | Wells Fargo Bank, N.A. |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>*See* DIP Financing and Guaranty Agreement, definitions of "Initial DIP Term Loan | A priming, senior secured, superpriority multi-draw term loan facility in the aggregate commitment amount of up to $5,500,000.00.<br><br>Subject to the terms and conditions of the DIP Loan Documents, an initial aggregate principal amount of $3,000,000.00 shall be made available (the "Initial DIP Term Loan") upon entry of the Interim Order.  Upon the entry of the Initial Order and prior to the entry of |

---

[6] For a complete description of the terms and conditions of the DIP Facility, reference is made to the DIP Financing and Guaranty Agreement, the Interim Order, and the Final Order, the terms of which shall control in all respects. This summary is qualified entirely by the provisions of the DIP Financing and Guaranty Agreement, the Interim Order, and the Final Order, and interested parties are strongly encouraged to read the operative documents and such orders.  Capitalized terms used, but not otherwise defined, in this summary shall be given the same meanings ascribed to them in the DIP Financing and Guaranty Agreement, the Interim Order, and the Final Order, as applicable.

01:23488629.1

| "Commitment," "Delayed Draw DIP Term Loan Commitment," and "Segregated Pre-Funding Account," § 2.01; Interim Order, ¶¶ 2(a), 18(a) | the Final Order, the Lenders shall (a) use reasonable best efforts to establish and maintain a segregated account (the "Segregated Pre-Funding Account") as soon as practicable following entry of the Interim Order with the Segregated Pre-Funding Account Bank (as defined in the DIP Financing and Guaranty Agreement); (b) promptly, but in any event within three (3) Business Days after the establishment of such Segregated Pre-Funding Accounts, fund an amount equal to the full portion of such Lender's Delayed Draw Term Loan Commitment (as defined in the DIP Financing and Guaranty Agreement) into the Segregated Pre-Funding Account, the aggregate amount of which shall be $2,500,000.00; and (c) maintain such funds until the earlier to occur of the funding in full of all Delayed Draw DIP Term Loans to the Borrower in accordance with the terms set forth in the DIP Financing and Guaranty Agreement or the occurrence of the Termination Date. Upon entry of the Final Order and the satisfaction of other applicable conditions precedent set forth in Section 5.02 of the DIP Financing and Guaranty Agreement, each Lender severally agrees to make, or, to the extent applicable, authorize a Segregated Pre-Funding Account Release of, Delayed Draw DIP Term Loans in an aggregate principal amount not to exceed such Lender's Delayed Draw DIP Term Loan Commitment. If for any reason, the Segregated Pre-Funding Account is not established and funded with the entire remaining amount of the DIP Lenders' aggregate DIP Term Loan Commitments prior to entry of the Final Order, and the Borrower makes a request for a Delayed Draw DIP Term Loan, each DIP Lender is directed to extend and disburse the requested Delayed Draw DIP Term Loans directly to the Borrower in accordance with the terms of the DIP Financing and Guaranty Agreement.<br><br>Any advance may, at the option of the Borrower, be funded, or released (by the Lenders), as applicable, net of any interest, fees, and expenses due to the DIP Agent, any DIP Lender or, in accordance with the Approved Budget (as defined in the DIP Financing and Guaranty Agreement), any third party in connection with the funding of such term loan amounts. |
|---|---|
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Financing and Guaranty Agreement, § | 8.5% for any DIP Term Loans funded to the Borrower, payable in cash; |

| 2.04 | |
|---|---|
| **Default Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Financing and Guaranty Agreement, § 2.04(a) | DIP Interest Rate + 2.0% |
| **Fees and Expenses**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii)<br><br>DIP Financing and Guaranty Agreement, §§ 2.06, 12.04; Interim Order, ¶ 7 | **Closing Fee.** $110,000.00<br><br>**Loan Servicing Fee.** $30,000.00<br><br>**Segregated Pre-Funding Ticking Fee:** 0.5% per month on the aggregate amount maintained in the Segregated Pre-Funding Account in accordance with DIP Financing and Guaranty Agreement<br><br>**Expenses.** Borrower will pay all reasonable and documented costs and expenses incurred by or on behalf of the DIP Agent and the DIP Lenders, as set forth in the DIP Loan Documents and Interim Order. |
| **Termination/Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>*See* DIP Financing and Guaranty Agreement, definition of "Termination Date" | The earliest of (a) the date that is the earlier of (i) sixty (60) days after entry of the Sale Order (as defined in the DIP Financing and Guaranty Agreement) or (ii) December 15, 2018; (b) the date of acceleration of the DIP Facility pursuant to an Event of Default (defined below); (c) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto or contemporaneously therewith; (d) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Required Lenders (as defined in the DIP Financing and Guaranty Agreement); (e) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Required Lenders; (f) the date of the consummation of the Approved Sale; and (g) the effective date of any Credit Party's plan of reorganization confirmed in the Chapter 11 Cases. |
| **Liens, Collateral, and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi) | The DIP Agent (for the benefit of itself and the DIP Lenders) will be granted perfected security interests in and liens on the DIP Collateral in the priorities set forth below.<br><br>"DIP Collateral" comprises, whether now existing or hereafter acquired: (i) all of the property, assets, or interests in property or |

| | |
|---|---|
| Local Rule 4001-2(a)(i)(D), (G), (a)(ii)<br><br>Interim Order, ¶¶ 9-10, 23 | assets of each Debtor and all "property of the estate," including Prepetition Collateral; (ii) the proceeds and products of any of the foregoing; (iii) all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring, and profits of any of the collateral described; and (iv) subject to entry of the Final Order, proceeds of avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions"); provided, however, that "Collateral" shall not include, among other things, (i) any Good Faith Deposit, (ii) that certain Certificate of Deposit #2239406347 for $200,000 deposited by RM OPCO LLC and held by Wells Fargo, and (iii) any Avoidance Actions, except that, subject to and solely upon entry of the Final Order, "Collateral" shall include proceeds of any Avoidance Actions.  The DIP Collateral shall be subject only to (a) the Permitted Priority Liens (as defined in the DIP Financing and Guaranty Agreement) and (b) prior payment of the Carve-Out.<br><br>All obligations of the Debtors under the DIP Facility (the "DIP Obligations") shall be entitled to:<br><br>(a) a perfected first-priority lien on the DIP Collateral to the extent such DIP Collateral was not subject to valid, perfected, and non-avoidable liens as of the Petition Date, pursuant to section 364(c)(2) of the Bankruptcy Code;<br><br>(b) a perfected lien on the DIP Collateral, junior to any Permitted Priority Liens on such DIP Collateral, pursuant to section 364(c)(3) of the Bankruptcy Code;<br><br>(c) a perfected first-priority priming and senior security interest and lien on the DIP Collateral subject to any Permitted Priority Lien, pursuant to section 364(d) of the Bankruptcy Code; and<br><br>(d) an allowed superpriority administrative expense claim, with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, subject only to prior payment of the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code.<br><br>The DIP Liens are valid in each case without any further action by the Debtors, the DIP Agent, the Prepetition Agents, or the Prepetition Lenders and without the execution, filing or recordation of any financing statements, security agreements, mortgages, or other documents or instruments. |

| | |
|---|---|
| | That certain Deposit Account Control Agreement, dated as of May 17, 2012, entered into by and among RM Opco LLC, the Prepetition Agents, and Wells Fargo shall inure to the benefit of the DIP Agent and the DIP Lenders.<br><br>The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |
| **Carve-out**<br><br>Local Rule 4001-2(a)(i)(F)<br><br>Interim Order, ¶ 13 | The "Carve-Out" is an amount equal to the sum of -<br><br>(i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court;<br><br>(ii) unpaid professional fees and expenses payable to any legal or financial advisors retained by the Debtors (the "Debtor's Professional Fees") or any Creditors' Committee (the "Committee's Professional Fees," and collectively, the "Professional Fees") that are incurred or accrued prior to the date on which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the occurrence of the Termination Date (as defined in the Interim Order), but solely if, as and to the extent such Professional Fees are or have been provided for in, and are consistent with, the DIP Budget (subject to the Permitted Variance) and are ultimately allowed by order of the Court pursuant to section 330 of the Bankruptcy Code;<br><br>(iii) unpaid (x) Debtors' Professional Fees incurred or accrued on or after the date on which the DIP Agent provides written notice to the Debtors of the occurrence of the Termination Date in an aggregate amount not to exceed $200,000.00 and (y) Committee's Professional Fees incurred or accrued on or after the date on which the DIP Agent provides written notice to the Creditors' Committee of the occurrence of the Termination Date in an aggregate amount not to exceed $25,000.00 (clause (iii) alone, the "Capped Carve-Out").<br><br>Any payment of Carve-Out expenses incurred after the occurrence of the Termination Date shall permanently reduce the Capped Carve-Out on a dollar-for-dollar basis. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Financing and Guaranty Agreement, § 9.01; Interim Order, ¶ | Section 9.01 of the DIP Financing and Guaranty Agreement sets forth the Events of Default thereunder, including failure to comply with the Approved Budget (subject to the Permitted Variance, as defined in the DIP Financing and Guaranty Agreement) without the consent of the DIP Agent and the Required Lenders and failure to pay the balance when due. |

| 35 | Further, paragraph 36 of the Interim Order provides that it shall be an Event of Default under the DIP Financing and Guaranty Agreement if any Debtor breaches the Sale Milestone Covenant set forth in section 7.01(r) of the DIP Financing and Guaranty Agreement. |
|---|---|
| **Adequate Protection**<br>Bankruptcy Rule 4001(c)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(i)(E)<br><br>Interim Order, ¶ 12, 23 | The Prepetition Agents (for the benefit of themselves and the Prepetition Lenders) will be granted the following adequate protection:<br><br>    (a) valid, perfect, postpetition security interests and liens in and on all of the DIP Collateral (the "<u>Replacement Liens</u>"), subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations, (ii) the Permitted Priority Liens (as defined in the DIP Financing and Guaranty Agreement), (iii) any lien granted to secure payment of the break-up fee in the Stalking Horse APA to the extent approved by the Court (a "<u>Bid Protection Lien</u>") and/or payment of such break-up fee to the extent due and owing under the Stalking Horse APA (the "<u>Break-Up Fee</u>"), and (iv) prior payment of the Carve-Out; and<br><br>    (b) a superpriority claim with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind whatsoever, subordinate and subject only to (i) the DIP Superpriority Claim, (ii) prior payment of the Break-Up Fee, to the extent payable under the Stalking Horse APA, and (iii) prior payment of the Carve-Out; and<br><br>    (c) the Prepetition Lenders and Prepetition Agents shall each receive from the Debtors payment of all reasonable and documented outstanding fees and expenses, including, but not limited to, fees and expenses of legal counsel, incurred by the Prepetition Lenders and Prepetition Agents, to the extent provided for under the Prepetition First Lien Loan Documents and Prepetition Second Lien Loan Documents. The payment of all invoiced outstanding fees and expenses as of the Petition Date shall be a condition to funding of any portion of the Initial DIP Term Loan.<br><br>The Replacement Liens are valid in each case without any further action by the Debtors, the DIP Agent, the Prepetition Agents, or the Prepetition Lenders and without the execution, filing or recordation of any financing statements, security agreements, mortgages, or other documents or instruments. |

|  | In addition to the foregoing, the Prepetition Agents and Prepetition Lenders shall be entitled to the following additional benefits:<br><br>(i) restriction on the Debtors' use of funds, as set forth in paragraph 14 of the Interim Order;<br><br>(ii) subject to the Challenge Period Termination Date (as defined in the Interim Order), the waivers, releases, and acknowledgements of the Creditors Committee and parties-in-interest, as set forth in paragraph 15 of the Interim Order;<br><br>(iii) various releases provided by the Debtor, as set forth in paragraph 17 of the Interim Order;<br><br>(iv) subject to entry of the Final Order, waiver of section 506(c) of the Bankruptcy Code, as set forth in paragraph 20 of the Interim Order;<br><br>(v) prohibition against the doctrine of marshaling, as set forth in paragraph 21 of the Interim Order;<br><br>(vi) waiver of "equities of the case" claims under section 522(b) of the Bankruptcy Code, as set forth in paragraph 22 of the Interim Order; and<br><br>(v) the sale milestones as set forth in Paragraph 35 of the Interim Order, and as more fully described in Section 7.01(r) of the DIP Financing and Guaranty Agreement. |
|---|---|
| **Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>DIP Financing and Guaranty Agreement, § 9;<br>Interim Order, ¶ 19(a)(ii) | The Interim Order and Final Order shall include relief from the automatic stay with respect to the exercise of rights and remedies upon the occurrence of an Event of Default, subject to a five (5) Business Day notice period.<br><br>The aforementioned provision shall remain in effect if the Interim Order is entered but the Final Order is not. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)<br><br>Local Rule 4001-2(a)(i)(B) | The recitals in paragraph H of the Interim Order provide acknowledgements and stipulations by the Debtors as to the validity and priority of the liens securing the Prepetition Indebtedness and amounts outstanding therein (the "Debtors' Stipulations").<br><br>Paragraph 15 of the Interim Order provides that these acknowledgements and stipulations shall be binding on all parties in interest, including the Creditors' Committee, *unless* such party |

| | |
|---|---|
| Interim Order, ¶ 15 | <u>first</u> commences, by the earlier of (i) in the case of a Creditors' Committee, sixty (60) days from the date of formation of any Creditors' Committee, or (ii) if no Creditors' Committee is formed, with respect to any other party in interest with requisite standing, seventy-five (75) days from the entry of the Interim Order, (a) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations (as defined in the Interim Order) or (b) a contested matter, adversary proceeding, or other action against any or all of the Prepetition Agents or Prepetition Lenders in connection with or related to the Prepetition Indebtedness, or the actions or inactions of any of the Prepetition Agents or the Prepetition Lenders arising out of or related to the Prepetition Indebtedness or otherwise, including, without limitation, any claim against the Prepetition Agents or any or all of the Prepetition Lenders in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Indebtedness ((a) and (b) collectively, the "<u>Challenge</u>"), and |
| | <u>second</u> obtains a final non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action. |
| | Upon the Challenge Termination Date (as defined in the Interim Order), (i) all payments made to or for the benefit of the Prepetition Agents or Prepetition Lenders shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance; (ii) any all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (iii) the Prepetition Indebtedness shall be deemed to be a fully allowed and secured claim within the meaning of section 506 of the Bankruptcy Code; and (iv) the Debtors' Stipulations and the releases set forth in paragraph 17 of the Interim Order shall be binding on all parties-in-interest, including any Creditors' Committee. |
| | The aforementioned provision shall remain in effect if the Interim Order is entered but the Final Order is not. |
| **Limitation on Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B), (B)(ii)<br><br>DIP Financing and Guaranty Agreement, § 7.01(k); | The Borrower shall utilize the Cash Collateral and the proceeds of the DIP Facility solely (a) to pay interest, fees and expenses owing to the Agent and the Lenders pursuant to this Agreement, (b) to make other payments in accordance with the Approved Budget (subject to the Permitted Variance) (both as defined in the DIP Financing and Guaranty Agreement) and the Interim and Final Orders (including, without limitation, (x) adequate protection payments to the Prepetition Lenders, to the extent set forth in the |

| | |
|---|---|
| Interim Order, ¶ 14 | Approved Budget (as defined in the DIP Financing and Guaranty Agreement) and (y) for general working capital purposes), (c) for certain other Prepetition expenses that are approved by the Bankruptcy Court and consented to by the Required Lenders, (d) for the Carve-Out and (e) to pay the Credit Support Fee (as defined in the Reimbursement and Fee Agreement).<br><br>Further, paragraph 14 of the Interim Order provides that no proceeds of the DIP Facility, any DIP Collateral, or Prepetition Collateral (including, without limitation, Cash Collateral), or portion of the Carve-Out may be used to pay any services rendered by any professionals to:<br><br>(a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other than from the DIP Agent or DIP Lenders, unless the proceeds of such loans or accommodations will be sufficient and will be used to indefeasibly pay in full in cash (or credit solely (x) in the case of any DIP Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) all DIP Obligations, Prepetition Indebtedness, and the other adequate protections set forth in the Interim Order; or<br><br>(b) investigate, subject to the Challenge period, assert, join, commence, support, or prosecute any type of action seeking any order, judgment, determination or similar relief against the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders (in their respective capacities as such), or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors (in their respective capacities as such), with respect to any type of transaction, occurrence, omission, or action related to the DIP Liens, the DIP Indebtedness, the Prepetition Liens, or the Prepetition Indebtedness.<br><br>Notwithstanding the foregoing, up to $25,000.00 may be used by a Creditors' Committee to investigate the Prepetition Indebtedness and/or claims against the parties released from claims prior to the termination of the Challenge period. |
| **Conditions Precedent**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Financing and Guaranty Agreement, | Conditions precedent include:<br><br>      (a) Borrower's payment of all reasonable fees, costs, and expenses payable pursuant to Sections 2.06 and 12.04 of the DIP Financing and Guaranty Agreement; |

| § 5.01 | (b) Lenders' receipt of a 13-week cash forecast, in form, scope, and substance reasonably acceptable to the Required Lenders (as defined in the DIP Financing and Guaranty Agreement), together with a certification provided by an Authorized Officer of the Borrower with respect to the amounts represented therein;<br><br>(c) DIP Agent's receipt of an executed copy of the DIP Financing and Guaranty Agreement and Security Agreement;<br><br>(d) DIP Agent and DIP Lenders' receipt of satisfactory evidence of the entry of all other "first day" orders, entered upon an application or motion of the Debtors reasonably satisfactory in form and substance to the Lenders;<br><br>(e) Entry of the Interim Order in form and substance acceptable to the DIP Agent and DIP Lenders which shall not have been stayed, materially modified, or reversed without the prior written consent of the DIP Agent, the Required Lenders, and the Debtors;<br><br>(f) DIP Agents' and DIP Lenders' satisfaction that the DIP Agent shall have been granted a perfected lien on and security interest in all of the collateral as set forth in (including in respect of priority) the Interim Order and Final Order;<br><br>(g) DIP Agent's and DIP Lenders' receipt of written opinions in form and substance acceptable to the DIP Agent and DIP Lenders from (i) Young Conaway Stargatt & Taylor, LLP as to authority, authorization, execution, and perfection of liens; and (ii) Sidley Austin LLP as to enforceability, remedies, pledge, and creation of security interests;<br><br>(h) Commencement of the Chapter 11 Cases with no trustee, examiner, or receiver appointed or designated therein;<br><br>(i) DIP Agent and DIP Lenders' receipt of a copy of the executed Stalking Horse APA (as defined in the DIP Financing and Guaranty Agreement);<br><br>(j) The bidding and sale procedures related to the Auction (attached substantially in the form of Exhibit F to the DIP Financing and Guaranty Agreement) shall be reasonably acceptable to the Lenders; |
| --- | --- |

|  | (k) Upon the request of the DIP Agent or DIP Lender, receipt of "know your customer" information within five (5) Business Days of a written request for such information;<br><br>(l) To the extent a Prepetition Lender is a DIP Lender, execution by each Prepetition Lender of a direction letter to the applicable Prepetition Agents, and acknowledgement by the Prepetition Agents, of actions to be taken by the Prepetition Agents in connection with the Chapter 11 Cases;<br><br>(m) The DIP Agent's receipt of, in form and substance acceptable to the DIP Agent: (i) a certificate of an Authorized Officer of each Debtor certifying the provided Governing Documents (as defined in the DIP Financing and Guaranty Agreement), board resolutions, and signature of each officer executing a DIP Credit Document; (ii) a certificate of an officer of the Borrower certifying the satisfaction of the conditions precedent; (iii) UCC financing statements for perfection of the liens; (iv) such information (financial or otherwise) as the Agent or any Lender may reasonably request; and (v) a certificate as to the good standing of each Debtor. |
|---|---|
| **Section 552(b)**<br>Local Rule 4001-2(a)(i)(H)<br><br>DIP Financing and Guaranty Agreement, § 2.07(d);<br>Interim Order, ¶ 22 | The DIP Agent, DIP Lenders, Prepetition Agents, and Prepetition Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and no person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Lenders with respect to proceeds, products, offspring, or profits of any of the DIP Collateral or the Prepetition Collateral. |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(1)(C)<br><br>DIP Financing and Guaranty Agreement, § 2.08;<br>Interim Order, ¶ 20 | Subject to entry of the Final Order, no costs or expenses of administration shall be surcharged against the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders, or any of their respective claims, the Carve-Out, or the Dip Collateral, without the prior written consent, as applicable, of the DIP Agent (at the direction of the DIP Required Lenders). |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Credit Parties agree to jointly and severally, defend, protect, indemnify, and hold harmless the DIP Agent and the DIP Lenders, and their representatives and affiliates (collectively, the |

01:23488629.1

22

| | |
|---|---|
| DIP Financing and Guaranty Agreement, § 12.15 | "Indemnitees") from and against any claims, damages, losses, liabilities, and reasonably costs and expenses incurred in connection with the following: (i) the negotiation, preparation, execution, or performance of the DIP Credit Documents; (ii) the furnishing of funds to the Borrower under the DIP Credit Documents, including, without limitation, the management of the DIP Facility or the Borrower's use of DIP Facility proceeds; (iii) the DIP Agent's and DIP Lenders' reliance on the Borrower's instructions regarding the handling of the DIP Collateral; (iv) any matter relating to the financing transactions contemplated by the DIP Credit Documents; or (v) any claim, litigation, investigation, or proceeding relating to the foregoing.<br><br>The foregoing is subject to customary limitations for gross negligence and willful misconduct, as well as limitations in the case of a material breach by an Indemnitee or a proceeding between Indemnitees that does not involve an act or omission by the Credit Parties.<br><br>In addition, each of the Credit Parties agrees to, jointly and severally, defend, indemnify and hold harmless the Indemnitees against any and all Environmental Liabilities (as defined in the DIP Financing and Guaranty Agreement).<br><br>The aforementioned provisions shall remain in effect if the Interim Order is entered but the Final Order is not. |
| **Sale Process Covenants** Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Financing and Guaranty Agreement, § 7.01(r) | Each of the Credit Parties must take the following actions no later than the applicable date set forth below:<br><br>(i) On or prior to the Petition Date, execute an asset purchase agreement (the "Stalking Horse APA") to sell all or substantially all of their respective assets to a purchaser (the "Stalking Horse Bidder"), subject to receipt of "higher and/or otherwise better" bids and approval of the Bankruptcy Court;<br><br>(ii) No later than five (5) calendar days after the Petition Date, file (a) a motion under Section 363 of the Bankruptcy Code (the "Sale Motion") to sell all or substantially all of their respective assets pursuant to the Stalking Horse APA, subject to the receipt of "higher and/or otherwise better" bids, and (b) a motion ("Bid Procedures Motion") for approval of the Bidding Procedures; provided, however, that the Sale Motion and the Bid Procedures Motion may be a single motion and must be in form and substance reasonably acceptable to the Required Lenders;<br><br>(iii) No later than thirty-three (33) calendar days after the Petition |

Date, obtain Bankruptcy Court approval of the Bidding Procedures, pursuant to an order (the "Bidding Procedures Order") in form and substance reasonably acceptable to the Required Lenders (provided, however, that an order of the Bankruptcy Court not materially different from the form of order attached as Exhibit F to the Stalking Horse APA shall be deemed to be reasonably acceptable to the Requisite Lenders), which Bidding Procedures Order shall set forth a final bid deadline (the "Bid Deadline") on a date acceptable to the Credit Parties, in consultation with the Required Lenders, but no later than fifty-four (54) calendar days after the Petition Date;

(iv) To the extent required pursuant to the Bidding Procedures, commence, no later than sixty-three (63) calendar days after the Petition Date, and conduct, subject to the supervision of the Bankruptcy Court and in accordance with the Bidding Procedures, the Auction, upon the completion of which the Credit Parties shall evaluate each bid at the Auction and, in accordance with the Bidding Procedures, the Decision Maker (as required in the Bidding Procedures), after consultation with the Required Lenders, shall select the successful bidder for subsequent approval by the Bankruptcy Court pursuant to the Sale Order (the "Successful Bid");

(v) No later than ten (10) calendar days after completion of the Auction (or, if there is no Auction, no later than seventy-three (73) calendar days after the Petition Date), obtain approval of the Approved Sale to one or more buyers on the terms of the Successful Bid pursuant to a sale order (1) that is in form and substance reasonably acceptable to the Required Lenders  (the "Sale Order"), and (2) that provides that the Liens granted under the Interim and Final Orders shall attach, subject to the Carve-Out, to the proceeds of the Approved Sale in the same amount and priority as such Liens have attached to the assets sold pursuant to the Approved Sale; and

(vi) Consummate the Approved Sale no later than the date that is the earlier of (1) sixty (60) days after entry of the Sale Order or (2) December 15, 2018;

Neither the Bidding Procedures Order (including the Bidding Procedures), nor the Sale Order nor any of the other approvals described above once given shall be amended or otherwise modified in any material respect (including with respect to any extension of any deadline described above) without the consent of the Borrower and Guarantors and the Required Lenders or amended or otherwise modified in any manner that has a negative impact on the rights or interests of the Agent or the Lenders without the consent of the Required Lenders.

| | |
|---|---|
| **Covenants Regarding the Continuous Engagement of Professional Advisors** Bankruptcy Rule 4001(c)(1)(B)<br><br>DIP Financing and Guaranty Agreement, § 7.01(z) | Within eight Business Days following the Petition Date, the Credit Parties shall file a motion reasonably satisfactory in form and substance to the Lenders seeking (i) Bankruptcy Court authorization to retain  Piper Jaffray & Co. (or another investment bank selected by the Borrower and reasonably acceptable to the Lenders such bank, an "<u>Investment Bank</u>") on terms substantially similar to the terms set forth in the agreement by and among RM Opco LLC and Piper Jaffray in effect as of January 22, 2018, or otherwise reasonably acceptable to the Lenders, and (ii) attaching a proposed order reasonably satisfactory in form and substance to the DIP Lenders and permitting such Investment Bank to market the assets of the Credit Parties in connection with the Stalking Horse APA and to solicit higher and/or otherwise better bids subject to the Bidding Procedures Order, and assist the Credit Parties with obtaining Bankruptcy Court approval pursuant to Section 363 of the Bankruptcy Code of an Approved Sale.  The Credit Parties shall serve the motion upon such parties required to receive notice of the motion and such other parties as may be reasonably requested by the DIP Agent. |

## III.    ADDITIONAL PROVISIONS

25.    In accordance with Local Rule 4001-2(a)(i), the following provisions of the DIP Financing and Guaranty Agreement are highlighted below:

**a. Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection to the prepetition secured creditors.**

There are no such provisions.

**b. Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five days (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.**

There are no such provisions.

**c. Provisions that seek to waive, without notice, whatever rights the Debtors' estate may have under 11 U.S.C. § 506(c).**

All rights of the Debtors' estates under section 506(c) of the Bankruptcy Code are waived with respect to the collateral of Prepetition Secured Lenders, subject to entry of the Final Order.

**d. Provisions that immediately grant to the prepetition secured creditors liens on the Debtors' claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549.**

Liens will not be granted on Avoidance Actions.  Upon entry of the Final Order, liens will be granted to the DIP Agent (for the benefit of itself and the DIP Lenders) and the Prepetition Agents (for the benefit of themselves and the Prepetition Lenders) on the proceeds of actions arising under section 549 of the Bankruptcy Code.

**e. Provisions that deem prepetition debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b).**

There are no such provisions.

**f. Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.**

There are no such provisions.

**g. Provisions that prime any secured lien absent consent of the affected lienor.**

The liens securing the DIP Facility will prime certain of the Prepetition Lenders' prepetition liens, but the Prepetition Lenders have consented to this priority.

**h. Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).**

The "equities of the case" exception set forth in section 552(b)(1) of the Bankruptcy Code shall not apply to the DIP Agent, DIP Lenders, or any of the Prepetition Secured parties.

## BASIS FOR RELIEF REQUESTED

**I.    APPROVAL OF THE DIP FACILITY IS APPROPRIATE
UNDER SECTION 364 OF THE BANKRUPTCY CODE**

26.      Section 364 of the Bankruptcy Code gives bankruptcy courts the power to
authorize postpetition financing for a chapter 11 debtor in possession.  To the extent a debtor
requires credit, but is unable to obtain such credit on unsecured terms, the Bankruptcy Code
offers a debtor in possession flexibility to provide various protections to induce a postpetition
lender to extend credit to a debtor in possession.  Specifically, a postpetition lender can be
granted a superpriority administrative expense claim, a lien on unencumbered property, a junior
lien on encumbered property, and, if the court finds that the interests of the holders of existing
liens are adequately protected, a priming lien on encumbered property.  11 U.S.C. § 364(c), (d).
See In re Defender Drug Stores, Inc., 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), aff'd, 146 B.R.
312 (B.A.P. 9th Cir. 1992) (quoting Unsecured Creditors' Comm. v. First Nat'l Bank & Trust
Co. of Escanaba (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 603 (6th Cir. 1987)) ("Having
recognized the natural reluctance of lenders to extend credit to a company in bankruptcy,
Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition
credit.'").   The DIP Financing and Guaranty Agreement satisfies applicable standards for
approval under section 364 of the Bankruptcy Code.

(a)      *The DIP Financing and Guaranty Agreement Satisfies Section 364(c) of the
Bankruptcy Code*

27.      Courts have articulated a three-part test to determine whether a debtor is entitled
to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:
(a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender
only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the

estate; and (c) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); In re The Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is not available.  See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986).  This is true especially when time is of the essence.  See, e.g., id.; In re Reading Tube Indus., 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987).

28.    As described in this Motion and in the First Day Declaration, the Debtors are in critical need of postpetition debtor-in-possession financing.  Throughout the Chapter 11 Cases, the Debtors' operating expenses will exceed their cash generation from postpetition operations alone.  In order to continue paying for basic business operating expenses, the Debtors needed to search for postpetition financing.   The Debtors searched for such financing on the most favorable terms, including by marketing the debtor-in-possession financing to multiple lenders over a course of several weeks in an effort to solicit meaningful debtor-in-possession financing proposals.  The Debtors submit that the terms and conditions of the DIP Facility are fair, reasonable, and consistent with market terms.  Throughout these efforts, the Debtors were unable to obtain the necessary financing on an unsecured, administrative expense basis under section 503(b)(1) of the Bankruptcy Code.   Although the Debtors attempted to secure financing from their Prepetition Lenders on better terms, the DIP Lenders were unwilling to extend additional funding without obtaining superpriority claim status, perfected security interests in liens on the

Debtors' existing and after-acquired assets with the priorities and protections set forth in the Interim Order.

29.     As a condition to extending the DIP Facility that the Debtors need, the DIP Lenders require the protections contained in sections 364(c) and 364(d) of the Bankruptcy Code. Specifically, the DIP Facility will be secured, in each case subject to the Carve-Out and the Permitted Priority Liens, by (i) first priority perfected liens and security interests in all of the Debtors' unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code, (ii) perfected lien in all of the Debtors' assets junior to any Permitted Priority Liens pursuant to section 364(c)(3) of the Bankruptcy Code, and (iii) priming first priority, perfected security interests and liens in all of Debtors' assets, subject to the Permitted Priority Liens, that constitute DIP Collateral.   In addition, subject to the Carve-Out, the DIP Lenders will receive a superpriority claim under section 364(c)(1), which will have priority over all administrative expense and unsecured claims.  The Debtors submit that the terms and conditions of the DIP Facility presented herein was the most favorable financing available under the circumstances.

30.     The DIP Facility provides the funding necessary for the Debtors to sell substantially all of their assets as a going concern.  Without the DIP Facility, the Debtors may be required to cease payments to fund critical business operating expenses, such as payroll and vendor payments, which would destroy a substantial portion of the going concern value of the Debtors' estates.

(b)     *The DIP Financing and Guaranty Agreement Satisfies Section 364(d) of the Bankruptcy Code*

31.     The DIP Financing and Guaranty Agreement also includes priming liens on all Prepetition Collateral for the benefit of the DIP Lenders, and therefore is subject to approval

under section 364(d) of the Bankruptcy Code.   Section 364(d)(1) of the Bankruptcy Code authorizes a debtor-in-possession to incur superpriority senior secured priming liens if: (a) the debtor is unable to obtain such credit otherwise, and (b) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected.  See 11 U.S.C. §§ 364(d)(1).  As described above, the Debtors are unable to obtain viable financing on terms more favorable than the DIP Financing and Guaranty Agreement.  Further, as described below, the Interim Order contemplates a fair adequate protection package which was consented to by the Prepetition Lenders.  Accordingly, the Debtors submit that the proposed DIP Facility satisfies the requirements of section 364(d) of the Bankruptcy Code.

## II.   THE COURT SHOULD APPROVE THE DEBTORS' USE OF CASH COLLATERAL

32.   Section 363 of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral, providing, in pertinent part, that "The trustee may not use, sell, or lease cash collateral . . . unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."   11 U.S.C. § 363(c)(2).   Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral so long as the applicable secured creditor consents or is adequately protected.  See In re McCormick, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to that the secured creditor's interest in the cash collateral is adequately protected); see also Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713, 721 (Bankr. D. Del. 1996) (holding that creditors were adequately protected and allowing debtor to use cash collateral); In re Atrium Corp., 2010 WL 2822131, at *6 (Bankr. D.

Del. Mar. 17, 2010) (authorizing debtor's use of cash collateral and granting creditor adequate protection).

33.    The Debtors have satisfied the requirements of section 363(c)(2) of the Bankruptcy Code and should be authorized to use the Cash Collateral.  The Prepetition Lenders have consented to the use of the Cash Collateral.  In addition, the Prepetition Lenders' interests in the Cash Collateral will be adequately perfected, as described further below.  Based upon the foregoing, the Debtors request that the Court authorize the Debtors to use of the Cash Collateral in accordance with the terms set forth in the Interim Order and the DIP Loan Documents.

### III.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS

34.    Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court ,with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  The propriety of adequate protection is determined on a case-by-case basis.  See Resolution Trust Corp. v. Swedeland Dev. Grp (In re Swedeland Dev. Grp), 16 F.3d 552, 564 (3d Cir. 1994) (citing MBank Dallas, N.A. v. O'Connor (In re O'Connor)), 808 F.2d 1393, 1397 (10th Cir. 1987)); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Columbia Gas Sys., Inc., Nos. 91_803, 91_804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

35.    Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Continental Airlines, Inc.,

154 B.R. 176, 180-181 (Bankr. D. Del. 1993); In re 495 Cent. Park Ave. Corp., 136 B.R. at 631; In re Beker Indus., 58 B.R. at 736.

36. Adequate protection is not expressly defined in the Bankruptcy Code. Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection. The flexibility provided by section 363 provides the Court with discretion in fashioning the protection provided to a secured party. See In re Swedeland, 16 F.3d at 564. Adequate protection may be provided through a "replacement lien" or "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. *See* 11 U.S.C. § 361(2), (3).

37. The Debtors believe that the measures of protection set forth in the DIP Facility constitute adequate protection, both for the granting of priming liens and for the use of cash collateral, to protect the Prepetition Lenders from any diminution in value from the priming of their lines or use of their prepetition collateral. The Debtors have obtained the consent of the Prepetition Lenders to the priming liens provided in the DIP Facility by offering the following adequate protection package: (a) a superpriority claim, subordinate and subject only to the superpriority claim of the DIP Lenders, [prior payment of the Break-Up Fee,] and prior payment of the Carve-Out; (b) a priming, perfected security interest in and replacement lien on all DIP Collateral subject and subordinate to the liens of the DIP Lenders, Permitted Priority Liens, [the Bid Protection Lien,] and prior payment of the Carve-Out; (c) the payment of all of the Prepetition Agent's and Prepetition Lenders' reasonable and documented outstanding fees and expenses; and (d) additional benefits, such as, subject to the Challenge Period Termination Date, various waivers, releases, and acknowledgements, as described more fully above and in the Interim Order.

38.     Preservation of value generally constitutes the "adequate protection" needed to prime existing liens.  See, e.g., Norton, et al., 2 *Norton Bankruptcy Law and Practice 2d.* § 38:7, p.38-17 (1994) (addressing the § 364(d) determination, "[f]actors influencing a court's decision will be the viability of the debtor's business and the need to protect assets against a sharp decline in value"); Snowshoe, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (funds from lender given "priming" lien used to improve collateral is transferred into value. "This value will serve as adequate protection. . . ."); In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); In re Devlin, 185 B.R. 376, 378 (Bankr. M.D. Fla. 1995) (chapter 11 debtor-motel operator authorized to incur debt with superpriority status to replace air-conditioning unit, boiler, and hot water heaters because such expenses were necessary to preserve value and maintain operations).  In any event, the only parties that the Debtors are aware of whose liens are being primed are the Prepetition Lenders, who have consented to the priming lien to preserve the going-concern value of their collateral and have been provided with acceptable adequate protection, as discussed above.

39.     The Debtors believe that the foregoing adequate protection reasonably balances the Debtors' need to use the collateral of the estate and the Prepetition Lenders' right to adequate protection under the Bankruptcy Code.  As a result, the Debtors request authority to provide adequate protection to the Debtors' Prepetition Lenders in the form described above.

## IV.     APPROVAL OF THE DIP FACILITY IS SUPPORTED BY THE EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT

40.     Generally, courts give broad deference to business decisions of a debtor in possession.  See, e.g., Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th

Cir. 1985).   Moreover, a bankruptcy court generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds.  As the court noted in <u>In re Ames Dep't Stores, Inc.</u>:

> [T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest., 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990).

Without the ability to incur secured debt, the debtor in possession would be placed at a competitive disadvantage and its efforts to reorganize could be seriously impaired.

41.     Here, the Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable.  The Debtors' decision to obtain financing pursuant to the terms of the DIP Facility represents an exercise of sound business judgment in the Debtors' continued effort to maximize the value of their estates as a going concern for all their stakeholders.  Absent such postpetition financing, the Debtors' ability to continue business operations and maintain the value of its assets prior to closing on a sale of those assets would be severely compromised.

## V.     THE DIP LENDERS ARE ENTITLED TO THE PROTECTIONS OF SECTION 364(E) OF THE BANKRUPTCY CODE

42.     Section 364(e) of the Bankruptcy Code provides that the "reversal or modification on appeal of an authorization . . . to obtain credit or incur debt . . . does not affect the validity of any debt so incurred or any priority or lien so granted, to an entity that extended such credit in good faith." 11 U.S.C. § 364(e).  As previously discussed herein, the terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors and the DIP Lenders.  Moreover, the terms and conditions of the DIP Facility are fair and reasonable, and the Debtors' entry into the DIP Financing and Guaranty Agreement is in the best interests of their estates and creditors.  Accordingly, the DIP Lenders should be provided with the benefit and protection of

section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by subsequent order of this or any Court, the DIP Lenders will be fully protected with respect to any amounts previously disbursed.

## VI.    THE SECTION 506(C) WAIVER SHOULD BE APPROVED IN THE FINAL ORDER

43.    Under the DIP Financing and Guaranty Agreement, the Debtors agree to waive any rights to charge costs and expenses against the collateral of the Prepetition Secured Parties. The Debtors request that the Court approve the waiver, upon entry of the Final Order.  Such waivers and provisions are standard under financings between sophisticated parties.  As one court noted, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)."  In re Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000).  See also In re Nutri/System of Florida Assocs., 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); In re Telesphere Communications, Inc., 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

44.    The waiver of surcharge rights is appropriate where, as here, the Prepetition Lenders have consented to the Carve-Out and to the continued use of Cash Collateral and the proceeds of the Prepetition Collateral to fund the administration of the Debtors' estates in accordance with the Approved Budget.

## VII.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

45.    The DIP Facility and proposed Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Agent, for itself and on behalf of the DIP Required Lenders, at the direction of the DIP Required Lenders, or the DIP Lenders, as applicable to exercise, upon the occurrence and during the continuation of any Event of Default (as defined in the DIP Financing and Guaranty Agreement), all rights and remedies provided for in the DIP Financing and Guaranty Agreement, and to take various other actions without further order of or application to the Court.  The Interim Order provides, however, that the DIP Lenders must provide the Debtors with at least five (5) business days prior written notice before exercising any enforcement rights or remedies, which will allow the Debtors to seek an expedited hearing before the Court in opposition to the DIP Agent's exercise of its rights and remedies.

46.    Stay modification provisions of this sort are ordinary features of DIP facilities and, in the Debtors' business judgment, are reasonable under the circumstances.  The provision provides the Debtors and other parties reasonable time to cure an event of default if possible and entitles the Debtors and any Committee to an emergency hearing before the Court.  Accordingly, the Debtors request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

## VIII.   LIENS ON THE PROCEEDS OF AVOIDANCE ACTIONS SHOULD BE APPROVED

47.    The Final Order, if approved by the Court, will grant the DIP Agent (for the benefit of itself and the DIP Lenders) liens on the proceeds of Avoidance Actions arising under section 549 of the Bankruptcy Code.  The DIP Lenders required the granting of such liens as a necessary condition to extending financing under the DIP Financing and Guaranty Agreement.

The Debtors require the financing under the DIP Financing and Guaranty Agreement to ensure that their business operations are not interrupted.  Accordingly, it is appropriate to grant the liens on the proceeds of Avoidance Actions arising under section 549 of the Bankruptcy Code for the limited purposes set forth above.  Courts in this District have approved the granting of such liens under similar circumstances. See, e.g., In re Bicent Holdings LLC, Case No. 12-11304 (KG) (Bankr. D. Del. May 16, 2012); In re Capitol Infrastructure, LLC, Case No. 12-11362 (KG) (Bankr. D. Del. May 15, 2012); In re Solar Trust of America, LLC, Case No. 12-11136 (KG) (Bankr. D. Del. Apr. 26, 2012); In re Delta Petroleum Corp., Case No. 11-14006 (KJC) (Bankr. D. Del. Jan. 11, 2012); In re Townsends, Inc., Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 28, 2011).

### IX.    IMMEDIATE RELIEF IS JUSTIFIED

48.    Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on a motion to use cash collateral or obtain postpetition financing may not be commenced earlier than fourteen days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such fourteen-day period and to authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.  The Debtors' cash needs are immediate.  Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors therefore request that the Court (i) authorize the Debtors to obtain and use financing on an interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing no later than 30 days from entry of the Interim Order to consider approval of the Debtors' request to obtain and use financing on a final basis pursuant to the terms of the Final Order.

49.    As described above and in the First Day Declaration, the Debtors submit that without access to the DIP Facility, the Debtors will be unable to maintain ongoing operations and

will face immediate and irreparable harm to their estates.  In light of the foregoing, the Debtors submit that the requirements of Bankruptcy Rule 4001(b) and (c) have been satisfied and the immediate availability of the DIP Facility pending the entry of the Final Order is appropriate. Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## X.     NOTICE PROCEDURES AND FINAL HEARING

50.     Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing and the Debtors may not schedule a hearing to consider the Final Order until at least seven (7) days after the organizational meeting of the Committee contemplated by section 1102 of the Bankruptcy Code.

51.     The Debtors shall promptly mail copies of the Interim Order and notice of the Final Hearing, which fixes the time, date, and manner for the filing of objections, to any known party affected by the terms of the Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall (i) be made in writing setting forth with particularity the grounds thereof, and (ii) filed with the Court and served so as to be actually received no later than seven (7) days prior to the Final Hearing at 4:00 p.m. Eastern by the following: (a) proposed counsel to the Debtors, Sidley Austin LLP, 555 West Fifth Street, Los Angeles, CA 90013 (Attn: Christina M. Craige); (b) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, (Attn: Robert S. Brady and Edmon L. Morton); (c) counsel to the TCP DIP Lenders, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022 (Attn: David M. Hillman and Kelly V. Knight) and Landis, Roth & Cobb, LLP, 919 Market Street, Wilmington, DE 19801 (Attn: Adam G. Landis and Kerri K. Mumford); (d) counsel to the Z Capital DIP Lenders, , Cleary Gottlieb Steen & Hamilton LLP, One Liberty

Plaza, New York, NY 10006 (Attn: James L. Bromley and Kara A. Hailey) and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St., Wilmington, DE 19801 (Attn: Derek C. Abbott); (e) counsel to the DIP Agent and the Prepetition Agents, Thompson Hine LLP, 335 Madison Avenue, 12th Floor, New York, New York, 10017 (Attn: Curtis L. Tuggle); (f) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801; and (g) any Creditors' Committee appointed in these cases.

## WAIVER OF BANKRUPTCY RULE 6004(h) REQUIREMENTS

52.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the Debtors require immediate relief to avoid immediate irreparable harm and continue ordinary business operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## RESERVATION OF RIGHTS

53.     Nothing in this Motion: (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (iv) shall be construed as a promise to pay a claim or continue any applicable payments postpetition, which decision shall be in the discretion of the

Debtors.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

54.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) Wells Fargo Bank, N.A. as agent to the proposed DIP Lenders and Prepetition Secured Lenders; (iv) Cleary Gottlieb Steen & Hamilton LLP as counsel to Z Capital Group, LLC; (v) Schulte Roth & Zabel LLP as counsel to Tennenbaum Capital Partners, LLC; and (vi) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

55.     The Debtors have not previously sought the relief requested herein from this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order granting the relief requested herein and granting such other relief as the Court deems just and proper.

Dated:  August 6, 2018
Wilmington, Delaware

SIDLEY AUSTIN LLP
Christina M. Craige
Ariella Thal Simonds
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Edmon L. Morton*
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Andrew L. Magaziner (No. 5426)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

PROPOSED   ATTORNEYS   FOR   THE   DEBTORS
AND DEBTORS IN POSSESSION

**<u>Exhibit A</u>**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RM Holdco, <u>et al.</u>[1] | Case No. 18-11795 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING

Upon the Debtors' *Motion For Entry Of Interim And Final Orders (I) Authorizing Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And (B) Use Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361, 362, 363, And 364, And (III) Scheduling Final Hearing* (the "<u>Motion</u>"),[2] seeking entry of (i) an interim order (this "<u>Interim Order</u>") and (ii) a final order (the "<u>Final Order</u>"); and the Debtors' having requested on the record at the interim hearing on the Motion (the "<u>Interim Hearing</u>") that the Court enter an Interim Order, *inter alia,*:

(a)    authorizing RM Opco LLC ("<u>Opco</u>") and its affiliated debtors (collectively, the "<u>Debtors</u>") to obtain secured postpetition financing on a superpriority basis (the "<u>DIP Facility</u>") pursuant to the terms and conditions of that certain "DIP Financing and Guaranty Agreement," in

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  RM Holdco LLC (6847); RM Opco LLC (7122); RM HQ LLC (8615); RM Chevys LLC (N/A); RM Acapulco LLC (N/A); and RM El Torito LLC (N/A).  The Debtors' headquarters and mailing address is 5660 Katella Avenue, Suite 200, Cypress, CA 90630.

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Financing Agreement.

substantially the form attached hereto as Exhibit A (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Financing Agreement"), by and among RM Opco, as borrower, RM Holdco LLC, RM Chevys LLC, RM Acapulco LLC, RM El Torito LLC and RM HQ LLC (each a "Guarantor", and collectively, the "Guarantors") and each lender party thereto (collectively, the "DIP Lenders"), and Wells Fargo Bank, National Association, in its capacity as agent (in such capacity, the "DIP Agent" and together with the DIP Lenders, the "DIP Secured Parties") on behalf of the DIP Lenders;

(b)      authorizing the Debtors to execute the DIP Financing Agreement and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time, and collectively with the DIP Financing Agreement, the "DIP Loan Documents");

(c)      granting to the DIP Agent, for itself and for the benefit of the DIP Lenders, first priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, this Interim Order and the Final Order (as defined below), as applicable (collectively, and including all "Obligations" as described in the DIP Financing Agreement, the "DIP Obligations"), subject only to Permitted Priority Liens (as defined below) and prior payment of the Carve-Out (as defined below);

(d)      granting allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders;

(e)      authorizing the Debtors to use Cash Collateral (as defined below);

01:23488630.1

(f)        authorizing the Debtors to grant adequate protection to Wells Fargo Bank, National Association, in its capacity as agent (in such capacity, the "Prepetition First Lien Agent") for certain lenders and noteholders (respectively, the "Prepetition First Lien Lenders" and the "Prepetition First Lien and Noteholders) under the "Financing Agreement (First Lien)," dated as of March 21, 2012, among the Debtors, the Prepetition First Lien Lenders, the Prepetition First Lien Noteholders, the guarantors party thereto and the Prepetition First Lien Agent (as the same has been amended, restated or modified from time to time prior to the Petition Date, the "Prepetition First Lien Financing Agreement," and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition First Lien Loan Documents");

(g)        authorizing the Debtors to grant adequate protection to Wells Fargo Bank, National Association, in its capacity as agent (in such capacity, the "Prepetition Second Lien Agent" and, together with the Prepetition First Lien Agent, the "Prepetition Agents") for certain lenders (the "Prepetition Second Lien Lenders", together with the Prepetition First Lenders, the "Prepetition Lenders") under the "Amended and Restated Financing Agreement (Second Lien)," dated as of March 21, 2012, among the Debtors, the Prepetition Second Lien Lenders, the guarantors party thereto and the Prepetition Second Lien Agent (as the same has been amended, restated or modified from time to time prior to the Petition Date, the "Prepetition Second Lien Financing Agreement", and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Second Lien Loan Documents");

(h)     scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of the Final Order (subparagraphs (a) through (h) collectively, the "Requested Relief");

and the interim hearing on the Requested Relief (the "Interim Hearing") having been held on August [___], 2018; and upon all of the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing; and the Court having heard and resolved or overruled any and all objections to the Requested Relief; and it appearing that the Requested Relief is in the best interests of the Debtors, their estates, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.      Petition Date.  On August 5, 2018 (the "Petition Date"), the Debtors commenced their chapter 11 cases (these "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "Creditors' Committee") has been appointed in any of these Chapter 11 Cases.

B.      Jurisdiction; Venue.  The Court has jurisdiction over these Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D).  The Court is a proper venue of these Chapter 11 Cases and the Requested Relief under 28 U.S.C. §§ 1408 and 1409.

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

C.      Notice.  Notice of the Motion, the relief requested therein and the Interim Hearing (the "Notice") has been served by the Debtors pursuant to Bankruptcy Rules 2002 and 4001 on (i) the Debtors' thirty largest unsecured creditors on a consolidated basis, (ii) counsel to the DIP Agent and the Prepetition Agents, (iii) counsel to the TCP Lenders, (iv) counsel to the Z Capital Lenders (v) any parties that have filed a notice of appearance in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, (vi) all of the landlords of the Debtors' commercial real properties, (vii) all known holders of liens upon the Debtors' assets, (viii) the United States Attorney for the District of Delaware, (ix) the Internal Revenue Service and (x) the United States Trustee for the District of Delaware.

D.      Prepetition First Lien Obligations

(i)      The commitments of the Prepetition First Lien Lenders and the Prepetition First Lien Noteholders are divided into the First Out Term Loan A, the Term Loan A, and the Term A Notes (in each case, as defined in the Prepetition First Lien Financing Agreement, each of which bears interest at a per annum rate of 7%, payable in-kind, and each of which matured on July 31, 2018.  The First Out Term Loan A has first payment priority over the Term A Loan and the Term A Notes.

(ii)      As of the Petition Date, (x) approximately $11,231,311.77 was outstanding under First Out Term Loan A; (y) approximately $20,297,023.90 was outstanding under Term Loan A; and (z) approximately $10,144,218.09 was outstanding in Term A Notes (collectively with interest, fees, costs and other expenses due and owing under the Prepetition First Lien Loan Documents, the "Prepetition First Lien Obligations").

(iii)    The Prepetition First Lien Obligations are secured by a first-priority lien (the "Prepetition First Priority Liens") on substantially all of the Debtors' assets (the "Prepetition First Lien Collateral").

        E.        Prepetition Second Lien Debt

(i)    The commitments of the Prepetition Second Lien Lenders are divided into the Senior Convertible Term B Loans, the Reimbursement Obligation Loans, the Convertible Term Loan B-1, the Term Loan B-1, and the Term Loan B (in each case, as defined in the Prepetition Second Lien Financing Agreement), each of which bears interest at a per annum rate of 8.5%, payable in-kind, and each of which matured on July 31, 2018.  The relative priority of the tranche is set forth in the Prepetition Second Lien Financing Agreement.

(ii)    As of the Petition Date, (i) approximately $61,035,916.94 remained outstanding under the Senior Convertible Term B Loans; (ii) approximately $17,534,710.00 remained outstanding under the Reimbursement Obligation Loans; (iii) approximately $17,824,258.25 remained outstanding under the Convertible Term Loan B-1; (iv) approximately $22,168,458.96 remained outstanding under Term Loan B-1; and (v) approximately $94,091,863.80 remained outstanding in Term Loan B (collectively, with interest, fees, costs and other expenses due and owing under the Prepetition Second Lien Loan Documents, the "Prepetition Second Lien Obligations").

(iii)    The Prepetition Second Lien Obligations are secured by a second-priority lien (the "Prepetition Second Priority Lien," and together with the Prepetition First Priority Lien, the "Prepetition Liens") on substantially all of the Debtors' assets (the "Prepetition Second Lien Collateral," and together with the Prepetition First Lien Collateral, the "Prepetition Collateral").

F.    <u>Intercreditor Agreement</u>.

(i)    The Prepetition Agents are party to that certain Intercreditor Agreement dated as of March 21, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>") to govern, among other things, the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the Prepetition Collateral.   Pursuant to and on the terms set forth in the Intercreditor Agreement, the Prepetition First Priority Liens are senior and prior in right to the Prepetition Second Priority Liens.   The Debtors have acknowledged and agreed to, and are bound by, the Intercreditor Agreement.

G.    <u>Subordination Agreement</u>.

(i)    The Prepetition Agents are party to that certain Subordination Agreement dated as of March 21, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Subordination Agreement</u>") to govern, among other things, the respective rights, priority, and positions of the Prepetition Secured Parties with respect to the subordinated unsecured debt issued by RM Holdco LLC pursuant to that certain Subordinated Convertible Loan Agreement dated as of March 21, 2012 (the "<u>Subordinated Financing Agreement</u>"). Pursuant to and on the terms set forth in the Subordination Agreement, all debt incurred by RM Holdco LLC pursuant to the Subordinated Financing Agreement is junior in priority of payment and subordinated to the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations.   The Debtors have acknowledged and agreed to, and are bound by, the Subordination Agreement.

H.    <u>Debtors' Acknowledgments and Stipulations</u>.    The Debtors acknowledge, represent, stipulate, and agree, subject to the terms and provisions of paragraph 15 below, that:

(i)    upon approval of this Interim Order by the Court, the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents and the use of Cash Collateral to which any Debtor is a party;

(ii)    until such time as all DIP Obligations are indefeasibly paid in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA (as defined in the DIP Financing Agreement)), the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens and security interests provided to the DIP Agent and the DIP Lenders by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to (a) the Permitted Priority Liens and (b) prior payment of the Carve-Out;

(iii)    until such time as all DIP Obligations are indefeasibly paid in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA), the Debtors shall not in any way or at any time permit to exist an administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses (a) on account of any break-up fee and expense reimbursement authorized to be paid to any person or entity (except for any Break-Up Fee secured by a Bid Protection Lien (as defined herein)), or (b) of the kind specified in, or arising or ordered under sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, that is superior to or

*pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to prior payment of the Carve-Out;

(iv)    the Debtors have requested that the Prepetition Agents consent to, among other things, (a) the Debtors' use of Cash Collateral and the other Prepetition Collateral, (b) the incurrence of the DIP Term Loans by the Debtors and the Guarantors' guarantees of the DIP Term Loans under the DIP Loan Documents and (c) the Debtors' granting of the priming DIP Liens (as defined below) in connection therewith.  The Prepetition Agents and Prepetition Lenders are entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral (x) in exchange for their consent to allow the Debtors' use of such Prepetition Collateral, including the Cash Collateral, and (y) for any diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition Liens by the DIP Agent and DIP Lenders pursuant to this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or otherwise;

(v)    as of the Petition Date, (a) the aggregate amount of the Prepetition First Lien Obligations and Prepetition Second Lien Obligations (collectively, the "Prepetition Indebtedness") is unconditionally owing by the Debtors; (b) the Prepetition Indebtedness is not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 15 below;

(vi)    the Prepetition Liens constitute valid, binding, enforceable, and perfected liens with priority over any and all other liens (other than Permitted Priority Liens and any Bid Protection Lien (as defined herein)) and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity except as set forth in paragraph 15 below;

(vii)    any payments made on account of the Prepetition Indebtedness prior to the Petition Date were (a) payments out of the Prepetition Collateral, and/or (b) made in the ordinary course of business, and did not diminish any property otherwise available for distribution to unsecured creditors; and

(viii)    all of the Debtors' cash (but not, for the avoidance of doubt, any Good Faith Deposit (as defined in the DIP Financing Agreement)), including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral constitutes Cash Collateral of the Prepetition Agents.

I.    Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Agent or the Prepetition Agents have, for the benefit of the DIP Lenders or the Prepetition Lenders, respectively, a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise and shall include, without limitation:

(i)    all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, including insurance policies, in or on which the

Prepetition Lenders have a lien or a replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of this Chapter 11 Case, or arose or was generated thereafter;

(ii)     all of the respective deposits, refund claims and rights in retainers of the Debtors on which the Prepetition Agents hold a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; and

(iii)     the proceeds of any sale of DIP Collateral or Prepetition Collateral in connection with any sale consummated prior to entry of the Final Order.

J.     <u>Adequate Protection</u>.  The Prepetition Agents and Prepetition Lenders are each entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtors' use of such Prepetition Collateral, to the extent of the diminution in value, if any, of the Prepetition Collateral, including, without limitation, any diminution in value resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition Liens of the Prepetition Agents on and in the Prepetition Collateral, for themselves and for the benefit of the Prepetition Lenders, by the DIP Agent or the DIP Lenders, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

K.     <u>Purpose and Necessity of Financing</u>.  The Debtors require the financing described in the Requested Relief to (i) permit the continuation of their businesses and preserve their going concern value through the consummation of a sale process, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set

forth in the DIP Loan Documents and the DIP Budget (as defined in paragraph 2 below) (subject to the Permitted Variance (as defined in the DIP Financing Agreement)) and (iii) pay fees and expenses related to the DIP Loan Documents and the Chapter 11 Cases.  If the Debtors do not obtain authorization to borrow under the DIP Financing Agreement, they will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances.  A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Agent, for the benefit of the DIP Lenders, superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time.

L.     Good Cause Shown.  Good cause has been shown for entry of this Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and creditors.  The liquidity to be provided under the DIP Loan Documents will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' assets.  Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of the Debtors, their estates and their creditors.

M.    <u>Sections 506(c) And 552(b) Waivers</u>.  In light of (i) the DIP Agent's and the DIP

Lenders' agreement to permit their DIP Liens and DIP Superpriority Claim (as defined below) to

be subject to prior payment of the Carve-Out, and in exchange for and as a material inducement

to the DIP Agent and DIP Lenders to agree to provide the DIP Facility and (ii) the Prepetition

Agents' and the Prepetition Lenders' agreement to permit their Prepetition Liens, Replacement

Liens (as defined below) and Adequate Protection Superpriority Claim (as defined below) to be

subject to prior payment of the Carve-Out, the DIP Liens, and the DIP Superpriority Claim and

to permit the use of their Cash Collateral for payments made in accordance with the DIP Budget

(subject to the Permitted Variance) and the terms of this Interim Order, the DIP Agent, the DIP

Lenders, the Prepetition Agents and the Prepetition Lenders are each entitled to (a) subject to

entry of the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the

Bankruptcy Code and (b) subject to entry of the Final Order in the case of the Prepetition Agents

and Prepetition Lenders, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

N.    <u>Good Faith</u>.  The terms of the DIP Loan Documents, including, without

limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more

favorable to the Debtors than any available from alternative sources.  Based upon the record

before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-

length among the Debtors, the DIP Lenders, and the DIP Agent.  Any DIP Term Loans and other

financial accommodations made to the Debtors by the DIP Agent and the DIP Lenders pursuant

to the DIP Loan Documents and this Interim Order shall be deemed to have been extended by the

DIP Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the

Bankruptcy Code, and the DIP Agent and the DIP Lenders shall be entitled to all protections

afforded thereby.

O.      <u>Fair Consideration and Reasonably Equivalent Value</u>.  All of the Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Term Loans and all other financial accommodations provided under the DIP Loan Documents and this Interim Order.  The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

P.      <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  The permission granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful reorganization or sale of substantially all of their assets.  Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      <u>Disposition</u>.  The relief requested by the Debtors in the Motion and on the record at the Interim Hearing is granted on the terms set forth in this Interim Order.  Any objection to the interim relief sought by the Debtors that has not previously been withdrawn or resolved is hereby overruled on its merits.  The term of this Interim Order, the DIP Loan Documents, and the use of Cash Collateral authorized hereunder shall expire, and the DIP Term Loans made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all

interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) (a) on the 30th day after the date of entry of this Interim Order if the Final Order has not been entered by the Court prior to such date, or (b) upon the occurrence of the Termination Date (as defined in the DIP Financing Agreement).

## AUTHORIZATION FOR DIP FINANCING AND USE OF CASH COLLATERAL

2.     Authorization For DIP Financing And Use of Cash Collateral Pursuant to DIP Budget.

(a)     The Debtors are hereby authorized, on an interim basis, to incur DIP Obligations immediately subject to the terms of this Interim Order, the DIP Budget (subject to the Permitted Variance), and the DIP Loan Documents, in the aggregate principal amount of up to $3,000,000.00 (the "Maximum Interim Borrowing").  Available financing and advances under the DIP Financing Agreement shall, on an interim basis, be made to fund, in accordance with the DIP Loan Documents and the DIP Budget (subject to the Permitted Variance), working capital and general corporate requirements of the Debtors, bankruptcy-related costs and expenses (including interest, fees, and expenses in accordance with this Interim Order or the DIP Loan Documents), and any other amounts required or allowed to be paid in accordance with this Interim Order, but only as and to the extent authorized by the DIP Budget (subject to the Permitted Variance) and the DIP Loan Documents.

(b)     Prior to the Termination Date, the Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in this Interim

Order, the DIP Budget (subject to the Permitted Variance) and the DIP Loan Documents, without further approval by the Court.

(c)      The Debtors have delivered to the DIP Agent a detailed thirteen (13) week budget that sets forth projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period from and including the Petition Date through the week ending November 4, 2018, a copy of which is attached hereto as Exhibit A (the "DIP Budget"). The DIP Budget shall at all times be in form and substance acceptable to the Required Lenders (as defined in the DIP Financing Agreement) (the "DIP Required Lenders") and approved in writing by the DIP Required Lenders, in their sole discretion. The Debtors shall provide updates to the DIP Budget and financial reporting with respect to the Debtors in accordance with the terms of the DIP Loan Documents. Funds borrowed under the DIP Financing Agreement and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with the DIP Budget (subject to the Permitted Variance), the DIP Loan Documents and this Interim Order. The consent of the DIP Required Lenders to any DIP Budget shall not be construed as a commitment to provide DIP Term Loans or to permit the use of Cash Collateral (subject to the Carve-Out) after the occurrence of the Termination Date under this Interim Order, regardless of whether the aggregate funds shown on the DIP Budget have been expended.

(d)      Any amendments, supplements or modifications to the DIP Budget must be consented to in writing by the DIP Required Lenders in their sole discretion prior to the implementation thereof and shall not require further notice, hearing, or court order; provided, however, that the Debtors will provide written notice of any such amendment, supplement or modification to the Creditors' Committee.

(e)     The DIP Agent and the DIP Lenders (i) may assume the Debtors will comply with the DIP Budget (subject to the Permitted Variance), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral or Prepetition Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any DIP Budget.  All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time.

3.     Authorization For Use of Cash Collateral Pursuant to Wind-Down Budget

(a)     Prior to the Termination Date, the Prepetition Lenders and the Debtors shall endeavor to negotiate in good faith a budget setting forth the projected cash receipts and cash disbursements (by line item) on a weekly basis from the time period from and including the Termination Date and the effective date of a Chapter 11 plan  (the "Wind-Down Budget") and plan milestones ("Plan Milestones"), which Wind-Down Budget and Plan Milestones shall be reasonably acceptable to the Debtors and the Prepetition Lenders and filed with the Court.

(b)     Upon filing the Wind-Down Budget with the Court, subsequent to the Termination Date, the Debtors shall be authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in the Wind-Down Budget, without further approval by the Court.

(c)     The Wind-Down Budget shall at all times be in form and substance acceptable to the Prepetition Lenders and approved in writing by the Prepetition Lenders, in their reasonable discretion.  The Debtors shall provide updates to the Wind-Down Budget and financial reporting with respect to the Debtors, substantially similar to the updates and reporting required for the DIP Budget under the terms of the DIP Loan Documents.  The consent of the Prepetition Lenders to any Wind-Down Budget shall not be construed as a commitment to permit the use of

Cash Collateral (subject to the Carve-Out) upon a breach of the Wind-Down Budget or Plan Milestones, regardless of whether the aggregate funds shown on the Wind-Down Budget have been expended.

(d)    Any amendments, supplements or modifications to the Wind-Down Budget must be consented to in writing by the Prepetition Lenders in their sole discretion prior to the implementation thereof and shall not require further notice, hearing, or court order.

(e)    The Prepetition Agent and the Prepetition Lenders (i) may assume the Debtors will comply with the Wind-Down Budget (subject to an agreed-upon variance), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Prepetition Collateral or proceeds thereof) any unpaid expenses incurred or authorized to be incurred pursuant to any Wind-Down Budget.

4.    <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)    Each of the Debtors is authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto.  Each of the Debtors is further authorized to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and securing all of the Debtors' obligations under the DIP Loan Documents, each as may be reasonably requested by the DIP Required Lenders.

(b)    Each of the Debtors is further authorized to (i) perform all of its obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order.

5.      <u>Valid and Binding Obligations</u>.  All obligations under the DIP Loan Documents shall constitute valid, binding, and nonavoidable obligations of each of the Debtors, enforceable against each of them and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.      <u>Termination of DIP Loan Documents</u>.  Notwithstanding anything in this Interim Order to the contrary, the DIP Loan Documents shall expire, and the DIP Term Loans made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the Termination Date (as defined in the DIP Financing Agreement).

7.      <u>Authorization for Payment of DIP Financing Fees and Expenses</u>.  All fees paid and payable, and all costs and/or expenses reimbursed or reimbursable (including, without limitation, the Closing Fee, the Loan Servicing Fee, and all other fees, costs and expenses referred to in the DIP Loan Documents and the DIP Agent's  and DIP Lenders' attorneys' fees and expenses), under the DIP Loan Documents, by the Debtors to the DIP Agent are hereby approved and shall not be subject to disgorgement by any party for any reason.  The Debtors are

hereby authorized to pay all such fees, costs, and expenses (including, without limitation, the Closing Fee and the Loan Servicing Fee) in accordance with the terms of the DIP Loan Documents and this Interim Order, without any requirement that the Debtors, the DIP Agent, the DIP Lenders, or any of their counsel file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs, or expenses.  The Debtors shall pay all reasonable and documented prepetition and postpetition out of pocket costs and expenses of the DIP Agent and the DIP Lenders, including all reasonable and documented fees, expenses and disbursements of one primary counsel and one local counsel for the DIP Agent and one primary counsel and one local counsel for each DIP Lender (as set forth in the DIP Loan Documents), and consultants, incurred in connection with the Debtors, their Chapter 11 Cases and any Successor Case(s) (as defined below), including, without limitation, for (a) preparation, execution, and delivery of the DIP Loan Documents, this Interim Order, and any Final Order, and the funding of all DIP Term Loans under the DIP Facility; (b) the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, this Interim Order, and any Final Order; and (c) the enforcement or protection of any of their rights and remedies under the DIP Loan Documents, this Interim Order, and any Final Order. Notwithstanding anything to the contrary herein, the foregoing fees, costs and expenses of the DIP Agent and the DIP Lenders authorized by this Interim Order, whether incurred prior to or after the Petition Date, including, without limitation, all fees referred to in the DIP Loan Documents, shall be deemed fully earned, non-refundable, and irrevocable as of the date of this Interim Order.  None of the DIP Agent's or DIP Lenders' attorneys, financial advisors and accountants' fees and disbursements shall be subject to the prior approval of this Court or the guidelines of the Office of the United States Trustee for this region (the "U.S. Trustee"), and no

recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  Any such fees, costs and expenses shall be evidenced by a summary invoice (redacted, as necessary, to protect any applicable privilege) and delivered to the Debtors and the U.S. Trustee.  The U.S. Trustee shall have ten (10) days from the date of such delivery within which to object in writing to such payment.  Following the expiration of such period, the applicable counsel shall notify the Debtors in writing of the expiration of such period and the absence of any objection by the U.S. Trustee, and the Debtors shall pay such invoice within five (5) business days of such written notice, without the need for further application to or order of the Court.  In the event that, within such period, the U.S. Trustee raises an objection to a particular invoice, the applicable counsel shall notify the Debtors in writing of the objection and the Debtors shall pay the fees and expenses not subject to the objection within five (5) business days of such written notice, without the need for further application to or order of the Court.

8.    _Amendments, Consents, Waivers, and Modifications_.  The Debtors, with the express written consent of the DIP Agent at the direction of the DIP Required Lenders, may enter into any non-material amendments, consents, waivers or modifications to the DIP Loan Documents without the need for further notice and hearing or any order of this Court.

**DIP LIENS AND DIP SUPERPRIORITY CLAIMS**

9.    _DIP Liens_

(a)    To secure the DIP Obligations, the DIP Agent is hereby granted for the benefit of itself and the DIP Lenders (i) pursuant to section 364(c)(2), a perfected first-priority lien on the DIP Collateral (as defined below) to the extent that such DIP Collateral was not subject to valid, perfected and non-avoidable liens as of the Petition Date; (ii) pursuant to section 364(c)(3), a

perfected lien on the DIP Collateral junior to any Permitted Priority Liens[4] on such DIP Collateral, and (iii) pursuant to section 364(d) of the Bankruptcy Code, a perfected first-priority, priming and senior security interest and lien on the DIP Collateral subject to any Permitted Priority Lien ((i)-(iii) collectively, the "DIP Liens").

(b)     The DIP Liens shall attach to all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to: (w) all of the property, assets or interests in property or assets of each Debtor and all "property of the estate", including the Prepetition Collateral; (x) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; (y) all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above; and (z) proceeds of avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions", and collectively with (w)-(y), the "DIP Collateral"), subject only to (A) the Permitted Priority Liens, and (B) prior payment of the Carve-Out; provided, however, that DIP Collateral shall not include any Good Faith Deposit nor that certain Certificate of Deposit #2239406347 for $200,000 (maturity 12/16/2016, on auto-renew every 12 months) deposited by RM Opco LLC and held by

---

[4] "Permitted Priority Liens" means valid, enforceable, non-avoidable and perfected liens in existence on the Petition Date (including valid liens in existence on the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code) that are senior in priority to the Prepetition First Priority Liens.

Wells Fargo Bank, N.A.  Notwithstanding the foregoing, proceeds of or property recovered or otherwise resulting from the successful prosecution or settlement of any Avoidance Actions ("Avoidance Action Proceeds") shall not constitute DIP Collateral until after the entry of a Final Order.

(c)    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than (i) the Permitted Priority Liens; and (ii) prior payment of the Carve-Out.

(d)    The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements or any other agreements or instruments, such that no additional actions need be taken by the DIP Agent or the DIP Lenders to perfect such interests.  Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting the DIP Agent, for the benefit of itself and the DIP Lenders, a security interest in such fee, leasehold or other interest or other collateral or the proceeds of any

assignment, sale or other transfer thereof, by any of the Debtors in favor of the DIP Agent, for the benefit of itself and the DIP Lenders, in accordance with the terms of the DIP Financing Agreement and the other DIP Loan Documents.

(e)    That certain Deposit Account Control Agreement (the "Control Agreement"), dated as of May 17, 2012, entered into by and among Opco, the Prepetition First Lien Agent, the Prepetition Second Lien Agent and Wells Fargo Bank, National Association as depository bank (the "Bank"), shall inure to the benefit of the DIP Agent and the DIP Lenders.  The Bank shall comply with instructions given to the Bank by the DIP Agent without further consent by Opco, the Prepetition First Lien Agent, the Prepetition Second Lien Agent or any other third party. This Interim Order hereby amends the Control Agreement so that the DIP Agent shall be an "Agent" as defined therein and that "Controlling Agent" shall mean the DIP Agent until such time as the Bank receives written notice from the DIP Agent otherwise.

10.    DIP Lenders' Superpriority Claim.  The DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Debtors' Chapter 11 Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Case(s)") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which

allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof including, without limitation but subject to entry of a Final Order, any Avoidance Actions Proceeds.  The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out.  Except as referenced in this Interim Order (including with respect to the Break-Up Fee), no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case(s).  The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with any sale of the Debtors' assets, and the Adequate Protection Superpriority Claim.

11.     <u>Survival of DIP Liens and DIP Superpriority Claim</u>.   The DIP Liens, DIP Superpriority Claim, and other rights and remedies granted under this Interim Order to the DIP Agent, for the benefit of itself and the DIP Lenders, shall continue in this and any Successor Case(s) and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and/or upon the dismissal of any or all of the Debtors' Chapter 11 Cases or any Successor Case(s) and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) and the DIP Lenders' commitments have been terminated in accordance with the DIP Loan Documents.

## ADEQUATE PROTECTION FOR CASH COLLATERAL USE

12.    Adequate Protection for Prepetition Agents and Lenders.  As adequate protection for any diminution in the value of the Prepetition Collateral resulting from the incurrence of the DIP Obligations, the use of Cash Collateral, the granting of DIP Liens and the agreement of the Prepetition Agents and Prepetition Lenders to subordinate their right to receive payment from the proceeds of Prepetition Collateral to the prior payment of the Carve-Out, or otherwise (collectively, the "Diminution Claim"), the Prepetition Agents (on behalf of the Prepetition Lenders) are hereby granted (in each case subject to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following adequate protection:

(a)    Adequate Protection Liens.  Subject to Paragraph 15, to secure the Diminution Claim, the Prepetition Agents, for themselves and for the benefit of the Prepetition Lenders, are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Replacement Liens") in and on all of the DIP Collateral, provided, however, that the Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof, (ii) the Permitted Priority Liens, (iii) any lien granted to secure payment of the Break-Up Fee in the Stalking Horse APA to the extent approved by the Court (a "Bid Protection Lien") and/or payment of such break-up fee to the extent due and owing under the Stalking Horse APA (the "Break-Up Fee"), and (iv) prior payment of the Carve-Out.  The Replacement Liens shall maintain their priority relative to the Prepetition Liens as set forth in the Intercreditor Agreement, Subordination Agreement, Prepetition First Lien Financing Agreement and Prepetition Second Lien Financing Agreement.

(b)     <u>Adequate Protection Superpriority Claims</u>.   Subject to Paragraph 15, as further adequate protection for the Diminution Claim, the Prepetition Agents and the Prepetition Lenders are hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "<u>Adequate Protection Superpriority Claim</u>"), which allowed Adequate Protection Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof including, without limitation but subject to and upon entry of the Final Order, any Avoidance Action Proceeds.  The Adequate Protection Superpriority Claim shall be subordinate and subject only to the DIP Superpriority Claim, prior payment of the Break-Up Fee, to the extent payable under the Stalking Horse APA, and prior payment of the Carve-Out.  The Adequate Protection Superpriority Claim shall maintain its priority relative to the Prepetition Indebtedness as set forth in the Intercreditor Agreement and Subordination Agreement, Prepetition First Lien Financing Agreement and Prepetition Second Lien Financing Agreement.

(c)     <u>Prepetition Lenders and Prepetition Agents Legal Fees and Expenses</u>.   The Prepetition Lenders and Prepetition Agents shall each receive from the Debtors payment of all reasonable and documented outstanding fees and expenses (the "<u>Prepetition Fee Payments</u>"), including, but not limited to, fees and expenses of legal counsel, incurred by the Prepetition Lenders and Prepetition Agents, to the extent provided for under the Prepetition First Lien Loan Documents and Prepetition Second Lien Loan Documents.  The payment of all invoiced

01:23488630.1

27

outstanding fees and expenses as of the Petition Date shall be a condition to funding of any portion of the Initial DIP Term Loan.  The Prepetition Fee Payments are hereby approved and shall not be subject to disgorgement by any party for any reason.

(d)     As additional adequate protection, the Prepetition Agents and Prepetition Lenders shall be entitled to the additional benefits set forth in this Interim Order, including paragraphs 14 (Restrictions on Use of Funds); 15 (Challenge Period); 17 (Estate Release); 20 (Section 506(c) Waiver Upon Entry of Final Order); 21 (No Marshaling); 22 (Equities of the Case Waiver Upon Entry of Final Order); and 35 (Sales Milestones).

(e)     <u>Consent to Priming and Adequate Protection</u>.  The Prepetition Agents and the Prepetition Lenders consent to the Debtors' use of Cash Collateral and the priming provided for herein; provided, however, that such consent to the priming, the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order relating to the DIP Loan Documents and DIP Term Loans set forth herein, and such consent shall not be deemed to extend to any replacement or other debtor in possession financing other than the DIP Term Loans provided under the DIP Loan Documents; and provided, further, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Loan Documents and DIP Term Loans as set forth herein are not approved.

## **CARVE-OUT; RESTRICTIONS ON USE OF FUNDS**

13.     <u>Carve-Out</u>.

(a)     The DIP Liens, the DIP Superpriority Claim, the Replacement Liens, the Adequate Protection Superpriority Claims and the Prepetition Liens shall be subject and subordinate only to prior payment of: (i) fees payable to the United States Trustee pursuant to 28

U.S.C. § 1930(a)(6) or to the Clerk of the Court (the "Case Administration Fees"), (ii) unpaid

professional fees and expenses payable to any legal or financial advisors retained by the Debtors

(the "Debtors' Professional Fees") or any Creditors' Committee (the "Committee's Professional

Fees" and, collectively, the "Professional Fees") that are incurred or accrued prior to the date on

which the DIP Agent provides written notice to the Debtors and the Creditors' Committee of the

occurrence of the Termination Date, but solely if, as and to the extent such Professional Fees are

or have been provided for in, and are consistent with, the DIP Budget (subject to the Permitted

Variance) and are ultimately allowed by the Court pursuant to section 330 of the Bankruptcy

Code, and (iii) unpaid (x) Debtors' Professional Fees incurred or accrued on or after the date on

which the DIP Agent provides written notice to the Debtors of the occurrence of the Termination

Date in an aggregate amount not to exceed $200,000.00 and (y) Committee's Professional Fees

incurred or accrued on or after the date on which the DIP Agent provides written notice to the

Creditors' Committee of the occurrence of the Termination Date in an aggregate amount not to

exceed $25,000.00 (clauses (i), (ii) and (iii), collectively, the "Carve-Out" and, clause (iii) alone,

the "Capped Carve-Out").    Subject to the immediately preceding sentence, so long as the

Termination Date has not occurred, the Debtors shall be permitted to pay Case Administration

Fees and Professional Fees allowed and payable under Bankruptcy Code sections 330, 331 and

503, as provided in the DIP Loan Documents and the DIP Budget (subject to the Permitted

Variance).    Any payment of Carve-Out expenses incurred after the occurrence of the

Termination Date, including any payment of Professional Fees, shall permanently reduce the

Capped Carve-Out on a dollar-for-dollar basis.  Without limiting the generality of the foregoing,

the Carve-Out shall not include, apply to, or be available for any success fee or similar payment

to any professionals or other persons, including without limitation any such fee payable in

connection with a restructuring or asset disposition with respect to any of the Debtors or otherwise unless otherwise agreed to by the DIP Agent, at the direction of the DIP Required Lenders, in writing.

(b)    Nothing contained in this Interim Order shall be construed:  (i) to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Court-approved procedure from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and, if applicable, any subsequent order of this Court requiring that such payments be disgorged, and/or (ii) as consent to the allowance of any fees and expenses referred to above, and shall not affect any right of the DIP Agent or the DIP Lenders to object to the reasonableness of such amounts.

14.    <u>Restrictions on Use of Funds</u>.  Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, any Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Case(s), or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other than from the DIP Agent or DIP Lenders, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) all DIP Obligations, the Prepetition Indebtedness, and the adequate

protection obligations set forth in paragraph 12 or (b) investigate (except as set forth in paragraph 15 below), assert, join, commence, support or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders (in their respective capacities as such), or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors (in their respective capacities as such), with respect to any transaction, occurrence, omission, or action related to the DIP Liens, the DIP Indebtedness, the Prepetition Liens or the Prepetition Indebtedness, including, without limitation, (i) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (ii) any action relating to any act or omission related to, or aspect of, the relationship between or among any of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders (in their respective capacities as such), on the one hand, and the Debtors or any of their affiliates, on the other; (iii) any action with respect to the validity and extent of the DIP Obligations or the Prepetition Indebtedness, or the validity, extent, and priority of the DIP Liens, the Prepetition Liens or the Replacement Liens; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the Prepetition Liens or the Replacement Liens; (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders in respect of the enforcement of their liens and security interests in the DIP Collateral, Cash Collateral or the Prepetition Collateral; (vi) pay any Claim of a Creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Agent or the Prepetition Agents (at the direction of the "Required Lenders", in each case, as defined in the Prepetition Loan Documents) (except as

permitted by the DIP Budget (subject to the Permitted Variance)); and/or (vii) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Loan Documents, without the consent of the DIP Required Lenders. Notwithstanding the foregoing, up to $25,000.00 in the aggregate of the DIP Facility, DIP Collateral, Cash Collateral, Prepetition Collateral and Carve-Out may be used by a Creditors' Committee to investigate the Prepetition Indebtedness, the Prepetition Liens and/or claims against the Releasees prior to the Challenge Period Termination Date (as each is defined below).

      15.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

      (a)    The Debtors' acknowledgements and stipulations set forth in paragraph H above (the "<u>Debtors' Stipulations</u>") shall be binding upon the Debtors upon entry of this Interim Order; <u>provided</u>, <u>however</u>, that the Debtors shall be permitted to share information with the Creditors' Committee upon a request therefor by the Creditors' Committee in connection with the investigation of claims against the Releasees, be permitted to use the proceeds DIP Loans, DIP Collateral and Cash Collateral to pay any Debtors' Professional Fees incurred in connection therewith. The Debtors' Stipulations shall be binding upon each other party in interest, including the Creditors' Committee, if any, unless such Creditors' Committee or any other party in interest having standing other than the Debtors (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case(s)), first, commences, by the earlier of (x) with respect to any Creditors' Committee, sixty (60) calendar days from the formation of any Creditors' Committee, and (y) solely if no Creditors' Committee is formed, with respect to other parties in interest with requisite standing other than the Debtors or any Creditors' Committee, seventy-five (75) calendar days following the date of entry of the Interim Order (such time period established by

the earlier of clauses (x) and (y), shall be referred to as the "Challenge Period," and the date that

is the next calendar day after the termination of the Challenge Period in the event that either (i)

no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with

respect only to those parties who properly file a Challenge, such Challenge is fully and finally

adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested

matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code)

challenging or otherwise objecting to the admissions, stipulations, findings, or releases included

in the Debtors' Stipulations, or (B) a contested matter, adversary proceeding, or other action

against any or all of the Prepetition Agents or the Prepetition Lenders in connection with or

related to the Prepetition Indebtedness, or the actions or inactions of any of the Prepetition

Agents or the Prepetition Lenders arising out of or related to the Prepetition Indebtedness or

otherwise, including, without limitation, any claim against the Prepetition Agents or any or all of

the Prepetition Lenders in the nature of a "lender liability" cause of action, setoff, counterclaim,

or defense to the Prepetition Indebtedness (including, but not limited to, those under sections

506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code (in each case including a

contested matter, adversary proceeding, or other action or "claim" brought derivatively on behalf

of one or more Debtors' estates but excluding, solely for the purpose of this Interim Order, those

under 506(c)) ((A) and (B) collectively, the "Challenges" and, each individually, a "Challenge"),

and second, obtains a final, non-appealable order in favor of such party in interest sustaining any

such Challenge in any such timely-filed contested matter, adversary proceeding, or other action.

      (b)    Upon the Challenge Period Termination Date and for all purposes in these

Chapter 11 Cases and any Successor Case(s), (i) all payments made to or for the benefit of the

Prepetition Agents or the Prepetition Lenders pursuant to, or otherwise authorized by, this

Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred, (iii) the Prepetition Indebtedness shall be deemed to be a fully allowed and fully secured claim within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations in paragraph H and the releases in paragraph 17 shall be binding on all parties in interest, including any Creditors' Committee.

16.    <u>Prohibition on Granting of Additional Liens and Interests</u>.    No liens, claims, interests or priority status, other than the Carve-Out, the Permitted Priority Liens or any Bid Protection Lien or Break-Up Fee, if any, having a lien or administrative priority superior to, *pari passu* with, or junior to that of the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Superpriority Claims, or the Replacement Liens granted by this Interim Order, shall be granted while any portion of the DIP Obligations remain outstanding, or any commitment under the DIP Loan Documents remains in effect, without the prior written consent of the DIP Lenders.

17.    <u>Release</u>.    The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph 17 shall be deemed effective upon entry of the Interim Order, and subject only to the rights set forth in paragraph 15 above.  The Debtors forever and irrevocably (a) release, discharge, and acquit the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders (in their respective capacities as such), and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and successors and predecessors in interest (in

their respective capacities as such) (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship among the DIP Agent, the DIP Lenders or the Prepetition Lenders or the Prepetition Agents (in their respective capacities as such) and the Debtors and their affiliates including any equitable subordination or recharacterization claims or defenses, with respect to or relating to the DIP Obligations, the DIP Liens, the DIP Loan Documents, Prepetition Indebtedness, the Prepetition Liens, the Prepetition Loan Documents, the Debtors' attempts to restructure the Prepetition Indebtedness, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DIP Obligations, the DIP Liens, the Prepetition Indebtedness and the Prepetition Liens.

## OBLIGATION OF DIP LENDERS WITH RESPECT TO DELAYED DRAW DIP TERM LOANS

18.     Each of the DIP Lenders is obligated to use its reasonable best efforts to establish and maintain the Segregated Pre-Funding Account (as defined in the DIP Financing Agreement) and deposit its Delayed Draw DIP Term Loan into the Segregated Pre-Funding Account as soon as reasonably practicable following entry of this Interim Order.  If for any reason the Segregated Pre-Funding Account is not established and funded with the entire remaining amount of the DIP Lenders' aggregate DIP Term Loan Commitments prior to entry of the Final Order, each DIP

Lender is ordered to extend and disburse the Delayed Draw DIP Term Loans directly to the Borrower in accordance with the terms of the DIP Financing Agreement.

### REMEDIES; MODIFICATION OF AUTOMATIC STAY

19.    Remedies and Stay Modification.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable):

(i)    whether or not a Default or an Event of Default under the DIP Loan Documents or a default by any of the Debtors of any of their obligations under this Interim Order has occurred (A) to require all cash, checks or other collections or proceeds from DIP Collateral received by any of the Debtors to be deposited in accordance with the requirements of the DIP Loan Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Agent and the DIP Lenders under the DIP Loan Documents in accordance with any requirements of the DIP Loan Documents, (B) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (C) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Loan Documents as provided therein, and (D) the right to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order;

(ii)    Subject to subparagraph (a)(iv) below, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified without the need for further Court

order to permit the DIP Agent, for itself and on behalf of the DIP Required Lenders, at the direction of the DIP Required Lenders, or the DIP Lenders, as applicable, upon the occurrence and during the continuance of an Event of Default, and without any interference from the Debtors or any other party in interest but subject to five (5) business days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Loan Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) cease making DIP Term Loans and/or suspend or terminate the commitments under the DIP Loan Documents; (B) declare all DIP Obligations immediately due and payable; (C) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (D) foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (E) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Agent and DIP Lenders); and/or (F) exercise any other default-related rights and remedies under the under the DIP Loan Documents or this Interim Order.  The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents.

(iii)    Immediately upon the occurrence of the Termination Date or a default by any of the Debtors of any of their obligations under this Interim Order, the DIP Agent, for itself and the benefit of the DIP Lenders, may charge interest at the default rate set forth in the DIP Loan Documents without being subject to the Remedies Notice Period.

(iv)    The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in

the event that the Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period. The Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay of section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief.

(v)     If the DIP Required Lenders are entitled, and have elected in accordance with the provisions hereof, to direct the DIP Agent to enforce the DIP Liens or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Agent or the DIP Required Lenders in connection with such enforcement by, among other things, (A) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Agent or the DIP Required Lenders (including any collateral liquidator or consultant), (B) providing the DIP Agent or the DIP Required Lenders and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the DIP Agent or the DIP Required Lenders or their respective representatives, (C) performing all other obligations set forth in the DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Agent's or the DIP Required Lenders' enforcement of rights.

(vi)    Upon the occurrence and during the continuance of a Default or an Event of Default under the DIP Loan Documents, a violation of the terms of or an event of default under this Interim Order, or occurrence of the Termination Date, and except as otherwise provided in the DIP Loan Documents with respect to the Remedies Notice Period, (A) the DIP Agent, at the direction of the DIP Required Lenders, shall, subject to the Carve-Out, have no

further obligation to provide financing under the DIP Loan Documents and (B) the DIP Agent and the Prepetition Agents, at the direction of the DIP Required Lenders and the Prepetition Lenders, shall, subject to the Carve-Out, have no further obligation to permit the continued use of Cash Collateral.

(vii)    Upon the occurrence and during the continuance of a Default or an Event of Default under the DIP Loan Documents, a violation of the terms of this Interim Order, or occurrence of the Termination Date, the DIP Agent (at the direction of the DIP Required Lenders) may at all times continue to collect and sweep cash as provided herein or as provided in the DIP Loan Documents.

(viii)    Upon the occurrence and during the continuance of an Event of Default, the DIP Agent (at the direction of the DIP Required Lenders) shall have the sole right, in the name of the DIP Lenders and any Debtor, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.  All policies covering the DIP Collateral shall be made payable to the DIP Agent for the benefit of the DIP Agent and the DIP Lenders, as its interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and  any payments to be made under such policies shall be made payable to the DIP Agent for the benefit of the DIP Agent and the DIP Lenders, as its interests may appear.

(ix)    This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the

application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested.

**MISCELLANEOUS**

20.    <u>Limitation on Section 506(c) Claims</u>.  Subject to entry of the Final Order and as additional adequate protection for the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders, or any of their respective claims, the Carve-Out, or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent, as applicable, of the DIP Agent (at the direction of the DIP Required Lenders).  No action, inaction or acquiescence by the DIP Agent or the DIP Lenders shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Agent or the DIP Lenders, any of their respective claims, the Carve-Out, or the DIP Collateral.

21.    <u>No Marshaling</u>.  The DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.  Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after an Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents.

22.    <u>Equities of the Case Waiver Upon Entry of Final Order</u>.  The DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders shall each be entitled to all of the

rights and benefits of section 552(b) of the Bankruptcy Code, and (b) no person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Prepetition Collateral.

23.    <u>Additional Perfection Measures</u>.  The DIP Liens and the Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim Order.  None of the Debtors, the DIP Agent, the Prepetition Agents or the Prepetition Lenders shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens.

(a)    If the DIP Agent, at the direction of the DIP Required Lenders, in their sole discretion, chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens, the DIP Agent is hereby authorized, but not directed, at the direction of the DIP Required Lenders, to take such action or to request that the Debtors take such action on its behalf (and the Debtors are hereby authorized and directed to take such action) and:

(i)        any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)        no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)        In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Agent may, at the direction of the DIP Required Lenders, in their sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of the Collateral, and such filing by the DIP Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

24.        <u>Application of Collateral Proceeds</u>.  To the extent required by this Interim Order and the DIP Loan Documents, after an Event of Default, the Debtors are hereby authorized and directed to remit to the DIP Agent, subject to the payment of or reserve for the Carve-Out, one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Agent or the DIP Lenders to retain and apply all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Loan Documents.  In furtherance of the foregoing:

(a)        all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first priority security interest in favor of the DIP Agent (or its designee);

(b)      upon the occurrence of the Termination Date and the expiration of the Remedies Notice Period, each bank or other financial institution with an account of any Debtor is hereby authorized and instructed to:  (i) comply at all times with any instructions originated by the DIP Agent (or its designee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Agent (or its designee) by wire transfer (to such account as the DIP Agent (or its designee) shall specify, or in such other manner as the DIP Agent (or its designee) shall direct) all such cash, securities, investment property and other items held by it; and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance as against the DIP Agent (or its designee);

(c)      any deposit account control agreement executed and delivered by any bank or other financial institution, any Debtor and the DIP Agent in connection with the DIP Loan Documents shall establish control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations; and

(d)      any deposit account control agreement executed and delivered by any bank or other financial institution, any Debtor and the Prepetition Agents prior to the Petition Date in connection with the Prepetition Loan Documents shall establish co-control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations (provided that primary control rights shall vest in the DIP Agent), and all rights thereunder in favor of the Prepetition Agents shall inure also to the benefit of, and shall be exercisable exclusively by, the

DIP Agent, until all of the DIP Obligations have been indefeasibly paid in full, at which time exclusive control shall automatically revert to the Prepetition Agent.

25.    <u>Access to Collateral</u>.  Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the DIP Lenders contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon three (3) business days' written notice to the landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Loan Documents, or a default by any of the Debtors of any of their obligations under this Interim Order has occurred and is continuing or that the Termination Date has occurred, the DIP Agent, at the direction of the DIP Required Lenders, (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent or the DIP Required Lenders (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph, without interference from lienholders, landlords or licensors thereunder, subject to such lienholders, landlords or licensors rights under applicable law, provided, however, that the DIP Required Lenders shall pay only base rent payable during the period of such occupancy or use by the DIP Agent or the DIP Lenders, as the case may be, calculated on *a per diem* basis.  Nothing herein shall require the Debtors, the DIP

Agent or the DIP Lenders to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Agent and the DIP Lenders in this paragraph.

26.     <u>Cash Management Systems</u>.  The Debtors are authorized to maintain their cash management system in a manner consistent with the DIP Loan Documents, this Interim Order, and any order of this Court approving the maintenance of the Debtors' cash management system, <u>provided</u>, <u>however</u>, that such order is and remains at all times on terms and conditions acceptable to the DIP Required Lenders and such order is not inconsistent with the terms specified herein or the DIP Loan Documents, and, after the Termination Date and the repayment of the DIP Obligations in full, on terms and conditions acceptable to the Prepetition Lenders.

27.     <u>Delivery of Documentation.</u>  The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Agent, counsel to the DIP Lenders, and, after the Termination Date and the repayment of the DIP Obligations in full, counsel to the Prepetition Lenders, all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings, and/or filings that are either (i) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Agent and/or the DIP Lenders pursuant to the DIP Loan Documents, or the Prepetition Agents, as the case may be (ii) requested by the DIP Agent and/or the DIP Required Lenders (or their legal and financial advisors), or by the Prepetition Agent and/or the Prepetition Lenders (or their advisors), as the case may be.

28.     <u>Access to Books and Records</u>.  The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with, and provide to the DIP Agent and the DIP

Required Lenders all such information as required or allowed under the DIP Loan Documents, the provisions of this Interim Order or that is afforded to the Creditors' Committee and/or the Creditors' Committee's respective legal or financial advisors, (c) permit, upon one (1) business day's notice, representatives of the DIP Lenders to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit representatives of the DIP Lenders to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition and operations.

29.    <u>Lenders Not Responsible Persons</u>.  In (a) making the decision to make the DIP Term Loans; (b) administering the DIP Term Loans; (c) extending other financial accommodations to the Debtors under the DIP Loan Documents; (d) making the decision to make the loans and financial accommodations under the Prepetition Loan Documents; (e) administering the loans and financial accommodations extended under the Prepetition Loan Documents; (f) extending other financial accommodations to the Debtors under the Prepetition Loan Documents; and (g) making the decision to collect the indebtedness and obligations of the Debtors, none of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders shall be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in

any way as a responsible person, or as an owner or operator under any applicable law, including

without limitation, any environmental law (including but not limited to the Comprehensive

Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource

Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to

time, or any similar federal or state statute).

30.     <u>Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this

Interim Order shall be binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition

Agents, the Prepetition Lenders and each of their respective successors and assigns, and shall

inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents, the

Prepetition Lenders and each of their respective successors and assigns including, without

limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator

or representative, or similar person appointed in a case for any Debtor under any chapter of the

Bankruptcy Code.  The terms and provisions of this Interim Order shall also be binding on all of

the Debtors' creditors, equity holders, and all other parties in interest, including, but not limited

to a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

31.     <u>Binding Nature of Agreement</u>.  Each of the DIP Loan Documents to which any of

the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the

Debtors party thereto, enforceable in accordance with their terms.  The DIP Loan Documents

have been or will be properly executed and delivered to the DIP Agent or the DIP Lenders by the

Debtors, no later than one business day after entry of this Interim Order.  Unless otherwise

consented to in writing, the rights, remedies, powers, privileges, liens, and priorities of the DIP

Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Lenders provided for in this

Interim Order, the DIP Loan Documents, or otherwise shall not be modified, altered or impaired

in any manner by any subsequent order (including a confirmation or sale order), by any plan of reorganization or liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or in any subsequent case under the Bankruptcy Code.

32.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lenders all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, prior to the date of receipt by the DIP Agent and the Prepetition Agents of written notice of the effective date of such action or (b) the validity and enforceability of any lien or priority authorized or created under this Interim Order or pursuant to the DIP Loan Documents. Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders prior to written notice to the DIP Agent and the Prepetition Agents of the effective date of such action, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligations or liability.

33.    <u>Collateral Rights</u>.  If any party who holds a lien or security interest in DIP Collateral or Prepetition Collateral that is junior and/or subordinate to the DIP Liens, the Replacement Liens or the Prepetition Liens in such DIP Collateral or Prepetition Collateral

receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral prior to the indefeasible payment in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) and the complete satisfaction of (a) all DIP Obligations under the DIP Loan Documents and termination of the commitment in accordance with the DIP Loan Documents and (b) the Prepetition Indebtedness under the Prepetition Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral or Prepetition Collateral in trust for the DIP Lenders and the Prepetition Lenders and shall immediately turn over such proceeds for application by the DIP Agent and the Prepetition Agents to repay the DIP Obligations and the Prepetition Indebtedness in accordance with the DIP Loan Documents, the Prepetition Loan Documents and this Interim Order until indefeasibly paid in full.

34.     <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Agent, DIP Lenders, Prepetition Agents or Prepetition Lenders may have to bring or be heard on any matter brought before this Court.

35.     <u>Sale/Conversion/Dismissal</u>.

(a)     It shall be an Event of Default under the DIP Financing Agreement if any Debtor breaches the Sale Milestone Covenant set forth in section 7.01(r) of the DIP Financing Agreement.

(b)     The Debtors shall not seek or support entry of any order that provides for either the sale of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code to any party unless, in connection with such event, (i) the proceeds of such sale are or will be paid to the DIP Agent and DIP Lenders on

account of the DIP Obligations and the commitments under the DIP Loan Documents are terminated in accordance therewith on the closing date of such sale, (ii) the sale is an Approved Sale, and (iii) the proceeds of such Approved Sale are distributed in accordance with the Sale Order.

(c)       If an order dismissing or converting any of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise, or appointing a chapter 11 trustee or a responsible officer or examiner with expanded powers, is at any time entered, such order shall provide that (a) the DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the Adequate Protection Superpriority Claims granted hereunder and in the DIP Loan Documents shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order and the DIP Loan Documents until all DIP Loan Obligations are indefeasibly paid in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance with the DIP Loan Documents and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the adequate protection obligations set forth in paragraph 11.

36.    <u>Limits on Lenders' Liability</u>.  Nothing in this Interim Order or in any of the DIP Loan Documents, the Prepetition Loan Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or, subject to Paragraph 15 of this Interim Order, the Prepetition Agents or the Prepetition Lenders, of any liability for any claims arising from any and all

activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

37.     Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, the Requested Relief, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Loan Documents (or words of similar import), the terms and provisions of this Interim Order shall govern.

38.     No Third Party Beneficiary.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

39.     Survival.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, the DIP Superpriority Claim and the Adequate Protection Superpriority Claims shall continue in these Chapter 11 Cases, in any such successor case or after any such dismissal.  Except as otherwise provided herein, the DIP Liens, the Replacement Liens, the DIP Superpriority Claim and the Adequate Protection Superpriority Claims shall maintain their priorities as provided in this Interim Order, the Final Order, and the DIP Term Sheet Documentation, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to

be provided by the DIP Agent or the DIP Lenders in accordance with the Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission until (i) all DIP Loan Obligations are indefeasibly paid in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) and completely satisfied, and the commitments under the DIP Term Sheet Documentation are terminated in accordance therewith, and (ii) the Prepetition Indebtedness has been or is deemed to have been satisfied in accordance with the Bankruptcy Code.

40.     <u>Adequate Notice/Scheduling of Final Hearing</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules and the Local Rules, such notice was sufficient under the particular circumstances and no other or further notice of the request for relief granted at the Interim Hearing is required.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to any known party affected by the terms of this Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be *actually received* no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Eastern) by the following: (a) proposed counsel to the Debtors, Sidley Austin LLP, 555 West Fifth Street, Los Angeles, CA 90013 (Attn.: Christina M. Craige); (b) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Robert S. Brady and Edmon L. Morton; (c) counsel to the TCP DIP Lenders, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022 (Attn:

David M. Hillman and Kelly V. Knight) and Landis, Roth & Cobb, LLP, 919 Market Street, Wilmington, DE 19801 (Attn: Adam G. Landis and Kerri K. Mumford); (d) counsel to the Z Capital DIP Lenders, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006 (Attn: James L. Bromley and Kara A. Hailey) and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St., Wilmington, DE 19801 (Attn: Derek C. Abbott); (e) counsel to the DIP Agent and the Prepetition Agents, Thompson Hine LLP, 335 Madison Avenue, 12th Floor, New York, New York 10017 (Attn: Curtis L. Tuggle); (f) Wells Fargo, in its capacity as Depository Bank; (g) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801; and (h) any Creditors' Committee appointed in these cases.  The Court shall conduct a Final Hearing on the Requested Relief commencing on [August ___,] 2018 at [_____] (Eastern).

41.     <u>Immediate Binding Effect; Entry of Interim Order</u>.  This Interim Order shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

42.     <u>Proofs of Claim</u>.  Notwithstanding any order of this Court to the contrary, the Prepetition Agents, Prepetition Lenders, DIP Agent and DIP Lenders hereby are relieved of any obligation or requirement to file proofs of claim in these Chapter 11 Cases with respect to any Prepetition Indebtedness or DIP Obligations and any other claims or liens granted hereunder or created hereby.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition Agents and the Prepetition Lenders upon approval of this Interim Order, and the Prepetition Agents and the Prepetition Lenders shall be treated under section 502(a) of the Bankruptcy Code as if they each have filed a proof of claim.  Notwithstanding the foregoing,

the Prepetition Agents and the Prepetition Lenders are hereby authorized and entitled, in their discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Case(s) for any claim allowed herein.

43.   <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.


Dated:  Wilmington, Delaware
            _____, 2018


_____

UNITED STATES BANKRUPTCY JUDGE

01:23488630.1

EXHIBIT A

**BUDGET**

[see attached]

**Exhibit B**

**DIP Financing and Guaranty Agreement**

# DIP FINANCING AND GUARANTY AGREEMENT

Dated as of August [•], 2018

by and among

**RM HOLDCO LLC,**

as the Parent,

and

**RM OPCO LLC,**
as the Borrower,

and

**THE PARENT AND EACH SUBSIDIARY OF THE PARENT LISTED
AS A GUARANTOR ON THE SIGNATURE PAGES HERETO,**
as Guarantors,

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**

as Lenders,

and

**WELLS FARGO BANK, N.A.,**

as Agent

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS; CERTAIN TERMS** ................................................................3

Section 1.01   Definitions ...........................................................................................3
Section 1.02   Terms Generally ................................................................................31
Section 1.03   Certain Matters of Construction .......................................................31
Section 1.04   Accounting and Other Terms ............................................................32
Section 1.05   Time References .................................................................................32

**ARTICLE II THE DIP TERM LOANS** ........................................................................33

Section 2.01   Commitments .....................................................................................33
Section 2.02   Procedure for Borrowing ..................................................................34
Section 2.03   Repayment of the DIP Term Loan; Evidence of Debt ......................35
Section 2.04   Interest ...............................................................................................36
Section 2.05   Termination and Reduction of Commitment; Prepayment of DIP Term
              Loans; Continuing Use of Cash Collateral ........................................37
Section 2.06   Fees ....................................................................................................38
Section 2.07   Super Priority Nature of Obligations and Lenders' Liens ................38
Section 2.08   No Discharge; Survival of Claims .....................................................39
Section 2.09   Release and Waiver of any Primary Rights .......................................39
Section 2.10   Security Interest .................................................................................40
Section 2.11   Taxes ..................................................................................................40
Section 2.12   Increased Costs and Reduced Return .................................................43

**ARTICLE III [RESERVED]** .........................................................................................45

**ARTICLE IV APPLICATION OF PAYMENTS; DEFAULTING LENDERS** ....................45

Section 4.01   Payments; Computations and Statements ..........................................45
Section 4.02   Sharing of Payments .........................................................................45
Section 4.03   Apportionment of Payments ..............................................................46
Section 4.04   Defaulting Lenders ............................................................................47

**ARTICLE V CONDITIONS TO CLOSING** ...................................................................48

Section 5.01   Conditions Precedent to Effectiveness ..............................................48
Section 5.02   Conditions Precedent to All Borrowings ...........................................51

**ARTICLE VI REPRESENTATIONS AND WARRANTIES** .............................................52

Section 6.01   Representations and Warranties of the Credit Parties .......................52

**ARTICLE VII COVENANTS OF THE CREDIT PARTIES** .............................................55

Section 7.01   Affirmative Covenants ......................................................................55
Section 7.02   Negative Covenants ...........................................................................65

ACTIVE 234178906
ACTIVE 234178906v.17

**ARTICLE VIII [RESERVED]** ...................................................................................................**71**

**ARTICLE IX EVENTS OF DEFAULT** ....................................................................................**71**

Section 9.01    Events of Default ......................................................................................71

**ARTICLE X AGENT** .................................................................................................................**77**

Section 10.01    Appointment.............................................................................................77
Section 10.02    Nature of Duties; Delegation ...................................................................78
Section 10.03    Rights, Exculpation, Etc ..........................................................................79
Section 10.04    Reliance....................................................................................................80
Section 10.05    Indemnification ........................................................................................80
Section 10.06    Agent Individually ...................................................................................80
Section 10.08    Successor Agent .......................................................................................81
Section 10.09    Collateral Matters.....................................................................................81
Section 10.10    Agency for Perfection ..............................................................................83
Section 10.11    No Reliance on the Agent's Customer Identification Program ................83
Section 10.12    No Third Party Beneficiaries ...................................................................83
Section 10.13    No Fiduciary Relationship .......................................................................83
Section 10.14    Reports; Confidentiality; Disclaimers .....................................................84
Section 10.15    [Reserved] ................................................................................................84
Section 10.16    Cash Management.....................................................................................84
Section 10.17    Agent May File Proofs of Claim ..............................................................85

**ARTICLE XI GUARANTY**........................................................................................................**86**

Section 11.01    Guaranty ..................................................................................................86
Section 11.02    Guaranty Absolute ...................................................................................86
Section 11.03    Waiver ......................................................................................................87
Section 11.04    Continuing Guaranty; Assignments .........................................................88
Section 11.05    Subrogation ..............................................................................................88

**ARTICLE XII MISCELLANEOUS** ..........................................................................................**89**

Section 12.01    Notices, Etc .............................................................................................89
Section 12.02    Amendments, Etc .....................................................................................90
Section 12.03    No Waiver; Remedies, Etc .......................................................................91
Section 12.04    Expenses; Taxes; Attorneys' Fees ...........................................................92
Section 12.05    Right of Set-off .......................................................................................93
Section 12.06    Severability ..............................................................................................93
Section 12.07    Assignments and Participations ...............................................................93
Section 12.08    Counterparts .............................................................................................96
Section 12.09    GOVERNING LAW .................................................................................97
Section 12.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE ........97
Section 12.11    WAIVER OF JURY TRIAL, ETC ............................................................98
Section 12.12    Consent by the Agent, Lenders................................................................98
Section 12.13    No Party Deemed Drafter ........................................................................98
Section 12.14    Reinstatement; Certain Payments.............................................................98
Section 12.15    Indemnification; Limitation of Liability for Certain Damages.................99

ACTIVE 234178906
ACTIVE 234178906v.17

Section 12.16   Records.................................................................................................100
Section 12.17   Binding Effect.......................................................................................100
Section 12.18   Interest..................................................................................................100
Section 12.19   Confidentiality ......................................................................................101
Section 12.20   Public Disclosure ..................................................................................102
Section 12.21   Integration ............................................................................................102
Section 12.22   USA PATRIOT Act...............................................................................102

ACTIVE 234178906
ACTIVE 234178906v.17

SCHEDULE AND EXHIBITS

Schedule 1.01(A)        Lender Commitments
Schedule 6.01(e)        Prepetition Obligations
Schedule 7.01(p)        Cash Management Accounts
Schedule 7.02(a)        Existing Liens
Schedule 7.02(b)        Existing Indebtedness
Schedule 7.02(e)        Existing Investments


Exhibit A        [Reserved]
Exhibit B        [Reserved]
Exhibit C        Form of Notice of Borrowing
Exhibit D        Form of Assignment and Acceptance
Exhibit E        Form of Lender Note
Exhibit F        Bidding Procedures
Exhibit G        Security Agreement
Exhibit H        Initial Approved Budget
Exhibit I        Acknowledgement Letter

ACTIVE 234178906
ACTIVE 234178906v.17

## DIP FINANCING AND GUARANTY AGREEMENT

DIP Financing and Guaranty Agreement, dated as of August [●], 2018 (as amended, restated, amended and restated, modified or supplemented from time to time, this "Agreement") by and among RM Holdco LLC, a Delaware limited liability company (the "Parent"), RM Opco LLC, a Delaware limited liability company ("RM Opco" or the "Borrower"), each subsidiary of the Borrower listed as a "Guarantor" on the signature pages hereto (together with the Parent, the "Guarantors" and each a "Guarantor," and, collectively and together with the Borrower, the "Credit Parties" and each individually a "Credit Party"), the lenders from time to time party hereto (each a "Lender" and collectively, the "Lenders") and Wells Fargo Bank, N.A., as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Agent").

## RECITALS

**WHEREAS**, on August [●], 2018 (the "Petition Date"), Parent, the Borrower and the other Credit Parties commenced bankruptcy cases (the "Chapter 11 Cases"), jointly administered at Chapter 11 Case No. 18-[●]-[●],[1] by filing separate voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended and in effect from time to time, the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Credit Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, prior to the Petition Date, certain Lenders provided financing to the Borrower pursuant to that certain Financing Agreement (First Lien), dated as of March 21, 2012, as amended by Amendment No. 1 to Financing Agreement (First Lien), dated as of November 2, 2012, as further amended by Amendment No. 2 to Financing Agreement (First Lien), dated as of April 26, 2013, as further amended by Amendment No. 3 to Financing Agreement (First Lien), dated as of November 21, 2014, as further amended by Amendment No. 4 to Financing Agreement (First Lien), dated as of June 17, 2015, as further amended by Amendment No. 5 to Financing Agreement (First Lien), dated as of March 22, 2016 and effective as of March 21, 2016, as further amended by Amendment No. 6 to Financing Agreement (First Lien), dated as of April 28, 2016, as further amended by Amendment No. 7 to Financing Agreement (First Lien), dated as of July 15, 2016, as further amended by Amendment No. 8 to Financing Agreement (First Lien), dated as of February 21, 2017, as further amended by Amendment No. 9 to Financing Agreement (First Lien), dated as of June 5, 2017, as further amended by Amendment No. 10 to Financing Agreement (First Lien), dated September 8, 2017, as further amended by Amendment No. 11 to Financing Agreement (First Lien), dated December 29, 2017 and as further amended by Amendment No. 12 to Financing Agreement (First Lien), dated June 20, 2018 (as so amended and as otherwise amended, restated, amended and restated, modified or otherwise supplemented from time to time prior to the Petition Date, the "Prepetition First Lien Credit Agreement" and the Credit Documents under and as defined therein, the "Prepetition First Lien Credit Documents") among Borrower, Parent, the other Credit Parties party thereto, the financial institutions from time to time

[1] Each Credit Party's Chapter 11 Case No. is as follows: [__] (Parent), [__] (Borrower), [__] (RM Chevys LLC), [__] (RM Acapulco LLC), [__] (RM El Torito LLC) and [__] (RM HQ LLC).

ACTIVE 234178906
ACTIVE 234178906v.17

party thereto as Lenders, as applicable (in each case, under and as defined therein, collectively, the "Prepetition First Lien Lenders"), and Wells Fargo Bank, N.A., as "Agent" (in such capacity, together with its successors and assigns, the "Prepetition First Lien Agent");

WHEREAS, prior to the Petition Date, certain Lenders provided financing to the Borrower pursuant to that certain Amended and Restated Financing Agreement (Second Lien), dated as of November 21, 2014, as amended by Amendment No. 1 to Amended and Restated Financing Agreement (Second Lien), dated as of June 17, 2015, as further amended by Amendment No. 2 to Amended and Restated Financing Agreement (Second Lien), dated as of July 15, 2016, as further amended by Amendment No. 3 to Amended and Restated Financing Agreement (Second Lien), dated as of November 18, 2016, as further amended by Amendment No. 4 to Amended and Restated Financing Agreement (Second Lien), dated as of February 17, 2017, as further amended by Amendment No. 5 to Amended and Restated Financing Agreement (Second Lien), dated as of June 5, 2017, as further amended by Amendment No. 6 to Amended and Restated Financing Agreement (Second Lien), dated as of September 8, 2017, as further amended by Amendment No. 7 to Amended and Restated Financing Agreement (Second Lien), dated as of November 20, 2017, as further amended by Amendment No. 8 to Amended and Restated Financing Agreement (Second Lien), dated as of December 29, 2017 and as further amended by Amendment No. 9 to Amended and Restated Financing Agreement (Second Lien), dated as of June 20, 2018 (as so amended, restated, amended and restated, modified or otherwise supplemented prior to the Petition Date, the "Prepetition Second Lien Credit Agreement" and the Credit Documents under and as defined therein, the "Prepetition Second Lien Credit Documents"; the Prepetition Second Lien Credit Agreement together with the Prepetition First Lien Credit Agreement, collectively shall hereinafter be referred to as the "Prepetition Credit Agreements" or, individually, a "Prepetition Credit Agreement" and the Prepetition Second Lien Credit Documents together with the Prepetition First Lien Credit Documents, collectively shall hereinafter be referred to as the "Prepetition Credit Documents" or, individually, a "Prepetition Credit Document") among Borrower, Parent, the other Credit Parties party thereto, the financial institutions from time to time party thereto as Lenders (under and as defined therein, collectively, the "Prepetition Second Lien Lenders" and together with the Prepetition First Lien Lenders, the "Prepetition Lenders"), and Wells Fargo Bank, N.A., as "Agent" (in such capacity, together with its successors and assigns, the "Prepetition Second Lien Agent" and, collectively, in its capacity as the Prepetition First Lien Agent, the "Prepetition Agents");

WHEREAS, the Parent, the financial institutions party thereto from time to time as Lenders under and as defined therein and Wells Fargo Bank, N.A., as "Agent" are parties to that certain unsecured Subordinated Convertible Loan Agreement, dated as of March 21, 2012 (as amended, restated, amended and restated, modified or otherwise supplemented prior to the Petition Date, the "Parent Subordinated Credit Facility" and the Credit Documents under and as defined therein, the "Parent Subordinated Credit Documents");

WHEREAS, the Borrower has requested that the Lenders provide a senior secured superpriority, multi-draw term loan credit facility to the Borrower of up to Five Million Five Hundred Thousand Dollars ($5,500,000) in the aggregate; the cash proceeds of the term loans will be used by the Credit Parties (a) to pay transaction fees and expenses related to, *inter alia*, this Agreement and any Approved Sale (as defined below), (b) the payment of authorized costs and expenses of the Chapter 11 Cases and (c) to fund general corporate needs, including working

- 2 -

capital needs and payments due, if any, under this Agreement, in each case, solely in accordance with the Approved Budget (as defined below) (subject to the Permitted Variance (as defined below)) and the Financing Orders (as defined below);

WHEREAS, the Credit Parties have agreed to secure all of their Obligations under this Agreement and the other Credit Documents by granting to Agent, for the benefit of the Lenders and the other secured parties under and pursuant to the Credit Documents, a security interest in and lien upon the Collateral having the priority specified in the Financing Orders; and

WHEREAS, the Lenders are severally, and not jointly, willing to extend such credit to Borrower, subject to the terms and conditions hereinafter set forth.

In consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01    Definitions.  As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"Acceptable Chapter 11 Plan" means a chapter 11 plan that is in form and substance reasonably acceptable to the Required Lenders.

"Acceptable Confirmation Order" means an order, in form and substance reasonably acceptable to the Required Lenders, confirming a chapter 11 plan.

"Acceptable Disclosure Statement" means a disclosure statement in support of a chapter 11 plan that is in form and substance reasonably acceptable to the Required Lenders

"Account Debtor" means each debtor, customer or obligor in any way obligated on or in connection with any Account Receivable, including any Credit Card Issuer or Credit Card Processor.

"Account Receivable" means, with respect to any Person, any and all rights of such Person to payment for goods sold and/or services rendered, including accounts, general intangibles (including all Credit Card Receivables and all rights to payment, including those arising in connection with bank and non-bank credit cards) and any and all such rights evidenced by chattel paper, instruments or documents, whether due or to become due and whether or not earned by performance, and whether now or hereafter acquired or arising in the future, and any proceeds arising therefrom or relating thereto.

"Action" has the meaning specified therefor in Section 12.12.

"Additional Amount" has the meaning specified therefor in Section 2.11(a).

- 3 -

"Advisor Management Fee Agreements" means the TCP Management Fee Agreement and the Z Capital Management Fee Agreement.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  Notwithstanding anything herein to the contrary, in no event shall the Agent or any Lender be considered an "Affiliate" of any Credit Party.

"Agent" has the meaning specified therefor in the preamble hereto.

"Agent's Account" means an account at a bank designated by the Agent from time to time as the account into which the Credit Parties shall make all payments to the Agent for the benefit of the Agent and the Lenders under this Agreement and the other Credit Documents.

"Agreement" has the meaning specified therefor in the preamble hereto.

"Anti-Terrorism Laws" means any laws relating to terrorism or money laundering, including, without limitation, (i) the Money Laundering Control Act of 1986 (*i.e.*, 18 U.S.C. §§ 1956 and 1957), (ii) the Bank Secrecy Act, as amended by the USA PATRIOT Act, (iii) the laws, regulations and Executive Orders administered by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), (iv) the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and implementing regulations by the United States Department of the Treasury, (v) any law prohibiting or directed against terrorist activities or the financing of terrorist activities (*e.g.*, 18 U.S.C. §§ 2339A and 2339B), or (vi) any similar laws enacted in the United States or any other jurisdictions in which the parties to this agreement operate, as any of the foregoing laws may from time to time be amended, renewed, extended, or replaced and all other present and future legal requirements of any Governmental Authority governing, addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and any regulations promulgated pursuant thereto.

"Approved Budget" means the Initial Approved Budget; provided, that upon approval of any Proposed Budget pursuant to Section 7.01(a)(ii), such Proposed Budget shall thereafter constitute the Approved Budget (as such budget shall be modified pursuant to Section 7.01(a)(iii) or otherwise with the consent of the Required Lenders).

"Approved Sale" means a sale pursuant to the Successful Bid in accordance with the Bidding Procedures and approved by the Bankruptcy Court and consummated in accordance with and pursuant to the Sale Order.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee in accordance with Section 12.07 hereof and substantially in the form of Exhibit D hereto or such other form acceptable to the Agent and the Required Lenders.

"Asserted CP Failure" has the meaning specified therefor in the definition of "Defaulting Lender."

- 4 -

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief financial officer, chief restructuring officer, president or executive vice president of such Person or any individual designated by the Board of Directors or managing member of such Person as an "Authorized Officer."

"Avoidance Action" means any estate cause of action under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning specified therefor in the recitals to this Agreement.

"Bankruptcy Court" has the meaning specified therefor in the recitals to this Agreement.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bidding Procedures" has the meaning specified therefor in Section 5.01(k).

"Bid Procedures Motion" has the meaning specified therefor in Section 7.01(r)(ii).

"Bidding Procedures Order" has the meaning specified therefor in Section 7.01(r)(iii).

"Blocked Person" means any Person (a) that is prohibited pursuant to any of the OFAC Sanctions Programs, including a Person named on OFAC's list of Specially Designated Nationals and Blocked Persons, (b) that is owned or controlled by, or that owns or controls, or that is acting for or on behalf of, any Person described in the preceding clause (a), (c) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law or (d) that is affiliated or associated with a Person described in the preceding clauses (a) through (c) above.

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Board of Directors" means, (a) with respect to any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) with respect to a partnership, the board of directors of the general partner of the partnership (or if such general partner is a limited liability company, the board of directors of such limited liability company), (c) with respect to a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Borrowing" has the meaning specified therefor in Section 2.02(a).

- 5 -

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"Capital Expenditures" means, with respect to any Person for any period, the sum of the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed (including pursuant to a Capitalized Lease), including Consolidated Restaurant Pre-Opening Costs.

"Capitalized Lease" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is (a) required under GAAP to be capitalized on the balance sheet of such Person or (b) a transaction of a type commonly known as a "synthetic lease" (i.e., a lease transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes).

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning set forth in the Financing Order.

"Cash Collateral" means, all "Cash Collateral" as defined by Section 363 of the Bankruptcy Code, all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Credit Parties in which any of the Prepetition Agents or the Agent has a security interest, Lien or mortgage, whether such security interests, liens or mortgages existed as of the commencement of the Chapter 11 Cases or arise thereafter pursuant to a Financing Order, and whether the property converted to cash existed as of the commencement of the Chapter 11 Cases or arose or was generated thereafter, including, without limitation, all proceeds from the sale or other disposition of the Prepetition Collateral or Collateral.

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within one year from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (c) certificates of deposit maturing not more than six months after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition; and (f) marketable tax exempt securities rated A or higher by Moody's or

- 6 -

A+ or higher by Standard & Poor's, in each case, maturing within one year from the date of acquisition thereof.

"Cash Management Accounts" means the bank accounts of each Credit Party (other than accounts (1) specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Credit Party's employees, (2) that do not contain deposits in an aggregate amount in excess of $10,000 for any one account and (3) any accounts established at a Cash Management Bank for purposes of collecting any Good Faith Deposit (collectively, the "Excluded Accounts")) maintained at one or more Cash Management Banks listed on Schedule 7.01(p).

"Cash Management Bank" has the meaning specified therefor in Section 7.01(p).

"Cash Management Motion" means the motion filed with the Bankruptcy Court by the Credit Parties seeking entry of the Cash Management Order.

"Cash Management Order" means an order of the Bankruptcy Court authorizing the continuation of the Credit Parties' Cash Management System on a postpetition basis.

"Cash Management System" means the cash management system in place among the Credit Parties as of the Petition Date, as described in and approved under the Cash Management Order.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Closing Fee" has the meaning specified therefor in Section 2.06(a).

"Collateral" has the meaning specified in the Security Agreement, and shall include all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Credit Party upon which a Lien is granted or purported to be granted by such Credit Party, whether under the Financing Order, this Agreement, the Security Documents or under any other documents, as security for all or any part of the Obligations; provided, however, that "Collateral" shall not include (i) any Good Faith Deposit unless and until the entry of a further order of the Bankruptcy Court deeming such Good Faith Deposit(s) to be "property of the estate" of any or all of the Credit Parties, (ii) any Avoidance Actions, except that, subject to and solely upon entry of the Final Order, "Collateral" shall include proceeds of any Avoidance Actions, or

ACTIVE 234178906
ACTIVE 234178906v.17

(iii) personal property or assets that are excluded from the definition of "Collateral" in the Security Agreement.

"Collections" means *all* cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds), and the proceeds thereof.

"Committees" mean collectively, any official committee of unsecured creditors, as well as any other official committee, formed, appointed or approved in the Chapter 11 Cases and each of such Committees shall be referred to herein as a Committee.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Controlled Investment Affiliate" means, as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

- 8 -

"Credit Card Agreements" means, with respect to the Credit Parties, all agreements now or hereafter entered into by any Credit Party with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Credit Card Issuer" means any Person (other than any Credit Party) who issues or whose members issue credit or debit cards, including, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., VISA, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, credit or debit cards issued by or through American Express Travel Related Services Company, Inc. and Novus Services, Inc.

"Credit Card Processor" means, with respect to each Credit Party, any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any of such Credit Party's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Receivables" means, with respect to each Credit Party, collectively, (a) all present and future rights of such Credit Party to payment from any Credit Card Issuer, Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of such Credit Party to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise.

"Credit Documents" means this Agreement, the Notes (if any), the Security Agreement, the Financing Orders and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing the DIP Term Loan or any other Obligation, in each case, as the same may be amended, restated, extended, renewed, replaced, supplemented or otherwise modified from time to time.

"Credit Parties" has the meaning set forth in the recitals hereto.

"Credit Parties' WC Obligations" has the meaning specified in Section 7.01(y).

"Credit Support Fee" has the meaning specified therefor in the Reimbursement and Fee Agreement.

"CRO" means Jonathan Tibus, as the chief restructuring officer of the Credit Parties, or such other individual whose identity and terms of retention shall be reasonably acceptable to the Required Lenders.

"Debtor Relief Law" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

ACTIVE 234178906
ACTIVE 234178906v.17

receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender that:

(a) has failed to (i) fund all or any portion of its DIP Term Loan within two (2) Business Days of the date that the DIP Term Loan was required to be funded hereunder unless such Person notifies the Agent and the Borrower in writing that such failure is the result of such Person's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied (any such failure, an "Asserted CP Failure") or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due;

(b) has notified the Borrower or the Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect unless (x) such writing or public statement relates to such Person's obligation to fund the DIP Term Loan hereunder and (y) states that such position is based on such Person's determination that an Asserted CP Failure has occurred (which Asserted CP Failure, together with any applicable default, shall be specifically identified in such writing or public statement) and cannot be satisfied;

(c) has failed, within three (3) Business Days after written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Person shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Agent and the Borrower); or

(d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Person or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

Any determination by the Required Lenders that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Person shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

- 10 -

"Delayed Draw DIP Term Loan" has the meaning specified in Section 2.01(b).

"Delayed Draw DIP Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to make Delayed Draw DIP Term Loans to the Borrower in the aggregate principal amount set forth opposite such Lender's name on the Schedule 1.01(A), under the caption "Delayed Draw DIP Term Loan Commitment" as amended to reflect each Assignment and Assumption executed by such Lender and as such amount may be reduced pursuant to this Agreement.  The aggregate amount of the Delayed Draw DIP Term Loan Commitments of all Lenders on the Effective Date shall be $2,500,000.

"DIP Term Loan" means, individually or collectively, as the context may require, the Initial DIP Term Loans and the Delayed Draw DIP Term Loans.  For all purposes hereunder, each reference to a "DIP Term Loan" in this Agreement and in the Credit Documents shall be deemed to include the Initial DIP Term Loan and any funded Delayed Draw DIP Term Loan, which, for the avoidance of doubt, constitute a single "class" and a single tranche with the Initial DIP Term Loan.

"DIP Term Loan Commitment" means, as to each Lender, the aggregate amount of such Lender's Initial DIP Term Loan Commitment and/or Delayed Draw DIP Term Loan Commitment, as applicable.

"Disbursement Account" has the meaning specified therefor in Section 2.02(c)(vi), which, for the avoidance of doubt, is a "Cash Management Account."

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person, excluding any sales of Inventory in the ordinary course of business on ordinary business terms.

"Dollar," "Dollars" and the symbol "$" each means lawful money of the United States of America.

"Effective Date" has the meaning specified therefor in Section 5.01.

"Employee Plan" means an employee benefit plan (other than a Multiemployer Plan) covered by Title IV of ERISA and maintained (or that was maintained at any time during the 6 calendar years preceding the date of any borrowing hereunder) for employees of any Credit Party or any of its ERISA Affiliates.

"Environmental Action" means any written complaint, summons, citation, directive, order, claim, litigation, investigation, inquiry, judgment, suit, demand or proceeding, or written notice of noncompliance or violation by any Governmental Authority or Person alleging potential liability arising out of or resulting from any violation of Environmental Law or Release of Hazardous Materials at, onto, or from any of the Facilities.

- 11 -

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), as such laws may be amended or otherwise modified from time to time, and any other applicable federal, state, local or foreign statute, ordinance, rule, regulation, order, judgment, decree, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or the Release of any Hazardous Materials into the environment.

"Environmental Liabilities and Costs" means all actual liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Environmental Action or any Remedial Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equity Interest" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Internal Revenue Code.

"Event of Default" means any of the events set forth in Section 9.01.

"Excluded Accounts" has the meaning specified therefor in the definition of "Cash Management Accounts."

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

ACTIVE 234178906
ACTIVE 234178906v.17

"Existing DACA" means that certain Deposit Account Control Agreement, dated as of May 17, 2012, by and among the Borrower, Wells Fargo Bank, National Association, as First Lien Agent and Second Lien Agent (in each case, under and as defined therein) and Wells Fargo Bank, National Association, as the Bank (under and as defined therein), as amended, restated, amended and restated, modified or supplemented.

"Extraordinary Receipts" means any cash received by the Parent or any of its Subsidiaries not in the ordinary course of business (and not consisting of the DIP Term Loans or of proceeds in connection with dispositions described in Section 2.05(c)(i) or proceeds described in Section 2.05(c)(ii) hereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance, (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than any cause of action against any of the Agent, the Lenders, the Prepetition Agents, or the Prepetition Lenders), (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments, and (g) any purchase price adjustment received in connection with any purchase agreement; provided, however, that neither proceeds from the Approved Sale nor any Good Faith Deposit shall be considered "Extraordinary Receipts."

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Final Availability Date" means the earlier of the Termination Date and one (1) Business Day prior to the Scheduled Termination Date.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedure as adopted by the Bankruptcy Court, from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been withdrawn, dismissed or denied (unless the Required Lenders waive such requirement), together with all extensions, modifications and amendments thereto in form and substance satisfactory to the Agent and the Lenders, which, among other matters but not by way of limitation, authorizes, on a final basis, the Credit Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens to the Agent under this Agreement and the other Credit Documents, provides for the super priority of the Agent's and the Lenders' claim and authorizes the use by the Credit Parties of their Cash Collateral in accordance with the terms of this Agreement, finds that Agent's Liens granted pursuant to Section 364 of the Bankruptcy Code shall be valid and perfected Liens in the Collateral, prior to all other Liens in the Collateral and finds and concludes that the Credit Documents (except for the Financing Orders) were negotiated in good faith and that the Agent and Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code.

"Financing Order" means, the Interim Order or the Final Order, whichever is in effect at the time of any determination made hereunder, and "Financing Orders" means the Interim Order and the Final Order, collectively.

"Fiscal Year" means the fiscal year of Parent and its Subsidiaries ending on the last Sunday of December of each calendar year.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis.

"Good Faith Deposit" means, with respect to the Stalking Horse Bidder, the Cash Deposit (as defined in the Stalking Horse APA) and, with respect to any other Qualified Bidder (as defined in the Bidding Procedures), such Qualified Bidder's Good Faith Deposit (as defined in the Bidding Procedures).

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"Governmental Authority" means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" means (a) the Parent and each Subsidiary of the Parent listed as a "Guarantor" on the signature pages hereto, and (b) each other Person which guarantees all or any part of the Obligations.

"Guaranty" means (a) the guaranty of each Guarantor party hereto contained in ARTICLE XI hereof and (b) each other guaranty, in form and substance satisfactory to the Agent and the Required Lenders, made by any other Guarantor in favor of the Agent for the benefit of the Agent and the Lenders guaranteeing all or part of the Obligations.

"Hazardous Material" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste,

- 14 -

or solid waste under Environmental Laws, (b) petroleum and its refined products or (c) polychlorinated biphenyls.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to the Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to the Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Holdout Lender" has the meaning specified therefor in Section 12.02(b).

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was created); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities of such Person under Hedging Agreements (which amount shall be calculated based on the amounts that would be payable by such Person if such Hedging Agreements were terminated on the date of determination); (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; and (j) all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer, to the extent of such Person's liability for such Indebtedness.

"Indemnified Matters" has the meaning specified therefor in Section 12.15(a).

"Indemnitees" has the meaning specified therefor in Section 12.15(a).

- 15 -

"Initial Approved Budget" has the meaning specified therefor in Section 5.01(b).

"Initial DIP Term Loan" has the meaning specified in Section 2.01(a).

"Initial DIP Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to make an Initial DIP Term Loans to the Borrower in the aggregate principal amount set forth opposite such Lender's name on Schedule 1.01(A) under the caption "Initial DIP Term Loan Commitment."  The aggregate amount of the Initial DIP Term Loan Commitments on the Effective Date is $3,000,000.00.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intellectual Property" means all foreign and domestic (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, Internet domain names, logos, symbols, slogans, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby, including without limitation all modifications and renewals of same (collectively, "Trademarks"); (ii) inventions, discoveries and ideas, whether patentable or not, and all patents, registrations, and applications therefor, including without limitation divisions, continuations, continuations-in-part and renewal applications, and including without limitation renewals, extensions and reissues (collectively, "Patents"); (iii) confidential and proprietary information, trade secrets and know-how, including without limitation processes, schematics, databases, formulae, drawings, prototypes, models, designs and customer lists (collectively, "Trade Secrets"); (iv) published and unpublished works of authorship, whether copyrightable or not, copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); and (v) all other intellectual property or proprietary rights and claims or causes of action arising out of or related to any infringement, misappropriation or other violation of any of the foregoing, including without limitation rights to recover for past, present and future violations thereof (collectively, "Other Proprietary Rights").

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications and amendments thereto, in form and substance satisfactory to the Agent and the Lenders, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Credit Parties to execute and perform under the terms of this Agreement and authorizes the use by the Credit Parties of their Cash Collateral in accordance with the terms of this Agreement, finds and concludes that the Credit Documents (except for the Financing Orders) were negotiated in good faith and that Agent and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and orders that, during the Interim Period, the Liens in favor of the Agent shall be valid and perfected Liens in the Collateral.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

- 16 -

"Inventory" means, with respect to any Person, all goods and merchandise of such Person leased or held for sale or lease by such Person, including, without limitation, all raw materials, work-in-process and finished goods, and all packaging, supplies and materials of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired.

"Investment" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts Receivable arising in the ordinary course of business), capital contributions, acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities) or Equity Interests, or the purchase of all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or commodities at a future date in the nature of a futures contract, or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"Investment Bank" has the meaning specified therefor in Section 5.01(f).

"Lease" means any lease of real property to which any Credit Party or any of its Subsidiaries is a party as lessor or lessee.

"Lender" has the meaning specified therefor in the preamble hereto.

"Lender Related Parties" has the meaning specified therefor in Section 2.09(a).

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Loan Servicing Fee" has the meaning specified therefore in Section 2.06(b).

"Material Adverse Effect" means a material adverse effect on any of (a) the operations, assets, liabilities, financial condition or prospects of the Credit Parties taken as a whole, (b) the ability of the Credit Parties taken as a whole to perform any of their obligations under any Credit Document, (c) the legality, validity or enforceability of this Agreement or any other Credit Document, (d) the rights and remedies of any Agent or any Lender under any Credit Document or (e) the validity, perfection or priority of a Lien in favor of the Agent for the benefit of the Agent, and the Lenders.

"Material Contract" means, with respect to any Person, (a) each contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $1,000,000 or more in any Fiscal Year (other than purchase orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days' notice without penalty or

- 17 -

premium) and (b) all other contracts or agreements material to the operations, assets, liabilities, financial condition or prospects of the Credit Parties taken as a whole.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Credit Party or any of its ERISA Affiliates has contributed to, or has been obligated to contribute, at any time during the preceding six (6) years.

"Net Cash Proceeds" means (a) with respect to any Disposition or the receipt of Extraordinary Receipts consisting of insurance proceeds or condemnation awards by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection therewith (other than Indebtedness under this Agreement), (ii) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (iii) (transfer taxes paid to any taxing authorities by such Person or such Subsidiary in connection therewith, and (iv) net income taxes to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements) and (b) with respect to the receipt of Extraordinary Receipts (other than insurance proceeds or condemnation awards) by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred compensation) by or on behalf of such Person or such Subsidiary in connection therewith, after deducting therefrom only (i) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (ii) transfer taxes paid by such Person or such Subsidiary in connection therewith, and (iii) net income taxes to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements), in each case of clause (a) and (b) to the extent, but only to the extent, that the amounts so deducted are actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and are properly attributable to such transaction or to the asset that is the subject thereof.

"New Lending Office" has the meaning specified therefor in Section 2.11(d).

"Non-U.S. Lender" has the meaning specified therefor in Section 2.11(d).

"Note" means any promissory note evidencing a DIP Term Loan, substantially in the form of Exhibit E hereto.

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Credit Party to the Agent and the Lenders arising under this Agreement or any other Credit Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, or unsecured. Without limiting the foregoing, the Obligations of each Credit Party under

- 18 -

ACTIVE 234178906
ACTIVE 234178906v.17

the Credit Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Credit Documents (including the Segregated Pre-Funding Ticking Fee), and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that the Agent (in its sole discretion) may elect to pay or advance on behalf of such Person.  For the avoidance of doubt, the Obligations do not include any obligations of the Credit Parties to (x) the Lenders in respect of any amount funded into the Segregated Pre-Funding Account until such time as such amounts are advanced to the Borrower in accordance with Section 2.02 or (y) under the Prepetition First Lien Credit Documents, the Prepetition Second Lien Credit Documents, the Parent Subordinated Credit Documents, the WC Insurance Letter of Credit, the Z Capital Subscription Lines or reimbursement obligations in connection therewith (including, without limitation, any "Obligations," as that term is defined in the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement, the Parent Subordinated Credit Documents, the WC Insurance Letter of Credit, the Z Capital Subscription Lines and/or any reimbursement obligations in connection therewith, respectively).

"OFAC" has the meaning set forth in the definition of "Anti-Terrorism Laws."

"OFAC Sanctions Programs" means the laws, regulations and Executive Orders administered by OFAC, including but not limited to, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as it has been or shall thereafter be renewed, extended, amended, or replaced, and the list of Specially Designated Nationals and Blocked Persons administered by OFAC, as such list may be amended from time to time.

"Other Taxes" has the meaning specified therefor in Section 2.11(b).

"Parent" has the meaning specified therefor in the preamble hereto.

"Parent Subordinated Credit Documents" has the meaning specified therefor in the recitals hereto.

"Parent Subordinated Credit Facility" has the meaning specified therefor in the recitals hereto.

"Parent Subordinated Indebtedness" means the Indebtedness of the Parent under the Parent Subordinated Credit Facility.

"Participant Register" has the meaning specified therefor in Section 12.07(g).

"Payment Office" means the Agent's office located at 9062 Old Annapolis, 1st Floor, Columbia, MD 21045, or at such other office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Permitted Holder" means (a) Tennenbaum Opportunities Partners V, LP, (b) Special Value Continuation Partners, LP and (c) MCMZ, LLC, or, in each case, any Controlled Investment Affiliate thereof.

ACTIVE 234178906
ACTIVE 234178906v.17

"Permitted Indebtedness" means:

(a)     any Indebtedness owing to the Agent or any Lender under this Agreement and the other Credit Documents;

(b)     Indebtedness existing on the Petition Date, as set forth on Schedule 7.02(b) (other than, subject to the following proviso, in respect of the Sysco Agreement), but not any extensions, modifications, renewals or replacements thereof without the written consent of the Required Lenders; provided, however, that Indebtedness related to the Sysco Agreement shall not exceed, on any date of determination, an aggregate principal amount of $1,500,000;

(c)     Indebtedness existing on the Petition Date evidenced by Capitalized Lease Obligations entered into in order to finance Capital Expenditures made by the Credit Parties in accordance with the provisions of Section 7.02(g);

(d)     [reserved];

(e)     Permitted Intercompany Payables;

(f)     Indebtedness incurred in the ordinary course of business under performance, surety, statutory, and appeal bonds;

(g)     Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Credit Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the twelve-month period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

(h)     [reserved;]

(i)     Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business;

(j)     Indebtedness in respect of the Prepetition Credit Agreements;

(l)     Indebtedness incurred under the Z Capital Subscription Lines and the Wells Fargo Letter of Credit Documents in connection with the WC Insurance Letter of Credit;

(o)     Parent Subordinated Indebtedness; and

(p)     Indebtedneess in respect of the Advisor Management Fee Agreements.

"Permitted Intercompany Payables" means intercompany payables incurred in the ordinary course of business of the Credit Parties on a book entry basis and in accordance with the Cash Management System.

- 20 -

"<u>Permitted Intercompany Receivables</u>" means intercompany receivables incurred in the ordinary course of business of the Credit Parties on a book entry basis and in accordance with the Cash Management System.

"<u>Permitted Investments</u>" means:

(a)     Investments in cash and Cash Equivalents;

(b)     Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)     advances made in connection with purchases of goods or services in the ordinary course of business in accordance with the Approved Budget (subject to the Permitted Variance);

(d)     Investments received in settlement of amounts due to any Credit Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Credit Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Credit Party or its Subsidiaries;

(e)     Investments existing on the date hereof, as set forth on Schedule 7.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof;

(f)     Permitted Intercompany Receivables; and

(g)     Investments existing on the Petition Date by a Credit Party in any other Credit Party.

"<u>Permitted Liens</u>" means:

(a)     Liens securing the Obligations;

(b)     Liens for taxes, assessments and governmental charges the payment of which is not required under Section 7.01(b);

(c)     Carriers', warehousemen's, mechanics', materialmen's and other Liens imposed by law, in each case arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)     Liens described on Schedule 7.02(a), <u>provided</u> that (i) no such Lien shall at any time be extended to cover any additional property not subject thereto on the Effective Date (other than in respect of the Sysco Agreement), (ii) the principal amount of the Indebtedness secured by such Liens shall not be extended, renewed, refunded or refinanced, and (iii) the direct or contingent obligor with respect thereto is not changed;

- 21 -

(e)      [reserved];

(f)      deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)      easements, zoning restrictions and similar encumbrances on real property, charges, entitlements and other land use regulations, including environmental regulations by any Governmental Authority, and irregularities in the title thereto, which would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect;

(h)      Liens of landlords and mortgagees of landlords (i) arising by statute or under any lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord, (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and (iv) for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(i)      Liens existing on the Petition Date on real property or equipment securing Indebtedness permitted by subsection (c) of the definition of Permitted Indebtedness;

(j)      the title and interest of a lessor or sublessor in and to personal property leased or subleased (other than through a capital lease), in each case extending only to such personal property;

(k)      non-exclusive licenses of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business;

(l)      judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 9.01(j);

(m)      rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(n)      Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(o)      rights of any bidder upon deposits of cash provided to any Credit Party (including a Good Faith Deposit) in connection with the Sales Process;

(p)      the Carve-Out and any other Liens granted or provided for in the Financing Orders;

- 22 -

ACTIVE 234178906
ACTIVE 234178906v.17

(q)    Liens on cash or Cash Equivalents securing (i) reimbursement obligations, fees and expenses with respect to the WC Insurance Letter of Credit and (ii) Indebtedness in connection with the WC Insurance Letter of Credit; and

(r)    Liens securing the Prepetition Obligations (including any "adequate protection" replacement Liens); provided, that such Liens are junior to and subordinate in all respect to the Agent's Liens securing the Obligations with respect to all Collateral pursuant to the Financing Orders.

"Permitted Variance" has the meaning set forth in Section 7.02(f)(i).

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Petition Date" has the meaning specified therefor in the recitals hereto.

"Plan" means any Employee Plan or Multiemployer Plan.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.00%.

"Prepetition" means the time period ending immediately prior to the Petition Date.

"Prepetition Agents" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition Credit Agreements" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition Credit Documents" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition Collateral" means all "Collateral" (as defined in the Prepetition Credit Agreements), together with any assets of the Credit Parties upon which the Prepetition Agents shall be granted a lien as "adequate protection."

"Prepetition First Lien Agent" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition First Lien Credit Agreement" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition First Lien Credit Documents" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition First Lien Indebtedness" means the Indebtedness of the Borrower under the Prepetition First Lien Credit Agreement.

- 23 -

"Prepetition First Lien Lenders" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition First Lien Obligations" means the Obligations of the Credit Parties under and as defined in the Prepetition First Lien Credit Agreement.

"Prepetition Indebtedness" means the Prepetition First Lien Indebtedness and the Prepetition Second Lien Indebtedness.

"Prepetition Lenders" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition Obligations" means the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations.

"Prepetition Second Lien Agent" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition Second Lien Credit Agreement" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition Second Lien Credit Documents" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition Second Lien Indebtedness" means the Indebtedness of the Borrower under the Prepetition Second Lien Credit Agreement.

"Prepetition Second Lien Lenders" has the meaning specified therefor in the recitals to this Agreement.

"Prepetition Second Lien Obligations" means the Obligations of the Credit Parties under and as defined in the Prepetition Second Lien Credit Agreement.

"Proposed Budget" has the meaning specified therefor in Section 7.02(a)(ii).

"Pro Rata Share" means:

(a)    with respect to a Lender's obligation to make the Initial DIP Term Loan and right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Initial DIP Term Loan Commitment, plus the aggregate unpaid principal amount of such Lender's Initial DIP Term Loan, by (ii) the sum of each Lender's available (unfunded) Initial DIP Term Loan Commitments, plus the aggregate unpaid principal amount of each Lender's total Initial DIP Term Loans; provided, however, that if the Initial DIP Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Initial DIP Term Loan and the denominator shall be the aggregate unpaid principal amount of the Initial DIP Term Loan;

- 24 -

(b)      with respect to a Lender's obligation to make the Delayed Draw DIP Term Loan and right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Delayed Draw DIP Term Loan Commitment, plus the aggregate unpaid principal amount of such Lender's Delayed Draw DIP Term Loan, by (ii) the sum of each Lender's available (unfunded) Delayed Draw DIP Term Loan Commitments, plus the aggregate unpaid principal amount of each Lender's total Delayed Draw DIP Term Loans provided that if the Delayed Draw DIP Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Delayed Draw DIP Term Loan and the denominator shall be the aggregate unpaid principal amount of the Delayed Draw DIP Term Loan; and

(c)      [reserved];

(d)      with respect to all other matters (including, without limitation, indemnification obligations arising under Section 10.05), with respect to any Lender, the percentage obtained by dividing (i) such Lender's DIP Term Loan Commitment, plus the aggregate unpaid principal amount of such Lender's DIP Term Loan by (ii) the sum of each Lender's available (unfunded) DIP Term Loan Commitments, plus the aggregate unpaid principal amount of each Lender's total DIP Term Loans, provided that if the DIP Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the DIP Term Loan and the denominator shall be the aggregate unpaid principal amount of the DIP Term Loan.

"Register" has the meaning specified therefor in Section 12.07(d).

"Registered", with respect to Intellectual Property, means issued, registered, or the subject of a pending application.

"Registered Loans" has the meaning specified therefor in Section 12.07(d).

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Reimbursement and Fee Agreement" means that certain Reimbursement and Fee Agreement, dated as of June 17, 2015, by and among the Credit Parties and the Z Capital Credit Support Parties, as amended by Amendment No. 1 to Reimbursement and Fee Agreement, dated as of July 15, 2016, as amended by Amendment No. 2 to Reimbursement and Fee Agreement, dated as of February 21, 2017, effective as of January 31, 2017, as the same may be further amended, restated, supplemented or otherwise modified from time to time.

"Related Fund" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment,

- 25 -

including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Released Parties" has the meaning specified therefor in Section 2.09(a).

"Releasing Parties" has the meaning specified therefor in Section 2.09(a).

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"Replacement Lender" has the meaning specified therefor in Section 12.02(b).

"Reportable Event" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"Required Lenders" means one or more of the Tennenbaum Lenders and one or more of the Z Capital Lenders; provided that, so long as (a) the Z Capital Lenders have not irrevocably and unconditionally disclaimed in a writing provided to the Debtors and Tennenbaum Capital Partners or their respective professionals (a copy of which writing may be filed on the docket in the Bankruptcy Court) any right (including the right of any of its affiliates, including Controlled Investment Affiliates) to participate as a bidder in connection with the Auction and (b) none of the Tennenbaum Lenders (or any of their affiliates, including Controlled Investment Affiliates) are participating as a bidder in connection with the Auction, then, in respect of (1) any amendment, waiver, consent, modification, consultation or other change to Section 7.01(r)(iii), (iv) or (v) (except with respect to Section 7.01(r)(v)(2) (the "TCP Sale Milestones"), including (x) the proviso at the end of Section 7.01(r) and (y) any rights of approval, consent, consultation, determination or other similar action, in each case, with respect to the TCP Sale Milestones, (2) any amendment, modification or other change to the definitions of the terms "Bidding Procedures," "Bidding Procedures Order," "Bid Deadline," "Successful Bid," and "Sale Order," as such terms are utilized in the TCP Sale Milestones and (3) any Default or Event of Default related to the TCP Sale Milestones (collectively with (1) and (2), the "TCP Sale Milestone Provisions"), "Required Lenders" shall mean solely one or more of the Tennenbaum Lenders. Notwithstanding the foregoing, to the extent that the Tennenbaum Lenders constitute "Required Lenders" in respect of the TCP Sale Milestone Provisions pursuant to the immediate preceding sentence, no amendment, waiver, consent, modification, consultation or other change, determination or approval or other similar action with respect to any TCP Sale Milestone Provision shall be permitted, without the consent of at least one Z Capital Lender, to the extent that it adversely affects (directly or indirectly) the rights or remedies of the Prepetition Lenders that are affiliates of Z Capital Lenders, or of any of their rights or remedies under the Prepetition Credit Documents (in each case, solely in their capacities as lenders under the Prepetition Credit Documents), in a manner different than the Prepetition Lenders that are affiliates of the Tennenbaum Lenders (solely in their capacities as

- 26 -

ACTIVE 234178906
ACTIVE 234178906v.17

lender under the Prepetition Credit Documents). For the avoidance of doubt, the rights of the Tennenbaum Lenders hereunder are not transferrable to any third party, including any assignee or participant under Section 12.07.

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"RM Opco" has the meaning specified therefor in the recitals to this Agreement.

"Sale Milestone Covenant" means the covenant of the Credit Parties set forth in Section 7.01(r).

"Sale Motion" has the meaning specified therefor in Section 7.01(r)(ii).

"Sale Order" has the meaning specified therefor in Section 7.01(r)(v).

"Sale Process" has the meaning specified therefor in Section 7.01(r).

"Scheduled Termination Date" means the date that is the earlier of (i) sixty (60) days after entry of the Sale Order or (ii) December 15, 2018.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Securitization" has the meaning specified therefor in Section 12.07(j).

"Security Agreement" means that certain Pledge and Security Agreement by the Credit Parties and the Agent for the benefit of the Agent and the Lenders substantially in the form of Exhibit G, securing the Obligations and delivered to the Agent.

"Security Documents" means the Security Agreement, the Uniform Commercial Code filings and all other instruments, documents and agreements delivered by or on behalf of a Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, Agent, for the benefit of the Lenders, a Lien on all property of that Credit Party as security for the Obligations.

"Segregated Pre-Funding Account" means a segregated deposit account maintained by the Segregated Pre-Funding Account Bank, in the name, and for the benefit of the Lenders, into

- 27 -

which each Lender shall deposit an amount equal to such Lender's Delayed Draw Term Loan Commitment as set forth in Section 2.01(b); for the avoidance of doubt, it is understood and agreed that (A) the funds on deposit in the Segregated Pre-Funding Account, shall not constitute assets of any of the Credit Parties and (B) the Credit Parties shall have no right, title or interest in such funds held in the Segregated Pre-Funding Account.

"Segregated Pre-Funding Account Release" means the release by the Segregated Pre-Funding Account Bank, as applicable, of all or any portion of the funds from the Segregated Pre-Funding Account into the Disbursement Account in accordance with Section 2.02.

"Segregated Pre-Funding Account Bank" means Wells Fargo, N.A., in its capacity as depositary bank for the Lenders in connection with establishing and maintaining the Segregated Pre-Funding Account.

"Segregated Pre-Funding Ticking Fee" has the meaning specified therefor in Section 2.06(c).

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Stalking Horse APA" has the meaning specified therefor in Section 7.01(r)(i).

"Stalking Horse Bidder" has the meaning specified therefor in Section 7.01(r)(i).

"Store" means a particular restaurant at a particular location that is owned or operated by the Borrower or any of its Subsidiaries.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.

"Successful Bid" has the meaning specified therefor in Section 7.01(r)(iv).

"Sysco Agreement" means that certain Amended and Restated Master Distribution Agreement, dated as of November 1, 2016 and effective as of December 1, 2013, by and between Sysco Corporation, a Delaware corporation, for itself and on behalf of its Operating Companies (as defined therein) and RM Opco LLC, a Delaware limited liability company, on behalf of itself and each Related Customer (as defined therein), as amended, restated, amended and restated, modified or supplemented prior to the Petition Date.

ACTIVE 234178906
ACTIVE 234178906v.17

"<u>Taxes</u>" has the meaning specified therefor in Section 2.11(a).

"<u>TCP Management Fee Agreement</u>" means that certain Management Fee Agreement, dated as of November 21, 2014, between Parent, the Borrower and Tennenbaum Capital Partners, LLC, as the same may be amended, restated, supplemented or otherwise modified from time.

"<u>TCP Sale Milestones</u>" has the meaning specified therefor in the definition of "Required Lenders."

"<u>TCP Sale Milestone Provisions</u>" has the meaning specified therefor in the definition of "Required Lenders."

"<u>Tennenbaum Lenders</u>" means Tennenbaum Opportunities Partners V, LP and Special Value Continuation Partners, LP.

"<u>Termination Date</u>" means, unless extended with the prior written consent of the Required Lenders, the earliest to occur of:  (a) the Scheduled Termination Date; (b) the date of acceleration of the DIP Term Loans pursuant to an Event of Default; (c) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto or contemporaneously therewith; (d) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Required Lenders; (e) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Required Lenders; (f) the date of the consummation of the Approved Sale; and (g) the effective date of any Credit Party's plan of reorganization confirmed in the Chapter 11 Cases.

"<u>Termination Event</u>" means (a) a Reportable Event with respect to any Employee Plan, (b) any event that causes any Credit Party or any of its ERISA Affiliates to incur liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate an Employee Plan or the treatment of an Employee Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate an Employee Plan, or (e) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan.

"<u>Transferee</u>" has the meaning specified therefor in Section 2.11(a).

"<u>Uniform Commercial Code</u>" has the meaning specified therefor in Section 1.04.

"<u>USA PATRIOT Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001).

"<u>U.S. Lender</u>" has the meaning specified therefor in Section 2.11(d).

"<u>Variance Covenant</u>" means the covenant of the Borrower set forth in Section 7.02(f).

- 29 -

"WARN" means the Worker Adjustment and Retraining Notification Act.

"WC Insurance Letter of Credit" means (i) one or more letters of credit in the aggregate face amount of $14,027,768, issued by any Z Capital Subscription Line Lender on behalf of any of the Borrower and the other Credit Parties for the benefit of the WC Insurer with respect to the WC Insurance (the "Z Capital Subscription Line Lender Letters of Credit"), and any renewal or replacement of the Z Capital Subscription Line Lender Letters of Credit shall be in form and substance acceptable to the Z Capital Credit Support Parties, and (ii) one or more letters of credit in the aggregate face amount of up to $2,381,800 issued by Wells Fargo on behalf of any of the Borrower and the other Credit Parties for the benefit of the WC Insurer with respect to the WC Insurance (the "Wells Fargo Letters of Credit"), in each case of the Z Capital Subscription Line Lender Letters of Credit and the Wells Fargo Letters of Credit, as the same may be amended, restated, supplemented, replaced, renewed, extended, increased or otherwise modified from time to time; provided that the aggregate face amount of such letter(s) of credit (including any subsequent increase, renewal or replacement thereof) shall not exceed, at any time, $17,000,000.

"WC Insurance" means the workers compensation insurance policies for the Borrower and the other Credit Parties underwritten by the WC Insurer.

"WC Insurer" means American International Group, Inc. and/or one or more of its Affiliates or any additional, successor or replacement insurers underwriting the workers compensation insurance policies for any of the Borrower and the other Credit Parties.

"Wells Fargo Letter of Credit Documents" means any and all agreements and other documents entered into (or to be entered into) by the Borrower in connection with the establishment or issuance of the Wells Fargo Letters of Credit, including the Wells Fargo Letters of Credit, in each case as amended, restated, supplemented, replaced, renewed, extended or otherwise modified from time to time.

"Wells Fargo Letters of Credit" has the meaning specified therefor in the definition of WC Insurance Letters of Credit.

"Z Capital Credit Support Parties" means Z Capital Partners GP II, L.P., Z Capital Partners II, L.P. and Z Capital Partners II-B, L.P., together with their respective successors or assigns.

"Z Capital Lenders" means Z Capital Partners II, L.P., Z Capital Partners II-A, L.P. and Z Capital Partners II-B, L.P.

"Z Capital Subscription Line Lender" means, collectively, Goldman Sachs Bank USA and any additional, successor or replacement lenders or noteholders under the Z Capital Subscription Lines.

"Z Capital Subscription Line Lender Letters of Credit" has the meaning specified therefor in the definition of WC Insurance Letters of Credit.

- 30 -

ACTIVE 234178906
ACTIVE 234178906v.17

"Z Capital Subscription Lines" means collectively, each of those certain Uncommitted Revolving Credit Agreements with the Subscription Line Lender, the Z Capital Credit Support Parties and the other borrowers party thereto from time, as applicable, each dated as of January 31, 2017 as each may be amended, restated supplemented, refinanced, replaced, renewed, extended or otherwise modified from time to time.

Section 1.02    Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03    Certain Matters of Construction.    References in this Agreement to "determination" by the Agent or the Required Lenders include good faith estimates by the Agent and the Required Lenders (in the case of quantitative determinations) and good faith beliefs by the Agent and the Required Lenders (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders. Any Lien referred to in this Agreement or any other Credit Document as having been created in favor of the Agent, any agreement entered into by the Agent pursuant to this Agreement or any other Credit Document, any payment made by or to or funds received by the Agent pursuant to or as contemplated by this Agreement or any other Credit Document, or any act taken or omitted to be taken by the Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agent and the Lenders. Wherever the phrase "to the knowledge of any Credit Party" or words of similar import relating to the knowledge or the awareness of any Credit Party are used in this Agreement or any other Credit Document, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Credit Party or (ii) the knowledge that a senior officer would have obtained if such officer had engaged in good faith and diligent performance of such officer's duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Credit Party and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates.  All covenants hereunder shall be given independent effect so that if a particular

- 31 -

action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists.  In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of, or a breach of, a representation or warranty hereunder.

Section 1.04    Accounting and Other Terms.

(a)    Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP.  Except as otherwise expressly stated herein, calculations in connection with the definitions, covenants and other provisions hereof shall be computed in accordance with GAAP; provided that the Initial Approved Budget, the Approved Budget, the Permitted Variance, any variance report and related information required to be delivered by the Borrower need not comply with GAAP and provided further, that, notwithstanding anything else in this Agreement to the contrary, in no event will any lease that would have been categorized as an operating lease as determined in accordance with GAAP prior to giving effect to the Financial Accounting Standards Board Accounting Standard Update 2016-02, Leases (Topic 842), issued in February 2016, or any other changes in GAAP subsequent to the Effective Date be considered a capital lease for purposes of this Agreement.  Notwithstanding the foregoing, for purposes of determining compliance with any covenant contained herein, Indebtedness of the Parent and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)    If at any time any change in GAAP after the date hereof would affect the computation of any financial requirement set forth in any Credit Document, and either the Borrower or the Required Lenders shall so request, then the Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders but without the requirement of any amendment or similar fee to the Agent or the Lenders); provided that, until so amended, (i) such requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such requirement made before and after giving effect to such change in GAAP.

(c)    All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute.

Section 1.05    Time References. Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight savings time, as in effect in New

- 32 -

York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to the Agent or any Lender, such period shall in any event consist of at least one full day.

## ARTICLE II

## THE DIP TERM LOANS

Section 2.01    Commitments.

(a)    Subject to the terms and conditions of this Agreement, including the entry and terms of the Interim Order and the satisfaction of the other applicable conditions precedent set forth in Article V, and relying on the representations and warranties herein set forth, each Lender severally agrees to make, pursuant to the procedures set forth in Section 2.02, a term loan (each a "Initial DIP Term Loan") to the Borrower on the Effective Date in an aggregate principal amount equal to the amount of such Lender's Initial DIP Term Loan Commitment.  The Initial DIP Term Loan may, at the option of the Borrower, be funded net of any fees and expenses due to the Agent, any Lender or, in accordance with the Approved Budget (subject to the Permitted Variance), any other third party in connection with the funding of such Initial DIP Term Loan. Amounts of the Initial DIP Term Loan repaid or prepaid may not be reborrowed.

(b)    Upon the entry of the Interim Order, each Lender severally agrees to (x) use reasonable best efforts to establish the Segregated Pre-Funding Account as soon as practicable with the Segregated Pre-Funding Account Bank, (y) promptly, but in any event within three (3) Business Days after the establishment of such Segregated Pre-Funding Account, fund an amount equal to the full portion of such Lender's Delayed Draw Term Loan Commitment into the Segregated Pre-Funding Account and (z) maintain such funds until the earlier to occur of the funding in full of all Delayed Draw DIP Term Loans to the Borrower in accordance with the terms herein, or the occurrence of the Termination Date; provided, however, for the avoidance of doubt, in the event the Segregated Pre-Funding Account is not established by the Segregated Pre-Funding Account Bank and the Lenders prior to the entry of the Final Order in accordance with the terms hereof and the Borrower makes a request for a Delayed Draw DIP Term Loan, each Lender agrees to extend such requested Delayed Draw DIP Term Loans directly to the Borrower in accordance with the terms herein.

(c)    Subject to the terms and conditions of this Agreement, including the entry and terms of the Final Order and the satisfaction of the other applicable conditions precedent set forth in Section 5.02, and relying upon the representations and warranties herein set forth, each Lender severally agrees to make or, to the extent applicable, authorize a Segregated Pre-Funding Account Release, in each case, pursuant to the procedures set forth in Section 2.02, term loans (the Delayed Draw DIP Term Loans" and each a "Delayed Draw Term Loan") to the Borrower from time to time on any Business Day during the period from and including the date on which the Final Order has been entered until the Final Availability Date in an aggregate principal amount not to exceed such Lender's Delayed Draw DIP Term Loan Commitment.  Any Delayed Draw DIP Term Loan may, at the option of the Borrower, be funded or released (by the Lenders), as applicable,

ACTIVE 234178906
ACTIVE 234178906v.17

net of any interest, fees and expenses due to the Agent, any Lender or, subject to the Approved Budget (subject to the Permitted Variance), any other third party in connection with the funding of such Delayed Draw DIP Term Loan.   Amounts of Delayed Draw DIP Term Loans repaid or prepaid may not be reborrowed.

Section 2.02    Procedure for Borrowing.

(a)    Notice of Borrowing.   The Borrower shall give the Agent and each Lender prior written notice, in substantially the form of Exhibit C hereto (a "Notice of Borrowing"), not later than 2:00 p.m. (New York City time) (x) on the date which is five (5) Business Days (or such shorter period as the Required Lenders are willing to accommodate) prior to the date of the proposed borrowing and/or Segregated Pre-Funding Account Release, as applicable, of any DIP Term Loan other than the Initial DIP Term Loan (each such borrowing and/or release, and the borrowing of the Initial DIP Term Loan, a "Borrowing") and (y) on the date which is one (1) Business Day (or such shorter period as the Required Lenders are willing to accommodate) prior to the date of the proposed borrowing of the Initial DIP Term Loan.   Such Notice of Borrowing shall specify (i) the principal amount of the proposed DIP Term Loan, which shall, unless the Required Lenders otherwise agree, be in an aggregate amount of not less than $250,000, (ii) the date of the proposed Borrowing, and (iii) a certification that the conditions in Sections 5.01 (solely as to the Initial DIP Term Loan and excluding the condition set forth in Section 5.01(m)) and Section 5.02 are satisfied as of the date of the Notice of Borrowing and that the proceeds of such Borrowing will be used in accordance with the Approved Budget (subject to the Permitted Variance); provided, however, that if the Notice of Borrowing for the Initial DIP Term Loan is given prior to the Effective Date, the certification described in this clause (iii) shall, for purposes of such Initial DIP Term Loan, certify that the relevant conditions will have been satisfied as of the Effective Date; provided, further, however, that (A) in respect of conditions in Section 5.01 and 5.02 that include receipt by the Agent, the Lenders or both, the certification described in clause (iii) of this Section 2.02(a) shall certify only that the documents or other items referenced in such conditions have been delivered by the Credit Parties to the Agent, the Lenders or both, as applicable, in accordance with the terms of this Agreement, and (B) in respect of conditions in Sections 5.01 and 5.02 that include the satisfaction or reasonable satisfaction of the Agent, the Lenders, or both, the certification described in clause (iii) of this Section 2.02(a) shall be made without reference to the satisfaction or reasonable satisfaction, as applicable, of any such parties, as applicable.   The Agent and the Lenders may act without liability upon the basis of any such written notice believed by the Agent in good faith to be from the Borrower (or from any Authorized Officer thereof).   The Agent and the Lenders shall (x) be entitled to rely conclusively on such Authorized Officer's authority to request the making of the Borrowing on behalf of the Borrower and (y) have no duty to verify the authenticity of the signature appearing on the written Notice of Borrowing.   The Notice of Borrowing pursuant to this Section 2.02(a) shall be irrevocable and the Borrower shall be bound to make a Borrowing in accordance therewith.

(b)    [Reserved.]

(c)    Making of the DIP Term Loans.

- 34 -

(i)     Subject to the terms and conditions herein set forth, each Lender shall make available to the Borrower a portion of the Initial DIP Term Loan equal to such Lender's Initial DIP Term Loan Commitment.

(ii)     Upon fulfillment (or due waiver in accordance with Section 12.02) at any time (and from time to time) on or after the date of the entry of the Final Order until the Final Availability Date, of the conditions set forth in Section 5.02, on the date of a proposed Borrowing, each Lender shall, as applicable, authorize a Segregated Pre-Funding Account Release and cause the Segregated Pre-Funding Account Bank to make available, or otherwise make available to the Borrower, in each case, in immediately available funds, Delayed Draw DIP Term Loans in accordance with the terms hereof, in each case, in a principal amount that will not exceed the aggregate amount of the Lenders' Pro Rata Shares of the then outstanding Delayed Draw DIP Term Loan Commitment.

(iii)     The Borrower shall execute and deliver to each Lender that requests that its portion of the DIP Term Loans be evidenced by a promissory note, a Note substantially in the form of Exhibit E hereto.

(iv)     The DIP Term Loans under this Agreement shall be made or released, as applicable, by the Lenders to the Borrower, as applicable, simultaneously and proportionately to their Pro Rata Shares of the DIP Term Loan Commitments, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make the DIP Term Loans hereunder, nor shall the DIP Term Loan Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make and/or release a DIP Term Loan requested hereunder.

(v)     All proceeds of the DIP Term Loans that are funded to the Borrower (including pursuant to any Segregated Pre-Funding Account Release) (less any agreed amounts to be retained for interest, fees and expenses) shall be deposited on the applicable date into the Concentration Account (as defined in the Cash Management Motion) or another Cash Management Account designated by the Credit Parties for receipt of the proceeds of the DIP Term Loans (the "Disbursement Account"). Proceeds of DIP Term Loans shall only be withdrawn from the Disbursement Account to fund amounts in accordance with the Approved Budget (subject to the Permitted Variance) and the use of proceeds restrictions set forth in Section 7.01(k).

Section 2.03     Repayment of the DIP Term Loan; Evidence of Debt.

(a)     The outstanding unpaid principal amount of the DIP Term Loan (plus all accrued but unpaid interest and fees due and owing as of the Termination Date) shall be repaid in full on the Termination Date, or if such date is not a Business Day, then on the immediately succeeding Business Day.

(b)     The Agent shall maintain accounts in which it shall record (i) the amount of the DIP Term Loans made to the Borrower hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Agent hereunder for the account of the Lenders and each Lender's share thereof.

ACTIVE 234178906
ACTIVE 234178906v.17

(c)     The entries made in the accounts maintained pursuant to paragraph (b) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the DIP Term Loan in accordance with the terms of this Agreement.

(d)     In the event a Lender's portion of the DIP Term Loans is evidenced by a Note, the DIP Term Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more Notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

(e)     To the extent amounts with respect to any Lender's Delayed Draw DIP Term Loan Commitment are funded into the Segregated Pre-Funding Account and never released to the Borrower, there shall be no obligation by the Borrower to repay any obligations in connection with such un-released funds, including, for the avoidance of doubt, any fee that may have accrued thereon in accordance with Section 2.06 or otherwise.

Section 2.04     Interest.

(a)     The DIP Term Loans shall bear interest on the principal amount thereof from time to time outstanding, from the date such DIP Term Loan is made until repaid, at a rate per annum equal to 8.5%; provided, however, that any DIP Terms Loan shall not be deemed made unless and until the date the proceeds of such DIP Term Loan are disbursed from the Segregated Pre-Funding Account to the Borrower.

(b)     Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, the DIP Term Loans funded to the Borrower (to the extent such DIP Term Loans are deemed made as provided in Section 2.04(a)), and all fees, indemnities, or any other Obligations of the Credit Parties under this Agreement and the other Credit Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(c)     Interest Payment.

(i)     Interest on the DIP Term Loans funded to the Borrower shall be payable in cash monthly, in arrears, on the first Business Day of each month, commencing on (x) in the case of the Initial DIP Term Loans, the first Business Day of the month following the month in which the Effective Date occurred and (y) in the case of any Delayed Draw DIP Term Loan funded to the Borrower (either from the Lenders directly or from the Segregated Pre-Funding Account), on the first Business Day of each month following receipt by the Borrower of such Delayed Draw DIP Term Loans, and, in each case, until the occurrence of the Termination Date and at maturity (whether upon demand, by acceleration or otherwise).

(d)     General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

- 36 -

Notwithstanding anything herein to the contrary, all interest shall be payable in cash at maturity (whether upon demand, by acceleration or otherwise).

Section 2.05    Termination and Reduction of Commitment; Prepayment of DIP Term Loans; Continuing Use of Cash Collateral.

(a)    Termination of Commitments.

(i)    The DIP Loan Commitments shall terminate upon the earlier of (x) the making (either directly or pursuant to a Segregated Pre-Funding Account Release, as applicable) of DIP Term Loans to the Borrower in the aggregate amount of the DIP Term Loan Commitments of all Lenders and (y) 5:00 p.m. (New York City time) on the Final Availability Date.

(b)    [Reserved]

(c)    Mandatory Prepayment.

(i)    Without limiting any other provision of this Agreement or any other Loan Document permitting or requiring prepayment of the DIP Term Loan in whole or in part, the Borrower shall prepay the DIP Term Loan in full on the date which is the earlier of (x) thirty (30) days following the entry of the Interim Order in the event that the Final Order shall not have been entered on or before such date and (y) the date of the consummation of the Approved Sale or any other conveyance, sale, transfer or other Disposition of all or substantially all of the assets of the Credit Parties to another Person.

(ii)    Upon five (5) Business Days' notice, the Agent may, at the direction of the Required Lenders, require the Borrower upon the receipt by any Credit Party or any of its Subsidiaries of Net Cash Proceeds from any Disposition by any Credit Party other than a Disposition accounted for by clause (y) of Section 2.05(c)(i) (it being understood that the Net Cash Proceeds shall be deposited into the Disbursement Account), to prepay the outstanding principal of the DIP Term Loan in accordance with clause (d) below in an aggregate amount equal to 100% of the Net Cash Proceeds of such Disposition. Nothing contained in this subsection (ii) shall permit any Credit Party to make a Disposition of any property other than in accordance with Section 7.02(c).

(iii)    Subject to clause (iv) below, upon five (5) Business Days' notice, the Agent may, at the direction of the Required Lenders, require the Borrower, upon the receipt by any Credit Party or any of its Subsidiaries, of any Extraordinary Receipts (it being understood that the Extraordinary Receipts shall be deposited in the Disbursement Account), to prepay the outstanding principal of the DIP Term Loan in accordance with clause (d) below in an aggregate amount equal to 100% of the Net Cash Proceeds of such Extraordinary Receipts.

(iv)    Notwithstanding Section 2.05(c)(iii) above, with respect to the Net Cash Proceeds received by any Credit Party or any of its Subsidiaries in connection with a receipt of Extraordinary Receipts consisting of insurance proceeds or condemnation awards that are required to be used to prepay the Obligations pursuant to Section 2.05(c)(iii) the Net Cash Proceeds from all such Extraordinary Receipts shall not be required to be used to prepay the

- 37 -

Obligations to the extent that such Net Cash Proceeds are used to replace, repair, or restore properties or assets used in such Person's business, provided that (A) no Default or Event of Default has occurred and is continuing on the date such Person receives such Net Cash Proceeds, (B) the Borrower delivers a certificate to the Agent within five (5) Business Days after such loss, destruction or taking, as the case may be, stating that such Net Cash Proceeds shall be used to replace, repair, or restore properties or assets used in such Person's business within a period specified in such certificate not to exceed 60 days after the date of receipt of such Net Cash Proceeds (which certificate shall set forth estimates of the Net Cash Proceeds to be so expended), (C) such Net Cash Proceeds are deposited in the Disbursement Account, and (D) upon the earlier of (1) the expiration of the period specified in the certificate furnished to the Agent pursuant to clause (B) above or (2) the occurrence of a Default or an Event of Default, such Net Cash Proceeds, if not theretofore so used, shall be used to prepay and redeem the Obligations in accordance with Section 2.05(c)(iii) above.

(d)     <u>Application of Payments</u>.   All prepayments made pursuant to Section 2.05 shall be applied in the manner set forth in Section 4.03(b).

Section 2.06     <u>Fees</u>.

(a)     <u>Closing Fee</u>.  On the Effective Date, the Borrower shall pay to the Lenders, in accordance with their Pro Rata Shares, a non-refundable closing fee (the "<u>Closing Fee</u>") equal to $110,000.00, which shall be deemed fully earned when paid.  At the option of the Borrower, the Initial DIP Term Loan may be net funded in the amount of such Closing Fee.

(b)     <u>Loan Servicing Fee</u>.  On, or substantially simultaneously with, the Effective Date, the Borrower shall pay to the Agent a non-refundable loan servicing fee (the "<u>Loan Servicing Fee</u>") equal to $30,000.00, which shall be deemed fully earned when paid.

(c)     <u>Segregated Pre-Funding Ticking Fee</u>.  Borrower shall pay to the Agent (for the account for each Lender in accordance with its Pro Rata Share) a ticking fee (the "<u>Segregated Pre-Funding Ticking Fee</u>") that will accrue and be earned monthly at rate equal to 0.5% of the aggregate amount deposited in the Segregated Pre-Funding Account (as determined on a daily basis) during the period from the date on which the Lenders have funded amounts that are required to satisfy each of their Delayed Draw DIP Term Loan Commitments into the Segregated Pre-Funding Account until, but not including, the Termination Date. Such Segregated Pre-Funding Ticking Fee shall be calculated on a pro-rated basis for partial months and shall be payable to the Agent for the benefit of the Lenders on the Termination Date.

Section 2.07     <u>Super Priority Nature of Obligations and Lenders' Liens</u>.

(a)     The payment in full of all Obligations will be secured as provided in the Credit Documents and the Financing Orders.  Subject to entry of the Interim Order, the Credit Parties consent and agree to be bound by the terms of the Credit Documents, as the same may be in effect from time to time, and agree to perform their obligations thereunder in accordance therewith. The Credit Parties will take any and all actions required by the Credit Documents to create and maintain, as security for the Obligations, a valid and enforceable perfected Lien in and

- 38 -

on all the Collateral in favor of the Lenders with the Lien priority required in the Financing Orders.

(b)    The priority of Lenders' Liens on the Collateral of the Credit Parties shall be set forth in the Interim Order and the Final Order.

(c)    All Obligations shall constitute administrative expenses of Credit Parties in the Chapter 11 Cases, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order).

(d)    The Agent and the Lenders shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under Section 552(b) of the Bankruptcy Code.

Section 2.08    No Discharge; Survival of Claims.    The Credit Parties agree that (a) the Obligations under the Credit Documents shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and each Credit Party hereby waives pursuant to Section 1141(d)(4) of the Bankruptcy Code any such discharge) and (b) the super priority administrative claim granted to Agent and Lenders pursuant to the Financing Orders and the Liens granted to Agent pursuant to the Financing Orders (and the Credit Documents) shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases.    The superpriority administrative expenses claims under section 364(c)(1) of the Bankruptcy Code and senior liens granted to the Agent pursuant to the Credit Documents and the Financing Orders shall (a) survive any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Cases and (b) subject to entry of the Final Order, not be subject to any rights, claims, charges, or Liens arising under section 506(c) of the Bankruptcy Code.

Section 2.09    Release and Waiver of any Primary Rights.

(a)    The Credit Parties hereby acknowledge effective upon entry of the Interim Order, that the Credit Parties have no defense, counterclaim, offset, recoupment, cross complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Credit Parties' liability to repay Agent or any Lender with respect to principal, interest or fees as provided in this Agreement.    Each Credit Party, in its own right and on behalf of its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges Agent, the Lenders, the Prepetition Agents and the Prepetition Lenders (in their capacity as such), and, in each case, each of their respective past, present and future officers, directors, servants, employees, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (the "Lender Related Parties", and collectively with the Agent, the Lenders, the Prepetition Agent and the Prepetition Lenders, the "Released Parties") of and from any and all causes of action,

- 39 -

demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever (but excluding all obligations of the Released Parties under this Agreement or the Financing Orders), whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof (other than any obligation of the Lender Released Parties under this Agreement or the Financing Orders) in any way, directly or indirectly arising out of or in connection with or relating to the Prepetition Credit Documents, the Parent Subordinated Credit Documents, this Agreement, the Financing Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing; provided, that the Releasing Parties' release and discharge granted by this Section 2.09(a) relating to the Prepetition Agent, the Prepetition Lenders, and each of their respective Lender Related Parties shall not bind the Committee or any other party in interest until the expiration of the Challenge Period under and as defined in the Financing Orders.

(b)    Upon the Effective Date, and on behalf of itself and its estate, and for so long as any Obligation shall be outstanding, each Credit Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to, except as otherwise consented to in writing by each Lender, grant any Lien of equal or greater priority than the Lien securing the Obligations, or approve a claim of equal or greater priority than the Obligations.

Section 2.10    Security Interest.  To the extent set forth in the Financing Order and the Security Agreement, each Credit Party has pledged, assigned and granted to the Agent, on behalf of and for the benefit of the Lenders, subject only to payment of the Carve-Out, a security interest in all of its right, title and interest in, to and under all Collateral, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Credit Party.  Each Credit Party hereby agrees to do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such acts, deeds, certificates, other instruments, and other documents as the Agent may, at the direction of the Required Lenders, reasonably request in order to evidence and perfect such security interest, and authorizes the Agent to file all Uniform Commercial Code financing statements from time to time requested by the Agent, as requested by the Required Lenders, with respect to the Collateral, and such financing statements may indicate the Collateral as all assets of the applicable Credit Party or words of similar effect (it being understood that the Agent shall have no obligation to file financing statements, amendments or continuation statements and that the Credit Parties shall file such statements on behalf of the Lenders).

Section 2.11    Taxes.  (a)  Except to the extent required by law, any and all payments by any Credit Party hereunder or under any other Credit Document shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts,

ACTIVE 234178906
ACTIVE 234178906v.17

deductions, charges or withholdings, and all liabilities with respect thereto, excluding (i) taxes imposed on or measured by net income, franchise taxes (generally imposed on business entities), and branch profits taxes of the Agent or any Lender (or any transferee or assignee thereof, including a participation holder (any such entity, a "Transferee")), in each case, by the jurisdiction in which such Person is organized or has its principal lending office or imposed as a result of a present or former connection between the Agent or any Lender and the jurisdiction imposing such tax (other than connections arising solely from having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned any interest in the DIP Term Loan or any Credit Document) or (ii) taxes imposed by FATCA (all such nonexcluded taxes, levies, imposts, deductions, charges withholdings and liabilities, collectively or individually, "Taxes"). If any Credit Party shall be required to deduct any Taxes from or in respect of any sum payable hereunder to the Agent or any Lender (or Transferee), (i) the sum payable shall be increased by the amount (an "Additional Amount") necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.11) the Agent or such Lender (or Transferee) shall receive an amount equal to the sum it would have received had no such deductions been made, (ii) such Credit Party shall make such deductions and (iii) such Credit Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, each Credit Party agrees to pay to the relevant Governmental Authority in accordance with applicable law any present or future stamp or documentary transfer, recording or filing  taxes or fees or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Credit Document ("Other Taxes"). Each Credit Party shall deliver to the Agent or each Lender official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)    The Credit Parties hereby jointly and severally indemnify and agree to hold the Agent and each Lender harmless from and against Taxes and Other Taxes (including, without limitation, Taxes and Other Taxes imposed on any amounts payable under this Section 2.11) paid by such Person, whether or not such Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefor specifying in reasonable detail the nature and amount of such Taxes or Other Taxes.

(d)    Each Lender that is a "United States person" as that term is defined in Section 7701(a)(30) of the Internal Revenue Code (a "U.S. Lender") shall deliver to the Borrower and the Agent on or prior to the date on which such U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Agent, but only if such U.S. Lender is legally entitled to do so) an original duly completed Internal Revenue Service Form W-9 (or any successor form). Each Lender (or Transferee) that is organized under the laws of a jurisdiction outside the United States (a "Non-U.S. Lender") agrees that it shall, no later than the Effective Date (or, in the case of a Lender which becomes a party hereto pursuant to Section 12.07 hereof after the Effective Date, promptly after the date upon which such Lender becomes a party hereto) deliver to the Agent (or, in the case of a participant, to the Lender granting

- 41 -

the participation only) one properly completed and duly executed copy of either U.S. Internal Revenue Service Form W-8BEN-E, W-8BEN, W-8ECI or W-8IMY or other applicable form or documentation (or any subsequent versions thereof or successors thereto), in each case claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax and payments of interest hereunder.  In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code, such Non-U.S. Lender hereby represents to the Agent and the Borrower that such Non-U.S. Lender  is not a bank for purposes of Section 881(c) of the Internal Revenue Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of the Parent and is not a controlled foreign corporation related to the Parent (within the meaning of Section 864(d)(4) of the Internal Revenue Code).  Each Non-U.S. Lender agrees that it shall promptly notify the Agent and the Borrower of any change in circumstances which would modify or render invalid any such claimed exemption or reduction or form delivered by such Lenders.  Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes a Transferee hereunder) and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "New Lending Office").  In addition, such Non-U.S. Lender shall deliver such forms within five (5) Business Days after receipt of a written request therefor from the Agent, the assigning Lender, or the Lender granting a participation, as applicable.  Notwithstanding any other provision of this Section 2.11, a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.11(d) that such Non-U.S. Lender is not legally able to deliver.

(e)      If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA, if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Credit Parties or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Credit Parties or the Agent as may be necessary for the Credit Parties and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)      The Credit Parties shall not be required to indemnify the Agent, any Lender or Transferee, or pay any Additional Amounts to the Agent, any Lender or  any Transferee, in respect of United States Federal withholding tax pursuant to this Section 2.11 to the extent that (i) the obligation to withhold amounts with respect to United States Federal withholding tax existed on the date such Lender or such Transferee became a party to this Agreement (or, in the case of a Transferee that is a participation holder, on the date such participation holder became a Transferee hereunder) or, with respect to payments to a New Lending Office, the date such Lender or such Transferee designated such New Lending Office with respect to any of the DIP Term Loan; provided, however, that this clause (i) shall not apply to the extent the indemnity payment or Additional Amounts any Lender (or Transferee) through a New Lending Office, would be entitled

- 42 -

to receive (without regard to this clause (i)) do not exceed the indemnity payment or Additional Amounts that the Person making the assignment, participation or transfer to such Lender (or Transferee) making the designation of such New Lending Office, would have been entitled to receive in the absence of such assignment, participation, transfer or designation, or (ii) the obligation to indemnify or pay such Additional Amounts would not have arisen but for a failure by such Non-U.S. Lender to comply with the provisions of clause (d) above.

(g)    The Agent or any Lender (or Transferee) claiming any indemnity payment or additional payment amounts payable pursuant to this Section 2.11 shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested in writing by the Borrower or to change the jurisdiction of its applicable lending office if the making of such a filing or change would avoid the need for or reduce the amount of any such indemnity payment or additional amount that may thereafter accrue, would not require the Agent or such Lender (or Transferee) to disclose any information the Agent or such Lender (or Transferee) deems confidential and would not, in the sole determination of the Agent or such Lender (or Transferee), be otherwise disadvantageous to the Agent or such Lender (or Transferee).

(h)    So long as no Event of Default has occurred and is continuing, if the Agent or any Lender determines that it has received a refund of any Taxes as to which it has been indemnified by any Credit Party or with respect to which any Credit Party has paid additional amounts pursuant to this Section 2.11, it shall pay to such Credit Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by any Credit Party under this Section 2.11 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses incurred by the Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that each Credit Party, upon the request of the Agent,  such Lender, agrees to repay the amount paid over to any Credit Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent or such Lender in the event the Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.  This subsection shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party or any other Person.

(i)    The obligations of the Credit Parties under this Section 2.11 shall survive the termination of this Agreement and the payment of the DIP Term Loan and all other Obligations.

(j)    The Lenders and any transferees or assignees after the Effective Date will be required to provide to the Agent all information, documentation, or certifications acceptable to it to permit the Agent to comply with its tax reporting obligations including cost basis obligations.

- 43 -

Section 2.12        Increased Costs and Reduced Return.

(a) If any Lender shall have determined that any Change in Law shall (i) subject the Agent or such Lender, or any Person controlling the Agent or such Lender to any tax, duty or other charge with respect to this Agreement or any DIP Term Loan made by such Lender, or change the basis of taxation of payments to the Agent or such Lender or any Person controlling the Agent or such Lender of any amounts payable hereunder (except for taxes on the overall net income of the Agent or such Lender or any Person controlling the Agent or such Lender), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against the DIP Term Loans or against assets of or held by, or deposits with or for the account of, or credit extended by, the Agent or such Lender or any Person controlling the Agent or such Lender or (iii) impose on the Agent or such Lender or any Person controlling the Agent or such Lender any other condition regarding this Agreement or the DIP Term Loans, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to the Agent or such Lender of maintaining the DIP Term Loans, then, upon demand by the Agent or such Lender, the Borrower shall pay to the Agent or such Lender such additional amounts as will compensate the Agent or such Lender for such increased costs or reductions in amount.

(b) If any Lender shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Lender or any Person controlling such Lender, and such Lender determines that the amount of such capital is increased as a direct or indirect consequence of the DIP Term Loans made, purchased, held or maintained, such Lender's, or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Lender's, or such other controlling Person's capital to a level below that which such Lender or such controlling Person could have achieved but for such circumstances as a consequence of the DIP Term Loans made, purchased, held or maintained or such Lender's or such other controlling Person's other obligations hereunder, then, upon demand by such Lender, the Borrower shall pay to such Lender from time to time such additional amounts as will compensate such Lender for such cost of maintaining such increased capital or such reduction in the rate of return on such Lender's or such other controlling Person's capital.

(c) All amounts payable under this Section 2.12 shall bear interest from the date that is 10 days after the date of demand by the Agent or any Lender until payment in full to the Agent or such Lender at the rate applicable to the DIP Term Loans. A certificate of the Agent or such Lender claiming compensation under this Section 2.12, specifying the event herein above described and the nature of such event shall be submitted by the Agent or such Lender to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and the Agent's or such Lender's reasons for invoking the provisions of this Section 2.12, and shall be final and conclusive absent manifest error.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 2.12 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and

- 44 -

ACTIVE 234178906
ACTIVE 234178906v.17

of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)       The obligations of the Credit Parties under this Section 2.12 shall survive the termination of this Agreement and the payment of the DIP Term Loans and all other amounts payable hereunder.

## ARTICLE III

## [RESERVED]

## ARTICLE IV

## APPLICATION OF PAYMENTS; DEFAULTING LENDERS

Section 4.01    Payments; Computations and Statements.  The Borrower will make each payment under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Agent's Account.  All payments received by the Agent after 12:00 noon (New York City time) on any Business Day will be credited on the next succeeding Business Day.  All payments shall be made by the Borrower without set-off, counterclaim, recoupment, deduction or other defense to the Agent and the Lenders.  Except as provided in Section 2.03, the Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.  Whenever any payment to be made under any Credit Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.  All computations of fees shall be made by the Agent on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such fees are payable.  Each determination by the Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

Section 4.02    Sharing of Payments.  Except as provided in Section 2.11 hereof, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing

- 45 -

Lender in respect of the total amount so recovered and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its DIP Term Loan to any assignee or participant. The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 4.02 may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

Section 4.03    Apportionment of Payments.    Subject to Section 2.11 hereof:

(a)    All payments of principal and interest in respect of the outstanding principal amount of the DIP Term Loans, all payments of fees (other than the fees set forth in Section 2.06 hereof) and all other payments in respect of any other Obligations, shall be allocated by the Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein.

(b)    After the occurrence and during the continuance of an Event of Default, the Agent may, and upon the direction of the Required Lenders shall, apply all proceeds of the Collateral, subject to the provisions of this Agreement and the Financing Orders, (i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agent (including attorneys' fees and expenses) until paid in full; (ii) second, ratably to pay the Obligations in respect of any fees and indemnities then due and payable to the Lenders holding the DIP Term Loans, until paid in full; (iii) third, ratably to pay interest then due and payable in respect of the DIP Term Loans, until paid in full; (iv) fourth, ratably to pay principal of the DIP Term Loans, until paid in full and (v) fifth, to the ratable payment of all other Obligations then due and payable to Lenders holding the DIP Term Loans.

(c)    In each instance, unless and until the Required Lenders have directed the Agent that payments shall be applied in accordance with Section 4.03(b) following the occurrence and during the continuation of an Event of Default, such section shall not be deemed to apply to any payment by the Borrower specified by the Borrower to the Agent to be for the payment of any Obligations then due and payable under any provision of this Agreement or the prepayment of all or part of the principal of the DIP Term Loans in accordance with the terms and conditions of Section 2.05.

(d)    For purposes of Section 4.03(b), "paid in full" means payment in cash of all amounts owing under the Credit Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of the Chapter 11 Cases), default interest, interest on interest, and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in the Chapter 11 Cases and excluding contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted.

(e)    In the event of a direct conflict between the priority provisions of this Section 4.03 and other provisions contained in any other Credit Document, or between the

- 46 -

priority provisions of this or any other provision in any Credit Document and the Financing Orders, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, (i) the terms and provisions of the Financing Orders shall control and govern in a conflict between the Financing Orders and any Credit Document and (ii) the terms of this Section 4.03 shall control and govern in a conflict between this Section 4.03 and any other provision contained in this Agreement or any other Credit Document.

Section 4.04          Defaulting Lenders.          Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)     Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(b)     The Agent shall not be obligated to transfer to such Defaulting Lender any payments made by the Borrower to the Agent for such Defaulting Lender's benefit, and, in the absence of such transfer to such Defaulting Lender, the Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Pro Rata Shares (without giving effect to the Pro Rata Shares of such Defaulting Lender) (but only to the extent that such Defaulting Lender's DIP Term Loans were funded by the other Lenders, as applicable).

(c)     Any failure to fund any DIP Term Loan directly to the Borrower or, if applicable, authorize release of any portion of the Delayed Draw DIP Term Loans from the Segregated Pre-Funding Account, in each case, by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrower to replace the Defaulting Lender with one or more substitute Lenders, in accordance with the terms of Section 12.07, and the Defaulting Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Defaulting Lender shall specify an effective date for such replacement, which date shall not be later than seven (7) Business Days after the date such notice is given. Prior to the effective date of such replacement, the Defaulting Lender shall execute and deliver an Assignment and Acceptance. If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and delivered such Assignment and Acceptance. In addition to the foregoing, to the extent any existing Lender that is not a Defaulting Lender elects to fund the portion of the Defaulting Lender's Pro Rata Share of the DIP Term Loan (either directly to the Borrower or to through authorization of release from funds from the Segregated Pre-Funding Account), (i) such existing Lender shall automatically be deemed to have increased its DIP Term Loan Commitment by such amount and (ii) at such existing Lender's election by notice to the Agent, may elect (x) to assume the remaining DIP Term Loan Commitment of such Defaulting Lender and (y) to purchase the outstanding DIP Term Loan of such Defaulting Lender, and, in each such case, the Defaulting Lender shall be deemed to have executed and delivered an Assignment and Acceptance in respect of such DIP Term Loan

- 47 -

Commitment and DIP Term Loan, as applicable, and shall have no right to refuse to be replaced hereunder.

(d)      The operation of this Section shall not be construed to increase or otherwise affect the DIP Term Loan Commitments of any other Lender (except pursuant to the last sentence of Section 4.04(c)), to relieve or excuse the performance by any Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by the Borrower of its duties and obligations hereunder to the Agent or the Lenders other than such Defaulting Lender.

(e)      This Section shall remain effective with respect to such Lender until either (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable or (ii) the non-Defaulting Lender, the Required Lenders, and the Borrower shall have waived such Defaulting Lender's default in writing, and the Defaulting Lender makes its Pro Rata Share of the applicable defaulted DIP Term Loans and pays to the Agent all amounts owing by such Defaulting Lender in respect thereof; _provided_ that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; and _provided_, _further_, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

## ARTICLE V

## CONDITIONS TO CLOSING

Section 5.01      <u>Conditions Precedent to Effectiveness</u>.      The obligation of the Lenders to make the Initial DIP Term Loan is subject to the prior or contemporaneous satisfaction of each of the following conditions precedent in a manner satisfactory to the Agent and the Lenders (the Business Day on which the last of such conditions has been satisfied is referred to herein as the "<u>Effective Date</u>"):

(a)      <u>Payment of Fees, Etc.</u>  The Borrower shall have paid on or before the Effective Date all reasonable fees, costs and expenses then payable pursuant to Section 2.06 and Section 12.04 (which amounts may be paid from the Initial DIP Term Loan, at the option of the Borrower), including for the avoidance of doubt, the fees and expenses of legal counsel and financial advisors to the Agent, the Lenders, the Prepetition Agents and the Prepetition Lenders, in each case due and payable under any Credit Document or Prepetition Credit Document, as applicable, on or before the Effective Date.

(b)      <u>Budgets</u>.  The Lenders shall have received a cash forecast, in form, scope and substance reasonably acceptable to the Required Lenders, for a period of thirteen (13) weeks, beginning on the Petition Date, setting forth projected cash flows and disbursements, together with a certificate of an Authorized Officer of the Borrower stating that such Approved Budget presents, in all material respects, on a pro forma basis, the projected financial operations and (except with respect to any professional fees accrued as incurred rather than as disbursed as provided in Section 7.02(f)) disbursements of the Credit Parties for the period specified therein

- 48 -

ACTIVE 234178906
ACTIVE 234178906v.17

and such forecasts in the view of the management of the Borrower, are reasonably achievable based upon reasonable assumptions and other information available to the Borrower as of the first day of such period; provided, however, that a cash forecast materially in the form, scope and substance of that attached hereto as Exhibit H (the "Initial Approved Budget") shall be deemed to be reasonably acceptable to the Required Lenders.

(c)    Delivery of Documents.  The Agent shall have received on or before the Effective Date (i) a duly executed copy of this Agreement signed by each party hereto and (ii) a  duly executed copy of the Security Agreement signed by each party thereto.

(d)    First Day Orders.  Except with the consent (which shall not be unreasonably withheld or delayed) of the Required Lenders, the Agent and the Lenders shall have received satisfactory evidence of the entry of all other "first day" orders, including the Cash Management Order, which shall be shall be reasonably satisfactory in form and substance to the Lenders, and which "first day" orders shall have been entered upon an application or motion of the Credit Parties reasonably satisfactory in form and substance to the Lenders and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent.

(e)    Interim Order.  The Agent and the Lenders shall have received at least satisfactory evidence of the entry of the Interim Order, which order: (i) shall be satisfactory in form and substance to the Agent and the Lenders, (ii) shall have been entered upon an application or motion of the Credit Parties reasonably satisfactory in form and substance to the Agent and the Lenders and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent and (iii) shall be in full force and effect and shall not have been stayed, materially modified or reversed without the prior written consent of the Agent, the Required Lenders and the Credit Parties; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such DIP Term Loans nor the performance by the Credit Parties any of their respective obligations hereunder, under the Credit Documents or under the Interim Order shall be the subject of a presently effective stay pending appeal.

(f)    [reserved].

(g)    Liens; Priority Provision.  The Lenders shall be satisfied that the Agent will, upon entry of the Interim Order, the execution of the Security Agreement and the making of the Initial DIP Term Loan, have been granted and hold, for the benefit of the Agent and the Lenders, a perfected Lien on and security interest in all of the Collateral with the priorities set forth in the Financing Orders.

(h)    Opinion.  The Agent and the Lenders shall have received originally executed copies of a favorable and customary written opinions of (i) Young Conaway Stargatt & Taylor, LLP, Delaware counsel to the Credit Parties, as to authority, authorization, execution, perfection of Liens on the Collateral in favor of the Agent and other customary matters, and (ii) Sidley Austin LLP, counsel to the Credit Parties, as to enforceability, remedies, pledge and creation of security interests and other customary matters, in each case, dated as of the Effective Date and in form and substance reasonably satisfactory to the Agent and the Lenders.

- 49 -

        (i)      <u>Commencement of Chapter 11 Cases</u>.  The Credit Parties shall have commenced the Chapter 11 Cases and no trustee, examiner or receiver shall have been appointed or designated with respect to the Credit Parties' business, properties or assets and no motion shall be pending seeking such relief.

        (j)      <u>Stalking Horse APA</u>. The Agent and Lenders shall have received a copy of the Stalking Horse APA, duly executed by the Stalking Horse Bidder and the Credit Parties.

        (k)      <u>Bidding Procedures</u>.  The bidding and sale procedures related to the Auction attached hereto substantially in the form of Exhibit F (the "<u>Bidding Procedures</u>") shall be reasonably acceptable to the Lenders.

        (l)      <u>Know Your Customer</u>.  If the Agent or any Lender has requested "know your customer" information, or other similar information, the Agent or Lender, as the case may be, shall have received such information within five (5) Business Days after such request is submitted in writing to the Borrower.

        (m)      <u>Prepetition Direction Letters</u>.  Each of the Prepetition Lenders that is a Lender (or an affiliate of a Lender) shall have duly executed (or caused the due execution of) a direction letter, addressed and delivered to, and acknowledged by, the applicable Prepetition Agent, in respect of actions to be taken by the such applicable Prepetition Agent in connection with the Chapter 11 Cases.

        (n)      <u>Other</u>.  The Agent shall have received, in each case in form and substance reasonably acceptable to the Required Lenders:

        (i)      a certificate of an Authorized Officer of each Credit Party dated as of the Effective Date, certifying (A) that attached thereto is a true and complete copy of the Governing Documents of such Credit Party certified (to the extent applicable) as of a recent date by the Secretary of State of Delaware, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of managers (or other similar governing body) of such Credit Party authorizing the execution, delivery, and performance of the Credit Documents to which such Credit Party is or will be a party and that such resolutions have not been modified, rescinded, or amended and are in full force and effect; (C) to the incumbency and specimen signature of each officer executing any Credit Document or any other document delivered by such Credit Party related thereto on behalf of such Credit Party (together with a certificate of another officer as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate required by this clause);

        (ii)      a certificate of an officer of the Borrower dated the Effective Date, certifying that each condition under Sections 5.01 and 5.02 (other than the condition set forth in Section 5.01(m)) has or will have been satisfied as of the date thereof; <u>provided</u>, <u>however</u>, that (A) in respect of conditions in Section 5.01 and 5.02 that include receipt by the Agent, the Lenders or both, the certification described in this clause (ii) shall certify only that the documents or other items referenced in such conditions have been delivered by the Credit Parties to the Agent, the Lenders or both, as applicable, in accordance terms of this Agreement, and (B) in respect of

- 50 -

conditions in Sections 5.01 and 5.02 that include the satisfaction or reasonable satisfaction of the Agent, the Lenders or both, the certification described in this clause (ii) shall be made without reference to the satisfaction or reasonable satisfaction, as applicable, of the Agent, the Lenders or both, as applicable;

(iii)    UCC financing statements for perfection of the Liens requested by the Lenders;

(iv)    such information (financial or otherwise) as the Agent or any Lender may reasonably request; and

(v)    a certificate as to the good standing of each Credit Party as of a recent date from the Secretary of State of Delaware.

Section 5.02    <u>Conditions Precedent to All Borrowings</u>.  The obligation of any Lender to make a DIP Term Loan (either directly or by authorizing Segregated Pre-Funding Account Release), as applicable, is subject to the satisfaction of each of the following conditions precedent in a manner satisfactory to the Agent and the Required Lenders:

(a)    The Agent and the Lenders shall have received the Notice of Borrowing pursuant to and in accordance with Section 2.02(a) hereof.

(b)    The representations and warranties by any Credit Party contained herein or in any other Credit Document are true or correct in all material respects (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representation and warranty shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

(c)    No trustee or examiner having enlarged powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed with respect to any Credit Party or their respective properties in the Chapter 11 Cases.

(d)    No Default or Event of Default has occurred and is continuing or would result after giving effect to any DIP Term Loan.

(e)    The Chapter 11 Cases of the Credit Parties shall not have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code with respect to any Credit Party.

(f)    If (i) the date of such requested Borrowing is more than thirty (30) days after the Petition Date or (ii) the amount of such requested Borrowing, together with the outstanding principal amount of the DIP Term Loans funded to the Borrower, shall exceed $3,000,000.00, the Final Order shall be entered and in full force and effect and shall not have been stayed, reversed, vacated, rescinded, amended or otherwise materially modified without the consent of the Agent, the Lenders and the Credit Parties and, if the Final Order is the subject of a pending appeal in any respect, neither the making of such DIP Term Loan nor the performance by

- 51 -

the Credit Parties of any of their respective obligations hereunder, under the Credit Documents or under the Final Order shall be the subject of a presently effective stay pending appeal.

(g)    The Borrower shall have paid (i) all fees described in Section 2.06 and all costs and expenses payable pursuant to Section 12.04 or otherwise required to be paid or reimbursed to the Agent and the Lenders on or before such date, including all reasonable and documented out-of-pocket fees of legal counsel to the Agent and the Lenders, and (ii) all adequate protection payments due and payable on or before such date.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01    Representations and Warranties of the Credit Parties.  Each Credit Party hereby represents and warrants to the Agent and the Lenders as follows on the date of this Agreement and on the Effective Date:

(a)    Organization, Good Standing, Etc.  Each Credit Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrower, to make the Borrowings hereunder, and to execute and deliver each Credit Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect.

(b)    Authorization, Etc.  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, the execution, delivery and performance by each Credit Party of each Credit Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene any of its Governing Documents or any applicable Requirement of Law or any Contractual Obligation binding on or otherwise affecting it or any of its properties the effect of which has not been stayed by the automatic stay or the Bankruptcy Court, other than any such conflict which could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Credit Document, any Financing Order or any other Permitted Lien) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties, which could individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(c)    The Initial Approved Budget.  The Initial Approved Budget reasonably presents, in all material respects, on a pro forma basis, the projected financial operations and (except with respect to any professional fees accrued as incurred rather than as disbursed as provided in Section 7.02(f)) disbursements of the Credit Parties for the period

- 52 -

specified therein and such projections in the view of the management of the Borrowers, are achievable based upon reasonable assumptions and other information available to the Borrower as of the first day of such period.

(d)    <u>Enforceability of Credit Documents</u>.    Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, this Agreement is, and each other Credit Document to which any Credit Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally.

(e)    <u>Prepetition Obligations; Defenses</u>.    As of the Petition Date, the aggregate outstanding principal balance of the Prepetition Obligations of the Credit Parties, and the aggregate face amount of all outstanding loans and letter of credit reimbursement obligations constituting Prepetition Obligations of the Credit Parties, are approximately as set forth in <u>Schedule 6.01(e)</u> attached hereto, and the Credit Parties are truly and justly indebted (as an allowed secured claim) to each of the Prepetition Agents and the Prepetition Lenders with respect to the Prepetition Obligations of the Credit Parties without setoff, defense or counterclaim.

(f)    <u>Prepetition Credit Documents</u>.    The Credit Parties acknowledge and agree (i) that the Prepetition Credit Documents are valid and enforceable, (ii) that, subject to the Liens hereunder or any Financing Order, any "adequate protection" Liens, the Carve-Out, and the Permitted Liens, (x) the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Lenders has a valid, enforceable and fully perfected first priority lien in all of the Prepetition Collateral, including Cash Collateral, and all proceeds thereof and (y) that the Prepetition Second Lien Agent for the benefit of the Prepetition Second Lien Lenders has a valid, enforceable and fully perfected second priority lien in all of the Prepetition Collateral, including Cash Collateral, and all proceeds thereof and (iii) the Prepetition Collateral is declining in value; <u>provided</u>, <u>however</u>, that the representations and warranties contained in this Section 6.01(f) shall not bind the Committee or any other party in interest until the expiration of the Challenge Period under and as defined in the Financing Orders.

(g)    <u>Compliance with Law, Etc.</u>    No Credit Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents or (ii) any Requirement of Law, including any laws and regulations relating to food or liquor, the effect of which has not been stayed by the automatic stay or the Bankruptcy Court or that could individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(h)    <u>Regulations T, U and X</u>.    No Credit Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of the DIP Term Loans will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(i)    <u>Chapter 11 Case Matters</u>.

- 53 -

(i)        The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Interim Order has been given and proper notice for the hearing for the approval of the Final Order will be (or after the entry of the Final Order, has been) given.

(ii)        After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having the priority set forth in the Financing Orders.

(iii)        After the entry of the Interim Order and execution of the Security Documents, the Obligations will be secured by a valid and perfected, enforceable and unavoidable first priority, priming Lien with priority over the Liens of each of the Prepetition Agents on all of the Collateral and the proceeds thereof to the extent provided and as more fully set forth in the Financing Orders and the Security Agreement.

(iv)        The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on or after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, terminated, stayed, materially modified or amended in any manner without the written consent of the Required Lenders.

(v)        Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court, subject to and as more fully set forth in the Financing Orders.

(j)        <u>Investment Company Act</u>.   None of the Credit Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(k)        <u>Appointment of Trustee or Examiner; Liquidation</u>.   No order has been entered in any of the Credit Parties' Chapter 11 Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner (other than a fee examiner) with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104(d) and 1106(b) of the Bankruptcy Code or (iii) to convert any of the Credit Parties' Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Credit Parties' Chapter 11 Cases.

(l)        <u>No Other Insolvency Proceeding</u>.   Other than the Chapter 11 Cases, no Credit Party is engaged as a debtor party in any Insolvency Proceeding.

(m)        <u>Super-priority Claims; Liens</u>.   Upon the entry of each of the Interim Order and the Final Order, each such order and the Credit Documents is sufficient to provide the

- 54 -

Super priority Claims and security interests and Liens on the Collateral described in, and with the priority provided in, the Financing Orders.

## ARTICLE VII

## COVENANTS OF THE CREDIT PARTIES

Section 7.01    Affirmative Covenants.  So long as any principal of or interest on the DIP Term Loan, or any other Obligation (whether or not due) shall remain unpaid or any Lender shall have any DIP Term Loan Commitment hereunder, each Credit Party will, unless the Required Lenders shall otherwise consent in writing:

(a)    Reporting Requirements.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (provided that monthly and quarterly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).  The Borrower shall deliver to Agent (for its distribution to the Lenders) by Electronic Transmission and in detail reasonably satisfactory to the Required Lenders:

(i)    Bankruptcy Matters.  Copies of all monthly operating reports, projections or other information respecting the Credit Parties' business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Credit Parties with the Bankruptcy Court.

(ii)    Revised Approved Budget.  Not later than five (5) Business Days prior to the first Business Day of each fiscal month of the Parent and its Subsidiaries, a revised cash forecast budget (each, a "Proposed Budget") for a thirteen (13) week period commencing on the first Business Day of such fiscal month certified by the CRO.  Each Proposed Budget shall be subject to review and approval as to form, scope and substance by the Required Lenders before being deemed the "Approved Budget" for purposes of this Agreement.  Five (5) Business Days after delivery of a Proposed Budget, unless the Agent (acting at the written direction of the Required Lenders) delivers a written, good faith, objection to the Borrower (a "Proposed Budget Objection") setting forth the specific objections to the Proposed Budget, such Proposed Budget shall be deemed approved by the Required Lenders and shall constitute the "Approved Budget" for purposes of this Agreement.  If the Agent (acting at the written direction of the Required Lenders) shall have timely delivered a Proposed Budget Objection to the Borrower, the prior Approved Budget shall continue in place and the Required Lenders and the Borrower shall negotiate in good faith to resolve the objections set forth in the Proposed Budget Objection.  Upon resolution of the objections set forth in the Proposed Budget Objection, the resulting Proposed Budget shall become an "Approved Budget" for purposes of this Agreement.

(iii)    Budget Analysis.  Not later than the fourth (4th) Business Day of each calendar week (with each week ending on Sunday), (i) a weekly line-by-line budget variance report certified by the CRO, in form and scope acceptable to the Required Lenders, which report shall compare actual cash receipts and disbursements of the Credit Parties with amounts

- 55 -

provided for in the Approved Budget on a line-by-line basis for the preceding weekly period and the preceding four-week rolling period and (ii) any proposed modifications to the Approved Budget (such proposed modifications to be in compliance with the Variance Covenant unless otherwise approved by the Required Lenders).

(iv)    as soon as available, and in any event within thirty (30) days after the end of each fiscal month of the Credit Parties commencing with the first fiscal month of the Credit Parties ending after the Effective Date, internally prepared consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows as at the end of such fiscal month, and for the period commencing on the first day of the then-current Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Parent, as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Parent and its Subsidiaries for such fiscal month and for such year to date period, in accordance with GAAP;

(v)    as soon as available and in any event within forty-five (45) days after the end of each fiscal quarter of the Credit Parties commencing with the first fiscal quarter of the Credit Parties ending after the Effective Date, consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows of the Credit Parties as at the end of such quarter, and for the period commencing on the first day of the then-current Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Parent as fairly presenting, in all material respects, the financial position of the Credit Parties as of the end of such quarter and the results of operations and cash flows of the Parent and its Subsidiaries for such quarter and for such year to date period, in accordance with GAAP;

(vi)    simultaneously with the delivery of the financial statements of the Credit Parties required by clauses (iv) and (v) of this Section 7.01(a), a certificate of an Authorized Officer of the Parent stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Credit Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Credit Parties during the period covered by such financial statements with a view to determining whether the Credit Parties were in compliance with all of the provisions of this Agreement and such Credit Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has not knowledge of, the existence during such period of an Event of Default or Default or, if an Event of Default or Default existed, describing the nature and period of existence thereof and the action which the Credit Parties propose to take or have taken with respect thereto;

(vii)    as soon as possible, and in any event within five (5) Business Days after the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written

- 56 -

statement of an Authorized Officer of the Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Credit Party proposes to take with respect thereto;

(viii)    (A) as soon as possible and in any event within ten (10) days after any Credit Party thereof knows or has reason to know that (1) any Reportable Event with respect to any Employee Plan has occurred, (2) any other Termination Event with respect to any Employee Plan has occurred, or (3) an accumulated funding deficiency has been incurred or an application has been made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including installment payments) or an extension of any amortization period under Section 412 of the Internal Revenue Code with respect to an Employee Plan, a statement of an Authorized Officer of the Borrower setting forth the details of such occurrence and the action, if any, which such Credit Party or such ERISA Affiliate proposes to take with respect thereto, (B) promptly and in any event within three (3) days after receipt thereof by any Credit Party or any ERISA Affiliate thereof from the PBGC, copies of each notice received by any Credit Party or any ERISA Affiliate thereof of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan, (C) promptly and in any event within 10 days after the filing thereof with the Internal Revenue Service if requested by the Agent, at the direction of the Required Lenders, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Employee Plan and Multiemployer Plan, (D) promptly and in any event within 10 days after any Credit Party or any ERISA Affiliate thereof knows or has reason to know that a required installment within the meaning of Section 412 of the Internal Revenue Code has not been made when due with respect to an Employee Plan, (E) promptly and in any event within 3 days after receipt thereof by any Credit Party or any ERISA Affiliate thereof from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Credit Party or any ERISA Affiliate thereof concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (F) promptly and in any event within 10 days after any Credit Party or any ERISA Affiliate thereof sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Credit Party or such ERISA Affiliate thereof;

(ix)    promptly after the commencement thereof but in any event not later than five (5) Business Days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Credit Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which could reasonably be expected to have a Material Adverse Effect;

(x)    promptly after the sending or filing thereof, copies of all statements, reports and other information any Credit Party sends to any holders of its Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange;

(xi)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Credit Party by its auditors in connection with any annual or interim audit of the books thereof;

- 57 -

(xii)    promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Credit Party as the Agent, at the direction of the Required Lenders, or any Lender may from time to time reasonably request; provided, however, that no Credit Party shall be required to disclose or provide any information (a) that constitutes non-financial trade secrets or non-financial proprietary information of such Person or any of its Subsidiaries or any of their respective customers and/or suppliers, (b) in respect of which disclosure to the Agent or any Lender (or any of their respective representatives) is prohibited by any applicable Law, (c) that is subject to attorney-client or similar privilege or constitutes attorney work product or (d) in respect of which such Credit Party owes confidentiality obligations to any third party (provided such confidentiality obligations were not entered into in contemplation of the requirements of this Section 6.01(a)(xii)); provided, further, that in the event that any Credit Party does not provide information in reliance on the preceding clause (c) or (d) due to confidentiality or waiver concerns, such Credit Party shall provide notice to the Agent that such information is being withheld and shall use its commercially reasonable efforts to communicate the applicable information in a way that would not violate the applicable obligation or risk waiver of such privilege;

(xiii)    promptly and in any event within five (5) calendar days of their becoming available, copies of all press releases and other written statements made available by any Credit Party to the public concerning material developments in the business of any Credit Party;

(xiv)    concurrently with any delivery of financial statements and related information by any Credit Party to any creditor (other than with respect to the Prepetition Indebtedness) that is not otherwise required to be delivered hereunder or filed with the Bankruptcy Court, copies of such financial statements and related information.

(b)    Compliance with Laws, Etc.  Except to the extent such failure to comply could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect, comply in all material respects, with all Requirements of Law, judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), such compliance to include, without limitation, (i) paying before the same become delinquent all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, and (ii) paying all lawful claims which if unpaid might become a Lien or charge upon any of its properties, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(c)    Preservation of Existence, Etc.  Maintain and preserve its existence, rights and privileges and become or remain duly qualified and in good standing in each jurisdiction where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect.

(d)    Keeping of Records and Books of Account.  Keep adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

ACTIVE 234178906
ACTIVE 234178906v.17

(e)    <u>Inspection Rights</u>.  Permit a designee of the Required Lenders at any time and from time to time during normal business hours, at the expense of the Borrower, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, Phase I Environmental Site Assessments (provided however that such environmental site assessments shall not include invasive or subsurface testing) or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.  In furtherance of the foregoing, each Credit Party hereby authorizes its independent accountants to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the Required Lenders and their designees in accordance with this Section 7.01(e).

(f)    <u>Maintenance of Properties, Etc.</u>  Maintain and preserve, in all material respects, all of its properties which are necessary or material to the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times in all material respects with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except, in each case, where such failure to do so either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect.

(g)    <u>Maintenance of Insurance</u>.  Maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and in any event in amount, adequacy and scope reasonably satisfactory to the Required Lenders.  The Financing Orders shall provide that all policies covering the Collateral shall be made payable to the Agent for the benefit of the Agent and the Lenders, as its interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and  any payments to be made under such policies shall be made payable to the Agent for the benefit of the Agent and the Lenders, as its interests may appear.  All policies are to be paid according to the terms of the policy and/or premium financing agreement.  If any Credit Party fails to maintain such insurance, the Agent (at the direction of the Required Lenders) may arrange for such insurance, but at the Borrower's expense and without any responsibility on the Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  The Financing Orders shall provide that, upon the occurrence and during the continuance of an Event of Default, the Agent (at the direction of the Required Lenders) shall have the sole right, in the name and at the direction of the Lenders and any Credit Party to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(h)    <u>Obtaining of Permits, Etc.</u>  Obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements

ACTIVE 234178906
ACTIVE 234178906v.17

and accreditations which are necessary or useful in the proper conduct of its business, including all approvals by any federal, state or local liquor authority necessary for the continued operation at all times of any Store operated by the Borrower with full liquor service, except, in each case, where such failure to do so either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect.

        (i)     <u>Environmental</u>.    (i) Keep all Facilities free of any material Environmental Liens, (ii) comply with all Environmental Laws with respect to operations at the Facilities, except where such failure to comply could not reasonably be expected to have a Material Adverse Effect and (iii) provide the Agent written notice within thirty (30) days of (A) any Release from, at or onto any of the Facilities which is reasonably expected have a Material Adverse Effect and take any Remedial Actions required to abate such Release, (B) any written notice that an Environmental Lien has been filed against any of the Facilities and (C) commencement of any Environmental Action against any Credit Party which is reasonably expected to have a Material Adverse Effect.

        (j)     <u>Further Assurances</u>.  Take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as the Agent, at the direction of the Required Lenders, may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement, the other Credit Documents and/or the Financing Orders, (ii) to subject to valid and perfected first priority Liens any of the Collateral, (iii) to establish and maintain the validity and effectiveness of any of the Credit Documents and the validity, perfection and priority of the Liens intended to be created thereby or by the Financing Orders, as applicable and (iv) to better assure, convey, grant, assign, transfer and confirm unto the Agent and each Lender the rights now or hereafter intended to be granted to it under this Agreement, any other Credit Document and/or the Financing Orders (including, without limitation, upon the occurrence of an Event of Default, causing each Credit Card Issuer and Credit Card Processor to direct all payments (due to any Credit Party) of all credit card charges submitted by any Credit Party to such Credit Card Issuer and Credit Card Processor to the Cash Management Accounts). In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Credit Party (i) authorizes the Agent to execute any such agreements, instruments or other documents in such Credit Party's name and to file such agreements, instruments or other documents in any appropriate filing office, (ii) authorizes the Agent to file any financing statement required hereunder or under any other Credit Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed prior to the date hereof. The assurances contemplated by this Section 7.01(k) shall be given under applicable non-bankruptcy law (to the extent not inconsistent with the Bankruptcy Code and the Financing Orders) as well as the Bankruptcy Code, it being the intention of the parties that the Agent may reasonably request assurances under applicable non-bankruptcy law, and such request shall be complied with (if otherwise made in good faith by the Agent) even if the Financing Orders are in force and whether or not dismissal of the Chapter 11 Cases or any other action by the Bankruptcy Court is imminent, likely or threatened. The Agent shall have no obligation to take any action pursuant to this Section absent written direction from the Required Lenders.

        (k)     <u>Use of Proceeds</u>.

- 60 -

(i)    The Borrower shall utilize the Cash Collateral and the proceeds of the DIP Term Loans solely (a) to pay interest, fees and expenses owing to the Agent and the Lenders pursuant to this Agreement, (b) to make other payments in accordance with the Approved Budget (subject to the Permitted Variance) and the Financing Orders (including, without limitation, (x) adequate protection payments to the Prepetition Lenders to the extent set forth in the Approved Budget and (y) for general working capital purposes), (c) for certain other Prepetition expenses that are approved by the Bankruptcy Court and consented to by the Required Lenders, (d) for the Carve-Out and (e) to pay the Credit Support Fee.

(ii)    Absent the consent of the Required Lenders, the Borrower shall not be permitted to use the Cash Collateral, the Carve-Out or the proceeds of the DIP Term Loans (x) for payment of interest and principal with respect to any other funded Indebtedness (other than Obligations and adequate protection payments with respect to the Prepetition Obligations), (y) (A) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging the validity, perfection, priority, extent or enforceability of the Obligations or the Liens of the Agent on the Collateral or (B) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation challenging the validity, perfection, priority, extent or enforceability of the obligations of the Borrowers under the Prepetition Credit Agreement or the Liens of the Prepetition Agents on the Prepetition Collateral; provided, however, that (1) in the case of this clause (ii), upon any and each instance that the Agent, the Lenders or both, as applicable, assert that an Event of Default has occurred, up to $75,000.00 shall be made available to the Credit Parties to seek a determination that an Event of Default under this Agreement or under the Prepetition Credit Agreement has not occurred or is not continuing; (2) up to $25,000 shall be made available to the Committee for investigation costs in respect of the stipulations set forth in the Financing Orders; and (3) nothing in this Section 7.01(k) shall prohibit the Credit Parties from using Cash Collateral to pay fees and expenses of the Credit Parties' professionals incurred responding to information requests as provided in Section 9.01(o)(x), (iii) to make any distribution under a plan of reorganization in the Chapter 11 Cases, unless agreed to by the Required Lenders, (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior consent of the Required Lenders, except as contemplated by the Approved Budget (subject to the Permitted Variance), (v) to pay any expenses other than the amounts set forth in the Approved Budget (subject to the Permitted Variance), unless the Required Lenders consent to such non-conforming payment in writing, or (vi) to prevent, hinder or delay, whether directly or indirectly, the Lenders' assertion of their Liens on the Collateral, or their efforts to realize upon any Collateral under the Credit Documents or exercise any other rights and remedies under the Credit Documents or applicable law.

(l)    Other Bankruptcy Matters.  The Borrower will deliver to the Agent and the Lenders drafts of all of the Credit Parties' proposed substantive pleadings and proposed orders in the Chapter 11 Cases as soon as reasonably practicable in advance of, and in no event less than two (2) Business Days (or such shorter period as the Required Lenders are willing to accommodate) in advance of, filing of such pleadings and proposed orders.

(m)    Landlord Waivers; Collateral Access Agreements.  At any time that Collateral with a book value in excess of $100,000 (when aggregated with all other Collateral at the same location) is located on any real property occupied or operated by a Credit Party (whether

- 61 -

such real property is now existing or acquired after the Effective Date) which is not owned by a Credit Party, at the request of the Required Lenders, use commercially reasonable efforts to obtain written subordinations or waivers, in form and substance satisfactory to the Agent, of all present and future Liens to which the owner or lessor of such premises may be entitled to assert against the Collateral.

          (n)    Fiscal Year.  Cause the Fiscal Year of the Parent to end on December 31 of each calendar year unless the Required Lenders consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

          (o)    Credit Card Agreements.  Each of the Credit Parties shall:  (a) observe and perform all material terms, covenants, conditions and provisions of the Credit Card Agreements to be observed and performed by it at the times set forth therein; (b) not do, permit, suffer or refrain from doing anything, as a result of which there could be a material default under or material breach of any of the terms of any of the Credit Card Agreements; (c) at all times maintain in full force and effect the Credit Card Agreements and not terminate, cancel, surrender, or materially modify, amend, waive or release any of the Credit Card Agreements, or consent to or permit to occur any of the foregoing; except, that, (i) any such Credit Party may terminate or cancel any of the Credit Card Agreements in the ordinary course of the business of such Credit Party; provided, that, such Credit Party shall give the Agent not less than 15 days' prior written notice of its intention to so terminate or cancel any of the Credit Card Agreements, and (ii) any Credit Party may modify or amend any of the Credit Card Agreements, so long as such modification or amendment does not give the Credit Card Issuer or Credit Card Processor party thereto greater rights to setoff against amounts otherwise payable to such Credit Party or greater rights to cease or suspend payments to such Credit Party; (d) not enter into any new Credit Card Agreements with any new Credit Card Issuer or Credit Card Processor unless the Agent shall have received not less than 30 days' prior written notice of the intention of such Credit Party to enter into such agreement (together with such other information with respect thereto as the Agent, at the direction of the Required Lenders, may request); and (e) furnish to the Agent, promptly upon the request of the Agent, at the direction of the Required Lenders, such information and evidence as the Agent may reasonably require from time to time concerning the observance, performance and compliance by such Credit Party or the other party or parties thereto with the terms, covenants or provisions of the Credit Card Agreements.

          (p)    Cash Management.

          (i)    The Credit Parties (A) have, prior to the Petition Date, established and maintained cash management services of a type and on terms reasonably satisfactory to the Required Lenders at one or more of the banks set forth on Schedule 7.01(p) (each a "Cash Management Bank"), provided that, unless otherwise agreed by the Required Lenders, each of the accounts (other than Excluded Accounts) maintained by each bank is subject to a Control Agreement that is in form reasonably satisfactory to the Required Lenders, and (B) except as otherwise provided under Section 7.01(p)(iii), shall deposit or cause to be deposited promptly in accordance with the Cash Management System all proceeds in respect of any Collateral and all Collections (of a nature susceptible to a deposit in a bank account) and all other amounts received by any Credit Party (including payments made by the Account Debtors directly to any Credit Party and remittances on credit card sales) into a Cash Management Account.

- 62 -

(ii)    [Reserved.]

(iii)    (A) So long as no Default or Event of Default has occurred and is continuing, the Borrower may amend Schedule 7.01(p) to add or replace a Cash Management Account, (B) the Credit Parties shall be permitted to establish and maintain one or more deposit accounts at a Cash Management Bank for purposes of collecting and maintaining deposits made by bidders in connection with the Sale Process (including without limitation any Good Faith Deposit), which accounts, for the avoidance of doubt, shall not be required to be subject to any Control Agreement in favor of the Agent or the Lenders, and (C) the Credit Parties shall be permitted to establish and maintain one or more deposit accounts at a Cash Management Bank (1) for purposes of collecting and maintaining payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Credit Party's employees and (2) that do not contain deposits in an aggregate amount in excess of $10,000 for any one account, which accounts, for the avoidance of doubt, shall not be subject to any Control Agreement in favor of the Agent or the Lenders.

(q)    <u>Investment Bank</u>.

(i)    The Credit Parties shall continue to retain the services of the Investment Bank on the terms contained in the Bankruptcy Court's order approving such retention or otherwise on terms acceptable to Required Lenders.

(ii)    The Credit Parties shall cause Investment Bank to provide an update to the Required Lenders regarding the Sale Process, in form and scope reasonably acceptable to the Required Lenders on or prior to the fourth Business Day of each week (with each week ending on Sunday) during the term of this Agreement.

(r)    <u>Sale Milestones</u>. Each of the Credit Parties shall take the following actions (collectively, the "<u>Sale Process</u>") no later than the applicable date set forth below:

(i)    On or prior to the Petition Date, execute an asset purchase agreement (the "<u>Stalking Horse APA</u>") to sell all or substantially all of their respective assets to a purchaser (the "<u>Stalking Horse Bidder</u>"), subject to receipt of "higher and/or otherwise better" bids and approval of the Bankruptcy Court;

(ii)    No later than five (5) calendar days after the Petition Date, file (a) a motion under Section 363 of the Bankruptcy Code (the "<u>Sale Motion</u>") to sell all or substantially all of their respective assets pursuant to the Stalking Horse APA, subject to the receipt of "higher and/or otherwise better" bids, and (b) a motion ("<u>Bid Procedures Motion</u>") for approval of the Bidding Procedures; <u>provided</u>, <u>however</u>, that the Sale Motion and the Bid Procedures Motion may be a single motion and must be in form and substance reasonably acceptable to the Required Lenders;

(iii)    No later than thirty-three (33) calendar days after the Petition Date, obtain Bankruptcy Court approval of the Bidding Procedures, pursuant to an order (the "<u>Bidding Procedures Order</u>") in form and substance reasonably acceptable to the Required Lenders (<u>provided</u>, <u>however</u>, that an order of the Bankruptcy Court not materially different from the form of order attached as Exhibit F to the Stalking Horse APA shall be deemed to be reasonably

- 63 -

acceptable to the Requisite Lenders), which Bidding Procedures Order shall set forth a final bid deadline (the "Bid Deadline") on a date acceptable to the Credit Parties, in consultation with the Required Lenders, but no later than fifty-four (54) calendar days after the Petition Date;

(iv)     To the extent required pursuant to the Bidding Procedures, commence, no later than sixty-three (63) calendar days after the Petition Date, and conduct, subject to the supervision of the Bankruptcy Court and in accordance with the Bidding Procedures, the Auction, upon the completion of which the Credit Parties shall evaluate each bid at the Auction and, in accordance with the Bidding Procedures, the Decision Maker (as defined in the Bidding Procedures), after consultation with the Required Lenders, shall select the successful bidder for subsequent approval by the Bankruptcy Court pursuant to the Sale Order (the "Successful Bid");

(v)     No later than ten (10) calendar days after completion of the Auction (or, if there is no Auction, no later than seventy-three (73) calendar days after the Petition Date), obtain approval of the Approved Sale to one or more buyers on the terms of the Successful Bid pursuant to a sale order (1) that is in form and substance reasonably acceptable to the Required Lenders  (the "Sale Order"), and (2) provides that the Liens granted under the Financing Orders shall attach, subject to the Carve-Out, to the proceeds of the Approved Sale in the same amount and priority as such Liens have attached to the assets sold pursuant to the Approved Sale; and

(vi)     No later than the Scheduled Termination Date, consummate the Approved Sale;

provided that neither the Bidding Procedures Order (including the Bidding Procedures), nor the Sale Order nor any of the other approvals described in this section once given shall be amended or otherwise modified in any material respect (including with respect to any extension of any deadline described above) without the consent of the Credit Parties and the Required Lenders or amended or otherwise modified in any manner that has a negative impact on the rights or interests of the Lenders without the consent of the Required Lenders.

(s)     Lender Meetings.  The Borrower will and will cause the CRO, upon the reasonable request of any Lender or any of its advisors, to participate in meetings with the Agent and the Lenders to be held at such location as may be agreed to by the Borrower and the Lenders or via conference call, at such time as may be agreed to by the Borrower and the Lenders.

(t)     Non-Consolidation.  Solely to the extent consistent with prepetition practice, each Credit Party shall (i) maintain entity records and books of account separate from those of any other Credit Party or other Affiliate of such Credit Party and; (ii) not commingle its funds or assets with those of any other Credit Party or other Affiliate of such Credit Party.

(u)     Debtor-in-Possession Obligations.  Each Credit Party shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code and any order of the Bankruptcy Court, as such order may be amended and in effect from time to time.

(v)     DIP Budget.  Aggregate disbursements by the Borrower shall not exceed the amounts set forth in the Approved Budget, together with the Permitted Variance.

- 64 -

(w)    CRO.  The Credit Parties shall provide the Agent and the Lenders with reasonable access to the CRO, the Investment Bank, and any consultant, turnaround management firm, broker or financial advisory firm retained by any Credit Party in any of the Chapter 11 Cases.  The Credit Parties shall retain the CRO at all times prior to termination of this Agreement.

(x)    Validation of Liens Securing Prepetition Obligations.  Each of the Credit Parties agrees to use its commercially reasonable efforts to obtain entry by the Bankruptcy Court of an order authorizing the Credit Parties to pay (or otherwise credit against the Prepetition Indebtedness solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) the allocable proceeds of the Approved Sale to the Prepetition Lenders.

(y)    Workers' Compensation.  The Credit Parties shall continue to make all payments due and fulfill all other obligations on account of the Credit Parties' WC Obligations, including, but not limited to (i) payment of all insurance premiums related to their workers compensation liabilities, (ii) payment of all ongoing weekly, monthly or quarterly obligations on account of their workers compensation liabilities, (iii) maintenance of any and all collateral in support of or related to their workers compensation liabilities and (iv) all payments in respect of the letters of credit that serve as collateral for any such obligations, including, but not limited to, the Credit Support Fee.

(z)    Retention of Investment Bank.  Within eight Business Days following the Petition Date, the Credit Parties shall file a motion reasonably satisfactory in form and substance to the Lenders seeking (i) Bankruptcy Court authorization to retain of Piper Jaffray & Co. (or another investment bank selected by the Borrower and reasonably acceptable to the Lenders, such bank, an "Investment Bank"), on terms substantially similar to the terms set forth in the agreement by and among the Parent and Piper Jaffray in effect as of January 22, 2018, or otherwise reasonably acceptable to the Lenders, which order shall (ii) attaching a proposed order reasonably satisfactory in form and substance to the Lenders and permitting such Investment Bank to market the assets of the Credit Parties in connection with the Stalking Horse APA and to solicit higher and/or otherwise better bids subject to the Bidding Procedures Order, and assist the Credit Parties with obtaining Bankruptcy Court approval pursuant to Section 363 of the Bankruptcy Code of an Approved Sale.  The Credit Parties shall serve the motion upon such parties required to receive notice of the motion and such other parties as may be reasonably requested by Agent.

(aa)    Post-Closing Covenant.  The Borrower shall use reasonable best efforts to cause, as promptly as practicable, Wells Fargo Bank, National Association, in its capacity as Bank under the Existing DACA, to enter into that certain acknowledgment letter in respect of the Existing DACA substantially in the form attached hereto as Exhibit I.

Section 7.02    Negative Covenants.  So long as any principal of or interest on the DIP Term Loans or any other Obligation (whether or not due) shall remain unpaid or any Lender shall have any DIP Term Loan Commitment hereunder, each Credit Party shall not, unless the Required Lenders shall otherwise consent in writing:

- 65 -

(a)     <u>Liens, Etc.</u>  Create, incur, assume or suffer to exist any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired, other than Permitted Liens.

(b)     <u>Indebtedness</u>.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to any Indebtedness other than Permitted Indebtedness.

(c)     <u>Fundamental Changes; Dispositions</u>.    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired; <u>provided, however</u>, that the Credit Parties may:

(i)     Sell assets or equity in an Approved Sale or otherwise pursuant to Section 363 of the Bankruptcy Code, on terms and conditions satisfactory to the Agent and the Required Lenders, and approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code;

(ii)     sell Inventory in the ordinary course of business; and

(iii)     (A) license, on a non-exclusive basis, patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business, (B) lease or sublease assets in the ordinary course of business, and (C) dispose of obsolete or worn-out equipment in the ordinary course of business.

(d)     <u>Change in Nature of Business</u>.

(i)     Make, or permit any of its Subsidiaries to make, any change in the nature of its business as conducted on the Effective Date.

(ii)     Permit the Parent to have any material liabilities (other than liabilities arising under the Credit Documents, and the existing liabilities under the Prepetition Credit Documents and the Parent Subordinated Credit Facility Documents), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(e)     <u>Loans, Advances, Investments, Etc.</u>  Make or commit or agree to make or permit any of its Subsidiaries make or commit or agree to make, any Investment in any other Person except for Permitted Investments.

(f)     <u>Variance Covenant</u>.

(i)     For any four-week rolling period subject to the Approved Budget, the Borrower shall not permit the aggregate disbursements of the Credit Parties for the same four-week period to exceed by more than fifteen percent (15%) the projected disbursements of the Credit Parties set forth in the Approved Budget for such period (the "<u>Permitted Variance</u>"), which requirement shall be tested, initially, upon the completion of three (3) calendar weeks

- 66 -

following the Petition Date, and thereafter, on a weekly basis, in each case, on the fourth (4th) Business Day for the week or period ending on the preceding Sunday; provided, however, that (x) the Credit Parties shall and shall be entitled to reserve budgeted professional fees on a weekly basis, such fees to be reconciled as to actual professional fees upon actual billing, Bankruptcy Court approval thereof, and payment, and (y) notwithstanding anything to the contrary herein, the fees and expenses of any professionals (including without limitation attorneys and other advisors in these Chapter 11 Cases) engaged by any of (i) the Agent, (ii) the Prepetition Agents, (iii) the Prepetition Lenders, and (iv) the Lenders, shall not be considered for purposes of measuring the Credit Parties' compliance with this Section 7.02(f).

(g)    Capital Expenditures.  Make or commit or agree to make, or permit any of its Subsidiaries to make or commit or agree to make, any Capital Expenditure (by purchase or Capitalized Lease), except as set forth in the Approved Budget (subject to the Permitted Variance).

(h)    Restricted Payments. (i) Declare or pay any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Credit Party or any of its Subsidiaries, now or hereafter outstanding, (ii) make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Credit Party or any direct or indirect parent of any Credit Party, now or hereafter outstanding, (iii) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of any class of Equity Interests of any Credit Party, now or hereafter outstanding, (iv) return any Equity Interests to any shareholders or other equity holders of any Credit Party or any of its Subsidiaries, or make any other distribution of property, assets, Equity Interests, warrants, rights, options, obligations or securities thereto as such or (v) pay any management, consulting, monitoring or advisory fees or any other fees or expenses (including the reimbursement thereof by any Credit Party or any of its Subsidiaries) pursuant to any management, consulting, monitoring, advisory or other services agreement to any of the shareholders or other equityholders of any Credit Party or any of its Subsidiaries or other Affiliates (in each case under this clause (v), in their capacities as such shareholders or equityholders), or to any other Subsidiaries or Affiliates of any Credit Party; provided, however,

(A)    [reserved;]

(B)    subject to and as set forth in the Approved Budget, the Credit Parties may pay the Credit Support Fee as provided in the Reimbursement and Fee Agreement in accordance with Section 7.01(y); and

(C)    to the extent constituting a Restricted Payment, any Credit Party may make and receive, as applicable, Permitted Intercompany Receivables and Permitted Intercompany Payables.

(i)    Federal Reserve Regulations.  Permit the DIP Term Loan or the proceeds of the DIP Term Loan under this Agreement to be used for any purpose that would cause the DIP Term Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

- 67 -

(j)    _Transactions with Affiliates_.  Enter into, renew, extend or be a party to any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except:

(i)    transactions consummated in the ordinary course of business in a manner and necessary or desirable for the operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, and that are fully disclosed to the Agent prior to the consummation thereof as set forth in the Approved Budget (subject to the Permitted Variance);

(ii)    transactions with another Credit Party;

(iii)    transactions permitted by Section 7.02(e) and Section 7.02(h);

(iv)    transactions pursuant to the Prepetition Credit Documents and the Parent Subordinated Credit Facility Documents and agreements permitted thereunder, in each case, with Lenders or Affiliates of Lenders, in each case that are Affiliates of the Credit Parties; provided, that, any payments required to be made thereunder shall be subject to the limitations set forth in this Agreement and the DIP Budget (subject to the Permitted Variance);

(v)    the payment of reasonable and customary fees to members of the Parent's Board of Directors who are not employed by a Permitted Holder or by any investment manager of a Permitted Holder, and benefits and reimbursement of expenses to officers and directors of such Credit Party and its Subsidiaries for services rendered, to the extent approved by its Board of Directors;

(vi)    the Z Capital Subscription Lines, the Reimbursement and Fee Agreement and the transactions contemplated thereby; provided, that, any such payments required to be made thereunder shall be subject to the limitations set forth in this Agreement;

(vii)    any agreement to sell all or substantially all of the assets of the Credit Parties with any Affiliate in accordance with Section 7.01(r), including, without limitation, the Stalking Horse APA and any other agreements contemplated thereby.

(k)    _Limitations on Issuance of Equity Interests_.  Issue or sell or enter into any agreement or arrangement for the issuance and sale of, or permit any of its Subsidiaries to issue or sell or enter into any agreement or arrangement for the issuance and sale of, any of its Equity Interests, or securities convertible into or exchangeable for Equity Interests of the Credit Parties and their respective Subsidiaries.

(l)    _Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc._

(i)    Without the consent of the Required Lenders, agree to a contractual amendment, modification or change any of the provisions of any of its other

- 68 -

ACTIVE 234178906
ACTIVE 234178906v.17

Indebtedness (other than Indebtedness in respect of the WC Insurance Letter of Credit (as permitted under the Reimbursement and Fee Agreement, as in effect on the Effective Date)) or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness;

(ii)     except pursuant to a confirmed reorganization plan, the "first day" orders, the Financing Orders or any other order consented to by the Required Lenders and except as specifically permitted hereunder, Borrower shall not, without the express prior written consent of the Required Lenders, make any payment or transfer with respect to any Lien, Indebtedness or other obligation incurred or arising prior to the filing of the Chapter 11 Cases that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise;

(iii)     amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN;

(iv)     amend, modify or otherwise change any of its Governing Documents, including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Equity Interests (including any shareholders' agreement), or enter into any new agreement with respect to any of its Equity Interests;

(v)     [Reserved]; or

(vi)     agree to any material amendment or other material change to or material waiver of any of its rights under any Material Contract.

(m)     Subsidiaries.  No Credit Party shall create any Subsidiaries after the Effective Date.

(n)     Reclamation Claims. Unless otherwise authorized or directed by an order of the Bankruptcy Court, no Credit Party shall enter into any agreement to return any of its inventory to any of its creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under Section 546(g) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code without the consent of the Required Lenders.

(o)     Chapter 11 Claims.  No Credit Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claims of Agent and Lenders against the Borrower or any other Credit Party, except with respect to the Carve-Out or as otherwise consented to by the Required Lenders.

(p)     ERISA.  (i) Establish, sponsor, maintain, become a party or contribute to or become obligated to sponsor, maintain or contribute to any Multiemployer Plan or any defined benefit plan (or permit any of its ERISA Affiliates to do any of the foregoing) or (ii) adopt or permit any ERISA Affiliate to adopt any employee welfare benefit plan within the

- 69 -

meaning of Section 3(1) of ERISA which provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or applicable law.

(q)    [Reserved].

(r)    Limitations on Negative Pledges.  Enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Credit Party or any Subsidiary of any Credit Party (other than RM Foods LLC) to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following: (i) this Agreement, the other Credit Documents, the Prepetition Credit Documents, the Parent Subordinated Credit Facility Documents or any other agreement approved by the Bankruptcy Court in connection with the Sale Process, (ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.02(a) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition; provided that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, and (iv) customary provisions in leases restricting the assignment or sublet thereof.

(s)    Cash Management Accounts.  Subject to Section 7.01(p)(iii), no Credit Party will deposit any funds in a deposit account (other than an Excluded Account) or deposit, acquire, or otherwise carry any security entitlement or commodity contract in a securities account that is not a Cash Management Account.

(t)    Anti-Terrorism Laws.  None of the Credit Parties, nor any of their Affiliates or agents shall:

(i)    conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person,

(ii)    deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the OFAC Sanctions Programs or

(iii)    engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the OFAC Sanctions Programs, the USA PATRIOT Act or any other Anti-Terrorism Law.

The Borrower shall deliver to the Lenders any certification or other evidence reasonably requested from time to time by any Lender, confirming the Borrower's compliance with this Section 7.02(t).

ACTIVE 234178906
ACTIVE 234178906v.17

(u)    Financing Orders; Administrative Priority; Lien Priority; Payment of Claims.  None of the Credit Parties, and, with respect to (i) and (ii) below, none of the Credit Parties' Affiliates or agents, shall:

(i)    at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Financing Orders, except for modifications and amendments agreed to by the Agent and the Required Lenders;

(ii)    at any time, suffer to exist a priority for any administrative expense or unsecured claim against the Credit Parties (now existing or hereafter arising of any kind or nature whatsoever), including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code equal or superior to the priority of the Agent and the Lenders in respect of the Obligations, except as provided in the Financing Orders or otherwise consented to by the Required Lenders; and

(iii)    prior to the date on which the Obligations have been paid in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA), pay any administrative expense claims except as provided in the Financing Orders, the Approved Budget (subject to the Permitted Variance).

Notwithstanding the foregoing, nothing in this Agreement shall prohibit transactions among the Credit Parties in the ordinary course of their business consistent with the Cash Management System.

**ARTICLE VIII**

**[RESERVED]**

**ARTICLE IX**

**EVENTS OF DEFAULT**

Section 9.01    Events of Default.  If any of the following shall occur and be continuing:

(a)    the Borrower shall (i) fail to pay any principal of the DIP Term Loans or (ii) fail to pay any interest on the DIP Term Loans or any fee, indemnity or other amount payable under this Agreement or any other Credit Document when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure continues for three (3) Business Days;

(b)    any representation or warranty made or deemed made by or on behalf of any Credit Party or by any officer of the foregoing under or in connection with any Credit Document or under or in connection with any report, certificate or other document delivered to the Agent or any Lender pursuant to any Credit Document, which representation or warranty is subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any respect

- 71 -

when made or deemed made; or any representation or warranty made or deemed made by or on behalf of any Credit Party or by any officer of the foregoing under or in connection with any Credit Document or under or in connection with any report, certificate or other document delivered to the Agent or any Lender pursuant to any Credit Document, which representation or warranty is not subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any material respect when made or deemed made;

      (c)      any Credit Party shall:

            (i)      fail to perform or comply with any covenant or agreement contained in Sections 7.01(a)(vii), 7.01(c), 7.01(k), 7.01(l), 7.01(p), 7.01(r), 7.01(t), 7.01(u), 7.01(v), 7.01(w), 7.01(x), 7.01(y) or 7.02 or any Credit Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement or other Security Document to which it is a party;

            (ii)      fail to perform or comply with any covenant or agreement contained in Sections 7.01(a) (other than Section 7.01(a)(vii)) or Section 7.01(g), and such failure shall remain unremedied for 15 days;

      (d)      any Credit Party shall fail to perform or comply with any other term, covenant or agreement contained in any Credit Document to be performed or observed by it and, except as set forth in subsections (a), (b), and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for 30 days after the earlier of the date a senior officer of any Credit Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent, at the direction of the Required Lenders, to such Credit Party;

      (e)      except as occasioned by the filing of the Chapter 11 Cases and obligations with respect to which the Bankruptcy Code prohibits any Credit Party from complying or permits any Credit Party not to comply, any Credit Party shall fail to pay any of its Indebtedness (excluding (i) Indebtedness evidenced by this Agreement which payment defaults are governed by other provisions of this Section 9.01 and (ii) any Indebtedness owed by any Credit Party existing on the Petition Date) in excess of $1,000,000, or any payment of principal, interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

      (f)      [reserved];

      (g)      [reserved];

ACTIVE 234178906
ACTIVE 234178906v.17

(h)    any material provision of any Credit Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Credit Party intended to be a party thereto, or the validity or enforceability thereof shall be contested in writing by any Credit Party thereto, or a proceeding shall be commenced by any Credit Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Credit Party shall deny in writing that it has any liability or obligation purported to be created under any Credit Document;

(i)    at any time after the Effective Date and prior to the repayment in full of the Obligations (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted), the Agent shall fail to have Liens that are valid and perfected and, except to the extent permitted by the terms of the Credit Documents, first priority Liens for the benefit of the Agent and the Lenders in accordance with Section 2.07;

(j)    one or more judgments, orders or awards for the payment of money exceeding $500,000 in the aggregate shall be rendered against any Credit Party or any of its Subsidiaries and remain unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement, or (ii) there shall be a period of 10 consecutive days after entry thereof during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such judgment, order, award or settlement shall not give rise to an Event of Default under this subsection (j) if and for so long as (A) the amount of such judgment, order, award or settlement is covered by a valid and binding policy of insurance between the defendant and the insurer covering full payment thereof and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment, order, award or settlement;

(k)    any Credit Party is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting, or otherwise ceases to conduct for any reason whatsoever, all or any material part of its business for a period which materially and adversely affects the ability of such Person to continue its business on a profitable basis;

(l)    any Termination Event with respect to any Employee Plan shall have occurred, and, 30 days after notice thereof shall have been given to any Credit Party by the Agent, at the direction of the Required Lenders, (i) such Termination Event (if correctable) shall not have been corrected, and (ii) the then-current value of such Employee Plan's vested benefits exceeds the then-current value of assets allocable to such benefits in such Employee Plan by more than $500,000 (or, in the case of a Termination Event involving liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, the liability is in excess of such amount);

(m)    [reserved];

(n)    [reserved]; or

- 73 -

(o)    any of the following occurs:

(i)    The Final Order shall not have been entered within thirty (30) days after the entry of the Interim Order; or

(ii)    Any of the Interim Order (or the Final Order, when applicable) or the Cash Management Order shall cease to be in full force and effect, or the Bankruptcy Court shall enter any order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order (or the Final Order, when applicable), the Cash Management Order in any material respect without the prior written consent of the Agent and the Required Lenders; or

(iii)    (A) Any of the Credit Parties shall fail to comply with any Financing Order, Cash Management Order or Sale Order (B) any of the Credit Parties shall fail to comply with any order of the Bankruptcy Court, other than the orders described in the preceding clause (A), in any material respect, and, in each case, such failure, if capable of being remedied, shall remain unremedied for five (5) days after the earlier of the date a senior officer of any Credit Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent, at the direction of the Required Lenders, to such Credit Party; or

(iv)    The Bankruptcy Court shall enter any order (A) dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case, (B) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Cases, (C) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of the Credit Parties' senior management, or (D) granting any other superpriority claim (other than the Carve-Out) or any other lien (including any adequate protection lien) having a priority equal or superior to the claims and Lien in favor of the Agent securing the Obligations or Liens in favor of the Prepetition Agent (other than the Liens of the Agent or as to the Prepetition Second Lien Lenders, the Liens in respect of the Agent and the Prepetition First Lien Agent); or

(v)    Other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget (subject to the Permitted Variance), any Credit Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness or payables (including, without limitation, reclamation claims); or

(vi)    The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor holding or asserting a Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Credit Party; or

(vii)    [reserved]

(viii)    The filing by any Credit Party of any plan of reorganization, or a pleading seeking approval of plan of reorganization, other than an Acceptable Chapter 11 Plan, or the termination of the Credit Parties' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization; or

- 74 -

(ix)     Any Credit Party shall file a motion in any of the Chapter 11 Cases to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code or to use any Cash Collateral without the Required Lenders' consent; or

(x)     (i) Any of the Prepetition Credit Documents for any reason ceases to be in full force (subject to the automatic stay) and effect or is declared to be null and void by a court of competent jurisdiction; (ii) this Agreement or any other Credit Document ceases to be in full force and effect, legal, valid and binding (other than by reason of a release of Collateral in accordance with the terms hereof or thereof) or shall be declared null and void, or the Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Credit Documents with the priority set forth in Section 2.07, in each case for any reason other than the failure of the Agent or any Lender to take any action within its control; (iii) any Credit Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Prepetition Credit Documents or the Liens securing the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the Liens securing the Prepetition Obligations; or (iv) any Credit Party engages in any investigation or asserts any claims or causes of action against the Prepetition Agents or the Prepetition Lenders; provided, however, that it shall not constitute an Event of Default if the Credit Parties provide information with respect to the Prepetition Credit Documents to a party in interest, or are compelled to provide information by an order of the Bankruptcy Court so long as Agent, the Lenders, the Prepetition Agents or the Prepetition Lenders have been served with the request for such an order or, if no such service has been made prior to the time the Credit Parties are required to provide information, so long as the Credit Parties provide prior written notice to the Agent, Lenders, Prepetition Agents and the Prepetition Lenders of any intention or requirement to do so; or

(xi)     Any Person shall obtain a Section 506(a) judgment or similar determination with respect to the Prepetition Obligations that is unacceptable to the Required Lenders; or

(xii)     From and after entry of the Final Order, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral without the advance written consent of the Required Lenders; or

(xiii)     The consummation of a sale of any material portion of the Credit Parties' assets outside of the ordinary course of business other than in respect of (x) an Approved Sale or (y) a sale with the prior written consent of the Required Lenders; or

(xiv)     The making of any payment (after allowance) in respect of any claim or claims under Section 546(c) or 503(b)(9) of the Bankruptcy Code that is not contemplated in the Approved Budget (subject to the Permitted Variance) and has not otherwise been consented to by the Agent and the Required Lenders; or

(xv)     Breach by any Credit Party of the Sale Milestone Covenant; or

ACTIVE 234178906
ACTIVE 234178906v.17

(xvi)    The entry of a final order in the Chapter 11 Cases of the Credit Parties avoiding or requiring disgorgement by any of the Lenders of any amounts received in respect of the Obligations under the Credit Documents or resulting in the marshalling of any Collateral, or the commencement of other actions by the Credit Parties that challenge the validity, extent, or priority of any Liens on the Collateral, the validity, extent, perfection or priority of any Liens granted under or in connection with the Prepetition First Lien Credit Documents or the Prepetition Second Lien Credit Documents, or the rights and remedies of the Agent or the Lenders under the Credit Documents in any of the Chapter 11 Cases of the Credit Parties or inconsistent with the applicable Credit Documents; or

(xvii)    The filing or support of any pleading by any Credit Party or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (ii), (iv), (vi), (viii), (ix), (x), (xi), (xii), (xiii), (xiv) and (xvi); or

(xviii)    The commencement of any Insolvency Proceeding by any Credit Party other than the Chapter 11 Cases; or

(xix)    Any Credit Party shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other adverse proceeding against the Agent or any Lender regarding the DIP Term Loan;

(xx)    Prior to repayment in full of all outstanding Obligations (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) due and owing under the Credit Documents, the Bankruptcy Court shall have entered an order approving a disclosure statement in any of the Credit Parties' cases other than an Acceptable Disclosure Statement or confirming a chapter 11 plan in any of the Credit Parties' cases other than an Acceptable Confirmation Order.

then, notwithstanding the provisions of Section 362 of the Bankruptcy Code but subject to the terms of the Financing Orders, the Agent shall, at the request of the Required Lenders, in each case by notice to the Borrower as set forth below and in addition to any other right or remedy provided under any Credit Document or by any applicable Requirement of Law, do each of the following:

a)    declare all or any portion of the DIP Term Loans then outstanding to be due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Credit Parties, whereupon all or such portion of the aggregate principal of the DIP Term Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Credit Documents shall become due and payable immediately;

b)    declare the right of the Credit Parties to use the Cash Collateral (other than the Carve-Out) to be terminated, whereupon such right to use the Cash Collateral (other than the Carve-Out) shall be terminated;

c)    declare all or any portion of the Delayed Draw DIP Term Loan Commitment of each Lender to make Delayed Draw DIP Term Loans to be suspended or

- 76 -

terminated, whereupon such Delayed Draw DIP Term Loan Commitments shall forthwith be suspended or terminated;

d)   exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Credit Documents; or

e)   terminate, reduce or restrict any DIP Term Loan Commitment to the extent any remains outstanding.

provided, prior to foreclosing on the Collateral or otherwise exercising remedies against the Collateral, upon direction of the Required Lenders, the Agent shall provide five (5) Business Days' prior written notice to the Credit Parties, the United States Trustee and counsel for the Committee (if appointed).  During such five (5) Business Day-period, the Credit Parties, the United States Trustee or the Committee (if appointed) may seek an emergency hearing before the Bankruptcy Court for the sole purpose of determining whether an Event of Default has occurred (and the Bankruptcy Court may consider this or any other matters); provided that, subject to the Carve-Out, the Credit Parties shall have no right to use or seek to use Cash Collateral during such five (5) Business Day-period.  Unless during such five (5) Business Day-period the Bankruptcy Court determines that an Event of Default has not occurred, upon the expiration of such five (5) Business Day-period the Agent shall have relief from the automatic stay without further notice or order (at the direction of the Required Lenders) and may foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral permitted under the Credit Documents, the Financing Orders and applicable nonbankruptcy law, including the exercise of rights of setoff, in respect of Obligations under the Credit Documents.

## ARTICLE X

## AGENT

Section 10.01  Appointment.  Each Lender hereby irrevocably appoints, authorizes and empowers the Agent, but solely to the extent directed by the Required Lenders, to perform the duties of the Agent as set forth in this Agreement and the other Credit Documents, together with such powers as are reasonably incidental thereto, including:  (i) to receive on behalf of each Lender any payment of principal of or interest on the DIP Term Loan outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to the Agent, and, subject to Section 2.03 of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by the Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agent shall not have any liability to the Lenders for the Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the DIP Term Loan and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement, any other Credit Document and/or the Financing Orders; (v) to make the DIP Term Loan, for the Agent or on behalf of the applicable

- 77 -

Lenders as provided in this Agreement or any other Credit Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Credit Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Agreement or any other Credit Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Credit Document; (viii) subject to Section 10.03 of this Agreement, to take such action as such Agent deems appropriate on its behalf to administer the DIP Term Loan and the Credit Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Credit Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Credit Documents, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Obligations. As to any matters not expressly provided for by this Agreement and the other Credit Documents, the Agent shall not exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents) shall be binding upon all Lenders; provided, however, that the Agent shall not be required to take any action which, in the reasonable opinion of any Agent, exposes the Agent to liability or which is contrary to this Agreement or any other Credit Document or applicable law.

Section 10.02    Nature of Duties; Delegation.

(a)    The Agent shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Credit Documents. The duties of the Agent shall be mechanical and administrative in nature. The Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender. Nothing in this Agreement or any other Credit Document, express or implied, is intended to or shall be construed to impose upon the Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein. Each Lender shall make its own independent investigation of the financial condition and affairs of the Credit Parties in connection with the making and the continuance of the DIP Term Loan hereunder and shall make its own appraisal of the creditworthiness of the Credit Parties and the value of the Collateral, and the Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the making of the DIP Term Loan hereunder at any time or times thereafter, provided that, upon the reasonable request of a Lender, the Agent shall provide to such Lender any documents or reports delivered to the Agent by the Credit Parties pursuant to the terms of this Agreement or any other Credit Document. If the Agent seeks the consent or approval of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents) to the taking or refraining from taking any action hereunder, the Agent shall send notice thereof to each Lender. The Agent shall promptly notify each Lender any time that the Required Lenders (or such other number or percentage of the

- 78 -

Lenders as shall be expressly provided for herein or in the other Credit Documents) have instructed the Agent to act or refrain from acting pursuant hereto.

(b)     The Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Credit Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Lender).  Any such Person shall benefit from this Article X to the extent provided by the applicable Agent.

(c)     Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement or any other Credit Document to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Agent, it is understood that in all cases the Agent shall be fully justified in failing or refusing to take any such action under this Agreement if it shall not have received such written instruction, advice or concurrence of the Required Lenders or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents as the Agent deems appropriate.  Upon receipt of such written instruction, advice or concurrence from the Required Lenders, the Agent shall take such discretionary actions in accordance with such written instruction, advice or concurrence.  This provision is intended solely for the benefit of the Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

Section 10.03  <u>Rights, Exculpation, Etc.</u>  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement, the other Credit Documents, the Prepetition Credit Documents or the Parent Subordinated Credit Documents, except, in the case of this Agreement, the other Credit Documents, the Prepetition Credit Documents or the Parent Subordinated Credit Documents, for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agent (i) may treat any payee of the DIP Term Loan as the owner thereof until the Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07 hereof, signed by such payee and in form satisfactory to the Agent; (ii) may consult with legal counsel (including, without limitation, counsel to the Agent or counsel to the Credit Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) may make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Credit Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Credit Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Credit Documents or any other instrument or

- 79 -

document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall the Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.  The Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.03, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled.  The Agent may at any time request instructions from the Required Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Credit Documents the Agent are permitted or required to take or to grant, and if such instructions are promptly requested, the Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Credit Documents until they shall have received such instructions from the Required Lenders.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting under this Agreement or any of the other Credit Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents).

Section 10.04  <u>Reliance</u>.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Credit Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05  <u>Indemnification</u>.  To the extent that the Agent is not reimbursed and indemnified by any Credit Party, the Lenders will, within five days of written demand by the Agent, reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, fees, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to the Agent), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Agreement, any of the other Credit Documents, or any action taken or omitted by the Agent under this Agreement or any of the other Credit Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 10.09; <u>provided</u>, <u>however</u>, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from the Agent's gross negligence or willful misconduct.  The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the DIP Term Loan and the termination of this Agreement.

Section 10.06  <u>Agent Individually</u>.  With respect to its Pro Rata Share of the DIP Term Loan Commitment hereunder and any DIP Term Loan made by it, the Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of the DIP Term Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly

ACTIVE 234178906
ACTIVE 234178906v.17

otherwise indicates, include the Agent in its individual capacity as a Lender or one of the Required Lenders. The Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrower as if it were not acting as the Agent pursuant hereto without any duty to account to the other Lenders.Successor Agent. (a) The Agent may at any time give at least 30 days prior written notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor Agent. If no such successor Agent shall have been so appointed by such Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by such Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Required Lenders, appoint a successor Agent. Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    The Required Lenders shall have the right, in consultation with the Borrower, to remove and replace the Agent with a successor Agent at any time (the date of the acceptance of its appointment as successor Agent being the "Replacement Effective Date").

(c)    With effect from the Resignation Effective Date or the Replacement Effective Date, as applicable, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by such Agent on behalf of the Lenders under any of the Credit Documents, the retiring Agent shall continue to hold such collateral security solely for the purposes of perfection of the Liens thereon until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above. Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents. After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Article, Section 12.04 and Section 12.15 shall continue in effect for the benefit of such retiring Agent in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

Section 10.09    Collateral Matters.

(a)    [Reserved].

(b)    The Lenders hereby irrevocably authorize the Agent to release any Lien granted to or held by the Agent upon any Collateral (w) upon termination of the DIP Term Loan Commitments and payment and satisfaction in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) of the DIP Term Loans and all other Obligations in accordance with the terms hereof (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted); (x) constituting property being sold or disposed of in the ordinary course of any Credit Party's business in

- 81 -

compliance with the terms of this Agreement and the other Credit Documents; (y) upon and effective simultaneously with the consummation of the Approved Sale, subject to entry of the Sale Order; or (z) constituting property in which the Credit Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders in accordance with Section 12.02.  Upon prior written request by any Credit Party, and if requested pursuant to Section 10.08(c), upon receipt by the Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, the Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Agent for the benefit of the Agent and the Lenders upon such Collateral; provided, however, that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Credit Party in respect of) all interests in the Collateral retained by any Credit Party.

(c)    Without in any manner limiting the Agent's authority to act pursuant to Section 10.08(b) without any specific or further authorization or consent by the Lenders, the Required Lenders (or all of the Lenders to the extent required in accordance with Section 12.02) agree to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under Section 10.08(b).

(d)    Anything contained in any of the Credit Documents to the contrary notwithstanding, the Credit Parties, the Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Credit Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Credit Documents may be exercised solely by the Agent for the benefit of the Lenders in accordance with the terms thereof, (ii) in the event of a foreclosure by the Agent on any of the Collateral pursuant to a public or private sale, the Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and (iii) at the direction of the Required Lenders, the Agent, as agent for and representative of the Agent and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Agent at such sale.

(e)    The Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Credit Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Agreement or any other Credit Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular

ACTIVE 234178906
ACTIVE 234178906v.17

manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this Section 10.09 or in any other Credit Document.

Section 10.10  <u>Agency for Perfection</u>.   The Agent and each Lender hereby appoints the Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and the Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agent and the Lenders as secured party.   Should the Agent or any Lender obtain possession or control of any such Collateral, the Agent or such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or in accordance with the Agent's instructions.   In addition, the Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Credit Documents.   Each Credit Party by its execution and delivery of this Agreement hereby consents to the foregoing.   Notwithstanding any other provision of this Agreement or the Credit Documents, the Agent shall not have any responsibility for the validity, perfection, priority or enforceability of any Lien, Collateral or Security Document or other security interest and shall have no obligation to take any action to procure or maintain such validity, perfection, priority or enforceability.

Section 10.11  <u>No Reliance on the Agent's Customer Identification Program</u>. Each Lender acknowledges and agrees that neither such Lender nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121,  as hereafter amended or replaced ("<u>CIP Regulations</u>"), or any other Anti-Terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Credit Parties, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby:  (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act.   Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.12  <u>No Third Party Beneficiaries</u>.   The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Credit Party shall have rights as a third-party beneficiary of any of such provisions other than in respect of Section 10.07 and Section 10.08.

Section 10.13  <u>No Fiduciary Relationship</u>.   It is understood and agreed that the use of the term "agent" herein or in any other Credit Document (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.   Instead such term is used as a

ACTIVE 234178906
ACTIVE 234178906v.17

matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.14    Reports; Confidentiality; Disclaimers.  By becoming a party to this Agreement, each Lender:

(a)    is deemed to have requested that the Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to the Parent or any of its Subsidiaries (each, a "Report") prepared by or at the request of the Required Lenders, and the Agent shall so furnish each Lender with each such Report,

(b)    expressly agrees and acknowledges that the Agent (i) does not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or other party performing any audit or examination will inspect only specific information regarding the Parent and its Subsidiaries and will rely significantly upon the Parent's and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)    agrees to keep all Reports and other material, non-public information regarding the Parent and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 12.19, and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold the Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans or a note or notes of the Borrower, and (ii) to pay and protect, and indemnify, defend and hold the Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys fees and costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.15    [Reserved].

Section 10.16      **Cash Management.**

(a)    Nothing herein contained shall be construed to constitute the Agent as agent of any Credit Party for any purpose whatsoever, and the Agent shall not be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof (other than from acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction).  The Agent shall not, under any circumstance

- 84 -

or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts Receivable or any instrument received in payment thereof or for any damage resulting therefrom (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction).  The Agent, by anything herein or in any assignment or otherwise, does not assume any of the obligations under any contract or agreement assigned to the Agent and shall not be responsible in any way for the performance by any Credit Party of any of the terms and conditions thereof.

(b)     If any Account Receivable includes a charge for any tax payable to any Governmental Authority, the Agent is hereby authorized (but in no event obligated) in its discretion to pay the amount thereof to the proper taxing authority for the Credit Parties' account and to charge the Credit Parties therefor.  The Credit Parties shall notify the Agent if any Account Receivable includes any taxes due to any such Governmental Authority and, in the absence of such notice, the Agent shall have the right to retain the full proceeds of such Account Receivable and shall not be liable for any taxes that may be due by reason of the sale and delivery creating such Account Receivable.

(c)     Notwithstanding any other terms set forth in the Credit Documents, the rights and remedies of the Agent and the Lenders herein provided, and the obligations of the Credit Parties set forth herein, are cumulative of, may be exercised singly or concurrently with, and are not exclusive of, any other rights, remedies or obligations set forth in any other Credit Document or as provided by law.

Section 10.17     Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Agent (irrespective of whether the principal of the DIP Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the DIP Term Loan and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Agent and the Lenders (including any claim for the compensation, expenses, disbursements and advances of the Agent and the Lenders and their respective agents and counsel and all other amounts due the Agent and the Lenders hereunder and under the other Credit Documents) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by the Agent and each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Agent and the Lenders, to pay to the Agent any amount due for the

- 85 -

reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent hereunder and under the other Credit Documents.

# ARTICLE XI

# GUARANTY

Section 11.01  <u>Guaranty</u>.    Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any Credit Document, whether for principal, interest, fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) by the Borrower, being the "<u>Guaranteed Obligations</u>"), and agrees to pay in full in cash any and all expenses (including reasonable counsel fees and expenses) incurred by the Agent and the Lenders in enforcing any rights under the guaranty set forth in this ARTICLE XI.    In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

Section 11.02  <u>Guaranty Absolute</u>.    Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) strictly in accordance with the terms of the Credit Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Agent or the Lenders with respect thereto.    Each Guarantor agrees that this ARTICLE XI constitutes a guaranty of payment in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) when due and not of collection and waives any right to require that any resort be made by the Agent or any Lender to any Collateral.    The obligations of each Guarantor under this ARTICLE XI are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Credit Party or whether any Credit Party is joined in any such action or actions.    The liability of each Guarantor under this ARTICLE XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Credit Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Credit Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Credit Party or otherwise;

ACTIVE 234178906
ACTIVE 234178906v.17

(c)      any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)      the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, the Agent or any Lender;

(e)      any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Credit Party; or

(f)      any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Agent or the Lenders that might otherwise constitute a defense available to, or a discharge of, any Credit Party or any other guarantor or surety.

This ARTICLE XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Agent, the Lenders or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

Section 11.03  <u>Waiver</u>.    Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this ARTICLE XI and any requirement that the Agent or the Lenders exhaust any right or take any action against any Credit Party or any other Person or any Collateral, (iii) any right to compel or direct the Agent or any Lender to seek payment or recovery of any amounts owed under this ARTICLE XI from any one particular fund or source or to exhaust any right or take any action against any other Credit Party, any other Person or any Collateral, (iv) any requirement that the Agent or any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Credit Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor (other than payment in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA)). Each Guarantor agrees that the Agent and the Lenders shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this ARTICLE XI, and acknowledges that this ARTICLE XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04  <u>Continuing Guaranty; Assignments</u>.    This ARTICLE XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been

- 87 -

asserted) and all other amounts payable under this ARTICLE XI and the Termination Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agent and the Lenders and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its DIP Term Loan Commitments and all or any portion of the DIP Term Loan owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case, as provided in Section 12.07.

       Section 11.05    <u>Subrogation</u>.  No Guarantor will exercise any rights that it may now or hereafter acquire against any Credit Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this ARTICLE XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Agent and the Lenders against any Credit Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Credit Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this ARTICLE XI shall have been paid in full in cash (or credit solely (x) in the case of any Obligations  (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) and the Termination Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash (or credit solely (x) in the case of any Obligations owed to the Z Capital Lenders or their affiliates and (y) to the extent contemplated in the Stalking Horse APA) of the Guaranteed Obligations and all other amounts payable under this ARTICLE XI and the Termination Date, such amount shall be held in trust for the benefit of the Agent and the Lenders and shall forthwith be paid to the Agent and the Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this ARTICLE XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this ARTICLE XI thereafter arising.  If (i) any Guarantor shall make payment to the Agent and the Lenders of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this ARTICLE XI (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) shall be paid in full in cash and (iii) the Termination Date shall have occurred, the Agent and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

ACTIVE 234178906
ACTIVE 234178906v.17

# ARTICLE XII

## MISCELLANEOUS

Section 12.01   <u>Notices, Etc.</u>  All notices and other communications provided for hereunder shall be in writing and shall be mailed (certified mail, postage prepaid and return receipt requested), telecopied or delivered by hand, Federal Express or other reputable overnight courier, (i) if to any Lender, to the address, telecopier number, electronic mail address or telephone number set forth on its signature page to this Agreement or in Assignment and Acceptance pursuant to which it became a Lender and (ii) if to the Agent or any Credit Party, at the following addresses:

If to the Agent:

Wells Fargo Bank, National Association
9062 Old Annapolis, 1st Floor
Columbia, MD 21045
Attention:  Jason Prisco
RM Opco – First Lien
Telephone: 410-884-2271
Telecopier: 866-373-0261
Email: ctsbankdebtadministrationteam@wellsfargo.com

with a copy to (which shall not constitute notice):

Curtis L. Tuggle
Yesenia Batista
Thompson Hine LLP
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Telephone:  212-344-5680
Telecopier:  212-344-6101
Email:  Curtis.Tuggle@ThompsonHine.com
        Yesenia.Batista@ThompsonHine.com

if to any Credit Party, to it at the following address:

RM Opco LLC
5660 Katella Avenue, Suite 200
Cypress, California 90630
Attention:  Jonathan Tibus, CRO
Telecopier:  562-346-1301

with a copy to:

Sidley Austin LLP
Christina M. Craige
555 West Fifth Street, Suite 4000

- 89 -

Los Angeles, California 90049
Attention: Christina M. Craige
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01. All such notices and other communications shall be effective, (i) if mailed (certified mail, postage prepaid and return receipt requested), when received or three (3) days after deposited in the mails, whichever occurs first, (ii) if telecopied, when transmitted and confirmation received, or (iii) if delivered by hand, Federal Express or other reputable overnight courier, upon delivery, except that notices to the Agent pursuant to ARTICLE II shall not be effective until received by the Agent.

Section 12.02    Amendments, Etc.  (a) No amendment or waiver of any provision of this Agreement or any other Credit Document, and no consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, consent or waiver granting a new Lien for the benefit of the Agent and the Lenders or extending an existing Lien over additional property, by the Agent and the Borrower (or by the Borrower on behalf of the Credit Parties), (y) in the case of any other waiver or consent, by the Required Lenders (or by the Agent with the consent of the Required Lenders) and (z) in the case of any other amendment, by the Required Lenders (or by the Agent with the consent of the Required Lenders) and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall:

(i)                    increase the DIP Term Loan Commitment of any Lender, reduce the principal of, or interest on, the DIP Term Loan payable to any Lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees on, the DIP Term Loan payable to any Lender, in each case, without the written consent of each affected Lender, as applicable; provided, however, (i) that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate and (ii) it being understood that the waiver or postponement of payment of any mandatory prepayment pursuant to Section 2.05(c) is not a postponement or extension of a scheduled date fixed for payment;

(ii)                   other than as set forth in Section 4.04, change the percentage of the DIP Term Loan Commitments or of the aggregate unpaid principal amount of the DIP Term Loan that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender;

(iii)                  amend the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender;

(iv)                  release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Credit Documents, including in connection with any sales of property or assets permitted in this Agreement), subordinate any Lien granted in

- 90 -

favor of the Agent for the benefit of the Agent and the Lenders, or release the Borrower or any Guarantor (except in connection with a conveyance, sale, lease, sublease, transfer or other disposition permitted under Section 7.02(c)), in each case, without the written consent of each Lender; or

(v)        amend, modify or waive Section 4.02, Section 4.03 or this Section 12.02 of this Agreement without the written consent of each Lender.

Notwithstanding the foregoing, (A) no amendment, waiver or consent shall, unless in writing and signed by the Agent, affect the rights or duties of the Agent under this Agreement or the other Credit Documents and (B) the consent of the Borrower shall not be required to change any order of priority set forth in Section 2.05(d) and Section 4.03.  Notwithstanding anything to the contrary herein, no Defaulting Lender that is a Lender shall have any right to approve or disapprove any amendment, waiver or consent under the Credit Documents and the DIP Term Loan held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the DIP Term Loan of all other Lenders in the aggregate (other than such Defaulting Lender).

(b)        If any action to be taken by the Lenders hereunder requires the consent, authorization, or agreement of all of the Lenders or any Lender affected thereby, and the Required Lenders have provided such consent, authorization or agreement but a Lender (the "Holdout Lender") fails to give its consent, authorization, or agreement, then the Agent, upon at least five (5) Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute lenders (each, a "Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than fifteen (15) Business Days after the date such notice is given.  Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever.  If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Holdout Lender shall be made in accordance with the terms of Section 12.07(b).

Section 12.03    No Waiver; Remedies, Etc.  No failure on the part of the Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Credit Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Credit Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Agent and the Lenders provided herein and in the other Credit Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Agent and the Lenders under any Credit Document against any party thereto are not conditional or contingent on any attempt by the Agent and the Lenders to exercise any of their rights under any other Credit Document against such party or against any other Person.

ACTIVE 234178906
ACTIVE 234178906v.17

Section 12.04  Expenses; Taxes; Attorneys' Fees.  The Borrower will pay on demand, all costs and expenses incurred by or on behalf of the Agent; provided, however, in the case of clauses (a) through (m) below, such costs and expenses for legal counsel shall be limited to reasonable, budgeted and documented fees, costs, client charges and expenses of one counsel and one local counsel for the Agent, one counsel and one local counsel for the Tennenbaum Lenders (collectively), and one counsel and one local counsel for the Z Capital Lenders (collectively), accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the DIP Term Loan, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:  (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Credit Documents (including, without limitation, the preparation of any additional Credit Documents pursuant to Section 7.01(j) or the review of any of the agreements, instruments and documents referred to in Section 7.01(e), and costs and expenses relating to the Segregated Pre-Funding Account), (b) any requested amendments, waivers or consents to this Agreement or the other Credit Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agent's or any of the Lenders' rights under this Agreement or the other Credit Documents, (d) the defense of any claim or action asserted or brought against the Agent or any Lender (in their respective capacities as such) by any Person that arises from this Agreement, any other Credit Document, the Agent's or the Lenders' (in their respective capacities as such) claims against any Credit Party, (e) the commencement or defense of, or intervention in, any court proceeding arising from this Agreement or any other Credit Document, (f) the filing of any petition, complaint, answer, motion or other pleading by the Agent or any Lender (in their respective capacities as such), or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Credit Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Credit Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Credit Document, (i) any attempt to collect from any Credit Party, (j) all liabilities and costs arising from or in connection with the past, present or future operations of any Credit Party involving any damage to real or personal property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (k) any Environmental Liabilities and Costs incurred in connection with the investigation, removal, cleanup and/or remediation of any Hazardous Materials present or arising out of the operations of any facility of any Credit Party, (l) any Environmental Liabilities and Costs incurred in connection with any Environmental Lien, or (m) after an Event of Default has occurred and is continuing, any workout or restructuring of the DIP Term Loan.  Without limitation of the foregoing or any other provision of any Credit Document:  (x) the Borrower agrees to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by the Agent or any Lender to be payable in connection with this Agreement or any other Credit Document, and the Borrower agrees to save the Agent and each Lender  harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, (y) the Borrower agrees to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Credit Documents, and (z) if the Borrower fails to perform any covenant or agreement contained herein or in any other Credit Document, the Agent may itself perform or cause

- 92 -

performance of such covenant or agreement, and the expenses of the Agent incurred in connection therewith shall be reimbursed on demand by the Borrower.  The obligations of the Borrower under this Section 12.04 shall survive the repayment of the Obligations and discharge of any Liens granted under the Credit Documents.

Section 12.05  <u>Right of Set-off</u>.  Subject to the Financing Orders, upon the occurrence and during the continuance of any Event of Default, the Agent (at the direction of the Required Lenders) or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Credit Party (any such notice being expressly waived by the Credit Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by the Agent or such Lender or any of their respective Affiliates to or for the credit or the account of any Credit Party against any and all obligations of the Credit Parties either now or hereafter existing under any Credit Document, irrespective of whether or not the Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 4.04 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The Agent and each Lender agree to notify such Credit Party promptly after any such set-off and application made by the Agent or such Lender or any of their respective Affiliates provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Agent and the Lenders under this Section 12.05 are in addition to the other rights and remedies (including other rights of set-off) which the Agent and the Lenders may have under this Agreement or any other Credit Documents.

Section 12.06  <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07  <u>Assignments and Participations</u>.

(a)    This Agreement and the other Credit Documents shall be binding upon and inure to the benefit of each Credit Party and the Agent and each Lender and their respective successors and assigns; <u>provided</u>, <u>however</u>, that none of the Credit Parties may assign or transfer any of its rights hereunder or under the other Credit Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)    Each Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its DIP Term Loan Commitments, or any DIP Term Loan made by it; <u>provided</u>, <u>however</u>, that (i) such assignment is in an amount which is at least $1,500,000 or a multiple of

- 93 -

$1,000,000 in excess thereof (or the remainder of such Lender's DIP Term Loan Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (x) a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (y) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $1,500,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's DIP Term Loan Commitment), (ii) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Agent, for the benefit of the Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender), (iii) [reserved] and (iv) no such assignment shall be made to (A) any Credit Party, (B) any Defaulting Lender or any of its Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), (C) any competitor of a Credit Party or (D) any Other Ineligible Assignee.  Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least three (3) Business Days after the delivery thereof to the Agent (or such shorter period as shall be agreed to by the Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder, as applicable, and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto). For the avoidance of doubt, any assignment by any Z Capital Lender to any of its Affiliates of all or a portion of such Z Capital Lender's rights and obligations under this Agreement with respect to all or a portion of its DIP Term Loan Commitments or any DIP Term Loan made by it in connection with an Approved Sale is permitted hereunder without the consent of any other party to this Agreement.

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Credit Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Credit Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Credit Party or any of its Subsidiaries or the performance or observance by any Credit Party of any of its obligations under this Agreement or any other Credit Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Credit Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, the Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not

- 94 -

taking action under this Agreement and the other Credit Documents; (v) such assignee appoints and authorizes the Agent to take such action as the Agent on its behalf and to exercise such powers under this Agreement and the other Credit Documents as are delegated to the Agent by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Credit Documents are required to be performed by it as a Lender, as applicable.

(d)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the DIP Term Loan Commitments of, and the principal amount of the DIP Term Loan (and stated interest thereon) (the "Registered Loans") owing to each Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon receipt by the Agent of a completed Assignment and Acceptance, the Agent shall accept such assignment, record the information contained therein in the Register and provide to the Agent a copy of the fully executed Assignment and Acceptance.

(f)     A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide).  Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).  Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agent shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(g)     In the event that any Lender sells participations in a Registered Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrower, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on

- 95 -

the Participant Register.  The Participant Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(h)      Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.11(d).

(i)      Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Credit Documents (including, without limitation, all or a portion of its DIP Term Loan Commitments, the DIP Term Loan made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its DIP Term Loan Commitments hereunder) and the other Credit Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrower, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Credit Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the DIP Term Loan subject to such participation, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the DIP Term Loan subject to such participation or the fees payable in respect thereof, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Credit Party (except as set forth in Section 10.09 of this Agreement or any other Credit Document).  The Credit Parties agree that each participant shall be entitled to the benefits of Section 2.11 and Section 2.12 of this Agreement with respect to its participation in any portion of the DIP Term Loan Commitments and the DIP Term Loan as if it was a Lender, as applicable.

(j)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to such Lender pursuant to securitization or similar credit facility (a "Securitization"); provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  The Credit Parties shall cooperate with such Lender and its Affiliates to effect the Securitization including, without limitation, by providing such information as may be reasonably requested by such Lender in connection with the rating of its DIP Term Loan or the Securitization.

Section 12.08   Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Credit Document *mutatis mutandis*.

ACTIVE 234178906
ACTIVE 234178906v.17

Section 12.09   GOVERNING LAW.  THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER CREDIT DOCUMENT IN RESPECT OF SUCH OTHER CREDIT DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD REQUIRED THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE).

Section 12.10   CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE.

(a)    EACH CREDIT PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE CREDIT PARTIES, THE AGENT AND THE LENDERS PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; PROVIDED, THAT THE AGENT, THE LENDERS AND EACH CREDIT PARTY ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER,  THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE AGENT.  EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION THAT SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  FOR THE AVOIDANCE OF DOUBT, EACH OF THE CREDIT PARTIES, THE LENDERS AND THE AGENT HEREBY ACKNOWLEDGE THE JURISDICTION AND CONSTITUTIONAL AUTHORITY OF THE BANKRUPTCY COURT TO ENTER FINAL ORDERS IN CONNECTION WITH ANY DISPUTES OR ISSUES OF INTERPRETATION THAT MAY ARISE UNDER OR IN CONNECTION WITH THIS AGREEMENT, AND EXPLICITLY CONSENT TO THE ENTRY OF A FINAL ORDER BY SUCH BANKRUPTCY COURT IN RELATION THERETO.

(b)    EACH    CREDIT    PARTY    IRREVOCABLY    AND UNCONDITIONALLY  WAIVES,  TO  THE  FULLEST  EXTENT  PERMITTED  BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (A) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

- 97 -

(c)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 12.01.</u> NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 12.11    <u>WAIVER OF JURY TRIAL, ETC.</u>  EACH CREDIT PARTY, THE AGENT, EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  EACH CREDIT PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  EACH CREDIT PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENT AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12    <u>Consent by the Agent, Lenders</u>.  Except as otherwise expressly set forth herein to the contrary or in any other Credit Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "<u>Action</u>") of the Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Credit Party is a party and to which the Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by the Agent or such Lender, in its reasonable discretion, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 12.13    <u>No Party Deemed Drafter</u>.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14    <u>Reinstatement; Certain Payments</u>.  If any claim is ever made upon the Agent or any Lender for repayment or recovery of any amount or amounts received by the Agent or such Lender in payment or on account of any of the Obligations, the Agent or such Lender shall give prompt notice of such claim to each other Lender and the Borrower, and if the Agent or such Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over the Agent or such Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by the Agent or such Lender with any such claimant, then and in such event each Credit Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Credit Documents or the termination of this Agreement or the other Credit Documents, and (B) it shall be and remain liable to the Agent or such Lender for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Agent or such Lender.

- 98 -

ory

Section 12.15    <u>Indemnification; Limitation of Liability for Certain Damages</u>.

(a)    In addition to each Credit Party's other Obligations under this Agreement, each Credit Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless the Agent and each Lender and all of their respective officers, directors, employees, attorneys, consultants and agents (collectively called the "<u>Indemnitees</u>") from and against any and all claims, damages, losses, liabilities, obligations, penalties, fees and reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Credit Document or of any other document executed in connection with the transactions contemplated by this Agreement and any workout or restructuring thereof, (ii) the Agent's or any Lender's furnishing of funds to the Borrower under this Agreement or the other Credit Documents, including, without limitation, the management of the DIP Term Loan or the Borrower's use of the proceeds thereof, (iii) the Agent and the Lenders relying on any instructions of the Borrower or the handling of the Collateral of the Borrower as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other Credit Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Credit Documents, (v) [reserved], or (vi) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "<u>Indemnified Matters</u>"); <u>provided</u>, <u>however</u>, that the Credit Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by (x) the bad faith, gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) a material breach by such Indemnitee (as determined by a court of competent jurisdiction in a final and non-appealable decision) or (z) any proceeding between and among Indemnitees that does not involve an act or omission by the Credit Parties.

(b)    <u>Environmental Indemnity</u>.    Without limiting Section 12.15(a) hereof, each Credit Party agrees to, jointly and severally, defend, indemnify, and hold harmless the Indemnitees against any and all Environmental Liabilities and Costs and all other claims, demands, penalties, fines, liability (including strict liability), losses, damages, costs and expenses (including without limitation, reasonable legal fees and expenses, consultant fees and laboratory fees), arising out of (i) any Releases or threatened Releases (x) at any property presently or formerly owned or operated by any Credit Party or any Subsidiary of any Credit Party, or any predecessor in interest, or (y) of any Hazardous Materials generated and disposed of by any Credit Party or any Subsidiary of any Credit Party, or any predecessor in interest; (ii) any violations of Environmental Laws; (iii) any Environmental Action relating to any Credit Party or any Subsidiary of any Credit Party, or any predecessor in interest; (iv) any personal injury (including wrongful death) or property damage (real or personal) arising out of exposure to Hazardous Materials used, handled, generated, transported or disposed by any Credit Party or any Subsidiary of any Credit Party, or any predecessor in interest; and (v) any breach of any covenant made by the Credit Parties in Section 7.01(i).  Notwithstanding the foregoing, the Credit Parties shall not have any obligation to any Indemnitee under this subsection (b) regarding any potential environmental matter covered hereunder which is caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.

- 99 -

(c)     To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Credit Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(d)     No Credit Party shall assert, and each Credit Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any DIP Term Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Credit Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(e)     The indemnities and waivers set forth in this Section 12.15 shall survive the repayment of the Obligations and discharge of any Liens granted under the Credit Documents.

Section 12.16   <u>Records</u>.   The unpaid principal of and interest on the DIP Term Loan, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the DIP Term Loan Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, including, without limitation, the Closing Fee and the Loan Servicing Fee, shall at all times be ascertained from the records of the Agent, which shall be conclusive and binding absent manifest error.

Section 12.17   <u>Binding Effect</u>.   This Agreement shall become effective when it shall have been executed by each Credit Party, the Agent and each Lender and upon entry of the Interim Order, and thereafter shall be binding upon and inure to the benefit of each Credit Party, the Agent and each Lender, and their respective successors and assigns, except that the Credit Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of the Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.18   <u>Interest</u>.   It is the intention of the parties hereto that the Agent and each Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other Credit Document would be usurious as to the Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Credit Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any Lender that is contracted for, taken, reserved, charged or received by the Agent or such Lender under this Agreement or any other Credit Document or agreements or otherwise in

- 100 -

connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such Lender, as applicable, to the Borrower); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this Section 12.18, be canceled automatically by the Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by the Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such Lender to the Borrower).  All sums paid or agreed to be paid to the Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to the Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the DIP Term Loan until payment in full so that the rate or amount of interest on account of the DIP Term Loan hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (x) the amount of interest payable to the Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to the Agent or such Lender pursuant to this Section 12.18 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such Lender would be less than the amount of interest payable to the Agent or such Lender computed at the Highest Lawful Rate applicable to the Agent or such Lender, then the amount of interest payable to the Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to the Agent or such Lender until the total amount of interest payable to the Agent or such Lender shall equal the total amount of interest which would have been payable to the Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.18.

For purposes of this Section 12.18, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrower, on the one hand, and the Agent and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19  <u>Confidentiality</u>.  The Agent and each Lender agrees (on behalf of itself and each of its Affiliates, directors, officers, employees and representatives) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable lenders or investors in debt securities, any non-public information supplied to it by the Credit Parties pursuant to this Agreement or the other Credit Documents which is identified in

- 101 -

writing by the Credit Parties as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure by the Agent or any Lender of any such information (i) to its investors or Affiliates and to its and its Affiliates' respective partners, directors, officers, investors, employees, agents, trustees, counsel, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.19); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization so long as such assignee or participant (or prospective assignee or participant) or party to a Securitization first agrees, in writing, to be bound by confidentiality provisions similar in substance to this Section 12.19; (iv) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority; (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized rating agency or otherwise to the extent consisting of general portfolio information that does not identify Credit Parties; (vi) in connection with any litigation to which the Agent or any Lender is a party; (vii) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder; or (viii) with the consent of the Borrower.

Section 12.20    Public Disclosure.  Each Credit Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of the Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Credit Document without the prior written consent of the Agent or such Lender, which consent shall not be unreasonably withheld or delayed, except to the extent that such Credit Party or such Affiliate is required to do so in connection with the Chapter 11 Cases or under applicable law (in which event, such Credit Party or such Affiliate will consult with the Agent or such Lender before issuing such press release or other similar public disclosure).  Each Credit Party hereby authorizes the Agent and each Lender, after consultation with the Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as the Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as the Agent or such Lender shall deem appropriate.

Section 12.21    Integration.   This Agreement, together with the other Credit Documents and the Financing Orders, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.22    USA PATRIOT Act.  The Agent and each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information

ACTIVE 234178906
ACTIVE 234178906v.17

that identifies the entities composing the Borrower, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Borrower in accordance with the USA PATRIOT Act. Each Credit Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as the Agent, any Lender may reasonably require from time to time in order to enable the Agent, such Lender to comply with the USA PATRIOT Act.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

ACTIVE 234178906
ACTIVE 234178906v.17

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

**RM OPCO LLC**

By:_____
Name:  Jonathan Tibus
Title:  Chief Restructuring Officer

**GUARANTORS:**

**RM HOLDCO LLC**

By:_____
Name:  Jonathan Tibus
Title:  Chief Restructuring Officer

**RM CHEVYS LLC**

**By:  RM Opco LLC, its Managing Member**

By:_____
Name:  Jonathan Tibus
Title:  Chief Restructuring Officer

**RM ACAPULCO LLC**

**By:  RM Opco LLC, its Managing Member**

By:_____
Name:  Jonathan Tibus
Title:  Chief Restructuring Officer

*Signature Page to DIP Financing Agreement*

**RM EL TORITO LLC**

**By:**      **RM Opco LLC, its Managing Member**


By:_____
Name:                 Jonathan Tibus
Title:            Chief Restructuring Officer

**RM HQ LLC**

**By:**      **RM Opco LLC, its Managing Member**


By:_____
Name:                 Jonathan Tibus
Title:            Chief Restructuring Officer

*Signature Page to DIP Financing Agreement*

**AGENT:**

**WELLS FARGO BANK, N.A.**

By:_____

Name:_____

Title:_____

ACTIVE 234178906v.17

**LENDERS:**

**SPECIAL VALUE CONTINUATION
PARTNERS, L.P.**

By:     Tennenbaum Capital Partners, LLC,
        its Investment Manager


By:_____
Name:
Title:

**TENNENBAUM OPPORTUNITIES
PARTNERS V, LP**

By:     Tennenbaum Capital Partners, LLC,
        its Investment Manager


By:_____
Name:
Title:

*Signature Page to DIP Financing Agreement*

**Z CAPITAL PARTNERS II, L.P.,**

By:_____

Name:  James J. Zenni, Jr.

Title:   Authorized Person

**Z CAPITAL PARTNERS II-A, L.P.,**

By:_____

Name:   James J. Zenni, Jr.

Title:    Authorized Person

**Z CAPITAL PARTNERS II-B, L.P.**

By:_____

Name:  James J. Zenni, Jr.

Title:   Authorized Person

*Signature Page to DIP Financing Agreement*

EXHIBIT C

FORM OF NOTICE OF BORROWING

[LETTERHEAD OF THE BORROWER]

[DATE]

Wells Fargo Bank, N.A.
as Agent for the Lenders
9062 Old Annapolis, 1st Floor
Columbia, MD 21045
Attention: Jason Prisco

Special Value Continuation Partners, L.P.
Tennenbaum Opportunities Partners V, LP
2951 28th Street, Suite 1000
Santa Monica, CA 90405
Attention: Asher Finci and Obaid Khanna
Asher.finci@tennenbaumcapital.com and obaid.khan@tennenbaumcapital.com
Fax: 310-899-4950

Z Capital Partners II, L.P.
Z Capital Partners II-A, L.P.
Z Capital Partners II-B, L.P.
150 N Field Dr, Suite 300,
Lake Forest, IL 60045
Attention: Rahul Sawhney

with copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza, New York, NY 10006
Attention: Kara Hailey

Ladies and Gentlemen:

The undersigned, RM Opco LLC, a Delaware limited liability company (the "Borrower"), (i) refers to the DIP Financing and Guaranty Agreement, dated as of August [ ], 2018 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "Financing Agreement"), by and among the Borrower, RM Holdco LLC, a Delaware limited liability company (the "Parent"), each subsidiary of the Parent listed as a "Guarantor" on the signature pages thereto (together with the

Parent, each a "Guarantor" and collectively, the "Guarantors"), the lenders from time to time party thereto (each a "Lender" and collectively, the "Lenders") and Wells Fargo Bank, N.A., as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Agent") and (ii) hereby gives you notice pursuant to Section 2.02 of the Financing Agreement that the undersigned hereby requests a[n] [DIP Term Loan][Initial DIP Term Loan] (the "Proposed Loan") under the Financing Agreement, and in that connection sets forth below the information relating to such loan as required by Section 2.02(a) of the Financing Agreement.  All capitalized terms used but not defined herein have the same meanings herein as set forth in the Financing Agreement.

     (i)     The aggregate principal amount of the Proposed Loan is $ _____.[1]

     (ii)     The borrowing date of the Proposed Loan is ___, 20__.[2]

The undersigned further confirms and certifies to the Agent and each Lender that the following statements are true and complete as of the date hereof:

     (i)     The proceeds of the Proposed Loan will be used in accordance with the Approved Budget (subject to the Permitted Variance).

     (ii)     The conditions specified in [Section 5.01 (other than the condition set forth in Section 5.01(m)) of the Financing Agreement and Section 5.02 of the Financing Agreement [will have been satisfied on the Effective Date][3] [are satisfied as of the date hereof][4][5] [Section 5.02 of the Financing Agreement are satisfied as of the date hereof][6]; provided, however, that (A) in respect of conditions in Section 5.01 or 5.02, as applicable, that include receipt by the Agent, the Lenders or both, the certification described herein certifies only that the documents or other items referenced in such conditions have been delivered by the Credit Parties to the Agent, the Lenders or both, as applicable, in accordance with the terms of the Financing Agreement, and (B) in respect of conditions in Sections 5.01 or 5.02, as applicable, that include the satisfaction or reasonable satisfaction of the Agent, the Lenders or both, the certification described herein are made without reference to the satisfaction or reasonable satisfaction, as applicable, of the Agent, the Lenders or both, as applicable.

---

[1] Amount shall be, unless Required Lenders otherwise agree, in an aggregate amount of not less than $250,000.

[2] Date shall be at least five (5) Business Days (or such shorter period as the Required Lenders are willing to accommodate) after the date of the Notice of Borrowing for any DIP Term Loan and/or Segregated Pre-Funding Account Release, as applicable, other than the Initial DIP Term Loan, which shall be at least one (1) Business Day after the Notice of Borrowing (or such shorter period as the Required Lenders are willing to accommodate).

[3] Include if requesting Initial DIP Term Loan prior to the Effective Date.

[4] Include if requesting an Initial DIP Term Loan on or after the Effective Date.

[5] To be included if the Notice of Borrowing is for the Initial DIP Term Loan.

[6] To be included if the Notice of Borrowing is for a DIP Term Loan other than the Initial DIP Term Loan.

Exhibit C-2

(iii) The Credit Parties have delivered to the Agent and the Lenders the Notice of Borrowing pursuant to and in accordance with Section 2.02(a) of the Financing Agreement.

(iv) The representations and warranties by any Credit Party contained Financing Agreement or in any other Credit Document are true or correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent that such representation or warranty (i) expressly relates to an earlier date (in which event such representation and warranty shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date), or (ii) is qualified as to "materiality," "Material Adverse Effect" or similar language (in which event such representation or warranty shall be true and correct in all respects on the date of such credit extension or on such earlier date, as the case may be).

(v) No trustee or examiner having enlarged powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code has been appointed with respect to any Credit Party or their respective properties in the Chapter 11 Cases.

(vi) No Default or Event of Default has occurred and is continuing or would result after giving effect to the Proposed Loan.

(vii) The Chapter 11 Cases of the Credit Parties have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code with respect to any Credit Party.

(viii) [The Final Order has been entered and is in full force and effect and has not been stayed, reversed, vacated, rescinded, amended or otherwise materially modified without the consent of the Agent, the Lenders and the Credit Parties][The Final Order is the subject of a pending appeal, however, neither the making of the Proposed Borrowing nor the performance by the Credit Parties of any of their respective obligations under the Financing Agreement, under the Credit Documents or under the Final Order are the subject of a presently effective stay pending appeal.][7]

(ix) The Borrower has paid or, on the date of the Proposed Loan shall cause to be paid, subject to the Interim Order and Final Order, (i) all fees described in Section 2.06 of the Financing Agreement and all costs and expenses payable pursuant to Section 12.04 of the Financing Agreement or otherwise required to be paid or reimbursed to the Agent and the Lenders, including all reasonable and documented out-of-pocket fees of legal counsel to the Agent and the Lenders in accordance with the Financing Agreement, Interim Order and Final Order, and (ii) all adequate protection payments due and payable in accordance with the Financing Agreement, Interim Order and Final Order.

[SIGNATURE PAGE FOLLOWS]

---

[7] Include if (i) the date of the Proposed Borrowing is more than thirty (30) days after the Petition Date or (ii) the amount of such Proposed Loan, together with the outstanding principal amount of the DIP Term Loans, shall exceed $3,000,000.

Exhibit C-3

Very truly yours,

RM OPCO LLC

By:_____
Name:_____
Title:_____

EXHIBIT D

FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

This ASSIGNMENT AND ACCEPTANCE AGREEMENT ("Assignment Agreement") is entered into as of ___ , 20_ between _____ ("Assignor") and _____ ("Assignee"). Reference is made to the agreement described in Item 2 of Annex I annexed hereto (as amended, restated, modified or otherwise supplemented from time to time, the "Financing Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Financing Agreement.

1.    In accordance with the terms and conditions of Section 12.07 of the Financing Agreement, the Assignor hereby irrevocably sells, transfers, conveys and assigns without recourse, representation or warranty ( expect as expressly set forth herein) to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, that interest in and to the Assignor's rights and obligations under the Credit Documents with respect to the Obligations owing to the Assignor, and the Assignor's portion of the Commitments and the Term Loan B as specified on Annex I.

2.    The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder ·and that such interest is free and clear of any adverse claim, and (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Documents or any other instrument or document furnished pursuant thereto; and (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Credit Party or the performance or observance by any Credit Party of any of its obligations under the Credit Documents or any other instrument or document furnished pursuant thereto.

3.    The Assignee (a) confirms that it has received copies of the Financing Agreement and the other Credit Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (b) agrees that it will, independently and without reliance upon the Agent, the Assignor or any other Lender based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents; (c) confirms that it is eligible as an assignee under the terms of the Financing Agreement; (d) appoints and authorizes the Agent to take such action as the Agent on its behalf and to exercise such powers under the Credit Documents as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (e) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender; and (f) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for purposes of determining exemption from United

Exhibit D-1

States withholding taxes with respect to all payments to be made to the Assignee under the Financing Agreement or such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty.

4.      Following the execution of this Assignment Agreement by the Assignor and the Assignee, it will be delivered by the Assignor to the Agent for recording by the Agent.  The effective date of this Assignment Agreement (the "Settlement Date") shall be the latest of (a) the date of the execution hereof by the Assignor and the Assignee, (b) the date this Assignment Agreement has been recorded in the Register by the Agent, (c) the date of receipt by the Agent of a processing and recordation fee in the amount of $5,000, (d) the settlement date specified on Annex I and (e) the receipt by Assignor of the Purchase Price specified in Annex I.

5.      As of the Settlement Date (a) the Assignee shall be a party to the Financing Agreement and, to the extent of the interest assigned pursuant to this Assignment Agreement, have the rights and obligations of a Lender thereunder and under the other Credit Documents, and (b) the Assignor shall, to the extent of the interest assigned pursuant to this Assignment Agreement, relinquish its rights and be released from its obligations under the Financing Agreement and the other Credit Documents.

6.      Upon recording by the Agent, from and after the Settlement Date, the Agent shall make all payments under the Financing Agreement and the other Credit Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and commitment fees (if applicable) with respect thereto) to the Assignee. The Assignor and the Assignee shall make all appropriate adjustments in payments under the Financing Agreement and the other Credit Documents for periods prior to the Settlement Date directly between themselves on the Settlement Date.

7.      THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8.      EACH PARTY HERETO HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS ASSIGNMENT AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

9.      This Assignment Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Assignment Agreement by facsimile or electronic mail shall be equally effective as delivery of an original executed counterpart.

[Remainder of page left intentionally blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized, as of the date first above written.

[ASSIGNOR]


By:_____
Name:_____
Title:_____

[ASSIGNEE]


By:_____
Name:_____
Title:_____

## ANNEX FOR ASSIGNMENT AND ACCEPTANCE

## ANNEX I

1. Borrower: RM Opco LLC, a Delaware limited liability company

2. Name and Date of Financing Agreement:

   DIP Financing and Guaranty Agreement, dated as of August [_], 2018 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "Financing Agreement"), by and among RM Holdco LLC, a Delaware limited liability company (the "Parent"), RM Opco LLC (the "Borrower"), each subsidiary of the Parent listed as a "Guarantor" on the signature pages thereto (together with the Parent, each a "Guarantor" and collectively, the "Guarantors"), the lenders from time to time party thereto (each a "Lender" and collectively, the "Lenders") and Wells Fargo Bank, N.A., a national banking association, as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Agent").

3. Date of Assignment Agreement:                          _____

4. Amount of Term B Commitment Assigned:                  $_____

5. Amount of Term Loan B Assigned:                        $_____

6. Purchase Price:                                        $_____

7. Settlement Date:                                       _____

8.      Notice and Payment Instructions, etc.

Assignee:                                      Assignor:

_____                _____
_____                _____
_____                _____
Attn:_____                Attn:_____
Fax No._____                Fax No.:_____

Bank Name:                                     Bank Name:
ABA Number:                                    ABA Number:
Account Name:                                  Account Name:
Account Number:                                Account Number:
Sub-Account Name:                              Sub-Account Name:
Sub-Account Number:                            Sub-Account Number:
Reference:                                     Reference:
Attn:                                          Attn:

<u>EXHIBIT E</u>

FORM OF NOTE

$_____                                                    _____, 201__

       FOR VALUE RECEIVED, RM Opco LLC, a Delaware limited liability company (the "<u>Borrower</u>"), hereby promises to pay to [Name of Lender] or its registered assigns, the principal amount of $ _____ , pursuant to the terms of the DIP Financing and Guaranty Agreement, dated as of August [_], 2018 (including all annexes, exhibits and schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "<u>Financing Agreement</u>"), by and among RM Holdco LLC, a Delaware limited liability company (the "<u>Parent</u>"), the Borrower, each subsidiary of the Parent listed as a "Guarantor" on the signature pages thereto (together with the Parent, each a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>"), the lenders from time to time party thereto and Wells Fargo Bank, N.A., a national banking association, as agent for the lenders (in such capacity, the "<u>Agent</u>"). This Note is a Note referred to in the Financing Agreement. Terms capitalized but not defined herein shall have the meanings given to them respectively in the Financing Agreement. Reference is made to the Financing Agreement for a statement of the terms and conditions under which this Note has been issued, is secured, and may be prepaid or accelerated.

       Until maturity (whether by acceleration or otherwise), interest shall accrue and be payable on the outstanding principal balance hereof at the annual rate of interest set forth in the Financing Agreement. When provided in accordance with the provisions of Section 2.04 of the Financing Agreement, interest shall accrue at the Post-Default Rate. Principal and accrued interest shall be payable in accordance with the terms and conditions of the Financing Agreement.

       All amounts payable by the Borrower hereunder shall be paid in accordance with the Financing Agreement in immediately available funds.

       The Borrower hereby waives the requirements of demand, presentment, protest, notice of protest and dishonor and all other demands or notices of any kind in connection with the delivery, acceptance, performance, default, dishonor or enforcement of this Note.

       THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

[Remainder of this page intentionally left blank.]

Exhibit E-1

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Borrower has caused this Note to be executed by its duly authorized officers as of the day and year first above written.

RM OPCO LLC


By:_____
Name:_____
Title:_____

# EXHIBIT F

BIDDING PROCEDURES

(See Attached.)

Exhibit F

**BIDDING PROCEDURES**

These bidding procedures (the "**Bidding Procedures**") set forth the guidelines and process by which RM Holdco LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") shall market substantially all of their assets (the "**Assets**") for sale to interested parties and conduct one or more sales of such Assets (each, a "**Sale**") through a court-approved auction (the "**Auction**").

On August ____, 2018 the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered an order that, among other things, approved the Bidding Procedures set forth herein (the "**Bidding Procedures Order**"). Pursuant to the Bidding Procedures Order, the Bankruptcy Court has approved FM Restaurants (PT), LLC (or its assignee(s) or designee(s)) as the stalking horse bidder (the "**Stalking Horse Bidder**") for the Assets as set forth more fully in that certain Asset Purchase Agreement among the Stalking Horse Bidder and the Debtors, dated as of August 5, 2018 (together with the schedules and related documents thereto, the "**Stalking Horse Agreement**").[1] The Bidding Procedures Order also set _____, 2018 as the date on which the Bankruptcy Court will conduct the Sale Hearing (as defined below) in the event an Auction (as defined below) is held, or _____, 2018 in the event no Auction is held. At the Sale Hearing, the Debtors will seek entry of an order from the Bankruptcy Court authorizing and approving the Sale of the Assets to the Stalking Horse Bidder or another Qualified Bidder (or Qualified Bidders) (as defined below) that the Debtors determine to have made the highest or otherwise best offer for the Assets.

The Debtors provide these Bidding Procedures for use by Potential Bidders (as defined below) and Qualified Bidders (as defined below) in submitting Bids (as defined below) proposing a transaction to purchase or otherwise acquire the Assets and, as necessary, qualifying for and participating in the Auction. The Debtors seek to enter into one or more transactions with one or more Qualified Bidders, so long as the individual Bid for all of the Assets by a Qualified Bidder or the Bids for less than all of the Assets by two or more Qualified Bidders, in combination, represent the highest or otherwise best offer for substantially all of the Assets.

As described further below, certain decisions under these Bidding Procedures will be made by the "**Decision Maker**", which shall mean (i) the board of managers of RM Holdco LLC (the "**Board**"), acting by majority vote cast by those members of the Board who are not (a) compensated by the Stalking Horse Bidder (unless the Stalking Horse Bidder has irrevocably and unconditionally disclaimed in a writing provided to the Debtors and Tennenbaum Capital Partners or their respective professionals (a copy of which writing may be filed on the docket in the Bankruptcy Court) any right (including the right of any of its affiliates, including Controlled Investment Affiliates (as defined in the DIP Facility)) to participate as a bidder in connection with the Auction, in which event such members shall be entitled to vote) or (b) officers of Holdco; or (ii) solely in the event that a vote of the

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Stalking Horse Agreement.

Board results in a deadlock decision, the CRO (as defined below).

1.      **Stalking Horse Agreement**

On August 5, 2018, the Debtors and the Stalking Horse Bidder entered into the Stalking Horse Agreement, pursuant to which the Stalking Horse Bidder proposes to acquire the Purchased Assets, which include substantially all Assets of the Debtors (but which, for the avoidance of doubt, exclude any Excluded Assets as defined in the Stalking Horse Agreement).

Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder will provide the Debtors with consideration for the Purchased Assets consisting of (a) payment to the Debtors of $46.75 Million in cash at Closing, *plus* (b) the Purchase Price Adjustment Amount, *plus* (c) the Assumed Liabilities, including the ongoing obligations under each Purchased Contract ((a)-(c) collectively estimated at approximately $48.74 Million), *less* (c) the Deduction Amount, all as detailed in the Stalking Horse Agreement.  In accordance with the Stalking Horse Agreement and as approved by the Bankruptcy Court in the Bidding Procedures Order, the Stalking Horse Bidder has been authorized to receive a break-up fee in the amount of $1,402,500, subject to the terms and conditions in the Stalking Horse Agreement and Bidding Procedures Order (the "**Bid Protection**"), in order to provide an incentive and compensate the Stalking Horse Bidder for serving as the Stalking Horse Bidder and entering into the Stalking Horse Agreement with the knowledge and risk that arises from its participating in the Sale and subsequent bidding process, absent which the Stalking Horse Bidder would not have entered into the Stalking Horse Agreement.  The Bid Protection shall be payable on the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures Order.

The Bid Protection shall constitute an allowed super-priority administrative expense claim against the Debtors' bankruptcy estates pursuant to sections 363, 503(b) and 507(a)(2) of the Bankruptcy Code, which such claims shall be junior only to the claims under the DIP Facility and the Carve-Out (as defined in the DIP Facility).  The Bid Protection shall be secured by a super-priority lien in the Debtors' Assets, junior only to liens under the DIP Facility and Carve-Out (as defined in the DIP Facility), and deemed automatically perfected by entry of the Bidding Procedures Order.  Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Assets or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination or similar fee or payment.

The transaction contemplated by the Stalking Horse Agreement is subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code.

The Stalking Horse Bidder is deemed to be a Qualified Bidder (as defined below), and the Stalking Horse Agreement is deemed to be a Qualified Bid (as defined below) under these Bidding Procedures.  For the avoidance of doubt, the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid pursuant to Section 6 of these Bidding

Procedures, and the Purchaser Deposit shall serve as the Stalking Horse Bidder's Good Faith Deposit (as defined below).

## 2.    **"As Is, Where Is"**

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates except to the extent set forth in the Stalking Horse Agreement or the Modified Agreement (as defined below) of another Successful Bidder or the Sale Order. The Stalking Horse Bidder and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures and (a) as to the Stalking Horse Bidder, the terms of the sale of the Assets set forth in the Stalking Horse Agreement, or (b) as to another Successful Bidder, the terms of the sale of the Assets set forth in the applicable Modified Agreement.

## 3.    **Free of Any and All Encumbrances**

Except as otherwise provided in the applicable Purchase Agreement (as defined below) or Sale Order, all of the Debtors' right, title, and interest in and to the Purchased Assets thereunder shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "**Encumbrances**") in accordance with 11 U.S.C. § 363, with such Encumbrances to attach to the proceeds of the sale of the Assets in accordance with the existing priorities of such Encumbrances.

## 4.    **Due Diligence**

### a.    **Diligence Provided to Potential Bidders**

Subject to execution of a confidentiality agreement on terms reasonably acceptable to the Debtors (a "**Confidentiality Agreement**"), any party (i) willing to submit any proposal, solicitation or offer (each, a "**Bid**," and the person or entity making such Bid, a "**Bidder**") for the Assets and (ii) (a) capable of demonstrating to the Debtors that such party can satisfy the financial requirements set forth in Section 6(j) below or (b) that the Debtors reasonably believe based on their own investigation or knowledge has such financial wherewithal (such party, a "**Potential Bidder**"), may be granted access to public and non-public information relating to the Assets to facilitate its consideration for making its Bid.   Any Confidentiality Agreement previously entered into between the Debtors and a Potential Bidder in effect on the date of the

ACTIVE 234584377

entry of the Bidding Procedures Order shall be deemed to be a Confidentiality Agreement for purposes of these Bidding Procedures.

For the avoidance of doubt, these participation requirements do not prohibit Piper Jaffray & Co. ("**Piper**") from distributing teaser and other promotional materials to potentially interested parties advising them of the opportunity to purchase the Assets pursuant to section 363 of the Bankruptcy Code, from engaging in discussions with such parties about the opportunity, or from providing non-confidential documents and information to such parties.

Until the Bid Deadline (as defined in Section 5 below), the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors determine in their discretion to be reasonable and appropriate under the circumstances. Potential Bidders requesting information in connection with their due diligence should contact the Debtors' investment banker, Piper, using the contact information provided below. The Debtors shall not be obligated to, but may in their discretion, furnish any due diligence information after the Bid Deadline and until the conclusion of the Auction to any Potential Bidder who has submitted a Bid as of the Bid Deadline. The Debtors and their advisors are not responsible for, and will bear no liability with respect to, any information obtained by Bidders in connection with the sale of the Purchased Assets except to the extent expressly set forth in the applicable Purchase Agreement.

Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, may withhold information or restrict access to certain materials in the Data Room if providing such information or materials to a Potential Bidder would, in the Debtors' business judgment, put the Debtors at a competitive disadvantage, result in the disclosure of information or materials subject to attorney-client privilege, or breach any contract or other obligation of the Debtors; provided, however, that the Debtors shall provide any Potential Bidder with such information as has been provided to the Stalking Horse Bidder, or with information substantively similar to such information. The Debtors, in consultation with the Consultation Parties (as defined below), reserve the right not to provide due diligence access to any Potential Bidder that the Debtors conclude in their reasonable business judgment is not likely to become a Qualified Bidder. As used in these Bidding Procedures, "**Consultation Parties**" means (i) the professionals and advisors to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"),[2] and (ii) any of the following parties, but only to the extent it has delivered written notice to the Debtors that it has irrevocably waived its right to bid on the Assets and participate at the Auction: (a) the DIP Agent and (b) the lenders under the DIP Facility (the "**DIP Lenders**," and together with the DIP Agent, the "**DIP Secured Parties**").

---

[2] Unless and until a member of the Committee delivers a written notice to the Debtors irrevocably waiving its right to bid on the Assets and participate at the Auction, the Committee's professionals and advisors (i) may not share or disclose any information they receive in their capacity as Consultation Parties with such Committee member, (ii) shall exclude such Committee member from any and all discussions within the Committee relating to the Auction and Sale of the Assets, and (iii) shall restrict, limit and prohibit the dissemination to such member of any confidential information relating to the Auction and Sale of the Assets. For the avoidance of doubt, the DIP Agent and each DIP Lender (if it is a Consultation Party) and their respective advisors may not disclose any confidential information received in their capacity as Consultation Parties, including any confidential information regarding Potential Bidders, Qualified Bidders or any Qualified Bid, to any other DIP Secured Party unless and until such time, if ever, that such information is made available to all Qualified Bidders.

For the avoidance of doubt, Z Capital Group, LLC and any of its affiliates (collectively, the "**Z Capital Parties**," and each, a "**Z Capital Party**") shall not be Consultation Parties unless and until the Stalking Horse Bidder has delivered written notice to the Debtors that it and all Z Capital Parties have irrevocably waived their right to bid on the Assets and be Auction Participants.

The Debtors will not provide any due diligence materials after the Bid Deadline to any party who has failed to submit a Bid as of the Bid Deadline.  The Debtors shall provide the Stalking Horse Bidder with access to all material due diligence materials, management presentations, on-site inspections, and other information provided to any Potential Bidder that were not previously made available to the Stalking Horse Bidder as soon as reasonably practicable and in no event later than five (5) Business Days after the date the Debtors made such information available to any Potential Bidder.

### b.    Diligence Provided by Potential Bidders and Qualified Bidders

Each Potential Bidder and each Qualified Bidder shall comply with all reasonable requests for information from the Debtors regarding such Bidder and its contemplated transaction.  Failure by a Potential Bidder or a Bidder that would otherwise be a Qualified Bidder to provide such information may be a basis for the Debtors, in consultation with the Consultation Parties, to deem such Bidder not to be a Qualified Bidder and to prohibit such Bidder from participating in any Auction.

### 5.    Bid Deadline

All Bids must be submitted in writing so that they are actually received no later than 4:00 p.m. (prevailing Eastern Time) on September 21, 2018 (the "**Bid Deadline**").  To properly submit a Bid, a Potential Bidder (as defined below) must deliver written copies of its Bid to each of the following notice parties (collectively, the "**Notice Parties**"):

(a)    Co-counsel to Debtors:

Sidley Austin LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Attention:  Vijay S. Sekhon
E-mail:  vsekhon@sidley.com

-and-

Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Attention:  Christina M. Craige
E-mail:  ccraige@sidley.com

ACTIVE 234584377

-and-

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attention:  Edmon L. Morton
E-mail:  emorton@ycst.com

(b)      The Debtors:

RM Holdco LLC
5660 Katella Avenue, Suite 200
Cypress, CA 90630
Attention:   Jonathan M. Tibus, Chief Restructuring Officer of the Debtors
("CRO")
E-mail:  jtibus@alvarezandmarsal.com

(c)      The Debtors' investment banker:

Piper Jaffray & Co.
2321 Rosecrans Avenue, Suite 3200
El Segundo, CA 90245
Attention:  Teri Stratton
E-mail:  teri.l.stratton@pjc.com

(d)      Counsel to the  Committee, if appointed:

[TBD]

A Bid delivered after the Bid Deadline and/or by a Potential Bidder that is not a Qualified Bidder shall not constitute a Qualified Bid (as defined below).

6.      **Bid Requirements**

To participate in the Auction, a Qualified Bidder (as defined below) other than the Stalking Horse Bidder must submit a Bid to the Notice Parties by the Bid Deadline that, as determined by the Debtors, satisfies each of the following conditions (unless such requirement is waived by the Debtors) (each such Bid, a "**Qualified Bid**"):

(a)      Written Submission of APA.  Each Bid must be in writing and include:  (i) a clean purchase agreement signed by the Bidder, accompanied by all exhibits and schedules contemplated by the purchase agreement and, to the extent required by the terms and conditions of the Bid, any ancillary agreements described in the

6

purchase agreement with all exhibits and schedules thereto (each such purchase agreement, together with its exhibits, schedules, and ancillary agreements, if any, a "**Modified Agreement**"); (ii) a redline reflecting the Bidder's proposed changes to the Stalking Horse Agreement (including all exhibits and schedules thereto). Each Modified Agreement and the Stalking Horse Agreement shall be a "**Purchase Agreement**" for purposes of these Bidding Procedures.

(b)    <u>Commitment to Close.</u>  Each Bid must contain a written statement that the Bidder is willing to consummate and fund the Sale proposed in the Modified Agreement within two (2) Business Days after satisfaction of the conditions to closing, and in any event by the close of business on the date that is the earlier of (i) sixty (60) days after the date on which the Sale Order is entered and (ii) December 15, 2018 (the "**Closing Deadline**").

(c)    <u>Commitment to Serve as Back-up Bidder</u>.  Each Bid must contain a written statement that the Bidder will serve as the Backup Bidder.

(d)    <u>Assets to be Acquired.</u>  Each Bid must identify with reasonable particularity the Assets be Purchased Assets and the Assets to be Excluded Assets.  The Bid may offer to purchase substantially all of the Assets or only a portion of the Assets; provided <u>however</u>, that a Bid that offers to purchase only a portion of the Assets may only be a Qualified Bid to the extent that the value of such Bid, in combination with the value of other Bids for the remaining Assets, exceeds the Minimum Initial Overbid Amount (as defined below) applicable to Qualified Bids for substantially all of the Assets.  The Debtors, in consultation with the Consultation Parties, may waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Assets (other than the requirement that the value of any such Qualified Bid, in combination with the value of other Bids for Assets, exceeds the Minimum Initial Overbid Amount applicable to Qualified Bids for substantially all of the Assets).

(e)    <u>Executory Contracts and Leases to be Assumed.</u>  Each Bid must identify with reasonable particularity the executory contracts and unexpired leases of the Debtors that the Bidder seeks to have the Debtors assume and assign to the Bidder; provided, <u>however</u>, that the Bid may provide for designation rights with respect to executory contracts and unexpired leases substantially similar to the designation rights to the extent set forth in the Stalking Horse Agreement.

(f)    <u>Irrevocable.</u>  Each Bid must be irrevocable until (i) if such Bidder is designated as a Successful Bidder, the Closing of the Sale to such Bidder, and (ii) if such Bidder is designated as a Backup Bidder, the earlier to occur of (A) five (5) days after the closing of the transaction(s) by which all of the Assets that were subject to the Backup Bid have been transferred to one or more Qualified Bidders at the closing of a Sale or Sales conducted pursuant to these Bidding Procedures or (B) the Closing Deadline (the "**Backup Bid Closing Deadline**"). Notwithstanding anything to the contrary in these Bidding Procedures, if the

7

Stalking Horse Bidder is selected as a Backup Bidder, the Stalking Horse Bidder's Backup Bid shall be subject to all of the terms of the Stalking Horse Agreement (as such agreement may be modified by the Stalking Horse Bidder at the Auction consistent with the provisions of these Bidding Procedures and the Bidding Procedures Order); provided, however, that, subject to the terms of the Stalking Horse Agreement permitting termination, each Backup Bid including, without limitation, the Backup Bid of the Stalking Horse Bidder, shall remain open and binding until the earlier to occur of (i) one (1) Business Day after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid have been transferred to one or more Qualified Bidders at the closing of a Sale or Sales conducted pursuant to these Bidding Procedures or (ii) the Backup Bid Closing Deadline.

(g)     Good-Faith Deposit.  Each Bid must be accompanied by a deposit paid by wire transfer of immediately available funds or such other form acceptable to the Debtors payable to the order of the Debtors (the "**Good Faith Deposit**") in the amount of not less than 10 percent (10%) of the stated cash Purchase Price in the Modified Agreement to be held in an account designated by the Debtors to be applied or returned, as applicable, pursuant to the terms of these Bidding Procedures.

(h)     Minimum Initial Overbid Amount.  Each Bid for substantially all of the Debtors' Assets must offer to the Debtors aggregate value in an amount, as determined by the Debtors, in their reasonable business judgment, that is greater than or equal to the sum of (i) the value offered under the Stalking Horse Agreement, *plus* (ii) the Bid Protection, *plus* (iii) cash in the amount of at least $250,000 (the "**Minimum Initial Overbid Amount**"), unless otherwise set by the Debtors.

(i)     Contingencies.  No Bid may be conditioned on any due diligence, internal approval, financing, or regulatory or third-party approval contingencies of any kind (other than regulatory contingencies required by law or as set forth in the Stalking Horse Agreement).  A Bid must set forth each regulatory approval to consummate the Sale and the time period within which the Bidder expects to receive such regulatory approval(s) (and in the case where receipt of any regulatory approval is expected to take more than 30 days following execution and delivery of the Purchase Agreement, those actions the Bidder will take to ensure receipt of such approvals as quickly as possible).

(j)     Proof of Financial Ability to Perform.  Each Bid must contain written evidence, to the Debtors' satisfaction, of a firm commitment for financing, or other evidence of ability to consummate the Sale contemplated by the Modified Agreement, that will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transactions contemplated in such Bidder's Modified Agreement (taking into account the conditions and

8

third-party beneficiary rights, if any, in any such commitment). If the purchaser will be a newly formed entity, the Bid must identify, among other things, the entity or entities that will provide backstops in the form of a guarantee and/or an equity commitment letter and describe the nature of such arrangement(s).

(k)     <u>Financial Statements.</u>  To the extent not previously provided, each Bid must include the latest audited financial statements and unaudited financial statements of the Bidder or, if the Bidder is an entity formed for the purpose of acquiring the Assets, the latest audited financial statements and unaudited financial statements of the direct and indirect equity holders or sponsors of the Bidder who will guarantee the obligations of the Bidder, or such other form of financial disclosure and/or credit support or enhancement, if any, that will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transactions contemplated in such Bidder's Modified Agreement.

(l)     <u>Identity of Purchaser.</u>  Each Bid must, to the satisfaction of the Debtors, in consultation with the Consultation Parties, fully disclose (i) the identity of each person or entity that will be bidding for the Assets or otherwise participating in connection with such Bid, (ii) the terms of any such participation, and (iii) if any entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such person or entity, and the financial capacity of such parties to satisfy such liability.

(m)     <u>No Fees or Commissions.</u>  With the exception of the Bid submitted by the Stalking Horse Bidder, no Bid may (i) request or entitle the Bidder to any break-up fee, expense reimbursement fee or similar type of payment, or (ii) obligate the Debtors to pay commissions, fees or expenses to any agent or broker.  Further, by submitting a Bid, a Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code or in any way related to the submission of its Bid or the Bidding Procedures.

(n)     <u>As Is, Where Is.</u>  Each Bid must contain an acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Purchase Agreement.

ACTIVE 234584377

(o)     Adequate Assurance.   Each Bid must include evidence of the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Bidder's ability to perform in the future the contracts and leases proposed in its Bid to be assumed by the Debtors and assigned to such Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases.

(p)     Regulatory Filings.   Each Bid must provide that the Bidder shall make all necessary filings under the Hart-Scott-Rudino Antitrust Improvements Act of 1976, as amended, or other applicable competition laws or regulations, if any, and pay all fees and expenses of such filings (including the Debtors' fees and expenses).

(q)     Corporate Authority.   Each Bid must include evidence of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission of the Bid and the consummation of the transactions contemplated in such Bidder's Purchase Agreement.

(r)     Employees.   Each Bid must contain a detailed description of how the Qualified Bidder intends to treat current employees of the Debtors.

(s)     Privacy Policies.   Each Bid must provide to the Debtors' satisfaction that the Bidder will adhere to the Debtors' prepetition privacy policies regarding personally identifiable information.

(t)     Access to Books and Records.   Each Bid must contain provisions allowing the Debtors reasonable access to the Debtors' books and records for the administration of their bankruptcy cases if the Bid provides for the purchase of such books and records.

(u)     Format.   All documentation for each Bid must be provided in electronic form.

The Debtors have retained or intend to retain Hilco Real Estate, LLC ("**HRE**") to negotiate lease concessions.   HRE is to be compensated based upon a percentage of the lease concessions it secures.   To the extent HRE's retention is approved by the Bankruptcy Court, any decision by a Qualified Bidder not to assume the obligation to pay HRE according to the terms of HRE's court-approved compensation agreement will be considered in determining which Qualified Bid ultimately is chosen as highest or otherwise best.

Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors, and the Bidder submitting that Bid will not be permitted to participate in the Auction (as defined below); provided, however, that the Debtors, in consultation with the Consultation Parties, reserve the right to work with any Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.   In addition, the Debtors may negotiate or seek clarification of any Bid from any Bidder between the Bid

ACTIVE 234584377

Deadline and the Auction.  Nothing in these Bidding Procedures shall be deemed to either limit or expand any rights of a Qualified Bidder with a valid and perfected lien on any of the Assets of the Debtors' estates (a "<u>Secured Creditor</u>"), if any, to credit bid all or a portion of such Secured Creditor's claim to the extent permitted under section 363(k) of the Bankruptcy Code.

Without the consent of the Debtors, a Qualified Bidder may not amend, modify, or withdraw its Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Qualified Bid during the period that such Qualified Bid is required to remain irrevocable and binding.  No Qualified Bid may be amended or modified to consist of terms that are less favorable to the Debtors than those contained in the original (or then current) version of such Qualified Bid, as determined by the Debtors in consultation with the Consultation Parties.

## 7.      Designation of Qualified Bidders

A "**Qualified Bidder**" is a Bidder that (i) submits a Qualified Bid by the Bid Deadline (or later, in the discretion of the Debtors in consultation with the Consultation Parties), and (ii) the Decision Maker determines, in the exercise of reasonable business judgment, after consultation with the Consultation Parties, is reasonably likely (based on financial information submitted by the Bidder, experience, and other considerations deemed relevant by the Debtors in consultation with the Consultation Parties) to consummate a Sale if selected as a Successful Bidder or a Backup Bidder.  As noted above, the Stalking Horse Bidder is deemed to be a Qualified Bidder.

As promptly as practicable after the Bid Deadline (but in no event later than one (1) Business Day prior to the Auction), the Debtors will notify (a) each Bidder that submits a Bid whether such Bidder is a Qualified Bidder, and (b) the Stalking Horse Bidder and all other Qualified Bidders, if any, whether or not any Bids (other than the Stalking Horse Agreement) constitute Qualified Bids and identify the Qualified Bidders making any such Qualified Bids. Each Qualified Bidder will be given access to the Opening Bid (as defined below).

Any Good Faith Deposit accompanying a Bid that the Debtors, after consultation with the Consultation Parties, determine not to be a Qualified Bid, shall be returned promptly following such determination unless otherwise agreed by the Bidder and the Debtors; <u>provided</u>, <u>however</u>, that for the avoidance of doubt, no Bidder may participate in the Auction regardless of whether it otherwise cures the deficiencies that initially prevented its Bid from being a Qualified Bid unless the Debtors are in possession of a Good Faith Deposit from such Bidder at the time of the Auction.

## 8.      Auction

If the Debtors receive a Qualified Bid other than the Stalking Horse Agreement, the Debtors will conduct an Auction to determine the Successful Bidder(s).  If no Qualified Bid other than the Qualified Bid submitted by the Stalking Horse Bidder is received by the Bid

Deadline (unless otherwise extended by the Debtors in consultation with the Consultation Parties), then (i) the Auction will not be held, (ii) the Stalking Horse Bidder will be deemed the Successful Bidder, (iii) the Stalking Horse Agreement will be the Successful Bid, and (iv) at the Sale Hearing (defined below), the Debtors will seek Bankruptcy Court approval of and authority to consummate the proposed Sale to the Stalking Horse Bidder as contemplated by the Stalking Horse Agreement.

At least one (1) Business Day in advance of the Auction, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid or Qualified Bid(s), as determined by the Debtors, in consultation with the Consultation Parties (the "**Opening Bid**"), and will provide copies of the applicable Purchase Agreement for such Opening Bid to each Qualified Bidder.

The determination of which Qualified Bid constitutes the Opening Bid shall take into account any factors the Decision Maker, in consultation with the Consultation Parties, reasonably deems relevant to the value of the Qualified Bid to the estates, including, among other things, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities; (iii) the ability of the Qualified Bidder to close the proposed transaction on or before the Closing Deadline; (iv) any Purchase Price adjustments; (v) the impact of the contemplated transaction on any actual or potential litigation; (vi) the net economic effect of any changes from the Stalking Horse Agreement, if any, provided by the contemplated transaction documents (the "**Contemplated Transaction Documents**"); (vii) the net after-tax consideration to be received by the Debtors' estates; (viii) the conditions set forth in the applicable Purchase Agreement, and (ix) such other considerations the CRO, in consultation with the Consultation Parties, deems relevant.

The Auction, if any, shall take place on [**October 4**], **2018, at [\_:\_\_ \_].m.** (prevailing Eastern Time), at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801. The Auction may be adjourned from time to time by the Decision Maker, in consultation with the Consultation Parties, so long as such extended deadline does not exceed the applicable milestone for such deadline under the DIP Facility, unless such milestone is extended in accordance with the terms of the DIP Facility, in which case notice of such adjournment and the time and place for the resumption of the Auction will be filed with the Bankruptcy Court and served promptly on Qualified Bidders, any other parties who have provided written notice of their intent to attend the Auction as set forth in Section 9(a) below, and all other parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 prior to the Auction.

The Auction shall be conducted according to the following procedures:

**a.** <u>**Participation at the Auction**</u>

Qualified Bidders shall attend the Auction in person, or through a duly-authorized representative.

Only the Stalking Horse Bidder and any other Qualified Bidder(s) (or their duly-authorized representatives) (collectively, the "**Auction Participants**") are eligible to submit Bids at the Auction. While only the Auction Participants may submit Bids at the Auction, the authorized representatives and respective counsel and advisors of each of the Qualified Bidder(s) (regardless of whether such representatives, counsel and advisors are serving as Auction Participants), the Debtors, the DIP Secured Parties, the Committee, the United States Trustee, and any of the Debtors' creditors who notify the Debtors in writing no later than two (2) days prior to the Auction of such creditors' intent to attend the Auction by contacting the Debtors' counsel, Vijay S. Sekhon (vsekhon@sidley.com) and Christina M. Craige (ccraige@sidley.com), shall be permitted to attend the Auction, underlined provided, underlined however, the Debtors, in consultation with the Consultation Parties, may exclude parties whom the Debtors deem to be detrimental to the sale process.

Each Qualified Bidder participating in the Auction (including any Qualified Bidder participating through a duly-authorized representative) will be required to confirm on the record that it has not engaged in any collusion regarding the Bidding Procedures, the Auction or the Sale.

### b. <u>The Debtors Shall Conduct the Auction</u>

The CRO and the Debtors' professionals shall direct and preside over the Auction on behalf of the Debtors. At the start of the Auction, the CRO shall describe the terms of the Opening Bid. All Bids made after the Opening Bid shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Opening Bid, all applicable Overbids, and the Successful Bid.

The CRO, on behalf of the Debtors, in his reasonable business judgment, and in consultation with the Consultation Parties, may conduct the Auction in the manner that he determines will result in the Successful Bid(s) that will maximize the overall value of the Debtors' estates, and may adopt and modify rules for the Auction at the Auction that, in his reasonable business judgment, in consultation with the Consultation Parties, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court.

### c. <u>Terms of Overbids</u>

An "**Overbid**" is any Bid made at the Auction subsequent to the CRO's announcement of the Opening Bid. To submit an Overbid for purposes of the Auction, a Qualified Bidder must comply with the following conditions:

> (i)    <u>Minimum Overbid Increment.</u> The initial Overbid, if any, shall provide for total consideration to the Debtors (net of any amount for Bid Protection, if applicable) with a value that exceeds the value of the

ACTIVE 234584377

consideration under the Opening Bid by an incremental amount that is not less than $250,000 in cash (the "Minimum Overbid Increment"), unless otherwise determined by the CRO in his reasonable business judgment.  Additional consideration in excess of the amount set forth in the Opening Bid shall be in the form of cash consideration.  Upon the solicitation of each round of Overbids, the CRO may, in his reasonable business judgment, and in consultation with the Consultation Parties, adjust the amount of the applicable Minimum Overbid Increment.

(ii)     Conclusion of Each Overbid Round.  Upon the solicitation of each round of applicable Overbids, the CRO may, in consultation with the Consultation Parties, announce a deadline (as the CRO may, in his reasonable business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors.

(iii)    Overbid Alterations.  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates on the whole than any prior Bid or Overbid, as determined in the CRO's reasonable business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(iv)    Announcing Highest or Otherwise Best Bid.  Subject to each Overbid Round Deadline, the CRO, on behalf of the Debtors, shall announce whether the Decision Maker, in consultation with the Consultation Parties, has identified in the initial applicable Overbid round, one or more Overbids as being higher or otherwise better than the Initial Minimum Overbid for such asset package, or in subsequent rounds, the Overbid(s) previously designated by the Decision Maker as the prevailing highest or otherwise best Bid for a given asset package (for each asset package, collectively, the "**Prevailing Highest Bid**").  After each round of bidding, including the initial round, the CRO shall disclose to all Qualified Bidders the material terms of any Overbid(s) designated by the Decision Maker as the Prevailing Highest Bid, as well as the value attributed by the Decision Maker to such Prevailing Highest Bid.

(v)     Bids for Less than Substantially All Assets.  The Decision Maker may consider and accept Bids for any portion of the Assets, as well as Bids for substantially all of the Assets, and the Decision Maker may hold separate Auctions for portions of the Assets in the discretion of the Decision Maker in consultation with the Consultation Parties; provided, however, that the Decision Maker may consider and accept Bids for less than substantially all of the Assets only so long as the value of such Bids, in combination, constitute an Overbid.

Each Overbid by a Qualified Bidder at the Auction, if not inconsistent with the provisions

of these Bidding Procedures, shall be deemed to constitute a Qualified Bid.

### d.  **Consideration of Overbids**

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things: (A) facilitate discussions between the Debtors, the Consultation Parties, and Qualified Bidders; (B) allow Qualified Bidders to consider how they wish to proceed; (C) consider and determine the current Prevailing Highest Bid at any given time during the Auction; and (D) give any Qualified Bidder the opportunity to provide the CRO with such additional evidence as the CRO, in consultation with the Consultation Parties, in his reasonable business judgment, may require that the Qualified Bidder (other than Stalking Horse Bidder) has sufficient internal resources, or has received sufficient debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

The Bid Protection will be taken into account in each round of bidding.  For the avoidance of doubt, during the Auction, any bid by the Stalking Horse Bidder shall be deemed to be increased by the amount of the Bid Protection, provided that in the event that the Stalking Horse Bidder is the Successful Bidder and its Successful Bid includes the Bid Protection, the Stalking Horse Bidder shall be entitled to credit that amount against the Purchase Price.

### e.  **No Round-Skipping**

To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a bid in such round of bidding that is of a higher value or is a better offer than the immediately preceding bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a bid in such round of bidding that is of a higher value or is a better offer than the immediately preceding bid submitted by a Qualified Bidder in such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction.  To the extent the Debtors hold separate Auctions for substantially all Assets and for Assets separated into lots, the requirements of this Section will be applied separately to each Auction.

### f.  **Closing the Auction**

(i)     The Auction shall continue until there is only one offer (which may consist of one Qualified Bid for substantially all of the Assets or more than one Qualified Bid for complementary portions of Assets) that the Decision Maker determines, on behalf of the Debtors, in the exercise of reasonable business judgment, and after consultation with the Consultation Parties, to be the highest or otherwise best offer for the Assets (one or more such Qualified Bids, the "**Successful Bid**," and the Qualified Bidder or Qualified Bidders making such Successful Bid, the "**Successful Bidder**"); provided further that, any release of liens by the DIP Agent or the Prepetition Agents shall not include any release of liens with respect to the proceeds of the Sale of the Assets subject to such Bid.  Within one (1) Business Day after the conclusion of the Auction, the Debtors shall file

with the Bankruptcy Court and serve upon all Qualified Bidders and parties that have requested notice in these cases a notice identifying the Successful Bidder and the Backup Bidder and post such notice on the Debtors' bankruptcy website.

(ii)    After determining the Successful Bid and the Successful Bidder, the CRO will also determine, on behalf of the Debtors, in his reasonable business judgment, and after consultation with the Consultation Parties, the Qualified Bidders(s) with the next highest or otherwise best Bid(s) for the Assets.    Such Bid(s) shall be declared the "**Backup Bid**," and the Qualified Bidder(s) making such Backup Bid, the "**Backup Bidder**," at which point the Auction will be closed.

(iii)    At the closing of the Auction, at the CRO's request, the Successful Bidder and the Backup Bidder shall recite on the record of the Auction any and all key terms of the Successful Bid and the Backup Bid, respectively, to ensure the accuracy of the final Bids and to aid in the final documentation of the Sale, and each of the Successful Bidder and the Backup Bidder shall promptly thereafter sign a revised Purchase Agreement reflecting the terms of the Successful Bid and the Backup Bid, as applicable.

(iv)    The Debtors shall not consider any Bids or Overbids submitted after the closing of the Auction, and any such Bids or Overbids shall be deemed untimely and shall not constitute Qualified Bids.  The determination of the Successful Bid and Backup Bid at the closing of the Auction shall be final, subject only to approval by the Bankruptcy Court.

(v)    As soon as reasonably practicable after the closing of the Auction, (A) each of the Successful Bidder and the Backup Bidder, as applicable, will transfer via wire transfer of immediately available funds or such other form acceptable to the CRO payable to the order of the Debtors an amount such that the Good Faith Deposit of the Successful Bidder and the Backup Bidder, as modified in the Auction, is not less than 10 percent (10%) of the stated cash Purchase Price in the Successful Bid and the Backup Bid, as applicable, and (B) the Debtors shall cause the Qualified Bid Documents for the Successful Bidder and the Backup Bidder to be filed with the Bankruptcy Court.

**g.  Consent and Waiver as Condition to Bid**

All Qualified Bidders at the Auction shall be deemed to have (i) consented to the Bankruptcy Court's jurisdiction and constitutional authority to enter a final order in connection with any disputes relating to the Auction, and the construction and enforcement of the Potential Bidder's Contemplated Transaction Documents, as applicable, (ii) waived any right to a jury trial in connection with such disputes, and (iii) waived any objection to these Bidding Procedures.

**h.  Terms of Bid Protection**

If the Decision Maker accepts a Qualified Bid other than the Qualified Bid of the Stalking Horse Bidder as the Successful Bidder, then upon consummation of the Sale to the Successful Bidder, the Debtors shall pay to the Stalking Horse Bidder as compensation for the Stalking Horse Bidder's efforts in connection with the negotiation and execution of the Stalking Horse Agreement and the transactions contemplated thereby an amount equal to the Bid Protection due to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse Agreement, as approved by the Bankruptcy Court under the Bidding Procedures Order.

**9.     Acceptance of Successful Bid**

The Debtors shall sell the Purchased Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court.  The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the Bid.  The Debtors will be deemed to have accepted a Bid only when such Bid has been approved by the Bankruptcy Court.

**10.    Sale Hearing**

A hearing to approve the sale of the Assets to the Successful Bidder shall be conducted by the Bankruptcy Court, located at 824 Market Street, Wilmington DE 19801, on (i) [_____], **2018, at [_:_0 _].m.** (Eastern Time), if no Auction is held or (ii) [_____], **2018, at [_:_0 _].m.** (Eastern Time) (the "**Sale Hearing**") if an Auction is held.

Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder (i) fails to consummate a Sale by the Closing Deadline, (ii) breaches such Successful Bidder's Purchase Agreement, or (iii) otherwise fails to perform, the Decision Maker shall be authorized, but not required, to deem the Backup Bid(s), as disclosed at the Sale Hearing, the Successful Bid(s) and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder(s) submitting such Backup Bid(s) without further notice or orders of the Bankruptcy Court.  In the event that there are multiple Successful Bidders and/or Backup Bidders and only one of such Successful Bidders or Backup Bidders engages in the acts or omissions described in clauses (i) through (iii) of the foregoing sentence, the Decision Maker may, in the exercise of discretion, and in consultation with the Consultation Parties, elect to close the contemplated transactions with some or all of the other Successful Bidders or Backup Bidders, as applicable.

The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing or in the agenda or notice filed in respect of such hearing; provided that such date is consistent with the applicable milestone for the entry of the Sale Order under the DIP Facility, unless such milestone is extended in accordance with the terms of the DIP Facility.

ACTIVE 234584377

11.    **Return of Good Faith Deposit**

Good Faith Deposits provided by Bidders other than the Stalking Horse Bidder (i) shall be held by the Debtors in one or more non-interest-bearing accounts on terms acceptable to the Debtors in their sole discretion, and (ii) shall not become property of the Debtors' estates nor become subject to any liens encumbering such accounts and/or the other funds therein absent further order of the Bankruptcy Court.   All Good Faith Deposits of Bidders not selected as the Successful Bidder or the Backup Bidder shall be returned to such Bidders no later than five (5) business days following the close of the Auction.   In no event shall interest or any other amounts in excess of the Good Faith Deposit be subject to refund.

The Good Faith Deposit of the Successful Bidder(s) shall be applied to the Purchase Price under such Successful Bidder's Purchase Agreement at the Closing thereunder.   If a Backup Bidder consummates a Sale transaction under such Backup Bidder's Purchase Agreement, the Good Faith Deposit of such Backup Bidder will be applied to the Purchase Price under such Backup Bidder's Purchase Agreement at the Closing thereunder.

If a Successful Bidder fails (or Successful Bidders fail), or a Backup Bidder fails (or Backup Bidders fail) to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder(s), the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder(s) or Backup Bidder(s), as applicable, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors.

Notwithstanding anything herein to the contrary, the terms under which the Stalking Horse Bidder provided a Good Faith Deposit (in the form of the Purchaser Deposit) and the terms of its use, release and return to the Stalking Horse Bidder shall be governed by the Stalking Horse Agreement.

12.    **Modifications**

These Bidding Procedures may be modified in any manner consistent with the Debtors' fiduciary duties and applicable law only upon the express written consent of the Debtors, in consultation with the Consultation Parties, or by order of the Bankruptcy Court; provided, however, that any such modifications must be provided in writing by email (to the notice parties listed in the draft purchase agreement submitted with the relevant Bid) to all Bidders (or Qualified Bidders following the Bid Deadline) and may in no event (a) permit the submission of Bids after the close of the Auction, unless otherwise ordered by the Bankruptcy Court and (b) change any of the Bid Requirements set forth in Section 6 of these Bidding Procedures except to the extent specifically provided therein.

ACTIVE 234584377

13.     <u>**Reservation of Rights**</u>

        Without prejudice to the rights of the Stalking Horse Bidder under the Stalking Horse Agreement, and subject to the limitations set forth in Section 12, the Debtors, after consultation with the Consultation Parties, shall have the right, in the exercise of the CRO's reasonable business judgment on behalf of the Debtors' estates, to adopt such other rules for the Bidding Procedures which, in the Debtors' reasonable business judgment, will better promote the goals of the Bidding Procedures, and which are not inconsistent with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court. All such additional rules shall be communicated to the Consultation Parties, Qualified Bidders, and (if such modifications are made prior to the Bid Deadline) Potential Bidders. Without limiting the foregoing, the Debtors may determine to distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction other than with respect to the distribution of the Opening Bid, and the disclosure of each Prevailing Highest Bid, as set forth above.

ACTIVE 234584377

<u>EXHIBIT G</u>

FORM OF SECURITY AGREEMENT

(See Attached.)

## PLEDGE AND SECURITY AGREEMENT

PLEDGE AND SECURITY AGREEMENT (the "Agreement") dated as of August [_], 2018, made by each of the Grantors referred to below, in favor of **Wells Fargo Bank, N.A.**, in its capacity as agent for the Secured Parties referred to below (in such capacity, together with its successors and assigns in such capacity, if any, the "Agent").

W I T N E S S E T H:

WHEREAS, RM Holdco LLC, a Delaware limited liability company (the "Parent"), RM Opco LLC, a Delaware limited liability company (the "Borrower"), each direct and indirect subsidiary of the Parent listed as a "Guarantor" on the signature pages thereto (together with the Parent, the "Guarantors," and each individually, a "Guarantor,"), the lenders from time to time party thereto (each a "Lender" and collectively, the "Lenders"), and the Agent are parties to a DIP Financing and Guaranty Agreement, dated as of the date hereof (such agreement, as amended, restated, amended and restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "Financing Agreement");

WHEREAS, pursuant to the Financing Agreement, the Lenders have agreed to make the DIP Term Loan (under and as defined in the Financing Agreement) to the Borrower;

WHEREAS, it is a condition precedent to the Lenders making the DIP Term Loan and providing any other financial accommodation to the Borrower pursuant to the Financing Agreement that Borrower and each of the Guarantors (collectively, the "Grantors," and each individually, a "Grantor") shall have executed and delivered to the Agent a pledge to the Agent, for the benefit of the Secured Parties, and grant to the Agent, for the benefit of the Secured Parties, of (a) a security interest in and Lien on the outstanding Equity Interests (as defined in the Financing Agreement) and indebtedness from time to time owned by such Grantor of each Person (as defined in the Financing Agreement) now or hereafter existing and in which such Grantor has any interest at any time and (b) a security interest in all other personal property and fixtures of such Grantor;

WHEREAS, the Grantors are mutually dependent on each other in the conduct of their respective businesses as an integrated operation, with credit needed from time to time by each Grantor often being provided through financing obtained by the Borrower and the ability to obtain such financing being dependent on the successful operations of all of the Grantors as a whole; and

WHEREAS, each Grantor has determined that the execution, delivery and performance of this Agreement directly benefit, and are in the best interest of, such Grantor;

NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Agent and the Lenders to make and maintain the DIP Term Loan and to provide other financial accommodations to the Borrower pursuant to the Financing Agreement, the Grantors hereby jointly and severally agree with the Agent, for the benefit of the Secured Parties, as follows:

SECTION 1.   Definitions.

(a)      Reference is hereby made to the Financing Agreement for a statement of the terms thereof.  All capitalized terms used in this Agreement and the recitals hereto which are defined in the Financing Agreement or in Article 8 or 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Code") and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Required Lenders may otherwise determine.

(b)      The following terms shall have the respective meanings provided for in the Code:  "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Security Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper".

(c)      As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"Additional Collateral" has the meaning specified therefor in Section 4(a)(i) hereof.

"Certificated Entities" has the meaning specified therefor in Section 5(m) hereof.

"Copyright Licenses" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to use or sell any works covered by any Copyright (including, without limitation, all Copyright Licenses set forth in Schedule II hereto).

"Copyrights" means all domestic and foreign copyrights, whether registered or unregistered, including, without limitation, all copyright rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship fixed in any tangible medium of expression (including computer software and internet website content) now or hereafter owned, acquired, developed or used by any Grantor (including, without limitation, all copyrights described in Schedule II hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States or any other country or any political subdivision thereof), and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

"Existing Issuer" has the meaning specified therefor in the definition of the term "Pledged Shares".

-2-

"Intellectual Property" means all Copyrights, Patents, Trademarks and Other Intellectual Property.

"Licenses" means the Copyright Licenses, the Patent Licenses and the Trademark Licenses.

"Other Intellectual Property" means all trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and privacy and other general intangibles of like nature, now or hereafter acquired, owned, developed or used by any Grantor (including, without limitation, all Other Intellectual Property set forth in Schedule II hereto).

"Patent Licenses" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to manufacture, use or sell any invention covered by any Patent (including, without limitation, all Patent Licenses set forth in Schedule II hereto).

"Patents" means all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and other general intangibles of like nature, now existing or hereafter acquired (including, without limitation, all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how and formulae described in Schedule II hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office, or in any similar office or agency of the United States or any other country or any political subdivision thereof), and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

"Pledged Debt" means the indebtedness described in Schedule VI hereto and all indebtedness from time to time owned or acquired, the Promissory Notes and other Instruments evidencing any or all of such indebtedness, and all interest, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and Commodity Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness.

"Pledged Interests" means, collectively, (a) the Pledged Debt, (b) the Pledged Shares and (c) all security entitlements in any and all of the foregoing.

"Pledged Issuer" has the meaning specified therefor in the definition of the term "Pledged Shares".

"Pledged Shares" means (a) Equity Interests described in Schedule VII hereto, whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, issued by the Persons described in such Schedule VII (the "Existing Issuers"), (b) Equity Interests at any time and from time to time acquired by a Grantor of any and all Persons now or hereafter existing (such Persons, together with the Existing Issuers, being hereinafter

referred to collectively as the "<u>Pledged Issuers</u>" and each individually as a "<u>Pledged Issuer</u>"), whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, and (c) the certificates representing such Equity Interests, all options and other rights, contractual or otherwise, in respect thereof and all dividends, distributions, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and Commodity Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property (including, without limitation, any stock dividend and any distribution in connection with a stock split) from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests.

"<u>Secured Parties</u>" means, collectively, the Agent and the Lenders.

"<u>Secured Obligations</u>" has the meaning specified therefor in Section 3 hereof.

"<u>Trademark Licenses</u>" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensor or licensee and providing for the grant of any right concerning any Trademark, together with any goodwill connected with and symbolized by any such trademark licenses, contracts or agreements and the right to prepare for sale or lease and sell or lease any and all Inventory now or hereafter owned by any Grantor and now or hereafter covered by such licenses (including, without limitation, all Trademark Licenses described in Schedule II hereto).

"<u>Trademarks</u>" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, acquired or used by any Grantor (including, without limitation, all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers described in Schedule II hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by such marks and all customer lists, formulae and other Records of any Grantor relating to the distribution of products and services in connection with which any of such marks are used.

"<u>WF Certificate of Deposit</u>" means that certain Certificate of Deposit number 2239406347 maintained with or issued by Wells Fargo Bank, National Association, as Collateral under and as defined under that certain Security Agreement: Specific Rights to Payment, dated on or about October 19, 2015 by the Borrower in favor of Wells Fargo Bank, National Association, as amended, restated, amended and restated, modified or supplemented prior to the date hereof.

SECTION 2.    <u>Grant of Security Interest</u>.  As collateral security for the payment, performance and observance of all of the Secured Obligations, each Grantor hereby pledges and assigns to the Agent (and its permitted agents and designees), and grants to the Agent (and its permitted agents and designees), for the benefit of the Secured Parties, a continuing security interest in, all personal property and Fixtures of such Grantor, wherever located and whether now

-4-

or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including, without limitation, the following (all being collectively referred to herein as the "<u>Collateral</u>"):

(a)     all Accounts;

(b)     all Chattel Paper (whether tangible or electronic);

(c)     the Commercial Tort Claims specified on Schedule V;

(d)     all Deposit Accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of the Agent or any Lender or any affiliate, representative, agent or correspondent of the Agent or any Lender;

(e)     all Documents;

(f)     all General Intangibles (including, without limitation, all Payment Intangibles, Intellectual Property and Licenses);

(g)     all Goods, including, without limitation, all Equipment, Fixtures and Inventory;

(h)     all Instruments (including, without limitation, Promissory Notes);

(i)     all Investment Property;

(j)     all Letter-of-Credit Rights;

(k)     all Pledged Interests;

(l)     all Supporting Obligations;

(m)     all other tangible and intangible personal property of such Grantor (whether or not subject to the Code), including, without limitation, all products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this Section 2 hereof (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 2 hereof or are otherwise necessary or helpful in the collection or realization thereof; and

(n)     all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral (including, for the avoidance of

doubt, but subject to and solely upon entry of the Final Order, proceeds of Avoidance Actions, if any); in each case howsoever such Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

Notwithstanding anything herein to the contrary, the term "Collateral" (and any component definition thereof) shall not include, and no Grantor is pledging, nor granting a security interest hereunder in, (i) any of such Grantor's right, title or interest in any license, WF Certificate of Deposit, contract or agreement to which such Grantor is a party or any of its right, title or interest thereunder to the extent, but only to the extent, that such a grant would, under the express terms of such license, contract or agreement result in a breach of the terms of, or constitute a default under, such license, contract or agreement (other than to the extent that any such term (A) has been waived or (B) would be rendered ineffective pursuant to Sections 9-406, 9-408, 9-409 of the Code or other applicable provisions of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity); provided, that (x) immediately upon the ineffectiveness, lapse, termination or waiver of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a security interest in, all such right, title and interest as if such provision had never been in effect and (y) the foregoing exclusion shall in no way be construed so as to limit, impair or otherwise affect the Agent's unconditional continuing security interest in and liens upon any rights or interests of a Grantor in or to the proceeds of, or any monies due or to become due under, any such license, contract or agreement, (ii) any intent-to-use United States trademark applications for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office, provided that, upon such filing and acceptance, such intent-to-use applications shall be included in the definition of Collateral, (iii) any Avoidance Actions, provided that, subject to and solely upon entry of the Final Order, the term "Collateral" shall include proceeds of Avoidance Actions, if any, or (iv) any Good Faith Deposits; provided, however, that, the limitations set forth in clause (i) of this paragraph shall be applicable to limit the scope of the "Collateral" solely to the extent that the applicable law (including applicable bankruptcy law) does not apply to permit a pledge of such license, contract or agreement without breach or default.

SECTION 3.   Security for Secured Obligations.   The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (the "Secured Obligations"):

(a)   the prompt payment by each Grantor, as and when due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), of all amounts from time to time owing by it in respect of the Financing Agreement and/or the other Credit Documents, including, without limitation, (i) all Obligations (as defined in the Financing Agreement) and (ii) in the case of a Guarantor, all Guaranteed Obligations (under and as defined in the Financing Agreement); and

(b)   the due performance and observance by each Grantor of all of its other obligations from time to time existing in respect of the Credit Documents.

SECTION 4.  Delivery of the Pledged Interests.

(a)    (i) All Promissory Notes currently evidencing the Pledged Debt and all certificates currently representing the Pledged Shares shall be delivered to the Agent on or prior to the execution and delivery of this Agreement.  All other Promissory Notes, certificates and Instruments constituting Pledged Interests from time to time required to be pledged to the Agent pursuant to the terms of this Agreement or the Financing Agreement (the "Additional Collateral") shall be delivered to the Agent promptly upon, but in any event within five (5) days (or such longer period as the Agent may agree, as directed by the Required Lenders in their sole discretion) of, receipt thereof by or on behalf of any of the Grantors.  All such Promissory Notes, certificates and Instruments shall be held by or on behalf of the Agent pursuant hereto and shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment or undated stock powers executed in blank, all in form and substance reasonably satisfactory to the Required Lenders.  If any Pledged Interests consist of uncertificated securities, unless the immediately following sentence is applicable thereto, such Grantor shall cause the Agent (or its designated custodian or nominee) to become the registered holder thereof, or cause each issuer of such securities to agree that it will comply with instructions originated by the Agent with respect to such securities without further consent by such Grantor.  If any Pledged Interests consist of security entitlements, such Grantor shall transfer such security entitlements to the Agent (or its custodian, nominee or other designee), or cause the applicable securities intermediary to agree that it will comply with entitlement orders by the Agent without further consent by such Grantor.  Notwithstanding the foregoing, the Agent hereby agrees that it will, subject to the Financing Order, (A) not send any instructions or entitlement orders to any depository bank, issuer, commodity intermediary or securities intermediary unless an Event of Default has occurred and is then continuing and (B) prior to the occurrence and continuance of any Event of Default, and with regard only to those Pledged Interests consisting of uncertificated securities of which pursuant to this Section 4(a)(i) it is the registered owner, comply with the Grantors' instructions, to the extent such instructions will not violate any applicable law, including the Financing Order, or any provision of the Loan Documents.

(ii)    Within 10 Business Days (or such longer period as the Agent may agree, as directed by the Required Lenders in their sole discretion) of the receipt by a Grantor of any Additional Collateral, a Pledge Amendment, duly executed by such Grantor, in substantially the form of Exhibit A hereto (a "Pledge Amendment"), shall be delivered to the Agent, in respect of the Additional Collateral that must be pledged pursuant to this Agreement and the Financing Agreement.  The Pledge Amendment shall from and after delivery thereof constitute part of Schedules VI and VII hereto.  Each Grantor hereby authorizes the Agent to attach each Pledge Amendment to this Agreement and agrees that all Promissory Notes, certificates or Instruments listed on any Pledge Amendment delivered to the Agent shall for all purposes hereunder constitute Pledged Interests and such Grantor shall be deemed upon delivery thereof to have made the representations and warranties set forth in Section 5 hereof with respect to such Additional Collateral.

(b)    If any Grantor shall receive, by virtue of such Grantor's being or having been an owner of any Pledged Interests, any (i) certificate (including, without

limitation, any certificate representing a stock dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of shares, stock split, spin-off or split-off), Promissory Note or other Instrument, (ii) option or right, whether as an addition to, substitution for, or in exchange for, any Pledged Interests, or otherwise, (iii) dividends payable in cash (except such dividends permitted to be retained by any such Grantor pursuant to Section 7 hereof) or in securities or other property or (iv) dividends, distributions, cash, Instruments, Investment Property and other property in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, such Grantor shall receive such certificate, Promissory Note, Instrument, option, right, payment or distribution in trust for the benefit of the Agent, shall segregate it from such Grantor's other property and shall deliver it forthwith to the Agent, in the exact form received, with any necessary indorsement and/or appropriate stock powers duly executed in blank, to be held by the Agent as Pledged Interests and as further collateral security for the Secured Obligations.

SECTION 5.  <u>Representations and Warranties</u>.  Each Grantor jointly and severally represents and warrants as follows:

(a)    Schedule I hereto sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of each Grantor, (ii) the jurisdiction of organization of each Grantor, (iii) the type of organization of each Grantor, (iv) the organizational identification number of each Grantor or states that no such organizational identification number exists and (v) the federal employer identification number of each Grantor.

(b)    Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, this Agreement is, and each other Credit Document to which any Grantor is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Grantor, enforceable against such Grantor in accordance with its terms, except as enforceability may be limited by the Financing Order or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally.

(c)    Except as disclosed in the Financing Agreement and the filing of the Chapter 11 Cases, there is no pending or, to the best knowledge of any Grantor, threatened (in writing) action, suit or proceeding affecting any Grantor or any of its properties before any court or other Governmental Authority or any arbitrator that (A) if adversely determined, could reasonably be expected to have a Material Adverse Effect on the grant by any Grantor, or the perfection of the security interest purported to be created hereby in the Collateral, or the exercise by the Agent of any of its rights or remedies hereunder, or (B) relates to this Agreement or any other Credit Document or any transaction contemplated hereby or thereby.

(d)    All Equipment, Fixtures, Inventory (except Inventory in transit or Equipment out for repair) and other Goods now existing are located at the addresses specified therefor in Schedule III hereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with Section 6(b))

-8-

and any other locations in the continental United States for which the applicable Grantor has provided written notice to the Agent.   Schedule III hereto contains a true, correct and complete list, as of the Effective Date, of the legal names and addresses of each warehouse (other than warehouses owned or leased by a Credit Party) at which Collateral of each Credit Party is stored.  None of the receipts received by any Grantor from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns.  Each Grantor's chief place of business and chief executive office, the place where such Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper are located at the addresses specified therefor in Schedule III hereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof).  None of the Accounts is evidenced by Promissory Notes or other Instruments (other than items deposited or to be deposited for collection in the ordinary course), except to the extent permitted by the Financing Agreement.  Set forth in Schedule IV hereto is a complete and accurate list, as of the date of this Agreement, of each Deposit Account, Securities Account and Commodities Account of each Grantor, together with the name and address of each institution at which each such Account is maintained, the account number for each such Account and a description of the purpose of each such Account.  Set forth in Schedule II hereto is (i) a complete and correct list of each trade name used by each Grantor and (ii) the name of, and each trade name used by, each Person from which such Grantor has acquired any substantial part of the Collateral within five years of the date hereof.

(e)    Each Grantor has delivered to the Agent true, complete and correct copies of each material License described in Schedule II hereto, including all schedules and exhibits thereto, which represents all of the material Licenses existing on the date of this Agreement.  Each such License sets forth the entire agreement and understanding of the parties thereto relating to the subject matter thereof, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby or the rights of any Grantor or any of its Affiliates in respect thereof.  Each material License now existing is, and each other material License will be, the legal, valid and binding obligation of the parties thereto, enforceable against such parties in accordance with its terms except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally.  No default under any material License by any such party has occurred, nor does any defense, offset, deduction or counterclaim exist thereunder in favor of any such party.  No party to any material License has given any Grantor written notice of its intention to cancel, terminate or fail to renew any such License.

(f)    To Grantor's knowledge, Grantors own and control, or otherwise have the right to use, all material Intellectual Property necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Schedule II hereto sets forth a complete and accurate list of all material Intellectual Property owned or used by each Grantor as of the date hereof.  To Grantor's knowledge, all such Intellectual Property is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, is valid and enforceable and has not been abandoned in

whole or in part. Except as set forth in Schedule II hereto, no such Intellectual Property is the subject of any licensing or franchising agreement. No Grantor has any knowledge of any conflict with the rights of others to any material Intellectual Property and, to the best knowledge of each Grantor, no Grantor is now infringing or in conflict with any such rights of others, and to the best knowledge of each Grantor, no other Person is now infringing or in conflict with any such properties, assets and rights owned or used by any Grantor, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No Grantor has received any written notice that it is violating or has violated in any material respect the Intellectual Property rights of any third party.

(g)    The Existing Issuers set forth in Schedule VII identified as a Subsidiary of a Grantor are each such Grantor's only Subsidiaries existing on the date hereof. The Pledged Shares have been duly authorized and validly issued and are fully paid and nonassessable and the holders thereof are not entitled to any preemptive, first refusal or other similar rights. Except as noted in Schedule VII hereto, the Pledged Shares constitute 100% of the issued shares of Equity Interests of the Pledged Issuers as of the date hereof. All other shares of Equity Interests constituting Pledged Interests will be duly authorized and validly issued, fully paid and nonassessable.

(h)    The Grantors are and will be at all times the sole and exclusive owners of, or otherwise have and will have adequate rights in, the Collateral free and clear of any Lien except for the Permitted Liens. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office except such as may have been filed to perfect or protect any Permitted Lien.

(i)    Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court and the Chapter 11 Cases, the exercise by the Agent of any of its rights and remedies hereunder in accordance with the terms hereof and in accordance with applicable laws will not contravene any law, including Securities Laws in connection with the enforcement of Pledged Shares, or any contractual restriction binding on or otherwise affecting any Grantor or any of its properties and will not result in, or require the creation of, any Lien upon or with respect to any of its properties.

(j)    Upon the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court and any notice or filing required by the Bankruptcy Court and the Chapter 11 Cases, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person, is required for (i) the due execution, delivery and performance by any Grantor of this Agreement (ii) the grant by any Grantor of the security interest purported to be created hereby in the Collateral or (iii) the exercise by the Agent of any of its rights and remedies hereunder, except, in the case of this clause (iii), as may be required in connection with any sale of any Pledged Interests by laws affecting the offering and sale of securities generally.

(k)    Upon the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court and any notice or filing required by the Bankruptcy

Court and the Chapter 11 Cases and the execution of this Agreement, each such Financing Order and this Agreement shall be effective to create in favor of the Agent, for benefit of the Lenders, a legal valid, enforceable and perfected security interest in the Collateral and proceeds thereof with the priority set forth in the Financing Orders. Notwithstanding the foregoing, it is agreed and understood that (x) any Grantor with any right, title or interest in a leasehold interest shall not be required to take actions or execute and deliver any documents necessary to perfect the Agent's security interest in such leasehold interest if the Required Lenders (in their sole discretion) have determined that the costs to be incurred by such Grantor to perfect the Agent's security interest would be unreasonably excessive in relation to the benefits to the Agent and the Lenders to be derived from such security interest and (y) nothing in this Agreement shall require any Grantor to make any filings or take any other actions to record or perfect the Agent's security interest in any assets located outside the United States.

(l)    As of the date hereof, no Grantor holds any Commercial Tort Claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant, except for such claims described in Schedule V.

(m)    (i) Each Grantor and any of its Subsidiaries that is a partnership or a limited liability company with certificated Equity Interests, has irrevocably opted into (and has caused each of its Subsidiaries that is a partnership or a limited liability company with certificated Equity Interests, and a Pledged Issuer to opt into) Article 8 of the Uniform Commercial Code (collectively, the "Certificated Entities"). Such interests are securities for purposes of Article 8 of any relevant Uniform Commercial Code. (ii) With respect to each Grantor and its Subsidiaries that is a partnership or a limited liability company and is not a Certificated Entity, the partnership interests or membership interests of each such Person are not (A) dealt in or traded on securities exchanges or in securities markets, (B) securities for purposes of Article 8 of any relevant Uniform Commercial Code, (C) investment company securities within the meaning of Section 8-103 of any relevant Uniform Commercial Code and (D) evidenced by a certificate. Such partnership interests or membership interests constitute General Intangibles.

SECTION 6.    Covenants as to the Collateral.    So long as any of the Secured Obligations (whether or not due) shall remain unpaid or any Lender shall have any DIP Term Commitment under the Financing Agreement (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted), unless the Required Lenders shall otherwise consent in writing:

(a)    Further Assurances. Each Grantor will take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as the Agent and the Required Lenders may reasonably require from time to time in order (i) to perfect and protect, or maintain the perfection of, the security interest and Lien purported to be created hereby; (ii) to enable the Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise to effect the purposes of this Agreement, including, without limitation: (A) if requested by the Agent, as directed by the Required Lenders, marking conspicuously all Chattel Paper, Instruments and Licenses and, at the request of the Agent, as directed by the Required Lenders, all of

-11-

its Records pertaining to such Collateral with a legend, in form and substance satisfactory o the Agent, indicating that such Chattel Paper, Instrument, License or Collateral is subject to the security interest created hereby, (B) if any Account shall be evidenced by a Promissory Note or other Instrument or Chattel Paper, delivering and pledging to the Agent such Promissory Note, other Instrument or Chattel Paper, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Required Lenders, (C) executing and filing (to the extent, if any, that such Grantor's signature is required thereon) or authenticating the filing of, such financing or continuation statements, or amendments thereto, (D) with respect to Intellectual Property hereafter existing and not covered by an appropriate security interest grant, executing and recording in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, appropriate instruments granting a security interest, as may be necessary or desirable or that the Agent may request in order to perfect and preserve the security interest purported to be created hereby, (E) delivering to the Agent irrevocable proxies in respect of the Pledged Interests, (F) furnishing to the Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Agent, as directed by the Required Lenders, may reasonably request, all in reasonable detail, (G) if any Collateral with a book value in excess of $100,000 (when aggregated with all other Collateral at the same location) shall be in the possession of a bailee, warehouseman or other third party, if requested by the Required Lenders, notifying such Person of the Agent's security interest created hereby, and using commercially reasonable efforts to obtain a written agreement, in form and substance reasonably satisfactory to the Required Lenders, providing access to such Collateral in order to remove such Collateral from such premises during an Event of Default and acknowledging that such Person holds possession of the Collateral for the benefit of the Agent and (H) if at any time after the date hereof, any Grantor acquires or holds any Commercial Tort Claim, promptly notifying the Agent in a writing signed by such Grantor setting forth a brief description of such Commercial Tort Claim and granting to the Agent a security interest therein and in the proceeds thereof, which writing shall incorporate the provisions hereof and shall be in form and substance satisfactory to the Required Lenders.  No Grantor shall take or fail to take any action which would in any manner impair the validity or enforceability of the Agent's security interest in and Lien on any Collateral, other than actions permitted by the Financing Agreement.

(b)    Location of Equipment and Inventory.  Each Grantor will keep the Equipment and Inventory (other than Equipment and Inventory sold in the ordinary course of business, in transit, out for repair, loaned to employees (including, without limitation, laptops), otherwise being "used in the field" in the operation of such Grantor's business in the ordinary course of business and/or Equipment and Inventory having an aggregate value of less than $100,000) at the locations specified in Schedule III hereto or, upon not less than thirty (30) days' prior written notice (or such shorter time as the Agent, at the written direction of the Required Lenders, may agree in its sole discretion) to the Agent accompanied by a new Schedule III hereto indicating each new location of the Equipment and Inventory, at such other locations in the continental United States as the Grantors may elect, provided that (i) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, as of the date hereof, all action has been taken to grant to the Agent a perfected, security interest in such Equipment and Inventory with the

priority set forth in the Financing Orders (subject in priority only to Permitted Liens that, pursuant to the definition of the term "Permitted Liens", are not prohibited from being prior to the Liens in favor of the Agent, for the benefit of the Secured Parties), and (ii) except to the extent permitted by the Financing Agreement and the applicable Financing Order, the Agent's rights in such Equipment and Inventory, including, without limitation, the existence, perfection and priority of the security interest created hereby in such Equipment and Inventory, are not adversely affected thereby.

(c)    Condition of Equipment.    Subject to the terms of the Financing Agreement and the applicable Financing Order, each Grantor will maintain or cause the Equipment which is necessary or useful in the proper conduct of its business to be maintained and preserved in good condition, repair and working order as when acquired and in accordance with any manufacturer's manual, ordinary wear and tear excepted, and will forthwith, or in the case of any loss or damage to any Equipment promptly after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith which are necessary or desirable, consistent with past practice, or which the Required Lenders may reasonably request to such end.  Each Grantor will, at the Agent's reasonable request, as directed by the Required Lenders, from time to time, promptly furnish to the Agent a statement describing in reasonable detail any loss or damage in excess of $100,000 to any Equipment.

(d)    Provisions Concerning the Accounts, Accounts Receivables and the Licenses.

(i)    Subject to Section 7.01(p) of the Financing Agreement and the applicable Financing Order, each Grantor will, except as otherwise provided in this subsection (d), continue to collect, at its own expense, all amounts due or to become due under the Accounts.  In connection with such collections, each Grantor may (and during the existence and continuation of an Event of Default, at the Agent's direction (acting at the written direction of the Required Lenders), will take such action as such Grantor (or, if applicable, the Agent (at the direction of the Required Lenders)) may deem necessary or advisable to enforce collection or performance of the Accounts; provided, however, that, subject to the Financing Order, the Agent shall have the right at any time, upon the occurrence and during the continuance of an Event of Default, to notify the Account Debtors or obligors under any Accounts of the assignment of such Accounts to the Agent and to direct such Account Debtors or obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Agent or its designated agent and, upon such notification and at the expense of such Grantor and to the extent permitted by law, to enforce collection of any such Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done.  After receipt by any Grantor of a notice from the Agent that the Agent has notified or has enforced a Grantor's rights against the Account Debtors or obligors under any Accounts as referred to in the proviso to the immediately preceding sentence, (A) all amounts and proceeds (including Instruments) received by such Grantor in respect of the Accounts shall be received in trust for the benefit of the Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Agent or its designated agent in the same form as so received (with any necessary endorsement)

to be held as cash collateral and applied as specified in Section 9(c) hereof, and (B) such Grantor will not adjust, settle or compromise the amount or payment of any Account or release wholly or partly any Account Debtor or obligor thereof or allow any credit or discount thereon. In addition, upon the occurrence and during the continuance of an Event of Default, the Agent may (in its sole and absolute discretion), in accordance with Article IX of the Financing Agreement, direct any or all of the banks and financial institutions with which any Grantor either maintains a Deposit Account or a lockbox or deposits the proceeds of any Accounts (other than Excluded Accounts (under and as defined in the Financing Agreement) to send immediately to the Agent or its designated agent by wire transfer (to such account as the Agent shall specify, or in such other manner as the Agent shall direct) all or a portion of such securities, cash, investments and other items by such institution. The Agent will make good faith efforts to provide notice to the applicable Grantor promptly after it has given any such directions to any such banks or financial institutions. Subject to the Financing Order, any such securities, cash, investments and other items so received by the Agent or its designated agent shall (in the sole and absolute discretion of the Agent (at the direction of the Required Lenders)) be held as additional Collateral for the Secured Obligations or distributed in accordance with Section 9 hereof.

(ii)    The Grantors shall take all reasonable steps to enforce, collect and receive all amounts owing on the Accounts Receivable of the Grantors. After the occurrence and during the continuance of an Event of Default, the Agent (at the direction of the Required Lenders) may send a notice of assignment and/or notice of the Lenders' security interest to any and all Account Debtors or third parties holding or otherwise concerned with any of the Collateral, and thereafter the Agent or its designee shall have the sole right to collect the Accounts Receivable and/or take possession of the Collateral and the books and records relating thereto. All checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness received directly by any Grantor from any of its Account Debtors, as proceeds from Accounts Receivable of such Grantor or as proceeds of any other Collateral shall be held by such Grantor in trust for the Agent and the Lenders and if of a nature susceptible to a deposit in a bank account, upon receipt be deposited by such Grantor in original form and no later than the next Business Day after receipt thereof into a Cash Management Account or other bank account referenced in the definition of Cash Management Accounts as excluded from the scope thereof. Each Grantor shall not commingle such collections with the proceeds of any assets not included in the Collateral. No checks, drafts or other instrument received by the Agent shall constitute final payment to the Agent unless and until such instruments have actually been collected.

(iii)    Upon the occurrence and during the continuance of any material breach or material default under any material License by any party thereto other than a Grantor, (A) the relevant Grantor will, promptly after obtaining knowledge thereof, give the Agent written notice of the nature and duration thereof, specifying what action, if any, it has taken and proposes to take with respect thereto, (B) except as could not reasonably be expected to have a Material Adverse Effect, no Grantor will, without the prior written consent of the Required Lenders, declare or waive any such breach or default or affirmatively consent to the cure thereof or exercise any of its remedies in respect thereof, and (C) each Grantor will, upon written instructions from the Agent and at such

-14-

Grantor's expense, take such action as the Required Lenders may deem necessary or advisable in respect thereof.

    (e)    <u>Provisions Concerning the Pledged Interests</u>.  Each Grantor will:

    (i)    at the Grantors' joint and several expense, promptly deliver to the Agent a copy of each material notice or other communication received by it in respect of the Pledged Interests;

    (ii)    at the Grantors' joint and several expense, defend the Agent's right, title and security interest in and to the Pledged Interests against the claims of any Person (other than Permitted Lien holders);

    (iii)    not make or consent to any amendment or other modification or waiver with respect to any Pledged Interests or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests other than pursuant to the Credit Documents; and

    (iv)    except as permitted under the Financing Agreement or Financing Order, not permit the issuance of (A) any additional shares of any class of Equity Interests of any Pledged Issuer, (B) any securities convertible voluntarily by the holder thereof or automatically upon the occurrence or non-occurrence of any event or condition into, or exchangeable for, any such shares of Equity Interests or (C) any warrants, options, contracts or other commitments entitling any Person to purchase or otherwise acquire any such shares of Equity Interests.

    (f)    <u>Intellectual Property</u>.

    (i)    Except as provided in subsection (ii) below, each Grantor (either itself or through licensees) will, and will cause each licensee thereof to, take all action necessary to maintain all of the Intellectual Property in full force and effect, including, without limitation, using the proper statutory notices and markings and using the Trademarks on each applicable trademark class of goods in order to so maintain the Trademarks in full force, free from any claim of abandonment for non-use, and no Grantor will (nor permit any licensee thereof to) do any act or knowingly omit to do any act whereby any Intellectual Property may become invalidated.

    (ii)    Notwithstanding the foregoing, so long as no Event of Default has occurred and is continuing, no Grantor shall have an obligation to use or to maintain any Intellectual Property (A) that relates solely to any product or work, that has been, or is in the process of being, discontinued, abandoned or terminated, (B) that is being replaced with Intellectual Property substantially similar to the Intellectual Property that may be abandoned or otherwise become invalid, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such replacement Intellectual Property is subject to the Lien created by this Agreement or any Financing Order, as applicable, (C) that is substantially the same as any other Intellectual Property that is in full force, so long as the failure to use or maintain such Intellectual Property does not materially

-15-

adversely affect the validity of such replacement Intellectual Property and so long as such other Intellectual Property is subject to the Lien and security interest created by this Agreement or any Financing Order, as applicable, or (D) that such Grantor has determined in its reasonable judgment is no longer used or useful to its business.

(iii)    Each Grantor will cause to be taken all necessary steps in any proceeding before the United States Patent and Trademark Office and the United States Copyright Office or any similar office or agency in any other country or political subdivision thereof to maintain each registration of the Intellectual Property (other than the Intellectual Property described in subsection (ii) above), including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings and payment of maintenance fees, filing fees, taxes or other governmental fees. If any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors shall (x) upon obtaining knowledge of such infringement, misappropriation, dilution or other violation, promptly notify the Agent in writing and (y) to the extent the Grantors shall deem appropriate under the circumstances, promptly sue for infringement, misappropriation, dilution or other violation, seek injunctive relief where appropriate and recover any and all damages for such infringement, misappropriation, dilution or other violation, or take such other actions as the Grantors shall deem appropriate under the circumstances to protect such Intellectual Property.

(iv)    Each Grantor shall furnish to the Agent statements and schedules further identifying and describing the Intellectual Property and Licenses and such other reports in connection with the Intellectual Property and Licenses as the Agent may reasonably request (at the direction of the Required Lenders), all in reasonable detail and promptly upon the request of the Agent (at the direction of the Required Lenders), following receipt by the Agent of any such statements, schedules or reports, the Grantors shall modify this Agreement by amending Schedule II hereto to include any Intellectual Property and Licenses, as the case may be, which become part of the Collateral under this Agreement or any Financing Order, as applicable, and shall execute and authenticate such documents and do such acts as shall be necessary or, in the reasonable judgment of the Required Lenders, desirable to subject such Intellectual Property and Licenses to the Lien and security interest created by this Agreement or any Financing Order, as applicable.

(v)    Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default, no Grantor may abandon or otherwise permit any Intellectual Property to become invalid without the prior written consent of the Required Lenders, and if any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors will take such action as the Agent, as directed by the Required Lenders, shall deem appropriate under the circumstances to protect such Intellectual Property.

(vi)    In the event that any Grantor shall (A) obtain rights to any new Trademarks necessary for the operation of its business, or any reissue, renewal or extension of any existing Trademark necessary for the operation of its business, (B) obtain rights to or develop any new patentable inventions, or become entitled to the benefit of any

-16-

Patent, or any reissue, division, continuation, renewal, extension or continuation-in-part of any existing Patent or any improvement thereof (whether pursuant to any license or otherwise), (C) obtain rights to or develop any new works protectable by Copyright, or become entitled to the benefit of any rights with respect to any Copyright or any registration or application therefor, or any renewal or extension of any existing Copyright or any registration or application therefor, or (D) obtain rights to or develop new Other Intellectual Property, the provisions of Section 2 hereof shall automatically apply thereto and such Grantor shall give to the Agent prompt written notice thereof in accordance with the terms of this Agreement and the Financing Agreement. Except as otherwise provided herein or in the Financing Agreement each Grantor, either itself or through any agent, employee, licensee or designee, shall, upon the request of the Agent or the Required Lenders, give the Agent written notice of each application submitted by it for the registration of any Trademark or Copyright or the issuance of any Patent with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, or in any similar office or agency of the United States or any country or any political subdivision thereof.

(vii)   Each Grantor hereby appoints the Agent its attorney-in-fact to execute and/or authenticate and file all such writings for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed, and such power (being coupled with an interest) shall be irrevocable until the date on which all of the Secured Obligations have been indefeasibly paid in full in cash or credit (to the extent contemplated in the Stalking Horse APA) after the termination of each Lender's Commitment and each of the Credit Documents.

(g)   [Reserved].

(h)   Accounts Receivable Documentation.   The Grantors will at such intervals as the Agent (at the direction of the Required Lenders) may reasonably require during the occurrence and continuance of an Event of Default, execute and deliver confirmatory written assignments of the Accounts Receivable to the Agent and furnish such further schedules and/or information as the Agent (at the direction of the Required Lenders) may require relating to the Accounts Receivable, including, without limitation, sales invoices or the equivalent, credit memos issued, remittance advices, reports and copies of deposit slips and copies of original shipping or delivery receipts for all merchandise sold. The items to be provided under this Section 6(h) are to be in form reasonably satisfactory to the Required Lenders and are to be executed and delivered to the Agent from time to time solely for their convenience in maintaining records of the Collateral. If the Grantors become aware of anything materially detrimental to any of the Grantors' customers' credit, the Grantors will promptly advise the Agent in writing thereof.

(i)   Properties.   No Grantor shall permit any property to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property the Agent does not have a valid and perfected Lien with the priority set forth in the Financing Orders or has not received a written subordination or waiver in accordance with Section 6(a).

-17-

(j)    Collateral Custodian.    Upon the occurrence and during the continuance of any Default or Event of Default, the Agent or its designee (at the direction of the Required Lenders) may at any time and from time to time employ and maintain on the premises of any Grantor a custodian selected by the Agent or its designee (at the direction of the Required Lenders) who shall have full authority to do all acts necessary to protect the Agent's and the Lenders' interests.  Each Grantor hereby agrees to cooperate with any such custodian and to do whatever the Agent or its designee may reasonably request to preserve the Collateral.

(k)    [Reserved].

(l)    Control.  To the extent required by the Financing Agreement and the applicable Financing Order, each Grantor hereby agrees to take any or all action that the Required Lenders may reasonably request in order for the Agent to obtain control in accordance with Sections 9-104, 9-105, 9406, and 9407 of the Code with respect to the following Collateral:  (i) Electronic Chattel Paper, (ii) Investment Property, (iii) Letter-of-Credit Rights and (iv) Deposit Accounts (other than Excluded Accounts).  Each Grantor hereby acknowledges and agrees that any agent or designee of the Agent shall be deemed to be a "secured party" with respect to the Collateral under the control of such agent or permitted designee for all purposes.

(m)    Records; Inspection and Reporting.

(i)    Each Grantor shall keep adequate records concerning the Accounts, Chattel Paper and Pledged Interests.

(ii)    Except as otherwise expressly permitted by Section 7.02(l) of the Financing Agreement, no Grantor shall, without the prior written consent of the Agent, amend, modify or otherwise change (A) its name, organizational identification number or FEIN (B) its jurisdiction of organization as set forth in Schedule I hereto or (C) its chief executive office as set forth in Schedule III hereto.

(n)    Partnership and Limited Liability Company Interest.  Except with respect to partnership interests and membership interests evidenced by a certificate, which certificate has been pledged and delivered to the Agent pursuant to Section 4 hereof, no Grantor that is a partnership or a limited liability company shall, nor shall any Grantor with any Subsidiary that is a partnership or a limited liability company, permit such partnership interests or membership interests to (i) be dealt in or traded on securities exchanges or in securities markets, (ii) become a security for purposes of Article 8 of any relevant Uniform Commercial Code, (iii) become an investment company security within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (iv) be evidenced by a certificate.  Each Grantor agrees that such partnership interests or membership interests shall constitute General Intangibles.

SECTION 7.   Voting Rights, Dividends, Etc. in Respect of the Pledged Interests.

(a)    So long as no Event of Default shall have occurred and be continuing:

-18-

(i)      each Grantor may exercise any and all voting and other consensual rights pertaining to any Pledged Interests for any purpose not inconsistent with the terms of this Agreement, the Financing Agreement or the other Credit Documents; provided, however, that, except for actions permitted under the Financing Agreement, (A) none of the Grantors will exercise or refrain from exercising any such right, as the case may be, if the Agent gives a Grantor notice that, in the Required Lenders' judgment, such action (or inaction) could reasonably be expected to have a Material Adverse Effect and (B) each Grantor will give the Agent at least 5 Business Days' written notice (or such shorter period as the Agent agrees in its sole discretion) of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right which could reasonably be expected to have a Material Adverse Effect;

(ii)     each of the Grantors may receive and retain any and all dividends, interest or other distributions paid in respect of the Pledged Interests to the extent permitted by the Financing Agreement; provided, however, that any and all (A) dividends and interest paid or payable other than in cash in respect of, and Instruments and other property received, receivable or otherwise distributed in respect of or in exchange for, any Pledged Interests, (B) dividends and other distributions paid or payable in cash in respect of any Pledged Interests in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, and (C) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Interests, together with any dividend, interest or other distribution or payment which at the time of such payment was not permitted by the Financing Agreement, shall be, and shall forthwith be delivered to the Agent, to hold as, Pledged Interests and shall, if received by any of the Grantors, be received in trust for the benefit of the Agent, shall be segregated from the other property or funds of the Grantors, and shall be forthwith delivered to the Agent in the exact form received with any necessary indorsement and/or appropriate stock powers duly executed in blank, to be held by the Agent as Pledged Interests and as further collateral security for the Secured Obligations; and

(iii)    the Agent (at the direction of the Required Lenders) will execute and deliver (or cause to be executed and delivered) to a Grantor all such proxies and other instruments as such Grantor may reasonably request for the purpose of enabling such Grantor to exercise the voting and other rights which it is entitled to exercise pursuant to Section 7(a)(i) hereof and to receive the dividends, interest and/or other distributions which it is authorized to receive and retain pursuant to Section 7(a)(ii) hereof.

(b)      Upon the occurrence and during the continuance of an Event of Default, subject to the Financing Order:

(i)      all rights of each Grantor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 7(a)(i) hereof, and to receive the dividends, distributions, interest and other payments that it would otherwise be authorized to receive and retain pursuant to Section 7(a)(ii) hereof, shall cease, and all such rights shall thereupon become vested in the Agent, which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Interests such dividends, distributions

and interest payments; provided, that if and when any such Event of Default shall have been cured or waived, (i) such voting rights shall automatically revert to the applicable Grantor and (ii) the Agent, at the expense of the Grantors, shall execute such documents reasonably requested by Grantors to allow the owner of any Pledged Interests to exercise any rights associated with such Pledged Interest subject to the Financing Agreement;

(ii)    the Agent is authorized to notify each debtor with respect to the Pledged Debt to make payment directly to the Agent (or its designee) and may collect any and all moneys due or to become due to any Grantor in respect of the Pledged Debt, and each of the Grantors hereby authorizes each such debtor to make such payment directly to the Agent (or its designee) without any duty of inquiry;

(iii)    without limiting the generality of the foregoing, the Agent may (at the direction of the Required Lenders) at its option exercise any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any of the Pledged Interests as if it were the absolute owner thereof, including, without limitation, the right to exchange, in its discretion, any and all of the Pledged Interests upon the merger, consolidation, reorganization, recapitalization or other adjustment of any Pledged Issuer, or upon the exercise by any Pledged Issuer of any right, privilege or option pertaining to any Pledged Interests, and, in connection therewith, to deposit and deliver any and all of the Pledged Interests with any committee, depository, transfer agent, registrar or other designated agent upon such terms and conditions as it may determine; and

(iv)    all dividends, distributions, interest and other payments that are received by any of the Grantors contrary to the provisions of Section 7(b)(i) hereof shall be received in trust for the benefit of the Agent, shall be segregated from other funds of the Grantors, and shall be forthwith paid over to the Agent as Pledged Interests in the exact form received with any necessary indorsement and/or appropriate stock powers duly executed in blank, to be held by the Agent as Pledged Interests and as further collateral security for the Secured Obligations.

SECTION 8.    Additional Provisions Concerning the Collateral.

(a)    To the maximum extent permitted by applicable law, and for the purpose of taking any action that the Agent may (at the direction of the Required Lenders) deem necessary or advisable to accomplish the purposes of this Agreement, each Grantor hereby (i) authorizes the Agent (at the direction of the Required Lenders) to, subject to the Financing Order, execute any such agreements, instruments or other documents in such Grantor's name and to file such agreements, instruments or other documents in such Grantor's name and in any appropriate filing office, (ii) authorizes the Agent (at the direction of the Required Lenders) at any time and from time to time to file, one or more financing or continuation statements and amendments thereto, relating to the Collateral (including, without limitation, any such financing statements that (A) describe the Collateral as "all assets" or "all personal property" (or words of similar effect) or that describe or identify the Collateral by type or in any other manner as the Agent (at the direction of the Required Lenders) may determine, regardless of whether any particular asset of such Grantor falls within the scope of Article 9 of the Uniform Commercial Code

-20-

or whether any particular asset of such Grantor constitutes part of the Collateral, and (B) contain any other information required by Part 5 of Article 9 of the Code for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including, without limitation, whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor) and (iii) ratifies such authorization to the extent that the Agent has filed any such financing statements, continuation statements, or amendments thereto, prior to the date hereof.  A photocopy or other reproduction of this Agreement, any Financing Order or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.  Notwithstanding anything to the contrary herein, the Agent shall have no obligation to file any financing statement, continuation statement or amendment and it is understood that the Grantor shall make such filings on behalf of the Agent.

(b)    Each Grantor hereby irrevocably appoints the Agent as its attorney-in-fact and proxy, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time in the Agent's discretion (at the direction of the Required Lenders), subject to the Financing Order, to take any action and to execute any instrument that the Agent or the Required Lenders may deem necessary or advisable to accomplish the purposes of this Agreement (subject to the rights of a Grantor under Section 6 hereof and Section 7(a) hereof), including, without limitation, (i) to obtain and adjust insurance required to be paid to the Agent pursuant to the Financing Agreement, (ii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (iii) to receive, endorse, and collect any drafts or other Instruments, Documents and Chattel Paper in connection with clause (i) or (ii) above, (iv) to receive, indorse and collect all Instruments made payable to such Grantor representing any dividend, interest payment or other distribution in respect of any Pledged Interests and to give full discharge for the same, (v) to file any claims or take any action or institute any proceedings which the Agent or the Required Lenders may deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of the Agent and the Lenders with respect to any Collateral, (vi) to execute assignments, licenses and other documents to enforce the rights of the Agent and the Lenders with respect to any Collateral, (vii) to pay or discharge taxes or Liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Required Lenders in their sole discretion, and such payments made by the Agent to become Secured Obligations of such Grantor to the Agent, due and payable immediately upon written demand, (viii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, assignments, verifications and notices in connection with Accounts, Chattel Paper and other documents relating to the Collateral, (ix) to endorse any Grantor's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Accounts Receivable, (x) to sign any Grantor's name on any invoice or bill of lading relating to any of the Accounts Receivable, drafts against Account Debtors with respect to Accounts Receivable, assignments and verifications of Accounts Receivable and notices to Account Debtors with respect to Accounts Receivable and (xi) to send verification of Accounts Receivable.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any

acts of omission or commission (other than acts of omission or commission constituting gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction), or for any error of judgment or mistake of fact or law; this power is coupled with an interest and is irrevocable until the date on which all of the Secured Obligations have been indefeasibly paid in full in cash or credit (to the extent contemplated in the Stalking Horse APA) (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) after the termination of each Lender's Commitment and each of the Credit Documents.

(c)     Subject to the Financing Order, for the purpose of enabling the Agent to exercise rights and remedies hereunder (at the direction of the Required Lenders) as the Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby (i) grants to the Agent an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to any Grantor) to use, assign, license or sublicense any Intellectual Property now or hereafter owned by any Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof; and (ii) upon the request of the Agent assigns to the Agent, to the extent assignable, all of its rights to any Intellectual Property now or hereafter licensed or used by any Grantor.  Notwithstanding anything contained herein to the contrary, but subject to the provisions of the Financing Agreement that limit the right of a Grantor to dispose of its property and Section 6(i) hereof, so long as no Event of Default shall have occurred and be continuing, each Grantor may exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property in the ordinary course of its business.  In furtherance of the foregoing, unless an Event of Default shall have occurred and be continuing, the Agent shall from time to time, upon the request of a Grantor, execute and deliver any instruments, certificates or other documents, in the form so requested, which such Grantor shall have certified are appropriate (in such Grantor's judgment) to allow it to take any action permitted hereunder (including relinquishment of the license provided pursuant to this clause (c) as to any Intellectual Property).  Further, upon the date on which all of the Secured Obligations have been indefeasibly paid in full in cash or credit (to the extent contemplated in the Stalking Horse APA) (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) after the termination of each Lender's Commitment and each of the Credit Documents, the Agent (subject to Section 13(e) hereof) shall release and reassign to the Grantors all of the Agent's right, title and interest in and to the Intellectual Property, and the Licenses, all without recourse, representation or warranty whatsoever and at the Grantors' sole expense.  The exercise of rights and remedies hereunder by the Agent shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by any Grantor in accordance with the second sentence of this clause (c).  Each Grantor hereby releases the Agent from any claims, causes of action and demands at any time arising out of or with respect to any actions taken or omitted to be taken by the Agent under the powers of attorney granted herein other than actions taken or omitted to be taken through the Agent's gross negligence, bad faith or willful misconduct, as determined by a final determination of a court of competent jurisdiction.

(d)     Subject to the Financing Order, if any Grantor fails to perform any agreement or obligation contained herein, the Agent may itself perform, or cause performance of, in each case, at the direction of the Required Lenders, such agreement or obligation, in the name of such Grantor or the Agent, and the expenses of the Agent incurred in connection therewith shall be jointly and severally payable by the Grantors pursuant to Section 10 hereof and shall be secured by the Collateral.

(e)     The powers conferred on the Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  It is understood that the Agent shall not be required to take any action or exercise any rights or remedies hereunder or pertaining to any Collateral absent written direction from the Required Lenders or all Lenders, in each case, as required under the Financing Agreement.  Other than the exercise of reasonable care to assure the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral and shall be relieved of all responsibility for any Collateral in its possession upon surrendering it or tendering surrender of it to any of the Grantors (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct). The Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Agent accords its own property, it being understood that the Agent shall not have responsibility for ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Agent has or is deemed to have knowledge of such matters. The Agent shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Agent in good faith.

(f)     Anything herein to the contrary notwithstanding (i) each Grantor shall remain liable under the Licenses and otherwise in respect of the Collateral to the extent set forth therein to perform all of its obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Agent of any of its rights hereunder shall not release any Grantor from any of its obligations under the Licenses or otherwise (at the direction of the Required Lenders) in respect of the Collateral, and (iii) the Agent shall not have any obligation or liability by reason of this Agreement under the Licenses or otherwise in respect of the Collateral, nor shall the Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(g)     Subject to the Financing Order, the Agent may at any time in its discretion after the occurrence and during the continuance of an Event of Default (i) without notice to any Grantor, transfer or register in the name of the Agent or any of its nominees any or all of the Pledged Interests, subject only to the revocable rights of such Grantor under Section 7(a) hereof, and (ii) exchange certificates or Instruments

constituting Pledged Interests for certificates or Instruments of smaller or larger denominations.

SECTION 9.  <u>Remedies Upon Default</u>.  If any Event of Default shall have occurred and be continuing, subject in all respects to the Financing Order:

(a)    The Agent, at the direction of the Required Lenders, shall exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code (whether or not the Code applies to the affected Collateral), and also shall, at the direction of the Required Lenders, (i) take absolute control of the Collateral, including, without limitation, transfer into the Agent's name or into the name of its nominee or nominees (to the extent the Agent has not theretofore done so) and thereafter receive, for the benefit of the Agent and the Lenders, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Agent forthwith, assemble all or part of the Collateral as directed by the Agent and make it available to the Agent at a place or places to be designated by the Agent that is reasonably convenient to both parties, and the Agent may enter into and occupy any premises owned or leased by any Grantor where the Collateral or any part thereof is located or assembled for a reasonable period in order to effectuate the Agent's rights and remedies hereunder or under law, without obligation to any Grantor in respect of such occupation, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, (A) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Agent's offices, at any exchange or broker's board or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Agent may deem commercially reasonable and/or (B) lease, license or otherwise dispose of the Collateral or any part thereof upon such terms as the Required Lenders may deem commercially reasonable.  Each Grantor agrees that, to the extent notice of sale or any other disposition of the Collateral shall be required by law, three (3) days' prior notice to the applicable Grantor of the time and place of any public sale or the time after which any private sale or other disposition of the Collateral is to be made shall constitute reasonable notification.  The Agent shall not be obligated to make any sale or other disposition of Collateral regardless of notice of sale having been given.  The Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Each Grantor hereby waives any claims against the Agent and the Lenders arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Agent accepts the first offer received and does not offer the Collateral to more than one offeree, and waives all rights that such Grantor may have to require that all or any part of the Collateral be marshaled upon any sale (public or private) thereof.  Each Grantor hereby acknowledges that (i) any such sale of the Collateral by the Agent shall be made without warranty, (ii) the Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, (iii) the Agent may bid (which bid may be, in whole or in part, in

-24-

the form of cancellation of indebtedness), if permitted by law, for the purchase, lease, license or other disposition of the Collateral or any portion thereof for the account of the Agent (on behalf of itself and the Lenders) and (iv) such actions set forth in clauses (i), (ii) and (iii) above shall not adversely affect the commercial reasonableness of any such sale of the Collateral. In addition to the foregoing, (i) upon written notice to any Grantor from the Agent, each Grantor shall cease any use of the Intellectual Property or any trademark, patent or copyright similar thereto for any purpose described in such notice; (ii) the Agent may, at the direction of the Required Lenders, at any time and from time to time, upon three (3) days' prior notice to any Grantor, license, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any of the Intellectual Property, throughout the universe for such term or terms, on such conditions, and in such manner, as the Required Lenders shall in their sole discretion determine; and (iii) the Agent may, at the direction of the Required Lenders, at any time, pursuant to the authority granted in Section 8 hereof (such authority being effective upon the occurrence and during the continuance of an Event of Default), execute and deliver on behalf of a Grantor, one or more instruments of assignment of the Intellectual Property (or any application or registration thereof), in form suitable for filing, recording or registration in any country. If an assignment of Intellectual Property shall have been made as provided herein, and if such Event of Default is no longer continuing (and no other Event of Default shall have occurred and be continuing), the Agent shall promptly execute and deliver to each Grantor, at such Grantor's sole cost and expense, any assignment or assignments as may be necessary to reassign to such Grantor any such Intellectual Property then-owned by the Collateral Agent; provided, after giving effect to such reassignment, the security interest granted pursuant to this Agreement, and all other rights and remedies of the Agent granted hereunder, shall continue to be in full force and effect. In the event the Agent assigns a Trademark, Agent shall also assign all goodwill associated therewith.

(b)     Each Grantor recognizes that the Agent may deem it impracticable to effect a public sale of all or any part of the Pledged Shares or any other securities constituting Pledged Interests and that the Agent may, therefore, determine to make one or more private sales of any such securities to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sales shall be deemed to have been made in a commercially reasonable manner and that the Agent shall have no obligation to delay the sale of any such securities for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act. Each Grantor further acknowledges and agrees that any offer to sell such securities which has been (i) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation in the financial community of New York, New York (to the extent that such an offer may be so advertised without prior registration under the Securities Act) or (ii) made privately in the manner described above to not less than fifteen bona fide offerees shall be deemed to involve a "public disposition" for the purposes of Section 9-610(c) of the Code (or any successor or similar, applicable statutory provision) as then in effect in the State of New York, notwithstanding that such sale may not constitute a "public

-25-

offering" under the Securities Act, and that the Agent may, in such event, bid for the purchase of such securities.

(c)        Any cash held by the Agent (or its agent or designee) as Collateral and all Cash Proceeds received by the Agent (or its agent or designee) in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral may, in the discretion of the Agent, be held by the Agent (or its agent or designee) as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Agent pursuant to Section 10 hereof) in whole or in part by the Agent against, all or any part of the Secured Obligations in such order as the Agent shall elect, consistent with the provisions of the Financing Agreement.  Any surplus of such cash or Cash Proceeds held by the Agent (or its agent or designee) and remaining after the date on which all of the Secured Obligations have been indefeasibly paid in full in cash or credit (to the extent contemplated in the Stalking Horse APA) (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) after the termination of each Lender's Commitment and each of the Credit Documents, shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(d)        In the event that the proceeds of any such sale, collection or realization are insufficient to pay all amounts to which the Agent and the Lenders are legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the highest rate specified in any applicable Credit Document for interest on overdue principal thereof or such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees, costs, expenses and other client charges of any attorneys employed by the Agent to collect such deficiency.

(e)        Each Grantor hereby acknowledges that if the Agent complies with any applicable requirements of law in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(f)        The Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that any Grantor lawfully may, such Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

SECTION 10. <u>Indemnity and Expenses</u>.

(a)    Each Grantor jointly and severally agrees to defend, protect, indemnify and hold harmless each Agent and each other Indemnitee to the extent of, and subject to the terms and limitations set forth in, Section 12.15 of the Financing Agreement.

(b)    Each Grantor jointly and severally agrees to pay to the Agents upon demand the amount of any and all costs and expenses as set forth in, and subject to the limitations of, Section 12.04 of the Financing Agreement.

SECTION 11. <u>Notices, Etc.</u>  All notices and other communications provided for hereunder shall be given in accordance with the notice provision of the Financing Agreement.

SECTION 12. <u>Security Interest Absolute; Joint and Several Obligations</u>.

(a)    All rights of the Secured Parties, all Liens and all obligations of each of the Grantors hereunder shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of the Financing Agreement, any Financing Order or any other Credit Document, (ii) any change in the time, manner or place of payment of, or in any other term in respect of, all or any of the Secured Obligations, or any other amendment or waiver of or consent to any departure from the Financing Agreement, any Financing Order or any other Credit Document, (iii) any exchange or release of, or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Obligations, or (iv) any other circumstance that might otherwise constitute a defense (other than payment in full in cash or credit (to the extent contemplated in the Stalking Horse APA) (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) of the Secured Obligations) available to, or a discharge of, any of the Grantors in respect of the Secured Obligations.  All authorizations and agencies contained herein with respect to any of the Collateral are irrevocable and powers coupled with an interest until the payment in full in cash or credit (to the extent contemplated in the Stalking Horse APA) (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) of the Secured Obligations.

(b)    Without limiting the rights of the Loan Parties under Section 12.01 of the Financing Agreement or any notice requirement otherwise expressly provided for in any Credit Document, each Grantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and notice of the incurrence of any Secured Obligation by the Borrower, (iii) notice of any actions taken by the Agent, any Lender, any Guarantor or any other Person under any Credit Document or any other agreement, document or instrument relating thereto, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Secured Obligations, the omission of or delay in which, but for the provisions of this subsection (b), might constitute grounds for relieving such Grantor of any such Grantor's obligations hereunder and (v) any requirement that the Agent or any Lender protect, secure, perfect or insure any security

-27-

interest or other lien on any property subject thereto or exhaust any right or take any action against any Grantor or any other Person or any collateral.

(c)     All of the obligations of the Grantors hereunder are joint and several. The Agent may, in its sole and absolute discretion, enforce the provisions hereof against any of the Grantors and shall not be required to proceed against all Grantors jointly or seek payment from the Grantors ratably.  In addition, the Agent may, in its sole and absolute discretion, select the Collateral of any one or more of the Grantors for sale or application to the Secured Obligations, without regard to the ownership of such Collateral, and shall not be required to make such selection ratably from the Collateral owned by all of the Grantors.  The release or discharge of any Grantor by the Agent shall not release or discharge any other Grantor from the obligations of such Person hereunder.

SECTION 13. Miscellaneous.

(a)     No amendment of any provision of this Agreement (including any Schedule attached hereto) shall be effective unless it is in writing and signed by each Grantor effected thereby and the Agent, and no waiver of any provision of this Agreement, and no consent to any departure by any Grantor therefrom, shall be effective unless it is in writing and signed by the Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)     No failure on the part of the Secured Parties to exercise, and no delay in exercising, any right hereunder or under any other Credit Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Secured Parties provided herein and in the other Credit Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Secured Parties under any Credit Document against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any other Credit Document against such party or against any other Person, including but not limited to, any Grantor.

(c)     This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to paragraph (e) below, until the date on which all of the Secured Obligations have been indefeasibly paid in full in cash or credit (to the extent contemplated in the Stalking Horse APA) (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) after the termination of each Lender's Commitment and each of the Credit Documents and (ii) be binding on each Grantor all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the Code, and shall inure, together with all rights and remedies of the Secured Parties hereunder, to the benefit of the Secured and their respective successors, transferees and assigns.  Without limiting the generality of clause (ii) of the immediately preceding sentence, the Secured Parties may assign or otherwise transfer their respective rights and obligations under this Agreement and any other Credit Document to any other Person pursuant to the terms of the Financing Agreement, and such other Person shall

-28-

thereupon become vested with all of the benefits in respect thereof granted to the Secured Parties herein or otherwise.  Upon any such assignment or transfer, all references in this Agreement to any Secured Party shall mean the assignee of any such Secured Party.  None of the rights or obligations of any Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Agent, and any such assignment or transfer shall be null and void.

(d)     Upon the date on which all of the Secured Obligations have been indefeasibly paid in full in cash or credit (to the extent contemplated in the Stalking Horse APA) (other than contingent indemnification obligations as to which no claim has been asserted and other contingent liabilities as to which no claim has been asserted) after the termination of each Lender's Commitment and each of the Credit Documents, (i) subject to paragraph (e) below, this Agreement and the security interests and licenses created hereby shall terminate and all rights to the Collateral shall revert to the Grantors, (ii) the Grantors agree, with the written consent and on behalf of the Agent, to file UCC amendments on or promptly after the Termination Date to evidence the termination of the Liens so released and (iii) the Agent will, upon the Grantors' request and at the Grantors' expense, without any representation, warranty or recourse whatsoever, (A) return to the Grantors (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct) such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof and (B) execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such termination without representation, warranty or recourse of any kind.  In addition, upon any sale or disposition of any item of Collateral in a transaction expressly permitted under the Financing Agreement, the Agent agrees to execute a release of its security interest in such item of Collateral, and the Agent shall, upon the reasonable request of the Grantors and at the Grantors' cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such release, without representation, warranty or recourse of any kind.

(e)     This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(f)     Upon the execution and delivery, or authentication, by any Person of a security agreement supplement in substantially the form of Exhibit C hereto (each a "Security Agreement Supplement"), (i) such Person shall be referred to as an "Additional Grantor" and shall be and become a Grantor, and each reference in this Agreement to "Grantor" shall also mean and be a reference to such Additional Grantor, and each reference in this Agreement and the other Credit Documents to "Collateral" shall also mean and be a reference to the Collateral of such Additional Grantor, and (ii) the supplemental

-29-

<u>Schedules I</u>-<u>VII</u> attached to each Security Agreement Supplement shall be incorporated into and become a part of and supplement <u>Schedules I</u>-<u>VII</u>, respectively, hereto, and the Agent may attach such Schedules as supplements to such Schedules, and each reference to such Schedules shall mean and be a reference to such Schedules, as supplemented pursuant hereto.

(g) **THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE), EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE VALIDITY AND PERFECTION OR THE PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTEREST CREATED HEREBY, OR REMEDIES HEREUNDER.    IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

(h) In addition to and without limitation of any of the foregoing, this Agreement shall be deemed to be a Credit Document and shall otherwise be subject to all of terms and conditions contained in Article X and Sections 12.10 and 12.11 of the Financing Agreement, *mutatis mutandis*.

(i) Each Grantor, irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding with respect to this Agreement any special, exemplary, punitive or consequential damages.

(j) Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(k) Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(l) This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which shall be deemed an original, but all of such counterparts taken together shall constitute one and the same agreement.    Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally effective as delivery of an original executed counterpart.

(m) Whenever reference is made in this Agreement to any action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to

-30-

be) suffered or omitted by the Agent to any amendment, waiver or other modification of this Agreement to be executed (or not to be executed) by the Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Agent, it is understood that in all cases the Agent shall be acting, giving, withholding, suffering, omitting, making or otherwise undertaking and exercising the same (or shall not be undertaking and exercising the same) as directed by the Required Lenders in accordance with the Financing Agreement.  This provision is intended solely for the benefit of the Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim under or in relation to any Loan Document, or confer any rights or benefits on any party hereto.

(n)    In the event of any conflict between the provisions of this Agreement (including but not limited to Section 9 hereof) and any Financing Order, the Financing Order shall control.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have executed this Pledge and Security Agreement as of the date first above written.

**<u>BORROWER</u>:**

RM OPCO LLC


By:_____
Name:  Jonathan Tibus
Title:   Chief Restructuring Officer

**<u>GUARANTORS</u>:**

RM HOLDCO LLC
RM CHEVYS LLC
RM ACAPULCO LLC
RM EL TORITO LLC
RM HQ LLC


By:_____
Name:  Jonathan Tibus
Title:   Chief Restructuring Officer

EXHIBIT A

PLEDGE AMENDMENT

This Pledge Amendment, dated _____ __, 201_, is delivered pursuant to Section 4 of the Pledge and Security Agreement referred to below.  The undersigned hereby agrees that this Pledge Amendment may be attached to the Pledge and Security Agreement, dated as of August [_], 2018, as it may heretofore have been or hereafter may be amended, restated, supplemented, modified or otherwise changed from time to time (the "Security Agreement") and that the Promissory Notes or shares listed on this Pledge Amendment shall be hereby pledged and assigned to the Agent and become part of the Pledged Interests referred to in such Pledge Agreement and shall secure all of the Secured Obligations referred to in such Security Agreement.

| Pledged Debt | | | |
|---|---|---|---|
| Grantor | Name of Maker | Description | Principal Amount Outstanding as of |
| | | | |
| | | | |

| Pledged Shares | | | | | |
|---|---|---|---|---|---|
| Grantor | Name of Pledged Issuer | Number of Shares | Percentage of Outstanding Shares | Class | Certificate Number |
| | | | | | |
| | | | | | |

[GRANTOR]

By: _____
　　Name:
　　Title:

**WELLS FARGO BANK, N.A.,**
as the Agent

By:_____
　　Name:
　　Title:

Exh. A-1

EXHIBIT B

[reserved]

EXHIBIT C

FORM OF SECURITY AGREEMENT SUPPLEMENT

[Date of Security Agreement Supplement]

Wells Fargo Bank, N.A., as Agent
9062 Old Annapolis Road
Columbia, Maryland 21045
Attention: Jason Prisco or Lance Yeagle – RM Opco LLC
Email: ctsbankdebtadministrationteam@wellsfargo.com

Ladies and Gentlemen:

      Reference hereby is made to (i) the DIP Financing and Guaranty Agreement, dated as of August [__], 2018 (such agreement, as amended, restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "Financing Agreement") by and among RM Holdco LLC, a Delaware limited liability company (the "Parent"), RM Opco LLC, a Delaware limited liability company (the "Borrower"), each subsidiary of the Parent listed as a "Guarantor" on the signature pages thereto (together with the Parent and each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations (as defined therein), each a "Guarantor" and collectively, the "Guarantors"), the lenders from time to time party thereto (each a "Lender" and collectively, the "Lenders"), and **Wells Fargo Bank, N.A.**, as agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Agent"), and (ii) the Pledge and Security Agreement, dated as of August [__], 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement"), made by the Grantors from time to time party thereto in favor of the Agent. Capitalized terms defined in the Financing Agreement or the Security Agreement and not otherwise defined herein are used herein as defined in the Financing Agreement or the Security Agreement.

      SECTION 1.  Grant of Security.  The undersigned hereby grants to the Agent, for the ratable benefit of the Secured Parties, a security interest in, all of its right, title and interest in and to all of the Collateral (as defined in the Security Agreement) of the undersigned, whether now owned or hereafter acquired by the undersigned, wherever located and whether now or hereafter existing or arising, including, without limitation, the property and assets of the undersigned set forth on the attached supplemental schedules to the Schedules to the Security Agreement.

      SECTION 2.  Security for Obligations.  The grant of a security interest in the Collateral by the undersigned under this Security Agreement Supplement and the Security Agreement secures the payment of all Secured Obligations of the undersigned now or hereafter existing under or in respect of the Credit Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise. Without limiting the generality of the foregoing, each of this Security Agreement Supplement and the Security

Agreement secures the payment of all amounts that constitute part of the Secured Obligations and that would be owed by the undersigned to the Agent or any Secured Party under the Credit Documents but for the fact that such Secured Obligations are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving a Grantor.

SECTION 3.   Supplements to Security Agreement Schedules.   The undersigned has attached hereto supplemental Schedules I through VII to Schedules I through VII, respectively, to the Security Agreement, and the undersigned hereby certifies, as of the date first above written, that such supplemental Schedules have been prepared by the undersigned in substantially the form of the equivalent Schedules to the Security Agreement, and such supplemental Schedules include all of the information required to be scheduled to the Security Agreement and do not omit to state any information material thereto.

SECTION 4.   Representations and Warranties.   The undersigned hereby makes each representation and warranty set forth in Section 5 of the Security Agreement (as supplemented by the attached supplemental Schedules) to the same extent as each other Grantor.

SECTION 5.   Obligations Under the Security Agreement.   The undersigned hereby agrees, as of the date first above written, to be bound as a Grantor by all of the terms and provisions of the Security Agreement to the same extent as each of the other Grantors.   The undersigned further agrees, as of the date first above written, that each reference in the Security Agreement to an "Additional Grantor" or a "Grantor" shall also mean and be a reference to the undersigned.

SECTION 6.   Governing Law.   This Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 7.   Credit Document.   In addition to and without limitation of any of the foregoing, this Security Agreement Supplement shall be deemed to be a Credit Document and shall otherwise be subject to all of terms and conditions contained in Sections 12.10 and 12.11 of the Financing Agreement, *mutatis mutandi*.

Very truly yours,

[NAME OF ADDITIONAL CREDIT PARTY]


By:   _____
      Name:
      Title:

Acknowledged and Agreed:

**Wells Fargo Bank, N.A.**,
as Agent

By:    _____
Name:
Title:

<u>EXHIBIT H</u>

INITIAL APPROVED BUDGET

(See Attached.)

**RM Holdco LLC, et al.**
DIP Cash Flow Forecast

| Projected Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 8/12/2018 | 8/19/2018 | 8/26/2018 | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 13 weeks |
| **Total Cash Receipts from Operations** | $4,444,161 | $4,406,149 | $4,353,065 | $4,176,097 | $4,670,858 | $4,121,375 | $4,162,451 | $4,133,170 | $4,139,338 | $4,017,750 | $4,020,808 | $4,136,555 | $3,913,570 | $54,695,347 |
| Food & Beverage | 907,634 | 891,293 | 791,009 | 867,540 | 811,039 | 786,821 | 801,181 | 816,115 | 785,106 | 771,576 | 803,467 | 754,372 | 774,505 | 10,561,658 |
| Utilities | 223,645 | 224,396 | 211,402 | 200,461 | 200,461 | 200,534 | 200,534 | 200,534 | 182,327 | 182,327 | 184,306 | 184,306 | 166,914 | 2,562,146 |
| A/P Others | 615,371 | 466,171 | 487,486 | 404,110 | 398,239 | 394,727 | 396,219 | 397,771 | 520,627 | 498,580 | 500,759 | 518,332 | 452,238 | 6,050,629 |
| Wages / Bonus / PR Taxes | 5,182 | 3,358,850 | 28,274 | 3,047,484 | 639 | 3,720,239 | 2,315 | 3,189,428 | 1,413 | 3,052,544 | 455 | 3,123,891 | 22 | 19,530,737 |
| Health and Benefits | 450,366 | - | 61,687 | - | 60,651 | - | - | 445,823 | - | 59,615 | - | 450,204 | 63,996 | 1,592,343 |
| Rent | - | - | 1,196,640 | 681,495 | - | - | 1,161,815 | 637,633 | - | - | - | - | 1,783,594 | 5,461,177 |
| Sales Taxes | - | - | 2,158,346 | - | - | - | - | 1,589,624 | - | - | - | 2,241,931 | - | 5,989,900 |
| Insurance & WC/GL Payments | 148,596 | 386,651 | 192,978 | 386,651 | 103,846 | 386,651 | 237,728 | 386,651 | 103,846 | 386,651 | 148,596 | 475,783 | 103,846 | 3,448,475 |
| CapEx | 81,442 | 81,442 | 184,442 | 81,442 | 81,442 | 81,442 | 81,442 | 184,442 | 81,442 | 40,721 | 81,442 | 36,888 | 81,442 | 1,179,475 |
| **Cash Disbursements from Operations** | 2,432,237 | 5,408,803 | 5,312,263 | 5,669,182 | 1,656,317 | 5,570,415 | 2,165,243 | 7,926,381 | 2,372,009 | 4,932,399 | 2,169,229 | 7,335,503 | 3,426,558 | 56,376,540 |
| **Operating Net Cash Flow** | $2,011,924 | ($1,002,655) | ($959,198) | ($1,493,085) | $3,014,541 | ($1,449,040) | $1,997,208 | ($3,793,211) | $1,767,330 | ($914,649) | $1,851,579 | ($3,198,948) | $487,011 | ($1,681,193) |
| **Chapter 11 Related Cash Flows** | | | | | | | | | | | | | | |
| Ch.11 Debtor Professionals | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 1,359,500 |
| Ch.11 Sec. Lender Professionals | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 697,500 |
| Ch.11 UCC Professionals | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 202,500 |
| Utility Adequate Assurance | - | - | 380,000 | - | - | - | - | - | - | - | - | - | - | 380,000 |
| Court Filing/ US Trustee Fees | 10,302 | - | - | - | - | - | - | - | - | - | - | - | 500,000 | 510,302 |
| Workers Comp LOC Fees & Interest | - | 1,402,783 | - | - | - | - | - | - | 87,674 | - | - | - | - | 1,490,456 |
| DIP Facility Fees & Interest | 130,000 | - | - | 21,667 | - | - | - | - | 29,861 | - | - | - | 53,472 | 235,000 |
| **Total Chapter 11 Cash Flows** | 314,110 | 1,576,590 | 553,808 | 195,474 | 173,808 | 173,808 | 173,808 | 173,808 | 291,343 | 173,808 | 173,808 | 173,808 | 727,280 | 4,875,258 |
| **Net Cash Flows** | $1,697,814 | ($2,579,245) | ($1,513,006) | ($1,688,559) | $2,840,733 | ($1,622,848) | $1,823,400 | ($3,967,019) | $1,475,987 | ($1,088,457) | $1,677,771 | ($3,372,755) | ($240,269) | ($6,556,452) |
| **Beginning Cash Balance** | 1,271,945 | 5,969,760 | 3,390,515 | 1,877,509 | 188,950 | 3,029,683 | 1,406,835 | 3,230,235 | 1,763,216 | 3,239,203 | 2,150,746 | 3,828,518 | 455,762 | 1,271,945 |
| Change in Cash | 1,697,814 | (2,579,245) | (1,513,006) | (1,688,559) | 2,840,733 | (1,622,848) | 1,823,400 | (3,967,019) | 1,475,987 | (1,088,457) | 1,677,771 | (3,372,755) | (240,269) | (6,556,452) |
| DIP Facility Draw | 3,000,000 | - | - | - | - | - | - | 2,500,000 | - | - | - | - | - | 5,500,000 |
| **Ending Cash Balance** | $5,969,760 | $3,390,515 | $1,877,509 | $188,950 | $3,029,683 | $1,406,835 | $3,230,235 | $1,763,216 | $3,239,203 | $2,150,746 | $3,828,518 | $455,762 | $215,494 | $215,494 |

**RM Holdco LLC, et al.**
DIP Cash Flow Forecast

| Projected Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 8/12/2018 | 8/19/2018 | 8/26/2018 | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 13 weeks |
| **Total Cash Receipts from Operations** | $4,444,161 | $4,406,149 | $4,353,065 | $4,176,097 | $4,670,858 | $4,121,375 | $4,162,451 | $4,133,170 | $4,139,338 | $4,017,750 | $4,020,808 | $4,136,555 | $3,913,570 | $54,695,347 |
| Food & Beverage | 907,634 | 891,293 | 791,009 | 867,540 | 811,039 | 786,821 | 801,181 | 816,115 | 785,106 | 771,576 | 803,467 | 754,372 | 774,505 | 10,561,658 |
| Utilities | 223,645 | 224,396 | 211,402 | 200,461 | 200,461 | 200,534 | 200,534 | 200,534 | 182,327 | 182,327 | 184,306 | 184,306 | 166,914 | 2,562,146 |
| A/P Others | 615,371 | 466,171 | 487,486 | 404,110 | 398,239 | 394,727 | 396,219 | 397,771 | 520,627 | 498,580 | 500,759 | 518,332 | 452,238 | 6,050,629 |
| Wages / Bonus / PR Taxes | 5,182 | 3,358,850 | 28,274 | 3,047,484 | 639 | 3,720,239 | 2,315 | 3,189,428 | 1,413 | 3,052,544 | 455 | 3,123,891 | 22 | 19,530,737 |
| Health and Benefits | 450,366 | - | 61,687 | - | 60,651 | - | - | 445,823 | - | 59,615 | - | 450,204 | 63,996 | 1,592,343 |
| Rent | - | - | 1,196,640 | 681,495 | - | - | - | 1,161,815 | 637,633 | - | - | - | 1,783,594 | 5,461,177 |
| Sales Taxes | - | - | 2,158,346 | - | - | - | - | 1,589,624 | - | - | - | 2,241,931 | - | 5,989,900 |
| Insurance & WC/GL Payments | 148,596 | 386,651 | 192,978 | 386,651 | 103,846 | 386,651 | 237,728 | 386,651 | 103,846 | 386,651 | 148,596 | 475,783 | 103,846 | 3,448,475 |
| CapEx | 81,442 | 81,442 | 184,442 | 81,442 | 81,442 | 81,442 | 81,442 | 184,442 | 81,442 | 40,721 | 81,442 | 36,888 | 81,442 | 1,179,475 |
| **Cash Disbursements from Operations** | 2,432,237 | 5,408,803 | 5,312,263 | 5,669,182 | 1,656,317 | 5,570,415 | 2,165,243 | 7,926,381 | 2,372,009 | 4,932,399 | 2,169,229 | 7,335,503 | 3,426,558 | 56,376,540 |
| **Operating Net Cash Flow** | $2,011,924 | ($1,002,655) | ($959,198) | ($1,493,085) | $3,014,541 | ($1,449,040) | $1,997,208 | ($3,793,211) | $1,767,330 | ($914,649) | $1,851,579 | ($3,198,948) | $487,011 | ($1,681,193) |
| **Chapter 11 Related Cash Flows** | | | | | | | | | | | | | | |
| Ch.11 Debtor Professionals | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 104,577 | 1,359,500 |
| Ch.11 Sec. Lender Professionals | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 53,654 | 697,500 |
| Ch.11 UCC Professionals | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 202,500 |
| Utility Adequate Assurance | - | - | 380,000 | - | - | - | - | - | - | - | - | - | - | 380,000 |
| Court Filing/ US Trustee Fees | 10,302 | - | - | - | - | - | - | - | - | - | - | - | 500,000 | 510,302 |
| Workers Comp LOC Fees & Interest | - | 1,402,783 | - | - | - | - | - | - | 87,674 | - | - | - | - | 1,490,456 |
| DIP Facility Fees & Interest | 130,000 | - | - | 21,667 | - | - | - | - | 29,861 | - | - | - | 53,472 | 235,000 |
| **Total Chapter 11 Cash Flows** | 314,110 | 1,576,590 | 553,808 | 195,474 | 173,808 | 173,808 | 173,808 | 173,808 | 291,343 | 173,808 | 173,808 | 173,808 | 727,280 | 4,875,258 |
| **Net Cash Flows** | $1,697,814 | ($2,579,245) | ($1,513,006) | ($1,688,559) | $2,840,733 | ($1,622,848) | $1,823,400 | ($3,967,019) | $1,475,987 | ($1,088,457) | $1,677,771 | ($3,372,755) | ($240,269) | ($6,556,452) |
| **Beginning Cash Balance** | 1,271,945 | 5,969,760 | 3,390,515 | 1,877,509 | 188,950 | 3,029,683 | 1,406,835 | 3,230,235 | 1,763,216 | 3,239,203 | 2,150,746 | 3,828,518 | 455,762 | 1,271,945 |
| Change in Cash | 1,697,814 | (2,579,245) | (1,513,006) | (1,688,559) | 2,840,733 | (1,622,848) | 1,823,400 | (3,967,019) | 1,475,987 | (1,088,457) | 1,677,771 | (3,372,755) | (240,269) | (6,556,452) |
| DIP Facility Draw | 3,000,000 | | | | | | | 2,500,000 | | | | | | 5,500,000 |
| **Ending Cash Balance** | $5,969,760 | $3,390,515 | $1,877,509 | $188,950 | $3,029,683 | $1,406,835 | $3,230,235 | $1,763,216 | $3,239,203 | $2,150,746 | $3,828,518 | $455,762 | $215,494 | $215,494 |

## EXHIBIT I

ACKNOWLEDGEMENT LETTER

(See Attached.)

Exhibit I

[LETTERHEAD OF WELLS FARGO BANK, NATIONAL ASSOCIATION]

August _____, 2018

[Wells Fargo Bank, N.A.
9062 Old Annapolis, 1st Floor
Columbia, MD 21045
Attention: Jason Prisco,
RM Opco – First Lien
Telephone: 410-884-2271]
Telecopier: 866-373-0261
Email:
ctsbankdebtadministrationteam@wellsfargo.com

Dear  [    ],

**Re: Acknowledgment of Control over Collateral Accounts**

          Reference is made to (i) that certain Deposit Account Control Agreement (attached hereto as Annex A, the "**Control Agreement**"), dated as of May 17, 2012, entered into by and among RM Opco, LLC, Wells Fargo Bank, National Association as agent for certain first lien lenders and first lien noteholders, Wells Fargo Bank, National Association as agent for certain second lien lenders and second lien noteholders in such capacity and Wells Fargo Bank, National Association and (ii) that certain Pledge and Security Agreement, dated as of August [__], 2018, entered into between Wells Fargo Bank, N.A. as agent (the "**DIP Agent**") and RM Opco, LLC, as pledgor (the "**Company**") (the "**Security Agreement**") for the purpose of creating a pledge over any claim the Company may have to the credit balance of the Collateral Accounts as well as any other claim the Company may have against the Bank in relation to such Collateral Accounts.  Capitalized terms used but not defined herein shall have the definitions set forth in the Control Agreement.

          The Bank agrees, along with the Company and DIP Agent, that, upon the entry of the Financing Order (under and as defined in the Security Agreement) and the effectiveness of the Financing Agreement and the Security Agreement, subject to the terms of the Control Agreement as amended by this letter (including, without limitation, Section 2), the Bank will comply with instructions given to the Bank by the DIP Agent without further consent by the Company, the First Lien Agent or the Second Lien Agent.  Except as otherwise required by law, the Bank will not agree with any third party to comply with instructions for disposition of funds in the Collateral Accounts originated by such third party: provided, however that in the case of a requirement by law that the Bank comply with third party instructions, the Bank will unless prohibited by law from doing so, use commercially reasonable efforts to give the DIP Agent prompt written notice of such third party instructions.

Further, the provisions of the Control Agreement are hereby amended so that the DIP Agent shall be an "Agent" as defined therein and that "**Controlling Agent**" shall *first* mean DIP Agent until such time as the Bank receives written notice from the DIP Agent stating in substance that henceforth First Lien Agent will be Controlling Agent and *second* mean First Lien Agent until such time as the Bank receives written notice from First Lien Agent stating in substance that henceforth Second Lien Agent will be Controlling Agent.

Section 3 of the Control Agreement is hereby amended to provide that, before the Bank receives a Change Notice from DIP Agent, the Bank agrees that the Destination Account will be DIP Agent's account specified in Annex B hereof (or specified in the Disposition Instructions, if applicable). After the Bank has received a Change Notice from DIP Agent and has had a reasonable opportunity to act on it, (i) the Destination Account will be First Lien Agent's account specified at the end of the Control Agreement (or specified in the Disposition Instructions, if applicable), (ii) the Bank will honor instructions only from First Lien Agent regarding the Collateral Accounts (without notifying or obtaining the consent of DIP Lien Agent) and (iii) First Lien Agent will assume all of DIP Agent's rights and obligations under the Control Agreement. Before the Bank receives a Change Notice from First Lien Agent, the Bank agrees that the Destination Account will be First Lien Agent's account specified at the end of the Control Agreement (or specified in the Disposition Instructions, if applicable). After the Bank has received a Change Notice from First Lien Agent and has had a reasonable opportunity to act on it, (i) the Destination Account will be Second Lien Agent's account specified at the end of the Control Agreement (or specified in the Disposition Instructions, if applicable), (ii) the Bank will honor instructions only from Second Lien Agent regarding the Collateral Accounts (without notifying or obtaining the consent of DIP Lien Agent or First Lien Agent) and (iii) Second Lien Agent will assume all of First Lien Agent's rights and obligations under the Control Agreement.

Section 15 of the Control Agreement is hereby amended to provide that the Control Agreement may be terminated by (i) DIP Agent, as to the DIP Agent only, (ii) all Agents acting together, (iii) First Lien Agent, as to First Lien Agent only, (iv) Second Lien Agent, as to Second Lien Agent only, or (v) the Bank, at any time, by the terminating party or parties giving thirty (30) calendar days prior written notice of such termination to the other parties to the Control Agreement at their contact addresses specified after their signatures to the Control Agreement (or such other address as such terminating parties may provide from time to time in accordance with the terms thereof).

This letter is governed by the law of the State of New York without regard to any conflicts of law principles thereof that would require the application of laws of another jurisdiction and any applicable laws of the United States of America.

Yours sincerely,

**WELLS FARGO BANK, N.A.**

By: _____
      Name:
      Title:

**[WELLS FARGO BANK, N.A., as DIP Agent]**

By: _____
      Name:
      Title:

**RM OPCO LLC**

By: _____
      Name:
      Title:

**[WELLS FARGO BANK, N.A., as First Lien Agent]**

By: _____
      Name:
      Title:

**[WELLS FARGO BANK, N.A., as Second Lien Agent]**

By: _____
      Name:
      Title:

**Annex A**

**Annex B**

**DIP Agent Destination Account:**