**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RM Holdco LLC, et al.[1] | Case No. 18-11795 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JONATHAN TIBUS, CHIEF RESTRUCTURING
OFFICER OF THE DEBTORS, IN SUPPORT OF CHAPTER 11
PETITIONS AND FIRST DAY MOTIONS**

I, Jonathan M. Tibus, declare as follows:

**Introduction**

1.      I am a Managing Director at Alvarez & Marsal North America, LLC
("A&M").  I have more than twenty-one (21) years of experience in interim management and
financial advisory roles and specialize in developing, evaluating, and implementing
restructuring and performance improvement plans for under performing companies, largely in
the restaurant, retail and hospitality sectors.  I have also managed numerous in-court and out-of-
court restructuring efforts.

2.      In July 2018, A&M was engaged by RM Holdco, LLC ("RMH") and each
of its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy
cases (collectively, the "Company" or the "Debtors") to provide restructuring advisory services,
and pursuant to that engagement, I have been acting as the Chief Restructuring Officer ("CRO")
of the Company.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax
identification numbers, are as follows: RM Holdco LLC (6847); RM Opco LLC (7122); RM HQ LLC (8615); RM
Chevys LLC (N/A); RM Acapulco LLC (N/A); and RM El Torito LLC (N/A).  The Debtors' headquarters and
mailing address is 5660 Katella Avenue, Suite 200, Cypress, CA 90630.

3.      As CRO, I am familiar with the Debtors' books and records, day-to-day operations, business affairs and financial condition, and with the facts and circumstances surrounding the Debtors' First Day Motions, their debtor-in-possession financing commitment, the commencement of these Chapter 11 Cases, and the key operational and strategic decisions made by the Debtors' senior management in cotnnection therewith.  However, no one individual has personal knowledge of all the facts in this Declaration.  The facts set forth herein are based upon (a) my personal knowledge of and familiarity with the Debtors' operations and finances, (b) information learned from my review of the relevant documents, and information supplied to me by other members of the Debtors' management, the Debtors' professionals and employees of the Debtors working under my supervision, and (c) my opinions based upon experience, knowledge and information concerning the Debtors and the industry in which the Debtors operate.  I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors.  If called upon to testify, I would and could testify competently to the facts set forth herein.

4.      On the date hereof (the "Petition Date"), the Debtors commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      To minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses, the Debtors have requested various types of relief in "first-day" motions, as well as in motions and applications that will be filed on or shortly after the Petition Date and that will require hearing within the first thirty days of the cases (collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among other things, (i) maintaining the Debtors' existing cash management system and insurance policies, (ii) bolstering employee morale and vendor and customer confidence, (iii) ensuring that the Debtors have sufficient resources and financial liquidity to continue to operate their business while in chapter 11, and (iv) obtaining approval of a process to sell substantially all of the Debtors'

assets under Section 363 of the Bankruptcy Code (the "363 Sale").  Although certain of the First Day Motions require hearings on an expedited basis (for the reasons set forth below) and the others are capable of being heard on regular notice during the first month of the Chapter 11 Cases, all of the First Day Motions are critical to the Debtors' success in chapter 11.

6.     I submit this declaration (this "Declaration") to provide an overview of the Debtors, their businesses, and the Chapter 11 Cases, and to support the Debtors' chapter 11 petitions and the First Day Motions.  Any capitalized terms not expressly defined herein have the meaning ascribed to them in the relevant First Day Motion.  I have reviewed each of the First Day Motions, including the exhibits attached thereto, or had such materials explained to me, and believe that the relief sought (i) is necessary to preserve the value and productivity of the Debtors' operations, (ii) is integral to the successful closing of a 363 Sale of the Debtors' businesses in these Chapter 11 Cases, and (iii) serves the best interest of the Debtors' estates, their creditors and other parties in interest.  The facts set forth in each First Day Motion are incorporated herein by reference.

## PRELIMINARY STATEMENT

7.     In March 2012, the Debtors purchased out of bankruptcy substantially all of the assets of certain corporate entities then operating the Real Mex family of restaurants (explained further below).  The Debtors are majority-owned by affiliated entities of Tennenbaum Capital Partners ("TCP") and Z Capital Group ("Z Capital"), both of which had been secured noteholders of the prior debtors.  For the past six (6) years, the Debtors have struggled with certain industry-wide and company-specific pressures that have negatively impacted their operations.  Trends in the greater restaurant industry, including increases to minimum wage and commodity costs, have created substantial pressure on the entire sector, as evidenced by the numerous brands that have filed for bankruptcy in recent years, including Ignite Restaurant Group (Brick House and Joe's Crab Shack), Macaroni Grill, Garden Fresh, Bertucci's, Crumbs, Cosi, and Buffets.  In addition, increased competition, especially in the form of available, quality Mexican fast casual options, has had a significant impact on traffic in

the Debtors' restaurants.  Against this backdrop, the Debtors have faced unique challenges, which are discussed further below.

8.      Despite these headwinds, the Debtors have managed to attain steady improvement in their operating results.  For example, they have managed their cost of goods sold to become first-in-class in the casual dining sector, have consistently increased monthly same-store-sales, and have demonstrably enhanced guest experience and satisfaction.  Despite these positive steps, the Debtors have been unable to support their debt service and working capital and capital expenditure needs.  They carry too-high a debt burden relative to their operating results and struggle with a number of long-term leases, which have provided a barrier to shutting down the unprofitable restaurant locations that must be closed in order to preserve the viability of the Company's successful locations.

9.      For the foregoing reasons, after evaluating all available options, the Company determined that seeking Chapter 11 protection, obtaining debtor-in-possession financing ("DIP Financing") and pursuing an orderly, court-supervised sale of its assets is the best available option to maximize value for the Company and its stakeholders.  The Debtors believe, and I agree, that the Chapter 11 process, including the proposed sale of substantially all of the Company's assets to the Stalking Horse Bidder (defined below), subject to higher or otherwise better bids through a 363 Sale, will be seamless for customers and suppliers, result in limited disruption to operations, and position the Real Mex business for significant future growth.

10.      Part I of this Declaration provides background information about the Debtors, their business operations, their corporate and capital structures, their restructuring efforts, and the events leading up to the filing of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Motions.

<u>**Part I**</u>

**A.     The Debtors' Business and Brief History**

11.     The Company is one of the largest full service Mexican casual dining restaurant chain operators in the United States in terms of number of restaurants.  As of the Petition Date, the Debtors (a) operated 69 restaurants, of which 61 are located in California and the remainder in six (6) other states and (b) franchised eleven (11) restaurants in seven (7) other states.  The Company owns and operates restaurants in the following states:  California, Florida, Maryland, New York, Oregon, Virginia, and Washington.  The Company franchises restaurants in the following states:  Florida, Illinois, Maryland, Minnesota, Missouri, New Jersey, and South Dakota.  All restaurant locations, in addition to the Debtors' headquarters, are leased.

12.     The Company's three primary restaurant concepts, each of which enjoy an established brand identity offering guests a unique, enhanced experience, are:  El Torito; Chevys Fresh Mex; and Acapulco Mexican Restaurant:

(a)     <u>El Torito (47.8% of fiscal year 2017 restaurant revenues)</u>.  El Torito was founded in 1954.  El Torito restaurants are primarily free standing buildings.  The restaurants average approximately 8,900 square feet with average seating for approximately 300 guests.

(b)     <u>Chevys Fresh Mex (32.1% of fiscal year 2017 restaurant revenues)</u>. Chevys was founded in Alameda, California in 1986.  Chevys restaurants are primarily freestanding and located in high-traffic urban and suburban areas.  Chevys restaurants generally average approximately 7,700 square feet with average seating for approximately 320 guests in the dining room and cantina.

(c)     <u>Acapulco (10.6% of fiscal year 2017 restaurant revenues)</u>.  The first Acapulco restaurant opened in Pasadena, California in 1960.  Acapulco restaurants, which are primarily freestanding and located in high-traffic urban and suburban areas, generally average approximately 8,700 square feet with average seating for approximately 260 guests.

(d)     <u>Other Restaurant Concepts (9.5% of fiscal year 2017 restaurant revenues)</u>. As of the Petition Date, the Company owned and operated four additional restaurant locations,

each of which are also full service Mexican formats, under the following brands:  El Torito Grill (two locations), Las Brisas and Sinigual.  These restaurants offer a more premium experience than the Company's other concepts, with Las Brisas occupying a landmark location on the coastline of Laguna Beach, California.

