**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RM Holdco LLC, et al.[1] | Case No. 18-11795 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE APA AND APPROVING CERTAIN BID PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO OMIT CERTAIN CONFIDENTIAL SCHEDULES FROM THE STALKING HORSE APA, (C) AUTHORIZING AND APPROVING BIDDING PROCEDURES, (D) SCHEDULING AN AUCTION AND SALE APPROVAL HEARING, (E) APPROVING THE FORM AND MANNER OF THE NOTICE OF THE SALE HEARING, (F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (G) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors"), submit this motion (the "Motion") for (i) entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"), (a) authorizing and approving the Debtors' entry into that certain Asset Purchase Agreement dated August 5, 2018 (the "Stalking Horse APA"), substantially in the form attached to the Bid Procedures Order as Exhibit 1, by and between the Debtors and FM Restaurants (PT), LLC (the "Stalking Horse Bidder") and approving certain bid protections (the "Stalking Horse Bid Protections") in connection with the sale (the "Sale") of substantially all of the Debtors' assets

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RM Holdco LLC (6847); RM Opco LLC (7122); RM HQ LLC (8615); RM Chevys LLC (N/A); RM Acapulco LLC (N/A); and RM El Torito LLC (N/A). The Debtors' headquarters and mailing address is 5660 Katella Avenue, Suite 200, Cypress, CA 90630.

(collectively, the "Assets"); (b) authorizing the Debtors to omit certain confidential schedules (the "Confidential Schedules") contained in the Stalking Horse APA; (c) authorizing and approving bidding procedures (the "Bidding Procedures"), substantially in the form attached to the Bid Procedures Order as Exhibit 2; (d) scheduling an auction (the "Auction") of the Assets and a hearing (the "Sale Hearing") to consider approval of the Sale; (e) approving the form and manner of notice of the Sale (the "Sale Notice"), substantially in the form attached to the Bid Procedures Order as Exhibit 3; (f) approving certain procedures (the "Assumption and Assignment Procedures") related to the assumption and assignment of certain executory contracts and unexpired leases and the form and manner of notice of assumption and assignment and related cure amounts (the "Assumption and Assignment Notice"), substantially in the form attached to the Bid Procedures Order as Exhibit 4; and (g) granting related relief; and (ii) entry of an order (the "Sale Order"),[2] (a) authorizing and approving the Sale of the Assets free and clear of any and all claims, liens, interests, and encumbrances, except for the Assumed Liabilities (as defined in the Stalking Horse APA); (b) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting related relief. The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of Jonathan Tibus in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[3] and the Stratton Declaration (as defined below).[4]  In further support of this Motion, the Debtors respectfully state as follows:

---

[2] On or before 21 days before the Sale Hearing, the Debtors shall file a proposed form of Sale Order.

[3] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the First Day Declaration.

01:23488599.1

## STATUS OF THE CASE AND JURISDICTION

1.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").   Concurrently with the filing of this Motion, the Debtors have requested joint administration and procedural consolidation of these chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No party has requested the appointment of a trustee or examiner in the Chapter 11 Cases, and no statutory committee has been appointed.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   The Debtors consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in

---

[4] In further support of the Motion, the Debtors submit the *Declaration of Teri Stratton in Support of the Debtors' Motion For Entry of (i) an Order (a) Authorizing and Approving the Debtors' Entry Into the Stalking Horse APA and Approving Certain Bid Protections Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (b) Authorizing the Debtors to Omit Certain Confidential Schedules From the Stalking Horse APA, (c) Authorizing and Approving Bidding Procedures, (d) Scheduling an Auction and Sale Approval Hearing, (e) Approving the Form and Manner of the Notice of the Sale Hearing, (f) Approving Assumption and Assignment Procedures, and (g) Granting Related Relief, and (ii) an Order (a) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (b) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (c) Granting Related Relief* attached hereto as Exhibit B (the "Stratton Declaration").

connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.        The statutory and other predicates for the relief requested herein are sections 105(a), 107(b), 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1.

## BACKGROUND OF THE DEBTORS

6.        The events leading up to the Petition Date and additional facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration, which is incorporated by reference herein.

## RELIEF REQUESTED

7.        By this Motion, the Debtors request entry of (i) the Bidding Procedures Order (a) authorizing and approving the Debtors' entry into the Stalking Horse APA and approving the Stalking Horse Bid Protections; (b) authorizing the Debtors to omit the Confidential Schedules from the Stalking Horse APA; (c) authorizing and approving the Bidding Procedures; (d) scheduling the Auction and Sale Hearing; (e) approving the Sale Notice; (f) approving the Assumption and Assignment Procedures and the Assumption and Assignment Notice; and (g) granting related relief; and (ii) the Sale Order (a) authorizing and approving the Sale of the Assets free and clear of any and all claims, liens, interests, and encumbrances, except for the Assumed Liabilities; (b) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting related relief.

I.      **The Debtors' Prepetition Marketing Efforts Leading to the Stalking Horse APA**

8.      As explained in the First Day Declaration, in December 2017, the Debtors began exploring their strategic options in light of the looming maturity of their secured debt and the fact that a number of their restaurants were performing poorly, thus dragging down the Debtors' overall operating performance.  In January 2018, the Debtors retained investment banker Piper Jaffray & Co. ("PJC") to evaluate their operations and present strategic alternatives to Holdco's Board of Managers (the "Board").

9.      After analyzing their strategic alternatives with their legal and investment banking advisors, the Debtors determined that the best course of action to preserve operations and maximize value would be to pursue an out-of-court marketing process for the business, which, depending upon bidder interest, would be effectuated through a bankruptcy filing and sale pursuant to  section 363 of the Bankruptcy Code.  The Debtors tasked PJC with marketing their assets and PJC prepared numerous marketing materials and began marketing the Debtors' assets in April 2018 (the "Prepetition Marketing Process").  Through the Prepetition Marketing Process, PJC contacted two hundred eleven (211) potential strategic and financial investors.  Of that number, fifty (50) signed non-disclosure agreements and were provided with a confidential information memorandum prepared by PJC and management.

10.     Beginning in mid-May 2018, the Debtors received written, initial indications of interest ("IOI") from four (4) potential bidders.  These parties were granted access to a virtual data room containing extensive due diligence information and invited to conduct calls and/or attend meetings with management.  After continued marketing efforts, the Debtors and PJC identified and provided access to another possible bidder who, along with two of the parties who

01:23488599.1

had submitted IOIs, submitted a markup of an asset purchase agreement to acquire up to substantially all of the Debtors' assets through a stalking horse bid in a section 363 sale.[5]

11.    Given the intensity of the sale process and the need to ensure that management had sufficient resources to respond to bidder inquiries while operating the business, the Debtors retained Alvarez & Marsal North America, LLC ("A&M") in July 2018 to provide restructuring and interim management services, principally through Jonathan Tibus, who became the Debtors' Chief Restructuring Officer ("CRO").  The due diligence and preliminary negotiation process then continued through the efforts of PJC, A&M and management.

12.    Before the Board determined which of the bidders had submitted the highest or otherwise best stalking horse bid, Z Capital Group ("Z Capital"), through counsel, announced its intention to participate in the stalking horse process as a potential bidder, and submitted a markup of the Debtors' draft asset purchase agreement and a formal letter of intent.  Upon that submission, the two members of the Board designated and compensated by Z Capital recused themselves from any further participation in the process of evaluating the stalking horse bids.  Bryan Lockwood, the Debtors' Chief Executive Officer and a member of the Board, also recused himself from decisions regarding the stalking horse selection because two of the bidders had expressed a potential interest in employing him post-closing.

13.    Upon submission of Z Capital's bid, the Debtors further evaluated the then-four (4) offers they had received.  Each proposed to purchase the Assets.  Of the parties who had submitted mark-ups of the Debtors' APA, three (3) offered substantial cash consideration for the Debtors' business and one (1) proposed to finance the acquisition with a note issued by the purchaser.  The Debtors and their advisors proceeded with vigorous, arms-length negotiations

---

[5] Two of the initial participants declined to submit a markup of the draft asset purchase agreement circulated by PJC.

01:23488599.1

with the three parties offering substantial cash consideration, and kept the disinterested subset of the Board apprised of the negotiations. On July 20, 2018, the Debtors and their advisors conducted a live, telephonic auction for the position of stalking horse bidder (the "Stalking Horse Auction"), in which two of the three potential bidders chose to participate. The Stalking Horse Auction resulted in a bid offering a headline purchase price of $46.75 Million, representing an increase in purchase price of $8.75 Million, or 23%, over the highest opening round bid. That bid was submitted by Z Capital.

14.     After evaluating several factors, including cash provided to the estates, contingencies to closing, assumption of liabilities, and other benefits inuring to the Debtors' estates, the Debtors' advisors ultimately concluded that Z Capital had submitted a superior stalking horse bid. The Debtors' advisors concluded that Z Capital's bid was superior because it offered an additional $2 Million in cash consideration over what was offered by the next highest bidder, was otherwise reasonably comparable in terms to the alternative proposal, and offered a consensual path forward for debtor-in-possession financing ("DIP Financing") and use of cash collateral. The Debtors' advisors presented the results of the Stalking Horse Auction to the disinterested subset of the Board, which directed the advisors to proceed with negotiating asset purchase and DIP Financing documentation with Z Capital, as stalking horse bidder and joint DIP Financing lender with TCP.

