**<u>Exhibit A</u>**

**Proposed Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RM Holdco LLC, <u>et al.</u>[1] | Case No. 18-11795 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. _____** |

**ORDER (A) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE APA AND APPROVING CERTAIN BID PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO OMIT CERTAIN CONFIDENTIAL SCHEDULES FROM THE STALKING HORSE APA; (C) AUTHORIZING AND APPROVING BIDDING PROCEDURES, (D) SCHEDULING AN AUCTION AND SALE APPROVAL HEARING, (E) APPROVING THE FORM AND MANNER OF THE NOTICE OF THE SALE HEARING, (F) APPROVING ASSUMPTION AND <u>ASSIGNMENT PROCEDURES, AND (G) GRANTING RELATED RELIEF</u>**

Upon the motion (the "<u>Motion</u>") of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Order</u>"), (a) authorizing and approving the Debtors' entry into that certain Asset Purchase Agreement dated August 5, 2018 (the "<u>Stalking Horse APA</u>"), substantially in the form attached hereto as <u>Exhibit 1</u>, by and between the Debtors and FM Restaurants (PT), LLC (the "<u>Stalking Horse Bidder</u>") and approving certain bid protections in connection with the sale (the "<u>Sale</u>") of substantially all of the Debtors' assets (collectively, the "<u>Assets</u>"); (b) authorizing the Debtors to omit certain confidential schedules (the "<u>Confidential Schedules</u>") contained in the Stalking Horse APA; (c) authorizing and approving bidding procedures (the "<u>Bidding Procedures</u>"), substantially in the form attached hereto as <u>Exhibit 2</u>; (d) scheduling an auction (the "<u>Auction</u>") of the Assets

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RM Holdco LLC (6847); RM Opco LLC (7122); RM HQ LLC (8615); RM Chevys LLC (N/A); RM Acapulco LLC (N/A); and RM El Torito LLC (N/A). The Debtors' headquarters and mailing address is 5660 Katella Avenue, Suite 200, Cypress, CA 90630.

and a hearing (the "Sale Hearing") to consider approval of the Sale; (e) approving the form and manner of notice of the Sale (the "Sale Notice"), substantially in the form attached hereto as Exhibit 3; (f) approving certain procedures (the "Assumption and Assignment Procedures") related to the assumption and assignment of certain executory contracts and unexpired leases and the form and manner of notice of assumption and assignment and related cure amounts (the "Assumption and Assignment Notice"), substantially in the form attached hereto as Exhibit 4; and (g) granting related relief; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given as provided in the Motion, and adequate notice of the Motion and opportunity for objection having been given under the circumstances; and this Court having reviewed the Motion; and this Court having held a hearing (the "Bidding Procedures Hearing") to consider the relief requested in the Motion; and upon the record of the Bidding Procedures Hearing; and upon the First Day Declaration and the Stratton Declaration; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and any objections to the Motion having been withdrawn or overruled on the merits; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

01:23488599.1

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.     This Court has jurisdiction over the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.     The statutory and other predicates for the relief requested in the Motion are sections 105(a), 363, 365 and 503 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court District of Delaware (the "<u>Local Rules</u>").

C.     Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and Local Rules, and no other or further notice is required except as set forth herein with respect to the hearing to be conducted to approve the transactions contemplated by the Stalking Horse APA (the "<u>Sale Hearing</u>").  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

D.     The Debtors' proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of substantially all of the Assets, the Auction for the Assets, and the Bidding Procedures to be employed in connection therewith.

E.     The Debtors have articulated good and sufficient reasons for this Court to: (i) authorize the Debtors to enter into the Stalking Horse APA; (ii) authorize the Debtors to omit

the Confidential Schedules from the Stalking Horse APA; (iii) approve the Stalking Horse Bidding Protections; (iv) approve the Bidding Procedures; (v) schedule the Auction and Sale Hearing; (vi) approve the Sale Notice; (vii) approve the Assumption and Assignment Procedures; and (viii) the Assumption and Assignment Notice.

F.      The entry of this Order is in the best interests of the Debtors, their estates, creditors, and other parties in interest.

G.      The Bidding Procedures are fair, reasonable and appropriate, and are designed to maximize the value to be achieved for the Purchased Assets. The Bidding Procedures were negotiated in good faith by the Debtors and the Stalking Horse Bidder.

H.      The Sale Notice, Assumption and Assignment Procedures, and Assumption and Assignment Notice are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, Sale Hearing, Bidding Procedures, the Debtors' proposed Cure Amounts, potential assumption and assignment of Assignable Contracts, and all relevant important dates and deadlines with respect to the foregoing, and no other or further notice of the sale of the Assets or the assumption and assignment of Assignable Contracts in connection therewith shall be required.

I.      The Break-Up Fee is (a) an actual and necessary cost of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code, (b) reasonably tailored to encourage, rather than hamper, bidding for the Assets, (c) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (d) reasonable and appropriate and (e) a material inducement for, and condition necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed agreement to purchase the Assets.

J.      The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

4

K.      The procedures for assumption and assignment of executory contracts and unexpired leases are fair, reasonable, and appropriate, and comply with the provisions of section365 of the Bankruptcy Code.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is GRANTED to the extent set forth herein.

2.      Except as provided to the contrary herein, all objections to the Motion or the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, hereby are overruled and denied on the merits with prejudice.

3.      The Debtors' entry into the Stalking Horse APA, attached hereto as <u>Exhibit 1</u>, is hereby approved.

4.      Pursuant to sections 363, 503(b) and 507 of the Bankruptcy Code, the Debtors are hereby authorized to pay the Break-Up Fee pursuant to the terms and conditions set forth in the Stalking Horse APA.  Specifically, the Break-Up Fee shall be paid to the Stalking Horse Bidder, if and to the extent required, pursuant to Section 4.8 of the Stalking Horse APA.

5.      Upon entry of this Order, the Break-Up Fee shall (if earned pursuant to the Stalking Horse APA) constitute an allowed super-priority administrative expense claim against the Debtors' bankruptcy estates pursuant to sections 363, 503(b) and 507(a)(2) of the Bankruptcy Code, which claim shall be junior only to the claims under the DIP Facility and the Carve-Out (as defined in the DIP Facility).  The Break-Up fee shall be secured by a super-priority lien in the Debtors' Assets, junior only to liens under the DIP Facility and Carve-Out (as defined in the DIP Facility), and deemed automatically perfected by entry of the Bidding Procedures Order.  The Debtors' obligation to pay the Break-Up Fee pursuant to the terms of the Stalking Horse APA shall survive termination of the Stalking Horse APA in

circumstances where such Break-Up Fee is payable by the Debtors.  No further or additional order from the Court shall be required to give effect to such provisions relating to the terms of payment of the Break-Up Fee.

6.      The Debtors are authorized to omit the Confidential Schedules from the Stalking Horse APA.

7.      The Confidential Schedules shall not be made available to anyone, except to the Court, the United States Trustee, and other parties as otherwise ordered or required by this Court.

8.      The Bidding Procedures, substantially in the form attached hereto as Exhibit 2, are incorporated herein, are approved and shall apply with respect to the Sale of the Assets.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

9.      If no Qualified Bid (as defined in the Bidding Procedures) other than the Qualified Bid submitted by the Stalking Horse Bidder is received by the Bid Deadline (unless otherwise extended by the Debtors in consultation with the Consultation Parties), then (i) the Auction will not be held, (ii) the Stalking Horse Bidder will be deemed the Successful Bidder, (iii) the Stalking Horse APA will be the Successful Bid, and (iv) at the Sale Hearing on **[_____], 2018 at [___] _.m.** (prevailing Eastern Time), the Debtors will seek Bankruptcy Court approval of and authority to consummate the proposed Sale to the Stalking Horse Bidder as contemplated by the Stalking Horse APA.

10.     If the Debtors receive more than one Qualified Bid, (i) the Auction shall take place on **October 4, 2018 at[ ____ _].m.** (prevailing Eastern Time) at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify all Qualified Bidders,

including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder and other invitees in accordance with the Stalking Horse APA, (ii) the Debtors are authorized to hold and conduct the Auction in accordance with the Bidding Procedures, and (iii) the Sale Hearing shall be held before this Court on **[_____], 2018 at [_____] _.m.** (prevailing Eastern Time).

11.     Within one (1) Business Day after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court and serve upon all Qualified Bidders and parties that have requested notice in these cases a notice identifying the Successful Bidder and the Backup Bidder (the "Notice of Successful Bidder") and post such notice on the Debtors' bankruptcy website (http://www.kccllc.net/realmex).

12.     In addition, within five (5) Business Days after the conclusion of the Auction, the Debtors will cause the Notice of Successful Bidder to be published once in the national edition of *USA Today* or the national edition of *The New York Times* as soon as practicable after entry of the Bidding Procedures Order.

13.     Objections, if any, to the sale of the Assets and the Sale contemplated by the Stalking Horse APA, or the relief requested in the Motion must: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2018 (the "Sale Objection Deadline"); and (e) be served upon:  (i) the Debtors, 5660 Katella Avenue, Suite 200, Cypress, CA 90630 (Attn: Jonathan Tibus); (ii) proposed co-counsel to the Debtors, Sidley Austin LLP, 555 W. 5th St., Suite 4000, Los Angeles, CA 90013 (Attn: Christina M. Craige, Esq. and Anna Gumport, Esq.); (iii) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney

7

Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Robert Brady, Esq.); (iv) counsel to the Stalking Horse Bidder, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 1006 (Attn: James Bromley, Esq. and Jane VanLare, Esq.); (v) co-counsel to the Stalking Horse Bidder, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801 (Attn:  Derek C. Abbott, Esq.); (vi) counsel to the official committee of unsecured creditors appointed in the Chapter 11 Cases; and (vii) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin Hackman, Esq.), in each case, so as to be received no later than 4:00 p.m. (Eastern Time) on the Sale Objection Deadline; provided, however, that any objection specifically relating to the Auction, the determination with respect to whether any entity was or was not a Qualified Bidder (or did or did not submit a Qualifying Bid), or the designation of any entity as the Successful Bidder or the Backup Bidder at the conclusion of the Auction may be filed with the Court on or before [_____], 2018 at 4:00 p.m. (prevailing Eastern Time) and served on the foregoing parties.

14.     Failure to file an Objection on or before the Sale Objection Deadline (a) shall forever bar the assertion, whether at any Sale Hearing or thereafter, of any objection to the Motion, to entry of the Sale Order, and/or to the consummation and performance of the Sale contemplated by an Asset Purchase Agreement with a Successful Bidder, and (b) for purposes of section 363(f)(2) of the Bankruptcy Code, shall be deemed to be "consent" to entry of the Sale Order and consummation of the Sale and all transactions related thereto.

15.     The notice, substantially in the form attached hereto as Exhibit 3 (the "Sale Notice"), is hereby approved.

16.     The Debtors will serve the Sale Notice by email, mail, or facsimile within two (2) Business Days after entry of the Bidding Procedures Order upon: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to Wells Fargo Bank, National Association, as agent to the proposed DIP Lenders and Prepetition Secured Lenders; (3) counsel to Z Capital; (4) counsel to TCP; (5) all parties known by the Debtors to assert a lien on any of the Assets; (6) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets in the Debtors within the six (6) months prior to the Petition Date; (7) the Office of the United States Attorney for the District of Delaware; (8) the Office of the Attorney General in each state in which the Debtors operate; (9) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (10) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (11) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (12) the Federal Trade Commission; (13) the United States Attorney General/Antitrust Division of Department of Justice; (14) all non-Debtor parties to any of the Assignable Contracts; (15) all of the Debtors' known creditors; and (16) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the service date (collectively, the "Sale Notice Parties").

17.     The Debtors will cause the Sale Notice to be published once in the national edition of *USA Today* or the national edition of *The New York Times* as soon as practicable after entry of the Bidding Procedures Order.

18.     The Debtors shall also post the Sale notice on the Debtors' bankruptcy website (http://www.kccllc.net/realmex).

19.     The notice, substantially in the form attached hereto as <u>Exhibit 4</u> (the "<u>Assumption and Assignment Notice</u>"), of potential assumption and assignment of certain of the Debtors' executory contracts and unexpired leases to be listed in the Assumption and Assignment Notice (collectively, the "<u>Assignable Contracts</u>"), is hereby approved in its entirety.

20.     The inclusion of a contract, lease or other agreement on an Assumption and Assignment Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and all rights of the Debtors and their estates with respect thereto are reserved.

21.     On or before [_____], 2018, the Debtors shall file and serve by first class mail or hand delivery the Assumption and Assignment Notice on all non-Debtor parties to the Assignable Contracts.  The Assumption and Assignment Notice shall identify the Assignable Contracts and provide the cure amounts that the Debtors believe must be paid to cure all prepetition defaults under the Assignable Contracts (each a "<u>Cure Amount</u>" and, collectively, the "<u>Cure Amounts</u>").

22.     The Stalking Horse Bidder shall provide adequate assurance information to the Debtors on [_____], 2018, who shall serve it on all of the Debtors' Assignable Contract counterparties either via e-mail, fax or first class mail on the same date.  The Debtors shall distribute adequate assurance information from each Qualified Bidder, either via e-mail, fax or first class mail, to all of the Debtors' Assignable Contract counterparties as soon as possible after receipt.

23.     Any objection to the Cure Amount or to the assumption and assignment to the Stalking Horse Bidder, including with respect to adequate assurance of future performance of the

Stalking Horse Bidder (collectively, a "Contract Objection"), must be filed with this Court no later than _____, 2018 (the "Contract Objection Deadline"), and served, so as to be received the same day as the objection is filed, to (i) the Debtors, 5660 Katella Avenue, Suite 200, Cypress, CA 90630 (Attn: Jonathan Tibus); (ii) proposed co-counsel to the Debtors, Sidley Austin LLP, 555 W. 5th St., Suite 4000, Los Angeles, CA 90013 (Attn: Christina M. Craige, Esq. and Anna Gumport, Esq.); (iii) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Robert Brady, Esq.); (iv) counsel to the Stalking Horse Bidder, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 1006 (Attn: James Bromley, Esq. and Jane VanLare, Esq.); (v) co-counsel to the Stalking Horse Bidder, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801 (Attn:  Derek C. Abbott, Esq.); (vi) counsel to the official committee of unsecured creditors appointed in the Chapter 11 Cases; and (vii) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin Hackman, Esq.).

24.     Any Contract Objection must state the basis for such objection and state with specificity what Cure Amount the party to the Assigned Contract believes is required (in all cases with appropriate documentation in support thereof).  If no Contract Objection is timely received, the Cure Amount set forth in the Assumption and Assignment Notice shall be controlling, notwithstanding anything to the contrary in the Assignable Contract or other documents as of the date of the Assumption and Assignment Notice.  The Assumption and Assignment Notice shall also provide that the Contract Objection to any Cure Amount or assumption and assignment will be heard at the Sale Hearing or at a later hearing to be set by the Court, as determined by the Debtors and the Successful Bidder.  If a Successful Bidder that is not

the Stalking Horse Bidder prevails at the Auction, then the deadline to object to assumption and assignment (solely on the grounds of adequate assurance of future performance) shall be extended to 4:00 p.m. (prevailing Eastern Time) one Business Day prior to the Sale Hearing, provided, however, that the deadline to object to the Cure Amount shall not be extended.

25.     Prior to the closing of the Sale, the Debtors may amend the Assumption and Assignment Notice, including without limitation amendment of any Cure Amount, and may make a determination not to assume certain contracts or unexpired leases.  In the event the Debtors add an Assignable Contract or decrease any proposed Cure Amount, the non-Debtor counterparty must file and serve a Contract Objection in accordance with paragraph 23 above within fourteen (14) days after filing of any such amendment.  In the event the Debtors amend the Assumption and Assignment Notice to decrease the Cure Amount of a contract previously included as an Assignable Contract, any such Contract Objection shall be limited to the Cure Amount only.

26.     Unless a non-Debtor party to any Assignable Contract files an objection to the Cure Amount by the applicable Contract Objection Deadline, then such counterparty shall be (a) forever barred from objection to the Cure Amount and (b) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount on the schedule of the Assumption and Assignment Notice, against the Debtors, the Stalking Horse Bidder, or any Successful Bidder or any other assignee of the relevant contract or lease.

27.     Unless a non-Debtor party to any Assignable Contract files a timely objection to the assumption and assignment of the contract to the Stalking Horse Bidder or the other Successful Bidder, then such counterparty shall be deemed to have consented to the assumption

and assignment to the Stalking Horse Bidder or the other Successful Bidder and shall be forever barred from objecting to the assumption and assignment of its lease or contract on any basis.

28.     Entry of the Sale Order shall have the effect of liquidating on a final basis all Cure Amounts that were not objected to and all Cure Amounts previously disputed that were consensually resolved prior to the Sale Hearing, and each counterparty whose Cure Amount is so liquidated shall be barred from asserting any additional cure or other amounts against the Debtors or their estates with respect to its executory contract or unexpired lease, for the time period ending on the date of the filing of the Assumption and Assignment Notice.

29.     Compliance with the foregoing notice provisions shall constitute sufficient notice of the Debtors' proposed sale of the Debtors' assets free and clear of liens, claims, interests and encumbrances, pursuant to section 363(f) and otherwise, and except as set forth in this Order, no other or further notice of the sale shall be required to be provided by the Debtors.

30.     The Stalking Horse Bidder is entitled to make any additional bids at the Auction in compliance with the Bidding Procedures.

31.     The Sale Hearing may be continued, from time to time, without further notice to creditors or other parties in interest other than by announcement of said continuance before this Court on the date scheduled for such hearing or in the hearing agenda for such hearing; provided that such date is consistent with the applicable milestone for the entry of the Sale Order under the DIP Facility, unless such milestone is extended in accordance with the terms of the DIP Facility.

32.     Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Purchased Assets or a Qualifying Bid shall be entitled to any expense reimbursement, break-up, termination or similar fee or payment.

01:23488599.1

33. Except as otherwise provided in the Stalking Horse APA, the Bidding Procedures, or this Order, the Decision Maker (as defined in the Bidding Procedures) further reserves the right, in the exercise of reasonable business judgment, after consultation with the Consultation Parties, to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders; (f) extend the deadlines set forth herein; and (g) continue or cancel the Auction and/or Sale Hearing in open court without further notice; provided, however, that any the Auction and/or Sale Hearing may be extended only so long as the extended deadline does not exceed the applicable milestone for such deadline under the DIP Facility, unless such milestone is extended in accordance with the terms of the DIP Facility; and provided further that any such modifications must be provided in writing by email (to the notice parties listed in the draft purchase agreement submitted with the relevant Bid) to all Bidders (or Qualified Bidders following the Bid Deadline) and may in no event (a) permit the submission of Bids after the close of the Auction, unless otherwise ordered by the Bankruptcy Court and (b) change any of the Bid Requirements set forth in Section 6 of the Bidding Procedures except to the extent specifically provided therein.

34. All persons and entities that participate in the bidding process or the Auction shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this Court and consented to a final order entered by this Court with respect to all matters related to

01:23488599.1

the terms and conditions of the transfer of Assets, the Auction and any transaction contemplated herein.

35.     The Debtors' obligations under this Order, the provision of this Order and the portions of the Stalking Horse APA pertaining to the Bidding Procedures shall survive conversion of these cases to cases under chapter 7 of the Bankruptcy Code, confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtors, a Chapter 7 trustee, the reorganized or reconstituted debtors, as the case may, after the effective date of a confirmed plan or plans in the Debtors' cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code).

36.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014 or any other provisions of the Bankruptcy Rules or the Local Rules stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry and no automatic stay shall apply to this Order.

37.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

38.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

39.     In the event there is any inconsistency between the Motion, the Bidding Procedures, the Stalking Horse APA, or this Order, this Order shall govern.

40.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order and to enter any Orders in aid or furtherance of this Order, and to adjudicate any and all remaining issues concerning the Debtors' right and authority to assume, assign and/or sell the Assets, including to approve the sale at the Sale Hearing.  All matters

arising from or related to the implementation of this Order may be brought before this Court as a

contested matter, without the necessity of commencing an adversary proceeding.


Dated: _____, 2018     _____
       Wilmington, Delaware

                                       UNITED STATES BANKRUPTCY JUDGE

01:23488599.1

**<u>Exhibit 1</u>**

**Stalking Horse APA**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**AMONG**

**RM HOLDCO LLC,**

**THE SUBSIDIARIES OF RM HOLDCO LLC LISTED ON <u>ANNEX 1</u>**

**AND**

**FM RESTAURANTS (PT), LLC**

**Dated as of August 5, 2018**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ......................................................................................... 1

    1.1     Certain Definitions .......................................................................... 1
    1.2     Other Definitional and Interpretive Matters ...................................... 17

ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ....... 18

    2.1     Purchase and Sale of Assets................................................................ 18
    2.2     Excluded Assets .................................................................................. 20
    2.3     Assumption of Liabilities.................................................................... 22
    2.4     Excluded Liabilities ........................................................................... 23
    2.5     Assignment and Assumption of Contracts........................................... 24
    2.6     Bulk Sales Laws.................................................................................. 26
    2.7     DIP Facility........................................................................................ 26

ARTICLE III CONSIDERATION .............................................................................. 26

    3.1     Purchase Price .................................................................................... 26
    3.2     Determination of Final Purchase Price. ............................................... 27

ARTICLE IV CLOSING AND TERMINATION.............................................................. 29

    4.1     Closing Date........................................................................................ 29
    4.2     Deliveries by the Sellers ..................................................................... 30
    4.3     Deliveries by Purchaser ...................................................................... 30
    4.4     Termination of Agreement................................................................... 30
    4.5     Procedure Upon Termination............................................................... 32
    4.6     Effect of Termination.......................................................................... 32
    4.7     Forfeiture of Purchaser Deposit .......................................................... 32
    4.8     Break-Up Fee ..................................................................................... 32

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS............................. 33

    5.1     Organization and Good Standing.......................................................... 33
    5.2     Authorization of Agreement ................................................................ 33
    5.3     Conflicts; Consents of Third Parties .................................................... 34
    5.4     Title to Purchased Assets; Sufficiency of Assets................................... 34
    5.5     Taxes ................................................................................................. 35
    5.6     Real Property ..................................................................................... 35
    5.7     Tangible Personal Property.................................................................. 36
    5.8     Intellectual Property............................................................................ 36
    5.9     Material Contracts............................................................................... 37
    5.10    Employee Benefits.............................................................................. 38
    5.11    Labor ................................................................................................. 39
    5.12    Litigation............................................................................................ 39

5.13    Compliance with Laws; Permits ................................................................. 39
5.14    Environmental Matters.............................................................................. 40
5.15    Financial Advisors .................................................................................... 41
5.16    Financial Statements ................................................................................. 41
5.17    Insurance ................................................................................................... 41
5.18    Absence of Certain Changes ..................................................................... 41
5.19    No Other Representations or Warranties; Schedules................................. 41

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER..................... 42

6.1    Organization and Good Standing................................................................ 42
6.2    Authorization of Agreement ...................................................................... 42
6.3    Conflicts; Consents of Third Parties .......................................................... 43
6.4    Litigation.................................................................................................... 43
6.5    Financial Advisors ..................................................................................... 43
6.6    Financial Capability ................................................................................... 43
6.7    Condition of the Business .......................................................................... 44

ARTICLE VII BANKRUPTCY COURT MATTERS........................................................... 44

7.1    Competing Bids .......................................................................................... 44
7.2    Bankruptcy Court Filings........................................................................... 44
7.3    Adequate Assurances ................................................................................. 45
7.4    Purchaser Deposit ...................................................................................... 45

ARTICLE VIII COVENANTS................................................................................................ 45

8.1    Access to Information ................................................................................ 45
8.2    Conduct of the Business Pending the Closing ........................................... 46
8.3    Consents; Liquor Licenses ......................................................................... 47
8.4    Regulatory Approvals ................................................................................ 48
8.5    Further Assurances..................................................................................... 48
8.6    RESERVED................................................................................................ 49
8.7    Preservation of Records ............................................................................. 49
8.8    Publicity ..................................................................................................... 49
8.9    Use of Name .............................................................................................. 50
8.10   Schedules ................................................................................................... 50
8.11   RESERVED................................................................................................ 50
8.12   WARN Act.................................................................................................. 50
8.13   Section 363(b)(1)(A).................................................................................. 50
8.14   Hilco Agreement ........................................................................................ 50
8.15   Sellers' Workers' Compensation Obligations ............................................ 50
8.16   Trade Payables ........................................................................................... 51

ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS ............................................. 51

9.1    Transferred Employees ............................................................................... 51
9.2    Employee Benefits. ..................................................................................... 51

ARTICLE X CONDITIONS TO CLOSING ........................................................................... 53

    10.1    Conditions Precedent to Obligations of Purchaser ............................ 53
    10.2    Conditions Precedent to Obligations of the Sellers .......................... 54
    10.3    Conditions Precedent to Obligations of Purchaser and the Sellers ..................... 54
    10.4    Frustration of Closing Conditions ..................................................... 55

ARTICLE XI NO SURVIVAL; LIMITATION ON DAMAGES ........................................... 55

    11.1    No Survival of Representations and Warranties ................................ 55
    11.2    Limitation on Damages ...................................................................... 55

ARTICLE XII TAXES ......................................................................................................... 55

    12.1    Transfer Taxes ................................................................................... 55
    12.2    Purchase Price Allocation .................................................................. 56
    12.3    Income Tax Treatment ........................................................................ 57
    12.4    Cooperation ........................................................................................ 57
    12.5    Audits, Claims and Proceedings ........................................................ 57

ARTICLE XIII MISCELLANEOUS ................................................................................... 57

    13.1    Expenses ............................................................................................ 57
    13.2    Injunctive Relief ................................................................................. 57
    13.3    Submission to Jurisdiction; Consent to Service of Process ............... 58
    13.4    WAIVER OF RIGHT TO TRIAL BY JURY ..................................... 59
    13.5    Entire Agreement; Amendments and Waivers ................................... 59
    13.6    Governing Law ................................................................................... 59
    13.7    Notices ................................................................................................ 59
    13.8    Severability ........................................................................................ 60
    13.9    Binding Effect; Assignment ............................................................... 60
    13.10   RESERVED ........................................................................................ 61
    13.11   Non-Recourse .................................................................................... 61
    13.12   Counterparts ....................................................................................... 61
    13.13   No Interpretation Against Drafter ..................................................... 61

**ANNEX**

1        Subsidiaries of the Company

**SCHEDULES**

I        Restaurant Locations
1.1(a)    Knowledge of the Sellers
1.1(b)    Retained Restaurants
2.1(j)    Purchased Permits
2.2(k)    Other Excluded Assets
2.2(o)    Surrendered Liquor Licenses
2.3(p)    Other Assumed Liabilities

2.5(a)(i)      Purchased Contracts
2.5(a)(ii)     Excluded Contracts
2.5(b)         Cure Schedule
5.3(a)         Conflicts (Seller)
5.3(b)         Consents
5.4(a)         Title to Purchased Assets
5.5(a)         Taxes; Pending Tax Actions
5.6(a)         Real Property
5.6(b)         Defaults Under Real Property Leases
5.7            Tangible Personal Property
5.8(a)         Owned Intellectual Property
5.8(b)         Intellectual Property Licenses - Exceptions
5.8(c)         Purchased Intellectual Property Legal Proceedings
5.8(d)         Material Intellectual Property Licenses
5.8(e)         Infringement on Purchased Intellectual Property
5.9(a)         Material Contracts
5.9(c)         Material Contracts Full Force and Effect
5.9(d)         Material Contract Defaults
5.10(a)        Employee Benefit Plans
5.10(h)        Effect of Execution of this Agreement
5.12           Litigation
5.13(b)        Permits
5.13(c)        Liquor Licenses
5.14           Environmental Matters
5.15           Financial Advisors
5.16           Financial Statements
5.17(a)        Insurance Policies
5.17(b)        Cancelled Insurance Policies
5.18           Absence of Certain Changes
6.3(a)         Conflicts (Purchaser)
8.2(b)         Negative Covenants
8.2(b)(i)      Compensation
8.9            Use of Names

**EXHIBITS**

A       Form of Bill of Sale
B       Form of Assignment and Assumption Agreement
C       Form of Intellectual Property Assignment Agreement
D       Form of [Patent][Trademark][Copyright] Assignment Agreement
E       Form of Assignment and Assumption Agreement (Real Property)
F       Form of Bidding Procedures Order
G       Form of Management Agreement
H       DIP Financing and Guaranty Agreement
I       Equity Commitment Letter

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**, dated as of August 5, 2018 (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), by and among RM Holdco LLC, a Delaware limited liability company (the "Company"), the Subsidiaries (as defined below) of the Company listed on Annex 1 (together with the Company, the "Sellers"), and FM Restaurants (PT), LLC, a Delaware limited liability company ("Purchaser").

