**Exhibit B**

**Declaration of Teri Stratton**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RM Holdco LLC, et al.[1] | Case No. 18-11795 (___) |
| Debtors. | (Jointly Administered) |

**AFFIDAVIT OF TERI STRATTON IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE APA AND APPROVING CERTAIN BID PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING AND APPROVING BIDDING PROCEDURES, (C) SCHEDULING AN AUCTION AND SALE APPROVAL HEARING, (D) APPROVING THE FORM AND MANNER OF THE NOTICE OF THE SALE HEARING, (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, AND (C) GRANTING RELATED RELIEF**

I, Teri Stratton, hereby declare under penalty of perjury:

1. I am a Managing Director of Piper Jaffray & Co. ("Piper"), a global investment banking and advisory firm. I submit this Affidavit in support of the *Debtors' Motion for Entry of (I) an Order (A) Authorizing and Approving the Debtors' Entry Into the Stalking Horse APA and Approving Certain Bid Protections in Connection with the Sale of Substantially all of the Debtors' Assets, (B) Authorizing and Approving Bidding Procedures, (C) Scheduling an Auction and Sale Approval Hearing, (D) Approving the Form and Manner of the Notice of the Sale*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RM Holdco LLC (6847); RM Opco LLC (7122); RM HQ LLC (8615); RM Chevys LLC (N/A); RM Acapulco LLC (N/A); and RM El Torito LLC (N/A). The Debtors' headquarters and mailing address is 5660 Katella Avenue, Suite 200, Cypress, CA 90630.

01:23488599.1

*Hearing, (E) Approving Assumption and Assignment Procedures, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale, and (C) Granting Related Relief,* filed by RM Holdco LLC and its above-captioned debtor subsidiaries (the "Debtors" or the "Company") (the "Motion"). Capitalized terms not otherwise defined herein as used as defined in the Motion.

2. I hold a Bachelor of Arts degree in Economics from the University of California, Los Angeles and a Masters of Business Administration in Finance, with Honors, from the Anderson School at UCLA. I am a Certified Insolvency and Restructuring Advisor ("CIRA") and currently a CIRA course instructor. I am a board member of the Association of Insolvency and Restructuring Advisors and head of the Committee on Investment Banking, a member of the Turnaround Management Association, and a member of the American Bankruptcy Institute. I regularly speak on a variety of investment banking and banking topics at industry conferences.

3. I have been an investment banker specializing in serving distressed and stressed clients for 18 years. Prior to my investment-banking career, I served in the special assets group of California Bank & Trust. In that capacity, I played an integral role in the assessment, valuation and management of various distressed loans. In the course of my employment, I have served a number of reorganization, workout, and bankruptcy clients in several industries across the United States, and I have extensive experience in structuring transactions and conducting merger and acquisition processes in the distressed environment. Some in and out-of-court restructurings and M&A assignments in which I have been involved include Ignite Restaurant Group, Inc., Central Grocers, Inc., Sotera Wireless, Inc., Garden Fresh Restaurant Intermediate

Holding, LLC, Rotary Drilling Tools, Malibu Lighting Corporation, Golden County Foods, Inc., Mi Pueblo Holdings, LLC, Chef Solutions, Inc., Claim Jumper Restaurants, LLC, Sun World International, Inc., Hoop Retail, Inc., Brown & Cole Stores, LLC, Larry's Markets, Select Snacks, CFP Holdings, Inc., Mercury Plastics, Edwards Theatres and JELD-WEN, Inc. as well as several private (undisclosed) transactions.

4. Except as otherwise indicated, I have personal knowledge of each of the facts stated in this Affidavit.  If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge, my review of relevant documents, my opinion, my experience as an investment banker or my conversations with the Debtors' employees.  I have read the Motion and am authorized to submit this declaration in support of the Motion on behalf of the Debtors.  I am not being compensated specifically for this testimony other than payments received by Piper as a professional retained in these Chapter 11 Cases.

**The Marketing Process**

5. Piper was retained on January 22, 2018 to advise the Debtors with respect to their strategic alternatives and to assist the Debtors with the marketing and sale of the Debtors' assets on a going concern basis. Among other things, Piper assisted the Debtors in (a) drafting an offering document describing Debtors, their operations, historical performance and future prospects; (b) identifying, contacting and screening potential purchasers of the Debtors' assets or business; (c) contacting such potential purchasers; and (d) preparing a due diligence data room and coordinating the due diligence investigations of potential purchasers.

6. To implement the Debtors' sale strategy, the Debtors and Piper identified a broad array of parties that were expected to have the interest and ability to consummate a transaction on terms acceptable to the Debtors.  Upon its retention, beginning in April 2018, Piper contacted

over 200 potential purchasers, including both strategic and financial investors, and provided such parties with a "teaser" containing information regarding a potential transaction with the Company. Fifty (50) of those parties executed a non-disclosure agreement and received a copy of a Confidential Information Memorandum prepared by Piper, with input from the Debtors' management. Interested parties were invited to submit a preliminary "indication of interest" ("IOI") describing the contours of a potential transaction, including the bidder's proposed structure and valuation of the transaction, upon which the bidder was given access to a confidential data room containing extensive due diligence materials. While none of the potential bidders were interested in pursuing an out-of-court transaction, I believe this process was sufficiently broad to reach the full universe of parties likely to be interested, and reflected a reasonable attempt to reach an out-of-court transaction with a strategic or financial party given the Debtors' liquidity and time constraints.

