**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RM Wind-Down Holdco LLC, <u>et al.</u>,[1] | Case No. 18-11795 (MFW) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: Apr. 25, 2019 at 10:30 a.m. (ET) |
| | Objection Deadline: Apr. 18, 2019 at 4:00 p.m. (ET) |

**DEBTORS' MOTION FOR ENTRY OF AN INITIAL ORDER AND A FURTHER ORDER (I) AUTHORIZING THE DEBTORS TO MAKE DISTRIBUTIONS TO CLAIMANTS HOLDING ALLOWED FIRST PRIORITY SECURED CLAIMS AND ALLOWED 503(b) CLAIMS; (II) AUTHORIZING THE DEBTORS TO ABANDON CERTAIN PROPERTY; (III) DISMISSING THE DEBTORS' CHAPTER 11 CASES; (IV) ESTABLISHING PROCEDURES WITH RESPECT TO FINAL FEE APPLICATIONS; (V) AUTHORIZING THE DEBTOR ENTITIES TO BE DISSOLVED IN ACCORDANCE WITH APPLICABLE STATE LAW; AND (VI) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>") hereby submit this motion (this "<u>Motion</u>") for entry of orders, substantially in the forms attached hereto (the "<u>Initial Order</u>," and the "<u>Dismissal Order</u>," respectively, and together, the "<u>Proposed Orders</u>"): (a) authorizing the Debtors to pay Allowed First Priority Secured Claims (as defined below) and Allowed 503(b) Claims (as defined below), with any excess funds remitted to the Secured Lenders (as defined below); (b) authorizing, but not directing, the Debtors to abandon and destroy any and all of the books and records that were not sold as part of the RM Asset Sale (as defined below) or other dispositions of the Debtors' assets; (c) approving procedures for the filing and approval of final fee applications by

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: RM Wind-Down Holdco LLC (f/k/a RM Holdco LLC) (6847); RM Wind-Down Opco LLC (f/k/a RM Opco LLC) (7122); RM Wind-Down HQ LLC (f/k/a RM HQ LLC) (8615); RM Wind-Down Chevys LLC (f/k/a RM Chevys LLC) (N/A); RM Wind-Down Acapulco LLC (f/k/a RM Acapulco LLC) (N/A); and RM Wind-Down El Torito LLC (f/k/a RM El Torito LLC) (N/A).

professionals retained in these chapter 11 cases (collectively, the "Professionals"), and providing for payment of fees incurred by Professionals in the Chapter 11 Cases ("Professional Fees"); (d) dismissing the Debtors' chapter 11 cases (collectively, the "Chapter 11 Cases"); (e) authorizing the Debtors to be dissolved in accordance with applicable state law and on the terms provided for in the Initial Order and Dismissal Order, respectively; and (f) providing such other related relief as is just and necessary in connection with the relief sought herein.  In support of this Motion, the Debtors respectfully represent as follows:

## **PRELIMINARY STATEMENT**[2]

1.      The Debtors and the Purchaser worked diligently from the outset of these Chapter 11 Cases to formulate and close a sale of substantially all of the Debtors' assets to preserve the Debtors' business as a going concern, save a significant number of jobs and maintain a restaurant business upon which hundreds of vendors and landlords could continue to depend.  Those efforts have been successful.  The sale of substantially all of the Debtors' assets (the "RM Asset Sale") closed on October 29, 2018, resulting in the satisfaction of the Debtors' obligations under the DIP Financing, the Purchaser's agreement to satisfy certain administrative expense claims (as identified in the APA), and the payment or assumption of certain other liabilities (as identified in the APA).

2.      Although the $46.75 million proceeds from the RM Asset Sale were sufficient to repay the DIP Financing, the Debtors commenced these Chapter 11 Cases with over $255 million in secured Prepetition Indebtedness (as defined and validated in the Final DIP Order).  The Final DIP Order recognized prepetition liens and created post-petition adequate protection liens on substantially all of the Debtors' assets, including proceeds of Avoidance

---

[2] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Motion.

01:24355082.1

Actions, in favor of the Debtors' prepetition Secured Lenders. No committee was appointed in these cases, and no party challenged the Secured Lenders' liens or claims. The Secured Lenders also received a superpriority administrative claim for any diminution in the value of their collateral ($5.5 million at minimum) on account of the DIP Financing. Given the extent of the Secured Lenders' liens and the magnitude of their deficiency claim, any value received by the Debtors' estates on account of Remaining Assets (and subsequent monetization thereof) would redound to the benefit of the Secured Lenders, unless they agree otherwise (which they have subject to certain limitations, as described below). Accordingly, there is no reasonable prospect of distributions from any Debtor's estate to any holders of prepetition unsecured claims against the Debtors (other than prepetition claims afforded administrative priority under section 503(b) of the Bankruptcy Code), and the estates do not and will not have available funds to satisfy either priority claims or general unsecured claims which have been asserted against them.

3.     The Debtors have explored various options to bring these Chapter 11 Cases to a conclusion, and believe, after making appropriate considerations, that a dismissal of these Chapter 11 Cases is the most expeditious and cost-effective mechanism to wind down the Debtors' affairs. In reaching this conclusion, the Debtors determined that a dismissal would not negatively impact creditors (as compared to a chapter 11 plan or conversion to chapter 7) because there are no remaining assets of any value available for distributions to unsecured creditors and insufficient funds to support the administrative costs of pursuing anything but a prompt exit from bankruptcy.