13.    The Debtors employ approximately 4,600 full-time and part-time employees.  The majority of the Debtors' employees, approximately 4,530 in all, work at one of the Debtors' restaurant locations or "in the field" overseeing restaurant operations in their assigned regions.  The Debtors' approximately remaining 70 employees work at the corporate headquarters located in Cypress, California (the "Corporate Employees"), at which a number of temporary employees and contract workers also work.  The Debtors are not parties to any collective bargaining agreements.

14.    An organizational chart showing the ownership relationship amongst the Debtors is attached hereto as Exhibit I.

**B.    Summary of Debt and Equity**

15.    As of the Petition Date, the substantial majority of the Debtors' liabilities consisted of funded debt (i.e., not trade debt).  The Debtors' principal liabilities and obligations are:

**First Lien Credit Facility**

16.    On March 21, 2012, in connection with its acquisition of the assets of the prior Real Mex owner out of bankruptcy, the Company entered into the Financing Agreement (First Lien), together with various security, subordination, and other supporting documentation (collectively, as amended from time to time, the "First Lien Credit Facility") by and among RM Opco, LLC ("RMO"), as borrower, RMH and the other Debtors, as guarantors (collectively, the "Guarantors"), the lenders party thereto (the "First Lien Lenders"), and Wells Fargo Bank, National Association, as agent.  The obligations of the Company under the First Lien Credit Facility are secured by first priority liens on and security interests in substantially all of the

Debtors' assets, excluding certain of the Debtors' leasehold interests.  The outstanding balance due under the First Lien Credit Facility as of the Petition Date is approximately $41.67 million, which comprises approximately $11.23 million in First Out Term Loan A, approximately $20.30 million in Term Loan A, and approximately $10.14 million in Term A Notes.  The First Lien Credit Facility sets forth the priorities of the different tranches of debt in such facility.

**Second Lien Credit Facility**

17.    Also on March 21, 2012, in connection with the same transaction, the Company entered into the Amended and Restated Financing Agreement (Second Lien), together with various security, subordination, and other supporting documentation (collectively, amended from time to time, the "Second Lien Credit Facility" and, together with the First Lien Credit Facility, the "Pre-Petition Credit Facilities"), by and among RMO, as borrower, the Guarantors, the lenders party thereto (the "Second Lien Lenders" and, together with the First Lien Lenders, the "Pre-Petition Lenders")), and Wells Fargo Bank, National Association, as agent.  The obligations of the Company under the Second Lien Credit Facility are secured by second priority liens on and security interests in substantially all of the Debtors' assets, excluding certain of the Debtors' leasehold interests.  The outstanding balance due under the Second Lien Credit Facility (exclusive of the Reimbursement Obligations Loans (defined below)) as of the Petition Date is approximately $195.12 million, which comprises approximately $61.04 million in Senior Convertible Term B Loans, approximately $17.82 million in Convertible Term Loan B-1, approximately $22.17 million in Term Loan B-1, and approximately $94.09 million in Term Loan B.  The Second Lien Credit Facility sets forth the priorities of the different tranches of debt in such facility.

**Intercreditor Agreement**

18.    The rights and priorities of the lenders under the First Lien Credit Facility and Second Lien Credit Facility (collectively, the "Pre-Petition Credit Facilities"), comprising various affiliates of Z Capital and TCP, are governed by that certain Intercreditor Agreement (Term A and Term B), dated as of March 21, 2012.

**Reimbursement and Fee Agreement and Z Capital Subscription Lines**

19.     On June 17, 2015, the Company entered into a Reimbursement and Fee Agreement (as amended from time to time, the "Reimbursement and Fee Agreement") with certain affiliates of Z Capital as lenders (collectively, the "Z Capital Credit Support Parties"), pursuant to which, among other things, the Z Capital Credit Support Parties agreed to guarantee, provide collateral for and otherwise backstop (each of the foregoing, the "LC Support") RMO's obligations under certain letters of credit issued on behalf of RMO for the benefit of its workers' compensation insurers (the "WC LOCs").  In exchange, the Company agreed to reimburse and/or pay to the Z Capital Credit Support Parties (i) any amounts drawn or paid under the WC LOCs and related obligations, (ii) certain Credit Support Fees (as defined in the Reimbursement and Fee Agreement), and (iii) any and all other obligations that may become payable by the Z Capital Credit Support Parties in connection with an LC Support or the Reimbursement and Fee Agreement (collectively, the "Reimbursement Obligations").

20.     Under the Second Lien Financing Agreement, Reimbursement Obligations are automatically converted into secured obligations under the Second Lien Credit Facility (the "Reimbursement Obligation Loans") upon (i) any draw or payment under the WC LOCs, (ii) the payment, pledge or reserve of any amount by any Z Capital Credit Support Party on account, or in support, of the WC LOCs and the other obligations in connection therewith, or (iii) the non-payment by the Company of any other Reimbursement Obligation when due.  As of the Petition Date, approximately $17.53 million in Reimbursement Obligation Loans remained outstanding, which comprises (i) approximately $14.03 million in undrawn outstanding WC LOCs and (ii) approximately $1.40 million in Credit Support Fees.

21.     In order to facilitate the transactions contemplated in the Reimbursement and Fee Agreement, RMO was added as a "Qualified Borrower" under two Uncommitted Revolving Credit Agreements dated as of January 31, 2017 by and among certain Z Capital affiliates and Goldman Sachs Bank USA ("Goldman Sachs") as lender (collectively, the "Z Capital Subscription Lines").  As contemplated under the Reimbursement and Fee Agreement,

the Z Capital affiliates used proceeds of their own loans under the Z Capital Subscription Lines to cash collateralize the WC LOCs on behalf of RMO, and also guaranteed RMO's obligations as a Qualified Borrower under the Z Capital Subscription Lines.  Although RMO's obligations to Goldman Sachs under the Z Capital Subscription Lines are unsecured, the Z Capital Credit Support Parties have secured claims (for Reimbursement Obligation Loans) against the Company for any amounts the Z Capital Credit Support Parties are obligated to pay on account of the WC LOCs or RMO's obligations under the Z Capital Subscription Lines.

<strong><u>RMH Unsecured Subordinated Convertible Loan</u></strong>

22.     Also on March 21, 2012, in connection with the purchase transaction for Real Mex assets, the Company entered into the Subordinated Convertible Loan Agreement (together with supporting documentation, as amended from time to time, the "<u>RMH Subordinated Loan</u>") by and among RMH, the lenders party thereto, and Wells Fargo Bank, National Association, as agent.  The outstanding balance due under the RMH Subordinated Loan as of the Petition Date is approximately $53.62 million.  The Debtors are informed that, as of the Petition Date, affiliates of Z Capital hold large positions in the RMH Unsecured Convertible Loan.

<strong><u>Other Debt</u></strong>

23.     The Debtors are parties one capitalized lease for equipment used in the Debtors' corporate headquarters.  In addition, as of the Petition Date, the Debtors owe approximately $6.5 million in trade, vendor and general unsecured debt (excluding payroll, the RMR Unsecured Convertible Loan, and accrued interest and liabilities related to self-insurance).

24.     One of the Company's key vendors – Sysco Corporation ("<u>Sysco</u>") – has filed UCC-1 financing statements to perfect security interests it asserts against certain assets of RMO.  Sysco and its affiliates provide most of the food and beverages served at the Debtors' restaurants, a large percentage of which may be entitled to special rights under PACA and PASA (as defined below), even if Sysco did not have a security interest in the goods it has provided.  Sysco asserts a security interest in, among other things, goods delivered by Sysco to

the Company.  The balance owing to Sysco and its affiliates as of the Petition Date was
approximately $1.5 milion.

### Debtors' Equity Holders and Board of Managers

25.      On information and belief, approximately 91% of the equity of Debtor
RMH is held by various affiliates of Z Capital and TCP, and the balance of RMH's equity is
held by approximately thirty-five (35) other institutions and individuals.  On information and
belief, none of the other interest-holders own more than 4.5% of the equity in RMH.  RMH's
board of managers comprises (i) Bryan Lockwood, the Debtors' Chief Executive Officer, (ii)
two managers appointed by and employed by Z Capital (including the Chairman of the Board),
(iii) two managers appointed by and employed by TCP, (iv) one independent manager
designated by Z Capital, and (v) one independent manager designated by TCP.  Approximately
90% of the equity in RMO is held by RMH, with the other 10% held by RM Incentive Plan Co
LLC, the vehicle through which one or more members of Real Mex management have received
equity incentive compensation.  The remaining Debtors are wholly owned by RMO.