15.     After continued extensive, arms-length negotiations on both the asset purchase documentation and the DIP Documentation, the Debtors determined that the Stalking Horse APA represented the highest or otherwise best bid, based on their business judgment, as informed by their advisors. On August 5, 2018 the Debtors entered into the Stalking Horse APA and that

certain DIP Financing and Guaranty Agreement, dated as of August 5, 2018, by and among the Sellers, the lenders party thereto and the DIP Agent (the "DIP Facility").

16.     Notwithstanding the substantial increase in purchase price already achieved through the prepetition marketing process, the Debtors are committed to obtaining the highest or otherwise best bid they can for the Assets.  Accordingly, PJC will continue to market the Assets postpetition for sale to potential purchasers other than the Stalking Horse Bidder and solicit Qualified Bids from Qualified Bidders.  The Debtors expect PJC's marketing process to result in competing bids submitted on or before the proposed September 21, 2018 Bid Deadline.  The Debtors believe, based on consultations with PJC, that the marketing period, which will have spanned approximately seventeen (17) weeks prepetition and approximately seven (7) weeks during the Chapter 11 Cases, is a reasonable and sufficient period to solicit bids on the Assets given the current market.  The Debtors also believe that the marketing efforts will be sufficient to ensure the highest or otherwise best offer, particularly in light of the Debtors' limited financing options and ongoing cash needs.

## II.     Need for a Timely Sale Process

17.     As part of the sale process, the Debtors and the Debtors' proposed DIP Lenders have agreed on certain case milestones (the "Milestones") to achieve three goals: (i) maximize the value of the Assets, (ii) preserve ongoing operations, and (iii) ensure that the Chapter 11 Cases proceed in a manner that is as efficient and cost-effective as possible.  Specifically, the Debtors and their proposed DIP Lenders have agreed to the following Milestones:

> a.  No later than thirty-three (33) calendar days after the Petition Date, the Debtors will obtain Court approval of the Bidding Procedures, pursuant to the Bidding Procedures Order;
>
> b.  To the extent required pursuant to the Bidding Procedures, no later than sixty-three (63) calendar days after the Petition date, the Debtors will conduct, subject

to the supervision of the Court and in accordance with the Bidding Procedures, the Auction;

c.   No later than ten (10) calendar days after the completion of the Auction (or, if there is no Auction, no later than seventy-three (73) calendar days after the Petition date), the Debtors will obtain approval of the Sale to one or more buyers on the terms of the Successful Bid pursuant to the Sale Order; and

d.   No later than the date that is the earlier of (i) sixty (60) days after entry of the Sale Order or (ii) December 15, 2018, the Debtors will consummate the Sale.

18.     Failure to adhere to the Milestones could jeopardize the closing of a Sale, which the Debtors believe is the best value-maximizing alternative for all of their creditor constituencies and other stakeholders.  Indeed, given that the Debtors have limited cash and no realistic financing option other than the DIP Facility, which itself depends on the Sale process moving forward as proposed, the only realistic alternative to a Sale would be a conversion of these Chapter 11 Cases to chapter 7 and a piecemeal liquidation of the Debtors' Assets, which would result in dramatically lower value to the Debtors' stakeholders, in addition to a loss of their operating business and a loss of more than four thousand five hundred (4,500) employees' jobs.  In light of the foregoing, the Debtors believe that the proposed timeline is both reasonable and necessary under the circumstances of these Chapter 11 Cases.  Indeed, the proposed timeline is consistent with (and exceeds many) sale timelines approved under similar circumstances.  See, e.g., In re Sungevity, Inc., No. 17-10561 (KG) (D.I. 142) (Bankr. D. Del. March 31, 2017) (approving auction date set thirty (30) days after petition date); In re Bertucci Holdings, Inc., No. 18-10894 (MFW) (D.I. 182) (Bankr. D. Del. May 7, 2018) (approving auction date set fifty (50) days after petition date); In re Central Grocers, Inc., No. 17-10993 (LSS) (D.I. 338) (Bankr. D. Del. May 13, 2017) (approving auction date set fifty-six (56) days after petition date).

III.    **The Stalking Horse APA**

19.    The Stalking Horse Bidder has agreed to purchase substantially all of the Assets and to assume certain liabilities and obligations (the "Assumed Liabilities") for a cash bid of $46.75 Million as the Base Purchase Price.  By this Motion, the Debtors request authority to provide the Stalking Horse Bidder with bid protections.  Specifically, the Stalking Horse APA provides for the payment of a break-up fee in an amount equal to $1,402,500, or three percent (3%) of the Stalking Horse Bidder's Base Purchase Price (the "Break-Up Fee").

20.    The following chart summarizes key provisions and aspects of the Stalking Horse APA, as well as any provisions required to be highlighted pursuant to Local Rule 6004-1.[6]

| MATERIAL TERMS OF THE STALKING HORSE APA | |
| --- | --- |
| **Sale to Insider**<br>Local Rule 6004-1(b)(iv)(A) | The proposed sale is to an insider, as defined in section 101(31) of the Bankruptcy Code.<br>• The insider is an affiliate of Z Capital.<br>• Z Capital is one of the two principal owners of the Debtors; Z Capital also appointed two managers of the Board, including the Chairman of the Board (who exercises two votes).<br>• Neither Z Capital nor any of its affiliates shall be a Consultation Party (as defined in the Bidding Procedures) while being a Bidder.  See Bidding Procedures Part 4 (Due Diligence). |
| **Agreements with Management**<br>Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Bidder has not entered into any understanding, agreement or arrangement with any member of Management, but has agreed to assume liabilities under that certain RM Opco LLC Retention Plan dated and effective as of February 21, 2018 (the "KERP"), to the extent approved by the Bankruptcy Court in the Bankruptcy Cases.  The amounts payable by the Sellers pursuant to KERP shall not exceed $775,000 in the aggregate.  See Stalking Horse APA § 1.1, 2.3(o). |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | None. |
| **Private Sale/No Competitive Bidding**<br>Local Bankr. R. | If the Debtors receive a Qualified Bid (as defined in the Bidding Procedures) other than the Stalking Horse APA, the Debtors will conduct an open public Auction in connection with the Sale. |

---

[6] The description of the Stalking Horse APA is intended as a summary only.  To the extent that there is any discrepancy between this summary and the Stalking Horse APA, the terms of the Stalking Horse APA shall govern. Capitalized terms used but not otherwise defined in connection with this summary shall have the meanings ascribed to such terms in the Stalking Horse APA.

01:23488599.1

| | |
|---|---|
| 6004-1(b)(iv)(D) | Only the Stalking Horse Bidder and any other Qualified Bidder(s) (or their duly-authorized representatives) (collectively, the "Auction Participants") are eligible to submit Bids at the Auction.<br><br>The Stalking Horse APA and the transactions contemplated thereby are subject to the Sellers' right and ability to consider higher or otherwise better competing bids with respect to the Business and the Purchased Assets pursuant to the Bid Procedures, as approved by the Bid Procedures Order. See Bidding Procedures Part 8 (Auction). |
| **Closing and Other Deadlines**<br>Local Rule 6004-1(b)(iv)(E) | The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II of the Stalking Horse APA hereof (the "Closing") shall take place via electronic exchange of closing documents and signature pages on the date that is no less than one (1) Business Day and no greater than three (3) Business Days after the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 of the Stalking Horse APA (or the waiver of any condition by the Party entitled to waive that condition), as such date may be determined by Purchaser in its sole discretion. The date on which the Closing shall be held is referred to in the Stalking Horse APA as the "Closing Date." Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of the Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (Pacific time) on the Closing Date.<br><br>Either the Purchaser or the Sellers may terminate the Stalking Horse APA if the Closing shall not have occurred by the close of business on the date that is the earlier of (i) sixty (60) days after the date on which the Sale Order is entered and (ii) December 15, 2018 (such date, the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to an inaccuracy or breach of any of representations, warranties, covenants or agreements contained in the Stalking Horse APA by Purchaser or the Sellers to an extent which would give the other party a right not to close pursuant to Article X of the Stalking Horse APA, then the breaching Party may not terminate the Stalking Horse APA Agreement pursuant to Section 4.4(a). See Stalking Horse APA § 4.4(a). |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | The Stalking Horse Bidder's Purchaser Deposit serves as the Stalking Horse Bidder's Good Faith Deposit (as defined in Bidding Procedures).<br><br>If a Successful Bidder fails (or Successful Bidders fail), or a Backup Bidder fails (or Backup Bidders fail) to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder(s) or Backup Bidder(s), as applicable, the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder(s) or Backup Bidder(s), as applicable, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors. See Bidding Procedures Part 11 (Return of Good Faith Deposit). |
| **Interim Arrangements with Proposed Buyer**<br>Local Rule 6004-1(b)(iv)(G) | None. |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | On the Closing Date, Purchaser shall pay in cash to the Sellers the sum of: (i) the Base Purchase Price, *plus* (ii) the Estimated Purchase Price Adjustment Amount, *less* (iii) the Deduction Amount, *less* (iv) the Purchaser Deposit (such amount, the "Closing Payment"). See Stalking Horse APA § 3.1(c). The Deduction Amount is defined as "the sum of (i) the Purchaser DIP Facility |