## RECITALS

WHEREAS, the Sellers intend to file voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), on or around August 5, 2018 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (such cases, collectively, the "Bankruptcy Cases");

WHEREAS, the Sellers (i) operate and franchise full service Mexican casual dining restaurant chains that offer food and alcoholic beverages; and (ii) provide purchasing and distribution services for their restaurant locations listed on Schedule I (the "Business");

WHEREAS, subject to the terms and conditions hereof, the Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from the Sellers, all of the Purchased Assets and Assumed Liabilities;

WHEREAS, the board of managers, managing member or applicable governing body of each Seller has determined that a sale of the assets of its applicable Seller is necessary to maximize value and it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transactions provided for herein and has approved this Agreement;

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bidding Procedures Order (as defined below) and, if Purchaser is the Successful Bidder, the Sale Order (as defined below) to be entered by the Bankruptcy Court in the Bankruptcy Cases; and

WHEREAS, certain terms used in this Agreement are defined in Section 1.1.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

### 1.1    Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Additional Material Contracts" has the meaning set forth in Section 5.9(e).

"Additional Material Contracts Schedule" has the meaning set forth in Section 5.9(e).

"Additional Payment Amount" has the meaning set forth in Section 3.2(d).

"Administrative Expenses" means any and all costs of the Bankruptcy Cases entitled to priority under 11 U.S.C. § 503, including legal and financial advisory fees and costs incurred by professionals retained by the Sellers and any official committee appointed in the Bankruptcy Cases, regardless of whether such professionals have been officially retained prior to or after the Closing and regardless of whether such fees and costs are approved by the Bankruptcy Court prior to or after the Closing.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.  For purposes of this Agreement, Purchaser and its Affiliates shall be deemed not to be "Affiliates" of any Seller and the Sellers and their respective Affiliates shall be deemed not to be "Affiliates" of Purchaser and its Affiliates.

"AIG Policy" means the workers' compensation insurance policy between the Company and an affiliate of American International Group, Inc.

"Agreement" has the meaning set forth in the Preamble hereto.

"Allocation Dispute" has the meaning set forth in Section 12.2(a).

"Allocation Dispute Notice" has the meaning set forth in Section 12.2(a).

"Alternative Transaction" means a sale of any material portion of the Purchased Assets to a Person or Persons other than Purchaser or an Affiliate of Purchaser pursuant to the Auction.

"Ancillary Agreements" means any other agreement, document or instrument that any Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby (including the Seller Documents and the Purchaser Documents).

"Antitrust Laws" has the meaning set forth in Section 8.4(b).

"Approved Budget" has the meaning set forth in the DIP Order.

"Assignable Contract" means any Contract to which any Seller is a party, but excluding, in each case, this Agreement and the Ancillary Agreements, the Sale Order, the DIP Facility and any ancillary agreements related thereto, and any engagement letters or agreements between any Seller and any estate professionals retained by such Seller.

2

"Assignment and Assumption Agreement(s)" means the Assignment and Assumption Agreement(s) in substantially the form annexed hereto as <u>Exhibit B</u>, <u>Exhibit C</u>, <u>Exhibit D</u> and <u>Exhibit E</u> evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Purchased Contracts.

"Assumed Liabilities" has the meaning set forth in <u>Section 2.3</u>.

"Auction" shall mean the auction as contemplated by the Bidding Procedures Order.

"Avoidance Actions" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller arising under or pursuable through Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) and all proceeds thereof.

"Backup Bidder" has the meaning set forth in the Bidding Procedures Order.

"Bankruptcy Cases" has the meaning set forth in the <u>Recitals</u> hereto.

"Bankruptcy Code" has the meaning set forth in the <u>Recitals</u> hereto.

"Bankruptcy Court" has the meaning set forth in the <u>Recitals</u> hereto.

"Base Purchase Price" has the meaning set forth in <u>Section 3.1(a)</u>

"Bid Procedures" has the meaning set forth in the Bidding Procedures Order.

"Bidding Procedures Order" means the bidding procedures order of the Bankruptcy Court in the Bankruptcy Cases substantially in the form attached as <u>Exhibit F</u> and otherwise reasonably acceptable to Purchaser and Sellers.

"Borrower" has the meaning set forth in the DIP Facility.

"Break-Up Fee" has the meaning set forth in <u>Section 4.8</u>.

"Business" has the meaning set forth in the <u>Recitals</u> hereto.

"Business Day" means any day of the year other than a Saturday, Sunday or a day on which national banking institutions in Los Angeles, California are required or authorized to close.

"Cash Deposit" has the meaning set forth in <u>Section 7.4</u>.

"Closing" has the meaning set forth in <u>Section 4.1</u>.

"Closing Date" has the meaning set forth in <u>Section 4.1</u>.

"Closing Date Report" has the meaning set forth in <u>Section 3.1(b)</u>

3

"Closing Payment" has the meaning set forth in Section 3.1(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble hereto.

"Consent" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Body or other Person.

"Contract" means any contract, indenture, note, bond, lease, Personal Property Lease, Real Property Lease or other lease, license, purchase or sale order, warranties, commitments, or other written or oral agreement.

"Copyrights" has the meaning set forth in the definition of "Intellectual Property."

"Credit Deposit" has the meaning set forth in Section 7.4.

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure defaults, if any, under the Purchased Contracts so that they may be assumed and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Cure Payments Adjustment Amount" means the lesser of: (i) the Cure Amounts and (ii) $200,000.00.

"Deduction Amount" means the sum of (i) the Purchaser DIP Facility Deduction Amount *plus* (ii) the Purchaser Prepetition Secured Debt Deduction Amount.

"Default" has the meaning set forth in the DIP Order.

"Delayed Draw DIP Term Loan" has the meaning set forth in the DIP Facility.

"Deposits Amount" means the aggregate amount of all deposits of the Sellers in respect of Real Property Leases and liquor, including keg deposits, in each case, that are Purchased Assets primarily related to the Retained Restaurants.

"Designation Rights Period" means the period of ninety (90) days from and after the Closing Date.

"DIP Agent" means the agent and administrative agent, if any, under the DIP Facility.

"DIP Facility" means that certain DIP Financing and Guaranty Agreement, substantially in the form of Exhibit H attached hereto, to be entered into by and among the Sellers, the lenders party thereto and the DIP Agent promptly following the entry of the DIP Order.

"DIP Order" means any order of the Bankruptcy Court then in-effect authorizing Sellers to obtain post-petition financing in the Bankruptcy Cases.

"DIP Term Loan" has the meaning set forth in the DIP Facility.

4

"Disputed Items" has the meaning set forth in Section 3.2(b)(iii).

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, supplier lists, stationery, forms, labels, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, catalogs, flyers, pamphlets, web pages, art work, photographs, etc.), recipes, menus, and other similar materials owned or used by any Seller, in each case, whether or not in electronic form.

"Employee Benefit Plans" means all "employee benefit plans," as defined in Section 3(3) of ERISA, and all other employee benefit arrangements or payroll practices, including, without limitation, bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs maintained by the Sellers or to which any Seller contributed or is obligated to contribute thereunder for current or former employees of the Sellers or under which any Seller has any liability.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by any Seller, together with individuals who are hired in the Ordinary Course of Business after the date hereof and prior to the Closing, and excluding individuals who are terminated in the Ordinary Course of Business after the date hereof and prior to the Closing.

"Environmental Claim" means any and all complaints, summons, citations, directives, orders, claims, litigation, investigations, notices of violation, judgments, administrative, regulatory or judicial actions, suits, demands or proceedings, or notices of noncompliance or violation by any Governmental Body or Person involving or alleging potential liability arising out of or resulting from (i) violations of Environmental Laws, (ii) Remedial Action (iii) any Release of a Hazardous Material or (iv) exposure to, handling, reporting, labeling, treatment, storage, disposal or recycling of any Hazardous Material.

"Environmental Law" means any foreign, federal, state or local statute, regulation, ordinance, Order, published policy or guidance, or rule of common law relating to the protection of human health or safety, Hazardous Materials or to the indoor or outdoor environment or natural resources including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and including the laws of nuisance and trespass, and the regulations promulgated pursuant thereto.

"Equipment" means the tangible personal property owned, used or held for use by any Seller on the Closing Date, including, but not limited to, the physical assets and all fixtures, leasehold improvements, furnishings, equipment, appliances, machinery, tools, supplies, spare parts, molds, trucks, cars, other vehicles and rolling stock vehicles, artwork, Hardware, copiers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office materials, located on, or off the premises of the Seller Properties.

"Equity Commitment" has the meaning set forth in Section 6.6.

"Equity Interests" means, with respect to any Person, (i) capital stock of, partnership interests, membership interests or other equity interests in, such Person, (ii) securities or other rights exercisable, convertible into or exchangeable for shares of capital stock, partnership interests, membership interests, voting securities or other equity interests in such Person and (iii) options, warrants, calls, commitments or other rights to acquire any of the foregoing described in clauses (i) and (ii), whether fixed or contingent, matured or unmatured, contractual, legal, equitable or otherwise.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Accrued Administrative Expenses" means all Administrative Expenses accrued and unpaid as of the Closing, as estimated by the Sellers in good faith at least five (5) Business Days prior to the Closing Date.

"Estimated Cure Payments Adjustment Amount" has the meaning set forth in Section 3.1(b).

"Estimated Deposits Amount" has the meaning set forth in Section 3.1(b).

"Estimated Purchase Price Adjustment Amount" means the sum of (i) the Estimated Prepaid Rent Amount, *plus* (ii) the Estimated Cure Payments Adjustment Amount, *plus* (iii) the Estimated Deposits Amount, *plus* (iv) the Estimated Retained Restaurant Cash Amount, *plus* (v) the Estimated Qualifying Excluded Restaurants Payment Amount.

"Estimated Prepaid Rent Amount" has the meaning set forth in Section 3.1(b).

"Estimated Retained Restaurant Cash Amount" has the meaning set forth in Section 3.1(b).

"Estimated Qualifying Excluded Restaurants Payment Amount" has the meaning set forth in Section 3.1(b).

"Estimated Wind-Down Expenses" means the costs and expenses that Sellers expect to incur in connection with winding down their bankruptcy estates from and after the Closing Date, as set forth in the Wind-Down Budget.

"Event of Default" has the meaning set forth in the DIP Order.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" means any Contract which is not a Purchased Contract.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Restaurants" means all restaurants operated as part of the Business other than the Retained Restaurants.

"Excluded Matter" has the meaning set forth in the definition of "Material Adverse Effect."

"Excluded Taxes" means, to the fullest extent permitted by applicable Law, all Taxes, other than (i) Transfer Taxes and (ii) any trust fund related Taxes, including sales Taxes that constitute trust fund taxes and any payroll or employment related Taxes, for any taxable period (A) which are imposed on any Seller; (B) which are imposed in respect of any period prior to the Closing Date on any Purchased Asset, or (C) for which any Seller may be liable under any applicable law, judicial determination or contractual obligation.

"Final Adjustment Report" has the meaning set forth in Section 3.2(b)(ii).

"Final Allocation" has the meaning set forth in Section 12.2(a).

"Final Cure Payments Adjustment Amount" has the meaning set forth in Section 3.2(b)(iii).

"Final Deposits Amount" has the meaning set forth in Section 3.2(b)(iii).

"Final Order" means an order of any Bankruptcy Court, any court of competent jurisdiction or other Governmental Body (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days after the entry of the order at issue.

"Final Prepaid Rent Amount" has the meaning set forth in Section 3.2(b)(iii).

"Final Purchase Price Adjustment Amount" means the sum of (i) the Final Prepaid Rent Amount, *plus* (ii) the Final Cure Payments Adjustment Amount, *plus* (iii) the Final Deposits Amount, *plus* (iv) the Final Retained Restaurant Cash Amount, *plus* (v) the Final Qualifying Excluded Restaurants Payment Amount, in each case, as finally determined in accordance with Section 3.2.

"Final Qualifying Excluded Restaurants Payment Amount" has the meaning set forth in Section 3.2(b)(iii).

"Final Retained Restaurant Cash Amount" has the meaning set forth in Section 3.2(b)(iii).

"Financial Statements" has the meaning set forth in Section 5.16.

"Fund" has the meaning set forth in the Equity Commitment Letter substantially in the form attached hereto as Exhibit I.

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the applicable periods.

"Governmental Body" means any government or governmental, quasi-governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, regional or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any man-made or naturally occurring substance, product, material, waste or recyclable material which is regulated by any Governmental Body including, without limitation, petroleum and its by products, asbestos, and any material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "special waste," "medical waste or biohazardous waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or other words of similar import under any provision of Environmental Law. Hazardous Material shall include mold, if such mold is present under such conditions as to render any structure, or portion thereof, unsafe or unfit for its intended uses.

"Hilco" means Hilco Real Estate, LLC.

"Hilco Agreement" means a real estate consulting and advisory services agreement to be entered into, between Hilco and Sellers that relates to certain consulting and advisory services to be provided by Hilco to Sellers with respect to the Real Property Leases, which agreement shall be, in form and substance, reasonably acceptable to the Sellers and Purchaser.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

"Income Tax" means any Tax based on or measured by reference to net income.

"Indebtedness" of any Person means, without duplication, (i) the principal, interest and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B)

indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person with respect to any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Initial DIP Term Loan Commitment" has the meaning set forth in the DIP Facility.

"Insurance Policies" has the meaning set forth in Section 5.17.

"Intellectual Property" means all intellectual property rights and other similar proprietary rights throughout the world, including, without limitation, all rights in, to and under all: (i) patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "Patents"), (ii) trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, corporate names, identifying symbols, emblems, signs or insignia and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications and registrations therefor and renewals thereof (collectively, "Marks"), (iii) copyrights and registrations and applications therefor (collectively, "Copyrights"), (iv) trade secrets, confidential inventions and confidential business information (including recipes, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, customer and supplier lists, pricing and cost information, business and marketing plans and proposals) (collectively, "Trade Secrets"), (v) Internet domain names, websites, web pages and social media channels (including, without limitation, Facebook, Instagram, and Twitter handles), (vi) income and royalty payments arising from or relating to any of the foregoing, and (vii) causes of action and rights to sue or seek other remedies (including with respect to any past, present or future infringement, misuse or misappropriation) arising from or relating to any of the foregoing.

"Intellectual Property Licenses" means any Contract pursuant to which (i) Seller grants to any third Person any right to use (including through releases, immunities from suit or covenants not to sue) any of the Purchased Intellectual Property owned by any Seller, and (ii) Seller receives from any third person any right to use (including through releases, immunities from suit or covenants not to sue) such third Person's Intellectual Property.

"Inventory" means all of the Sellers' inventory (including, without limitation, finished goods, merchandise, work in progress, residual by-products, consumable food and beverages, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables) owned and maintained, held or stored by or for any of the Sellers as of the Closing Date.

"IRS" means the Internal Revenue Service.

"KERP" means that certain RM Opco LLC Retention Plan dated and effective as of February 21, 2018, to the extent approved by the Bankruptcy Court in the Bankruptcy Cases.

"Knowledge of the Sellers" means, as of the relevant date, the actual knowledge following due inquiry possessed by those officers of the Sellers identified on Schedule 1.1(a).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any claim, liability, action, complaint, suit, citizen suit, litigation, arbitration, appeal, petition, demand, inquiry, hearing, proceeding, investigation or other dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Body or any third person and any appeal from any of the foregoing; provided, that, the Bankruptcy Cases shall not be considered a "Legal Proceeding".

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Licensed Intellectual Property" means any Intellectual Property that the Sellers are licensed or otherwise permitted by other Persons to use pursuant to any Intellectual Property License.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, charge, or encumbrance.

"Liquor License Approvals" has the meaning set forth in Section 8.3.

"Marks" has the meaning set forth in the definition of "Intellectual Property."

"Material Adverse Effect" means any event, circumstance, development, change, condition, occurrence, result or effect that, individually or in that aggregate, (a) has had or would reasonably be expected to have or result in a material adverse effect on the business, assets, results of operation or condition (financial or otherwise) of any of the Company and its Subsidiaries (taken as a whole), the Business or the Purchased Assets and the Assumed Liabilities (taken as a whole), in each case, other than to the extent an effect results from an Excluded Matter or (b) would prevent, materially delay or materially impair the ability of the Sellers to consummate the transactions contemplated by this Agreement. "Excluded Matter" means any one or more of the following, whether independently or in combination with any other of the following: (i) the effect of any change in the global or domestic economy; (ii) the effect of any change in the domestic securities, financial or capital markets in general; (iii) the effect of any change that generally affects the domestic restaurant industry; (iv) the effect of any change arising in connection with earthquakes, hurricanes, floods, other natural disasters, national calamities, acts of war or the engagement of the United States in hostilities, acts of God, political conditions, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, national calamities, acts of war, acts of God, political conditions, sabotage or terrorism or military actions

existing or underway as of the date hereof; (v) the effect of any changes in applicable Laws or Tax or accounting rules or GAAP or any change in the interpretation of the foregoing by any Governmental Body; (vi) any effect resulting from the public announcement or pendency of this Agreement, the identity of Purchaser, compliance with the terms of this Agreement (other than Section 8.2), or the consummation of the transactions contemplated by this Agreement; in each case, including on relationships, contractual or otherwise, with customers, suppliers, vendors or employees; (vii) failure by the Sellers to meet any projections (provided that the underlying causes of the failure shall not be excluded); (viii) any action by Purchaser or any of its Affiliates or the omission of an action that was required to be taken by Purchaser or any of its Affiliates under this Agreement; (ix) any action taken by the Sellers which is required by this Agreement (other than any action required to be taken by Section 8.2) or is taken at the request of Purchaser; or (x) any effect resulting from the filing or prosecution of the Bankruptcy Cases or any action taken by the Bankruptcy Court, provided, however, that the foregoing clauses (i) through (v) shall not include, and thus the determination of "Material Adverse Effect" shall not exclude, any event, circumstance, development, change, circumstance, occurrence, result or effect that has a material and disproportionate adverse effect on any of the Company and its Subsidiaries (taken as a whole), the Business or the Purchased Assets and the Assumed Liabilities (taken as a whole) as compared to the effect on other affected Persons that operate in the domestic restaurant industry.

"Material Contracts" has the meaning set forth in Section 5.9(a).

"Material Decision" shall mean any of the following to the extent the same may affect the Business following the Closing Date: (i) entering into any Material Contract; (ii) terminating any Material Contract to which any Seller is party; or (iii) making any material amendment to any Material Contract to which any Seller is party.

"Neutral Firm" has the meaning set forth in Section 12.2(a).

"Neutral Firm's Report" has the meaning set forth in Section 3.2(b)(iii).

"Non-Recourse Parties" has the meaning set forth in Section 13.11.

"Notice of Disagreement" has the meaning set forth in Section 3.2(b)(ii).

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary course of business subject, to the extent applicable to any action to be taken by any Seller on or following the date hereof, to any limitations applicable to such Seller arising as a result of the fact that it is a debtor-in-possession under the Bankruptcy Code and that it is operating under the supervision of the Bankruptcy Court.

"Owned Intellectual Property" means the Intellectual Property owned by the Sellers.

"PACA" means Perishable Agricultural Commodities Act of 1930, 7 U.S.C. §§ 499a, et seq.

"Party" means and refers to any signatory to this Agreement.  Such parties are collectively referred to as the "Parties."

"PASA" means Packers and Stockyard Act of 1921, 7 U.S.C. §§ 181, et seq.

"Patents" has the meaning set forth in the definition of "Intellectual Property."

"Permits" means any material approvals, authorizations, consents, registrations, licenses, permits or certificates issued by a Governmental Body (including liquor licenses).

"Permitted Exceptions" means (i) all Liens, defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in title records or policies of title insurance; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iii) zoning, building codes, entitlement and other land use and environmental regulations by any Governmental Body; (iv) pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation; (v) deposits by or on behalf of any Seller to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations incurred in the Ordinary Course of Business; (vi) any interest or title of a lessor under any lease of a Seller; (vii) Liens created under this Agreement or any Ancillary Agreement or arising from any action provided for under this Agreement or any Ancillary Agreement, or created by or through Purchaser; and (viii) Liens for Taxes not yet due and payable under applicable Law or that are being contested in good faith by appropriate proceedings.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Leases" has the meaning set forth in Section 5.7.

"Petition Date" has the meaning set forth in the Recitals hereto.

"Prepaid Rent Amount" means the aggregate amount of all advance and prepaid rental payments (excluding any Deposits) made by the Sellers in respect of Real Property Leases that are Purchased Assets.

"Prepetition Financing Agreement (First Lien)" means that certain Financing Agreement (First Lien), dated as of March 21, 2012 (as amended by Amendment No. 1 to Financing Agreement (First Lien), dated as of November 2, 2012, as further amended by Amendment No. 2 to Financing Agreement (First Lien), dated as of April 26, 2013, as further amended by Amendment No. 3 to Financing Agreement (First Lien), dated as of November 21, 2014, as further amended by Amendment No. 4 to Financing Agreement (First Lien), dated as of June 17, 2015, as further amended by Amendment No. 5 to Financing Agreement (First Lien), dated as of March 22, 2016 and effective as of March 21, 2016, as further amended by Amendment No, 6 to Financing Agreement (First Lien), dated as of April 28, 2016, as further amended by Amendment No. 7 to Financing Agreement (First Lien), dated as of July 15, 2016, as further amended by Amendment No. 8 to Financing Agreement (First Lien), dated as of February 21,

2017, as further amended by Amendment No. 9 to Financing Agreement (First Lien), dated as of June 5, 2017, as further amended by Amendment No. 10 to Financing Agreement (First Lien), dated September 8, 2017 and as further amended by Amendment No. 11, dated December 29, 2017, as further amended by Amendment No. 12, dated June 20, 2018, and as may be further amended from time to time thereafter), by and among the Company, RM Opco LLC, a Delaware limited liability company, as the borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto, the noteholders from time to time party thereto, and Wells Fargo, as agent for the lenders and noteholders from time to time party thereto.