7. To date, Piper has contacted a total of 211 parties, sent proposed non-disclosure agreements to 69 parties, has received 50 executed non-disclosure agreements, has sent the Confidential Information Memorandum to those same parties. The Debtors received four (4) formal IOIs and conducted follow-up diligence calls or meetings with four (4) potential bidders. By mid-July 2018, the Company had received four (4) bids for substantially all of the Assets of the Company, three of which carried significant cash components. In addition, Piper reached out to fourteen (14) parties that had entered into confidentiality agreements to determine whether such parties had interest in providing debtor-in-possession financing ("DIP Financing") to support another party's acquisition, but none expressed interest. These parties included ten (10) prospective bidders that had passed on the purchase of the Debtors' Assets but had lending arms

or the ability to lend out of their funds, all of which declined to offer DIP Financing without priming liens given the lack of unencumbered Assets.

8.    On July 13, 2018, just before a scheduled meeting of the board of managers of RM Holdco, LLC (the "Board") to evaluate the bids submitted to date by proposed stalking horse bidders, Z Capital Group ("Z Capital"), through its counsel, delivered a marked-up asset purchase agreement and letter of intent to consummate (through an affiliate) a purchase of all or substantially all of the Debtors' assets, as a stalking horse.  Rahul Sawhney and Yury Sandovich, both employed by Z Capital and seated on the Board, immediately recused themselves from any further discussion of stalking horse bids.

9.    The disinterested subset of the Board, as advised by Piper, Alvarez & Marsal ("A&M"), and Sidley Austin ("Sidley"), as Debtors' advisors, continued to evaluate the previously-received bids, along with the new bid submitted by Z Capital.  The Debtors and their advisors proceeded with vigorous, arms-length negotiation with the potential bidders offering substantial cash consideration, and continued to advise the Board on the status of the negotiations.

10.   On July 20, 2018, Piper, A&M, and Sidley conducted a live, telephonic auction for the position of stalking horse bidder (the "Stalking Horse Auction"), in which Z Capital and one other bidder took part.  The Stalking Horse Auction ended when Z Capital offered a headline purchase price of $46.75 Million and the other bidder declined to bid further.

11.   After the Stalking Horse Auction concluded, the disinterested subset of the Board directed Sidley to further negotiate the terms of the asset purchase agreement ("Stalking Horse APA") submitted by Z Capital prior to execution.

12. Following the Petition Date, Piper will continue to market the Assets to potential buyers up until the Bid Deadline by (a) engaging previously-identified and new potential buyers and investors that may have an interest in the Assets; (b) executing non-disclosure agreements with such parties; (c) delivering an updated CIM; (d) providing access to a data room of confidential information; and (e) providing customized information packets to potential purchasers. In this way, the Debtors, assisted by Piper, intend to maximize the number of potential buyers at the Auction and thus maximize the value to be realized from the Sale. I believe that the robust marketing process to date, along with additional marketing after the petition date, will have yielded a fair and open bidding process and result in the highest or otherwise best price for the Assets.

### The Stalking Horse Bid

13. The transaction offered by Z Capital, through an affiliate (the "Stalking Horse Bidder") contemplates a sale of substantially all of the Debtors' assets for a total consideration of $46.75 Million, plus certain assumed liabilities, subject to certain adjustments at closing (the "Stalking Horse Bid"). The Stalking Horse Bid constitutes the best offer available for the Debtors' Assets at this time and provides an avenue for the Debtors to sell a substantial portion of their businesses as a going concern and in doing so preserve several thousand jobs. Furthermore, the Stalking Horse Bid will be subject to higher or otherwise better bids and thus ultimately, the successful bidder will have submitted the highest or otherwise best bid. Finally, the Stalking Horse Bid provides an avenue for the Debtors to navigate their bankruptcy cases with consensual debtor-in-possession financing and the consensual use of cash collateral.

14. Given the active involvement of the disinterested subset of the Board, along with the Debtors' professionals, the parties have, to my knowledge, entered into the Stalking Horse

01:23488599.1

APA without collusion, in good faith and from arm's-length bargaining positions. Further, I am not aware of any indication of fraud, collusion between the Stalking Horse Bidder and other bidders or any similar conduct that would taint the sale process for the Assets.