4.     The Debtors are unable to pursue a confirmable chapter 11 plan because they do not have sufficient assets available to pay all administrative and priority creditors in full, nor a credible path to securing a non-insider, impaired consenting class. The Debtors considered

01:24355082.1

3

exiting the Chapter 11 Cases through a chapter 7 process but believe that the additional chapter 7 trustee's fees, commissions and related costs would make any recovery to priority and unsecured creditors similarly unlikely, if not impossible.  In seeking approval of the dismissal of these Chapter 11 Cases pursuant to the Initial Order and Dismissal Order, respectively, the Debtors are mindful of the Supreme Court's decision in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) and the propriety of "structured" dismissals.  Accordingly, the Initial Order provides for distributions that comply with sections 507(a) and 726 of the Bankruptcy Code.

5.      Therefore, with the support of the Purchaser and the Secured Lenders, the Debtors (a) propose making payments to holders of (i) valid, allowed first priority secured claims (the "Allowed First Priority Secured Claims"), which claims are based on Permitted Prior Liens (as defined in the Final DIP Order), and (ii) valid, allowed claims arising under section 503(b) of the Bankruptcy Code (such claims, collectively, the "Allowed 503(b) Claims"),[3] (b) request the dismissal of the Chapter 11 Cases and related relief on the terms set forth in the Proposed Orders attached hereto, and (c) request certain related relief, as set forth in this Motion.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this

---

[3] Upon the conclusion of the Debtors' claims reconciliation process, the Debtors will file a notice on the docket in these Chapter 11 Cases setting forth the Allowed First Priority Secured Claims and Allowed 503(b) Claims, which will be paid in full upon agreement of the Debtors' Secured Lenders.

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are pursuant to sections 105(a), 305, 349, 363(b)(1), 554(a), 726, and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 1017, 2002, 6007 and 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 1017-2.

## BACKGROUND

### A.      General Background

9.      On August 5, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On August 7, 2018, the Court entered an order [D.I. 43] authorizing the joint administration and procedural consolidation of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

10.     The Debtors continue to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in the Chapter 11 Cases, and no statutory committee has been appointed.

11.     Additional information regarding the Debtors, including their business operations, corporate and capital structure, and the events leading to the commencement of the Chapter 11 Cases, is set forth in the *Declaration of Jonathan Tibus in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 14] (the "First Day Declaration") and incorporated by reference herein.

**B.**    **Background Regarding Prepetition Debt, Selection of Stalking Horse Bidder, the DIP Facility, and the RM Asset Sale**

*1. Prepetition Debt*

12.    As detailed in the First Day Declaration, as of the Petition Date, the Debtors were majority owned by affiliated entities of Tennenbaum Capital Partners ("TCP") and Z Capital Group ("Z Capital").    Prior to the Petition Date, and in connection with the Debtors' predecessor's chapter 11 proceeding, the Debtors entered into a First Lien Credit Facility with the First Lien Lenders and Wells Fargo Bank, N.A., as agent ("Wells Fargo").  As of the Petition Date, the outstanding balance due under the First Lien Credit Facility was approximately $41.67 million.  The Debtors also entered into a Second Lien Credit Facility prior to the Petition Date with certain Second Lien Lenders and Wells Fargo, as agent.  As of the Petition Date, the outstanding balance due under the Second Lien Credit Facility, exclusive of certain reimbursement obligation loans, was approximately $195.12 million.

13.    The rights and priorities of the lenders under the First Lien Credit Facility and the Second Lien Credit Facility, comprising various affiliates of Z Capital and TCP (the "Secured Lenders"), were and remain governed by an Intercreditor Agreement dated as of March 21, 2012.

*2. DIP Financing*

14.    On the Petition Date, the Debtors sought entry of interim and final orders authorizing the Debtors' entry into a multi-draw secured credit facility (the "DIP Facility") in the amount of $5.5 million, to be provided by the Secured Lenders with Wells Fargo, as agent.  The DIP Facility, coupled with the use of cash collateral, was structured to provide the Debtors with sufficient liquidity and working capital to preserve ordinary course operations and the business as a going concern while the Debtors pursued the sale and auction process detailed below.

01:24355082.1

15.     On September 6, 2018, the Court entered an order [D.I. 189] (the "Final DIP Order")[4] authorizing the Debtors to, *inter alia*, obtain up to $5.5 million in debtor-in-possession financing (the "DIP Financing").  The DIP Financing provided the Debtors with sufficient funding to maintain their operations during the Chapter 11 Cases, satisfy the administrative costs incurred during the Chapter 11 Cases, and pursue—and ultimately consummate—the RM Asset Sale.

### 3.    The RM Asset Sale

16.     Prior to the Petition Date, the Debtors explored all viable strategic alternatives, and retained investment bank Piper Jaffray & Co. in January 2018 to assist them in analyzing and pursuing such alternatives.  During the marketing process and in connection with the solicitation of interest in the Debtors' assets, Z Capital, through counsel, advised the Debtors of its intention to participate in the prepetition stalking horse process as a potential bidder.  As detailed in the First Day Declaration, the two members of Holdco's Board designated and compensated by Z Capital immediately recused themselves from any further participation in the process of evaluating the stalking horse bids, and subsequent thereto, and upon the conclusion of a telephonic auction, Z Capital was selected as the Stalking Horse Bidder based on, among other things, its proposed purchase price of $46.75 million and prospect of the provision of a consensual DIP Facility, which could be utilized in pursuit of a section 363 sale.  On August 5, 2018, the Debtors entered into an Asset Purchase Agreement (as has been and may be amended, supplemented, or modified from time to time, and including all exhibits thereto, the "APA") with FM Restaurants (PT), LLC, an affiliate of Z Capital (the "Stalking Horse Bidder").

---

[4] *See Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364* [D.I. 348].