### C.      Factors Leading to the Chapter 11 Filings

26.      Over the past several years, the Debtors have experienced several unique
operational issues that, together with pressures on the industry generally, have increased their
debt load and have created the need to file these Chapter 11 Cases.

### Financial Losses Arising From Unprofitable Operations

27.      Since the Debtors purchased Real Mex's operations out of its prior
bankruptcy, operations have failed to produce sufficient cash flow to cover all operating
expenses and to service debt obligations.  Certain historic Real Mex operations contributed to
more of a cash drain than others, including the Company's freestanding operations providing for
(i) centralized food purchasing and distribution services for Real Mex restaurants and (ii)
manufacturing of specialty products for sales to outside customers (such operations, "Real Mex
Foods").  Real Mex Foods generated, among other things, significant purchasing economies of

scale for the Company and was intended to ensure quality and consistency across their entire store base.  However, Real Mex Foods continued to struggle post-bankruptcy for multiple reasons, including a significant increase in commodity costs.  By mid-2013, Real Mex Foods had been losing roughly $1 million a month for over a year.  In July of that year, the Board determined to shut down Real Mex Foods' operations and, in May 2014, executed a general assignment for the benefit of creditors for that entity.  Since that time, the Debtors' restaurants have ordered food and other items from suppliers offering preferred pricing to the Debtors' entire enterprise.

28.     In addition to the losses arising out of Real Mex Foods, certain Real Mex restaurant locations have lagged behind on performance, impacting the Company overall.  In 2012, the Debtors operated approximately 128 restaurant locations, including 113 in California.  By December 31 of that year, the number had declined to 125 restaurant locations, including 111 in California.  Over the following five years, the Debtors' restaurant count decreased by between a net seven (7) and twenty-two (22) restaurants per year, resulting in the store count as of the Petition Date of 68 total restaurant locations, including 61 in California.  Some of the historic restaurant closures resulted in either significant settlements with landlords or ongoing breach-of-lease litigation.  Together with the settlement payment required to close Real Mex Foods, the Debtors have spent millions of dollars to date in up-front costs to shut down unprofitable operating locations.

**Expenses from Unconsummated Growth Strategy**

29.     Beginning in the summer of 2016, the Debtors undertook several capital-intensive steps with the goal of expanding their overall footprint.  For example, they engaged a mergers and acquisitions advisor and hired executives with broad experience and the capacity to run a much larger organization.  And after previously having previously outsourced their accounting function as a cost-saving measure, the Debtors brought that function back in-house and implemented an expensive Oracle Fusion system in order to streamline their processes in anticipation of an acquisition.  In late 2016 and early 2017, the Debtors pursued a transaction

with Garden Fresh, both during and after the latter's bankruptcy case.  Although the Debtors were ultimately unable to consummate that transaction and explored others unsuccessfully, they incurred millions of dollars in associated expenses and continue to pay related, ongoing costs.

### Risk Management-Related Expenses

30.    Prior to hiring its current Chief Executive Officer, the Company experienced higher-than-normal litigation and enforcement-related expenses arising out of a failure by its human resources department to properly educate employees as to risk management and a failure to undertake necessary capital expenditures in certain restaurant locations.  Not only was there a lack of focus on risk and deferred maintenance, there were also no clear compliance platforms for crucial policies such as alcohol awareness, sexual harassment, and food handling safety, leading to costly health and safety complaints.  Since 2015, the Company has increased its focus on risk management and deferred maintenance.  Although this approach has substantially lowered the number of lawsuits brought against the Company, the costs of the prior litigation, as well as ongoing compliance costs, has impacted profitability.

31.    Another significant use of the Company's liquidity relates to its workers compensation program.  Recently, the Company substituted a guaranteed cost workers compensation insurance policy for the self-insurance retention program the Company has had in place since 2013.  The latter program, issued by AIG, essentially backstopped the Company in the event it became unable to pay its own actual workers compensation claims.  The AIG program carried not only an expensive premium (driven by the historically high incidence of workers' compensation claims arising out of the Debtors' restaurants), it also required ever-increasing amounts of collateral security.  The Debtors' current management has had substantial success in lowering the incidence of workers compensation claims, which has ultimately permitted the Debtors to purchase a guaranteed cost plan at an advantageous price.  However, the Debtors have continued to pay substantial weekly amounts on account of historic workers compensation exposure under the prior program, as well as associated costs.

**Other Significant Costs**

32.     While struggling with the specific issues discussed above, the Debtors have also suffered from rising employee wage costs, which are particularly high in California, where the vast majority of the Debtors' restaurants are located.  In an attempt to minimize these costs, the Debtors have implemented a scheduling program that has reduced employee hours and has optimized both front-of-house and back-of-house staffing.  The Debtors' cash flow is also being pressured by California-specific lease and occupancy expenses, which are generally higher than industry standard.  The combination of all of the foregoing losses and expenses has also forced the Debtors to seek additional funding from its First Lien Lenders and Second Lien Lenders, resulting in additional financing-related costs.

**D.     Exploration of Strategic Options**

33.     Despite the foregoing struggles, the Company has continued to generate meaningful cash flow from its profitable restaurants.  To preserve this value, in December 2017, the Board determined that the time had come to explore strategic alternatives.  The Debtors engaged investment bank Piper Jaffray & Co. ("PJC") in January 2018 to assist them in analyzing and pursuing such alternatives.  As a result of that analysis, the Board tasked PJC with marketing the Company's assets for sale.

34.     PJC, working with management of the Debtors, put together a confidential information memorandum presenting a sale transaction for the Debtors' assets (the "CIM").  At the Debtors' direction, PJC contacted numerous parties from April to July 2018 to determine their interest in consummating such a transaction.

35.     Specifically, I understand that PJC contacted 211 potential strategic and financial bidders.  Of these contacted parties, 50 potential bidders ultimately negotiated confidentiality agreements and were provided with the CIM.  Interested parties were then asked to provide an "indication of interest" containing a proposed structure for the transaction, as well as the value or a range of value to be provided.  Each of the four (4) parties providing an

indication of interest ("IOI") proposed to purchase the Company's assets through a 363 Sale.

36.     Parties that provided written indications of interest were given access to a virtual data room containing extensive due diligence information and invited to conduct calls and/or attend meetings with management.  After continued marketing efforts, the Debtors and PJC identified and provided access to another possible bidder who, along with two of the parties who had submitted IOIs, submitted a markup of an asset purchase agreement to acquire up to substantially all of the Debtors' assets through a stalking horse bid in a 363 Sale.[2]  Two such bidders also expressed preliminary interest in potentially offering DIP Financing in connection with a stalking horse bid, although the DIP Financing offered by one of them was the only cash component of that bid (with the remaining consideration taking the form of a note).  I understand that PJC reached out to fourteen (14) parties that had entered into confidentiality agreements to determine whether such parties had interest in providing DIP Financing to support another party's acquisition, but none expressed interest.  These parties included ten (10) prospective bidders that had passed on the purchase of the Debtors' assets but had lending arms or the ability to lend out of their funds, all of which declined to offer DIP Financing without priming liens given the lack of unencumbered assets.

37.     Given the intensity of the sale process and the need to ensure that management had sufficient resources to respond to bidder inquiries while operating the business, the Debtors retained A&M in July so that I and my team could provide restructuring and interim management services.  The due diligence and preliminary negotiation process then continued through the efforts of PJC, A&M and management.

38.     Before the Board determined which of the then-identified bidders had submitted the highest or otherwise best stalking horse bid, Z Capital, through counsel, announced its intention to participate in the stalking horse process as a potential bidder, and

---

[2]     Two of the initial participants declined to submit a markup of the draft asset purchase agreement circulated by PJC.

submitted a markup of the Debtors' draft asset purchase agreement and a formal letter of intent. The two members of Holdco's Board designated by, and compensated by, Z Capital immediately recused themselves from any further participation in the process of evaluating the stalking horse bids.  Bryan Lockwood, the Debtors' Chief Executive Officer and a member of the Board, also recused himself from decisions regarding the stalking horse selection because two of the bidders had expressed a potential interest in employing him post-closing.