| | |
|---|---|
| | Deduction Amount *plus* (ii) the Purchaser Prepetition Secured Debt Deduction Amount." The Purchaser DIP Facility Deduction Amount is defined as "the amount of all obligations owing to Purchaser or any of its Affiliates under the DIP Facility and any DIP Order as of the Closing, including any unpaid principal, interest, fees, costs (including, but not limited to, professional fees and expenses), and any other amounts due and owing to Purchaser or any of its Affiliates under any DIP Order and the DIP Facility." The Purchaser Prepetition Secured Debt Deduction Amount is defined as "an amount equal to the portion of the Prepetition Secured Debt Cash Proceeds Amount that would be payable to Purchaser or its Affiliates on account of the Purchaser Prepetition Secured Debt (to the extent validated by the entry of a Final Order by the Bankruptcy Court prior to the Closing Date) if the Sellers were to distribute the Prepetition Secured Debt Cash Proceeds Amount to the Prepetition Lenders in accordance with the existing seniority and priority between the Prepetition Lenders under the Prepetition Financing Agreements." <u>See</u> Stalking Horse APA § 1.1. |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | None. |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | The Sellers and their successors and Purchaser agree that each of them shall preserve and keep the books and records held by them or their Affiliates relating to the Purchased Assets for a period of three (3) months from the Closing Date and during such period shall make such books and records as well as any of their respective employees available to the other (and such Party's respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of the Sellers or Purchaser any of their Affiliates or in order to enable any Party to comply with its obligations under the Stalking Horse APA, any Ancillary Agreement or the Bankruptcy Cases; <u>provided</u>, <u>however</u>, that Section 8.7 of the Stalking Horse APA shall not apply to any Seller upon liquidation of such Seller. Each Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall be entitled to inspect and make copies of any such books and records held by the other Party. In the event any Seller or Purchaser wishes to destroy such books and records or the Sellers move to convert the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, in each case, before or within three (3) months from the Closing Date, it shall first give 10 days' prior written notice to the other Party (and its respective successors and representatives appointed by the Bankruptcy Court, if any) and the other Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall have the right, at their option and expense, upon prior written notice within such 10-day period, to take possession of the records within 10 days after the date of such notice. <u>See</u> Stalking Horse APA § 8.7(a).<br><br>Access pursuant to Section 8.7(b) of the Stalking Horse APA shall be afforded by the party in possession of such records, upon receipt of reasonable advance notice, during normal business hours and at the expense of the party seeking such access; <u>provided</u>, <u>however</u>, that (i) any review of such records shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party, (ii) no party shall be required to take any action that would constitute a waiver of the attorney-client privilege, and (iii) no party shall be required to supply the other party with any information which such |

| | party is under a legal obligation not to supply. See Stalking Horse APA § 8.7(b). |
|---|---|
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | None. All avoidance actions are Excluded Assets and will not be sold by Debtors pursuant to the Stalking Horse APA. See Stalking Horse APA § 2.2(d). |
| **Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | The Debtors seek to sell the Acquired Assets to the Stalking Horse Bidder free and clear of all Liens, claims and encumbrances, including any claims of successor liability. See Stalking Horse APA § 2.1; see also Stalking Horse APA § 2.4. |
| **Sale Free and Clear of Unexpired Leases**<br>Local Rule 6004-1(b)(iv)(M) | None. Leases will be either assumed and assigned to Purchaser or rejected by Sellers. See Stalking Horse APA § 2.5. |
| **Credit Bid**<br>**Local Bankr. R.**<br>6004-1(b)(iv)(N) | Nothing herein shall be deemed to either limit or expand any rights of a Qualified Bidder with a valid and perfected lien on any of the Assets of the Debtors' estates (a "Secured Creditor"), if any, to credit bid all or a portion of such Secured Creditor's claim to the extent permitted under section 363(k) of the Bankruptcy Code. See Bidding Procedures Part 6 (Bid Requirements). |
| **Relief from**<br>**Bankruptcy Rule**<br>**6004(h)**<br>Local Bankr. R.<br>6004-1(b)(iv)(O) | The Debtors seek a waiver of the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d), as described in more detail below in this Motion. |
| **Bid**<br>**Protections to**<br>**Stalking Horse Bidder**<br>Local Rule 6004-1(c)(i)(C) | Subject to the approval of the Court, if the Stalking Horse APA is terminated pursuant to Section 4.4(g), the Stalking Horse Bidder shall be entitled to be paid an amount equal to $1,402,500, or three percent (3%) of the Base Purchase Price (the "Break-Up Fee") if the Sellers consummate an Alternative Transaction. The Break-Up Fee shall (to the extent payable pursuant to the preceding sentence) be paid by Sellers or the Successful Bidder to Purchaser within five (5) Business Days after the consummation of such Alternative Transaction. Except as provided in Section 4.8 of the Stalking Horse APA, Purchaser shall not be entitled to any portion of the Break-Up Fee. See Stalking Horse APA § 4.8. The Bid Protection shall constitute an allowed super-priority administrative expense claim against the Debtors' bankruptcy estates pursuant to sections 363, 503(b) and 507(a)(2) of the Bankruptcy Code, which such claims shall be junior only to the claims under the DIP Facility and the Carve-Out (as defined in the DIP Facility). The Bid Protection shall be secured by a super-priority lien in the Debtors' Assets, junior only to liens under the DIP Facility and Carve-Out (as defined in the DIP Facility), and deemed automatically perfected by entry of the Bidding Procedures Order. In addition, each Bid for substantially all of the Debtors' Assets must offer to the Debtors aggregate value in an amount, as determined by the Debtors, in their reasonable business judgment, that is greater than or equal to the sum of (i) the value offered under the Stalking Horse APA, *plus* (ii) the Bid Protection, *plus* (iii) $250,000 in cash. |

## IV.    The Bidding Procedures

### A.    Overview

21.    The Debtors believe that the Bid Procedures will promote a transparent, competitive, and expedient sale process.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that may produce the highest or otherwise best offer for the Assets on a schedule consistent with the Milestones, the deadlines under the Stalking Horse APA, and the Debtors' chapter 11 strategy.

22.    The following sets forth a summary of the key provisions of the Bidding Procedures, including those provisions required to be highlighted under Local Rule 6004-1:[7]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Qualification of Bidders and Qualified Bids** Local Rule 6004-1(c)(i)(A)-(B) | a.  **Due Diligence**. <br> 1.  Only Potential Bidders who sign a confidentiality agreement may be granted access to public and non-public information relating to the Debtors' Assets. Until the Bid Deadline (as defined below) the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors determine in their discretion to be reasonable and appropriate under the circumstances. <br> 2.  The Debtors shall not be obligated to, but may in their discretion, furnish any due diligence information after the Bid Deadline and until the conclusion of the Auction to any Potential Bidder who has submitted a Bid as of the Bid Deadline. <br> 3.  The Debtors, in consultation with the Consultation Parties, reserve the right not to provide due diligence access to any Potential Bidder that the Debtors conclude in their reasonable business judgment is not likely to become a Qualified Bidder. <br> 4.  The Debtors will not provide any due diligence materials after the Bid Deadline to any party who has failed to submit a Bid as of the Bid Deadline.  The Debtors shall provide the Stalking Horse Bidder with access to all material due diligence materials, management presentations, on-site inspections, and other information provided to any Potential Bidder that were not previously made available to the Stalking Horse Bidder as soon as reasonably practicable and in no event later than five (5) Business Days after the date the Debtors made such information available to any Potential Bidder. |

---

[7] This summary is qualified in its entirety by the Bidding Procedures.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meaning ascribed such term in the Bidding Procedures.  To the extent there are any conflicts or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

b.  **Bid Deadline**. September 21, 2018 at 4:00 p.m. (prevailing Eastern Time)

c.  **Qualified Bid Requirements**. To participate in the Auction, a Qualified Bidder (as defined below) other than the Stalking Horse Bidder must submit a Bid by the Bid Deadline that, as determined by the Debtors, satisfies each of the following conditions (unless such requirement is waived by the Debtors) (each such bid, a "Qualified Bid"):

1.  Written Submission of APA.  Each Bid must be in writing and include:  (i) a clean purchase agreement signed by the Bidder, accompanied by all exhibits and schedules contemplated by the purchase agreement and, to the extent required by the terms and conditions of the Bid, any ancillary agreements described in the purchase agreement with all exhibits and schedules thereto (each such purchase agreement, together with its exhibits, schedules, and ancillary agreements, if any, a "Modified Agreement"); (ii) a redline reflecting the Bidder's proposed changes to the Stalking Horse APA (including all exhibits and schedules thereto).  Each Modified Agreement and the Stalking Horse APA shall be a "Purchase Agreement" for purposes of the Bidding Procedures.

2.  Commitment to Close.  Each Bid must contain a written statement that the Bidder is willing to consummate and fund the Sale proposed in the Modified Agreement within two (2) Business Days after satisfaction of the conditions to closing, and in any event by the close of business on the date that is the earlier of (i) sixty (60) days after the date on which the Sale Order is entered and (ii) December 31, 2018 (the "Closing Deadline").

3.  Commitment to Serve as Backup Bidder.  Each Bid must contain a written statement that the Bidder will serve as the Backup Bidder.