"Prepetition Financing Agreement (Second Lien)" means that certain Amended and Restated Financing Agreement (Second Lien), dated as of November 21, 2014 (as amended by Amendment No. 1 to Amended and Restated Financing Agreement (Second Lien), dated as of June 17, 2015, as further amended by Amendment No. 2 to Amended and Restated Financing Agreement (Second Lien), dated as of July 15, 2016, as further amended by Amendment No. 3 to Amended and Restated Financing Agreement (Second Lien), dated as of November 18, 2016, as further amended by Amendment No. 4 to Amended and Restated Financing Agreement (Second Lien), dated as of February 17, 2017, as further amended by Amendment No. 5 to Amended and Restated Financing Agreement (Second Lien), dated as of June 5, 2017, as further amended by Amendment No. 6 to Amended and Restated Financing Agreement (Second Lien), dated as of September 8, 2017, as further amended by Amendment No. 7 to Amended and Restated Financing Agreement (Second Lien), dated as of November 20, 2017 and as further amended by Amendment No. 8 to Amended and Restated Financing Agreement (Second Lien), dated as of December 29, 2017, as further amended by Amendment No. 9 to Amended and Restated Financing Agreement (Second Lien), dated as of June 20, 2018, and as may be further amended from time to time thereafter), by and among the Company, RM Opco LLC, a Delaware limited liability company, as the borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto, and Wells Fargo, as agent for the lenders from time to time party thereto.

"Prepetition Financing Agreements" means the Prepetition Financing Agreement (First Lien) and the Prepetition Financing Agreement (Second Lien).

"Prepetition Lenders" means the lenders under the Prepetition Financing Agreements.

"Prepetition Secured Debt" means any amounts payable to the Prepetition Lenders in respect of secured Indebtedness of the Sellers.

"Prepetition Secured Debt Cash Proceeds Amount" means an amount equal to the sum of (i) the Base Purchase Price, *less* (ii) the Estimated Wind-Down Expenses, *less* (iii) the Estimated Accrued Administrative Expenses, *less* (iv) the sum of all amounts payable by the Sellers under the DIP Facility and any DIP Order as of the Closing.

"Products" means any and all products developed, manufactured, marketed, sold or given away by the Sellers.

"Proposed Allocation" has the meaning set forth in Section 12.2(a).

13

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Purchase Price Adjustment Resolution Period" has the meaning set forth in Section 3.2(b)(ii).

"Purchase Price Adjustment Review Period" has the meaning set forth in Section 3.2(b)(i).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Contracts" has the meaning set forth in Section 2.5(a).

"Purchased Intellectual Property" means the Owned Intellectual Property and the Licensed Intellectual Property.

"Purchased Permits" has the meaning set forth in Section 2.1(j).

"Purchaser" has the meaning set forth in the Preamble hereto.

"Purchaser Adjustment Report" has the meaning set forth in Section 3.2(a).

"Purchaser Core Representations" has the meaning set forth in Section 10.2(a).

"Purchaser Deposit" has the meaning set forth in Section 7.4.

"Purchaser DIP Facility Deduction Amount" means the amount of all obligations owing to Purchaser or any of its Affiliates under the DIP Facility and any DIP Order as of the Closing, including any unpaid principal, interest, fees, costs (including, but not limited to, professional fees and expenses), and any other amounts due and owing to Purchaser or any of its Affiliates under any DIP Order and the DIP Facility.

"Purchaser DIP Obligation" has the meaning set forth in Section 7.4.

"Purchaser Documents" has the meaning set forth in Section 6.2.

"Purchaser Plans" has the meaning set forth in Section 9.2(b).

"Purchaser Prepetition Secured Debt" means the Prepetition Secured Debt held by Purchaser or any Affiliate thereof as of the Closing Date.

"Purchaser Prepetition Secured Debt Deduction Amount" means an amount equal to the portion of the Prepetition Secured Debt Cash Proceeds Amount that would be payable to Purchaser or its Affiliates on account of the Purchaser Prepetition Secured Debt (to the extent validated by the entry of a Final Order by the Bankruptcy Court prior to the Closing Date) if the Sellers were to distribute the Prepetition Secured Debt Cash Proceeds Amount to the Prepetition Lenders in accordance with the existing seniority and priority between the Prepetition Lenders under the Prepetition Financing Agreements.

"Purchaser's 401(k) Plan" has the meaning set forth in Section 9.2(c).

"Qualified Plans" has the meaning set forth in Section 5.10(d).

"Qualifying Excluded Restaurant" means any Excluded Restaurant for which all Equipment and Permits primarily relating thereto will be transferred to Purchaser free and clear of any Liens on the Closing Date.

"Qualifying Excluded Restaurants Payment Amount" means an amount equal to the product of (i) $25,000.00 *multiplied by* (ii) the aggregate number of Qualifying Excluded Restaurants.

"Real Property Lease" and "Real Property Leases" has the meaning set forth in Section 5.6.

"Receivables" means any and all accounts receivable, credit card receivables, notes and other amounts receivable by the Sellers from third parties, including customers, arising before the Closing Date, whether or not in the Ordinary Course of Business.

"Registered Owned Intellectual Property" has the meaning set forth in Section 5.8.

"Release" means any active or passively migrating release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching into the indoor or outdoor environment, or into or out of any property (including groundwater).

"Remedial Action" means all actions to (i) clean up, remove, treat or in any other way address any Hazardous Material or restore natural resources; (ii) prevent the Release of any Hazardous Material so it does not endanger or threaten to endanger worker or public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

"Retained Restaurants"  means the restaurants operated as part of the Business set forth on Schedule 1.1(b), which schedule may be amended, modified or supplemented by Purchaser, in its sole discretion, at any time until the date that is seven (7) Business Days prior to the Closing.

"Retained Restaurants Cash Amount" means the aggregate amount of all cash, cash equivalents and negotiable instruments of the Sellers attributable to or used in the ordinary course operation of the Retained Restaurants on the Closing Date, including, without limitation, all cash, cash equivalents and negotiable instruments (i) in the registers at, (ii) in any bank account maintained by or on behalf of, or (iii) represented by checks or other negotiable instruments in the possession of or in transit to, in each case, any Retained Restaurant or any other location if such cash, cash equivalents or negotiable instruments are used to fund the ordinary course operation of any Retained Restaurant.

"Resolution Period" has the meaning set forth in Section 12.2(a).

"Review Period" has the meaning set forth in Section 12.2(a).

15

"Sale Order" means, if Purchaser is the Successful Bidder, a Final Order of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and the Sellers approving this Agreement and all of the terms and conditions hereof, and approving and authorizing the Sellers to consummate the transactions contemplated hereby and distribute the proceeds received pursuant hereto; provided, however, that solely for purposes of Section 4.4(f)(ii), the term "Sale Order" shall not be a Final Order.

"Seller Documents" means any agreement, document, instrument or certificate contemplated by this Agreement or which has been or is to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement.

"Seller Marks" has the meaning set forth in Section 8.9.

"Seller Property" and "Seller Properties" has the meaning set forth in Section 5.6.

"Sellers" has the meaning set forth in the Preamble hereto.

"Sellers' 401(k) Plan" has the meaning set forth in Section 9.2(c).

"Sellers Core Representations" has the meaning set forth in Section 10.1(a).

"Sellers' Workers' Compensation Obligations" has the meaning set forth in Section 10.1(e).

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding voting securities or other voting Equity Interests of which is owned, directly or indirectly, by such first Person.

"Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

"Tax Authority" means any federal, state, local or foreign government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Tax Claim" has the meaning set forth in Section 12.5.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, environmental, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes whether computed on a separate or consolidated, unitary or combined basis or in any other manner, and (ii) all interest, penalties, fines, additions to tax or additional amounts, whether disputed or not, imposed by any Tax Authority in connection with any item described in clause (i).

"TCP" means Tennenbaum Capital Partners or its affiliates and their respective successors and permitted assigns.

"TCP Prepetition Secured Debt" means the Prepetition Secured Debt held by TCP or any Affiliate thereof as of the Closing Date.

"TCP Proportionate Distribution" means the sum of (i) the amount of all obligations owing to TCP under the DIP Facility and any DIP Order as of the Closing, including any unpaid principal, interest, fees, costs (including, but not limited to, professional fees and expenses), and any other amounts due and owing to TCP under any DIP Order and the DIP Facility and (ii) an amount equal to the portion of the Prepetition Secured Debt Cash Proceeds Amount that would be payable to TCP on account of the TCP Prepetition Secured Debt (to the extent validated by the entry of a Final Order by the Bankruptcy Court prior to the Closing Date) if the Sellers were to distribute the Prepetition Secured Debt Cash Proceeds Amount to the Prepetition Lenders in accordance with the existing seniority and priority between the Prepetition Lenders under the Prepetition Financing Agreements.

"Termination Date" has the meaning set forth in Section 4.4(a).

"Trade Secrets" has the meaning set forth in the definition of "Intellectual Property."

"Transfer Taxes" has the meaning set forth in Section 12.1.

"Transfer Taxes Cap" has the meaning set forth in Section 12.1.

"Transferred Employees" has the meaning set forth in Section 9.1.

"Treasury Regulations" means the income tax regulations promulgated under the Code and effective as of the date hereof.

"Wells Fargo" means Wells Fargo Bank, National Association.

"WARN Act" means and refers to the Worker Adjustment and Retraining Notification Act of 1988, and all comparable state, local or other Laws, in each case, as amended from time to time.

"Wind-Down Budget" means a budget prepared in good faith by Sellers of the Estimated Wind-Down Expenses, setting forth a reasonably detailed breakdown of such costs and expenses by category, which shall be delivered in accordance with Section 3.1(b).

"Z Capital Delayed Draw DIP Funding Amount" has the meaning set forth in Section 7.4.

"Z Capital Lenders" has the meaning set forth in the DIP Facility.

1.2    Other Definitional and Interpretive Matters.  Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

17

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to "$" shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  Words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and (if Purchaser is the Successful Bidder) the Sale Order, and subject to Section 2.5(a) and Section 2.5(d), at the Closing, Purchaser shall purchase, acquire and accept from the Sellers, and the Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser all of the Sellers' right, title and interest, in, to and under the Purchased Assets, on an "as is" and "where is" basis, free and clear of all Liens to the extent set forth in this Agreement and the Sale Order.  "Purchased Assets" shall mean, as of the Closing Date, all of the properties, assets, rights and interests of the Sellers (excluding the Excluded Assets), including the following:

> (a)    the Receivables, to the extent accruing from and after the Closing;

> (b)    the Inventory;

18

(c)    all cash, cash equivalents and negotiable instruments of the Sellers attributable to or used in the ordinary course operation of the Retained Restaurants on the Closing Date, including, without limitation, all cash, cash equivalents and negotiable instruments (i) in the registers at, (ii) in any bank account maintained by or on behalf of, or (iii) represented by checks or other negotiable instruments in the possession of or in transit to, in each case, any Retained Restaurant or any other location if such cash, cash equivalents or negotiable instruments are used to fund the ordinary course operation of any Retained Restaurant;

(d)    any interests of the Sellers in all cash and cash equivalents collateralizing any of the Sellers' Workers' Compensation Obligations and any letters of credit in connection with such workers' compensation obligations;

(e)    all deposits, advance payments and prepaid and deferred payments, including any security deposits, prepaid rentals, and unbilled charges, fees and deposits of the Sellers on the Closing Date, and collateral in support of workers' compensation insurance policies, but excluding any security deposits, prepaid rentals, and unbilled charges, fees and deposits related exclusively to Excluded Assets;

(f)    the Equipment;

(g)    the Purchased Intellectual Property (including, without limitation, all goodwill associated with the Business and all customer and supplier lists);

(h)    the Purchased Contracts;

(i)    all Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business, including Documents relating to Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property (including, without limitation, all prosecution and opposition files and dockets, registration certificates, litigation files and related opinions of counsel and correspondence relating thereto), supplier lists, customer lists, records, literature, correspondence and financial and tax records, but excluding such files as may not be transferred under applicable Law, including, without limitation, laws regarding confidentiality and privacy; provided, that, following the Closing, Purchaser shall provide the Sellers copies of or continued access to all Documents as are necessary to administer the Bankruptcy Cases or in connection with any Tax audits or filings of the Sellers or which are required to realize the benefits of any Excluded Assets;

(j)    all Permits, to the extent assignable or transferable, used by the Sellers in connection with the Purchased Assets or the Qualifying Excluded Restaurants ("Purchased Permits"), including those set forth on Schedule 2.1(j) hereto, provided that the cost of any such assignment shall be borne by Purchaser;

(k)    all supplies owned by the Sellers;

(l)    to the extent assignable, all rights of the Sellers under non-disclosure or confidentiality, non-compete, non-solicitation or similar agreements with any Employees and agents of the Sellers or with third parties, other than any such rights of the Sellers to the extent pertaining exclusively to any Excluded Assets;

19

(m)    to the extent assignable, all rights of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the Sellers, other than any warranties, representations and guarantees to the extent pertaining exclusively to any Excluded Assets;

(n)    all goodwill and other intangible assets of the Sellers;

(o)    to the extent not prohibited by applicable Law, all personnel files and employment records of the Transferred Employees (including, without limitation, I-9 forms and attachments);

(p)    subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights to the telephone and facsimile numbers and email addresses used by the Sellers, as well as rights to receive mail and other communications addressed to the Sellers (including mail and communications from customers, suppliers, distributors and agents), other than any telephone and facsimile numbers for employees who will remain employees of the Sellers following the Closing;

(q)    to the extent transferable, all unexpired warranties, indemnities, or guaranties from any third party of the Sellers, including any such item of real property, personal property or equipment;

(r)    to the extent transferable and to the extent primarily related to the Purchased Assets, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by any of the Sellers on the purchase or other acquisition of the Purchased Assets;

(s)    any rights, demands, claims, credits, allowances, rebates, or rights of setoff (other than against the Sellers or any of their Affiliates) arising out of or relating to any of the Purchased Assets; and

(t)    any claim, right or interest of any Seller in or to any refund, rebate, abatement or recovery of any Taxes other than Excluded Taxes, including any Transfer Taxes up to the Transfer Taxes Cap, together with interest thereon and any refund of any penalties in respect thereof.

2.2    <u>Excluded Assets</u>.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "<u>Excluded Assets</u>" shall mean each of the following assets of the Sellers:

(a)    the Excluded Contracts (including this Agreement and the Ancillary Agreements), including any accounts receivable and other rights arising out of or in connection with any Excluded Contract (including, without limitation, the Purchase Price under this Agreement);

(b)    any (i) other books and records that the Sellers are required by Law or Contract to retain, including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; (ii) legal entity, minute books, stock ledgers, corporate seals,

taxpayer and other identification numbers, stock certificates and similar materials of the Sellers; and (iii) documents exclusively relating to the Excluded Assets or Excluded Liabilities or proposals to acquire the Business by Persons other than Purchaser or exclusively relating to any employees of the Sellers who are not Transferred Employees;

        (c)     all cash, cash equivalents and negotiable instruments of the Sellers that are not otherwise included as a Purchased Asset pursuant to Section 2.1(c) or Section 2.1(d);

        (d)     all Avoidance Actions;

        (e)     the Equity Interests or other ownership interest in the Sellers;

        (f)     all directors or officers liability insurance policies owned by any Seller (in each case of the foregoing, including any tail policies or coverage thereon), together with all rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

        (g)     professional retainers paid by any Seller to its advisors or representatives in connection with the Bankruptcy Cases and the transactions contemplated herein;

        (h)     any security deposits, prepaid rentals, and unbilled charges, fees and deposits related exclusively to Excluded Assets;

        (i)     any claim, right or interest of any Seller in or to any refund, rebate, abatement or recovery of any Excluded Taxes together with interest thereon and any refund of any penalties in respect thereof;

        (j)     any Contract that any Seller is unable to assign to Purchaser or that is an Excluded Contract;

        (k)     all other assets listed on Schedule 2.2(k);

        (l)     all claims or causes of action that relate exclusively to any Excluded Asset or Excluded Liability (including all claims or causes of action arising out of, in connection with, or contemplated by the DIP Order and/or under a Plan (e.g. claims or causes of actions against the equityholders of the Sellers, against the Sellers' directors, officers, managers and employees, against lenders or other third-parties, and/or against any of the Affiliates, agents or representatives of the foregoing);

        (m)     any other assets of the Sellers that are not lawfully transferable;

        (n)     Receivables, to the extent accruing prior to the Closing;

        (o)     all surrendered liquor licenses set forth on Schedule 2.2(o), which licenses are not used by any Restaurant and are held by the Sellers; and

        (p)     any assets identified by Purchaser in writing (including any Assignable Contract previously designated as a Purchased Contract, but excluding any Excluded

Asset), in its sole discretion, at any time until the date that is seven (7) Business Days prior to the Closing Date.

2.3     Assumption of Liabilities.  Purchaser shall assume no liability or obligation of the Sellers, or of any predecessor or any Affiliate of any of the Sellers, except the liabilities and obligations expressly set forth in this Section 2.3 (collectively, the "Assumed Liabilities"), which Purchaser or its permitted assignee, as the case may be, shall on the terms and subject to the conditions of this Agreement, assume at the Closing, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto:

(a)     all Liabilities or obligations (including indemnification obligations) of the Sellers under the Purchased Contracts (including under the AIG Policy with respect to Sellers' Workers' Compensation Obligations) first arising after the Closing Date, in each case, excluding all Cure Amounts;

(b)     all Liabilities (except to the extent relating exclusively to any Excluded Asset) from the sale or giving away of Products after the Closing Date pursuant to product warranties, product returns and rebates;

(c)     subject to Section 12.1, Transfer Taxes payable in connection with the transactions contemplated by this Agreement;

(d)     any trust fund related Taxes, including sales Taxes that constitute trust fund Taxes and any payroll or employment related Taxes, for any taxable period, but only to the extent such Taxes accrued prior to the Closing and were not due and payable as of the Closing;

(e)     intentionally omitted;

(f)     except as otherwise provided in this Agreement, all Liabilities with respect to the Purchased Assets to the extent arising from and after the Closing, including, without limitation, under any Indebtedness incurred by Purchaser or any of its Affiliates concurrently with or following the Closing, but excluding any Liabilities to the extent arising prior to the Closing or relating to any services that were sold or provided by Sellers prior to the Closing;

(g)     allowed and unpaid administrative expenses under Bankruptcy Code Section 503(b)(9) arising in the Bankruptcy Cases up to an aggregate amount not to exceed $50,000;

(h)     intentionally omitted;

(i)     all Liabilities relating to amounts expressly required to be paid by, or other obligations of, Purchaser hereunder or under any Ancillary Agreement;

(j)     all accrued and unpaid ordinary course trade payables as of the Closing Date that arose after the Petition Date;

(k)      amounts owing to current or former employees who are not Transferred Employees for accrued salary, vacation time and sick leave for which either (1) one or more Sellers would be liable as an administrative expense under 11 U.S.C. § 503 or (2) the officers or directors of any Seller would be held personally or criminally liable if such amounts were not paid, taking into account the impact of the Bankruptcy Cases on such Liability and after giving effect to any available insurance;

(l)      all Liabilities arising from the employment of the Transferred Employees after the Closing;

(m)      all Liabilities incurred in the Ordinary Course of Business consistent with past practice to Transferred Employees for vacation time, sick leave and other paid time off, wages, salaries, commissions and bonuses, in each case with respect to the items described in this Section 2.3(m), that as of the Closing Date is fully earned and vested and unpaid;

(n)      all Liabilities with respect to gift cards, merchandise credits, coupons and any other similar arrangement or program that has not, as of the Closing Date, expired and/or become subject to a limit or other provision that could cause the same to be subject to escheatment or any similar provision or condition under any applicable Law, but expressly excluding any Liabilities under any escheatment, abandoned property, unclaimed property or similar Laws of any jurisdiction;

(o)      amounts payable by the Sellers pursuant to the KERP, which amounts shall not exceed $775,000.00 in the aggregate (the "KERP Liabilities Cap");

(p)      all Liabilities of the Sellers set forth on Schedule 2.3(p); and

(q)      all Liabilities for Environmental Claims which come due after the Closing, but only to the extent the facts or circumstances of such Liabilities first arose or existed after the Closing.

2.4      Excluded Liabilities.  Except as specifically set forth in Section 2.3, Purchaser will not assume or be liable for any Liabilities or other obligations of the Sellers, or any predecessor or Affiliate of the Sellers, of any nature whatsoever, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise (other than the Assumed Liabilities), including the following (collectively, the "Excluded Liabilities"):

(a)      except as otherwise set forth herein, all Liabilities related to or arising out of the Excluded Assets, including Excluded Contracts and all Liabilities related to the Excluded Restaurants;

(b)      except as expressly set forth in Article IX or assumed by Purchaser pursuant to Section 2.3, any liability under or relating to any Employee Benefit Plan, whether or not such liability or obligation arises on, prior to or after the Closing Date, or any other liability relating to the employment or termination of employment of any (x) Person employed by the Sellers prior to Closing or the transactions contemplated by this Agreement (including but not limited to, any severance or stay or incentive bonuses), including any liabilities of Sellers pursuant

to the KERP in excess of the KERP Liabilities Cap, but subject to any limitations set forth therein, or (y) Person who is not a Transferred Employee;

(c)    all Indebtedness of any Seller;

(d)    all obligations and Liabilities of the Sellers related to the right to or issuance of any capital stock or other Equity Interest of any Seller, including any stock options or warrants;

(e)    all obligations and Liabilities of the Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of the Sellers or ownership, lease or license of any properties or assets or any properties or assets previously used by the Sellers or any predecessor of any Seller, or other actions or omissions, including any amounts due and owing or accrued under any Purchased Contract for the period prior to the Closing (including any Cure Amounts, but excluding any ordinary course trade payables as of the Closing Date that arose after the Petition Date);

(f)    any obligation or Liability arising out of or resulting from (i) non-compliance or alleged non-compliance with any Law (ii) any tort or breach of contract by the Sellers;

(g)    any obligation or Liability of the Sellers under this Agreement or any other document executed in connection herewith;

(h)    any claim (as defined in the Bankruptcy Code) arising prior to Closing and not expressly assumed pursuant to this Agreement;

(i)    all Excluded Taxes;

(j)    any obligations or Liability arising out of or relating to, directly or indirectly, Releases of Hazardous Materials or violations of Environmental Laws with respect to the Business, the conduct of the Sellers or the ownership, lease or license of any properties or assets or any properties or assets previously used by the Sellers or any predecessor of any Seller prior to Closing; and

(k)    any other Liabilities of the Sellers not expressly assumed by Purchaser pursuant to <u>Section 2.3</u> above.

2.5    <u>Assignment and Assumption of Contracts</u>.

(a)    <u>Assignment of Contracts and Unexpired Leases</u>.  At Closing, the Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) (to the extent applicable), assign or assume and assign to Purchaser (the consideration for which is included in the Purchase Price) all Assignable Contracts, other than any Assignable Contract that is set forth on <u>Schedule 2.5(a)(ii)</u> (the "<u>Excluded Contracts</u>"), including the Hilco Agreement, the AIG Policy and the Assignable Contracts set forth on <u>Schedule 2.5(a)(i)</u> (all Assignable Contracts other than the Excluded Contracts, collectively, the "<u>Purchased Contracts</u>"); provided that, with the exception of the AIG Policy, Purchaser shall be entitled to add, in its sole discretion, upon

written notice to the Sellers no later than seven (7) Business Days prior to the Closing Date, any Assignable Contract to Schedule 2.5(a)(ii) and any Assignable Contract so added shall be an Excluded Contract as of the Closing.  Purchaser will assume and agree to perform and discharge the Assumed Liabilities under the Purchased Contracts as of the Closing, pursuant to the Assignment and Assumption Agreement.

(b)    Cure Payments.  As of the Closing, the Sellers shall pay all Cure Amounts in connection with the assumption and assignment of Assignable Contracts identified as Purchased Contracts at the Closing for which all necessary Consents and Bankruptcy Court approval to transfer have been obtained (as agreed to between Purchaser and the Sellers or as determined by the Bankruptcy Court).  The Sellers have provided to Purchaser a schedule set forth on Schedule 2.5(b) setting forth a good faith estimate of all Cure Amounts for all Purchased Contracts, which schedule the Sellers may update prior to the date that is five (5) days prior to the Closing Date.  The Sellers shall use commercially reasonable efforts to provide, within 30 days following the Petition Date, a schedule containing the wire information and contact information for each party entitled to receive any Cure Amounts and, prior to the Closing, the Sellers and Purchaser shall cooperate in good faith to establish a protocol for the payment by the Sellers of the Cure Amounts as of the Closing.

(c)    Preservation of Contracts and Unexpired Leases.  The Sellers shall not reject any Assignable Contract unless such Assignable Contract is designated by Purchaser as an Excluded Contract or unless otherwise agreed in writing by Purchaser.  The Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Purchased Contracts and take all other actions necessary to cause such Purchased Contracts to be assumed by the Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser shall, at or prior to Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign to Purchaser the Purchased Contracts.

(d)    Designation Right Contract.

(i)    Purchaser shall have the right, by written notice to the Sellers no later than seven (7) days prior to the Closing Date, to specify that any Assignable Contract that is an Excluded Contract shall be held by the Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code (any such Contract, a "Designation Right Contract") for the duration of the Designation Rights Period; provided that, with respect to any such Designation Right Contract, (A) Purchaser shall promptly reimburse the Sellers on demand, and thereby be solely responsible for, all costs associated with the continuation by, and ultimate assumption or rejection by, the Sellers of such Designation Right Contract (as set forth in a budget proposed by the Sellers and approved by Purchaser no later than three (3) days prior to the Closing Date (such budget, the "Designation Right Budget") for the period from the Closing through the end of the Designation Rights Period (such costs, "Continuation Costs"); (B) all cash collected by the Sellers in respect of, and other benefits deriving from, such Designation Right Contract shall be promptly delivered to Purchaser, provided that Sellers shall be entitled to deduct Continuation Costs from any cash collected by the Sellers in respect of the Designation Rights Contract giving rise to such costs; and (C) the foregoing shall not affect the validity of the transfer to Purchaser of any other Purchased Asset that may be related to such Designation Right Contract.  In the event that the costs associated with any Designation Right Contract exceed the budgeted Continuation Costs attributable to such

25

Designation Right Contract (a "Designation Cost Overage"), Purchaser shall have the right to, by written notice to the Sellers, provide a Rejection Notice (as defined below) with respect to such Designation Right Contract, in which case Sellers shall be liable for such Designation Cost Overage from and after the date of such Rejection Notice from Purchaser.