### The Reasonableness of the Proposed Break-Up Fee

15. Based on my experience, I believe that the Break-Up Fee is reasonable and appropriate in light of the size of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder. Moreover, the Break-Up Fee is actually necessary to preserve the value of the estate. First, the Break-Up Fee of $1,400,250 represents approximately 3% of the estimated $46.75 Million of cash consideration offered by the Stalking Horse Bidder. Each of the other bidders offering substantial cash consideration to the Debtors prior to the Stalking Horse Auction required a break-up fee of 3%. The Stalking Horse Bidder was unwilling to participate in the Stalking Horse Auction without a comparable break-up fee. The Break-Up Fee was negotiated in good faith and was necessary to secure the Stalking Horse Bidder's commitment under the Stalking Horse APA. In sum, the Debtors' ability to offer the Break-Up Fee enables them to ensure the sale of the Assets at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates.

16. The Break-Up Fee also promotes competitive bidding for the Assets by incentivizing the Stalking Horse Bidder to hold the Stalking Horse Bid open as a minimum bid on which other bidders and the Debtors can rely. The Debtors were also informed that the Stalking Horse Bidder was unwilling to hold open its offer without assurance of payment of the Break-Up Fee under the conditions set forth in the Stalking Horse APA. The Stalking Horse Bidder has helped lay the foundation for the final phase of the Debtors' sale process of seeking higher or of otherwise better offers than the Stalking Horse Bid with the comfort of knowing that

the Assets will be sold for an acceptable baseline price. This baseline price already exceeds the opening bid at the Stalking Horse Auction by $8.75 Million, or 23%. Moreover, the payment of the Break-Up Fee will not diminish the Debtors' estates because the Debtors do not intend to terminate the Stalking Horse APA if to do so would incur an obligation to pay the Break-Up Fee other than to accept an alternative bid exceeding the consideration offered by the Stalking Horse Bid by an amount sufficient to pay the Break-Up Fee.

17. In light of the foregoing, I believe that the Debtors' decision to offer the Break-Up Fee is: (a) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; and (b) fair, reasonable, and appropriate in light of the size and nature of the proposed sale and the commitment that has been made by, and the efforts that have been and will be expended by, the Stalking Horse Bidder; and (c) necessary to induce the Stalking Horse Bidder to pursue the Sale and to continue to be bound by the Stalking Horse APA.

**The Bidding Procedures**

18. The Bidding Procedures are fair and reasonable, based upon my experience in similar situations. They are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The proposed Bid Deadline requires bids for the purchase of the Assets to be delivered no later than 4:00 p.m. prevailing Eastern Time on September 21, 2018, which will ensure that the Sale is completed in a timely manner.

19. The Bid Deadline provides parties with sufficient time to obtain information and formulate and submit a timely and informed bid to purchase the Assets. As described above, the Debtors' Assets have been extensively marketed over the last four months to a broad group of

strategic and financial buyers and substantial information regarding the Debtors' businesses has been made available during that process. As such, numerous parties that may have an interest in bidding at the Auction will not need to start from scratch in composing their bids. In addition, potential bidders will have access to updated information prepared by Piper and a substantial body of information, including management presentations, financial projections and an extensive data room, including information gathered specifically based upon the due diligence requests of several potential buyers. Thus, based upon the Debtors' extensive marketing efforts prior to the Petition Date and the level of preparation at the outset of the post-petition marketing process, the time contained in the Bidding Procedures for the Debtors to further market the Assets is reasonable.

20. In my opinion, the proposed Bidding Procedures will ensure that the consideration received for the Assets will be fair and reasonable and that the Debtors will have an opportunity to consider all competing offers and to select, in their reasonable business judgment, and with reasonable consultation with any creditors' committee appointed in these Chapter 11 Cases, the highest or otherwise best offer for the Assets.

21. I believe potential bidders will have adequate time to perform due diligence and formulate an offer for the Debtors' Assets, in accordance with the Bidding Procedures, prior to the Bid Deadline. I believe the other aspects of the Bidding Procedures, including, without limitation, the Qualified Bid requirements, Minimum Qualified Bid, and Deposit Requirements are reasonable and reflect what another stalking horse bidder would require under similar conditions.

22. Further, in order to preserve going concern value and the employment of several thousand employees, it is imperative that the sale process proceed quickly. With the Stalking Horse Bid in place, the Debtors are prepared to complete the final phase of their sale process.

23. Moreover, as a condition to providing necessary liquidity, I understand that the Debtors' debtor-in-possession lenders ("DIP Lenders") have established various milestones (the "Milestones") for completing a sale of substantially all of the Debtors' Assets.

24. Access to DIP Financing is critical to the Debtors' ability to continue their operations and manage their bankruptcy estates through the conclusion of the sale process.

25. Failure to adhere to the Milestones could jeopardize the Debtors' available borrowings under the DIP Facility and, in turn, compromise the sale process and the Debtors' ability to maximize recoveries for creditors. In light of the foregoing, I believe that the proposed timeline is both reasonable and necessary under the circumstances of these Chapter 11 Cases. In light of the foregoing, I believe the Bidding Procedures are fair and reasonable, and the Assets will have been sufficiently marketed by the Bid Deadline, and that the pre- and post-petition marketing and bidding process described above and in the Motion will yield the highest or otherwise best price for the Assets.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

This the 5th day of __August__, 2018

_____
Teri Stratton