01:24355082.1

17.    On the Petition Date, the Debtors also sought approval of (i) proposed bid procedures (the "Bid Procedures") in connection with the RM Asset Sale and (ii) certain bid protections (the "Stalking Horse Bid Protections") for the Stalking Horse Bidder.    On September 6, 2018, the Court entered an order approving, among other things, the Bid Procedures and Stalking Horse Bid Protections [D.I. 187] (the "Bid Procedures Order"), which provided, among other things, that interested parties were required to submit Qualified Bids (as defined in the Bid Procedures Order) by September 21, 2018 (the "Bid Deadline").

18.    The Debtors did not receive any competing bids for any subset of their assets prior to the Bid Deadline and, accordingly, the auction scheduled for October 4, 2018, was cancelled.    The Debtors presented the Stalking Horse Bid, deemed the highest and best bid for the Debtors' assets, at a sale hearing conducted on September 27, 2018.

19.    On September 28, 2018, the Court entered the *Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside of the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of all Liens, (III) Authorizing the Assumption and Assignment or Rejection of Certain Executory Contracts and Unexpired Leases and (IV) Granting Related Relief* [D.I. 288] (the "Sale Order"), thereby approving, among other things, the RM Asset Sale and the assumption and assignment of certain executory contracts and unexpired leases to FM Restaurants (PT), LLC (together with its affiliates or assignees, the "Purchaser"), pursuant to the APA.

20.    The RM Asset Sale closed on October 29, 2018 (the "Closing Date").  Pursuant to the Sale Order and the APA, the Purchaser, among other things, had the ability during the Designation Rights Period (as defined in the APA) to designate any Designation Right Contract (as defined in the APA) for assumption and assignment, and, subject to objection rights held by

01:24355082.1

counterparties thereto, such Designation Right Contract would be assumed and assigned to the Purchaser.    The period in which any Designation Right Contract may be designated for assumption or assignment by the Purchaser has now expired, with the exception of one lease for which the applicable landlord, Purchaser, and Debtors have consented to an extension of such period through April 15, 2019.

21.    Pursuant to Section 2.3 of the APA, the Purchaser assumed certain Assumed Liabilities, including, among other things, as more fully described in the APA, (a) allowed and unpaid administrative expenses arising under section 503(b)(9) of Bankruptcy Code (collectively, "503(b)(9) Claims") in an amount not to exceed $50,000, (b) accrued and unpaid ordinary course trade payables as of the Closing Date that arose after the Petition Date, (c) all Liabilities arising from the employment of Transferred Employees post-closing, and (d) certain Liabilities arising under the Court-approved KERP.    The Purchaser is also obligated to reimburse the Debtors for Continuation Costs arising in respect of the continuation by, and ultimate assumption or rejection by, the Debtors of the Designation Right Contracts.[5]

22.    Because the Debtors sold substantially all of their assets as a going concern pursuant to the RM Asset Sale, the Debtors ceased operating as of the Closing Date, and the Purchaser has agreed to reimburse the Debtors for any Continuation Costs associated with Designation Right Contracts, the Debtors do not believe any additional administrative expense claims (beside Professional Claims that have accrued or will accrue) will accrue against the estates after the Closing Date.    The Debtors further believe that the claims bar date and reconciliation process (detailed below) accurately captures the administrative expense claim

---

[5] Capitalized terms used in this paragraph but not otherwise defined herein shall have the meanings ascribed to such terms in the APA.

01:24355082.1

exposure of the Debtors and their estates.[6]  Moreover, the Debtors believe that service of notice (the "Dismissal Notice") of this Motion—which will expressly set forth that any creditors that believe that they hold an administrative expense claim arising between October 10, 2018 (the Administrative Claims Bar Date, as defined below), and the filing of this Motion, should contact Debtors' counsel or otherwise respond to this Motion regarding such purported claims—will ensure that any and all potential holders of administrative expense claims arising post-petition will have an additional, if untimely, opportunity to assert such claims or otherwise be heard in connection with the relief sought herein.[7]  As set forth below, the Dismissal Notice will be served on all of the Debtors' creditors and equity holders.

## C.    Sale of Remaining Assets

23.    The Debtors have consulted closely with their Secured Lenders in evaluating how best to proceed vis-à-vis the estates' remaining assets, consisting of, primarily, dormant liquor licenses, certain outstanding deposits and avoidance actions arising under chapter 5 of the Bankruptcy Code (collectively, the "Remaining Assets").  The Debtors also anticipate collecting certain deposits associated with rejected leases and executory contracts.  The Debtors also obtained Court authority to sell certain of their dormant liquor licenses in January and February 2019 [D.I. 471, 533].  The Debtors intend to use the proceeds realized from those efforts to satisfy Allowed 503(b) Claims (to the extent the Purchaser is not obligated to pay such claims),

---

[6] The California Department of Tax and Fee Administration has filed three contingent proofs of administrative claim in certain of the Chapter 11 Cases for approximately $1.2 million each.  The Debtors believe these are protective claims for transfer taxes purportedly owing in connection with the RM Asset Sale.  The Debtors are in the process of filing the transfer tax documentation with the California Department of Tax and Fee Administration demonstrating that the amount actually owed is significantly lower.  Furthermore, the Purchaser has committed under the APA to pay certain of the Debtors' transfer tax obligations.  The Debtors believe that this should result in the consensual withdrawal of the proofs of administrative claim or an agreement with the claimant as to their satisfaction.  If this cannot be achieved, the Debtors intend to object to these claims and obtain their disallowance prior to the dismissal of the Chapter 11 Cases becoming effective.