39.    At this point, the Debtors and their advisors further evaluated the then-four (4) offers they had received.  Of the parties who had submitted mark-ups of the Debtors' APA, three offered substantial cash consideration for the Debtors' business and one (1) proposed to finance the acquisition with a note issued by the purchaser.  The Debtors and their advisors proceeded with vigorous, arms-length negotiation with the three parties offering substantial cash consideration, and kept the disinterested subset of the Board apprised of the negotiations.[3]

40.    On July 20, 2018, the Debtors and their advisors conducted a live, telephonic auction for the position of stalking horse bidder (the "Stalking Horse Auction"), in which two of the three remaining potential bidders participated.  The Stalking Horse Auction resulted in a bid by Z Capital offering a broader swath of assumed liabilities than it had originally proposed and a headline purchase price of $46.75 Million, representing an $8.75 Million increase in purchase price, or 23%, over the highest opening round bid.

41.    After evaluating several factors, including cash provided to the estate, contingencies to closing, assumption of liabilities, and other benefits inuring to the Debtors' estates, the Debtors' advisors ultimately concluded that Z Capital had submitted a superior stalking horse bid.  The Debtors' advisors concluded that Z Capital's bid was superior because it offered additional cash consideration over what was offered by the next highest bidder, was

---

[3]    Each member of the disinterested subset was designated by TCP, one of whom as an independent manager. TCP (in its capacity as (i) proposed lender under the DIP Facility and (ii) lender under the Pre-petition Credit Facilities) has advised the Debtors that it does not intend to extend its necessary vote to direct the agents under those facilities to credit bid.

otherwise reasonably comparable in terms to the alternative proposal, and offered a consensual path forward for DIP Financing and use of cash collateral.  The Debtors' advisors presented the results of the Stalking Horse Auction to the disinterested subset of the Board, which directed the advisors to negotiate asset purchase and DIP Financing documents with Z Capital, as stalking horse bidder and joint DIP Financing lender with TCP.

42.    After continued extensive, arms-length negotiations on both the asset purchase and the DIP Financing documentation, the Debtors determined that the Stalking Horse APA (defined below) represented the highest or otherwise best bid, based on the business judgment of the Debtors and their advisors, after considering all other options and following an extensive effort to negotiate favorable terms.  Additionally, the Stalking Horse APA provides that the bidder will offer employment to all Company employees at purchased restaurants who are employed at the closing, and may offer employment to other Company employees as well.

### E.    The Decision to File the Chapter 11 Cases

43.    While the preliminary stages of the sale process were underway, and despite their efforts to improve performance, the Debtors were unable (and have remained unable) to comply with their obligations under the Pre-Petition Credit Facilities.  Both the First Lien Credit Facility and Second Lien Credit Facility were scheduled to mature and become payable on March 30, 2018.[4]  The Debtors and the Pre-Petition Lenders entered into a series of forbearance agreements beginning on March 21, 2018, which ultimately expired on July 31, 2018.  In connection with the forbearances and in order to facilitate an orderly and value-maximizing sale process, the First Lien Lenders extended additional secured financing to the Debtors, but only to bridge to a bankruptcy filing that would facilitate such sale process.

---

[4]    The RMH Convertible Subordinated Loan was scheduled to mature earlier in March 2018, but was extended to July 31, 2018 pursuant to the above-described forbearance agreements.  Further, all remedies under that facility are subordinate to the exercise of remedies under the Pre-Petition Credit Facilities.

01:23488620.1

44.     To further attempt to conserve cash, in the weeks leading up to the Petition Date, the Debtors engaged in a comprehensive review of their nonresidential real estate portfolios and identified the restaurant locations with the most significant losses (the "Exit Locations").  After confirming that none of the potential bidders were looking to acquire the Exit Locations, the Debtors closed those restaurants and reduced their workforce accordingly (where they were unable to offer positions at nearby open locations).  As a result, between approximately July 22, 2018 and July 26, 2018, the Debtors closed nine (9) restaurants.  The Debtors vacated the premises, leaving behind certain personal property, including, but not limited to, furniture, fixtures, and equipment.  Despite tendering possession back to their landlords, the landlords under such leased locations had the right to file complaints in state court and seek writs of attachment as to Company assets on account of the breaches under the leases, in the absence of a stay on such proceedings.

45.     Ultimately, the potential litigation and cost arising out of shutting down both the Exit Locations and other unprofitable or minimally profitable restaurants, combined with the Company's funded debt burden and potentially interested parties' sole interest in acquiring the Company's assets through a 363 Sale, made the Company's need to file for bankruptcy clear.

46.     On August 5, 2018 the Debtors entered into that certain Asset Purchase Agreement with FM Restaurants (PT), LLC, an affiliate of Z Capital (the "Stalking Horse Bidder"), a true and correct copy of which (excluding Schedules) is attached to the Debtors' Bidding Procedures and Sale Motion (defined below) (the "Stalking Horse APA").  The Debtors at that time also entered into that certain DIP Financing and Guaranty Agreement (the "DIP Credit Agreement") with Wells Fargo Bank, National Association as agent, and the lenders thereto (which are affiliates of Z Capital and TCP) (the "DIP Lenders").  In order to prevent a potentially full shut-down of operations, to preserve the jobs of thousands of employees working at profitable locations, to protect the interests of their creditors, to effectuate the

Stalking Horse APA, and to allow an orderly, court-supervised process in which all constituencies are protected, the Debtors have instituted these Chapter 11 Cases.

## Part II

47.    The Debtors have filed a number of First Day Motions, consisting of (i) administrative motions, (ii) motions relating to the Debtors' business operations, and (iii) a motion related to approval of a process to sell the Debtors' businesses on a going concern basis, the relevant facts for which are set forth above.  The Debtors believe, and I agree, that approval of each First Day Motion is an important element of their reorganization efforts and is necessary to ensure a smooth transition into chapter 11 with minimal disruption to their operations.  I have reviewed each of the First Day Motions or had their contents explained to me, including the exhibits thereto, and believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations and swiftly confirm the Plan, all as requested in the First Day Motions.  Factual information with respect to each First Day Motion is provided below and additional detail is contained in each First Day Motion.  Capitalized terms, to the extent not defined herein, have the meanings provided in the respective First Day Motions.

A.    **Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")**

48.    These Chapter 11 Cases involve six affiliated Debtors.  In the Joint Administration Motion, the Debtors are requesting consolidation for procedural purposes only.  Accordingly, my understanding is that no party's substantive rights will be adversely impacted if the cases are jointly administered.  Given the integrated nature of the Debtors' business operations, joint administration of the Debtors' cases will promote efficiency and ease the administrative burden on this Court and all parties in interest.

49.    Further, I understand that joint administration will significantly reduce the volume of paper that otherwise would be filed with the office of the Clerk of the Bankruptcy

Court, reduce costs associated with various administrative tasks, and minimize the number of unnecessary delays.  Moreover, the joint administration of these Chapter 11 Cases will simplify supervision of these cases by the Office of the United States Trustee.  Accordingly, the Debtors believe, and I agree, that joint administration of these Chapter 11 Cases is in the best interest of the Debtors' respective estates, creditors and all other parties in interest.

      **B.**      **Debtors' Application To Employ Kurtzman Carson Consultants LLC as Claims and Noticing Agent to the Debtors (the "<u>KCC Application</u>").**

      50.      I understand that this Court is authorized to utilize agents and facilities other than the Clerk for the administration of bankruptcy cases.  I believe that if Kurtzman Carson Consultants LLC ("<u>KCC</u>") is retained as the claims and noticing agent in these Chapter 11 Cases, the distribution of notices and the processing of claims will be expedited and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

      51.      I have also reviewed KCC's Retention Agreement, which is attached as Exhibit C to the Claims Agent Application, and the description of services that KCC has agreed to provide and the compensation and other terms of the engagement as provided in its application.  Based on that review, I believe that the Debtors' estates, creditors, parties in interest, and the Court will benefit from KCC's experience and cost-effective methods.  Prior to retaining KCC, the Debtors also solicited, and reviewed, engagement proposals from three other potential claims and noticing agents.  The Debtors believe, and I agree, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise, and that the appointment of KCC as claims and noticing agent is the most effective and efficient manner by which to provide noticing and claims processing services in the Chapter 11 Cases and is necessary and in the best interest of the Debtors and their estates.

**C.    Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Continue Using Existing Their Cash Management System, Including Existing Bank Accounts and Purchase Card Program, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Interdebtor Transactions, and (D) Maintain Existing Check Form; (II) Waiving the Requirements of Section 345(b) on an Interim Basis; and (III) Granting Related Relief ("Cash Management Motion")**

52.    The Debtors maintain a centralized Cash Management System, which they use in the ordinary course of business to collect funds generated by their operations and disburse those funds to satisfy obligations required to operate their business.  The Cash Management System is similar to the systems commonly employed by complex businesses comparable to that of the Debtors.