4.  Assets to be Acquired.  Each Bid must identify with reasonable particularity the Assets be Purchased Assets and the Assets to be Excluded Assets.  The Bid may offer to purchase substantially all of the Assets or only a portion of the Assets; provided, however, that a Bid that offers to purchase only a portion of the Assets may only be a Qualified Bid to the extent that the value of such Bid, in combination with the value of other Bids for the remaining Assets, exceeds the Minimum Initial Overbid Amount (as defined below) applicable to Qualified Bids for substantially all of the Assets.  The Debtors, in consultation with the Consultation Parties, may waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Assets (other than the requirement that the value of any such Qualified Bid, in combination with the value of other Bids for Assets, exceeds the Minimum Initial Overbid Amount applicable to Qualified Bids for substantially all of the Assets).

5.  Executory Contracts and Leases to be Assumed.  Each Bid must identify with reasonable particularity the executory contracts and unexpired leases of the Debtors that the Bidder seeks to have the Debtors assume and assign to the Bidder; provided, however, that the Bid may provide for designation rights with respect to executory contracts and unexpired leases substantially similar to the designation rights to the extent set forth in the Stalking Horse APA.

6.  Irrevocable.  Each Bid must be irrevocable until (i) if such Bidder is designated as a Successful Bidder, the Closing of the Sale to such Bidder, and (ii) if such Bidder is designated as a Backup Bidder (as defined below), the earlier to occur of (A) five (5) days after the closing of the transaction(s) by which all of the Assets that were subject to the Backup Bid have been transferred to one or more Qualified Bidders at the closing of a Sale or Sales conducted pursuant to these Bidding Procedures or (B) the Closing Deadline (the "Backup Bid Closing Deadline").  Notwithstanding anything to the contrary in these Bidding Procedures, if the Stalking Horse Bidder is selected as a Backup Bidder, the Stalking Horse Bidder's Backup Bid shall be subject to all of the terms of the

Stalking Horse APA (as such agreement may be modified by the Stalking Horse Bidder at the Auction consistent with the provisions of these Bidding Procedures and the Bidding Procedures Order); provided, however, that, subject to the terms of the Stalking Horse APA permitting termination, each Backup Bid including, without limitation, the Backup Bid of the Stalking Horse Bidder, shall remain open and binding until the earlier to occur of (i) one (1) Business Day after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid have been transferred to one or more Qualified Bidders at the closing of a Sale or Sales conducted pursuant to these Bidding Procedures or (ii) the Backup Bid Closing Deadline.

7. <u>Good-Faith Deposit</u>.  Each Bid must be accompanied by a deposit paid by wire transfer of immediately available funds or such other form acceptable to the Debtors payable to the order of the Debtors (the "<u>Good Faith Deposit</u>") in the amount of not less than 10 percent (10%) of the stated cash Purchase Price in the Modified Agreement to be held in an account designated by the Debtors to be applied or returned, as applicable, pursuant to the terms of these Bidding Procedures.

8. <u>Minimum Initial Overbid Amount</u>.  Each Bid for substantially all of the Debtors' Assets must offer to the Debtors aggregate value in an amount, as determined by the Debtors, in their reasonable business judgment, that is greater than or equal to the sum of (i) the value offered under the Stalking Horse APA, *plus* (ii) the Bid Protection, *plus* (iii) cash in the amount of at least $250,000 (the "<u>Minimum Initial Overbid Amount</u>"), unless otherwise set by the Debtors.

9. <u>Contingencies</u>.  No Bid may be conditioned on any due diligence, internal approval, financing, or regulatory or third-party approval contingencies of any kind (other than regulatory contingencies required by law or as set forth in the Stalking Horse APA).  A Bid must set forth each regulatory approval to consummate the Sale and the time period within which the Bidder expects to receive such regulatory approval(s) (and in the case where receipt of any regulatory approval is expected to take more than 30 days following execution and delivery of the Purchase Agreement, those actions the Bidder will take to ensure receipt of such approvals as quickly as possible).

10. <u>Proof of Financial Ability to Perform</u>.  Each Bid must contain written evidence, to the Debtors' satisfaction, of a firm commitment for financing, or other evidence of ability to consummate the Sale contemplated by the Modified Agreement, that will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transactions contemplated in such Bidder's Modified Agreement (taking into account the conditions and third-party beneficiary rights, if any, in any such commitment).  If the purchaser will be a newly formed entity, the Bid must identify, among other things, the entity or entities that will provide backstops in the form of a guarantee and/or an equity commitment letter and describe the nature of such arrangement(s).

11. <u>Financial Statements</u>.  To the extent not previously provided, each Bid must include the latest audited financial statements and unaudited financial statements of the Bidder or, if the Bidder is an entity formed for the purpose of acquiring the Assets, the latest audited financial statements and unaudited financial statements of the direct and indirect equity holders or sponsors of the Bidder who will guarantee the obligations of the Bidder, or such other form of financial disclosure and/or credit support or enhancement, if any, that will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transactions contemplated in such Bidder's Modified Agreement.

12. <u>Identity of Purchaser</u>.  Each Bid must, to the satisfaction of the Debtors, in consultation with the Consultation Parties, fully disclose (i) the identity of each person or entity that will be bidding for the Assets or otherwise participating in connection with such Bid, (ii) the terms of any such participation, and (iii) if any entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such person or entity, and the financial capacity of such parties to satisfy such liability.

13. <u>No Fees or Commissions</u>.  With the exception of the Bid submitted by the Stalking Horse Bidder, no Bid may (i) request or entitle the Bidder to any break-up fee, expense reimbursement fee or similar type of payment, or (ii) obligate the Debtors to pay commissions, fees or expenses to any agent or broker.  Further, by submitting a Bid, a Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code or in any way related to the submission of its Bid or the Bidding Procedures.

14. <u>As Is, Where Is</u>.  Each Bid must contain an acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Purchase Agreement.

15. <u>Adequate Assurance.</u>  Each Bid must include evidence of the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Bidder's ability to perform in the future the contracts and leases proposed in its Bid to be assumed by the Debtors and assigned to such Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases.

16. <u>Regulatory Filings</u>.  Each Bid must provide that the Bidder shall make all necessary filings under the Hart-Scott-Rudino Antitrust Improvements Act of 1976, as amended, or other applicable competition laws or regulations, if any, and pay all fees and expenses of such filings (including the Debtors' fees and expenses).

17. <u>Corporate Authority</u>.  Each Bid must include evidence of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission of the Bid and the consummation of the transactions contemplated in such Bidder's Purchase Agreement.

18. <u>Employees</u>.  Each Bid must contain a detailed description of how the Qualified Bidder intends to treat current employees of the Debtors.

19. <u>Privacy Policies</u>.  Each Bid must provide to the Debtors' satisfaction that the Bidder will adhere to the Debtors' prepetition privacy policies regarding personally identifiable information.

20. <u>Access to Books and Records</u>.  Each Bid must contain provisions allowing the Debtors reasonable access to the Debtors' books and records for the administration of their bankruptcy cases if the Bid provides for the purchase of such books and records.

21. <u>Format</u>.  All documentation for each Bid must be provided in electronic form.

| | |
|---|---|
| | d.  **Qualified Bidder**.  A "<u>Qualified Bidder</u>" is a Bidder that (i) submits a Qualified Bid by the Bid Deadline (or later, in the discretion of the Debtors in consultation with the Consultation Parties), and (ii) the Decision Maker[8] determines, in the exercise of reasonable business judgment, after consultation with the Consultation Parties, is reasonably likely (based on financial information submitted by the Bidder, experience, and other considerations deemed relevant by the Debtors in consultation with the Consultation Parties) to consummate a Sale if selected as a Successful Bidder or a Backup Bidder.  As noted above, the Stalking Horse Bidder is deemed to be a Qualified Bidder.  As promptly as practicable after the Bid Deadline (but in no event later than one (1) Business Day prior to the Auction), the Debtors will notify (a) each Bidder that submits a Bid whether such Bidder is a Qualified Bidder, and (b) the Stalking Horse Bidder and all other Qualified Bidders, if any, whether or not any Bids (other than the Stalking Horse APA) constitute Qualified Bids and identify the Qualified Bidders making any such Qualified Bids.  Each Qualified Bidder will be given access to the Opening Bid (as defined below). |
| **Bid Protections to Stalking Horse Bidder** Local Rule 6004- 1(c)(i)(C) | a.  **Break-Up Fee**. The Stalking Horse Bidder is entitled to receive a break-up fee in the amount of $<u>1,402,500</u> (3% of the Base Purchase Price), subject to the terms and conditions in the Stalking Horse APA and Bidding Procedures Order (the "<u>Bid Protection</u>"), in order to provide an incentive and compensate the Stalking Horse Bidder for serving as the Stalking Horse Bidder and entering into the Stalking Horse APA with the knowledge and risk that arises from its participating in the Sale and subsequent bidding process, absent which the Stalking Horse Bidder would not have entered into the Stalking Horse APA.  The Bid Protection shall be payable on the terms and conditions set forth in the Stalking Horse APA and the Bidding Procedures Order.  The transaction contemplated by the Stalking Horse APA is subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code.  The Bid Protection shall constitute an allowed super-priority administrative expense claim against the Debtors' bankruptcy estates pursuant to sections 363, 503(b) and 507(a)(2) of the Bankruptcy Code, which such claims shall be junior only to the claims under the DIP Facility and the Carve-Out (as defined in the DIP Facility).  The Bid Protection shall be secured by a super-priority lien in the Debtors' Assets, junior only to liens under the DIP Facility and Carve-Out (as defined in the DIP Facility), and deemed automatically perfected by entry of the Bidding Procedures Order.  Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Assets or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination or similar fee or payment. |
| | b.  **Minimum Initial Overbid Amount**. As described above, each Bid for substantially all of the Debtors' Assets must offer to the Debtors aggregate value in an amount, as determined by the Debtors, in their reasonable business judgment, that is greater |