(ii)    As to each Designation Right Contract, as soon as practical after receiving further written notice(s) (each, an "Assumption Notice") from Purchaser during the Designation Rights Period requesting assumption and assignment of any Designation Right Contract, the Sellers shall, subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code any Designation Right Contract(s) set forth in an Assumption Notice.

(iii)    As to each Designation Right Contract, as soon as practical after receiving further written notice(s) (each, a "Rejection Notice") from Purchaser during the Designation Rights Period requesting rejection of any Designation Right Contract, the Sellers shall take all actions required by the Sale Order or otherwise that are reasonably necessary to reject such contract pursuant to Section 365 of the Bankruptcy Code.

(iv)    The Sellers and Purchaser agree and acknowledge that the covenants set forth in this Section 2.5 shall survive the Closing.

(v)    Notwithstanding anything in this Agreement to the contrary, on the date any Designation Right Contract is assumed and assigned to Purchaser pursuant to this Section 2.5(d), such Designation Right Contract shall be deemed a Purchased Contract for all purposes under this Agreement and no further consideration shall be required to be paid for any Designation Right Contract that is assumed and assigned to Purchaser.

2.6    Bulk Sales Laws.  Notwithstanding any other provision in this Agreement, Purchaser hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" and similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

2.7    DIP Facility.  On the Petition Date or promptly thereafter, but subject to the approval of the Bankruptcy Court, Purchaser will provide, or cause to be provided, to the Sellers the portion of the DIP Facility to be provided by Purchaser or one or more of its Affiliates in an amount not to exceed $5,500,000 upon customary terms and conditions as provided in the DIP Financing and Guaranty Agreement in substantially the form attached hereto as Exhibit H.

ARTICLE III

CONSIDERATION

3.1    Purchase Price.

(a)    In consideration of the sale of the Purchased Assets to Purchaser, upon the terms and subject to the conditions set forth in this Agreement, the purchase price (the "Purchase Price") for the Purchased Assets shall be equal to the sum of: (i) Forty-Six Million

26

Seven Hundred Fifty Thousand Dollars ($46,750,000) (the "Base Purchase Price"), *plus* (ii) the assumption of the Assumed Liabilities by Purchaser, *plus* (iii) the Final Purchase Price Adjustment Amount as finally determined in accordance with Section 3.2, *less* (iv) the Deduction Amount.

(b)     At least five (5) Business Days prior to the Closing Date, the Sellers shall prepare and deliver to Purchaser a written report (the "Closing Date Report") setting forth in reasonable detail the Sellers' good faith estimate of (i) the Prepaid Rent Amount ("Estimated Prepaid Rent Amount"), (ii) the Cure Payments Adjustment Amount ("Estimated Cure Payment Adjustment Amount"), (iii) the Deposits Amount ("Estimated Deposits Amount"), (iv) the Retained Restaurant Cash Amount ("Estimated Retained Restaurant Cash Amount"), (v) the Qualifying Excluded Restaurants Payment Amount ("Estimated Qualifying Excluded Restaurants Payment Amount"), and (vi) the Wind-Down Budget, in each case, as of the Closing Date.

(c)     On the Closing Date, Purchaser shall pay in cash to the Sellers the sum of:  (i) the Base Purchase Price, *plus* (ii) the Estimated Purchase Price Adjustment Amount, *less* (iii) the Deduction Amount, *less* (iv) the Purchaser Deposit (such amount, the "Closing Payment"), which Closing Payment shall be paid by wire transfer of immediately available funds into one or more accounts designated by the Sellers.  The Purchaser shall waive and shall cause its Affiliates to waive any security interest in the TCP Proportionate Distribution.  Purchaser and its Affiliates and TCP shall retain any security interests in amounts funded for the Estimated Accrued Administrative Expenses and Estimated Wind-Down Expenses, to secure any claims for their respective *pro rata* shares of any cash remaining with the Sellers after payment of all Administrative Expenses.

3.2     Determination of Final Purchase Price.

(a)     As soon as reasonably practicable following the Closing Date (but no later than sixty (60) days after the Closing Date), Purchaser shall deliver to the Sellers a statement (the "Purchaser Adjustment Report") setting forth in reasonable detail Purchaser's good-faith calculation of (i) the Prepaid Rent Amount, (ii) the Cure Payments Adjustment Amount, (iii) the Deposits Amount, (iv) the Retained Restaurant Cash Amount, and (v) the Qualifying Excluded Restaurants Payment Amount, in each case, as of the Closing Date.

(b)     The following procedures shall apply with respect to the review of the Purchaser Adjustment Report:

(i)     The Sellers shall have a period of thirty (30) days after receipt by the Sellers of the Purchaser Adjustment Report to review the Purchaser Adjustment Report (the "Purchase Price Adjustment Review Period").  During the Purchase Price Adjustment Review Period, Purchaser shall make available to the Sellers and their representatives reasonable access during normal business hours to all relevant personnel, representatives of Purchaser, books and records of the Business and other items reasonably requested by the Sellers in connection with the Seller's review of the Purchaser Adjustment Report and any dispute with respect thereto as contemplated by this Section 3.2.

(ii)     If the Sellers do not deliver to Purchaser a written statement describing any objections the Sellers have to the Purchaser Adjustment Report (a "Notice of

Disagreement") on or before the final day of the Purchase Price Adjustment Review Period, then the Sellers shall be deemed to have irrevocably accepted such Purchaser Adjustment Report, and such Purchaser Adjustment Report shall be deemed to be the "Final Adjustment Report" for purposes of the payment (if any) contemplated by Section 3.2(c). If the Sellers deliver to Purchaser a Notice of Disagreement on or before the final day of the Purchase Price Adjustment Review Period, then Purchaser and the Sellers shall attempt to resolve in good faith the matters contained in the Notice of Disagreement within thirty (30) days after Purchaser's receipt of the Notice of Disagreement (the "Purchase Price Adjustment Resolution Period"). If Purchaser and the Sellers reach a resolution with respect to such matters on or before the final day of the Purchase Price Adjustment Resolution Period, then the Purchaser Adjustment Report, as modified by such resolution, shall be deemed to be the "Final Adjustment Report" for purposes of the payment (if any) contemplated by Section 3.2(c).

(iii)     If such a resolution is not reached on or before the final day of the Purchase Price Adjustment Resolution Period, then Purchaser and the Sellers shall promptly (and in any event no later than five (5) Business Days after the last day of the Purchase Price Adjustment Resolution Period) retain the Neutral Firm (including by executing a customary agreement with the Neutral Firm in connection with its engagement) and submit any unresolved objections covered by the Notice of Disagreement (the "Disputed Items") to the Neutral Firm for resolution in accordance with this Section 3.2(b)(iii). The Neutral Firm will be instructed to (A) make a final determination on an expedited basis (and in any event within thirty (30) days after submission of the Disputed Items) with respect to each of the Disputed Items (and only the Disputed Items) that is within the range of the respective positions taken by each of Purchaser and the Sellers and (B) prepare and deliver to Purchaser and the Sellers a written statement setting forth its final determination (and a reasonably detailed description of the basis therefor) with respect to each Disputed Item (the "Neutral Firm's Report"). During the ten (10) days after submission of the Disputed Items to the Neutral Firm, each of Purchaser and the Sellers may provide the Neutral Firm with a definitive statement in writing of their respective positions with respect to the Disputed Items (and only the Disputed Items). The Neutral Firm will be provided with reasonable access to the books and records of Purchaser and the Sellers for purposes of making its final determination with respect to the Disputed Items, and Purchaser and the Sellers shall otherwise reasonably cooperate with the Neutral Firm in connection therewith. Each of Purchaser and the Sellers agrees that (w) the Neutral Firm's determination with respect to each Disputed Item as reflected in the Neutral Firm's Report shall be deemed to be final, conclusive, binding and non-appealable, absent fraud or manifest error, (x) the Purchaser Adjustment Report, as modified by any changes thereto in accordance with the Neutral Firm's Report, shall be deemed to be the "Final Adjustment Report" for purposes of the payment (if any) contemplated by Section 3.2(c), (y) the procedures set forth in this Section 3.2 shall be the sole and exclusive remedy with respect to the final determination of the Final Adjustment Report and (z) the Neutral Firm's determination under this Section 3.2(b)(iii) shall be enforceable as an arbitral award, and judgment may be entered thereupon in any court having jurisdiction over the Party against which such determination is to be enforced. The Prepaid Rent Amount, the Cure Payments Adjustment Amount, the Deposits Amount, the Retained Restaurant Cash Amount, and the Qualifying Excluded Restaurants Payment Amount, in each case, as of the Closing Date and set forth in the Final Adjustment Report shall be deemed the "Final Prepaid Rent Amount", the "Final Cure Payments Adjustment Amount", the "Final Deposits Amount", the "Final Retained Restaurant Cash Amount", and the "Final Qualifying Excluded Restaurants Payment Amount", respectively.

(iv)     Each of Purchaser and the Sellers shall (A) pay their own respective costs and expenses incurred in connection with this <u>Section 3.2</u> and (B) be responsible for 50% of the fees and expenses of the Neutral Firm.

(c)     Within two (2) Business Days after the determination of the Final Adjustment Report in accordance with this <u>Section 3.2</u> (including by failure to timely deliver a Notice of Disagreement):

(i)     if the Additional Payment Amount is a positive number, then Purchaser shall pay an amount in cash equal to the Additional Payment Amount to the Sellers by wire transfer of immediately available funds to an account of the Sellers designated in writing by the Sellers to Purchaser; or

(ii)     if the Additional Payment Amount is a negative number, then the Sellers shall pay an amount in cash equal to the absolute value of the Additional Payment Amount to Purchaser by wire transfer of immediately available funds to an account of Purchaser designated in writing by Purchaser to the Sellers.

(d)     For purposes hereof, "Additional Payment Amount" means the Final Purchase Price Adjustment Amount minus the Estimated Purchase Price Adjustment Amount (for the avoidance of doubt, the Additional Payment Amount may be a negative number).

(e)     The Sellers shall retain the portion of the Closing Payment equal to the Estimated Purchase Price Adjustment Amount and shall not make any distributions of such portion of the Closing Payment to the Prepetition Lenders in respect of the Prepetition Secured Debt unless and until (i) the Final Adjustment Report has been finally determined in accordance with this <u>Section 3.2</u> and (ii) solely in the event that the Additional Payment Amount is a negative number, the Sellers have paid Purchaser the absolute value of the Additional Payment Amount in accordance with <u>Section 3.2(c)(ii)</u>.

ARTICLE IV

CLOSING AND TERMINATION

4.1     <u>Closing Date</u>.  The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> hereof (the "<u>Closing</u>") shall take place via electronic exchange of closing documents and signature pages on the date that is no less than one (1) Business Day and no greater than three (3) Business Days after the satisfaction of the conditions set forth in <u>Sections 10.1</u>, <u>10.2</u> and <u>10.3</u> hereof (or the waiver of any condition by the Party entitled to waive that condition), as such date may be determined by Purchaser in its sole discretion.  The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>."  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of the Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (Pacific time) on the Closing Date.

    4.2  <u>Deliveries by the Sellers</u>.  At the Closing, the Sellers shall deliver to Purchaser:

    (a)  a duly executed Bill of Sale substantially in the form of <u>Exhibit A</u> hereto;

    (b)  duly executed Assignment and Assumption Agreement(s) substantially in the form of <u>Exhibit B</u>, <u>Exhibit C</u>, <u>Exhibit D</u> and <u>Exhibit E</u> hereto;

    (c)  the officer's certificate required to be delivered pursuant to <u>Sections 10.1(a)</u> and <u>10.1(b);</u>

    (d)  to the extent requested by Purchaser, a certification of non-foreign status pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations sufficient to exempt Purchaser from the requirements of Code Section 1445(a);

    (e)  a copy of the Sale Order;

    (f)  a duly executed Management Agreement substantially in the form of <u>Exhibit G</u> hereto; and

    (g)  all other documents, instruments or writings of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary or reasonably desirable to convey the Purchased Assets to Purchaser.

    4.3  <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver to the Sellers:

    (a)  the Closing Payment as set forth in <u>Section 3.1(c)</u> hereof;

    (b)  duly executed Assignment and Assumption Agreement(s) substantially in the form of <u>Exhibit B</u>, <u>Exhibit C</u>, <u>Exhibit D</u> and <u>Exhibit E</u> hereto;

    (c)  a duly executed Management Agreement substantially in the form of <u>Exhibit G</u> hereto; and

    (d)  the officer's certificate required to be delivered pursuant to <u>Sections 10.2(a)</u> and <u>10.2(b)</u>.

    4.4  <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

    (a)  by Purchaser or the Sellers, if the Closing shall not have occurred by the close of business on the date that is the earlier of (i) sixty (60) days after the date on which the Sale Order is entered and (ii) December 15, 2018 (such date, the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before the Termination Date due to an inaccuracy or breach of any of representations, warranties, covenants or agreements contained in this Agreement by Purchaser or the Sellers to an extent which would give the other

party a right not to close pursuant to Article X, then the breaching Party may not terminate this Agreement pursuant to this Section 4.4(a);

        (b)      by mutual written consent of the Sellers and Purchaser;

        (c)      by Purchaser, if there shall be an inaccuracy in any representation or warranty of the Sellers, or a breach by any Seller of any covenant or agreement contained in this Agreement, which inaccuracy or breach would result in a failure of a condition set forth in Section 10.1 or 10.3 and which inaccuracy or breach cannot be cured or has not been cured by the earlier of (i) 15 Business Days after the giving of written notice by Purchaser to the Sellers of such breach and (ii) one Business Day prior to the Termination Date; provided, however, that if there shall be an inaccuracy or breach of any of representations, warranties, covenants or agreements of Purchaser contained in this Agreement to an extent which would give the Sellers the right not to close pursuant to Article X, then Purchaser may not terminate this Agreement pursuant to this Section 4.4(c);

        (d)      by the Sellers, if there shall be a inaccuracy in any representation or warranty of Purchaser, or a breach by Purchaser of any covenant or agreement contained in this Agreement, which would result in a failure of a condition set forth in Section 10.2 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) 15 Business Days after the giving of written notice by the Sellers to Purchaser of such breach and (ii) one Business Day prior to the Termination Date; provided, however, that if there shall be an inaccuracy or breach of any of representations, warranties, covenants or agreements of any Seller contained in this Agreement to an extent which would give Purchaser the right not to close pursuant to Article X, then the Sellers may not terminate this Agreement pursuant to this Section 4.4(d);

        (e)      by the Sellers or Purchaser if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, it being agreed that the Sellers shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence) unless and until Purchaser elects to terminate this Agreement in accordance with the terms hereof;

        (f)      by Purchaser, if (i) the Bidding Procedures Order has not been entered by the date that is forty-four (44) calendar days following the Petition Date, or (ii) the Sale Order or an order of the Bankruptcy Court approving an Alternative Transaction has not been entered by the earlier of (A) the date that is eighty-one (81) calendar days following the Petition Date or (B) the date that is sixteen (16) calendar days following the conclusion of the Auction;

        (g)      by Sellers, if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and (i) Sellers have provided Purchaser with written notice that they are prepared to consummate the Closing, (ii) the conditions to Closing in Sections 10.1 and 10.3 have been satisfied (or waived, to the extent permissible, by the party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied by actions customarily taken at Closing) and (iii) the Closing Date does not occur within three (3) Business Days of Sellers providing Purchaser with such notice; and

(h)      by Purchaser or the Sellers, if (1) the Sellers consummate an Alternative Transaction or (2) Purchaser is neither the Successful Bidder nor a Backup Bidder at the conclusion of the Auction.

4.5      Procedure Upon Termination.  In the event of termination of this Agreement by Purchaser or the Sellers, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or the Sellers.

4.6      Effect of Termination.  In the event that this Agreement is validly terminated pursuant to Section 4.4, (i) all further obligations of the Parties under this Agreement shall terminate, except that the obligations in this Section 4.6, Section 4.7 (Forfeiture of Purchaser Deposit); Section 4.8 (Break-up Fee) and Article XIII shall survive and (ii) each Party shall pay the fees, costs and expenses incurred by it in connection with this Agreement, except as provided in clause (i) above or Article XIII.  Notwithstanding the foregoing, the termination of this Agreement shall not relieve any Party to this Agreement of liability for its willful and material breach of this Agreement. For purposes of this Agreement, "willful and material breach" means a material inaccuracy or breach of any material representation, warranty or covenant or other agreement set forth in this Agreement that is a consequence of an act or failure to act by or on behalf of the breaching Party with knowledge that the taking of such act or failure to take such act would, or would reasonably be expected to, result in a breach of this Agreement.

4.7      Forfeiture of Purchaser Deposit.  If the Sellers validly terminate this Agreement pursuant to Section 4.4(d) or Section 4.4(g), then the Sellers, as the Sellers' sole and exclusive remedy as a result of such termination, shall have the right  to (i) retain the Cash Deposit, if any, and (ii) permanently apply the credit against the Sellers' repayment obligations in respect of the Purchaser DIP Obligation represented by the Credit Deposit; provided that nothing in Section 11.2 shall or shall be deemed to limit the right of the Sellers to retain the Cash Deposit and/or apply the Credit Deposit to the extent provided in this Section 4.7.  In the event of any termination of this Agreement other than pursuant to Section 4.4(d) or Section 4.4(g), (x) the credit against the Sellers' repayment obligations in respect of the DIP Term Loan represented by the Credit Deposit shall be automatically and immediately reversed such that the DIP Term Loan is restored to the amount that would have been payable without taking into account any application of the Credit Deposit and (y) the Sellers shall return to Purchaser, within five (5) Business Days following any such termination, the Cash Deposit.

4.8      Break-Up Fee.  Subject to the approval of the Bankruptcy Court, if this Agreement is terminated pursuant to Section 4.4(h), Purchaser shall be entitled to be paid an amount equal to three percent (3%) of the Base Purchase Price (the "Break-Up Fee") if the Sellers consummate an Alternative Transaction.  The Break-Up Fee shall (to the extent payable pursuant to the preceding sentence) be paid by Sellers or the Successful Bidder to Purchaser within five (5) Business Days after the consummation of such Alternative Transaction.  Except as provided herein, Purchaser shall not be entitled to any portion of the Break-Up Fee.  Purchaser acknowledges that this Agreement is subject to overbid at an Auction in the Bankruptcy Cases, and that, in the event this Agreement is terminated pursuant to Section 4.4(h), the Sellers shall have no liability to Purchaser under this Agreement other than to pay the Break-Up Fee as set forth

above; provided, however, that nothing in this sentence shall relieve the Sellers from any liability for breach of this Agreement prior to its termination; provided, further, however, that nothing in Section 11.2 shall, or shall be deemed to, limit the right of Purchaser to retain the Break-Up Fee to the extent provided in this Section 4.8.  For the avoidance of doubt, payment of the Break-Up Fee shall not relieve the Sellers of any obligations (a) under the DIP Facility, (b) in respect of Purchaser's or its Affiliates' secured debt in the Sellers or (c) with respect to any other Contracts or other arrangements to which Purchaser and/or one or more of its Affiliates may be party from time to time.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLERS

Purchaser specifically acknowledges and agrees to the following with respect to the representations and warranties of the Sellers:

A.  Except in the case of fraud, following the Closing, Purchaser will not have any recourse to any Seller or to any Non-Recourse Party in the event any of the representations and warranties made herein or deemed to be made are untrue as at any time of expression thereof.

B.  Purchaser has conducted its own due diligence investigations of the Business or has waived its right to conduct such due diligence.

C.  Except as expressly provided, Sellers make no representations or warranties in this Article V with respect to Excluded Assets.

Except as otherwise disclosed to Purchaser in the Schedules hereto, the Sellers jointly and severally represent and warrant to Purchaser as follows:

5.1    Organization and Good Standing.  Each Seller is a limited liability company duly organized, incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation and has all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each Seller is duly qualified or authorized to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or leased by it requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not reasonably be expected to have a Material Adverse Effect.

5.2    Authorization of Agreement.  Except for such authorization as may be required by the Bankruptcy Court, each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and has all requisite power, authority and legal capacity to execute and deliver the Seller Documents, to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each Seller and no other corporate or limited liability company action on the

33

part of any of the Sellers is necessary authorize the execution and delivery of this Agreement and the Seller Documents by the Sellers and the consummation of the transactions contemplated hereby and thereby by each Seller. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by the Sellers and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order and any other necessary Order to close the sale of the Purchased Assets) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Sellers enforceable against such Sellers in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

3.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 5.3(a), none of the execution and delivery by any Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in the creation of any Lien upon the Purchased Assets, or conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration cancellation under any provision of (i) the certificate of formation, limited liability company agreement, operating agreement or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order, any Contract or Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations, modifications, accelerations or cancellations that would not reasonably be expected to have a Material Adverse Effect.

(b)    Subject to entry of the Sale Order, and except as set forth on Schedule 5.3(b), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by such Seller of any other action contemplated hereby or thereby, except for compliance with such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

5.4    Title to Purchased Assets; Sufficiency of Assets.

(a)    Except as set forth in Schedule 5.4(a), the Sellers have good, valid, marketable and undivided title to the Purchased Assets free and clear of all Liens, other than Permitted Exceptions. Purchaser will be vested with good title to (or, in the case of leased Purchased Assets, a valid and subsisting leasehold interest in) such Purchased Assets, free and clear of all Liens, to the extent set forth in the Sale Order and, subject to the entry of the Sale

Order, Purchaser will be vested to the fullest extent permissible under Section 363(f) of the Bankruptcy Code with good valid, marketable and undivided title to the Purchased Assets free and clear of all Liens.

(b)     The Purchased Assets (which, for the avoidance of doubt, do not include Excluded Assets) constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used (to the extent the Sellers hold rights, title and interest in such tangible personal property) or held for use by the Sellers, or otherwise necessary for Purchaser to conduct and operate the Purchased Assets and the Business (other than the Business conducted at the Excluded Restaurants) immediately after the Closing in all material respects as conducted and operated by the Sellers as presently conducted.  No Person other than the Sellers are engaged in the operation of, or hold rights, title and interest in, the Purchased Assets or assets that are used or useful in the operation of the Business.

5.5     Taxes.  Except as set forth on Schedule 5.5(a):

(a)     Except for matters that would not reasonably be expected to have a Material Adverse Effect, (i) the Sellers have timely filed all Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of any Seller) and all such Tax Returns are true, correct and complete in all material respects; and (ii) all Taxes required to be shown to be payable on such Tax Returns have been paid.  Each Seller has withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(b)     To the Knowledge of the Sellers, no action, suit, proceeding or audit is pending against or with respect to the Sellers regarding Taxes.

(c)     No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, other than any waiver or exclusion which has expired.

(d)     No Seller is a "foreign person" within the meaning of Section 1445 of the Code.

5.6     Real Property.  Schedule 5.6(a) sets forth a complete list of all material real property and interests in real property leased, subleased, or otherwise occupied by the Sellers (individually, a "Real Property Lease" and collectively, the "Real Property Leases", and each such real property, a "Seller Property" and collectively as the "Seller Properties") as lessee, sublessee, lessor or sublessor, together with the parties to, and date of, each Real Property Lease and the full street address of each parcel subject to a Real Property Lease.  The Sellers have good and valid leasehold interests in the real property conveyed by the Real Property Leases.  Each Real Property Lease is in full force and effect, and is valid and enforceable in accordance with its terms.  To the Knowledge of the Sellers, no Seller has received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default by the Company or any Subsidiary

under any of the Real Property Leases that are currently in effect and eligible to be assumed by Purchaser.  Except as a result of the filing of the Bankruptcy Cases or as set forth on <u>Schedule 5.6 (b)</u>, to the Knowledge of the Sellers, there has been no default or event that with notice or lapse of time, or both, would constitute a default by the Company or any Subsidiary under any of the Real Property Leases.

       5.7     <u>Tangible Personal Property</u>.  <u>Schedule 5.7</u> sets forth all leases of personal property ("<u>Personal Property Leases</u>") involving annual payments in excess of $100,000 relating to personal property used or owned by any Seller or to which any Seller is a party or by which the properties or assets of any Seller is bound.  Except as set forth on <u>Schedule 5.7</u>, to the Knowledge of the Sellers, no Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by any Seller under any of the Personal Property Leases contemplated to be assumed by any Seller and assigned to Purchaser other than in respect of any such default (or prospective default, as the case may be) that can be cured in connection with the assumption and assignment of the applicable underlying Personal Property Lease.

       5.8     <u>Intellectual Property</u>.

       (a)     <u>Schedule 5.8(a)</u> lists each item of Owned Intellectual Property for which any Seller has received or applied for a registration or issuance, including, without limitation, any patent, patent application, copyright registration or application therefor, and trademark, trade name, service mark, domain name registration or application therefor ("<u>Registered Owned Intellectual Property</u>"). To the Knowledge of the Sellers, all of the Registered Owned Intellectual Property is subsisting, valid and enforceable.