[7] The Debtors reserve all rights to object to any claims that may be asserted on any applicable grounds, including that such claims are untimely asserted.

likely in part.  To the extent that the disposition of the Remaining Assets does not generate sufficient funds to satisfy Allowed First Priority Secured Claims and Allowed 503(b) Claims respectively in full, the Secured Lenders have committed to funding the balance owed on account of such claims, in full satisfaction thereof.

24.     Upon meeting that commitment, the Secured Lenders have collectively advised the Debtors that there will be no more funds made available to satisfy unpaid priority or general unsecured claims against the Debtors' estates.  Because the Secured Lenders have committed, however, to satisfying all Allowed First Priority Secured Claims and Allowed 503(b) Claims (including allowed 503(b)(9) Claims) asserted against the Debtors' estates, they have agreed to pay the "freight" for the remainder of these proceedings.  In exchange for this commitment, the Secured Lenders have made clear their desire that the Debtors liquidate as many assets (other than Avoidance Actions, which they have directed the Debtors not to pursue) as possible within the time period during which the Debtors must retain a reserve for any purchase price adjustment under the APA, but not to delay dismissal of these Chapter 11 Cases on the hope that someday additional assets may materialize.

**D.     Bar Date and Claims Objections**

25.     On October 12, 2018, the Court entered an order [D.I. 322] (the "Bar Date Order") establishing November 15, 2018 (the "Bar Date" and "Administrative Claims Bar Date"), as the deadline for non-governmental creditors to file, among other things, proofs of claim for claims arising before the Petition Date (including 503(b)(9) Claims) as well as proofs of claim asserting administrative priority for claims that arose between the Petition Date and October 10, 2018.  The deadline for governmental creditors to file claims against the Debtors' estates was February 1, 2019.

01:24355082.1

26.     Prior to the filing hereof, the Debtors commenced the claims objection process by filing four omnibus objections to various claims, including, but not limited to, claims improperly asserting administrative expense or secured status, claims for which there is no record of liability, claims that should be reduced and/or reclassified, claims that duplicate previously filed claims, and claims that have been amended and superseded [D.I. 432, 433, 538, 539] (collectively, the "Claims Objections").  The Court has sustained all of the Claim Objections [D.I. 462, 747, 582, 583].  The Debtors have objected to claims seeking treatment under section 503(b) of the Bankruptcy Code on the grounds that certain claims subject thereto either do not qualify for administrative expense priority on legal grounds or such claims lack factual support, in whole or in part.  The Debtors have also filed two notices of satisfaction (together, the "Notices of Satisfaction") addressing proofs of claim that were satisfied post-petition by virtue of Court-authorized payments and, accordingly, are no longer valid claims against the Debtors' estates.  The Debtors may file additional Claims Objections or Notices of Satisfaction, as appropriate, but in any event endeavor to have all objections resolved prior to, or simultaneously with, the Dismissal Date.

**E.      The Debtors' Books and Records**

27.     As of the Petition Date, the Debtors maintained voluminous books and records, including, without limitation: (a) accounting documents; (b) bank documents; (c) corporate governance documents; (d) documents related to contracts, leases and other contractual agreements of the Debtors; (e) insurance documents; (f) human resources and other related employment documents; (g) documents related to the Chapter 11 Cases; (h) customer lists; and (i) electronic documents.  Pursuant to section 2.1(i) of the APA, substantially all such books and records pertaining to the Debtors have been transferred to the Purchaser.  The Debtors have also

obtained an order of this Court authorizing them to reject an unexpired lease related to the storage facility containing many of their historical business records and to abandon the records at that location [D.I. 515]. To the extent that any books and records remain with the Debtors (collectively, the "Books and Records"),[8] however, the continued preservation of such Books and Records would be a cost and burden to the Debtors' estates, and the destruction or abandonment of such Books and Records is necessary for the resolution of the Chapter 11 Cases. Because the Debtors do not have any ongoing operations—and because the process of reconciling claims against the Debtors will be complete or otherwise provided for upon the Dismissal Date—the abandonment and destruction of such Books and Records would not be prejudicial to the Debtors' stakeholders.    The Debtors accordingly seek approval of the abandonment and destruction of any remaining Books and Records in their possession pursuant to this Motion.

**F.      Other Administrative Matters**

28.      On September 4, 2018, the Court entered that certain *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 156] (the "Interim Compensation Order"), pursuant to which the Court approved procedures governing applications for and payments of fees and expenses requested by Professionals.

29.      The Debtors have worked to prepare for the orderly wind-down of the Chapter 11 Cases.  For example, the Debtors have sought, and obtained, numerous orders authorizing the rejection of leases and contracts that the Debtors have determined (upon consultation with the

---

[8] Because the Debtors' physical facilities which house the Books and Records were sold to the Purchaser, the Debtors do not believe that there are any Books and Records that remain with the Debtors.  Out of an abundance of caution, however, the Debtors seek the authority to abandon any Books and Records that may be stored off-site, in the "cloud," or elsewhere.

Purchaser, as applicable post-closing) serve no benefit to the estates and are not needed for the wind down of the Debtors' affairs. *See* [D.I. 155, 288, 310, 392, 436, 482, 519, 534, 584].   To the extent that there are any additional contracts that have not been rejected as of the date upon which the Initial Order is entered, the Debtors request that the Initial Order authorize the rejection of all remaining executory contracts as of the entry of such order.