53.    The Cash Management System is operated primarily through 8 bank accounts (collectively, the "Primary Bank Accounts") maintained by the Debtors at Wells Fargo, as well as 69 subaccounts (one for each of the Debtors' 69 operating restaurants) (the "Sub-Accounts").  Schedules identifying the Debtors' Primary Bank Accounts and Sub-Accounts (collectively, the "Bank Accounts") are attached as Exhibit 2 and Exhibit 3, respectively, to the Debtors' proposed order granting Cash Management Motion on an interim basis.  The Primary Accounts are as follows:

(a)    The "Primary Deposit Account" is a deposit account in the name of RM Opco LLC, with an account number ending in 2785, into which the Debtors deposit restaurant receipts

(b)    The "Concentration Account" is a deposit account in the name of RM Opco LLC, with an account number ending in 2777, used by the Debtors to aggregate cash.

(c)    The "Accounts Payable Account" is a checking account in the name of RM Opco LLC, with an account number ending in 9797, through which the Debtors make disbursements to satisfy their financial obligations (other than those satisfied via the Specialized Accounts (as defined below)).

(d)    The "Payroll Account" is a deposit account in the name of RM HQ LLC, with an account number ending in 9453, through which the Debtors make payroll

disbursements.

(e)     The "Voluntary Disability Account" is a deposit account in the name of RM Opco LLC, with an account number ending in 7073,  through which the Debtors make disbursements related to their voluntary disability program.

(f)     The "Liquor Imprest Account" is a deposit account in the name of RM Opco LLC, with an account number ending in 2819, that the Debtors use to pay for cash-on-delivery liquor purchases.

(g)     Miscellaneous Accounts.  In addition to the accounts discussed above, which are currently used in the Debtors' everyday cash management transactions, the Debtors maintain two other accounts at Wells Fargo.  The first account, with an account number ending in 5890 (the "RM Chevys Account") was established for  the purpose of cash collateralizing a letter of credit related to the Chevys location in Northridge, California.  That account is currently used to hold interest accruing on that cash collateral and has a current balance of approximately $1,000.00.  The second miscellaneous account, with an account number ending in 2306 (the "Funding Account").  The Funding Account was historically used to receive loan proceeds from the Debtors' lenders but, more recently, such loan proceeds have been deposited directly into the Concentration Account.

54.     The Debtors generate revenue principally through restaurant receipts.  The vast majority (approximately 90%) of the Debtors' restaurant receipts are credit card receipts. Customer credit card payments are processed by the Debtors' credit-card processor, Bank Associates Merchant Services (the "Credit Card Processor") and take approximately two or three business days to settle.  Once settled, credit card receipts, net of credit card processing fees, are deposited into RM Opco LLC's Primary Deposit Account.  At the end of each business day, these receipts are automatically swept into the Concentration Account, along with all other amounts on deposit in the Primary Deposit Account.  Credit card processing fees are paid daily as part of the daily settlement of credit card receipts.

55.     Cash receipts generated at the Debtors' restaurants are collected from each restaurant by Dunbar Armored, Inc. ("Dunbar") between once and three times per week, depending upon the level of cash receipts generated at such restaurant.  Dunbar deposits the cash receipts of each restaurant into that restaurant's dedicated Sub-Account.  Funds are then automatically swept from the Sub-Accounts to the Primary Deposit Account at the end of each business day and, from there, swept into the Concentration Account.  Once per month, the accounting department of RM HQ LLC (the "Accounting Staff") will run a cash reconciliation that ties cash deposited into each restaurant's Sub-Account to the cash receipts of that restaurant reflected in the Debtors' point-of-sale system.  Because of this monthly reconciliation system and the large percentage of the Debtors' receipts that are paid via credit card, discrepancies between cash receipts deposited and the numbers reflected in the point-of-sale system are minimal.

56.     Receipts transferred into the Concentration Account (together with proceeds of the Pre-Petition Credit Facilities) are used by the Debtors to satisfy their financial obligations, including payroll and benefits program payments, vendor payments, insurance premiums, capital expenditures, rent, debt service, and taxes.  Disbursements made by wire transfer are manually initiated by the Debtors, while ACH transfer disbursements are initiated by certain vendors against the Concentration Account.  Payments made by the Company via check are generally presented against the Accounts Payable Account, which is funded once per day with the aggregate dollar amount of the checks presented on that day.  However, as described above, certain types of disbursements are made from the Payroll Account, the Voluntary Disability Account, and the Liquor Imprest Account.

57.     The Debtors also have an overnight sweep arrangement with Wells Fargo, pursuant to which the bank sweeps the balance in the concentration account into an investment vehicle overnight.  This arrangement yields for the Company a higher interest on the Concentration Account balance than would otherwise be available.

58.     The Debtors or their agents print nearly all of their own checks and do so on an ongoing, as-needed basis.  The Debtors believe that they will be in a position to begin printing checks with the designation "Debtor in Possession" and the corresponding bankruptcy number on all such checks within fifteen (15) days of the date of the entry of the Interim Order.

59.     The Cash Management System also includes a purchase card program (the "Purchase Card Program") with Wells Fargo, which allows select employees to purchase work-related travel, fuel, meals and other ordinary-course business-related expenses.  Under the Purchase Card Program, the Debtors issue credit cards to eligible employees to be used for authorized travel and other business-related expenses, including meals, fuel, airfare, and lodging.  As of the Petition Date only approximately 25 of the Debtors' employees held cards issued and authorized for use under the Purchase Card Program.  To avoid disruption to their businesses, the Debtors are seeking authority to continue utilizing the Purchase Card Program postpetition in the ordinary course of business.

60.     In the normal course of their businesses, the Debtors do not engage in regular interdebtor transactions or incur substantial intercompany obligations because RM Opco LLC is the only entity with active business operations.  The other Debtors' assets largely comprise leases and, with respect to RM Holdco LLC, equity in its wholly owned direct and indirect subsidiaries.  When, however, as a result of the centralized Cash Management System, RM Opco LLC receives or disburses funds on behalf of another Debtor—for example, when it pays rent owed by its subsidiaries for the stores it operates—it accounts for that transaction with journal entry receivables and payables, as applicable, in the Debtors' accounting records.  These interdebtor transactions are an integral and inevitable consequence of the centralized Cash Management System, and the Debtors are seeking authority to continue engaging in such ordinary-course interdebtor transactions on a postpetition basis.

61.     Maintaining the Cash Management System will enable the Debtors to preserve a "business as usual" atmosphere and avoid the costly delays, distraction and unnecessary confusion that would accompany any substantial disruption in the Cash

Management System.  The Debtors are seeking to consummate a going-concern sale of their businesses, and avoiding unnecessary expense and disruption to their business operations is critical to ensuring that the Debtors' proposed sale process yields the most value possible for the Debtors' creditors.  Moreover, in light of the proposed sale of the Debtors' businesses and the extensive prepetition marketing process undertaken by the Debtors' management, their outside investment banker and CRO, the Debtors anticipate a relatively short chapter 11 process. Maintaining the Cash Management System will facilitate the Debtors' goal of moving swiftly to confirm a chapter 11 plan that distributes sale value to the Debtors' creditors by, among other things, eliminating administrative inefficiencies and allowing the Debtors' treasury and accounting employees to focus on their daily responsibilities.

> **D.      Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Post-Petition Financing And (B) To Utilize Cash Collateral; (II) Granting Adequate Protection To Pre-Petition Secured Lenders; (III) Providing Superpriority Administrative Expense Status; (IV) Scheduling A Final Hearing; And (V) Granting Related Relief (the "DIP Motion")**

62.      The Debtors intend to finance ongoing operations of their business during these Chapter 11 Cases through a multi-draw postpetition secured credit facility (the "DIP Facility") in the amount of up to $5.5 million, which will be provided by TCP and Z Capital, with Wells Fargo Bank, National Association as agent.

63.      I believe that the proposed DIP Facility and use of Cash Collateral are critical to the Debtors' successful reorganization efforts.  The Debtors currently do not have sufficient available sources of working capital to finance their business operations in the ordinary course of business.  The proposed DIP Facility and the use of Cash Collateral will provide liquidity for working capital and other general corporate purposes of the Debtors subject to a budget, to be approved by the lenders, thereby permitting the Debtors to preserve ordinary course business operations and preserve their business as a going concern pending the sale of substantially all of their assets.  In addition, the proposed DIP Facility and use of Cash Collateral will permit the Debtors to pay the administrative costs of these chapter 11 cases.