---

[8] "Decision Maker" means (i) the board of managers of RM Holdco LLC (the "<u>Board</u>"), acting by majority vote cast by those members of the Board who are not (a) compensated by the Stalking Horse Bidder (unless the Stalking Horse Bidder has irrevocably and unconditionally disclaimed in a writing provided to the Debtors and Tennenbaum Capital Partners or their respective professionals (a copy of which writing may be filed on the docket in the Bankruptcy Court) any right (including the right of any of its affiliates, including Controlled Investment Affiliates (as defined in the DIP Facility)) to participate as a bidder in connection with the Auction, in which event such members shall be entitled to vote) or (b) officers of Holdco; or (ii) solely in the event that a vote of the Board results in a deadlock decision, the CRO (as defined above).

| | |
|---|---|
| | than or equal to the sum of (i) the value offered under the Stalking Horse APA, *plus* (ii) the Bid Protection, *plus* (iii) $250,000 in cash. |
| **Backup Bidders** Local Rule 6004-1(c)(i)(E) | a. **Back-up Bidder.**<br>    1. Each Bid must contain a written statement that the Bidder will serve as the Backup Bidder.<br>    2. A Back-up Bidder's Bid must be irrevocable until the Backup Bid Closing Deadline.<br>    3. Within one (1) Business Day after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court and serve upon all Qualified Bidders and parties that have requested notice in these cases a notice identifying the Successful Bidder and the Backup Bidder and post such notice on the Debtors' bankruptcy website.<br>    4. Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder (i) fails to consummate a Sale by the Closing Deadline, (ii) breaches such Successful Bidder's Purchase Agreement, or (iii) otherwise fails to perform, the Decision Maker shall be authorized, but not required, to deem the Backup Bid(s), as disclosed at the Sale Hearing, the Successful Bid(s) and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder(s) submitting such Backup Bid(s) without further notice or orders of the Bankruptcy Court. In the event that there are multiple Successful Bidders and/or Backup Bidders and only one of such Successful Bidders or Backup Bidders engages in the acts or omissions described in clauses (i) through (iii) of the foregoing sentence, the Decision Maker may, in the exercise of discretion, and in consultation with the Consultation Parties, elect to close the contemplated transactions with some or all of the other Successful Bidders or Backup Bidders, as applicable. |
| **The Auction** Local Rule 6004-1(c)(ii) | a. **Auction**. If the Debtors receive a Qualified Bid other than the Stalking Horse APA, the Debtors will conduct an Auction to determine the Successful Bidder(s). If no Qualified Bid other than the Qualified Bid submitted by the Stalking Horse Bidder is received by the Bid Deadline (unless otherwise extended by the Debtors in consultation with the Consultation Parties), then (i) the Auction will not be held, (ii) the Stalking Horse Bidder will be deemed the Successful Bidder, (iii) the Stalking Horse APA will be the Successful Bid, and (iv) at the Sale Hearing (defined below), the Debtors will seek Bankruptcy Court approval of and authority to consummate the proposed Sale to the Stalking Horse Bidder as contemplated by the Stalking Horse APA.<br><br>b. **Auction Time and Location**. The Auction, if any, shall take place on **October 4, 2018, at [\_:\_\_ \_].m.** (prevailing Eastern Time), at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801. The Auction may adjourned from time to time by the Decision Maker, in consultation with the Consultation Parties, so long as such extended deadline does not exceed the applicable milestone for such deadline under the DIP Facility, unless such milestone is extended in accordance with the terms of the DIP Facility, in which case notice of such adjournment and the time and place for the resumption of the Auction will be filed with the Bankruptcy Court and served promptly on Qualified Bidders, any other parties who have provided written notice of their intent to attend the Auction as set forth in Section 9(a) below, and all other parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 prior to the Auction.<br><br>c. **Participation at the Auction**. Qualified Bidders shall attend the Auction in person, or through a duly-authorized representative. Only the Stalking Horse Bidder and any other Qualified Bidder(s) (or their duly-authorized representatives) (collectively, |

the "Auction Participants") are eligible to submit Bids at the Auction.  While only the Auction Participants may submit Bids at the Auction, the authorized representatives and respective counsel and advisors of each of the Qualified Bidder(s) (regardless of whether such representatives, counsel and advisors are serving as Auction Participants), the Debtors, the proposed DIP Lenders, the Committee, the United States Trustee, and any of the Debtors' creditors who notify the Debtors in writing no later than two (2) days prior to the Auction of such creditors' intent to attend the Auction by contacting the Debtors' counsel, Vijay S. Sekhon (vsekhon@sidley.com) and Christina M. Craige (ccraige@sidley.com), shall be permitted to attend the Auction, provided, however, the Debtors, in consultation with the Consultation Parties, may exclude parties whom the Debtors deem to be detrimental to the sale process.  Each Qualified Bidder participating in the Auction (including any Qualified Bidder participating through a duly-authorized representative) will be required to confirm on the record that it has not engaged in any collusion regarding the Bidding Procedures, the Auction or the Sale.

d.   **Auction Procedures**.

1.   Opening Bid.  At least one (1) Business Day in advance of the Auction, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid or Qualified Bid(s), as determined by the Debtors, in consultation with the Consultation Parties (the "Opening Bid"), and will provide copies of the applicable Purchase Agreement for such Opening Bid to each Qualified Bidder.  The determination of which Qualified Bid constitutes the Opening Bid shall take into account any factors the Decision Maker, in consultation with the Consultation Parties, reasonably deems relevant to the value of the Qualified Bid to the estates, including, among other things, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities; (iii) the ability of the Qualified Bidder to close the proposed transaction on or before the Closing Deadline; (iv) any Purchase Price adjustments; (v) the impact of the contemplated transaction on any actual or potential litigation; (vi) the net economic effect of any changes from the Stalking Horse APA, if any, provided by the contemplated transaction documents (the "Contemplated Transaction Documents"); (vii) the net after-tax consideration to be received by the Debtors' estates; (viii) the conditions set forth in the applicable Purchase Agreement, and (ix) such other considerations the CRO, in consultation with the Consultation Parties, deems relevant.

2.   Debtors Shall Conduct the Auction.  The CRO and the Debtors' professionals shall direct and preside over the Auction on behalf of the Debtors.  At the start of the Auction, the CRO shall describe the terms of the Opening Bid.  All Bids made after the Opening Bid shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Opening Bid, all applicable Overbids, and the Successful Bid.

3.   Terms of Overbid**.**  An "Overbid" is any Bid made at the Auction subsequent to the CRO's announcement of the Opening Bid.   To submit an Overbid for purposes of the Auction, a Qualified Bidder must comply with the following conditions:

i.   Minimum Overbid Increment.  The initial Overbid, if any, shall provide for total consideration to the Debtors (net of any amount for Bid Protection, if applicable) with a value that exceeds the value of the consideration under the Opening Bid by an incremental

amount that is not less than $250,000 in cash (the "Minimum Overbid Increment"), unless otherwise determined by the CRO in his reasonable business judgment. Additional consideration in excess of the amount set forth in the Opening Bid shall be in the form of cash consideration. Upon the solicitation of each round of Overbids, the CRO may, in his reasonable business judgment, and in consultation with the Consultation Parties, adjust the amount of the applicable Minimum Overbid Increment.

    ii.    <u>Conclusion of Each Overbid Round.</u> Upon the solicitation of each round of applicable Overbids, the CRO may, in consultation with the Consultation Parties, announce a deadline (as the CRO may, in his reasonable business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

    iii.    <u>Overbid Alterations.</u> An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates on the whole than any prior Bid or Overbid, as determined in the CRO's reasonable business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

    iv.    <u>Announcing Highest or Otherwise Best Bid.</u> Subject to each Overbid Round Deadline, the CRO, on behalf of the Debtors, shall announce whether the Decision Maker, in consultation with the Consultation Parties, has identified in the initial applicable Overbid round, one or more Overbids as being higher or otherwise better than the Initial Minimum Overbid for such asset package, or in subsequent rounds, the Overbid(s) previously designated by the Decision Maker as the prevailing highest or otherwise best Bid for a given asset package (for each asset package, collectively, the "Prevailing Highest Bid"). After each round of bidding, including the initial round, the CRO shall disclose to all Qualified Bidders the material terms of any Overbid(s) designated by the Decision Maker as the Prevailing Highest Bid, as well as the value attributed by the Decision Maker to such Prevailing Highest Bid.

    v.    <u>Bids for Less than Substantially All Assets.</u> The Decision Maker may consider and accept Bids for any portion of the Assets, as well as Bids for substantially all of the Assets, and the Decision Maker may hold separate Auctions for portions of the Assets in the discretion of the Decision Maker in consultation with the Consultation Parties; provided, however, that the Decision Maker may consider and accept Bids for less than substantially all of the Assets only so long as the value of such Bids, in combination, constitute an Overbid.