       (b)     Except as set forth on <u>Schedule 5.8(b)</u>, (i) the Sellers own or have valid and enforceable Intellectual Property Licenses to use all material Intellectual Property owned or used by them, and (ii) to the Knowledge of the Sellers, the Purchased Intellectual Property constitutes all Intellectual Property used in the Business as currently conducted;

       (c)     Except as set forth on <u>Schedule 5.8(c)</u>, no Purchased Intellectual Property is the subject of any Legal Proceeding or of any challenge received (including with respect to validity, enforceability or ownership) by the Sellers in writing;

       (d)     <u>Schedule 5.8(d)</u> sets forth all material Intellectual Property Licenses to which any Seller is a party.  Except as set forth on <u>Schedule 5.8(d)</u>, no Seller has received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any material Intellectual Property License;

       (e)     To the Knowledge of the Sellers, no Seller nor any of its products or services is currently infringing, misappropriating or otherwise violating, and the operation of the Business as currently conducted does not infringe, misappropriate or violate, any Intellectual Property of any Person, except for any infringement, misappropriation or violation that is not and would not reasonably be expected to be material to the Business.  Except as set forth on <u>Schedule 5.8(a)</u>, to the Knowledge of the Sellers, no Person is currently infringing, misappropriating or violating any of the Purchased Intellectual Property owned by any Seller.

(f)     To the Knowledge of the Sellers, (i) no Seller has experienced any material failures, disruptions, unauthorized intrusions or breaches of its information technology or telecommunications networks, nor any material loss, theft or unauthorized access to or use of any personal information held by or on behalf of such Seller, and (ii) each Seller has implemented industry standard security measures to protect the security of its information technology and telecommunications networks and systems and the privacy and security of any material data or personal information stored thereon.

5.9     Material Contracts.

(a)     Schedule 5.9(a) sets forth all of the following Orders or Contracts to which any Seller is a party or by which it is bound and that are currently in effect (or by which the Purchased Assets may be bound or affected) (collectively, whether or not disclosed on Schedule 5.9(a), the "Material Contracts"):

(i)     with any labor union or association representing any Employees of any Seller;

(ii)     for the sale after the date hereof of any Purchased Asset owned or used by the Sellers for consideration in excess of $250,000;

(iii)     relating to the acquisition by any Seller of any operating business or the capital stock of any other Person;

(iv)     which involve any Contract (A) granting or obtaining any right to use (including through releases, immunities from suit or covenants not to sue) any Purchased Intellectual Property (including, without limitation, any franchise agreements) or (B) restricting the Sellers' rights to use any Purchased Intellectual Property;

(v)     which involve any Purchased Contract (other than purchase orders entered into in the ordinary course of business) the performance of which involves payment by or to any of the Sellers of consideration in excess of $250,000 over the term of such Contract and which cannot be canceled by notice of ninety (90) days or fewer without penalty or payment; and

(vi)     which regard the employment, services, consulting, termination or severance from employment relating to or for the material benefit of any director, officer, employee, independent contractor or consultant of any Seller and require annual payments by any Seller in excess of $100,000.

(b)     The Sellers have delivered to Purchaser true and complete copies of such Material Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

(c)     Each Material Contract is in full force and effect and is the valid and binding obligation of the Seller party thereto, and to the Knowledge of the Sellers, each other party thereto.

37

(d)     Except as set forth on Schedule 5.9(d), no Seller is in default under any Material Contract, to the knowledge of the Sellers, no other party thereto is in default under any Material Contract and no Seller received any notice of any default or event that with notice or lapse of time or both would constitute a default by any party under any Material Contract.

(e)     Within ten (10) Business Days following the execution of this Agreement, the Sellers shall provide to Purchaser a schedule (the "Additional Material Contracts Schedule") setting forth each Order or Contract (i) to which any Seller is a party or by which it is bound, (ii) that is currently in effect or by which the Purchased Assets may be bound or affected and (iii) which (A) involves the expenditure after the date hereof of more than $250,000 in the aggregate or (B) requires performance by any party more than one year from the date hereof, in each case, that are not terminable by any Seller without penalty or payment on less than 90-days' notice (the "Additional Material Contracts").  Upon delivery of the Additional Material Contracts Schedule pursuant to the preceding sentence, each Additional Material Contract shall be deemed to be a Material Contract for all purposes hereunder and the Sellers shall be deemed to have made each representation and warranty set forth in this Section 5.9 with respect to each Additional Material Contract as of the date hereof.

5.10    Employee Benefits.

(a)     Schedule 5.10(a) lists all material Employee Benefit Plans.

(b)     True, correct and complete copies of the following documents, with respect to each of the Employee Benefit Plans, have been made available to Purchaser (A) any plans and related trust documents, and all amendments thereto, (B) the most recent Forms 5500 for the past three years and schedules thereto, (C) the most recent financial statements and actuarial valuations for the past three years, (D) the most recent IRS determination letter, (E) the most recent summary plan descriptions (including letters or other documents updating such descriptions) and (F) written descriptions of all non-written agreements relating to the Employee Benefit Plans.

(c)     Neither the Sellers nor any trade or business (whether or not incorporated) which are or have ever been under common control, or which are or have ever been treated as a single employer, with the Sellers under Section 414(b), (c), (m) or (o) of the Code sponsors, maintains, or has any liability with respect to any "employee pension plans," as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, including without limitation, any multiemployer plan as defined in Section 3(37) of ERISA, or any plan subject to Sections 4063 or 4064 of ERISA.

(d)     Each of the Employee Benefit Plans intended to qualify under Section 401 of the Code ("Qualified Plans") has been determined by the IRS to be so qualified, and, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(e)     All contributions and premiums required by law or by the terms of any Employee Benefit Plan or any agreement relating thereto have been timely made (taking into account any waivers granted with respect thereto) to any funds or trusts established thereunder or in connection therewith in all material respects.

38

(f)     None of the Employee Benefit Plans which are "welfare benefit plans" within the meaning of Section 3(1) of ERISA provide for continuing benefits or coverage for any participant or any beneficiary of a participant post-termination of employment except as may be required under COBRA.

(g)     Each of the Employee Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

(h)     Except as set forth on Schedule 5.10(h), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any employee of any Seller; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits.

5.11    Labor.

(a)     No Seller is a party to any labor or collective bargaining agreement and no Employees are represented by any labor organization; no labor organization or group of Employees has made a pending demand for recognition or certification to the Seller and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Sellers, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority relating to the Company.  There are no organizing activities involving the Seller pending with any labor organization or group of Employees.

(b)     There are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any employee or group of employees of any Seller, except in each case as would not have a Material Adverse Effect.

(c)     The Seller is in compliance with all laws governing the employment of labor, including, but not limited to, all such laws relating to wages, hours, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding and/or social security Taxes and similar Taxes, except where such violation would not have a Material Adverse Effect.

5.12    Litigation.  Except as set forth on Schedule 5.12, there are no Legal Proceedings pending or, to the Knowledge of the Sellers, threatened by or against any Seller before any Governmental Body (a) that could reasonably be expected to result in damages in excess of $250,000 and that are not subject to the automatic stay in the Bankruptcy Cases, (b) that involve allegations that are being brought or could reasonably be expected to be brought by a "class" or (c) could result in a Material Adverse Effect.

5.13    Compliance with Laws; Permits.

(a)     The Sellers are, and have been since December 31, 2015, in material compliance with all Laws applicable to their respective operations or assets or the Business, except

where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect and except with respect to Environmental Laws which are addressed in <u>Section 5.14</u>. No Seller has received any written notice of or been charged with the violation of any Laws since December 31, 2015, except where such violation would not reasonably be have a Material Adverse Effect.

(b)    The Sellers currently have all Permits which are reasonably required for the operation of the Business as presently conducted, except where the absence of which would not have a Material Adverse Effect, and such Permits are in full force and effect, subject to renewal in the ordinary course of business, and no Legal Proceeding is pending by any Governmental Body, or to the Knowledge of the Sellers, threatened by any Governmental Body, seeking the revocation, limitation or non-renewal of any such Permits. <u>Schedule 5.13(b)</u> sets forth a complete and correct list as of the date of this Agreement of all Permits required for the conduct of the business other than liquor licenses. No Seller is in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, except where such default or violation would not be material to the operation of the Business.

(c)    <u>Schedule 5.13(c)</u> sets forth a complete and correct list as of the date of this Agreement of all liquor licenses (including, without limitation, beer and wine licenses) held or used by the Sellers, including the Person in whose name such license is issued, date of issuance and renewal date. Since December 31, 2015, (i) such liquor licenses have been valid and in full force and effect, (ii) there have been no material defaults under or violations of such liquor licenses, (iii) there have been no Legal Proceedings (in any such case, with respect to investigations, to the Knowledge of the Sellers) brought, or to the Knowledge of the Sellers, threatened to be brought, by or before a Governmental Body in respect of such liquor licenses or the activities of the Sellers in connection with such liquor licenses, and (iv) to the Knowledge of the Sellers none of such liquor licenses have been threatened by a Governmental Body to be revoked, limited or not renewed.

5.14    <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 5.14</u> hereto or in each case as would not have a Material Adverse Effect:

(a)    the Business and operations of the Sellers are in compliance with all applicable Environmental Laws and all Permits issued pursuant to Environmental Laws;

(b)    the Sellers have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business, subject to renewal of such Permits in the ordinary course of business;

(c)    no Seller is the subject of any outstanding Liability respecting (i) violations of Environmental Laws, (ii) Remedial Action or (iii) any Release of a Hazardous Material by Seller;

(d)    excluding each of such matters which Seller has resolved for total payments of less than $250,000, no Seller has received in the last two (2) years prior to the date of this Agreement any written communication alleging that any Seller or the Business may be in

violation of any applicable Environmental Law or any Permit issued pursuant to Environmental Law; and

(e)    the Sellers have delivered or made available to Purchaser copies of all environmental site assessments relating to the Sellers, the Business, or properties currently or formerly owned or operated by the Sellers that are in the Sellers' possession.

5.15    <u>Financial Advisors</u>.  Except as set forth on <u>Schedule 5.15</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from the Sellers in respect thereof.

5.16    <u>Financial Statements</u>.  The Sellers have delivered to Purchaser true and correct copies of (i) the audited consolidated balance sheets of the Company and its Subsidiaries as at December 31, 2015 and December 31, 2016 and the related audited consolidated statements of income and of cash flows of the Company and its Subsidiaries for the years then ended and (ii) the unaudited consolidated balance sheet of the Company and its Subsidiaries as at April 30, 2018, and the related consolidated statement of income and cash flows of the Company and its Subsidiaries for the 16 months then ended (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "<u>Financial Statements</u>").  Except as set forth on <u>Schedule 5.16</u> and to the Knowledge of the Sellers, each of the Financial Statements has been prepared in accordance with GAAP consistently applied without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of the Company and its Subsidiaries as at the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements.

5.17    <u>Insurance</u>.  <u>Schedule 5.17(a)(i)</u> contains a true and complete list of all insurance policies (by policy number, insurer, expiration date and type and amount of coverage) covering the Sellers and the Business, including self-insurance (the "<u>Insurance Policies</u>"). The Sellers are in material compliance with the terms and provisions of the Insurance Policies and all premiums due and payable with respect thereto have been paid.  Except as set forth in <u>Schedule 5.17(b)</u>, the Sellers have not received a notice of cancellation or termination of any Insurance Policy. Except as set forth on <u>Schedule 5.17(a)(ii)</u>, there is no material claim pending under any of the Insurance Policies as to which coverage has been questioned, denied or disputed by the underwriters of such policy.

5.18    <u>Absence of Certain Changes</u>.  Except (a) as set forth in <u>Schedule 5.18</u> and (b) for the commencement or pendency of the Bankruptcy Cases, since December 31, 2016, there has been no event or condition that has had (or is reasonably likely to result in) a Material Adverse Effect.

5.19    <u>No Other Representations or Warranties; Schedules</u>.  Except for the representations and warranties contained in this <u>Article V</u> (as modified by the Schedules hereto), no Seller nor any other Person makes any other express or implied representation or warranty with respect to any Seller, the Business, the Purchased Assets, the Assumed Liabilities or the

transactions contemplated by this Agreement, and the Sellers disclaim any other representations or warranties, whether made by any Seller, any Affiliate of the Sellers or any of their respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), the Sellers (i) expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information of any kind or description made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, marketing materials, confidential information memorandum or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of the Sellers or any of their Affiliates).  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Sellers that:

6.1    Organization and Good Standing.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted, except where the failure to have such power and authority would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

6.2    Authorization of Agreement.  Purchaser has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary action on behalf of Purchaser and no other action on the part of Purchaser is necessary to authorize the execution and delivery of this Agreement and the Purchaser Documents by Purchaser and the consummation of the transaction contemplated hereby and thereby by Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity.

42

6.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 6.3(a), none of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound or (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to conduct the Business, except where the failure of which to obtain or make would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

6.4    Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions hereby.  Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

6.5    Financial Advisors.  Purchaser does not have any obligation to pay any broker, finder or financial advisor for Purchaser any fee or commission or like payment in connection with the transactions contemplated by this Agreement for which the Sellers would be held responsible.

6.6    Financial Capability.  Purchaser at the Closing will have sufficient funds available to pay the portion of the Purchase Price payable in cash and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement.  Purchaser shall deliver to the Sellers concurrently herewith a copy of an executed equity commitment letter, substantially in the form attached hereto as Exhibit I, including all annexes, exhibits, schedules and other attachments thereto, dated as of the date hereof, pursuant to which the Funds shall commit to provide equity financing in the respective amounts, and subject to the terms and conditions, set forth therein (the "Equity Commitment").

6.7    Condition of the Business.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges, understands and agrees that the Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Sellers in Article V hereof (as modified by the Schedules hereto), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis.  Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of the Sellers set forth in Article V hereof (as modified by the Schedules hereto).  Purchaser further represents that no Seller nor any of their Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Sellers, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and, except in the case of fraud, none of the Sellers, or any of their Affiliates, will have or be subject to any liability to Purchaser resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential information memorandum distributed on behalf of the Sellers relating to the Business or any other publications or data room or due diligence information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the transactions contemplated hereby.  Purchaser acknowledges that it can bear the economic risk of its purchase of the Purchased Assets and assumption of the Assumed Liabilities, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of such purchase.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

7.1    Competing Bids.  This Agreement and the transactions contemplated hereby are subject to the Sellers' right and ability to consider higher and/or otherwise better competing bids with respect to the Business and the Purchased Assets, pursuant to the Bid Procedures.  In accordance with the Bid Procedures, the Sellers have the right to, and may cause their representatives and Affiliates to, (a) initiate contact with any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any sale or other disposition of the Purchased Assets; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person; and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing.

7.2    Bankruptcy Court Filings.  The Sellers shall use reasonable best efforts to make any filings, take all actions and obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable following the date hereof.  Each Party agrees that it will promptly take such actions as are reasonably requested by any other Parties to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith"

purchaser under Section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code.  In the event the entry of the Sale Order shall be appealed, the Sellers shall use their respective reasonable best efforts to defend such appeal unless and until Purchaser elects to terminate this Agreement in accordance with the terms hereof.

7.3    Adequate Assurances.  With respect to each Purchased Contract, Purchaser shall use reasonable best efforts to provide adequate assurance of the future performance by it of such Purchased Contract, Personal Property Lease or Real Property Lease to the extent requested by the counterparty to such Purchased Contract.

7.4    Purchaser Deposit.  The sum of Four Million Six Hundred Seventy-Five Thousand Dollars ($4,675,000.00) (the "Purchaser Deposit") shall be paid by Purchaser via (a) a cash payment in the amount of Three Million One Hundred Seventy-Five Thousand Dollars ($3,175,000.00) (the portion of the Purchaser Deposit described in this clause (a), the "Cash Deposit") to be paid within one (1) Business Day following the date of this Agreement and (b) a credit, in an amount equal to the Z Capital Lenders' portion of the Initial DIP Term Loan Commitment (which, as of the date hereof, is $1,500,000), against the Borrower's repayment obligations with respect to the Z Capital Lenders' portion of the DIP Term Loan (the portion of the Purchaser Deposit described in this clause (b), the "Credit Deposit").  In the event that any portion of the Delayed Draw DIP Term Loan is funded to the Borrower pursuant to the DIP Facility (the Z Capital Lenders' portion of such funding, the "Z Capital Delayed Draw DIP Funding Amount"), (x) the Sellers shall immediately upon the Borrower's receipt of the Z Capital Delayed Draw DIP Funding Amount pay to Purchaser in cash an amount equal to such Z Capital Delayed Draw DIP Funding Amount, (y) the Cash Deposit shall be deemed to be reduced by an amount equal to the Z Capital Delayed Draw DIP Funding Amount for all purposes hereunder and (z) the Credit Deposit shall be deemed to be increased by an amount equal to the Z Capital Delayed Draw DIP Funding Amount for all purposes hereunder.  Purchaser's and Sellers' right to retain the Purchaser Deposit in the event of a termination of this Agreement shall be governed by Section 4.6 of this Agreement.

ARTICLE VIII

COVENANTS

8.1    Access to Information.  The Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, legal advisors and accountants), to make such investigation of the properties (including environmental site assessments), businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as is reasonable (and reasonably requested) and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted in a reasonable manner (and shall not unreasonably interfere with the operations of the Sellers or the Business), during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to any applicable restrictions under applicable Law.  The Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of the Sellers to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and

examination, and Purchaser and Purchaser's representatives shall cooperate with the Sellers and the Sellers' representatives and Purchaser and Purchaser's representatives shall, at the discretion of the Sellers, take reasonable measures to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information subject to attorney-client privilege.

        8.2    <u>Conduct of the Business Pending the Closing</u>.

        (a)    Prior to the Closing, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement or (3) with the prior consent of Purchaser, which shall not be unreasonably conditioned, withheld or delayed, the Sellers shall, provided that such conduct would not result in a Default or Event of Default under the Approved Budget or the DIP Order:

        (i)    conduct the Business only in the Ordinary Course of Business as in effect on the date hereof (taking into account such Seller's status as a debtor-in-possession); and

        (ii)    use commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with customers and suppliers of the Business.

        (b)    Prior to the Closing, except as required by applicable Law, (3) as otherwise expressly contemplated, required or permitted by this Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), the Sellers shall not:

        (i)    (A) increase the annual level of compensation payable or to become payable by any Seller to any director, officer or salaried employee of any Seller, (B) increase the annual level of compensation payable or to become payable by any Seller to any other employee of any Seller, except in the Ordinary Course of Business, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any director, officer or employee, (D) increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (E) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement to which any Seller is a party or involving a director, officer or employee of any Seller, except, in each case, as required by applicable Law from time to time in effect or by any of the Employee Benefit Plans;

        (ii)    subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

        (iii)    acquire any material properties or assets that would be Purchased Assets or sell, assign, transfer, convey, lease or otherwise dispose of (including, without limitation, by abandoning, cancelling, letting lapse or forfeiting to the public any Purchased Intellectual Property) any Purchased Assets (except acquisitions of Inventory, Equipment and similar assets in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets);

46

(iv)    grant a license, release, immunity or covenant not to sue under any Purchased Intellectual Property, other than non-exclusive licenses of Owned Intellectual Property granted by a Seller in the Ordinary Course of Business to a service provider (where such license is granted solely for the benefit of such Seller) or to a customer;

(v)    cancel or compromise any material debt or claim or waive or release any material right of any Seller that constitutes a Purchased Asset;

(vi)    enter into any commitment for any capital expenditures in excess of $100,000 for any individual commitment and $1,500,000 for all commitments in the aggregate with respect to the Purchased Assets;

(vii)    enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization with respect to any Purchased Asset;

(viii)    make any Material Decision;

(ix)    resolve any Liability that would be an Assumed Liability;

(x)    fail to make any payments due and owing under Seller's workers' compensation insurance plan with American International Group, Inc. (or its Affiliate) or any other Sellers' Workers' Compensation Obligation;

(xi)    transfer, to the extent that following such transfer such amounts would be treated as Excluded Assets, any security deposits, prepaid rentals, unbilled charges, fees, deposits or, other than in the Ordinary Course of Business, cash, cash equivalents or negotiable instruments, in each case, constituting Purchased Assets;

(xii)    conduct, outside the Ordinary Course of Business, any promotion between execution of this Agreement and the Closing Date on gift card sales, coupons or rebates or conduct any other promotion that would have the effect of increasing the amount of Assumed Liabilities related to gift cards, coupons or rebates;

(xiii)    change the policies or practices regarding working capital as compared with past practice;

(xiv)    other than in the Ordinary Course of Business, satisfy any Excluded Liability with a Purchased Asset; or

(xv)    agree to do anything prohibited by this Section 8.2.

8.3    Consents; Liquor Licenses.  Purchaser and Sellers shall use their reasonable best efforts to obtain at the earliest practicable date all consents and approvals required of them to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that Sellers shall not be obligated to pay any material consideration therefor (other than the Cure Amounts) to any third party from whom consent or approval is requested or to initiate any litigation or Legal

47

Proceedings (other than pursuant to the Bankruptcy Cases) to obtain any such consent or approval. The Sellers shall reasonably cooperate with Purchaser in connection with Purchaser's efforts to make any required filings with or obtain any approvals required by any Governmental Body or third party with respect to any of the Sellers' liquor licenses ("Liquor License Approvals"), all at Purchaser's sole cost and expense.

8.4    Regulatory Approvals.

(a)    Purchaser and the Sellers shall (i) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for information, documents, or other materials received by each of them or any of their respective Subsidiaries from any other Governmental Body in respect of the transactions contemplated hereby, and (ii) cooperate with each other in connection with resolving any investigation or other inquiry of any Governmental Body under any Antitrust Laws with respect to any such transaction. Each such Party shall promptly inform the other Parties of any material oral communication with, and provide copies of material written communications with, any Governmental Body regarding any such transaction. Absent an emergency circumstance, no Party shall independently participate in any formal meeting with any Governmental Body in respect of any such investigation or other inquiry without giving the other Parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party relating to proceedings under the HSR Act or other Antitrust Laws. The Sellers and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (the Sellers or Purchaser, as the case may be).

(b)    Each of Purchaser and each Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws").

8.5    Further Assurances. Each of Purchaser and each Seller shall, at its own expense, use its reasonable best efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement, (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement and (iii) cooperate in connection with the transfer, collection or similar realization of the Purchased Assets for the benefit of Purchaser, including by making regulatory or other filings. Each party agrees to execute and deliver such other documents, certificates, agreements and other writings and take such other actions as may be reasonably

necessary or reasonably desirable in or order to vest in Purchaser good and valid title to the Purchased Assets or evidence the assumption by Purchaser of the Assumed Liabilities. The covenants in this <u>Section 8.5</u> shall survive the Closing.

        8.6    <u>RESERVED</u>.

        8.7    <u>Preservation of Records</u>. (a) The Sellers and their successors and Purchaser agree that each of them shall preserve and keep the books and records held by them or their Affiliates relating to the Purchased Assets for a period of three (3) months from the Closing Date and during such period shall make such books and records as well as any of their respective employees available to the other (and such Party's respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of the Sellers or Purchaser any of their Affiliates or in order to enable any Party to comply with its obligations under this Agreement, any Ancillary Agreement or the Bankruptcy Cases; <u>provided</u>, <u>however</u>, that this <u>Section 8.7</u> shall not apply to any Seller upon liquidation of such Seller. Each Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall be entitled to inspect and make copies of any such books and records held by the other Party. In the event any Seller or Purchaser wishes to destroy such books and records or the Sellers move to convert the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, in each case, before or within three (3) months from the Closing Date, it shall first give 10 days' prior written notice to the other Party (and its respective successors and representatives appointed by the Bankruptcy Court, if any) and the other Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall have the right, at their option and expense, upon prior written notice within such 10-day period, to take possession of the records within 10 days after the date of such notice.

        (b)    Access pursuant to this <u>Section 8.7(b)</u> shall be afforded by the party in possession of such records, upon receipt of reasonable advance notice, during normal business hours and at the expense of the party seeking such access; <u>provided</u>, <u>however</u>, that (i) any review of such records shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party, (ii) no party shall be required to take any action that would constitute a waiver of the attorney-client privilege, and (iii) no party shall be required to supply the other party with any information which such party is under a legal obligation not to supply.

        8.8    <u>Publicity</u>. Prior to the Closing, neither the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the reasonable judgment of Purchaser or the Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, <u>provided</u>, <u>however</u>, that the Party intending to make such release shall use its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

8.9    <u>Use of Name</u>.  The Sellers agree that they shall (i) as soon as practicable after the Closing Date and in any event within ninety (90) days following the Closing Date, cease to make any use of the names associated with the Business, including those set forth on <u>Schedule 8.9</u> hereto, or any Marks, Internet domain names, websites, web pages and social media channels (including, but not limited to Facebook, Instagram and Twitter handles) related thereto or containing or comprising any of the foregoing or that are confusingly similar thereto (collectively, the "<u>Seller Marks</u>"), and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Business.

8.10    <u>Schedules</u>.  The Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information disclosed in the Schedules as an exception to a particular representation or warranty shall constitute a disclosure with respect to other representations and warranties, in each case, to the extent that the relevance of any such information to any other representation or warranty is readily apparent from the text of such disclosure notwithstanding any reference to a specific section.

8.11    <u>RESERVED</u>.

8.12    <u>WARN Act</u>.  Purchaser shall be responsible for (and shall indemnify and hold the Sellers harmless from and against) all Liabilities for any and all WARN Act notices, payments, fines or assessments, including reasonable attorneys' fees incurred by the Sellers in connection therewith, with respect to the employment, discharge or layoff, on or after the Closing Date, of any Transferred Employees.  Sellers shall be responsible for (and shall indemnify and hold Purchaser harmless from and against) all Liabilities for any and all WARN Act notices, payments, fines or assessments, including reasonable attorneys' fees incurred by Purchaser in connection therewith, with respect to the employment, discharge or layoff of any employees of Purchaser other than the Transferred Employees.  Notwithstanding anything to the contrary herein, Sellers shall be entitled to send WARN Act notices (i) in Sellers' sole discretion, at any time, in respect of any Excluded Restaurants and (ii) with the prior consent of Purchaser (which shall not be unreasonably withheld, conditioned or delayed) in respect of Retained Restaurants which are reasonably expected to be designated as Excluded Restaurants.