## RELIEF REQUESTED

30.    By this Motion, the Debtors request entry of: (a) the Initial Order (i) authorizing the Debtors to make payments to holders of Allowed First Priority Secured Claims and Allowed 503(b) Claims, which such claims will be identified in a distribution schedule to be filed on the docket in these Chapter 11 Cases prior to dismissal thereof; (ii) establishing procedures for the payment of Professional Fees; and (iii) authorizing the abandonment and destruction of Books and Records not sold to the Purchaser or otherwise previously addressed; and (b) the Dismissal Order (upon filing of a certification of counsel stating that the conditions precedent to dismissal as described in this Motion have been met) dismissing the Chapter 11 Cases pursuant to section 1112(b) of the Bankruptcy Code.   For the avoidance of doubt, the steps taken pursuant to the Initial Order shall be made after the Debtors pay all U.S. Trustee fees and pay approved Professional Fees.   To the extent that there are any assets remaining with the estates upon the payment of Allowed First Priority Secured Claims, Allowed 503(b) Claims, and allowed Professional Fees, such assets shall be remitted to the Purchaser, as set forth in the APA, or the Secured Lenders, on account of their prepetition secured claims and superpriority administrative claims granted by the Final DIP Order, as applicable.

01:24355082.1

## BASIS FOR RELIEF REQUESTED

**A.    These Chapter 11 Cases Must Be Dismissed if the Elements for "Cause" Are Shown Under Section 1112(b)(4) of the Bankruptcy Code**

31.    Upon the request of a party in interest, § 1112(b)(1) of the Bankruptcy Code provides that, absent unusual circumstances, a court "shall" dismiss a chapter 11 bankruptcy case (or convert such case to a case under chapter 7) "for cause."  *See* 11 U.S.C. § 1112(b)(1).  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the statutory language with respect to conversion or dismissal from permissive to mandatory.[9]  *See* H.R. Rep. No. 109-31(I), at 442, *reprinted in* 2005 U.S.C.C.A.N. 88, 94 (stating that the Act "mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances."); *see also Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the amendments to section 1112 limit the court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal, such that this Court has no choice, and no discretion, in that it 'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4).").  For reasons more fully explained below, the Debtors submit that the Court should dismiss the Chapter 11 Cases because cause exists.  Further, dismissal (and not conversion to a case under chapter 7) is in the best interests of the Debtors, their creditors, and their estates.

---

[9] Prior to the enactment of BAPCPA, a bankruptcy court had the discretion, pursuant to its broad equitable powers, to dispose of a debtor's case, including by means of dismissal.  However, a court was <u>not</u> mandated to dismiss a case upon the showing of cause.  H.R. Rep. No. 95-595, at 405 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963; S. Rep. No. 95-989, at 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787.

**B.      Cause Exists to Dismiss the Chapter 11 Cases Because the Debtors Have Ceased Business Operations and Will Have Insufficient Assets to Confirm a Plan**

32.     Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of 16 grounds for dismissal.  11 U.S.C. § 1112(b)(4)(A)-(P).  *See In re Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3d Cir. 1991)); *In re 3 Ram, Inc.*, 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, [and] not exhaustive has not.") (citation omitted).[10]

33.     One statutory basis to dismiss a case is where a party in interest shows that (a) there has been a "loss" or "diminution" of value of the estate and (b) the debtor does not have a "reasonable likelihood of rehabilitation."  *See* 11 U.S.C. § 111(b)(4)(A); *see also In re Photo Promotion Assocs., Inc.*, 47 B.R. 454, 458 (Bankr. S.D.N.Y. 1985); *Clarkson v. Cooke Sales & Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (dismissal is warranted where "the absence of financial data and certain sources of income for the [debtors] indicate[d] the absence of a reasonable likelihood of rehabilitation").  Further, the dismissal of a chapter 11 case has been found appropriate where "a feasible plan is not possible."  *In re 3 Ram*, 343 B.R. at 117-18.  "If [a] chapter 11 [debtor] cannot achieve . . . reorganization within the statutory requirements of the Bankruptcy Code, then there is no point in expending estate assets on administrative expenses . . . ."  *Id.* at 118 (citing, *inter alia*, *In re Brown*, 951 F.2d at 572).

---

[10] In *TCR of Denver*, the court recognized the apparent typographical error in § 1112(b)(4) of the Bankruptcy Code. The sixteen illustrative examples of "cause" set forth in that section are linked by the word "and" after subsection (O).  Accordingly, strict construction of the statute would require that a debtor establish all of the items constituting "cause" before a case can be dismissed by the court.  The *TCR* Court held that Congress could not have intended to require a "perfect storm" of all sixteen circumstances listed before a case may be dismissed.  *See In re TCR of Denver*, 338 B.R. at 498.

34.     A chapter 11 plan is not feasible in these cases.   The Debtors liquidated substantially all of their assets in connection with the RM Asset Sale and no longer conduct business.   Post-closing, the Debtors' estates exist solely to (i) meet the Debtors' obligations under the APA and (ii) effectuate an orderly exit from these Chapter 11 Cases.   While doing so, the estates continue to accrue Professional Fees and U.S. Trustee fees, which have been addressed pursuant to the Final DIP Order and Sale Order.   There is no longer a business to reorganize or assets to distribute, and thus no reason (or funds available) to pursue a plan of reorganization or liquidation.    Accordingly, cause exists to dismiss the Chapter 11 Cases pursuant to § 1112(b)(4) of the Bankruptcy Code and relevant case law.

**C.     Dismissal is in the Best Interests of the Debtors' Creditors and Their Estates**

35.     Once a court determines that cause exists to dismiss a debtor's chapter 11 case, the court must then evaluate whether dismissal is in the best interests of the debtor's creditors and of the estate.   *See, e.g.*, *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994) ("Once 'cause' is established, a court is required to consider this second question of whether to dismiss or convert.").   A variety of factors demonstrate that it is in the best interest of the Debtors' estates and their creditors to dismiss the Chapter 11 Cases.