64.     In contrast, without the DIP Facility, the Debtors will lack sufficient funding for basic business operations, much less successfully complete a sale process.  Basic operations that rely on the Debtors' continued liquidity include but are not limited to, maintaining vendor and supply relationships and continuing to pay employees.  Without access to the DIP Facility, the value of the Debtors' businesses almost assuredly would suffer immediate deterioration.

65.     I believe that the Debtors' financial advisor and investment banker, PJC, adequately marketed the proposed DIP Financing.  In connection with those marketing efforts, the Debtors approached a number of potential DIP lenders in the hopes of soliciting meaningful DIP proposals.  I also believe that, given the market of potential lenders willing to provide DIP Financing, the Debtors would be unable to find financing other than through a priming DIP facility.  Thus, based on my consultations with the Debtors' advisors, I believe that the proposed DIP Facility was the best available postpetition financing option for the Debtors at this time.

66.     In addition, during the weeks leading up to the Petition Date, the Debtors worked closely with the Pre-Petition Lenders to negotiate appropriate adequate protection of the Pre-Petition Lenders' interests in connection with the proposed DIP Facility's priming feature and the Debtors' use of Cash Collateral.  Ultimately, the parties agreed that the Pre-Petition Lenders would receive adequate protection in the form of replacement liens and superpriority claims, as well as other additional benefits, such as various Debtor acknowledgements and releases relating to the validity and priority of the Pre-Petition Credit Facilities.  Furthermore, the Pre-Petition Lenders agreed to certain case and sale milestones that would help ensure that these chapter 11 cases and the sale process would be run as efficiently and as cost effectively as possible, yet at the same time provide the Debtors with sufficient time to fully market and maximize the value of the Debtors' assets, for the benefit of all stakeholders.

E.   **Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to (a) Pay Prepetition Wages, Salaries, Employee Benefits, Prepetition Payroll Taxes and Other Compensation, and (b) Maintain Employee Benefits Programs and Payment of Related Administrative Obligations, (ii) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (iii) Granting Related Relief (the "<u>Wages Motion</u>")**

67.     The Wages Motion requests authority to pay certain prepetition amounts related to the Workforce Compensation Obligations and to continue to pay Workforce Compensation Obligations on a postpetition basis in the ordinary course of business. Workforce Compensation Obligations consist of wages, salaries and other compensation provided to the Debtors' employees, as well as related withholdings, deductions and expense reimbursement obligations (including any related obligations and administrative expenses). In addition, the Wages Motion requests that the Debtors be authorized to maintain Employee Benefits Programs and pay related administrative obligations. A summary description of Workforce Compensation Obligations and the Employee Benefits Programs is set forth below, and further detail is contained in the Wages Motion.

68.     As of the Petition Date, the Debtors have approximately 4,600 employees in both full- and part-time positions. Approximately 55 of the employees are located at the Debtors' headquarters in Cypress, California (the "<u>HQ Employees</u>"), with the remainder located at the Debtors' restaurant locations in California, Oregon, Florida, Illinois, Maryland, New York, Virginia, and Washington or in the field overseeing one or more groups of restaurants in various regions (the "<u>Restaurant Employees</u>"). In addition, a small number of corporate employees work remotely. Approximately 278 of the employees are employed on a salaried basis, while the remainder are employed on an hourly basis. Approximately 114 of the employees are on leave as of the Petition Date. The Debtors' workforce is not unionized and none of the Debtors is party to a collective bargaining agreement.

69.     The Debtors also utilize the services of approximately 15 temporary workers to perform a variety of daily business functions. The number of temporary workers fluctuates from time to time based on the Debtors' business needs. The temporary workers'

services are procured indirectly through six third-party staffing agencies, LEAPROS Workforce Solutions, LLC, AgentHR, Inc., KForce, Inc., Teg Staffing, Inc., Robert Half, and Randstad North America, Inc.  In addition, the Debtors utilize the services of five 1099 contract workers whose services are procured directly.  The temporary workers and 1099 contract workers provide accounting, information systems, and other services as needed, and are an important component of the Debtors' operations.

70.     The Debtors' aggregate average gross bi-weekly payroll (including basic wages, salaries, and car allowances) is approximately $4.1 million.  This amount is based on the past five months and does not include gratuities collected by the Debtors for tipped employees, which may, on occasion, be paid in cash.  The Debtors pay their employees in arrears, on a bi-weekly basis (except for hourly employees at the Debtors' New York locations, who are paid on a weekly basis), on Fridays, via direct deposit or check.  Most of the HQ employees are paid a fixed salary, while most Restaurant Employees (other than regional directors), as well as a handful of HQ Employees, are paid on an hourly basis.

71.     The Debtors process payroll obligations internally using software provided by The Ultimate Software Group, Inc.  The Debtors estimate that, as of the Petition Date, they owe approximately $1.48 million in accrued and unpaid prepetition wages and salaries to their employees and approximately $137,000 to staffing agencies and 1099 contract workers.  In addition, the Debtors rely on a workforce management system known as PeopleMatter (the "Onboarding System") for recruitment, hiring, onboarding, and training of the Employees.  The Debtors pay approximately $8,800 per month for the Onboarding System, which is paid in advance.  Because the Debtors already paid in advance for FY2018 in December 2017, as of the Petition Date, the Debtors do not owe any amounts for the Onboarding System for services rendered prepetition.

72.     I believe that, when Employee Compensation Obligations are combined with the other Prepetition Employee Obligations currently owed to or for the benefit of the Debtors' employees, exclusive of Payroll Taxes and Deductions, and PTO, no individual

employee is owed more than $12,850.

73.      In addition to the Employee Compensation Obligations discussed above, the Debtors offer employees a number of Employee Benefit Programs.  These Employee Benefit Programs include medical plans, disability coverage plans, workers compensation plans, life and accidental death and dismemberment plans, optional employee-funded coverage plans, a 401(k) plan, and vacation and leave policies.  The Debtors utilize the services of various third-party administrators, including PlanSource Benefits Administration, Inc., Gallagher Bassett Services, Inc., and Standard Security, in connection with the Employee Benefit Programs.

74.      The Debtors also provide additional Employee Compensation and Benefits to certain eligible employees, including a car allowance program, a legal services plan, and complimentary meal and meal discount programs.  All of the Employee Compensation and Benefits, including the Debtors' estimated prepetition Employee Compensation Obligations with respect thereto, are described in further detail in the Wages Motion.

75.      I believe that payment of the Prepetition Employee Obligations as described in the Wages Motion enhances the value of the Debtors' estates for the benefit of all parties in interest.  I also believe that any delay in paying any such Employee Compensation and Benefits could severely disrupt the Debtors' relationship with their employees and risk substantial disruption of the Debtors' business operations at a critical time in the Debtors' restructuring efforts.

76.      I believe it is critical that the Debtors obtain the authority to pay the Prepetition Employee Obligations and to continue to honor and pay Employee Compensation and Benefits, in order to ensure the uninterrupted operation of the Debtors' business, prevent undue harm to the Debtors' employees, and maximize the value of the Debtors' estates.

77.      I further believe that failure to honor and pay Employee Compensation and Benefits may impair employees' morale, dedication, confidence and cooperation to the detriment of the Debtors' restructuring efforts.  At this early stage in the Chapter 11 Cases, I do not believe that the Debtors can risk the substantial damage to their businesses that could attend

any decline in their employees' morale attributable to the Debtors' failure to pay the Prepetition

Employee Obligations or maintain Employee Compensation and Benefits. The Debtors also

face a risk of attrition of key employees if they are unable to honor prepetition obligations and

continue paying compensation and funding employee programs postpetition. Absent assurances

that such employees will continue to be compensated in the ordinary course, the Debtors'

employees may seek opportunities elsewhere, including at competitors of the Debtors. The

Debtors' employees are critical to the Company's business model and operations and provide

valuable services to and on behalf of the Debtors. Losing valuable employees at this stage of

the Debtors' restructuring efforts would have a direct and negative impact on the Debtors'

abilities to sustain operations and maintain revenues.