    4.    <u>Consideration of Overbids</u>. The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things: (A) facilitate discussions between the Debtors, the Consultation Parties, and Qualified Bidders; (B) allow Qualified Bidders to consider how they wish to proceed; (C) consider and determine the current Prevailing Highest Bid at any given time during the Auction; and (D) give any Qualified Bidder the opportunity to provide the CRO with such additional evidence as the CRO, in consultation with the Consultation Parties, in his reasonable business judgment, may require that the Qualified Bidder (other than Stalking Horse Bidder) has sufficient internal resources, or has received sufficient debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

5. <u>No Round-Skipping</u>. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a bid in such round of bidding that is of a higher value or is a better offer than the immediately preceding bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a bid in such round of bidding that is of a higher value or is a better offer than the immediately preceding bid submitted by a Qualified Bidder in such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction. To the extent the Debtors hold separate Auctions for substantially all Assets and for Assets separated into lots, the requirements of this Section will be applied separately to each Auction.

e. **Closing the Auction**.

1. The Auction shall continue until there is only one offer (which may consist of one Qualified Bid for substantially all of the Assets or more than one Qualified Bid for complementary portions of the Assets) that the Decision Maker determines, on behalf of the Debtors, in the exercise of reasonable business judgment, and after consultation with the Consultation Parties, to be the highest or otherwise best offer for the Assets (one or more such Qualified Bids, the "<u>Successful Bid</u>," and the Qualified Bidder or Qualified Bidders making such Successful Bid, the "<u>Successful Bidder</u>"); provided further that, any release of liens by the DIP Agent or the Prepetition Agents shall not include any release of liens with respect to the proceeds of the Sale of the Assets subject to such Bid. Within one (1) Business Day after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court and serve upon all Qualified Bidders and parties that have requested notice in these cases a notice identifying the Successful Bidder and the Backup Bidder and post such notice on the Debtors' bankruptcy website.

2. After determining the Successful Bid and the Successful Bidder, the CRO will also determine, on behalf of the Debtors, in his reasonable business judgment, and after consultation with the Consultation Parties, the Qualified Bidders(s) with the next highest or otherwise best Bid(s) for the Assets. Such Bid(s) shall be declared the "<u>Backup Bid</u>," and the Qualified Bidder(s) making such Backup Bid, the Backup Bidder at which point the Auction will be closed.

3. The Debtors shall not consider any Bids or Overbids submitted after the closing of the Auction, and any such Bids or Overbids shall be deemed untimely and shall not constitute Qualified Bids. The determination of the Successful Bid and Backup Bid at the closing of the Auction shall be final, subject only to approval by the Bankruptcy Court.

**B.    Key Dates and Deadlines**

23.    The Debtors propose the following timeline for the solicitation of bids, the Auction and the Sale Hearing.

| DATE | TIME | DESCRIPTION |
|---|---|---|
| September 21, 2018 | 4:00 p.m. (ET) | Proposed Bid Deadline |

| DATE | TIME | DESCRIPTION |
|---|---|---|
| Approximately fifty-five (55) days after the Petition Date | | Proposed Sale Hearing (if no additional Qualified Bids are received by the Bid Deadline) |
| October 4, 2018 | | Proposed Auction Date (if additional Qualified Bids are received by the Bid Deadline) |
| Approximately sixty-five (65) days after the Petition Date | | Proposed Sale Hearing (if Qualified Bids are received by the Bid Deadline) |

**V.      Proposed Notice of the Sale, Bidding Procedures, Auction and Sale Hearing**

24.      The Debtors also request approval of the Sale Notice substantially in the form attached to the Bidding Procedures Order as Exhibit 3.

25.      The Debtors will serve the Sale Notice by email, mail, or facsimile within two (2) Business Days after entry of the Bidding Procedures Order upon: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Wells Fargo Bank, National Association, as agent to the proposed DIP Lenders and Prepetition Secured Lenders, Thompson Hine LLP, 335 Madison Avenue, 12th Floor, New York, NY 10017-4611 (Attn: Yesenia D. Batista and Curtis L. Tuggle); (3) counsel to Z Capital, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006 (Attn: James Bromley, Esq. and Jane VanLare, Esq.); (4) local counsel to Z Capital, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801 (Attn:  Derek C. Abbott, Esq.); (5) counsel to TCP, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022 (Attn: David M. Hillman and Kirby Chin); (6) co-counsel to TCP, Landis, Roth & Cobb, LLP, 919 Market Street, Wilmington, DE 19801 (Attn: Adam G. Landis and Kerri K. Mumford); (7) all parties known by the Debtors to assert a lien on any of the Assets; (8) all persons known or reasonably believed to have expressed

an interest in acquiring all or a substantial portion of the Assets in the Debtors within the six (6) months prior to the Petition Date; (9) the Office of the United States Attorney for the District of Delaware; (10) the Office of the Attorney General in each state in which the Debtors operate; (11) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (12) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (13) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (14) the Federal Trade Commission; (15) the United States Attorney General/Antitrust Division of Department of Justice; (16) all non-Debtor parties to any of the Assignable Contracts; (17) all of the Debtors' known creditors; and (18) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the service date (collectively, the "<u>Sale Notice Parties</u>").

26.     The Debtors will cause the Sale Notice to be published once in the national edition of *USA Today* or the national edition of *The New York Times* as soon as practicable after entry of the Bidding Procedures Order.

27.     The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent: http://www.kccllc.net/realmex.

## VI.     <u>Assumption and Assignment Procedures</u>

28.     The Debtors propose the following Assumption and Assignment Procedures for notifying counterparties to executory contracts and unexpired leases (collectively, the "<u>Assignable Contracts</u>") of potential cure amounts and adequate information in the event the Debtors decide to assume such Assignable Contracts and assign them to the Successful Bidder at the sale:

Assumption and Assignment Notice.  On or before three (3) Business Days after the entry of the Bidding Procedures Order, the Debtors shall file and serve on each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assignable Contract the Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 4.  The Assumption and Assignment Notice shall (i) identify the Assignable Contracts including, if known, any Designation Right Contract (as defined in the Stalking Horse APA) that may be designated for assumption and assignment to the Stalking Horse Bidder; and (ii) include the cure amount (each, a "Cure Amount" and, collectively, the "Cure Amounts"), if any, that the Debtors believe must be paid to cure all defaults outstanding for each of the Assignable Contracts and Designation Right Contracts as of the date the Assumption and Assignment Notice is filed.  The presence of a contract, lease or agreement on the Assumption and Assignment Notice does not constitute an admission that such contract, lease or agreement is an executory contract, and the Debtors reserve all rights, claims, defenses and causes of action with respect to all contracts, leases, and agreements listed on the Assumption and Assignment Notice.

Objections.  Any objection to the proposed assumption, assignment, or potential designation of an Assignable Contract or the Cure Amount proposed with respect thereto, including with respect to adequate assurance of future performance (collectively, a "Contract Objection"), must be filed with the Court no later than fourteen (14) days after service of the Assumption and Assignment Notice (the "Contract Objection Deadline"), and served, so as to be received the same day as the objection is filed, on (i) the Debtors, 5660 Katella Avenue, Suite 200, Cypress, CA 90630 (Attn: Jonathan Tibus); (ii) proposed co-counsel to the Debtors, Sidley Austin LLP, 555 W. 5th St., Suite 4000, Los Angeles, CA 90013 (Attn: Christina M. Craige, Esq. and Anna Gumport, Esq.); (iii) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Robert Brady, Esq.); (iv) counsel to the Stalking Horse Bidder, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 1006 (Attn: James Bromley, Esq. and Jane VanLare, Esq.); (v) co-counsel to the Stalking Horse Bidder, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801 (Attn:  Derek C. Abbott, Esq.); (vi) counsel to the official committee of unsecured creditors appointed in the Chapter 11 Cases; and (vii) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin Hackman, Esq.).

Any Contract Objection must state the basis for such objection and state with specificity what Cure Amount the party to the Assignable Contract believes is required (in all cases with appropriate documentation in support thereof).  If no Contract Objection is timely received, the Cure Amount set forth in the Assumption and Assignment Notice shall be controlling, notwithstanding anything to the contrary in the Assignable Contract or other documents as of the date of the Assumption and Assignment Notice.  The Assumption and Assignment Notice shall also provide that the Contract Objection to any Cure Amount or assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Successful Bidder.  If a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, then the deadline to object to assumption and assignment (solely on the grounds of adequate assurance of future performance) shall

01:23488599.1

be extended to 4:00 p.m. one Business Day prior to the Sale Hearing, <u>provided, however, that the deadline to object to the Cure Amount shall not be extended</u>.

<u>Unless a Counterparty to any Assignable Contract files an objection to the Cure Amount by the applicable objection deadline, then such Counterparty shall be: (a) forever barred from objecting to the Cure Amount and (b) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount on the schedule of the Assumption and Assignment Notice, against the Debtors, the Stalking Horse Bidder, or any Successful Bidder or any other assignee of the relevant contract or lease</u>.

Unless a Counterparty to any Assignable Contract files a timely objection to the assumption and assignment of the contract to the Stalking Horse Bidder, then such Counterparty shall be deemed to have consented to the assumption and assignment to the Stalking Horse Bidder.