8.13    <u>Section 363(b)(1)(A)</u>.  Purchaser shall honor and observe any and all policies of the Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

8.14    <u>Hilco Agreement</u>.  Notwithstanding anything herein to the contrary, Purchaser shall pay and satisfy all amounts due and payable to Hilco under the Hilco Agreement, provided that Hilco shall have duly satisfied its obligations under the Hilco Agreement in Purchaser's reasonable discretion.

8.15    <u>Sellers' Workers' Compensation Obligations</u>.  Sellers shall cooperate with Purchaser in good faith to negotiate and reach agreement with AIG or any of its affiliates with

respect to ensuring continued maintenance of all collateral in support of the Sellers' Workers' Compensation Obligations.

8.16    Trade Payables.  The Sellers shall in all material respects make all payments in respect of trade payables of the Business (including rent payments and sales taxes) arising from and after the Petition Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in accordance with the Sellers' ordinary course cash management policies and practices, in each case, subject to the DIP Budget.  Within twenty-one (21) days following the date hereof, the Sellers shall deliver to Purchaser an initial report containing an aging report for all payables of the Business (including food and beverage payables) allocated by vendor.  The Sellers shall make their employees and advisors (including the Chief Restructuring Officer) reasonably available upon reasonable advance notice from Purchaser to answer any questions Purchaser may have, and provide such additional information Purchaser may reasonably request, with respect to any accrued expenses of the Business.

ARTICLE IX

EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Transferred Employees.  Purchaser shall offer employment commencing on the Closing Date to all employees at the restaurant locations acquired by Purchaser (excluding any management-level employees whose responsibilities cover more than one restaurant) who are actively employed by the Sellers immediately prior to the Closing Date (including those on vacation or leave of absence or disability with a defined date of return) and may, at Purchaser's sole discretion, offer employment commencing on the Closing Date to any other employees of the Sellers located at restaurant locations not acquired by Purchaser or located at the corporate headquarters of the Sellers.  Those employees to whom offers of employment are made and who commence employment with Purchaser as of the Closing Date shall be collectively referred to as the "Transferred Employees."

9.2    Employee Benefits.

(a)    Benefits.  Purchaser shall provide, or cause to be provided, to each Transferred Employee for a period of one year following the Closing Date or such longer period of time required by applicable law (i) base salary or wages, (ii) commissions, bonus and incentive pay opportunities, (iii) severance benefits and (iv) other employee benefits that in the aggregate are no less favorable than those provided to such Transferred Employee immediately prior to the Closing Date; provided, however, that Purchaser shall not have any obligation to issue, or adopt any plans or arrangements providing for the issuance of, shares of capital stock, warrants, options or other rights in respect of any shares of capital stock of any entity or any securities convertible or exchangeable into such shares pursuant to any such plans or arrangements; provided, further, that no plans or arrangements of the Sellers providing for such issuance shall be taken into account in determining whether employee benefits are in the aggregate no less favorable than those provided prior to the Closing Date.

(b)    For purposes of eligibility, vesting and benefit accrual (other than accruals under a defined benefit pension plan) under the employee benefit plans of Purchaser

51

providing benefits to Transferred Employees (the "Purchaser Plans"), Purchaser shall credit each Transferred Employee with his or her years of service with any Seller and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan. Purchaser Plans shall not deny Transferred Employees coverage on the basis of pre-existing conditions and shall use commercially reasonable efforts to cause such Transferred Employees to be credited for any deductibles and out-of-pocket expenses paid in the year of initial participation in Purchaser Plans.

(c)     As soon as practicable (but no later than thirty (30) days) after the Closing Date, Purchaser shall establish or designate an individual account plan for the benefit of Transferred Employees who were eligible to participate in the Seller's 401(k) Plan (the "Purchaser's 401(k) Plan"), shall take all necessary action, if any, to qualify such plan under the applicable provisions of the Code and shall make any and all filings and submissions to the appropriate governmental agencies required to be made by it in connection with the transfer of assets described below. As soon as practicable after the Closing Date, Seller shall cause the trustee of the Real Mex Restaurants 401(k) Plan (the "Seller's 401(k) Plan") to transfer in the form of cash (or promissory notes representing outstanding loans of the Transferred Employees) the full account balances of the Transferred Employees under the Seller's 401(k) Plan (which account balances will have been credited with appropriate earnings attributable to the period from the Closing Date to the date of transfer described herein), reduced by any necessary benefit or withdrawal payments to or in respect of Transferred Employees occurring during the period from the Closing Date to the date of transfer described herein, to the appropriate trustee as designated by Purchaser under the trust agreement forming a part of Purchaser's 401(k) Plan.

(d)     Purchaser shall be responsible for and pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Transferred Employee with respect to claims incurred by such Transferred Employees or their covered dependents prior to, on or after the Closing Date.

(e)     With respect to any accrued but unused vacation time and sick leave to which any Transferred Employee is entitled pursuant to the vacation and sick leave policy applicable to such Transferred Employee immediately prior to the Closing Date, Purchaser shall allow such Transferred Employee to use such accrued vacation and sick leave following the Closing Date. Purchaser shall permit each Transferred Employee to accrue additional vacation and sick leave in accordance with the vacation and sick leave policy of Purchaser.

(f)     Nothing herein expressed or implied is intended to confer on any person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Article IX.

(g)     Nothing contained in this Section 9.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee or any amendment to any employee benefit plan.

ARTICLE X

CONDITIONS TO CLOSING

10.1    <u>Conditions Precedent to Obligations of Purchaser</u>.    The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, as of the Closing, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    (i) the representations and warranties of the Sellers set forth in Sections 5.1 (Organization and Good Standing), 5.2 (Authorization of Agreement), and 5.4 (Title to Purchased Assets; Sufficiency of Assets) (collectively, the "Sellers Core Representations") shall be true and correct in all material respects at and as of the date hereof and the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); (ii) the representations and warranties of the Sellers set forth in this Agreement other than the Sellers Core Representations (without giving effect to any "materiality," "Material Adverse Effect" or similar qualifiers, other than the reference to "Material Adverse Effect" in the representation and warranty set forth in Section 5.18) shall be true and correct at and as of the date hereof and the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of an inaccuracy of a representation or warranty set forth in this Section 10.1(a)(ii), the condition set forth in this Section 10.1(a)(ii) shall be deemed satisfied unless the effect of all such inaccuracies of representations and warranties taken together result in or would reasonably be expected to result in a Material Adverse Effect to any of the Sellers or the Business, and (iii) Purchaser shall have received an officer's certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the foregoing effect;

(b)    the Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received an officer's certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the forgoing effect;

(c)    the Sellers shall have made arrangements, satisfactory to Purchaser in its reasonable discretion, to pay, as of the Closing, any and all Cure Amounts due under Assignable Contracts designated as Purchased Contracts as of the Closing;

(d)    Since the date of this Agreement, no Material Adverse Effect shall have occurred; and

(e)    Since the date of this Agreement, the Sellers shall have continued to make all payments due on account of any workers' compensation liabilities of the Sellers in the ordinary course (the "Sellers' Workers' Compensation Obligations"), including payment of any insurance premiums related to the Sellers' Workers' Compensation Obligations, payment of any ongoing weekly, monthly or quarterly obligations of Sellers on account of the Sellers' Workers'

53

Compensation Obligations and maintenance by Seller of any collateral in support of the Sellers' Workers' Compensation Obligations and all payments in respect of the letters of credit that serve as collateral for any such obligations, until the earlier to occur of (i) such Sellers' Workers Compensation Obligations having been fully assumed or satisfied by Purchaser or another third party and (ii) the Closing.

10.2    Conditions Precedent to Obligations of the Sellers.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, as of the Closing, of each of the following conditions (any or all of which may be waived by the Sellers in whole or in part to the extent permitted by applicable Law, provided that any such waiver does not materially and adversely affect the Sellers' estates):

(a)    (i) the representations and warranties of Purchaser set forth in Sections 6.1 (Organization and Good Standing), 6.2 (Authorization of Agreement), and 6.6 (Financial Capability) (collectively, the "Purchaser Core Representations") shall be true and correct in all material respects at and as of the date hereof and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); (ii) the representations and warranties of Purchaser set forth in this Agreement other than the Purchaser Core Representations (without giving effect to any "materiality," "Material Adverse Effect" or similar qualifiers) shall be true and correct at and as of the date hereof and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of an inaccuracy of a representation or warranty set forth in this Section 10.2(a)(ii), the condition set forth in this Section 10.2(a)(ii) shall be deemed satisfied unless the effect of all such inaccuracies of representations and warranties taken together would reasonably be expected to prevent, materially delay or materially impair the ability of Purchaser to consummate the transactions, and (iii) the Sellers shall have received an officer's certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Sellers shall have received an officer's certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect.

10.3    Conditions Precedent to Obligations of Purchaser and the Sellers.  The respective obligations of Purchaser and the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, as of the Closing, of each of the following conditions (any or all of which may be waived by Purchaser and the Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, nor shall there be any statute, rule, regulation, Order or other law promulgated, enacted, entered, enforced or deemed applicable to the parties hereto which

makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded; and

(b)    the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, and those orders shall have become Final Orders.

10.4    <u>Frustration of Closing Conditions</u>.  Neither the Sellers nor Purchaser may rely on the failure of any condition set forth in Section <u>10.1</u>, <u>10.2</u> or <u>10.3</u>, as the case may be, if such failure was primarily caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE XI

## NO SURVIVAL; LIMITATION ON DAMAGES

11.1    <u>No Survival of Representations and Warranties</u>.  The Parties agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof. The Parties agree that the covenants contained in this Agreement to be performed prior to the Closing shall terminate at the Closing, and that the covenants contained in this Agreement to be performed in any part at or after the Closing shall survive the Closing hereunder until fully performed in accordance with their terms, and each Party shall be liable to the other after the Closing for any breach thereof during such period.

11.2    <u>Limitation on Damages</u>.  No Party shall be liable in connection with this Agreement, the negotiation, execution or performance of this Agreement or any Ancillary Agreement, or the transactions contemplated hereby or thereby, for any losses, claims, damages, judgements, fines, penalties, amounts paid in settlement and costs and expenses that are punitive, incidental, consequential, special or indirect (including any lost profits).

## ARTICLE XII

## TAXES

12.1    <u>Transfer Taxes</u>.  Purchaser shall be responsible for (and shall indemnify and hold harmless the Sellers and their directors, officers, employees, Affiliates, agents, attorneys, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest, fine, penalty, additions to Tax or additional amount thereon) payable in connection with the transactions contemplated by this Agreement ("<u>Transfer Taxes</u>") up to an amount not to exceed, in the aggregate, $250,000 ("<u>Transfer Taxes Cap</u>").  Sellers shall be responsible for (and shall indemnify and hold harmless Purchaser and its directors, officers, employees, Affiliates, agents, attorneys, successors and permitted assigns against) any Transfer Taxes in excess of the Transfer Taxes Cap. Provided that Purchaser has not paid or been assessed, in the aggregate, Transfer Taxes equal to the Transfer Taxes Cap, to the extent that any Transfer Taxes are required to be paid by any Seller (or such Transfer Taxes are assessed against such Seller), Purchaser shall promptly reimburse such Seller for such Transfer Taxes.  Sellers shall promptly reimburse Purchaser for any Transfer Taxes

required to be paid by Purchaser (or assessed against Purchaser) in excess of the Transfer Taxes Cap (calculated together with all prior Transfer Taxes paid by, or assessed against, Purchaser). Each Party shall take all reasonable actions to mitigate or otherwise reduce (and shall not take any actions which would increase or fail to mitigate or reduce) all such Transfer Taxes through securing exemptions therefrom or otherwise and shall continue to cooperate with the other Parties post-Closing to reduce the liability for, or to increase the amount or availability of any refund of, any such Transfer Taxes.

12.2    Purchase Price Allocation.

(a)    As promptly as reasonably practicable, but in any event within 60 days following the Closing, Purchaser shall prepare and deliver to the Sellers a proposed allocation of the Purchase Price (including the Assumed Liabilities properly included therein) among the Purchased Assets in accordance with Section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as applicable) (the "Proposed Allocation").  The Sellers shall have 30 days (the "Review Period") to review and object to the Proposed Allocation.  On or prior to the last day of the Review Period, the Sellers may object to the Proposed Allocation by delivering to Purchaser a written statement setting forth the Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement therewith (the "Allocation Dispute Notice").  If the Sellers fail to deliver the Allocation Dispute Notice before the expiration of the Review Period, the Proposed Allocation shall be deemed to have been accepted by the Sellers and become final and binding.  If the Sellers deliver the Allocation Dispute Notice before the expiration of the Review Period, Purchaser and the Sellers shall negotiate in good faith to resolve any such objections within 30 days (the "Resolution Period") following the delivery of the Allocation Dispute Notice, and if resolution of such dispute is reached, the agreed upon allocation shall become final and binding.  If Purchaser and the Sellers are unable to completely resolve any such objections within 30 days, the unresolved issues (and only the unresolved issues) (the "Allocation Dispute") shall promptly be submitted for resolution to a recognizable, reputable and impartial certified public accounting firm that is mutually acceptable to Purchaser and the Sellers (the "Neutral Firm").  If Purchaser and the Sellers cannot agree on a Neutral Firm within 10 days of the expiration of the Resolution Period the Los Angeles office of the American Arbitration Association shall choose a recognized, reputable and impartial certified public accounting firm to act as the Neutral Firm.  The Neutral Firm shall be instructed to resolve any outstanding Allocation Dispute; provided, that, the Neutral Firm's determination of any amount subject to the Allocation Dispute shall be (x) no less than the lesser of the amounts claimed by Purchaser and the Sellers, respectively, or (y) no greater than the greater of the amounts claimed by Purchaser and the Sellers, respectively.  The Parties shall instruct the Neutral Firm to render its determination with respect to the entire Allocation Dispute within 30 days of the referral of the Allocation Dispute thereto, and the determination of the Neutral Firm shall be final and binding upon the parties hereto for all purposes of this Agreement. The fees and expenses of the Neutral Firm shall be borne 50% by Purchaser and 50% by the Sellers. The final and binding allocation determined hereunder is hereinafter referred to as the "Final Allocation".

(b)    The Sellers and Purchaser agree to cooperate with each other in preparing IRS Form 8594 (including any subsequent adjustments required thereto) in a manner consistent with such Final Allocation, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.  If such Final Allocation is

disputed by any Tax Authority or other Governmental Body, Purchaser or any Seller receiving notice of such dispute will promptly notify the other Parties and the Parties will use their reasonable best efforts to sustain the Final Allocation. Neither Purchaser nor the Sellers shall take any position (including in any Tax Returns, reports, audits or otherwise) that is inconsistent with such allocation, unless otherwise required pursuant to a final determination by a court of competent jurisdiction or pursuant to a closing agreement with the IRS entered into pursuant to Section 7121 of the Code. The purchase price allocation determined in connection with this <u>Section 12.2</u> shall be utilized for tax reporting purposes only. For the avoidance of doubt, such allocation shall not be binding upon any party for purposes other than tax reporting or used as evidence, or for any other purpose, in connection with any dispute regarding valuation.

12.3    <u>Income Tax Treatment</u>. The Sellers and Purchaser will treat the transactions contemplated hereunder as taxable sales of assets for all federal, state and local Income Tax purposes and will not treat such transactions as a transaction described in Code Sections 351 or 368 except to the extent that Purchaser determines to restructure such transactions as a transaction described in any such Code section.

12.4    <u>Cooperation</u>. The Sellers, on the one hand, and Purchaser, on the other hand, will provide each other with such cooperation and information as either of them may reasonably request of the other in connection with filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.

12.5    <u>Audits, Claims and Proceedings</u>. The Sellers shall have the right to control the conduct of the defense of any audit, claim, proceeding, investigation, or other controversy relating to Excluded Taxes (each, a "<u>Tax Claim</u>").

ARTICLE XIII

MISCELLANEOUS

13.1    <u>Expenses</u>. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each of Sellers and Purchaser shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with the negotiation and execution of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    <u>Injunctive Relief</u>.

(a)    The Parties acknowledge and agree that (i) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (ii) damages and/or remedies at law would be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, each of the Parties shall be entitled to seek injunctive relief (without the posting of any bond or other security) with respect to any such breach, including without limitation specific performance of such

covenants, promises or agreements or an order enjoining Purchaser from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The Parties' right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. The rights set forth in this Section 13.2 shall be in addition to any other rights which the Parties may have at law or in equity in connection with this Agreement.  If any action, suit or proceeding is brought by a Party to enforce this Agreement against another Party, the Party such action, suit or proceeding is brought against shall waive the defense that there is an adequate remedy at law and agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason. The right to specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, none of the Parties would have entered into this Agreement.

(b)     Notwithstanding the foregoing or any other provisions of this Agreement to the contrary, it is explicitly agreed that the Sellers shall be entitled to seek specific performance of Purchaser's obligation to cause the Equity Commitment to be funded, the funding of the Equity Commitment or to consummate the Closing, if and only if (i) the conditions set forth in Sections 10.1 and 10.3 have been satisfied (other than those conditions that by their nature are to be satisfied by actions taken at the Closing; provided that such conditions are then capable of being satisfied and will be satisfied at the Closing) or have been waived (in writing) by Purchaser in each case at the time the Closing is required to have occurred pursuant to Section 4.1, (ii) the Sellers have irrevocably confirmed to Purchaser in writing that, if specific performance is granted and the Equity Commitment is funded, the Sellers are ready, willing and able to (and shall) perform their obligations in connection with effectuating the Closing and the Closing will occur pursuant to Article IV (and the Sellers have not revoked such notice), (iii) the Parties are obligated to consummate the Closing under Section 4.1 and (v) Purchaser fails to consummate the Closing by the later of (A) within three (3) Business Days following the date of the notice described in clause (ii) and (B) the date the Closing is required to have occurred in accordance with Section 4.1. Notwithstanding anything in this Agreement to the contrary, only the Sellers shall be entitled to seek to specifically enforce Purchaser's obligations under this Agreement in accordance with the terms hereof.

13.3     Submission to Jurisdiction; Consent to Service of Process.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court, including to the entry by the Bankruptcy Court of final orders in any such proceedings, and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Cases have been closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware or the Delaware Court of Chancery and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby

irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 13.7</u>.

13.4    <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

13.5    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the schedules and exhibits hereto) and the Ancillary Agreements represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State.

13.7    <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by electronic mail (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to the Sellers, to:

RM Holdco LLC
5660 Katella Avenue, Suite 200

Cypress, California 90630
Attention: Bryan Lockwood
E-mail:  bryan.lockwood@realmexrestaurants.com

With a copy (which shall not constitute notice) to:

Sidley Austin LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, California 90067
Attention:  Vijay S. Sekhon
E-mail:  vsekhon@sidley.com

If to Purchaser, to:

c/o Z Capital Partners, L.L.C.
Two Conway Park
150 Field Drive, Suite 300
Lake Forest, IL 60045
Attention:  Rahul Sawhney
E-mail: rsawhney@zcap.net

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention:  James L. Bromley
E-mail: jbromley@cgsh.com

      13.8   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

      13.9   <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void and without effect; provided that Purchaser may assign its rights or obligations under this Agreement to one or more of its Affiliates without

60

the consent of any other Party.  No assignment of any obligations hereunder shall relieve the Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to any such permitted assignor shall apply to any such permitted assignee unless the context otherwise requires.

13.10  <u>RESERVED</u>.

13.11  <u>Non-Recourse</u>.  The Parties acknowledge that (i) no direct or indirect equity holder or lender of any Party, (ii) no member of any board of managers or special committee of any Party or any Affiliate of any Party and (iii) no past, present or future director, officer, committee member, employee, incorporator, member, partner or direct or indirect equity holder or lender of any Party (such Persons described in clauses (i)-(iii) above, the "<u>Non-Recourse Parties</u>") is a party to this Agreement or, except as expressly contemplated therein as parties thereto, any Ancillary Agreement.  The Parties further acknowledge that none of the Non-Recourse Parties, whether individually or collectively, shall have any liability whatsoever of any kind or description for any obligations or liabilities of any Party under this Agreement or, except as expressly contemplated therein as parties thereto, any Ancillary Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or thereby.  Accordingly, the Parties hereby agree that in the event (a) there is any alleged breach or alleged default or breach or default by any Party under this Agreement or any of the Ancillary Agreements or (b) any Party has or may have any claim arising from or relating to the terms of this Agreement or any Ancillary Agreement, no Party shall, or shall have any right to, commence any proceedings or otherwise seek to impose any Liability or obligation whatsoever of any kind or description on or against the Non-Recourse Parties, whether collectively or individually, by reason of such alleged breach, default or claim, except and only to the extent that a Non-Recourse Party is expressly contemplated in an Ancillary Agreement as a party to such Ancillary Agreement.

13.12  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.13  <u>No Interpretation Against Drafter</u>.  This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and any rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS**

**RM HOLDCO LLC**

By: _____
Name:    Jonathan Tibus
Title:    Chief Restructuring Officer

**SELLERS**

**RM OPCO LLC**

**By: RM HOLDCO LLC**
**Its Managing Member**


By: _____
Name:  Jonathan Tibus
Title:  Chief Restructuring Officer

**<u>SELLERS</u>**

**RM HQ LLC**
**RM CHEVYS LLC**
**RM ACAPULCO LLC**
**RM EL TORITO LLC**

**By: RM OPCO, Managing Member of each party listed above**

By: _____

Name: Jonathan Tibus

Title: Chief Restructuring Officer

**PURCHASER**

**FM RESTAURANTS (PT), LLC**

By: _____
Name: James J. Zenni, Jr.
Title: Authorized Signatory

[Signature Page to Asset Purchase Agreement]

## ANNEX 1

RM Opco LLC, a Delaware limited liability company
RM HQ LLC, a Delaware limited liability company
RM Chevys LLC, a Delaware limited liability company
RM Acapulco LLC, a Delaware limited liability company
RM El Torito LLC, a Delaware limited liability company

**Exhibit 2**

**Bidding Procedures**

## BIDDING PROCEDURES

These bidding procedures (the "**Bidding Procedures**") set forth the guidelines and process by which RM Holdco LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") shall market substantially all of their assets (the "**Assets**") for sale to interested parties and conduct one or more sales of such Assets (each, a "**Sale**") through a court-approved auction (the "**Auction**").

On August _____, 2018 the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered an order that, among other things, approved the Bidding Procedures set forth herein (the "**Bidding Procedures Order**"). Pursuant to the Bidding Procedures Order, the Bankruptcy Court has approved FM Restaurants (PT), LLC (or its assignee(s) or designee(s)) as the stalking horse bidder (the "**Stalking Horse Bidder**") for the Assets as set forth more fully in that certain Asset Purchase Agreement among the Stalking Horse Bidder and the Debtors, dated as of August 5, 2018 (together with the schedules and related documents thereto, the "**Stalking Horse Agreement**").[1] The Bidding Procedures Order also set _____, 2018 as the date on which the Bankruptcy Court will conduct the Sale Hearing (as defined below) in the event an Auction (as defined below) is held, or _____, 2018 in the event no Auction is held. At the Sale Hearing, the Debtors will seek entry of an order from the Bankruptcy Court authorizing and approving the Sale of the Assets to the Stalking Horse Bidder or another Qualified Bidder (or Qualified Bidders) (as defined below) that the Debtors determine to have made the highest or otherwise best offer for the Assets.

The Debtors provide these Bidding Procedures for use by Potential Bidders (as defined below) and Qualified Bidders (as defined below) in submitting Bids (as defined below) proposing a transaction to purchase or otherwise acquire the Assets and, as necessary, qualifying for and participating in the Auction. The Debtors seek to enter into one or more transactions with one or more Qualified Bidders, so long as the individual Bid for all of the Assets by a Qualified Bidder or the Bids for less than all of the Assets by two or more Qualified Bidders, in combination, represent the highest or otherwise best offer for substantially all of the Assets.

As described further below, certain decisions under these Bidding Procedures will be made by the "**Decision Maker**", which shall mean (i) the board of managers of RM Holdco LLC (the "**Board**"), acting by majority vote cast by those members of the Board who are not (a) compensated by the Stalking Horse Bidder (unless the Stalking Horse Bidder has irrevocably and unconditionally disclaimed in a writing provided to the Debtors and Tennenbaum Capital Partners or their respective professionals (a copy of which writing may be filed on the docket in the Bankruptcy Court) any right (including the right of any of its affiliates, including Controlled Investment Affiliates (as defined in the DIP Facility)) to participate as a bidder in connection with the Auction, in which event such members shall be entitled to vote) or (b) officers of Holdco; or (ii) solely in the event that a vote of the

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Stalking Horse Agreement.

1

Board results in a deadlock decision, the CRO (as defined below).

1.    **Stalking Horse Agreement**

On August 5, 2018, the Debtors and the Stalking Horse Bidder entered into the Stalking Horse Agreement, pursuant to which the Stalking Horse Bidder proposes to acquire the Purchased Assets, which include substantially all Assets of the Debtors (but which, for the avoidance of doubt, exclude any Excluded Assets as defined in the Stalking Horse Agreement).

Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder will provide the Debtors with consideration for the Purchased Assets consisting of (a) payment to the Debtors of $46.75 Million in cash at Closing, *plus* (b) the Purchase Price Adjustment Amount, *plus* (c) the Assumed Liabilities, including the ongoing obligations under each Purchased Contract ((a)-(c) collectively estimated at approximately $48.74 Million), *less* (c) the Deduction Amount, all as detailed in the Stalking Horse Agreement.  In accordance with the Stalking Horse Agreement and as approved by the Bankruptcy Court in the Bidding Procedures Order, the Stalking Horse Bidder has been authorized to receive a break-up fee in the amount of $1,402,500, subject to the terms and conditions in the Stalking Horse Agreement and Bidding Procedures Order (the "**Bid Protection**"), in order to provide an incentive and compensate the Stalking Horse Bidder for serving as the Stalking Horse Bidder and entering into the Stalking Horse Agreement with the knowledge and risk that arises from its participating in the Sale and subsequent bidding process, absent which the Stalking Horse Bidder would not have entered into the Stalking Horse Agreement.  The Bid Protection shall be payable on the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures Order.

The Bid Protection shall constitute an allowed super-priority administrative expense claim against the Debtors' bankruptcy estates pursuant to sections 363, 503(b) and 507(a)(2) of the Bankruptcy Code, which such claims shall be junior only to the claims under the DIP Facility and the Carve-Out (as defined in the DIP Facility).  The Bid Protection shall be secured by a super-priority lien in the Debtors' Assets, junior only to liens under the DIP Facility and Carve-Out (as defined in the DIP Facility), and deemed automatically perfected by entry of the Bidding Procedures Order.  Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Assets or a Qualified Bid shall be entitled to any expense reimbursement, break-up fee, termination or similar fee or payment.

The transaction contemplated by the Stalking Horse Agreement is subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code.

The Stalking Horse Bidder is deemed to be a Qualified Bidder (as defined below), and the Stalking Horse Agreement is deemed to be a Qualified Bid (as defined below) under these Bidding Procedures.  For the avoidance of doubt, the Stalking Horse Bidder shall not be required to submit an additional Qualified Bid pursuant to Section 6 of these Bidding

Procedures, and the Purchaser Deposit shall serve as the Stalking Horse Bidder's Good Faith Deposit (as defined below).

## 2.      **"As Is, Where Is"**

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates except to the extent set forth in the Stalking Horse Agreement or the Modified Agreement (as defined below) of another Successful Bidder or the Sale Order. The Stalking Horse Bidder and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely on its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures and (a) as to the Stalking Horse Bidder, the terms of the sale of the Assets set forth in the Stalking Horse Agreement, or (b) as to another Successful Bidder, the terms of the sale of the Assets set forth in the applicable Modified Agreement.

## 3.      **Free of Any and All Encumbrances**

Except as otherwise provided in the applicable Purchase Agreement (as defined below) or Sale Order, all of the Debtors' right, title, and interest in and to the Purchased Assets thereunder shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "**Encumbrances**") in accordance with 11 U.S.C. § 363, with such Encumbrances to attach to the proceeds of the sale of the Assets in accordance with the existing priorities of such Encumbrances.

## 4.      **Due Diligence**

### a.      **Diligence Provided to Potential Bidders**

Subject to execution of a confidentiality agreement on terms reasonably acceptable to the Debtors (a "**Confidentiality Agreement**"), any party (i) willing to submit any proposal, solicitation or offer (each, a "**Bid**," and the person or entity making such Bid, a "**Bidder**") for the Assets and (ii) (a) capable of demonstrating to the Debtors that such party can satisfy the financial requirements set forth in Section 6(j) below or (b) that the Debtors reasonably believe based on their own investigation or knowledge has such financial wherewithal (such party, a "**Potential Bidder**"), may be granted access to public and non-public information relating to the Assets to facilitate its consideration for making its Bid.   Any Confidentiality Agreement previously entered into between the Debtors and a Potential Bidder in effect on the date of the

3

entry of the Bidding Procedures Order shall be deemed to be a Confidentiality Agreement for purposes of these Bidding Procedures.

For the avoidance of doubt, these participation requirements do not prohibit Piper Jaffray & Co. ("**Piper**") from distributing teaser and other promotional materials to potentially interested parties advising them of the opportunity to purchase the Assets pursuant to section 363 of the Bankruptcy Code, from engaging in discussions with such parties about the opportunity, or from providing non-confidential documents and information to such parties.

Until the Bid Deadline (as defined in Section 5 below), the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors determine in their discretion to be reasonable and appropriate under the circumstances. Potential Bidders requesting information in connection with their due diligence should contact the Debtors' investment banker, Piper, using the contact information provided below. The Debtors shall not be obligated to, but may in their discretion, furnish any due diligence information after the Bid Deadline and until the conclusion of the Auction to any Potential Bidder who has submitted a Bid as of the Bid Deadline. The Debtors and their advisors are not responsible for, and will bear no liability with respect to, any information obtained by Bidders in connection with the sale of the Purchased Assets except to the extent expressly set forth in the applicable Purchase Agreement.

Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, may withhold information or restrict access to certain materials in the Data Room if providing such information or materials to a Potential Bidder would, in the Debtors' business judgment, put the Debtors at a competitive disadvantage, result in the disclosure of information or materials subject to attorney-client privilege, or breach any contract or other obligation of the Debtors; provided, however, that the Debtors shall provide any Potential Bidder with such information as has been provided to the Stalking Horse Bidder, or with information substantively similar to such information. The Debtors, in consultation with the Consultation Parties (as defined below), reserve the right not to provide due diligence access to any Potential Bidder that the Debtors conclude in their reasonable business judgment is not likely to become a Qualified Bidder. As used in these Bidding Procedures, "**Consultation Parties**" means (i) the professionals and advisors to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"),[2] and (ii) any of the following parties, but only to the extent it has delivered written notice to the Debtors that it has irrevocably waived its right to bid on the Assets and participate at the Auction: (a) the DIP Agent and (b) the lenders under the DIP Facility (the "**DIP Lenders**," and together with the DIP Agent, the "**DIP Secured Parties**").

---

[2] Unless and until a member of the Committee delivers a written notice to the Debtors irrevocably waiving its right to bid on the Assets and participate at the Auction, the Committee's professionals and advisors (i) may not share or disclose any information they receive in their capacity as Consultation Parties with such Committee member, (ii) shall exclude such Committee member from any and all discussions within the Committee relating to the Auction and Sale of the Assets, and (iii) shall restrict, limit and prohibit the dissemination to such member of any confidential information relating to the Auction and Sale of the Assets. For the avoidance of doubt, the DIP Agent and each DIP Lender (if it is a Consultation Party) and their respective advisors may not disclose any confidential information received in their capacity as Consultation Parties, including any confidential information regarding Potential Bidders, Qualified Bidders or any Qualified Bid, to any other DIP Secured Party unless and until such time, if ever, that such information is made available to all Qualified Bidders.

ACTIVE 234584377

For the avoidance of doubt, Z Capital Group, LLC and any of its affiliates (collectively, the "**Z Capital Parties**," and each, a "**Z Capital Party**") shall not be Consultation Parties unless and until the Stalking Horse Bidder has delivered written notice to the Debtors that it and all Z Capital Parties have irrevocably waived their right to bid on the Assets and be Auction Participants.

The Debtors will not provide any due diligence materials after the Bid Deadline to any party who has failed to submit a Bid as of the Bid Deadline.  The Debtors shall provide the Stalking Horse Bidder with access to all material due diligence materials, management presentations, on-site inspections, and other information provided to any Potential Bidder that were not previously made available to the Stalking Horse Bidder as soon as reasonably practicable and in no event later than five (5) Business Days after the date the Debtors made such information available to any Potential Bidder.

### b.    Diligence Provided by Potential Bidders and Qualified Bidders

Each Potential Bidder and each Qualified Bidder shall comply with all reasonable requests for information from the Debtors regarding such Bidder and its contemplated transaction.  Failure by a Potential Bidder or a Bidder that would otherwise be a Qualified Bidder to provide such information may be a basis for the Debtors, in consultation with the Consultation Parties, to deem such Bidder not to be a Qualified Bidder and to prohibit such Bidder from participating in any Auction.

### 5.    Bid Deadline

All Bids must be submitted in writing so that they are actually received no later than 4:00 p.m. (prevailing Eastern Time) on September 21, 2018 (the "**Bid Deadline**").  To properly submit a Bid, a Potential Bidder (as defined below) must deliver written copies of its Bid to each of the following notice parties (collectively, the "**Notice Parties**"):

(a)    Co-counsel to Debtors:

Sidley Austin LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Attention:  Vijay S. Sekhon
E-mail:  vsekhon@sidley.com

-and-

Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Attention:  Christina M. Craige
E-mail:  ccraige@sidley.com

ACTIVE 234584377

-and-

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attention:  Edmon L. Morton
E-mail:  emorton@ycst.com

(b)    The Debtors:

RM Holdco LLC
5660 Katella Avenue, Suite 200
Cypress, CA 90630
Attention:   Jonathan M. Tibus, Chief Restructuring Officer of the Debtors ("CRO")
E-mail:  jtibus@alvarezandmarsal.com

(c)    The Debtors' investment banker:

Piper Jaffray & Co.
2321 Rosecrans Avenue, Suite 3200
El Segundo, CA 90245
Attention:  Teri Stratton
E-mail:  teri.l.stratton@pjc.com

(d)    Counsel to the  Committee, if appointed:

[TBD]

A Bid delivered after the Bid Deadline and/or by a Potential Bidder that is not a Qualified Bidder shall not constitute a Qualified Bid (as defined below).

**6.    Bid Requirements**

To participate in the Auction, a Qualified Bidder (as defined below) other than the Stalking Horse Bidder must submit a Bid to the Notice Parties by the Bid Deadline that, as determined by the Debtors, satisfies each of the following conditions (unless such requirement is waived by the Debtors) (each such Bid, a "**Qualified Bid**"):

(a)    Written Submission of APA.  Each Bid must be in writing and include:  (i) a clean purchase agreement signed by the Bidder, accompanied by all exhibits and schedules contemplated by the purchase agreement and, to the extent required by the terms and conditions of the Bid, any ancillary agreements described in the

ACTIVE 234584377

purchase agreement with all exhibits and schedules thereto (each such purchase agreement, together with its exhibits, schedules, and ancillary agreements, if any, a "**Modified Agreement**"); (ii) a redline reflecting the Bidder's proposed changes to the Stalking Horse Agreement (including all exhibits and schedules thereto). Each Modified Agreement and the Stalking Horse Agreement shall be a "**Purchase Agreement**" for purposes of these Bidding Procedures.

(b)     <u>Commitment to Close.</u>  Each Bid must contain a written statement that the Bidder is willing to consummate and fund the Sale proposed in the Modified Agreement within two (2) Business Days after satisfaction of the conditions to closing, and in any event by the close of business on the date that is the earlier of (i) sixty (60) days after the date on which the Sale Order is entered and (ii) December 15, 2018 (the "**Closing Deadline**").

(c)     <u>Commitment to Serve as Back-up Bidder</u>.  Each Bid must contain a written statement that the Bidder will serve as the Backup Bidder.

(d)     <u>Assets to be Acquired.</u>  Each Bid must identify with reasonable particularity the Assets be Purchased Assets and the Assets to be Excluded Assets.  The Bid may offer to purchase substantially all of the Assets or only a portion of the Assets; <u>provided</u> <u>however</u>, that a Bid that offers to purchase only a portion of the Assets may only be a Qualified Bid to the extent that the value of such Bid, in combination with the value of other Bids for the remaining Assets, exceeds the Minimum Initial Overbid Amount (as defined below) applicable to Qualified Bids for substantially all of the Assets.  The Debtors, in consultation with the Consultation Parties, may waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Assets (other than the requirement that the value of any such Qualified Bid, in combination with the value of other Bids for Assets, exceeds the Minimum Initial Overbid Amount applicable to Qualified Bids for substantially all of the Assets).

(e)     <u>Executory Contracts and Leases to be Assumed.</u>  Each Bid must identify with reasonable particularity the executory contracts and unexpired leases of the Debtors that the Bidder seeks to have the Debtors assume and assign to the Bidder; <u>provided</u>, <u>however</u>, that the Bid may provide for designation rights with respect to executory contracts and unexpired leases substantially similar to the designation rights to the extent set forth in the Stalking Horse Agreement.

(f)     <u>Irrevocable.</u>  Each Bid must be irrevocable until (i) if such Bidder is designated as a Successful Bidder, the Closing of the Sale to such Bidder, and (ii) if such Bidder is designated as a Backup Bidder, the earlier to occur of (A) five (5) days after the closing of the transaction(s) by which all of the Assets that were subject to the Backup Bid have been transferred to one or more Qualified Bidders at the closing of a Sale or Sales conducted pursuant to these Bidding Procedures or (B) the Closing Deadline (the "**Backup Bid Closing Deadline**"). Notwithstanding anything to the contrary in these Bidding Procedures, if the

7

Stalking Horse Bidder is selected as a Backup Bidder, the Stalking Horse Bidder's Backup Bid shall be subject to all of the terms of the Stalking Horse Agreement (as such agreement may be modified by the Stalking Horse Bidder at the Auction consistent with the provisions of these Bidding Procedures and the Bidding Procedures Order); provided, however, that, subject to the terms of the Stalking Horse Agreement permitting termination, each Backup Bid including, without limitation, the Backup Bid of the Stalking Horse Bidder, shall remain open and binding until the earlier to occur of (i) one (1) Business Day after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid have been transferred to one or more Qualified Bidders at the closing of a Sale or Sales conducted pursuant to these Bidding Procedures or (ii) the Backup Bid Closing Deadline.

(g)     Good-Faith Deposit.  Each Bid must be accompanied by a deposit paid by wire transfer of immediately available funds or such other form acceptable to the Debtors payable to the order of the Debtors (the "**Good Faith Deposit**") in the amount of not less than 10 percent (10%) of the stated cash Purchase Price in the Modified Agreement to be held in an account designated by the Debtors to be applied or returned, as applicable, pursuant to the terms of these Bidding Procedures.

(h)     Minimum Initial Overbid Amount.  Each Bid for substantially all of the Debtors' Assets must offer to the Debtors aggregate value in an amount, as determined by the Debtors, in their reasonable business judgment, that is greater than or equal to the sum of (i) the value offered under the Stalking Horse Agreement, *plus* (ii) the Bid Protection, *plus* (iii) cash in the amount of at least $250,000 (the "**Minimum Initial Overbid Amount**"), unless otherwise set by the Debtors.

(i)      Contingencies.  No Bid may be conditioned on any due diligence, internal approval, financing, or regulatory or third-party approval contingencies of any kind (other than regulatory contingencies required by law or as set forth in the Stalking Horse Agreement).  A Bid must set forth each regulatory approval to consummate the Sale and the time period within which the Bidder expects to receive such regulatory approval(s) (and in the case where receipt of any regulatory approval is expected to take more than 30 days following execution and delivery of the Purchase Agreement, those actions the Bidder will take to ensure receipt of such approvals as quickly as possible).

(j)      Proof of Financial Ability to Perform.  Each Bid must contain written evidence, to the Debtors' satisfaction, of a firm commitment for financing, or other evidence of ability to consummate the Sale contemplated by the Modified Agreement, that will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transactions contemplated in such Bidder's Modified Agreement (taking into account the conditions and

ACTIVE 234584377

third-party beneficiary rights, if any, in any such commitment). If the purchaser will be a newly formed entity, the Bid must identify, among other things, the entity or entities that will provide backstops in the form of a guarantee and/or an equity commitment letter and describe the nature of such arrangement(s).

(k)   <u>Financial Statements.</u>   To the extent not previously provided, each Bid must include the latest audited financial statements and unaudited financial statements of the Bidder or, if the Bidder is an entity formed for the purpose of acquiring the Assets, the latest audited financial statements and unaudited financial statements of the direct and indirect equity holders or sponsors of the Bidder who will guarantee the obligations of the Bidder, or such other form of financial disclosure and/or credit support or enhancement, if any, that will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transactions contemplated in such Bidder's Modified Agreement.

(l)   <u>Identity of Purchaser.</u>   Each Bid must, to the satisfaction of the Debtors, in consultation with the Consultation Parties, fully disclose (i) the identity of each person or entity that will be bidding for the Assets or otherwise participating in connection with such Bid, (ii) the terms of any such participation, and (iii) if any entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such person or entity, and the financial capacity of such parties to satisfy such liability.

(m)   <u>No Fees or Commissions.</u>   With the exception of the Bid submitted by the Stalking Horse Bidder, no Bid may (i) request or entitle the Bidder to any break-up fee, expense reimbursement fee or similar type of payment, or (ii) obligate the Debtors to pay commissions, fees or expenses to any agent or broker. Further, by submitting a Bid, a Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code or in any way related to the submission of its Bid or the Bidding Procedures.

(n)   <u>As Is, Where Is.</u>   Each Bid must contain an acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Purchase Agreement.

ACTIVE 234584377

(o)    <u>Adequate Assurance.</u>    Each Bid must include evidence of the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Bidder's ability to perform in the future the contracts and leases proposed in its Bid to be assumed by the Debtors and assigned to such Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases.

(p)    <u>Regulatory Filings.</u>    Each Bid must provide that the Bidder shall make all necessary filings under the Hart-Scott-Rudino Antitrust Improvements Act of 1976, as amended, or other applicable competition laws or regulations, if any, and pay all fees and expenses of such filings (including the Debtors' fees and expenses).

(q)    <u>Corporate Authority.</u>    Each Bid must include evidence of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission of the Bid and the consummation of the transactions contemplated in such Bidder's Purchase Agreement.

(r)    <u>Employees.</u>    Each Bid must contain a detailed description of how the Qualified Bidder intends to treat current employees of the Debtors.

(s)    <u>Privacy Policies.</u>    Each Bid must provide to the Debtors' satisfaction that the Bidder will adhere to the Debtors' prepetition privacy policies regarding personally identifiable information.

(t)    <u>Access to Books and Records.</u>    Each Bid must contain provisions allowing the Debtors reasonable access to the Debtors' books and records for the administration of their bankruptcy cases if the Bid provides for the purchase of such books and records.

(u)    <u>Format.</u>    All documentation for each Bid must be provided in electronic form.

The Debtors have retained or intend to retain Hilco Real Estate, LLC ("**HRE**") to negotiate lease concessions.  HRE is to be compensated based upon a percentage of the lease concessions it secures.  To the extent HRE's retention is approved by the Bankruptcy Court, any decision by a Qualified Bidder not to assume the obligation to pay HRE according to the terms of HRE's court-approved compensation agreement will be considered in determining which Qualified Bid ultimately is chosen as highest or otherwise best.

Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors, and the Bidder submitting that Bid will not be permitted to participate in the Auction (as defined below); <u>provided</u>, <u>however</u>, that the Debtors, in consultation with the Consultation Parties, reserve the right to work with any Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  In addition, the Debtors may negotiate or seek clarification of any Bid from any Bidder between the Bid

10

Deadline and the Auction. Nothing in these Bidding Procedures shall be deemed to either limit or expand any rights of a Qualified Bidder with a valid and perfected lien on any of the Assets of the Debtors' estates (a "<u>Secured Creditor</u>"), if any, to credit bid all or a portion of such Secured Creditor's claim to the extent permitted under section 363(k) of the Bankruptcy Code.

Without the consent of the Debtors, a Qualified Bidder may not amend, modify, or withdraw its Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Qualified Bid during the period that such Qualified Bid is required to remain irrevocable and binding. No Qualified Bid may be amended or modified to consist of terms that are less favorable to the Debtors than those contained in the original (or then current) version of such Qualified Bid, as determined by the Debtors in consultation with the Consultation Parties.

## 7.    <u>Designation of Qualified Bidders</u>

A "**Qualified Bidder**" is a Bidder that (i) submits a Qualified Bid by the Bid Deadline (or later, in the discretion of the Debtors in consultation with the Consultation Parties), and (ii) the Decision Maker determines, in the exercise of reasonable business judgment, after consultation with the Consultation Parties, is reasonably likely (based on financial information submitted by the Bidder, experience, and other considerations deemed relevant by the Debtors in consultation with the Consultation Parties) to consummate a Sale if selected as a Successful Bidder or a Backup Bidder. As noted above, the Stalking Horse Bidder is deemed to be a Qualified Bidder.

As promptly as practicable after the Bid Deadline (but in no event later than one (1) Business Day prior to the Auction), the Debtors will notify (a) each Bidder that submits a Bid whether such Bidder is a Qualified Bidder, and (b) the Stalking Horse Bidder and all other Qualified Bidders, if any, whether or not any Bids (other than the Stalking Horse Agreement) constitute Qualified Bids and identify the Qualified Bidders making any such Qualified Bids. Each Qualified Bidder will be given access to the Opening Bid (as defined below).

Any Good Faith Deposit accompanying a Bid that the Debtors, after consultation with the Consultation Parties, determine not to be a Qualified Bid, shall be returned promptly following such determination unless otherwise agreed by the Bidder and the Debtors; <u>provided</u>, <u>however</u>, that for the avoidance of doubt, no Bidder may participate in the Auction regardless of whether it otherwise cures the deficiencies that initially prevented its Bid from being a Qualified Bid unless the Debtors are in possession of a Good Faith Deposit from such Bidder at the time of the Auction.

## 8.    <u>Auction</u>

If the Debtors receive a Qualified Bid other than the Stalking Horse Agreement, the Debtors will conduct an Auction to determine the Successful Bidder(s). If no Qualified Bid other than the Qualified Bid submitted by the Stalking Horse Bidder is received by the Bid

Deadline (unless otherwise extended by the Debtors in consultation with the Consultation Parties), then (i) the Auction will not be held, (ii) the Stalking Horse Bidder will be deemed the Successful Bidder, (iii) the Stalking Horse Agreement will be the Successful Bid, and (iv) at the Sale Hearing (defined below), the Debtors will seek Bankruptcy Court approval of and authority to consummate the proposed Sale to the Stalking Horse Bidder as contemplated by the Stalking Horse Agreement.

At least one (1) Business Day in advance of the Auction, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid or Qualified Bid(s), as determined by the Debtors, in consultation with the Consultation Parties (the "**Opening Bid**"), and will provide copies of the applicable Purchase Agreement for such Opening Bid to each Qualified Bidder.

The determination of which Qualified Bid constitutes the Opening Bid shall take into account any factors the Decision Maker, in consultation with the Consultation Parties, reasonably deems relevant to the value of the Qualified Bid to the estates, including, among other things, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities; (iii) the ability of the Qualified Bidder to close the proposed transaction on or before the Closing Deadline; (iv) any Purchase Price adjustments; (v) the impact of the contemplated transaction on any actual or potential litigation; (vi) the net economic effect of any changes from the Stalking Horse Agreement, if any, provided by the contemplated transaction documents (the "**Contemplated Transaction Documents**"); (vii) the net after-tax consideration to be received by the Debtors' estates; (viii) the conditions set forth in the applicable Purchase Agreement, and (ix) such other considerations the CRO, in consultation with the Consultation Parties, deems relevant.

The Auction, if any, shall take place on [**October 4**], **2018, at [_:__ _].m.** (prevailing Eastern Time), at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801.  The Auction may be adjourned from time to time by the Decision Maker, in consultation with the Consultation Parties, so long as such extended deadline does not exceed the applicable milestone for such deadline under the DIP Facility, unless such milestone is extended in accordance with the terms of the DIP Facility, in which case notice of such adjournment and the time and place for the resumption of the Auction will be filed with the Bankruptcy Court and served promptly on Qualified Bidders, any other parties who have provided written notice of their intent to attend the Auction as set forth in Section 9(a) below, and all other parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 prior to the Auction.

The Auction shall be conducted according to the following procedures:

a. **Participation at the Auction**

Qualified Bidders shall attend the Auction in person, or through a duly-authorized representative.

Only the Stalking Horse Bidder and any other Qualified Bidder(s) (or their duly-authorized representatives) (collectively, the "**Auction Participants**") are eligible to submit Bids at the Auction.  While only the Auction Participants may submit Bids at the Auction, the authorized representatives and respective counsel and advisors of each of the Qualified Bidder(s) (regardless of whether such representatives, counsel and advisors are serving as Auction Participants), the Debtors, the DIP Secured Parties, the Committee, the United States Trustee, and any of the Debtors' creditors who notify the Debtors in writing no later than two (2) days prior to the Auction of such creditors' intent to attend the Auction by contacting the Debtors' counsel, Vijay S. Sekhon (vsekhon@sidley.com) and Christina M. Craige (ccraige@sidley.com), shall be permitted to attend the Auction, provided, however, the Debtors, in consultation with the Consultation Parties, may exclude parties whom the Debtors deem to be detrimental to the sale process.

Each Qualified Bidder participating in the Auction (including any Qualified Bidder participating through a duly-authorized representative) will be required to confirm on the record that it has not engaged in any collusion regarding the Bidding Procedures, the Auction or the Sale.

### b.   The Debtors Shall Conduct the Auction

The CRO and the Debtors' professionals shall direct and preside over the Auction on behalf of the Debtors.  At the start of the Auction, the CRO shall describe the terms of the Opening Bid.  All Bids made after the Opening Bid shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Opening Bid, all applicable Overbids, and the Successful Bid.

The CRO, on behalf of the Debtors, in his reasonable business judgment, and in consultation with the Consultation Parties, may conduct the Auction in the manner that he determines will result in the Successful Bid(s) that will maximize the overall value of the Debtors' estates, and may adopt and modify rules for the Auction at the Auction that, in his reasonable business judgment, in consultation with the Consultation Parties, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court.