36.     *First*, a dismissal of a chapter 11 bankruptcy case meets the "best interests of creditors" test where a debtor has nothing to reorganize and the debtor's assets are fixed and liquidated.   *See Camden Ordinance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage business which ceased business was unfeasible); *Royal Trust Bank, N.A. v. Brogdon Inv. Co. (In re Brogdon Inv. Co.)*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (court dismissed chapter 11 proceeding in part where there was "simply nothing to reorganize" and no reason to continue the

01:24355082.1

reorganization).  The Debtors have nothing left to reorganize because substantially all of their assets and operations were transferred to the Purchaser upon the closing of the RM Asset Sale, and the Debtors have insufficient unencumbered cash to make distributions to creditors pursuant to a chapter 11 plan or upon conversion of the Chapter 11 Cases to chapter 7.

37.     *Second*, courts have found that dismissal is in the "best interests of creditors" where an interested party, other than the debtor, supports the dismissal of the debtor's chapter 11 case.  *See Camden Ordinance*, 245 B.R. at 798; *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. E.D. Pa. 1995), *aff'd*, 200 B.R. 568 (E.D. Pa. 1996) (factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7 where debtor and U.S. Trustee both favored dismissal).  Here, both the Purchaser and the Secured Lenders, as the major remaining stakeholders, support the proposed dismissal.

38.     *Third*, a court may find dismissal to be in the "best interests of the creditors" where a debtor demonstrates the ability to oversee its own liquidation.  *See Camden Ordinance*, 245 B.R. at 798; *Mazzocone,* 183 B.R. at 412 ("Only when a Chapter 11 debtor has no intention or ability to . . . perform its own liquidation . . . should a debtor be permitted to remain in bankruptcy . . . .").  Here, the Debtors have already liquidated their assets and satisfied their obligations under the DIP Financing and they are positioned to satisfy all Allowed First Priority Secured Claims and Allowed 503(b) Claims, in full, prior to dismissing the Chapter 11 Cases. The Debtors have retained Alvarez & Marsal professionals as their Acting Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, and thus benefit from their professional guidance.  Accordingly, the Debtors have demonstrated their ability to oversee their own liquidation, to the extent this factor applies.

39.     *Fourth*, and finally, dismissal is appropriate where, as here, it will maximize the value of the Debtors' estates because the alternative—conversion to a chapter 7 liquidation and appointment of a trustee—is (a) unnecessary and would provide no benefit to creditors and (b) would impose significant additional administrative costs upon the Debtors' estates without any meaningful source of funds to satisfy such costs.

40.     Under the circumstances, a chapter 7 trustee would have extremely limited funds to satisfy additional claims arising after conversion to cases under chapter 7 of the Bankruptcy Code.  As noted earlier, substantially all of the Debtors' assets have been sold to the Purchaser pursuant to the RM Asset Sale.  The Debtors have further determined that, given the Prepetition Lenders' liens on Avoidance Actions, their superpriority claim of at least $5.5 million, and their deficiency claim, additional marketing or efforts to dispose of the Remaining Assets—including dormant liquor licenses and Avoidance Actions—would be unlikely to result in a return for the Debtors' prepetition priority or unsecured creditors.  As a result, such creditors would not receive greater recoveries (and certain creditors and stakeholders could possibly fare worse) in a chapter 7 liquidation.  For these reasons, the Debtors submit that a dismissal pursuant to section 1112 of the Bankruptcy Code is in the best interests of the Debtors' creditors and their estates.

**D.      Dismissal of the Chapter 11 Cases is Warranted Under Section 305(a) of the Bankruptcy Code**

41.     Cause also exists to dismiss the Chapter 11 Cases pursuant to section 305(a) of the Bankruptcy Code, which provides that the "court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if— (1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . ."  *See* 11 U.S.C. § 305(a).  Dismissal under section 305(a) is an extraordinary

01:24355082.1

remedy, and dismissal is only appropriate where the court finds that both creditors and the debtor would be better served by dismissal. *In re AMC Investors, LLC*, 406 B.R. 478, 487-88 (Bankr. D. Del. 2009).

42.     Whether dismissal is appropriate under this provision is determined on a case-by-case basis and rests within the sound discretion of the bankruptcy court. *In re Sky Grp. Int'l, Inc.*, 108 B.R. 86, 91 (Bankr. W.D. Pa. 1989).  Many factors are considered when determining the best interests of creditors and the debtor, including (a) the economy and efficiency of administration, (b) whether federal proceedings are necessary to reach a just and equitable solution, (c) whether there is an alternative means of achieving an equitable distribution of assets, and (d) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement that better serves all interests in the case. *AMC Investors*, 406 B.R. at 488.

43.     Here, as described above, cause exists for dismissal under section 305 of the Bankruptcy Code.  The Debtors have sold substantially all of their assets, the only assets left to monetize are speculative as to both timing and recovery, the beneficiaries of any value from those assets (the Secured Lenders) have advised the Debtors that they should not expend further estate resources pursuing such assets, and the Debtors are unable to confirm a liquidating plan. Under the circumstances, conversion to chapter 7 would impose additional administrative costs with no corresponding benefit to the Debtors' creditors or their estates.  Dismissal of the Chapter 11 Cases as set forth in this Motion, among other things, provides the most efficient, cost-effective method of effectuating the wind-down of the Debtors' estates, and ensures payment of all U.S. Trustee fees and allowed administrative claims.

**E.      The Court Should Establish a Procedure to Approve Professional Fees**

44.     In connection with winding down the Debtors' estates and the dismissal of the Chapter 11 Cases, and notwithstanding any provisions to the contrary in the Interim

01:24355082.1

Compensation Order, the Debtors seek the Court's approval of procedures for the final payment of Professional Fees and expenses incurred by Professionals on behalf of the Debtors' estates throughout the Chapter 11 Cases.