F.    **Debtors' Motion For Order:  (I) Authorizing Debtors To Remit And Pay Prepetition Sales, Use, And Franchise Taxes And Certain Other Government Fees And Charges; And (II) Authorizing Banks And Other Financial Institutions To Receive, Process, Honor, And Pay Checks Issued And Electronic Payment Requests Made Relating To The Foregoing (the "Taxes Motion")**

78.    In the ordinary course of business, the Debtors (i) collect, withhold, and

incur various taxes such as sales, use, liquor, property, payroll, income, and other taxes

necessary to operate their businesses (collectively, the "Taxes"), and (ii) pay certain business

and regulatory fees, including but not limited to liquor license fees, health permits, and business

license fees (the "Fees" and collectively, the "Taxes and Fees"). The Debtors are required to

remit the Taxes and Fees to various governmental entities (the "Taxing Authorities"), including

those identified in Exhibit C to the Tax Motion, in accordance with applicable law. Although

the Debtors believe that they are substantially current on all of the Taxes that have become due

as of the Petition Date, because many such Taxes and Fees are paid on a periodic basis, there is

in many instances a lag between the time when the Debtors incur an obligation to pay the Taxes

and Fees and the date such Taxes and Fees become due and payable. The principal categories

of these Taxes and Fees, as well as the estimated accrued and unpaid amounts with respect to

such Taxes and Fees as of the Petition Date, are described in greater detail in the Tax Motion.

79.     The amounts of the Taxes and Fees listed in the Tax Motion are good faith estimates based on the Debtors' books and records and remain subject to potential audits and other adjustments.  Although the estimates of outstanding Taxes are based on a good-faith assessment of the existing amounts due on a prepetition basis, there is a possibility—because of audit rights—that one or more of the various Taxing Authorities may determine at a later date that the Debtors owe additional prepetition Taxes and Fees.

80.     I believe that the relief requested in the Tax Motion represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of the resources and going-concern values of their estates.  I am informed that the Debtors' failure to pay the prepetition Taxes as they come due may ultimately increase the amount of priority claims held by the Taxing Authorities against the Debtors' estates to the detriment of the Debtors' general unsecured creditors.  I further believe that payment of the prepetition Taxes is critical to the Debtors' uninterrupted operations.  I am informed that nonpayment of these obligations may also cause certain Taxing Authorities to take precipitous actions, including, but not limited to, initiating audits, preventing the Debtors from conducting business in applicable jurisdictions, seeking to modify the automatic stay, attempting to file liens against the Debtors' real and personal property, and/or pursuing other remedies, all of which would disrupt the Debtors' day-to-day operations, hinder the Debtors' efficient and effective administration of the Chapter 11 Cases, and burden the Debtors' estates with unnecessary expenses.

81.     I am informed that certain of the Debtors' managers and officers might also be subject to lawsuits alleging personal liability – even if the nonpayment of Taxes was not a result of any malfeasance on their part – which I believe would distract such key personnel from their duties related to the Debtors' restructuring.

G.    **Debtors' Motion For Order Authorizing: (I) Payment Of Prepetition Obligations Incurred In The Ordinary Course Of Business In Connection With Workers' Compensation, Liability, Property, And Other Insurance Programs, Including Payment Of Policy Premiums; And (II) Continuation Of Insurance Premium Financing Programs (the "<u>Insurance Motion</u>")**

82.    Prior to the Petition Date, the Debtors maintained, through several different Insurance Carriers, Insurance Policies, including those identified in Exhibit C[5] to the Insurance Motion. The Insurance Policies provide the Debtors with insurance coverage for liabilities relating to, among other things, general liability (including excess liability), directors' and officers' liability, liquor liability (including excess liability), automobile liability (including excess liability), workers' compensation and employers' liability (including excess liability), trade name restoration, franchisors' errors and omissions coverage, crime liability, and various other property-related and general liabilities.  The aggregate amount of annual premiums on account of all of the current Insurance Policies is approximately $1.0 million.  The Debtors also incur amounts for other related obligations, including financing fees under a Premium Financing Agreement ("<u>PFA</u>"), fees paid to an insurance broker (the "<u>Brokerage Fees</u>"), and fees paid to a third party to administer claims (the "<u>Third-Party Administrator Fees</u>").  As detailed more fully in the Insurance Motion, certain of the Insurance Policies are supported by letters of credit provided by the Debtors.

83.    In the ordinary course of the Debtors' business, the Debtors finance the premiums on certain of the Insurance Policies pursuant to a PFA, attached to the Insurance Motion as Exhibit D, with a third-party lender, Prime Rate Premium Finance of California, Inc. The obligations under the PFA are secured by the unearned or return premiums and dividends under the policies.  The PFA is used to finance premiums in the aggregate amount of $999,261.23.  The payment system under the PFA, including down payments and monthly

---

[5] In addition to the Insurance Programs listed on <u>Exhibit A</u> of the Insurance Motion, the Debtors maintain several other insurance policies and programs with respect to employee benefits, including health, dental, disability, and life insurance.  These programs and policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employee wage policies and benefit programs.

finance charges, is described in greater detail in the Insurance Motion.  The Debtors believe that, as of the Petition Date, the Debtors owe approximately $450,000 under the PFA.

84.    The Debtors obtain their Insurance Policies through an insurance broker, BB&T Insurance Services, Inc. (the "Insurance Broker").  The Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing risk management services.  The Debtors pay Brokerage Fees to the Insurance Broker in the amount of $200,000, the cost of which is incorporated in the total amount of the PFA.  As of the Petition Date, the Debtors believe they owe approximately $125,000 to the Insurance Broker on account of Brokerage Fees.

85.    The Debtors utilize the services of Gallagher Basset Services, Inc. (the "Third-Party Administrator") to administer certain general liability and workers' compensation claims that are less than the deductible amount under certain of the Debtors' Insurance Policies. As discussed in the Insurance Motion, the Third-Party Administrator administers claims under the Debtors' previous insurance policies.  The Third-Party Administrator is paid monthly fees for its services in the approximate amount of $40,000, as well as per claim fees.  As part of the claims administration process, the Debtors, on a weekly basis, fund an account from which the Third-Party Administrator draws to administer claims.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of Third-Party Administrator Fees for claims and services rendered.

86.    I believe that continuation of the Insurance Policies and entry into new insurance policies when necessary is essential to the operation of the Debtors' businesses and is necessary to protect the Debtors from potential liability.  Furthermore, I have been advised that, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  I believe that, because the Debtors are required by the U.S. Trustee and the Debtors' customers, among others,

to maintain insurance coverage during their Chapter 11 Cases, the cancellation of these policies would have significant negative consequences for the Debtors.

H.    **Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business (the "Customer Programs Motion")**

87.    The Debtors are seeking an order authorizing, but not directing, the Debtors to continue, maintain, implement new and/or modify, their customer programs, promotions, and practices in the ordinary course of business consistent with past practice. These include the following:  (i) prepaid gift cards sold directly by the Debtors and indirectly through one or more third-parties (the "Gift Cards"); (ii) various coupons, discounts, promotions and similar policies, programs, and practices of the Debtors (collectively, the "Promotions") and (iii) refunds to guests that have a bad experience at one of the Debtors' locations (the "Customer Refunds").  On account of the Customer Programs, the Debtors may owe certain obligations to their customers as well as other third parties, arising both before and after the Petition Date (collectively, the "Customer Obligations").

88.    The Debtors and their affiliates have developed the Customer Programs to access new customers, build brand loyalty, and take advantage of special sales opportunities. Honoring the Customer Programs will help to ensure the continued patronage of their customers, which is imperative to the ongoing operations and viability of Debtors' business.  If the Debtors are unable to continue their Customer Programs post-petition or satisfy Customer Obligations, the Debtors risk losing revenue, customer loyalty, and goodwill that will harm their prospects for reorganization and/or for maximizing value.

89.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

I.      **Debtors' Motion For Interim And Final Orders:  (I) Prohibiting Utilities From Discontinuing, Altering Or Refusing Service; (II) Establishing Procedures For Determining Adequate Assurances Of Payment; And (III) Establishing Procedures For Utilities To Opt Out Of Proposed Adequate Assurance Procedures (the "Utilities Motion")**

90.     To operate their businesses and manage their properties, the Debtors incur utility expenses for natural gas, electricity, water, sewage, waste management, local and long-distance telecommunications, data, recycling, and other similar services (collectively, the "Utility Services").  These services are provided by approximately 113 Utility Providers, with which one or more of the Debtors may have multiple accounts.  A non-exhaustive list of the Utility Providers is attached to the Utilities Motion as Exhibit C.  The Debtors spend an aggregate amount of approximately $716,000 each month on Utility Services from the Utility Providers listed on the Utility Services List.  I believe the Utility Services List is substantially complete.