<u>Designation by the Stalking Horse Bidder or other Qualified Bidder</u>.  No later than the Bid Deadline, (i) the Stalking Horse Bidder shall designate each Assignable Contract on the Cure Schedule (as defined in the Stalking Horse APA) as "Purchased," "Rejected," or "Held," by delivering written notice to the Debtors, and (ii) each Qualified Bidder, other than the Stalking Horse Bidder, shall, by delivering written notice to the Debtors, designate each Assignable Contract on the Cure Schedule as "Purchased," "Rejected," or "Held."

Prior to the Sale Hearing, the Debtors shall file the list of Purchased Contracts (as defined in the Stalking Horse APA) as of such date.

## BASIS FOR RELIEF

## I.    Sufficient Business Justification Exists for Consummation of the Sale under Sections 105(a) and 363(b) of the Bankruptcy Code

29.    Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  <u>See, e.g.</u>, <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel</u>

Corp.), 722 F.2d 1063, 1070–71 (2d Cir. 1983); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of In re Lionel Corp.); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in Abbotts Dairies); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) (same).

30.     The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

31.     The Debtors' decision to consummate the Sale represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors will continue to conduct an extensive process to market the Assets post-petition, after having conducted a comprehensive prepetition marketing process.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or otherwise best value available for the Assets by allowing the market to determine the purchase price of the Assets. Given the Debtors' cash flow, closing on an expeditious sale will provide a greater recovery to creditors than would be provided by any other viable alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be

paid by the Stalking Horse Bidder or other Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

32.    Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse APA, the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

33.    The Sale conducted in accordance with the Bidding Procedures represents the best path forward for maximizing recoveries to the Debtors' estates, the Debtors' creditors, and all parties in interest, given both the open nature of the proposed process and the need for a Sale to occur given the Debtors' current financial circumstances as outlined in the First Day Declaration. The Debtors submit that ample business justification exists for the consummation of Sale and, therefore, request that the Court approve such Sale.

## II.    The Sale of Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code

34.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be

01:23488599.1

compelled, in a legal or equitable proceeding, to accept a money satisfaction of
such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code,

which provides that "[t]he court may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

35.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive,

satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free

and clear" of liens and interests. See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94

B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a

court may approve a sale free and clear if any one subsection is met); see also Mich. Emp't Sec.

Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th

Cir. 1991) (same); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. See In re

Trans World Airlines, Inc., 322 F.3d 283, 289 (3d Cir. 2003).

36.     The Sale free and clear of liens, claims, interests, and other encumbrances, if any,

other than the Assumed Liabilities is necessary to maximize the value of the Assets. A sale of

the Assets other than one free and clear of all interests except for Assumed Liabilities would

provide less certainty and yield substantially less value for the Debtors' estates.

37.     Additionally, the Debtors believe that section 363(f)(2) of the Bankruptcy Code

will be met because the Debtors' proposed DIP Lenders and Prepetition Lenders are secured by

the Assets and have consented to the Sale in connection with the DIP Financing, provided that,

(i) the Sale is an Approved Sale as defined in the DIP Facility, and (ii)(A) in the case of the DIP

Agent, sufficient cash proceeds generated from the Sale shall be paid to the DIP Agent upon the

closing of such sale for permanent application against the remaining obligations owing by the

Debtors under the DIP Documents until such time as all DIP obligations have been paid in full in accordance with the terms and conditions of the DIP Documents, the Financing Order, and the Purchase Price mechanism in the Stalking Horse APA; and (B) in the case of the Prepetition Agent, all Liens attach to the cash proceeds of the Sale (subject to the Estimated Accrued Administrative Expenses) in the same order of priority, with the same validity, force, and effect that such Prepetition Agent had prior to the Sale.

38.     Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented.  See FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. at 345 (same).  Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

39.     To the extent a party asserting a lien, claim, or encumbrance against the Assets objects, the Debtors believe that any such party could be compelled to accept a monetary

satisfaction of such claims or that such lien is in bona fide dispute.  <u>See</u> 11 U.S.C. 363(f)(5).

Additionally, the Debtors believe that the sale of the Assets free and clear is permitted under

applicable non-bankruptcy law pursuant to section 363(f)(1).

40.     Furthermore, the Debtors propose that any Encumbrances asserted against the

Assets be transferred to and attach to the proceeds of such Sale.  Application of the proceeds

generated by the Sale will be subject to any applicable provisions of the Financing Order.

### III.     <u>The Sale Should Be Subject to the Protections of 363(m) of the Bankruptcy Code</u>

41.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or

modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c)

of the Bankruptcy Code does not affect the validity of a sale under such authorization to an entity

that purchased such property in good faith, whether or not such entity knew of the pendency of

the appeal, unless such authorization and such sale were stayed pending appeal.  <u>See</u> 11 U.S.C.

§ 363(m).  In approving the Sale free and clear of Encumbrances, the Debtors request that the

Court find and hold that all purchasers of Assets purchased in accordance with the Bidding

Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.

Such relief is appropriate in that selection of the Successful Bidder will be the result of a

competitive bidding process and arm's-length, good faith negotiations, and parties in interest will

have the opportunity to review and object to a proposed transaction.  <u>See</u> <u>Esposito v. Title Ins.</u>

<u>Co. of Pa. (In re Fernwood Mkts.)</u>, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith

purchasers are protected under section 363(m) where notice is provided to lienholders).

### IV.     <u>The Court Should Approve of the Stalking Horse Bid Protections</u>

42.     In order to incentivize potential bidders, the Debtors are seeking authorization to

enter into the Stalking Horse APA for the sale of substantially all of the Assets.  The Debtors

submit that the opportunity to enter into the Stalking Horse APA will encourage bidders to submit bids and participate at the Auction.  To compensate the Stalking Horse Bidder for these benefits, the Debtors also seek to provide the Break-Up Fee, which amounts to $1,402,500, or three percent (3%) of the Base Purchase Price offered as part of the Stalking Horse APA, without further order of the Court.

43.     Approval of break-up fees and other forms of bid protections in connection with the sale of assets pursuant to section 363 of the Bankruptcy Code is an established practice in chapter 11 cases.  In the Third Circuit, termination or break-up fees are considered administrative expenses and, therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999).  In O'Brien, the Third Circuit provided two examples of a potential benefit accruing from the payment of a termination fee.  Id.  First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, a break-up fee encourages potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.

44.     A break-up fee of three percent is within the range of similar fees approved by this Court.  See, e.g., In re BPS US Holdings Inc., No. 16-12373 (KJC) (D.I. 233) (Bankr. D. Del. Nov. 30, 2016) (approving a break-up fee to an alleged insider that was 3% of stalking horse purchase); In re Orchard Supply Hardware Stores Corp., No. 13-11565 (CSS) (D.I. 155) (Bankr. D. Del. July 8, 2013) (approving a break-up fee to an affiliate of the debtors that was 3% of stalking horse purchase price); In re Chef Solutions Holdings, LLC, No. 11-13139 (KG) (D.I.

129) (Bankr. D. Del. Oct. 19, 2011) (approving a break-up fee allegedly benefitting an insider that was 3.4% of $36.4 million cash portion of purchase price).

45.     By conducting due diligence, participating in negotiations for a potential transaction and entering into the Stalking Horse APA, the Debtors believe that the Stalking Horse Bidder will help the Debtors establish a bid standard, including a price floor, and initiate a legitimate sales process that should serve as a catalyst for other bidders.  Further, the proposed Stalking Horse Protections are the result of an arm's-length negotiated agreement between the Debtors and the Stalking Horse Purchaser.  In short, the Stalking Horse Bidder should be compensated for helping to create an active auction environment for the benefit of the Debtors' estates.

**V.      The Court Should Authorize the Debtors to Omit the Confidential Schedules From the Stalking Horse APA**

46.     Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the authority to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information.  This section provides in part that:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may –
>
> (1)     protect an entity with respect to a trade secret or confidential research, development, or commercial information; or
>
> (2)     protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b).  In addition, under section 105(a) of the Bankruptcy Code, the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

47.     Bankruptcy Rule 9018 sets forth the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code, and provides that "[o]n motion, or on its

own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . ." Fed. R. Bankr. P. 9018.

48.    Unlike its counterpart in Rule 26(c) of the Federal Rules of Civil Procedure, section 107(b) of the Bankruptcy Code does not require an entity seeking such protection to demonstrate "good cause." See, e.g., Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 28 (2d Cir. 1994); Phar-Mor, Inc. v. Defendants Named Under Seal (In re Phar-Mor, Inc.), 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995). Rather, if the material sought to be protected satisfies one of the categories identified in section 107(b), "the court is required to protect a requesting party and has no discretion to deny the application." Orion Pictures, 21 F.3d at 27; see also In re Altegrity, Inc., No. 15-10226, 2015 WL 10963572, at *3 (Bankr. D. Del. July 6, 2015) ("[I]f it is established that the documents sought to be sealed fall within the enumerated statutory exception, the court *must* grant the requested relief (or such other relief that protects the moving party)." (emphasis added)).

49.    The Debtors submit that the Confidential Schedules satisfy one of the categories in section 107(b) of the Bankruptcy Code because they contain non-public, confidential "commercial information" that merits protection under section 107(b).