### c.   Terms of Overbids

An "**Overbid**" is any Bid made at the Auction subsequent to the CRO's announcement of the Opening Bid.   To submit an Overbid for purposes of the Auction, a Qualified Bidder must comply with the following conditions:

> (i)   Minimum Overbid Increment.   The initial Overbid, if any, shall provide for total consideration to the Debtors (net of any amount for Bid Protection, if applicable) with a value that exceeds the value of the

13

consideration under the Opening Bid by an incremental amount that is not less than $250,000 in cash (the "Minimum Overbid Increment"), unless otherwise determined by the CRO in his reasonable business judgment.  Additional consideration in excess of the amount set forth in the Opening Bid shall be in the form of cash consideration.  Upon the solicitation of each round of Overbids, the CRO may, in his reasonable business judgment, and in consultation with the Consultation Parties, adjust the amount of the applicable Minimum Overbid Increment.

(ii)     Conclusion of Each Overbid Round.  Upon the solicitation of each round of applicable Overbids, the CRO may, in consultation with the Consultation Parties, announce a deadline (as the CRO may, in his reasonable business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors.

(iii)    Overbid Alterations.  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates on the whole than any prior Bid or Overbid, as determined in the CRO's reasonable business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(iv)     Announcing Highest or Otherwise Best Bid.  Subject to each Overbid Round Deadline, the CRO, on behalf of the Debtors, shall announce whether the Decision Maker, in consultation with the Consultation Parties, has identified in the initial applicable Overbid round, one or more Overbids as being higher or otherwise better than the Initial Minimum Overbid for such asset package, or in subsequent rounds, the Overbid(s) previously designated by the Decision Maker as the prevailing highest or otherwise best Bid for a given asset package (for each asset package, collectively, the "**Prevailing Highest Bid**").  After each round of bidding, including the initial round, the CRO shall disclose to all Qualified Bidders the material terms of any Overbid(s) designated by the Decision Maker as the Prevailing Highest Bid, as well as the value attributed by the Decision Maker to such Prevailing Highest Bid.

(v)      Bids for Less than Substantially All Assets.  The Decision Maker may consider and accept Bids for any portion of the Assets, as well as Bids for substantially all of the Assets, and the Decision Maker may hold separate Auctions for portions of the Assets in the discretion of the Decision Maker in consultation with the Consultation Parties; provided, however, that the Decision Maker may consider and accept Bids for less than substantially all of the Assets only so long as the value of such Bids, in combination, constitute an Overbid.

Each Overbid by a Qualified Bidder at the Auction, if not inconsistent with the provisions

of these Bidding Procedures, shall be deemed to constitute a Qualified Bid.

### d. **Consideration of Overbids**

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things: (A) facilitate discussions between the Debtors, the Consultation Parties, and Qualified Bidders; (B) allow Qualified Bidders to consider how they wish to proceed; (C) consider and determine the current Prevailing Highest Bid at any given time during the Auction; and (D) give any Qualified Bidder the opportunity to provide the CRO with such additional evidence as the CRO, in consultation with the Consultation Parties, in his reasonable business judgment, may require that the Qualified Bidder (other than Stalking Horse Bidder) has sufficient internal resources, or has received sufficient debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

The Bid Protection will be taken into account in each round of bidding.  For the avoidance of doubt, during the Auction, any bid by the Stalking Horse Bidder shall be deemed to be increased by the amount of the Bid Protection, provided that in the event that the Stalking Horse Bidder is the Successful Bidder and its Successful Bid includes the Bid Protection, the Stalking Horse Bidder shall be entitled to credit that amount against the Purchase Price.

### e. **No Round-Skipping**

To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a bid in such round of bidding that is of a higher value or is a better offer than the immediately preceding bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a bid in such round of bidding that is of a higher value or is a better offer than the immediately preceding bid submitted by a Qualified Bidder in such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction.  To the extent the Debtors hold separate Auctions for substantially all Assets and for Assets separated into lots, the requirements of this Section will be applied separately to each Auction.

### f. **Closing the Auction**

(i)     The Auction shall continue until there is only one offer (which may consist of one Qualified Bid for substantially all of the Assets or more than one Qualified Bid for complementary portions of Assets) that the Decision Maker determines, on behalf of the Debtors, in the exercise of reasonable business judgment, and after consultation with the Consultation Parties, to be the highest or otherwise best offer for the Assets (one or more such Qualified Bids, the "**Successful Bid**," and the Qualified Bidder or Qualified Bidders making such Successful Bid, the "**Successful Bidder**"); provided further that, any release of liens by the DIP Agent or the Prepetition Agents shall not include any release of liens with respect to the proceeds of the Sale of the Assets subject to such Bid.  Within one (1) Business Day after the conclusion of the Auction, the Debtors shall file

ACTIVE 234584377

with the Bankruptcy Court and serve upon all Qualified Bidders and parties that have requested notice in these cases a notice identifying the Successful Bidder and the Backup Bidder and post such notice on the Debtors' bankruptcy website.

(ii)     After determining the Successful Bid and the Successful Bidder, the CRO will also determine, on behalf of the Debtors, in his reasonable business judgment, and after consultation with the Consultation Parties, the Qualified Bidders(s) with the next highest or otherwise best Bid(s) for the Assets.   Such Bid(s) shall be declared the "**Backup Bid**," and the Qualified Bidder(s) making such Backup Bid, the "**Backup Bidder**," at which point the Auction will be closed.

(iii)    At the closing of the Auction, at the CRO's request, the Successful Bidder and the Backup Bidder shall recite on the record of the Auction any and all key terms of the Successful Bid and the Backup Bid, respectively, to ensure the accuracy of the final Bids and to aid in the final documentation of the Sale, and each of the Successful Bidder and the Backup Bidder shall promptly thereafter sign a revised Purchase Agreement reflecting the terms of the Successful Bid and the Backup Bid, as applicable.

(iv)    The Debtors shall not consider any Bids or Overbids submitted after the closing of the Auction, and any such Bids or Overbids shall be deemed untimely and shall not constitute Qualified Bids.  The determination of the Successful Bid and Backup Bid at the closing of the Auction shall be final, subject only to approval by the Bankruptcy Court.

(v)     As soon as reasonably practicable after the closing of the Auction, (A) each of the Successful Bidder and the Backup Bidder, as applicable, will transfer via wire transfer of immediately available funds or such other form acceptable to the CRO payable to the order of the Debtors an amount such that the Good Faith Deposit of the Successful Bidder and the Backup Bidder, as modified in the Auction, is not less than 10 percent (10%) of the stated cash Purchase Price in the Successful Bid and the Backup Bid, as applicable, and (B) the Debtors shall cause the Qualified Bid Documents for the Successful Bidder and the Backup Bidder to be filed with the Bankruptcy Court.

**g.   Consent and Waiver as Condition to Bid**

All Qualified Bidders at the Auction shall be deemed to have (i) consented to the Bankruptcy Court's jurisdiction and constitutional authority to enter a final order in connection with any disputes relating to the Auction, and the construction and enforcement of the Potential Bidder's Contemplated Transaction Documents, as applicable, (ii) waived any right to a jury trial in connection with such disputes, and (iii) waived any objection to these Bidding Procedures.

ACTIVE 234584377

**h.  Terms of Bid Protection**

If the Decision Maker accepts a Qualified Bid other than the Qualified Bid of the Stalking Horse Bidder as the Successful Bidder, then upon consummation of the Sale to the Successful Bidder, the Debtors shall pay to the Stalking Horse Bidder as compensation for the Stalking Horse Bidder's efforts in connection with the negotiation and execution of the Stalking Horse Agreement and the transactions contemplated thereby an amount equal to the Bid Protection due to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse Agreement, as approved by the Bankruptcy Court under the Bidding Procedures Order.

**9.     Acceptance of Successful Bid**

The Debtors shall sell the Purchased Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court.  The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the Bid.  The Debtors will be deemed to have accepted a Bid only when such Bid has been approved by the Bankruptcy Court.

**10.    Sale Hearing**

A hearing to approve the sale of the Assets to the Successful Bidder shall be conducted by the Bankruptcy Court, located at 824 Market Street, Wilmington DE 19801, on (i) **[_____], 2018, at [_:_0 _].m.** (Eastern Time), if no Auction is held or (ii) **[_____], 2018, at [_:_0 _].m.** (Eastern Time) (the "**Sale Hearing**") if an Auction is held.

Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder (i) fails to consummate a Sale by the Closing Deadline, (ii) breaches such Successful Bidder's Purchase Agreement, or (iii) otherwise fails to perform, the Decision Maker shall be authorized, but not required, to deem the Backup Bid(s), as disclosed at the Sale Hearing, the Successful Bid(s) and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder(s) submitting such Backup Bid(s) without further notice or orders of the Bankruptcy Court.  In the event that there are multiple Successful Bidders and/or Backup Bidders and only one of such Successful Bidders or Backup Bidders engages in the acts or omissions described in clauses (i) through (iii) of the foregoing sentence, the Decision Maker may, in the exercise of discretion, and in consultation with the Consultation Parties, elect to close the contemplated transactions with some or all of the other Successful Bidders or Backup Bidders, as applicable.

The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing or in the agenda or notice filed in respect of such hearing; provided that such date is consistent with the applicable milestone for the entry of the Sale Order under the DIP Facility, unless such milestone is extended in accordance with the terms of the DIP Facility.

ACTIVE 234584377

## 11.    **Return of Good Faith Deposit**

Good Faith Deposits provided by Bidders other than the Stalking Horse Bidder (i) shall be held by the Debtors in one or more non-interest-bearing accounts on terms acceptable to the Debtors in their sole discretion, and (ii) shall not become property of the Debtors' estates nor become subject to any liens encumbering such accounts and/or the other funds therein absent further order of the Bankruptcy Court.   All Good Faith Deposits of Bidders not selected as the Successful Bidder or the Backup Bidder shall be returned to such Bidders no later than five (5) business days following the close of the Auction.  In no event shall interest or any other amounts in excess of the Good Faith Deposit be subject to refund.

The Good Faith Deposit of the Successful Bidder(s) shall be applied to the Purchase Price under such Successful Bidder's Purchase Agreement at the Closing thereunder.  If a Backup Bidder consummates a Sale transaction under such Backup Bidder's Purchase Agreement, the Good Faith Deposit of such Backup Bidder will be applied to the Purchase Price under such Backup Bidder's Purchase Agreement at the Closing thereunder.

If a Successful Bidder fails (or Successful Bidders fail), or a Backup Bidder fails (or Backup Bidders fail) to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder(s), the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder(s) or Backup Bidder(s), as applicable, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors.

Notwithstanding anything herein to the contrary, the terms under which the Stalking Horse Bidder provided a Good Faith Deposit (in the form of the Purchaser Deposit) and the terms of its use, release and return to the Stalking Horse Bidder shall be governed by the Stalking Horse Agreement.

## 12.    **Modifications**

These Bidding Procedures may be modified in any manner consistent with the Debtors' fiduciary duties and applicable law only upon the express written consent of the Debtors, in consultation with the Consultation Parties, or by order of the Bankruptcy Court; provided, however, that any such modifications must be provided in writing by email (to the notice parties listed in the draft purchase agreement submitted with the relevant Bid) to all Bidders (or Qualified Bidders following the Bid Deadline) and may in no event (a) permit the submission of Bids after the close of the Auction, unless otherwise ordered by the Bankruptcy Court and (b) change any of the Bid Requirements set forth in Section 6 of these Bidding Procedures except to the extent specifically provided therein.

ACTIVE 234584377

13.     <u>**Reservation of Rights**</u>

       Without prejudice to the rights of the Stalking Horse Bidder under the Stalking Horse Agreement, and subject to the limitations set forth in Section 12, the Debtors, after consultation with the Consultation Parties, shall have the right, in the exercise of the CRO's reasonable business judgment on behalf of the Debtors' estates, to adopt such other rules for the Bidding Procedures which, in the Debtors' reasonable business judgment, will better promote the goals of the Bidding Procedures, and which are not inconsistent with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court. All such additional rules shall be communicated to the Consultation Parties, Qualified Bidders, and (if such modifications are made prior to the Bid Deadline) Potential Bidders. Without limiting the foregoing, the Debtors may determine to distribute or not distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction other than with respect to the distribution of the Opening Bid, and the disclosure of each Prevailing Highest Bid, as set forth above.

ACTIVE 234584377

## Exhibit 3

**Proposed Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RM Holdco LLC, <u>et al.</u>[1] | Case No. 18-11795 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. __** |

### NOTICE OF ENTRY OF BIDDING PROCEDURES AND PROPOSED SALE

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

The above-captioned debtors and debtors-in possession (collectively, the "<u>Debtors</u>") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "<u>Bankruptcy Code</u>"), on August 5, 2018 (the "<u>Petition Date</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). The Debtors are seeking to sell (the "<u>Sale</u>") all or substantially all of their assets (collectively, the "<u>Assets</u>"), or subset(s) thereof, free and clear of all liens, claims, encumbrances, and other interests.

By order dated [__], 2018 [Docket No. *] (the "<u>Bidding Procedures Order</u>"),[2] the Bankruptcy Court approved certain "<u>Bidding Procedures</u>" that govern the Sale. All interested parties should carefully read the Bidding Procedures Order and the Bidding Procedures. Copies of the Bidding Procedures Order and the Bidding Procedures are available upon request to the Debtors' claims and noticing agent KCC, 888-251-3046 (US and Canada) & 310-751-2615 (International) and are available for download at http://www.kccllc.net/realmex. A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtors that may be assumed and assigned in connection with the Sale. **Any interested bidder should contact the Debtors' investment banking advisors, Piper Jaffray & Co., by contacting Teri Stratton (310-297-6030; teri.l.stratton@pjc.com). All due diligence inquiries solely related to the Debtors' real estate, including fee-owned real properties and nonresidential real property leases, should be directed to the Debtors' real estate consultant, Hilco Real Estate, LLC, by contacting Ryan Lawlor ((847) 418-2086; Rlawlor@hilcoglobal.com).**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RM Holdco LLC (6847); RM Opco LLC (7122); RM HQ LLC (8615); RM Chevys LLC (N/A); RM Acapulco LLC (N/A); and RM El Torito LLC (N/A). The Debtors' headquarters and mailing address is 5660 Katella Avenue, Suite 200, Cypress, CA 90630.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE OF THE FOLLOWING INFORMATION AND IMPORTANT DEADLINES IN CONNECTION WITH THE SALE, WHICH DATES AND DEADLINES SUPERSEDE ANY DATES AND DEADLINES SET FORTH IN THE MOTION [DOCKET NO. _____] PREVIOUSLY FILED AND SERVED BY THE DEBTORS.**

- The deadline to submit a bid for any Assets (the "Bid Deadline") is **September 21, 2018 at 4:00 p.m. (prevailing Eastern Time)**.

- Any objections to the Sale or the relief requested in connection with the Sale (a "Sale Objection"), other than a Contract Objection, which shall be governed by the Assumption and Assignment Procedures, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, **on or before 4:00 p.m. (prevailing Eastern Time) on [_____], 2018** (the "Sale Objection Deadline"); and (e) be served, so as to be actually received on or before the Sale Objection Deadline, upon the Objection Notice Parties. The "Objection Notice Parties" are as follows: (i) the Debtors, 5660 Katella Avenue, Suite 200, Cypress, CA 90630 (Attn: Jonathan Tibus); (ii) proposed co-counsel to the Debtors, Sidley Austin LLP, 555 W. 5th St., Suite 4000, Los Angeles, CA 90013 (Attn: Christina M. Craige, Esq. and Anna Gumport, Esq.); (iii) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Robert Brady, Esq.); (iv) counsel to the Stalking Horse Bidder, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 1006 (Attn: James Bromley, Esq. and Jane VanLare, Esq.); co-counsel to the Stalking Horse Bidder, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801 (Attn: Derek C. Abbott, Esq.); (vi) counsel to the official committee of unsecured creditors appointed in the Chapter 11 Cases; and (vii) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin Hackman, Esq.).

- An auction for the Assets (the "Auction"), if any, shall take place on **October 4, 2018, at _____ (prevailing Eastern Time**, at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801.

- Unless adjourned in accordance with the Bidding Procedures Order, the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to consider the Sale on (i) **[_____], 2018 at _____ (prevailing Eastern Time)**, if there is no Auction, or (ii) **[_____], 2018 at _____ (prevailing Eastern Time**, if there is an Auction.

**PLEASE TAKE FURTHER NOTICE THAT IF A SALE OBJECTION IS NOT FILED AND SERVED ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE ENTERED BIDDING PROCEDURES ORDER, THE OBJECTING PARTY SHALL BE BARRED FROM OBJECTING TO THE SALE AND SHALL NOT BE HEARD AT THE SALE HEARING, AND THE BANKRUPTCY**

**COURT MAY ENTER THE SALE ORDER WITHOUT FURTHER NOTICE TO SUCH PARTY.**

Dated:  August 5, 2018
Wilmington, Delaware

SIDLEY AUSTIN LLP
Christina M. Craige
Ariella Thal Simonds
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Andrew L. Magaziner (No. 5426)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

3

**<u>Exhibit 4</u>**

**Proposed Assumption and Assignment Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RM Holdco LLC, et al.[1] | Case No. 18-11795 (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. __ |

## NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT
## AND CURE AMOUNTS WITH RESPECT TO THE EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), on August 5, 2018, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are seeking to assume and assign certain of their executory contracts and unexpired leases in connection with the sale (the "Sale") of all or substantially all of their assets (collectively, the "Assets"), or some subset(s) thereof. The Debtors are seeking Court approval of such Sale and assumptions and assignments pursuant to a motion, dated August 5, 2018 [Docket No. _] (the "Motion").

The Debtors have obtained order approving the relief requested in the Motion (the "Bidding Procedures Order"),[2] and approval of certain Bidding Procedures that will govern the sale of the Debtors' Assets to the highest or best bidders. Copies of the Motion and the Bidding Procedures Order are available for download at http://www.kccllc.net/realmex or by calling the Debtors' claims and noticing agent, KCC, at 888-251-3046 (US and Canada) & 310-751-2615 (International).

**You are receiving this Notice because you may be a party to an unexpired lease or an executory contract that is potentially to be assumed and assigned (collectively, the "Assignable Contracts"), in connection with such Sale. A list of the Assignable Contracts is attached hereto as Exhibit A.** The presence of a contract, lease or agreement on the Assumption and Assignment Notice does not constitute an admission that such contract, lease or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RM Holdco LLC (6847); RM Opco LLC (7122); RM HQ LLC (8615); RM Chevys LLC (N/A); RM Acapulco LLC (N/A); and RM El Torito LLC (N/A). The Debtors' headquarters and mailing address is 5660 Katella Avenue, Suite 200, Cypress, CA 90630.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures Order.

agreement is an executory contract, and the Debtors reserve all rights, claims, defenses and causes of action with respect to all contracts, leases, and agreements listed on the Assumption and Assignment Notice.

The Debtors have determined the current amounts owing (the "Cure Amounts") under each Contract, and have listed the applicable Cure Amounts on Exhibit A attached hereto. The Cure Amounts are the only amounts proposed to be paid upon any assumption and assignment of the Contracts, in full satisfaction of all amounts outstanding under the Contracts.

Any objection to (i) the proposed assumption, assignment, or potential designation of such party's Assignable Contract, (ii) the applicable Cure Amount, or (iii) the provision of adequate assurance of future performance (a "Contract Objection") must be: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, **on or before [＿＿] (prevailing Eastern Time) on [＿＿], 2018 (the "Contract Objection Deadline")**; (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Objection Notice Parties (as defined herein); and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto. The "Objection Notice Parties" are as follows: (i) the Debtors, 5660 Katella Avenue, Suite 200, Cypress, CA 90630 (Attn: Jonathan Tibus); (ii) proposed co-counsel to the Debtors, Sidley Austin LLP, 555 W. 5th St., Suite 4000, Los Angeles, CA 90013 (Attn: Christina M. Craige, Esq. and Anna Gumport, Esq.); (iii) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Robert Brady, Esq.); (iv) counsel to the Stalking Horse Bidder, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 1006 (Attn: James Bromley, Esq. and Jane VanLare, Esq.); (v) co-counsel to the Stalking Horse Bidder, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801 (Attn: Derek C. Abbott, Esq.); (vi) counsel to the official committee of unsecured creditors appointed in the Chapter 11 Cases; and (vii) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin Hackman, Esq.).

In connection with the proposed sale process, interested bidders may be subject to an expedited discovery process.

**IF NO OBJECTION IS TIMELY RECEIVED WITH RESPECT TO CURE AMOUNT, (I) A NON-DEBTOR PARTY TO A CONTRACT SHALL BE FOREVER BARRED FROM OBJECTING TO THE CURE AMOUNT AND FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH CONTRACT, (II) THE CURE AMOUNT SET FORTH ON EXHIBIT 1 ATTACHED HERETO SHALL BE CONTROLLING, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN ANY CONTRACT, OR ANY OTHER DOCUMENT, AND THE NON-DEBTOR PARTY TO A CONTRACT SHALL BE DEEMED TO HAVE CONSENTED TO THE CURE AMOUNT, AND (III) THE NON-DEBTOR PARTY TO A CONTRACT**

**SHALL BE FOREVER BARRED AND ESTOPPED FROM ASSERTING ANY OTHER CLAIMS RELATED TO SUCH CONTRACT AGAINST THE DEBTORS OR THE APPLICABLE TRANSFEREE, OR THE PROPERTY OF ANY OF THEM.**

**IF NO OBJECTION IS RECEIVED BY THE CONTRACT OBJECTION DEADLINE TO ANY STALKING HORSE BIDDER'S ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO A CONTRACT, A NON-DEBTOR PARTY TO SUCH CONTRACT SHALL BE DEEMED TO HAVE CONSENTED TO THE ASSUMPTION, ASSIGNMENT, AND/OR TRANSFER OF THE APPLICABLE CONTRACT TO THE APPLICABLE STALKING HORSE BIDDER, AND SHALL BE FOREVER BARRED AND ESTOPPED FROM ASSERTING OR CLAIMING THAT ANY CONDITIONS TO SUCH ASSUMPTION, ASSIGNMENT, AND/OR TRANSFER MUST BE SATISFIED UNDER SUCH APPLICABLE CONTRACT OR THAT ANY RELATED RIGHT OR BENEFIT UNDER SUCH APPLICABLE CONTRACT CANNOT OR WILL NOT BE AVAILABLE TO THE APPLICABLE STALKING HORSE BIDDER.**

Subject to the terms of the Bidding Procedures Order, an auction (the "Auction") for the Assets, including the Contracts, will be conducted on **October 4, 2018 at *:* *.m. (prevailing Eastern Time)** at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801.  As soon as reasonably practicable after the Auction, the Debtors will file and serve a notice that identifies the Successful Bidder for the Assets, including any Contracts.  **IF THE SUCCESSFUL BIDDER IS NOT THE STALKING HORSE BIDDER, THEN THE DEADLINE TO OBJECT TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO SUCH SUCCESSFUL BIDDER WILL BE EXTENDED TO TWO (2) HOURS PRIOR TO THE COMMENCEMENT OF THE SALE HEARING; PROVIDED THAT THE DEADLINE TO OBJECT TO THE CURE AMOUNTS WITH RESPECT TO SUCH CONTRACTS, AND TO OTHERWISE OBJECT TO THE ASSUMPTION AND ASSIGNMENT OF SUCH CONTRACTS, SHALL NOT BE EXTENDED.**

Pursuant to the terms of the Stalking Horse APA (or any Asset Purchase Agreement that the Debtors may enter into with the Successful Bidder), the Debtors may seek to assume and assign one or more of the Assignable Contracts to the Stalking Horse Bidder or the Successful Bidder, as the case may be, subject to approval at the hearing (the "Sale Hearing") to be held at (i) **_____    (prevailing Eastern Time) on  [      ], 2018**, if there is no Auction, or (ii) **_____    (prevailing Eastern Time) on [      ] 2018**, if there is an Auction before the Court. On the date of the closing of the transactions contemplated by the Stalking Horse APA (the "Closing Date"), or as soon thereafter as is reasonably practicable, the Debtors will pay the amount the Debtors' records reflect is owing for any Cure Amounts, as set forth on Exhibit A hereto.  The Debtors' records reflect that all post-petition amounts owing under the Assignable Contracts have been paid and will continue to be paid until the assumption and assignment of the Assignable Contracts and that, other than the Cure Amount, there are no other defaults under the Assignable Contracts.

**Prior to the date of the closing of the Sale, the Debtors may amend their decision with respect to the assumption and assignment of any Assignable Contract, including amending the Cure Amount, and provide a new notice amending the information provided in this notice, including, without limitation, a determination not to assume certain contracts.**

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated:  August 5, 2018                 SIDLEY AUSTIN LLP
Wilmington, Delaware                   Christina M. Craige
                                       Ariella Thal Simonds
                                       555 West Fifth Street, Suite 4000
                                       Los Angeles, California 90013
                                       Telephone:  (213) 896-6000
                                       Facsimile:  (213) 896-6600

                                               -and-

                                       YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                       _/s/_____
                                       Robert S. Brady (No. 2847)
                                       Edmon L. Morton (No. 3856)
                                       Andrew L. Magaziner (No. 5426)
                                       Elizabeth S. Justison (No. 5911)
                                       Rodney Square
                                       1000 North King Street
                                       Wilmington, Delaware 19801
                                       Telephone:  (302) 571-6600
                                       Facsimile:  (302) 571-1253
                                       PROPOSED ATTORNEYS FOR THE DEBTORS
                                       AND DEBTORS IN POSSESSION

**Exhibit A to Assumption and Assignment Notice**