45.    Specifically, the Debtors request that the Court schedule a final omnibus fee hearing (the "Final Fee Hearing") in the Initial Order.  The Debtors further request that the Court require all Professionals retained in the Chapter 11 Cases to file final requests for allowance and payment of all fees and expenses incurred during the Chapter 11 Cases (collectively, the "Final Fee Applications") not later than twenty-one (21) days after the date the Initial Order is entered (the "Final Fee Application Deadline") and that any objections to the Final Fee Applications be filed and served on counsel for the Debtors and such applicable Professional by 4:00 p.m. (prevailing Eastern Time) no later than twenty (20) days after the Final Fee Application Deadline.

46.    Courts in this jurisdiction have granted similar relief in the context of dismissals. *See, e.g., In re The Wet Seal, LLC*, No. 17-10229 (CSS) (Bankr. D. Del. Mar. 19, 2019) [D.I. 1006]; *In re The Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 1, 2019) [D.I. 1436]; *In re Quantum Foods, LLC*, No. 14-10318 (KJC) (Bankr. D. Del. Apr. 6, 2018) [D.I. 1798]; *In re Sunco Liquidation, Inc.*, No. 17-10561 (KG) (Bankr. D. Del. Aug. 18, 2017) [D.I. 706].

**F.    The Proposed Distributions Comply with Applicable Law**

47.    Following the payment of allowed Professional Fees pursuant to the Final Fee Applications and the calculation and reservation of U.S. Trustee fees, the Debtors intend to pay

Allowed First Priority Secured Claims and Allowed 503(b) Claims in full, and remit any remaining funds[11] to the Secured Lenders or Purchaser, as applicable.

48.    The proposed distributions comply with applicable law governing distributions of estate property in connection with a dismissal.  The Supreme Court has acknowledged that structured dismissals, which approve distributions to creditors, among other things, are "increasingly common." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 979 (2017).  Such final distribution schemes "ordered in connection with the dismissal of a Chapter 11 case," however, "cannot, without the consent of the affected parties, deviate from the basic priority rules" contained within the Bankruptcy Code. *Id.* at 978.  In other words, a debtor may not use a dismissal as a means to distribute assets to a favored class of "low-priority general unsecured creditors" while "skipping" a disfavored class that would otherwise be entitled to priority of payment under a plan of liquidation. *See id.*  As it applies here, the Bankruptcy Code requires distributions first be made to holders of allowed secured claims (from the property or proceeds of such property on which they hold liens), and then administrative expenses allowed under section 503(b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 724, 507(a).  The Initial Order provides for distributions that the Secured Lenders have consented to and are otherwise strictly compliant with the priority scheme set forth in sections 507(a), 724, and 726 of the Bankruptcy Code.  The Debtors, therefore, submit that the relief requested herein is consistent with the mandate set forth in *Jevic.*

---

[11] Such funds include (i) any funds that remain reserved and held by the Debtors pursuant to the *Order Approving Stipulation Among the Debtors, FM Restaurants (PT), LLC and Westchester Fire Insurance Company* [D.I. 340], (ii) any deposits returned to the Debtors after the closure of all existing utility accounts, and (iii) any other assets that remain with the Debtors after the reserves are established and payments set forth in the Initial Order are made.

G.      **The Court Should Authorize the Debtors to Abandon and Destroy the Books and Records and Make Payments Necessary in Connection Therewith**

49.     A debtor-in-possession is authorized, upon notice and a hearing, to abandon estate property that is of little value to the estate or is otherwise burdensome to maintain, pursuant to section 554(a) of the Bankruptcy Code and Bankruptcy Rule 6007.  As one bankruptcy court has noted, if a debtor "feels an asset is of inconsequential value and benefit to the estate *or* that it is 'burdensome to the estate,' [the debtor] may abandon it."  *Reich v. Burke (In re Reich)*, 54 B.R. 995, 1004 (Bankr. E.D. Mich. 1985).

50.     Here, the Debtors request that the Court authorize, but not direct, the Debtors to abandon and destroy the Books and Records pursuant to sections 105(a) and 554 of the Bankruptcy Code, and Bankruptcy Rule 6007, and to make all payments necessary to effectuate such destruction.  As previously discussed, the Debtors have sold substantially all of their assets through the RM Asset Sale, no longer have an operating business, and have largely wound down their affairs.  A substantial portion of their Books and Records were transferred to the Purchaser as part of the RM Asset Sale.  To the extent any Books and Records are retained, they will be of no value to the Debtors after dismissal of the Chapter 11 Cases.  For those reasons, the Debtors submit that they should not incur the potentially significant costs associated with maintaining and storing Books and Records that have no value to their estates, and they should be authorized to abandon and destroy, as applicable, such Books and Records.

H.      **The Court Should Authorize, but Not Require, Dissolution of the Debtors**

51.     Because the Debtors have sold substantially all of their assets and ceased operations, the Debtors intend for their corporate entities to be dissolved as soon as reasonably practicable upon entry of the Dismissal Order.  Courts in this jurisdiction have previously authorized the dissolution of debtors by court order in connection with the dismissal of a

chapter 11 case, in accordance with applicable state law.  *See, e.g., In re Quantum Foods, LLC*, No. 14-10318 (KJC) (Bankr. D. Del. Apr. 6, 2018) [D.I. 1798]; *In re Sunco Liquidation, Inc.*, No. 17-10561 (KG) (Bankr. D. Del. Aug. 18, 2017) [D.I. 706]; *In re TAH Windown, Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Jan. 13, 2017) [D.I. 408]; *In re Hospitality Liquidation I, LLC*, No. 13-12740 (BLS) (Bankr. D. Del. Jan. 5, 2015) [D.I. 447].