91.     To manage the Utility Services at their many locations, the Debtors contract with Engie Insight Services, Inc. ("Engie") a third-party processor.  Engie manages the Debtors' accounts for almost all of the Utility Providers, including managing the Utility Services, reviewing bills for the Utility Services, paying bills for the Utility Services as an agent for the company (after receiving funds from the Debtors for such payments), establishing new Utility Services, terminating Utility Services for closing locations and providing accounting information to the Debtors with respect to the Utility Services managed by Engie.  Although the Debtors contract directly with the Utility Providers, invoices from the Utility Providers are directed to Engie, which then reconciles and consolidates the invoices, submits them to the Debtors with a request for funding and a payment date (via a consolidated daily invoice), and then disburses the funds from the Debtors to the Utility Providers.  Engie charges the Debtors a monthly fee for such services based on the volume of activity with respect to the Debtors' accounts, approximately $4,000 per month.  The Debtors believe that, as of the Petition Date, the Debtors owe approximately $22,000 to Engie for prepetition accrued but unpaid service and administrative fees.  The services provided by Engie are integral to the Debtors' operations.

92.     I believe that uninterrupted Utility Services are essential to the Debtors'

ongoing operations, and, therefore, to the success of the Debtors' reorganization efforts.

Indeed, I believe that any disruption in utility services—even for a brief period of time—would

seriously disrupt the Debtors' continued operations.  The Debtors operate a complex business

with operations in numerous states that depend on the reliable delivery of power and other

Utility Services.  Should any Utility Provider refuse or discontinue service even for a brief

period, I believe the Debtors' operations could be severely disrupted.  In addition to interrupting

restaurant operations and risking the safety of patrons, such a disruption could negatively

impact the Debtors' revenue and could jeopardize the Debtors' sale efforts and, ultimately,

creditors' recoveries.

**J.      Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay (a) Prepetition Claims of Certain Lien Claimants and (b) Section 503(b)(9) Claims (the "Lien Claimants/503(b)(9) Motion")**

93.     The Debtors are seeking an order authorizing, but not directing, the

Debtors to pay (a) prepetition claims which may be supported by a mechanic's, artisan's,

materialman's, or similar lien and (b) claims entitled to administrative priority under section

503(b)(9) of the Bankruptcy Code, in the ordinary course of business.

94.     The Debtors maintain the flow of goods into their restaurants by relying

on suppliers.  Although the majority of suppliers deliver goods directly to the Debtors'

restaurants, some suppliers use third-party transporters (collectively, the "Shippers") to deliver

goods to the Debtors' restaurants.

95.     If the Debtors fail to reimburse the Shippers for charges incurred in

connection with the transport of goods, various state laws would permit the Shippers to assert

statutory liens against the goods in their possession and the subject of any delinquent charges,

which would secure such charges but also potentially block the Debtors' access to the goods.

To maintain access to and preserve the value of goods essential to the continued viability of the

Debtors' operations, the Debtors seek authority to pay any amounts that may be owed to such

Shippers in connection with Lien Claims (as defined below) (the "Shipping Claims").

96.     In the ordinary course of business, the Debtors engage a number of third-party mechanics and other service providers (the "Third-Party Lien Claimants") to repair, maintain, and improve the Debtors' store front and restaurant premises.

97.     The Third-Party Lien Claimants may be entitled under applicable non-bankruptcy law to assert liens, including mechanic's liens, artisan's liens and materialman's liens against the Debtors' property (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  If the Debtors are unable to pay Third-Party Lien Claims, they risk losing access to facilities and equipment that are critical to the continued operation of their businesses, which could immediately and irreparably harm their businesses to the detriment of all stakeholders.  The Debtors seek authority to pay any amounts that may be owed to such Third-Party Lien Claimants in connection with Lien Claims (the "Third Party Lien Claims," and together with Shipping Claims, "Lien Claims"), provided that such amounts shall not exceed, in the aggregate, $2.2 million.

98.     In the ordinary course of business, the Debtors rely on various vendors to provide them with goods, including restaurant specialty items and food products on a daily basis.  Certain of these vendors will be entitled to claims with administrative expense priority under section 503(b)(9) of the Bankruptcy Code to the extent that the Debtors received such goods within the twenty-day period prior to the Petition Date (the "503(b)(9) Claims" and, the holders of such claims, "503(b)(9) Vendors").

99.     To the extent that the Debtors do determine, in their business judgment, to satisfy all or a portion of the 503(b)(9) Claims, the Debtors will seek to condition payment of such claims on the agreement of the applicable 503(b)(9) Vendor to continue supplying goods to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the 503(b)(9) Vendor and the Debtors in the twelve (12) months prior to the Petition Date (collectively, the "Customary Trade Terms"), or

such other trade terms as are agreed to by the Debtors and the 503(b)(9) Vendor.  The Debtors believe that this will allow the Debtors to maintain favorable terms with some of their most important vendors, which will benefit the Debtors, their estates and stakeholders.  In total, the Debtors seek authority to, in their discretion, pay or otherwise honor or satisfy the 503(b)(9) Claims in an amount not to exceed $5.5 million.

100.    I am advised by counsel that the Debtors must satisfy the 503(b)(9) Claims in full if they are to confirm a chapter 11 plan and, as such, the proposed payment of the 503(b)(9) Claims would affect only the timing of such payments, and not the amount to be received by the 503(b)(9) Vendors on account of such claims.  Accordingly, the Debtors believe that the relief sought is in the best interest of the Debtors, their estates and creditors, and the motion should, therefore, be approved.

K.    **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Claims Arising Under (a) the Perishable Agricultural Commodities Act, (b) the Packers and Stockyards Act, and (c) Any State Statutes of Similar Effect (the "PACA/PASA Motion")**

101.    In the ordinary course, the Debtors purchase a variety of consumable goods essential for the operations of their restaurants.  The Debtors believe that a certain portion of these goods supplied to their restaurants may qualify as "perishable agricultural commodit[ies]" under PACA.  The definition of "perishable agricultural commodity" under PACA generally includes "[f]resh fruits and fresh vegetables of every kind and character [whether or not frozen or packed in ice]." 7 U.S.C § 499a(b)(4).  I am advised that, under PACA, eligible produce suppliers and their agents (the "PACA Vendors") are the beneficiaries of a statutory trust (the "PACA Trust") in all of the buyer's perishable agricultural commodity inventory or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets").  See 7 U.S.C. § 499e(c)(2).  It is my understanding that PACA Trust Assets are preserved as a non-segregated floating trust and may be commingled with non-trust assets, and are not property of a debtor's estate.

102.    Similarly, certain of the Debtors' suppliers (the "PASA Vendors" and, together with the PACA Claimants, the "PACA/PASA Vendors") may be eligible to assert claims under PASA, which prescribes the conditions of operations for businesses dealing in livestock and poultry.  PASA creates a statutory trust (the "PASA Trust" and, together with the PACA Trust, the "PACA/PASA Trusts") scheme, which is virtually identical to the PACA Trust in respect of delivery of livestock, meat products and related products, products derived therefrom and the proceeds related to the sale of such commodities or products.

103.    PACA/PASA Vendors may be eligible to assert claims under the respective statutes for outstanding payments owed by the Debtors on account of applicable goods (collectively, the "PACA/PASA Claims").  In particular, the Debtors estimate that, as of the Petition Date, PACA/PASA Vendors hold approximately $900,000 in unpaid PACA/PASA Claims.  Because the PACA/PASA Vendors may impose a PACA/PASA Trust on certain of the goods and thereby obtain priority ahead of all other secured and unsecured creditors of the Debtors' estates, it is my understanding that the Debtors' payment of valid PACA/PASA Claims will not prejudice or affect the amount of recoveries available to other creditors.

104.    In addition, many PACA/PASA Vendors may also be entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods in the ordinary course of business within the twenty-day period immediately prior to the Petition Date.

105.    The Debtors seek authority to, in their discretion, pay or otherwise satisfy all valid PACA/PASA Claims in the ordinary course of business in an aggregate amount not to exceed $900,000.

Dated:  August 5, 2018

Atlanta, Georgia

Respectfully submitted,

_____

Jonathan Tibus
Chief Restructuring Officer
RM Holdco LLC

ACTIVE 232897048

**EXHIBIT I**

# Real Mex Restaurants Legal Entity Organizational Chart