50.    Significantly, commercial information need not rise to the level of a trade secret to be entitled to protection. Altegrity, 2015 WL 10963572, at *3; see also Orion, 21 F.3d at 28 (finding that the use of the disjunctive in section 107(b)(1) "neither equates 'trade secret' with 'commercial information' nor requires the latter to reflect the same level of confidentiality as the former"). Rather, a party seeking the protection of section 107(b) need only demonstrate that the information is "confidential" and "commercial" in nature. Orion, 21 F.3d at 28; see also

34

Altegrity, 2015 WL 10963572, at *3.  Once it is established that the subject information qualifies as "commercial information" under section 107(b)(1), the Bankruptcy Code mandates that this information be protected from disclosure.

51.    The Confidential Schedules include non-public, confidential commercial information regarding the business and financial affairs of the Debtors.  The Confidential Schedules include, among other things, sensitive information concerning the Debtors' trademarks, real property, employee arrangements, suppliers, insurance, pending litigation and tax matters.  Accordingly, the Confidential Schedules easily come within the definition of confidential "commercial information" under section 107(b) and the Debtors respectfully request authority to omit the Confidential Schedules from the Stalking Horse APA.

52.    Based on the foregoing, the Debtors respectfully submit that good cause exists for the Court to grant the Debtors authority to omit the Confidential Schedules from the Stalking Horse APA and that such authority is necessary and appropriate.

## VI.    The Court Should Approve the Bidding Procedures

53.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  See In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  See In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999); see also Integrated Res. Inc., 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

35

54.     The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors.  The Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or otherwise best possible consideration for the Assets.  Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.

55.     Moreover, the Debtors are required under the DIP Facility to complete the auction and sale process on the timetable set forth in the Bidding Procedures, which timetable is fair and reasonable in light of the circumstances of these Chapter 11 Cases, including the Debtors' current liquidity position.

56.     The Debtors submit that the Bidding Procedures are fair, transparent and will derive the highest or best otherwise bids for the Assets.  Therefore, the Debtors request that the Court approve the Bidding Procedures, including, without limitation, the dates established thereby for the Auction and the Sale Hearing.

## VII.  Secured Parties Are Authorized to Credit Bid on the Assets under Section 363(k) of the Bankruptcy Code

57.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does

01:23488599.1

not limit the credit bid to the claim's economic value.  See Cohen v. KB Mezzanine Fund II, LP

(In re Submicron Sys. Corp.), 432 F.3d 448, 459–60 (3d Cir. 2006).

58.     TCP and its affiliates (in their capacity as (i) proposed DIP Lender, (ii) lender

under the Financing Agreement (First Lien) and (iii) lender under Amended and Restated

Financing Agreement (Second Lien)) have advised the Debtors that they do not intend to direct

the DIP Agent or Prepetition Agent to credit bid.  As a result, without a direction from both Z

Capital and TCP (as the Required Lenders under the DIP and Prepetition Facilities), there can be

no formal credit bid.[9]  However, the Debtors also do not believe that there is "cause" to limit the

rights of any party secured by valid, binding, enforceable, non-avoidable and perfected liens on

and security interests in any Assets from credit bidding all or a portion of such secured

obligations pursuant to section 363(k) of the Bankruptcy Code.

**VIII.   The Assumption and Assignment of the Assignable Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

59.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in

possession, "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Second Circuit has stated that "[t]he

purpose behind allowing the assumption or rejection of executory contracts is to permit the

trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and

abandon burdensome property.'"  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion

---

[9] As noted above, the Purchase Price mechanism contained in Section 3.1 of the Stalking Horse APA enables the Stalking Horse Bidder to deduct a certain portion of the distribution it would receive on account of the Sale from the cash component of the Purchase Price.  However, such entity does not hold authority to direct either the DIP Agent or the Prepetition Agent to "credit bid" debt under the applicable documentation, and thus is not formally credit bidding under section 363(k).  For the avoidance of doubt, nothing herein is intended to limit the ability of Purchaser to apply the Debtors' obligations under the DIP Facility and the Prepetition Secured Debt to the Purchase Price as set forth in Section 3.1 of the Stalking Horse APA.

01:23488599.1

Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

60.     The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  See In re AbitibiBowater Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances"); In re HQ Glob. Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989).

61.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assignable Contracts in connection with the Sale is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code.  See, e.g., In re Philadelphia Newspapers, LLC, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981)

(holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

62.     As set forth above, the Debtors believe that the Sale will yield the maximum value for the Debtors' estates.   To that end, the assumption, assignment and sale of the Assignable Contracts will be necessary for the Debtors to obtain the benefits of the Stalking Horse APA or any topping purchase agreement.   In addition, under section 365(k) of the Bankruptcy Code, a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).   Thus, following an assignment to the Successful Bidder of any Assignable Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith, providing additional value to the estate.

63.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assignable Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with the Court, and serve on each Counterparty to an Assignable Contract, the Assumption and Assignment Notice that will indicate the proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Assignable Contract.

64.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate

assurance of future performance by the assignee of such contract or lease is provided."   11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  See In re Fleming Cos., Inc., 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit).

65.    Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and has expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

66.    As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Qualifying Bidder must include evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information").

67.    Therefore, the Debtors respectfully request that the Court (i) approve the proposed assumption and assignment of the Assignable Contracts, and (ii) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[10]

---

[10] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that

IX.    **No Consumer Ombudsman is Needed**

68.    The Sale may include the transfer of "personally identifiable information" as defined in section 101(41A) of the Bankruptcy Code.  However, the Debtors believe that no "consumer privacy ombudsman" need be appointed under section 363(b)(1) of the Bankruptcy Code because the Debtors are not aware of any policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the Debtors was in effect for the Debtors as of the Petition Date, and the Stalking Horse Bidder has agreed to adhere to any privacy policies applicable to the Debtors.[11]  See Stalking Horse APA § 8.13; see also 11 U.S.C. § 363(b)(1)(A); see also, e.g., In re Velocity Express Corp., Case No. 09-13294 (MFW), 2009 WL 6690931, at *7 (Bankr. D. Del. Nov. 3, 2009); see also In re Escada (USA) Inc., Case No. 09-15008 (SMB), 2010 WL 4916435, at *4 (Bankr. S.D.N.Y. Jan. 7, 2010) (finding that no consumer privacy ombudsman need be appointed under section 363(b)(1) of the Bankruptcy Code because purchaser had agreed to become debtor's successor in interest as to customer information and to use customer information only in accordance with debtor's privacy policy).

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)**

69.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory

---

terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

[11] The Debtors' privacy policy is available at:  http://www.realmexrestaurants.com/privacy-policy/.

01:23488599.1

contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry

of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). The Debtors request

that the Bidding Procedures Order be effective immediately by providing that the fourteen (14)

day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

70.    As set forth throughout this Motion, and further detailed in the First Day

Declaration, any delay in the Debtors' ability to consummate the Sale—should the Debtors

determine it is the best or only viable disposition of the Assets—would be detrimental to the

Debtors, their creditors and estates, and would impair the Debtors' ability to maximize value in

the Assets through an expeditious closing of the Sale.

71.    For this reason and those set forth above, the Debtors submit that ample cause

exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and

6006(d), to the extent applicable.

## NOTICE

72.    Notice of this Motion will be provided to: (i) the Office of the United States

Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims

against the Debtors on a consolidated basis; (iii) counsel to Wells Fargo Bank, National

Association, as agent to the proposed DIP Lenders and Prepetition Secured Lenders; (iv) Cleary

Gottlieb Steen & Hamilton LLP as counsel to Z Capital Group, LLC; co-counsel to Z Captal

Group, LLC, Morris, Nichols, Arsht & Tunnell LLP; (v) Schulte Roth & Zabel LLP as counsel

to Tennenbaum Capital Partners, LLC; (vi) co-counsel to TCP, Landis, Roth & Cobb, LLP;

(vii) all parties known by the Debtors to assert a lien on any of the Assets; (viii) all persons

known or reasonably believed to have expressed an interest in acquiring all or a substantial

portion of the Assets in the Debtors within the six (6) months prior to the Petition Date; (ix) the

Office of the Attorney General in each state in which the Debtors operate; (x) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (xi) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (xii) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (xiii) the Federal Trade Commission; (xiv) the United States Attorney General/Antitrust Division of Department of Justice; (xv) all non-Debtor parties to any of the Assignable Contracts; and (xvi) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order and Sale Order, substantially in the form attached hereto as <u>Exhibit A</u>,[12] granting the relief requested herein and granting such other relief as the Court deems just and proper.

Dated:  August 6, 2018           SIDLEY AUSTIN LLP
Wilmington, Delaware          Christina M. Craige
                                   Ariella Thal Simonds
                                   555 West Fifth Street, Suite 4000
                                   Los Angeles, California 90013
                                   Telephone:  (213) 896-6000
                                   Facsimile:  (213) 896-6600

                                           -and-

                          YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        */s/ Andrew L. Magaziner*
                        Robert S. Brady (No. 2847)
                        Edmon L. Morton (No. 3856)
                        Andrew L. Magaziner (No. 5426)
                        Elizabeth S. Justison (No. 5911)
                        Rodney Square
                        1000 North King Street
                        Wilmington, Delaware 19801
                        Telephone:  (302) 571-6600
                        Facsimile:  (302) 571-1253

                        PROPOSED ATTORNEYS FOR THE DEBTORS
                        AND DEBTORS IN POSSESSION

---

[12] On or before 21 days before the Sale Hearing, the Debtors shall file a proposed form of Sale Order.

01:23488599.1