52.     It is appropriate and necessary for the Court to authorize the dissolution of the Debtors.  The Debtors have no further business to conduct and no other purpose in remaining active as corporate entities in their respective jurisdictions. The Debtors may incur additional taxes and statutory fees owing to their continued corporate existence absent their prompt dissolution.  Accordingly, it is in the best interests of the Debtors' estates for the Debtors to dissolve as soon as practicable following entry of the Dismissal Order.

**I.     All Prior Releases, Stipulations, Settlements, Rulings, Orders and Judgments Should Remain Binding and Should Continue To Have Full Force and Effect**

53.     The dismissal of a chapter 11 case ordinarily vacates all orders previously entered by the bankruptcy court and restores all parties to the prepetition status quo.  *See* 11 U.S.C. § 349(b).  A bankruptcy court may, however, "for cause, order[] otherwise . . . ." *Id.*  Courts in this jurisdiction have regularly maintained the enforceability of orders, including those approving releases and settlements, after a dismissal, notwithstanding section 349 of the Bankruptcy Code. *See, e.g., In re Sunco Liquidation, Inc.*, No. 17-10561 (KG) (Bankr. D. Del. Nov. 6, 2017) [D.I. 865] (giving continued effect to orders entered throughout the pendency of the chapter 11 cases); *In re Old Towing Co.*, Case No. 17-10249 (LSS) (Bankr. D. Del. May 30, 2017) [D.I. 381] (giving continued effect to 363 sale order and any releases, injunctions and successor liability provisions provided for in such sale);  *In re TAH Windown, Inc.*, Case No. 16-11599 (MFW)

(Bankr. D. Del. Jan. 13, 2017) [D.I. 408] (giving orders, releases, and injunctions continuing effect).

54.    In these cases, the Debtors have sold substantially all of their assets to the Purchaser pursuant to a highly negotiated and complex series of transactions. *See supra* ¶¶ 16–22.  Following the RM Asset Sale, the Debtors pursued an orderly wind-down of these Chapter 11 Cases, including evaluating and objecting to various claims, assuming and assigning various executory contracts and unexpired leases, and disposing of remaining estate property. Given all of these facts and circumstances, ample cause exists to allow all prior orders, releases (including, without limitation, all releases granted to the DIP Lender and Prepetition Lenders and any other Releasee (as defined in the DIP Order) through the DIP Order), stipulations, settlements, rulings, and judgments entered by the Court in connection with the Chapter 11 Cases to be given continued effect, notwithstanding the requested dismissal, unless otherwise provided by a subsequent stipulation with the same party or parties.

**J.      The Certification Process and the Request for Entry of Final Dismissal Order is Reasonable Under the Circumstances**

55.    As soon as reasonably practicable following the filing of a certification of counsel stating that the conditions precedent to dismissal have been met (the "Certification"), the Debtors request that the Court enter the Dismissal Order, substantially in the form submitted herewith. Among other things, the Certification will verify that: (a) all quarterly fees of the U.S. Trustee owed in connection with the Chapter 11 Cases have been paid in full and all Monthly Operating Reports have been filed, (b) the Professional Fees incurred in the Chapter 11 Cases have been approved on a final basis (to the extent applicable) and paid in full, and (c) all Allowed First Priority Secured Claims and Allowed 503(b) Claims have been paid in full.  The Dismissal Order will dismiss the Chapter 11 Cases immediately upon entry.

01:24355082.1

56.    The Debtors intend to serve the Certification on the U.S. Trustee and all entities that have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"), but will not send the Certification to all of the Debtors' creditors and equity holders and parties in interest, as such parties will receive reasonable notice of the proposed dismissal through the Dismissal Notice.

## NOTICE

57.    A copy of this Motion and notice of the hearing thereon are being sent to (i) the Notice Parties; (ii) Thompson Hine LLP, as counsel to Wells Fargo Bank, National Association, as agent to the Secured Lenders; (iii) Cleary Gottlieb Steen & Hamilton LLP, as counsel to Z Capital Group, LLC; (iv) Morris, Nichols, Arsht & Tunnell LLP, as co-counsel to Z Capital Group, LLC; (v) Schulte Roth & Zabel LLP and Landis, Roth & Cobb, LLP, as co-counsel to Tennenbaum Capital Partners, LLC; (vi) holders of Allowed 503(b) Claims; and (vii) holders of Allowed First Priority Secured Claims.

58.    In addition, the Debtors are providing the Dismissal Notice by first-class United States Mail to all of the Debtors' creditors and equity holders, as provided in Bankruptcy Rule 2002(a)(4).  The Dismissal Notice includes specific information regarding how to obtain a copy of this Motion free of charge and the procedures for filing objections to this Motion.  In addition, the Dismissal Notice will advise all parties that, to the extent they believe they hold an administrative expense claim arising between October 10, 2018, and the filing of this Motion, such parties shall contact the Debtors' undersigned counsel and, as appropriate, file a response by the deadline to submit objections to this Motion.  The Debtors submit that, under the circumstances, no other or further notice is necessary.

01:24355082.1

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of (i) the Initial Order, granting certain of the relief requested herein, (ii) the Dismissal Order, upon filing of the Certification, and (iii) such other and further relief as is just and proper.

Dated: April 4, 2019
Wilmington, Delaware

SIDLEY AUSTIN LLP

Kenneth P. Kansa (*pro hac vice* pending)
Alyssa Russell (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew L. Magaziner*
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Andrew L. Magaziner (No. 5426)
Elizabeth S. Justison (No. 5911)
Betsy L. Feldman (No. 6410)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION

01:24355082.1